IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ERIN ENERGY CORPORATION, *et al.*,[1] | § | Case No. 18-32106 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |
| | § | (Joint Administration Requested) |
| | § | |

## DECLARATION OF SAKIRU ADEFEMI (FEMI) AYOADE IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Sakiru Adefemi (Femi) Ayoade, hereby submit this declaration (this "Declaration") under penalty of perjury:

1.     I am the Chief Executive Officer of Erin Energy Corporation ("ERN"), a publicly traded corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (the "Debtors"). I have served as CEO of ERN since May 18, 2017.

2.     In such capacity, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' employees, operations, and finances; information learned from my review of relevant documents; information supplied to me by other members of ERN's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am over the age of 18 and authorized to submit

---

[1] The last four digits of Erin Energy Corporation's ("ERN") federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited ("EEL"); Erin Energy Kenya Limited ("EEKL"); and Erin Petroleum Nigeria Limited ("EPNL"). The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would competently testify to the facts set forth herein.

3.      To effectuate this restructuring, on April 25, 2018, the Debtors filed voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  To minimize the adverse effects on their businesses, the Debtors have filed motions seeking various types of "first day" relief (the "First Day Motions") to allow the Debtors to meet their obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value.  I further believe that the relief sought in each First Day Motion constitutes a critical element in achieving a successful reorganization of the Debtors' businesses, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

4.      This Declaration has been organized into four sections.  Section 1 provides background information on the Debtors and their operations.   Section 2 offers information on the Debtors' debt and capital structure.[2]  Section 3 describes the events leading to the filing of these Bankruptcy Cases and the Debtors' prepetition restructuring efforts.  Section 4 summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

---

[2] Many of the financial figures that will be presented in this Declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

## I.   COMPANY OVERVIEW

**A.   Erin's History and Hierarchy**

5.       On April 7, 2010, Pacific Asia Petroleum, Inc. ("PAP"), a Delaware corporation, consummated the acquisition of all of the interests held by CAMAC Energy Holdings Limited ("CEHL") and certain of its affiliates (collectively, "CAMAC") in a Production Sharing Contract with respect to an oilfield asset known as the Oyo Field located offshore Nigeria (the "Contract Rights"). The Oyo Field was under development through 2009, and oil production commenced in December 2009. As consideration for the Contract Rights, PAP paid CEHL $32 million in cash consideration and issued to CEHL 89,467,120 shares of ERN's Common Stock, par value $0.001, representing approximately 62.74% of the Company's issued and outstanding Common Stock at closing. In April 2010, PAP was renamed CAMAC Energy Inc. Further, in April 2015, CAMAC Energy Inc. changed its name to "Erin Energy Corporation."

6.       Today, ERN operates as an independent oil and gas exploration and production ("E&P") company focused on energy resources in Africa. ERN's headquarters is located at 1330 Post Oak Blvd., Suite 2250, Houston, Texas 77056 (the "Houston Facility"). As an E&P company, ERN's strategy has been to acquire and develop high potential E&P assets in Sub-Saharan Africa, and to explore those assets through strategic partnerships with national oil companies, indigenous local partners, and other independent oil companies.

7.       The Debtors own valuable oil and gas assets, both onshore and offshore, that they have acquired and prepared for development over the years. The Debtors' strategic acquisitions and aggressive E&P strategies have helped sustain their growth and success. ERN's shares are now traded on the New York Stock Exchange and on the Johannesburg Stock Exchange under the symbol "ERN." Unfortunately, a number of factors – including regulation and the prolonged

commodity downturn – have had a material adverse effect on ERN's financial condition. The Debtors filed these Bankruptcy Cases to overcome these impediments and ensure fair and equitable distributions to their creditors.

8.      The Debtors in these Bankruptcy Cases include Erin Energy Corporation ("ERN"), and its subsidiaries Erin Energy Ltd. ("EEL"), Erin Petroleum Nigeria Limited ("EPNL"), and Erin Energy Kenya Limited ("EEKL"). In total, ERN has ten (10) wholly owned subsidiaries and one partially owned subsidiary.

9.      Founded in 2012, EEL is a wholly owned subsidiary of ERN organized under the laws of the Cayman Islands. EEL is also the parent of EEKL.

10.      EPNL is a limited company incorporated under the laws of the Federal Republic of Nigeria. Founded in 2009, EPNL is currently the main operating subsidiary of ERN in Nigeria and accounts for almost all of ERN's revenues.

11.      EEKL is a subsidiary of EEL and is organized under the laws of the Republic of Kenya. Founded in 2012, EEKL was the operating subsidiary of ERN in the country of Kenya. As set forth in Section C(iv), below, although EEKL holds two licenses in the country, there are no ongoing operations in Kenya.

12.      For ease of reference, a corporate organizational chart identifying the Debtors is set forth below.



## B. Executive Offices and International Facilities

13.    ERN's Houston Facility covers approximately 13,200 square feet of office space and is under a lease which commenced on July 1, 2012, and ends on October 31, 2019.  In addition to the Houston Facility, ERN has leased office facilities located in Lagos, Nigeria, Nairobi, Kenya, and Accra, Ghana.

## C. Current Oil and Gas Assets and Operations

14.    Currently, ERN's asset portfolio consists of five licenses across Nigeria, Ghana and The Gambia covering an area of approximately 1.5 million acres.  ERN and its subsidiaries focus their efforts on acquiring and developing high-potential exploration and production assets in these countries.  The map below sets forth a visual representation of the geographical locations of ERN's oil and gas operations on the continent of Africa.



15.     As described above, ERN's operating subsidiaries in Africa include EPNL, EEKL, Erin Energy Gambia Ltd., and Erin Energy Ghana Limited.   A breakdown of the Debtors' operations across each country is detailed below.

     i.     *Nigeria*

16.     On August 28, 2002, Allied Energy Plc ("Allied") and CAMAC International (Nigeria) Limited ("CINL"), each related parties, were granted Oil Mining Leases 120 and 121 (the "OMLs") located offshore Nigeria by the Federal Republic of Nigeria.   Pursuant to a Deed

of Assignment dated July 22, 2005, Allied and CINL assigned to Nigerian Agip Exploration Limited ("NAEL"), a subsidiary of the international oil and gas company Eni SpA, a forty-percent (40%) participating interest in the OMLs, with the remaining sixty-percent (60%) participating interest in the OMLs being retained by Allied and CINL.

17.     In April 2010, ERN, through EPNL, acquired certain economic interests in the Oyo Field through the purchase of that portion of Allied's and CINL's rights in the Production Sharing Contract (the "Nigeria PSC") relating to the Oyo Field in exchange for cash and the issuance to CEHL of shares of ERN's Common Stock.  In the 2010 transaction, CEHL became the majority shareholder of ERN. As part of the transaction, ERN gave CEHL registration rights with respect to these shares.

18.     In February 2011, ERN acquired all of Allied's and CINL's rights in the Nigeria PSC outside the Oyo Field for cash and ERN's agreement to make additional payments, contingent upon completion of specified milestones in any future exploration and development of the OMLs outside of the Oyo Field.

19.     In June 2012, Allied acquired all of NAEL's participating interest in the OMLs and all of NAEL's interest in the Nigeria PSC for $250.0 million in cash subject to certain adjustments.  As a result of this transaction, Allied became the operator of the OMLs and the holder of the interests in the Nigeria PSC apart from the interests previously acquired by ERN in 2010 and 2011.

20.     In November 2013, the ERN entered into a Transfer Agreement (the "Transfer Agreement") pursuant to which the ERN agreed to acquire from Allied, a wholly owned subsidiary of CEHL (the 57.2% majority stockholder of ERN), all remaining economic interests in the Nigeria PSC and related assets, contracts and rights pertaining to OMLs 120 and 121

including the currently producing Oyo Field (the "Allied Assets").  In consideration for the Allied Assets, ERN agreed to issue 497,454,857 shares of ERN's Common Stock, deliver to Allied a $50.0 million convertible subordinated promissory note and pay $170.0 million in cash (the "Allied Transaction"). The Allied Transaction closed February 21, 2014.  The transfer of the Allied Parties' contractual rights to the Nigeria PSC was accomplished by novation of all of Allied's and CINL's right, title and interest in and to the Nigeria PSC through a novation agreement that was effective upon the closing of the Allied Acquisition.  Upon completion of the Allied Acquisition, ERN, though EPNL, owned one hundred percent (100%) economic interest in the Nigeria PSC covering the OMLs (though Allied retained bare title to the OMLs). Subsequent to the Allied Acquisition, ERN and EPNL made substantial investment in the development of the Allied Assets.

21.    Despite having acquired or developed a number of producing assets in the Oyo Field, heavy regulation by the Nigerian government as well as disputes with lenders have severely hampered the Debtors' operations.  For example, during the period from May to September 2015, the Debtors produced approximately 1.5 million barrels ("Bbls") of crude oil but were only able to sell approximately 0.6 million Bbls due to delays in the issuance of permits.  Specifically, the enforcement of certain control measures implemented by the Nigerian government with regards to the quarterly sale of crude oil products from Nigeria forced the Debtors to curtail production on the Oyo-8 well in September 2015.

22.    Similarly, in August 2017, EPNL commenced drilling the Oyo-9 well, and in October 2017, completed the drilling phase.  Both the engineering and manufacturing of subsea equipment are at various stages of completion.  However, due to delays in the release of

remaining funds and improper interference by the guarantor of the MCB Finance Facility (defined below), EPNL suspended completion and hookup of Oyo-9.

23.     Currently, ERN derives the totality of its revenue from the sale of crude oil in Nigeria.  As a result, ERN's revenues and ultimate profitability, the value of its reserves, its access to capital, and its growth as a company are subject to the prevailing prices of crude oil which have seen a prolonged downturn in recent years.

    *ii.*     *Ghana*

24.     In April 2014, ERN, through Erin Energy Ghana Limited ("EEGH"), signed a Petroleum Agreement with the Republic of Ghana (the "Ghana Agreement") relating to the Expanded Shallow Water Tano block ("ESWT") offshore Ghana.  The contracting parties holding interests in the block are EEGH (60% ownership) as the operator, GNPC Exploration and Production Company Limited (25% ownership), and Base Energy (15% ownership) (collectively, the "Ghana Agreement Parties").  The Ghana Agreement required the Ghana Agreement Parties to determine the economic viability of three previously discovered fields in the ESWT block within nine months of the effective date.  In addition the Ghana Agreement provided for an initial exploration period of two years from the effective date, with specified work obligations during such time.

25.     In January 2015, the Ghana Agreement became effective.  In October 2015, at the completion of the economic evaluation described above, the Ghana Agreement Parties concluded that the fiscal terms of the Ghana Agreement had to be adjusted to achieve commerciality under the current economic conditions.  This conclusion is currently under review by the Ghanaian government.  In the interim, the government granted an extension of the initial exploration period through the end of July 2018.  EEGH has submitted an application for an additional extension

and continues to work with the Ghanaian government and its partners to progress the development activities in the ESWT block offshore Ghana.

     *iii.*    *The Gambia*

26.    In May 2012, ERN, through Erin Energy Gambia Ltd. ("EEGL"), signed two Petroleum Exploration, Development & Production Licenses with The Republic of The Gambia for offshore exploration blocks A2 and A5 (the "Gambia Licenses").  EEGL operated both blocks, with the government having the right to participate up to a fifteen percent (15%) interest, following approval of a development and production plan.

27.    The term of the initial exploration period for both blocks, now extended through December 2018, required EEGL to interpret certain seismic data that was acquired in 2015 and 2016, and to drill an exploration well on either block and evaluate the results.  EEGL is still in the process of interpreting the seismic data.

     *iv.*    *Kenya*

28.    In May 2012, ERN, through its subsidiary, EEKL, entered into four production sharing contracts with the Government of the Republic of Kenya, covering onshore exploration of blocks L1B and L16, and offshore exploration blocks L27 and L28 (the "Kenya PSCs"). EEKL was the operator of these blocks, subject to the government's right to participate up to twenty percent (20%).  EEKL is responsible for all exploration expenditures.

29.    In accordance with the Kenya PSCs, EEKL conducted exploration activities during the initial exploration period for the onshore blocks.  The initial exploration period ended in June 2015, and EEKL received approval from the government for an additional exploration period for the blocks. This period ended in July 2017.  In June 2017, ERN wrote off the costs related to onshore blocks, and declined to renew or extend the leases.

30.     The Kenya PSCs for the offshore blocks provided for an initial exploration period of three years, through August 2015.  In August 2015, EEKL received approval from the government for an extension of the initial exploration period, which lasted through February 2017.  Again, ERN wrote off the costs related to the offshore blocks and declined to renew or extend the leases.  The Debtors have not engaged in further E&P activities in Kenya.

## II.     SECURED AND UNSECURED DEBT

### A.     Secured Debt Facilities

31.     The Debtors have incurred a substantial amount of debt in order to sustain operations.  As of December 31, 2017, the Debtors owed approximately $312.1 million to various lenders, excluding ordinary course trade debt.  The Debtors' secured debt includes:

- $81.3 million, net of discount, under a term credit facility with Zenith Bank PLC (the "Zenith Facility"); and

- $66.5 million outstanding on a Mauritius Commercial Bank Limited Finance Facility (the "MCB Facility").

32.     The Zenith Facility is secured by first liens in substantially all of EPNL's assets, including EPNL's cash on deposit with Zenith.  The MCB Facility is secured by second liens upon substantially all of EPNL's assets.  Additionally, Public Investment Corporation Soc Ltd. ("PIC"), a significant shareholder of ERN, has guaranteed the MCB Facility pursuant to a US$100,000,000.00 Payment Guarantee issued by The Standard Bank of South Africa Limited.

33.     The terms of the Zenith Facility and the MCB Facility also restrict the terms of any future indebtedness and the Debtors' ability to comply with such restrictions and covenants is unclear.  Further, the Debtors risk cross-default for each Related Party Note if the holder of the Zenith Facility exercises its right to terminate the Zenith Facility and accelerate its maturity.

### B.     Unsecured Debt Facilities

34.    The Debtors have also incurred significant unsecured debt, including:

- $27.3 million outstanding under a borrowing facility with Allied in the form of a promissory note (the "2011 Note");

- $61.4 million outstanding in aggregate principal under the 2014 Convertible Subordinated Note (the "2014 Note") with Allied;

- $55.8 million outstanding under a borrowing facility with Allied in the form of a convertible note (the "2015 Note");

- $7.4 million outstanding under the 2016 James Street Capital Partners Limited Note (the "2016 JSC Note");

- $11.7 million outstanding under the 2017 James Street Capital Partners Limited Note (the "2017 JSC Note");

- $200,000 under a 2017 short term loan with CAMAC Nigeria Limited.

35.    Allied, a related party to the Debtors, was the original lender and holder of the 2011 Note, the 2014 Note and the 2015 Note (collectively, the "Related Party Notes").  In July 2017, Oltasho became the holder of the Related Party Notes and subsequently agreed to waive its rights under all default provisions of each note.

C.    **Trade Debt**

36.    In addition to the secured debt, the Debtors' have substantial unsecured debt owed to numerous trade creditors, among others.  Due to the various liquidity issues described herein, the Debtors do not have sufficient cash flow to pay the trade payables.

## III.    EVENTS LEADING TO BANKRUPTCY

A.    **Financial Issues**

37.    As a result of (i) the current low commodity prices, (ii) a history of low oil production volumes due to the shut-in of the Oyo-8 well from September 2015 to May 2016, and (iii) the continued shut-in of the Oyo-7 well, the Debtors have not been able to generate

sufficient cash from operations to satisfy certain obligations as they become due.  These factors have significantly harmed the Debtors' financial position, and as a result, ERN incurred losses from operations in each of the past three fiscal years.  As of December 31, 2017, ERN's total current liabilities of $398.3 million exceeded its total current assets of $51.2 million, resulting in a working capital deficit of $347.0 million.

38.     As a result of the delays or abatements in production described above, the Debtors have been relying on drawdown under the MCB Facility and the 2016 Note to supplement their liquidity needs for the development of their assets.  In or about October 2017, PIC, who, via a Financial Support Agreement, is a guarantor for the MCB Facility, began to wrongfully control the approval and payment of funds under the MCB Facility.  As a result of PIC's tortious interference, the Debtors were unable to make timely payments to various critical vendors resulting in severe disruptions in EPNL's operations.  On or about January 17, 2018, ERN and EPNL filed an Original Complaint against PIC in the District Court for the Southern District of New York.

## B.     Pending Legal Matters in Nigeria

39.     EPNL's Nigerian operations have been hampered as a result of certain disputes related to the Debtor's predecessor in interest in the Oyo Field – Allied.  Specifically, Allied defaulted on certain payment obligations to NAEL related to the NAEL Transaction, described above.  In 2016, nearly four years after the conclusion of the NAEL Transaction, NAEL commenced an arbitration proceeding in the London Court of International Arbitration ("LCIA") based on claims that Allied failed to pay the consideration required by the Allied Transfer Agreement.  The case was LCIA Arbitration No. 132498 (the "Arbitration").  The record of the Arbitration demonstrates that NAEL was aware of the Allied Acquisition, and that EPNL, not

Allied or CINL, was the economic owner of the OMLs.  Indeed, both the Allied Acquisition and EPNL's ownership of the OMLs were the subject of numerous news articles and public filings made by ERN with the Securities and Exchange Commission.

40.     Following the conclusion of the Arbitration, on February 14, 2017, the LCIA issued a Final Award in favor of NAEL against Allied and CINL (the "Arbitration Award") which required payment by Allied of approximately $205,000,000, plus interest, and an additional amount for reimbursement of NAEL's legal fees, expenses and other costs.  In April 2017, NAEL sought enforcement of the Arbitration Award against Allied and CINL in Lagos, Nigeria.  Specifically, on April 20, 2017, NAEL filed an Ex-Parte Originating Summons in the Federal High Court, Holden at Lagos Nigeria (the "Nigeria Court").  The Ex-Parte Originating Summons sought the enforcement of the Arbitration Award against Allied and CINL pursuant to the Nigerian Arbitration and Conciliation Act.

41.     On May 15, 2017, the Nigerian Court issued an order granting leave to NAEL for the recognition and enforcement of the Arbitration Award (the "Nigerian Enforcement Order"). On May 30, 2017, the Deputy Chief Registrar of the Nigerian Court issued a Certificate of Judgment with respect to the Arbitration Award.  On June 23, 2017, Allied and CINL filed a Motion Upon Notice with the Nigerian Court seeking, among other things, an order vacating the Nigerian Enforcement Order, vacating and setting aside the Certificate of Judgment, and staying the execution or enforcement of proceedings pursuant to the Nigerian Enforcement Order. Allied and CINL's Motion Upon Notice was rejected by the Nigerian Court.

42.     On January 23, 2018, the Nigerian Court issued the following three documents: (i) a Judgment Summons and Order of Commitment naming Allied, (ii) a Judgment Summons and Order of Commitment naming CINL, and (iii) a Writ of Attachment and Sale of Goods naming

both Allied and CINL (the "Writ").  The Writ purported to grant NAEL the right to pursue the

assets of Allied and CINL located "within the Lagos Judicial Division."  However, as neither

Allied nor CINL are affiliates of ERN or EPNL, the Debtors maintain that the Writ constitutes an

improper implementation of the Nigerian Enforcement Order against the Debtors' assets in the

Oyo Field and is an abuse of legal process.

     43.     On January 31, 2018, NAEL, in conjunction with armed personnel from the

Nigerian navy and police force, and sheriff's of the Nigerian Court, and under the guise of a

routine naval inspection, landed a helicopter on the FPSO Armada Perdana (the "FPSO").  The

FPSO is EPNL's (not Allied's or CINL's) production and offtake vessel for OML 120

operations.  The FPSO is owned by Bumi Armada Berhad, a Malaysia-based international

offshore oilfield services provider.  The crude oil on board the FPSO belonged to EPNL.  Once

on board, NAEL's agents forced their way into restricted areas of the FPSO and chained and

counter-locked the vessel's main export valve.  NAEL asserted that EPNL's crude oil stored on

the FPSO was being seized pursuant to the Writ, although such assets belonged to neither Allied

nor CINL.

     44.     On February 12, 2018, Allied and CINL filed an Application for Mandatory

Injunction with the High Court of Lagos State, in the Lagos Judicial Division (the "Lagos

Court").  On February 20, 2018, NAEL filed a Preliminary Objection seeking an order to strike

the Application for Mandatory Injunction, and also sought enforcement of the Writ.

     45.     On March 2, 2018, EPNL filed a Motion on Notice with the Lagos Court seeking

an order setting aside the Writ and the purported execution carried out by NAEL on January 31,

2018, due to the fact that (i) EPNL is the owner of the crude oil on the FPSO, (ii) the Writ did

not authorize NAEL to attach EPNL's crude oil, and (iii) the attachment of EPNL's crude oil

interfered with its constitutionally protected property rights.  On March 8, 2018, the Lagos Court ruled that NAEL's conduct in attempting to enforce the Writ in both the Nigerian Court and the Lagos Court was an "abuse of process."

46.     On March 14, 2018, Allied and CINL filed a Notice of Preliminary Objection with the Court in which Allied and CINL stated, *inter alia*, that they did not have title in the property or assets attached to the Writ – meaning the FPSO and crude oil contained on it.

47.     On March 16, 2018, the Department of Petroleum Resources ("DPR"), which is part of the Ministry of Petroleum Resources of the Nigerian government, and the primary oil and gas regulator in Nigeria, wrote a letter to NAEL stating that NAEL must "unlock the export valve at the Oyo Field Terminal [on the FPSO since] the operation (lock/unlock) of which is statutorily vested in the [DPR]."  In short, the DPR advised NAEL that in attempting to enforce the Writ, it had violated the legal authority of the DPR to control the export valve on the FPSO.

48.     EPNL had an offtake of crude oil from the FPSO scheduled for March 27-28, 2018.  Generally, a government permit is required for such an offtake.  However, due to NAEL's improper use of the Writ and its continued interference with EPNL's operations, the DPR was unwilling to issue such a permit, causing the scheduled offtake to be delayed.  On April 12, 2018, EPNL received a copy of written correspondence from DPR stating that it would suspend processing the required permit indefinitely until such a time as the Writ, as it specifically applied to the FPSO and EPNL's operations, was vacated.

49.     On April 19, 2018, in a Form 8-K filing, ERN announced an emergency shutdown of the FPSO, which resulted in the shut-in of the Oyo-8 well.  Although the Debtors intend to continue challenging the legality of the execution against the Debtors' assets, the immediate result of the Writ and Nigerian Enforcement Order has resulted in the Debtors' inability to

market produced hydrocarbons from the Oyo Field.  Accordingly, the Debtors have suspended all Nigerian operations.

50.     In sum, the Debtors' inability to service their mounting debt obligations and other trade payable obligations, as well as the complex Nigerian litigation pending against the Debtors, has resulted in a severe cash-flow shortage.  Prior to filing the petitions, the Debtors used substantially all of their remaining cash to fund existing payroll obligations.  Through these Bankruptcy Cases, the Debtors seek protection and enforcement of the automatic stay with respect to the Debtors' assets, including the Allied Assets, while the Debtors seek an alternative source of funding pending resolution of the Nigerian litigation.  If the Debtors are unable to find a source of funding or to resolve the Writ and resume Nigerian operations, the Debtors' temporary cessation of operations will become permanent, and the Debtors will be required to liquidate their remaining assets.

## IV.     **FIRST DAY MOTIONS**

51.     Below is an overview of the First Day Motions. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtors into the Bankruptcy Cases and minimize disruptions to the Debtors' business operations.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

**A.     Debtors' Emergency Motion for Entry of an Order Authorizing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Joint Administration Motion")**

52.     In the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of the Bankruptcy Cases.  The Debtors are "affiliates" as defined in Bankruptcy Code § 101(2).

53.     I believe that Joint Administration of the Bankruptcy Cases will save the Debtors and their estates substantial time and expense because joint administration of these cases will remove the need to prepare, replicate, file, and service duplicative notices, applications, and orders.  Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets.  The United States Trustee for the Southern District of Texas and other parties in interest will similarly benefit from joint administration of these Bankruptcy Cases by sparing them the time and effort of reviewing duplicative pleadings and papers.

54.     I do not believe joint administration will adversely affect creditors' rights because the Debtors request only the administrative consolidation of the estates.  The Debtors do not seek substantive consolidation. As such, each creditor may still file its proof of claim against a particular estate.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.      Debtors' Emergency Motion For Entry Of An Order Extending The Time To File Schedules And Statements ("Schedules Motion")**

55.     In the Schedules Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by thirty (30) days, for a total of forty-four (44) days from the Petition Date, through and including May 8, 2018.

56.     To prepare the Schedules and Statements, I understand that the Debtors must compile information from books, records, and documents maintained by each of the Debtors, relating to the claims of hundreds of creditors, as well as the Debtors' many assets and contracts.

Given the scope of the Debtors' operations, it will take substantial time to gather and process such information. The Debtors have a limited number of employees with detailed knowledge of the Debtors' financial affairs and the skill to perform the necessary review and analysis of the Debtors' financial records. In light of the size and complexity of the Debtors' businesses, and the resulting significant amount of work required to complete the Schedules and Statements, as well as the competing demands on the Debtors' employees and professionals to assist in critical efforts to stabilize the Debtors' business operations during the initial post-petition period, I believe an extension is necessary.

57.    I believe the requested extension also will aid the Debtors in efficiently preparing accurate Schedules and Statements, as it will allow the Debtors to account for prepetition invoices not yet received or entered into their accounting systems as of the Petition Date, and will minimize the possibility that any subsequent amendments to the Schedules and Statements are necessary. As such, I believe the extension will benefit not only the Debtors, but all creditors and other parties in interest. Although the Debtors, with the assistance of their professional advisors, have begun to compile the information necessary for the Schedules and Statements, the Debtors have been consumed with a multitude of other legal, business, and administrative matters in the weeks prior to the Petition Date. Nevertheless, recognizing the importance of the Schedules and Statements in these Bankruptcy Cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

58.    In view of the amount of information that must be assembled and compiled, and the limited time available to do so, I believe that ample cause exists for the requested extension.

C.     **Debtors' Emergency Motion For Entry of an Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code Enforcing and Restating Automatic Stay and *Ipso Facto* Provisions ("Stay Motion").**

59.     In the Stay Motion, the Debtors seek entry of an order enforcing the automatic stay as to their operations in Africa as whole, and more specifically in regards to their critical Nigerian assets.  Given that the Debtors' Nigerian operations are currently the primary source of revenue for ERN, enforcement of the automatic stay with respect to EPNL's assets will be critical to the success or failure of these Bankruptcy Cases.

Signed on this the ___ th day of April, 2018.

By:_____
**Sakiru Adefemi (Femi) Ayoade**
**Chief Executive Officer**
**Erin Energy Corporation**