**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE SOUTHERN DISTRICT OF TEXAS**

**HOUSTON DIVISION**

Case No. 18-32106

In re: ERIN ENERGY

CORPORATION, et al

Debtors.

## SWORN AFFIDAVIT OF FACTS OF MR BOSAH OKONYIA

I, **Mr Bosah Okonyia**, Adult, Male, Christian, Nigerian Citizen of Zenith Heights, Plot 84/87Ajose Adeogun Street, Victoria Island, Lagos, Nigeria do hereby make oath and state as follows:

## INTRODUCTION

1. That this Affidavit is being sworn to form records in the matter of re: Erin Energy Corporation with case No. 18-32106 at the United States Bankruptcy Court, Southern District of Texas, Houston Division.

2. That I am a Legal Officer in the legal department of Zenith Bank Plc. Creditor of Erin Petroleum Nigeria Limited, by virtue of which position I am conversant with the facts of this case.

3. That I have the consent and authority of my employer Zenith Bank Plc (hereinafter referred to as "Zenith Bank") to depose to this Affidavit.

4. That except as otherwise stated, I depose to facts within my personal knowledge, as well as from information obtained by me from reading the documents pertaining to the events leading up to this matter and from information derived in the course of carrying out my duties in the employment of Zenith Bank.

5. That I have perused the Petition, Motion papers amongst other processes filed in this matter and am well acquainted with the facts of this matter.

**FACTS SURROUNDING ZENITH TERM LOAN FACILITY**

6. That Zenith Bank Plc is a public company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84/87, Ajose Adeogun Street, Victoria Island, Lagos State.

7. That Erin Petroleum Nigeria Limited Previously known as ('*Camac International Nigeria Limited*') is a private limited company incorporated under the Laws of the Federal Republic of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos, Nigeria.

8. That Erin Energy Corporation with United States Federal Tax Identification Number 9798 Corporation and situate at 1130 Post Oak Blvd, Suite 2250, Houston Texas 77056, is a Company Registered in the United States and alleges to be the parent company for Erin Petroleum Nigeria Limited.

9. That Allied Energy PLC is a public company incorporated under the Laws of the Federal Republic of Nigeria with its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos, Nigeria, and an affiliate of Erin Petroleum Nigeria Limited.

10.   The Nigerian Agip Exploration Limited (NAEL) is a private limited company incorporated under the Laws of the Federal Republic of Nigeria to carry on business in Nigeria with its offices situate at 1, Elsie Femi Pearse Street, Victoria Island, Lagos, Nigeria.

11.   That by virtue of an Acreage Allocation (Discretionary Award) of OPL 210 issued by the Ministry of Petroleum Resources (Petroleum Resources Department), Allied Energy Plc. is the legal holder of Oil Mining Leases (OML) 120 and 121.

12.   That by virtue of a transfer agreement between Erin Petroleum Nigeria Limited and Allied Energy Plc., Erin Petroleum Nigeria Limited acquired all the economic interest of Allied Energy Plc. in the oil block covered by OML 120 and 121 (although the approval of the Minister of Petroleum was yet to be obtained with respect to the transfer).

13.   That Erin Petroleum Nigeria Limited sometime in 2014, approached Zenith Bank Plc for a Term Loan Facility of USD100, 000,000.00 (One Hundred Million United States Dollars) to part-finance the expansion and development of the oil blocks covered by OML120 and 121.

14.   That by virtue of a Term Loan Facility Agreement on about September 30, 2014, Zenith Bank granted a loan facility of USD100, 000,000.00 (One Hundred Million United States Dollars) to Erin Petroleum Nigeria Limited. A copy of the Term Loan Facility Agreement is hereto annexed and marked as **Exhibit 1**.

15.   That as security for the repayment of the loan facility granted by Zenith Bank to Erin Petroleum Nigeria Limited, Erin Petroleum Limited undertook to obtain in favour of Zenith Bank, a legal charge over the

both Erin Petroleum Nigeria Limited and Allied Energy Plc.'s entire interest in Oil Block OML 120 and 121.

16. That further to paragraph 15 above, a Deed of Legal Charge over interest in OML 120 and 121 dated May 14, 2014 was executed between Zenith Bank and Erin Petroleum Nigeria Limited as well as Allied Energy Plc., by which Allied Energy Plc. charged its entire interest in OML 120 and 121 in favour of Zenith Bank.

17. That an undertaking from Allied Energy Plc committing to domicile the proceeds from sale of crude oil and processing of all NXPs through its account with Zenith.

18. That similarly, an All Asset Debenture dated November 25, 2014 was executed between Zenith Bank and Erin Petroleum Nigeria Limited, by which Erin Petroleum Nigeria Limited charged ALL its assets whether fixed, or floating, present and future in favour of Zenith Bank.

19. That some of the agreements executed as security for the repayment of the Term Loan Facility Agreement granted by Zenith Bank to Erin Petroleum Nigeria Limited are:

   19.1   All Assets Debenture dated November 25, 2014;

   19.2   Deed of Legal Charge dated May 14, 2015; and

   19.3   Deed of Assignment of Rights.

20. The agreements outlined in the above paragraph  are hereto annexed and marked as **Exhibits 2, 3 and 4** respectively.

21. That following the execution of the above referenced Deed of Legal Charge and Deed of All Assets Debenture, in evincing security of credits

under Nigerian law, Zenith Bank registered the aforementioned security documents at the Corporate Affairs Commission which are evidenced by the Certificate of Registration of Deed of Legal Charge dated May 26, 2015 and the Certificate of Registration of Deed of All Assets Debenture dated December 12, 2014. Copies of the Certificates of Registration are hereto annexed and marked as **Exhibits 5 and 6 respectively**.

## ERIN PETROLEUM NIGERIA LIMITED'S DEFAULT IN LOAN REPAYMENT OBLIGATION

22. That by Clause 17 (Representation and Warranties) of the Term Loan Facility Agreement between Zenith Bank and Erin Petroleum Nigeria Limited, particularly, paragraph 17.8 thereof (proceedings pending or threatened), Erin Petroleum Nigeria Limited represented and warranted to Zenith Bank that, no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been stated or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

   a) May restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

   b) If adversely determined, would reasonably be expected to have a material adverse effect.

23. That at the time of entering into the Term Loan Facility Agreement and the Disbursement of the loan sum by Zenith Bank to Erin Petroleum Nigeria Limited, Zenith Bank was not aware or informed of the existence

of any litigation, arbitration or administrative proceeding the Erin Petroleum Nigeria Limited or Allied Energy Plc., or any other parties thereof.

24.  That by a *Thisday* Newspaper in Nigeria extract dated February 20, 2018; Zenith Bank became aware of an Arbitral Award given at the London Court of International Arbitration (LCIA) on February 14, 2017. A copy of the newspaper extract is hereto *annex*ed and marked as **Exhibit 7**.

25. That by the above referenced newspaper publication, Zenith Bank became aware that the NAEL had obtained a Final Arbitral Award against Erin Petroleum Nigeria Limited and Allied Energy Plc. from the LCIA in an Arbitration with Arbitration number: LCIA 132498.

26. That the Arbitral Award which was given by the London Court of International Arbitration purportedly arose from a dispute on a Sale and Purchase Agreement (SPA) which was concluded in June 2012 between NAEL as Seller and Allied Energy Plc. as Purchaser.

27. That by virtue of the above referenced SPA; the NAEL had transferred to Allied Energy Plc., the entirety of its interest and rights in both Oil Mining Leases 120 and 121.

28. That the said Arbitral Award was given in respect of the Oil Assets (OML 120 and 121), the interest of which is charged in favour of Zenith Bank as security for the repayment of the Term Loan Facility granted by Zenith Bank to Erin Petroleum Nigeria Limited.

29. That by virtue of an Order of the Federal High Court of Nigeria made on May 11, 2017, leave of Court was granted to NAEL that the LCIA Final Award dated February 14, 2017 be recognised and enforced. A copy of the Order of the Federal High Court dated May 11, 2017 is hereto annexed and marked as **Exhibit 8**.

30. That the said order of the Federal High Court enforcing and recognising the Arbitral Award is for the cumulative sum of $101,638,966.67 (One Hundred and One Million, Six Hundred and Thirty Eight Thousand, Nine Hundred and Sixty Six United States Dollars, Sixty Seven Cents) and interest thereon compounded on a monthly basis against Erin Petroleum Nigeria Limited.

31. That NAEL in an attempt to realise the fruits of the Award granted by the LCIA and recognised by an Order of the Federal High Court dated May 11, 2017 executed a 'Notice of Seizure/Attachment of Goods' by locking the export valve on the FPSO operated by Allied Energy Plc. (the interest of which has been charged in favour of Zenith Bank for the repayment of the loan granted by Zenith Bank to Erin Petroleum Nigeria Limited).

32. That Clause 19 (III) (IV) and (v) of the loan facility agreement stipulates what amounts to an event of default as it relates distresses or encumbrances on the charged assets under the loan.

33. That there have also been defaults by Erin Petroleum Nigeria Limited on the repayment of the loan facility.

34. That there has been non-payment of the Principal of $4,903,272.79 and Interest of $2,065,019 which were due on March 30, 2018.

35. That it was agreed by Erin Petroleum Nigeria Limited and Zenith Bank Plc., that Debt Service Recovery Account (DSRA) funding would initially be for one (1) quarter of interest, but will increase to two (2) quarters once oil price is at or above $55 per barrel.

36. That there has been non-funding of the additional quarter of DSRA upon achievement of Crude Oil price of over $55 dollars.

37. That contrary to an agreement between Erin Petroleum Nigeria Limited and Zenith Bank Plc., notwithstanding several notices issued by Zenith Bank Plc. to Erin Petroleum Nigeria Limited, there has been a continued failure to institute a hedge protection.

## APPLICABLE LAW AND COURT WITH JURISDICTION

38. That I know for a fact that the contract between Zenith Bank Plc and Erin Petroleum Nigeria Limited and all the relevant agreements between them including the Term Loan Facility Agreement, the All Assets Debenture and all relevant security documents are governed by Nigerian Law by the mutual agreement of the Parties.

39. That the Companies and Allied Matters Act Chapter C20, Laws of the Federation of Nigeria 2004 is the relevant Law governing Nigerian-registered companies and their activities.

40. That Erin Petroleum Nigerian Limited being a company registered in Nigeria, is subject to the authority of Nigerian courts, the Companies and Allied Matters Act and other extant laws of Nigeria.

41. That the aforesaid Companies and Allied Matters Act contains numerous and copious provisions regulating Arrangement and Compromise of a Company with its Creditors, which provisions are

similar in nature to the provisions sought to be relied up by Erin Energy Corporation on behalf of Erin Petroleum Nigeria Limited in the Voluntary Petition for Chapter 11 Bankruptcy in the United States of America.

42.   That I know for a fact that reliefs identical to those sought by Erin Energy Corporation purportedly on behalf of Erin Petroleum Nigeria Limited for reorganisation, bankruptcy or howsoever referred to, are provided for in the Companies and Allied Matters Act and other extant Nigerian Laws on the subject.

43.   That the 1999 Constitution of the Federal Republic of Nigeria (as amended) is the grundnorm, the supreme law of Nigeria and has binding force on all the authorities and persons throughout the Federal Republic of Nigeria.

44.   That the aforesaid 1999 Constitution of Nigeria vests the Nigerian courts with all judicial power and authority to adjudicate upon all matters between persons, or between government or authority and to any persons in Nigeria, and to all actions and proceedings relating thereto, for the determination of any question as to the civil rights and obligations of that person.

45.   That the Federal High Court (of Nigeria) is the particular court vested with the authority and exclusive jurisdiction under the 1999 Constitution of Nigeria to determine all matters arising from the operation of the Companies and Allied Matters Act or any other enactment replacing the Act or regulating the operation of companies incorporated under the Companies and Allied Matters Act.

46.   That I know for a fact that the proper forum for creditor arrangement or business reorganisation involving Erin Petroleum Nigeria Limited is the judicial division of the Federal High Court of Nigeria where the head office of Erin Petroleum Nigeria Limited is situate, being the Federal High Court of Nigeria, Lagos Judicial Division.

## CONCEALMENT OF FACTS BY ERIN PETROLEUM NIGERIA LIMITED

47.   That one Mr. Kase Lukman Lawal is the Chairman and Chief Executive of Erin Energy Corporation which is the parent company of Erin Petroleum Nigeria Limited and the corporate entity which filed the petition for Chapter 11 Bankruptcyat the United States Bankruptcy Court, Southern District of Texas, Houston Division..

48.   That Mr. Kase Lukman Lawal is also the Chairman and Chief Executive of other related corporations including CAMAC International Corporation and Allied Energy Corporation. Annexed hereto is the search report dated April 13, 2018 by the law firm of Okwubanego & Okwubanego as **Exhibit 9**.

49.   That a dispute arose sometime in 2012 between Camac Petroleum Limited (now Erin Nigeria Petroleum Limited) and Nigeria AGIP Energy Limited (NAEL), a subsidiary of Italian oil major ENI. Allied Energy purportedly bought 40 percent of the oil rights in Oil Mining Lease (OML) 120 and 121 from NAEL and transferred same to Camac Petroleum Limited, however Allied Energy only paid $100 million of a $270million purchase price, according to court records.

50.   That I know for a fact that the Courts in Nigeria and the London Court
of International Arbitration ruled in favour of NAEL in the dispute,
instructing Camac International to pay NAEL $200-million, a Cayman
Islands court issued a winding up order for Lawal's Camac International
who was its chairman, CEO and controlling shareholder.

**51.**   That Zenith Bank Plc has filed an application dated April 17, 2018
seeking leave of the Court of Appeal to appeal as an interested party
against the Judgment of the Federal High Court of Nigeria (recognising
and enforcing the Award of the London Court of International Arbitration
granted in favour of NAEL) as well as an application for Stay of
execution of the said Judgment. The above referenced application of
Zenith Bank plc seeking leave to appeal as an interested party dated
April 14, 2018 and the application for Stay of Execution dated May 8,
2018 are herein annexed and marked **Exhibits 10 and 11.**

52.   That in 2016, South Africa's Pension Investment Corporation (PIC)
investment committee agreed to secure a $100-million bank guarantee
so that Erin Energy Corporation could borrow for drilling and other
expenses at the Oyo oil field covered by the aforementioned OMLs 120
and 121. This secondary loan was finalised in January 2017, and Erin
pledged its assets as security thereunder.

53.   That I know for a fact that neither Erin Energy Corporation nor Erin
Petroleum Nigeria Limited or any of its subsidiaries raised any of the
above facts before this Honourable Court in its Voluntary Petition for
Chapter 11 Bankruptcy

**CONCLUSION**

54. That Erin Petroleum Nigeria Limited being a private limited company registered under Nigeria laws of the Federal Republic of Nigeria is a body corporate, separate and distinct from Erin Energy Corporation.

55. That Erin Petroleum Nigeria Limited and its subscribers together with the members of the Company constitute a body capable of exercising all the powers and functions of an incorporated company including the power to sue and be sued in its own name.

56. That the credit facility advanced by Zenith Bank Plc to part finance the expansion and development of the oil blocks covered by OML 120 and 121 was granted to Erin Petroleum Nigeria Limited and not its parent company and/or such other entity affiliated to it.

57. That Zenith Bank continues to possess a first lien over ALL the economic interest accruing from OML 120 and 121 as security for the repayment of the credit facility granted to Erin Petroleum Nigeria Limited.

58. That further to paragraph … above, Erin Petroleum Nigeria Limited charged in favour of Zenith Bank Plc, ALL its assets whether fixed or floating, present and future as security for the credit facility advanced to it by Zenith Bank Plc.

59. That in paragraph 3 of the 'Debtors' Emergency Motion for the Entry of an Order pursuant to Section 105 (a) and 362 of the Bankruptcy code extending the automatic stay', the Petitioners alluded to the fact that Erin Petroleum Nigeria Limited accounts for virtually all of Erin Energy Corporation's revenues.

60. That what the Petitioners seek to do by this voluntary petition filed under chapter 11 of the United States Code is to utilize the assets of Erin Petroleum Nigeria Limited held by Zenith Bank Plc as a security for the credit facility granted in 2014 to finance its operations and settle its outstanding obligations to other creditors despite Zenith Bank Plc being a first lienor to ALL the Assets of Erin Petroleum Nigeria Limited.

61. That Erin Petroleum Nigeria Limited being a Company incorporated under the Companies and Allied Matters Act, Cap C20, Laws of the Federation of Nigeria, 2004 is a Nigerian Company, governed and subject to Nigerian Laws.

62. That matters relating to arrangement and compromise involving a Company incorporated under the Laws of Nigerian (as in the instant case with 'Erin Petroleum Nigeria Limited') has been sufficiently provided from Section 537 – 540 of the Companies and Allied Matters Act, Cap. C20, Laws of the Federation of Nigeria, 2004.

63. That the appropriate Court clothed with jurisdiction to hear any matter relating to arrangement and compromise with creditors involving a Company incorporated under the Laws of Nigerian is the 'Federal High Court of Nigeria' to the exclusion of any other Court.

64. That the voluntary filing of the petition under Chapter 11 by Erin Petroleum Nigeria Limited is a deliberate attempt to usurp the powers of the Federal High Court of Nigeria as conferred upon it by Section 251 the 1999 Constitution of the Federal Republic of Nigeria (as amended) and Section 567 of the Companies and Allied Matters Act, Cap C20, Laws of the Federation of Nigeria, 2004.

65. That the above facts are relevant and ought to be brought to the attention of this Honourable Court.

66. That this action is designed to overreach Zenith Bank's secured interest in its lending to Erin petroleum Nigeria Limited.

67. That this Affidavit is to place on record, material particulars pertaining to the voluntary petition under chapter 11 of the United States Code filed by Erin Energy Corporation and its purported 'subsidiaries' including Erin Petroleum Nigeria Limited which may have been suppressed and/or unrevealed.

68. That it is in the interest of justice to refuse the grant of the applications filed by the Debtors as same is orchestrated to hoodwink this Honourable Court into making Order in vain, and further plunge Erin Petroleum Nigeria Limited into further debt with unsuspecting creditors.

69. That I make this Affidavit solemnly and in good faith, conscientiously believing the same to be true and correct in accordance with the Oaths Law of Lagos State.

DEPONENT

SWORN to at the Lagos State
High Court Registry, Lagos, Nigeria
This          day of May, 2018

BEFORE ME
ORIADE O. M.
PRINCIPAL ADMIN OFFICER
HIGH COURT OF LAGOS

COMMISIONER FOR OATHS

## FOR SERVICE ON THE DEBTORS

**1. Erin Energy Corporation –
lionel.mcbee@erinenergy.com
AND (2) Erin Energy Corporation's** Attorneys
and/ or Proposed Attorneys, David L. Curry Jr.
Texas Bar No. 00784695
**Bridget Moore – bmoore@okinadams.com**
Okin Adams LLP
1113 Vine St. Suite 201, Houston, Texas 77002
Tel: 713.228.4100, Fax:888.865.2118

2. Zenith Bank Plc (non-party to US suit)
C/o their Proposed Attorneys
Professor Fabian Ajogwu, SAN
Kenna Partners
Barristers & Solicitors
8, Ogunyemi Road
Palace Way, Oniru
Victoria Island, Lagos, Nigeria
Tel: +234 815 8390714; +234 706 5197981
Email: cnwabulu@kennapartners.com

DATED  THIS ..........DAY OF ......................................, 2014

## CAMAC PETROLEUM LIMITED
### AS BORROWER

### AND

### ZENITH BANK PLC
### AS LENDER

---

**$100,000,000 (ONE HUNDRED MILLION UNITEDSTATES DOLLARS)**

**TERM LOAN FACILITY AGREEMENT
FOR THE EXPANSION AND DEVELOPMENT OF THE OIL
BLOCK OML 120 AND 121**

---

THIS TERM LOAN FACILITY AGREEMENT is made the ...... day of ......
between

CAMAC PETROLEUM LIMITED, a company incorporated under the laws of the Federal Republic of Nigeria having its office at Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos (hereinafter referred to as "The Borrower" which expression shall where the context so admits include its successors-in-title and assigns) of the one part.

DULY STAMPED

AND

ZENITH BANK PLC, a banking Company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84/87 Ajose Adeogun Street, Victoria Island, Lagos State (hereinafter referred to as "The Lender" which expression shall where the context so admits include its successors-in-title and assigns) of the other part.

The Borrower and the Lender shall be jointly referred to as "Parties" in this agreement.

WHEREAS:

i.   The Borrower has applied to the Lender for a **Term Loan Facility** in the principal sum of **$100,000,000.00 (One Hundred Million United States Dollars)** for the purposes of part financing the expansion and development of the Oil Block OML 120 and 121.

ii.  The legal holder of the Oil Block OML 120 and 121 is Allied Energy Plc. The Lender understands that by virtue of a Transfer Agreement, between Allied Energy Plc and the Borrower, the Borrower acquired all the economic interest of Allied Energy Plc in Oil Block OML 120 and 121. The approval of the Minister of Petroleum has not been obtained with respect to the transfer.

iii. Pursuant to the request for the Term Loan Facility by the Borrower, the Lender has made an Offer of Credit Facility (dated July 21, 2014) to the Borrower, the terms of which have been duly accepted by the Borrower.

iv.  The Lender and the Borrower have agreed upon the grant of the term loan facility by the Lender to the Borrower on the terms and conditions herein contained.

**NOW THEREFORE IT IS AGREED** as follows:

1.   <u>INTERPRETATION</u>

1.1  In this Loan agreement except the context otherwise admits, the following words, terms, phrases and expressions shall have the meanings ascribed hereto. Further the male gender shall include the female gender and vice-versa while the words and phrases in the singular shall include the plural and vice-versa.



i.   **"All Assets Debenture"** means the Nigerian law governed agreement so granted by or to be granted by the Borrower in favour of the Lender and to include, without limitation, a charge over the current and future assets of the Borrower.

**"Availability Period"** means the period during which the Lender undertakes to make the Term Loan Facility available to the Borrower for utilization subject to the satisfaction by the Borrower of all the conditions precedent to drawdown.

iii.   **"Available Facility"** means the undrawn and uncancelled portion of the Term Loan Facility.

iv.   **"Ancillary Documents"** means the Legal Charge over the OML 120 and 121, All Asset Debenture, Deed of Share Charge over the shares of the sponsors, Corporate Guarantees, Letter of Comfort from CAMAC Energy Holdings Limited and all other documents referenced in this Agreement required in order to give effect to the Terms of this Agreement.

v.   **"Board of Directors"** means the board of directors for the time being of the Borrower within the meaning of the Companies and Allied Matters Act CAP C20, Laws of the Federal Republic of Nigeria, 2004.

vi.   **"Business Day"** means a day on which banks in Nigeria are open for normal banking business excluding Saturdays and Sundays and any public holiday declared by the Federal Government of Nigeria.

vii.   **"Charged Assets"** means each of the assets and undertakings of the Borrower and more particularly charged to the Lender in the All Assets Debenture dated on or about the date of this Agreement between the Lender and the Borrower.

viii.   **CAPEX Reserve Account ("CRA"):** An account established with the Lender and which will be used to build up and maintain the CRA required balance. Such amount shall not be less than 10% of net revenue after expenses.

ix.   **"Compensation Account"** Means the account established with the Lender to be used to receive all insurance payments and/or any other compensation due to the Borrower.

x.   "**Closing date**" means the _____ or any other date agreed for the execution of this Agreement and any other ancillary agreements.

xi.   "**Drawdown**" means when all the conditions to drawdown set forth in this Agreement are met.

xii.   **"Debt Service Reserve Account"** means the account established by the borrower with the Lender to be used to fund debt service obligations dues on the next repayment date. To be funded no later than 7 days prior to each repayment date.

xiii.   **"Events of Default"** means any one of the events stated in clause 19 hereof.

xiv.   **"Final Maturity Date"** means ..., 2019 or any other date as may be agreed in writing between the Lender and the Borrower.

xv.   **"Legal Charge"** means the legal charge created or to be created over Oil Block OML 120 and 121 (which license is held by Allied Energy Plc).

xvi.  **"LIBOR"** means the London Interbank Offered Rate which is the rate at which banks offer and place money at the London inter-bank money market. Specifically, this is the one-month LIBOR rate for a period equal to that Interest period which appears on the screen display designated as page 3750 on the Moneyline Telerate Service (or such other screen display or service as may replace it for the purpose of displaying British Bankers' Association LIBOR Rates for Dollar deposits in the London interbank market) at or about 1100 hours GMT on the applicable rate fixing day.

xvii.  **Material Adverse Effect:** means any outcome or circumstance which materially and adversely affects the obligations of the Borrower under this facility agreement or materially and adversely affects any of the securities hereby created.

xviii.  **"Moratorium"** means a period of grace during which repayment of the principal amount of the Loan shall be suspended and shall be twelve (12) months commencing from the date of the first drawdown.

xix.  **"Month"** means a calendar month.

xx.  "Obligor" means any person having an obligation (directly or indirectly under this facility agreement or any other ancillary agreement related to this facility (including Allied Energy Plc, the off takers, Camac Energy Incorporated.... etc)

xxi.  **"Project"** means the further expansion and development of the Oil Block OML 120 and 121.

xxii.  **"Request"** means a request by the Borrower to utilize the Term Loan Facility, substantially in the form of Schedule 1.

xxiii.  "Sponsors" means the shareholders of the Borrowers.

xxiv.  **"The Term Loan Facility"** means the term loan facility described in clause 2 granted to the Borrower by the Lender.

xxv.  **"The Loan amount"** means the aggregate principal amounts drawn by the Borrower at any time under the Term Loan Facility and not repaid or prepaid.

xxvi.  **"USD"** and **"$"** means the lawful currency of the United States of America.

1.2  Words and phrases defined in the Companies and Allied Maters Act Cap C20 Laws of the Federal Republic of Nigeria 2004 shall subject to the foregoing have the same meanings respectively in this Term Loan Facility Agreement.

1.3.  The headings of the various clauses are inserted for convenience only and shall not affect the construction of the clauses of this Term Loan Facility Agreement.

1.4   References to any statute or statutory provisions are to the statute or provisions as may from time to time be amended, modified, extended or re-enacted.

2.   **FACILITY**

The Lender hereby grants to the Borrower upon the terms and subject to the conditions herein contained a term loan facility in the aggregate principal sum of **US$100,000,000.00 (One Hundred Million United States Dollars)** to be designated the Term Loan Facility and the Borrower hereby accepts the Facility from the Lender.

3.   **DISBURSEMENT**

3.1.   The Term Loan Facility shall be available for utilization for a period of 12 (twelve) months from the date of execution of this agreement.

3.2.   The disbursement shall be made in 4 (four) tranches of US$25,000,000 (Twenty Five Million US Dollars) each upon satisfaction by the Borrower of all the condition precedent. It being understood that at least 10% of the facility (equivalent of N1.6Billion Naira) shall be disbursed in Nigeria currency (Naira).

3.3.   The Term Loan Facility shall be available in US Dollars (for offshore portion) and Naira (for payment to local contractors and suppliers). The dollar portion will also be available for utilization as letters of credit: unconfirmed, confirmed, deferred and Usance.

4.   **COMMITMENT**

The Lender hereby undertakes and agrees that subject to the terms of this Loan Agreement and the Offer Letter for the facility it shall during the Availability Period make the Term Loan Facility available to the Borrower for utilization for the purpose stated in clause 5 as contemplated under this Agreement.

5.   **PURPOSE**

5.1.   The Borrower shall utilize the Loan strictly for the purposes of part financing the expansion and development of the Oil Block OML 120 and 121.

5.2.   The Facility shall be utilized (i) via direct payment to suppliers and contractors, offshore payment via letters of credit and transfers based on the terms of supply while direct disbursement shall be made to local suppliers from the Naira disbursement (ii) to fund financing costs, expenses and fees associated with the facility.

5.3.   The Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

6.   **TENOR**

This Term Loan Facility shall be for a period of five (5) years inclusive of twelve (12) months moratorium on Principal only.

7.   **DRAWINGS**

7.1. The Borrower shall be entitled to make drawings under the Term Loan Facility at any time during the Availability Period, and for each such drawing (to be designated a "Drawing") the Borrower must complete a Request, such Request to be made in the form of schedule 1 hereto and delivered to the Lender during a Business Day. The Lender shall communicate acceptance of the Request to the Borrower within thirty (30) days of the request.

7.2. Drawings under the Facility shall be subject to satisfaction by the Borrower of all the conditions precedent to drawdown stipulated in the accepted Offer Letter dated July 21, 2014 in each case in form and substance satisfactory to the Lender unless waived by the Lender on such terms as the Lender deems fit in writing.

7.3. Notwithstanding any other provision of this Loan Agreement, including, without limitation, those in Clauses 3.3 and 5.2, the amount of any standby letter of credit issued hereunder shall not be considered to be a drawing under the Term Loan Facility but shall be considered to be a Contingent Liability which reduces availability but does not incur interest and/or charges until actual presentation for payment.

8.   **INTEREST AND OTHER FEES**

8.1. The dollar rate of interest chargeable in respect of the Loan shall be LIBOR + 7.5% per annum, subject to a floor of 9.5% per annum.

8.2. The Naira interest rate shall be 18.75% per annum. This rate is subject to upward or downward review by the Lender in line with money market realities. However, any future advice of upward review shall be for information only and will be deemed accepted accordingly unless the facility is paid down on the effective date of such upward review.

8.3. Default interest will be payable on all overdue amounts at floor rate plus applicable margin of 2.00% per annum.

8.4. The Borrower shall also pay the following other fees

   (i)    **Management Fee** at 1% flat, payable upfront upon acceptance of offer;

   (ii)   **Processing Fee** at 0.35% flat, payable upfront upon acceptance of offer.

   (iii)  **Commitment Fee** at 0.50%, payable quarterly in arrears annually on the undrawn balance.

   (iv)   **Loan Service Fee (Periodic):** 0.5% payable upfront upon acceptance and on every anniversary on the outstanding balance until the facility is fully repaid.

8.5. Where any interest payment or principal repayment under this Clause is due on a day that is not a Business Day, such payment shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is none).

9. **SECURITY**

9.1. As security for the repayment of the Loan, which security shall terminate and be released by the Lender at such time as no amount is or may be outstanding under this Loan Agreement, the Borrower shall:

(a) Obtain in favor of the Lender a Legal Charge over Allied Energy Plc and Camac Energy Incorporated's entire interest in Oil Block OML 120 and 121;

(b) Create in favor of the Lender a fixed and floating Legal Charge by way of an All Assets Debenture over its present and future assets including any currently unissued shares in the Borrower or any shares created as a result of an increase in the authorised share capital of the Borrower. This Agreement and the All Asset Debenture to be executed and read contemporaneously.

(c) Obtain in favor of the Lender, a corporate guarantee (covering the entire facility and interests) from Camac Energy Incorporated (the parent company of the Borrower) and a corporate guarantee (covering the entire facility and interests) from Allied Energy Plc.

(d) Obtain an undertaking from Allied Energy Plc and Camac Energy Incorporated committing to domicile the proceeds from the sale of crude oil from OMLs 120 and 121 and processing of all NXPs from such sales through its account with the Lender.

(e) Obtain a letter of comfort from Camac Energy Holdings Limited to ensuring that its subsidiary (Allied Energy Plc and Camac Energy Incorporated) domicile the crude oil proceeds with the Lender and ensure performance of obligations under this Term Loan Facility Agreement

(f) Obtain an assignment to the Lender of all the rights in the share capital of the Borrower and to ensure the shareholders of the borrower create a pledge in favor of the Lender over their shares in the Borrower (including current and future shares as well as additional shares in the event of increase in the authorized share capital of the Borrower).

(g) Assign to the Lender, the Borrower's rights under all commercial contracts including sale and purchase agreements, off-take agreements and crude handling agreements.

(h) Cause Allied Energy Plc and Camac Energy Incorporated to assign to the Lender all their rights under all commercial contracts relating to OMLs 120 and 121 including sale and purchase agreements, off-taker agreements and crude handling agreements.

(i) Create in favor of the Lender, an Irrevocable Domiciliation agreement (between the Borrower, Allied Energy Plc, Camac Energy Incorporated and off-takers domiciling all proceeds from the off take agreement in the designated accounted opened with the Lender.

(j) Enter into an Irrevocable undertaking (along with Allied Energy Plc and Camac Energy Incorporated) to open all NXP in respect of crude oil lifting from OMLs 120 and 121 being financed throughout the tenor of the facility with the Lender and to route all proceeds of crude oil sales from OMLs 120 and 121 to its account with the Lender.

(k) Create a charge in favor of the Lender over all of the Borrower's accounts, receivables, rights and interest and cause Allied Energy Plc and Camac Energy Incorporated to create a charge in favor of the Lender over all its accounts, receivables, rights and interest with respect to OML 120 and 121.

(l) Assign to the Lender, all rights under any hedging agreement entered into in relation to the Facility.

(m) Assign to the Lender, all insurance and reinsurance contracts including performance guarantees by EPC related to the project.

(n) Obtain from the off-takers of the crude oil from OMLs 120 and 121 a commitment/acknowledgment of domiciliation instruction by Allied Energy Plc and Camac Energy Incorporated to domicile all sales proceeds to the Borrower's account with the Lender.

(o) Pledge all its unissued shares (including news shares issued in the event increase in the share capital) to the Lender.

9.2.    Except with the written consent of the Lender, the Borrower hereby undertakes not to and shall not create or permit to subsist any other mortgage, charge, pledge or lien (each a "Security Interest") on any of its Charged Assets and/or securities hereby created except for any Security Interest:

a. To secure any excise or import taxes or duties owed to, or industrial grants made by any state, government, political sub-division or international organization, or any agency, authority, instrumentality or body or any regulatory authority; or

b. Arising by operation of law; or

c. Created or arising with the prior written approval of the Lender; or

d. Created or arising out of retention of title provisions or a conditional sale in respect of goods acquired by the Borrower in the ordinary course of business; or

e. Which is a lien or other Security Interest arising in the ordinary course of the Borrower's business consistent with the Borrower's past practice and not securing Borrowings; or

f. The principal purpose and effect of which is to allow the setting-off or netting off obligations with those of a financial institution in the ordinary course of the cash management arrangements of the Borrower; or

g. Constituted by netting, set-off or cash collateral arrangements in relation to swaps or other derivative agreements in the ordinary course of its business; or

h. Arising under arrangements in connection with the participation in or trading on or through any clearing system or investment, commodities or stock exchange where the Security Interest arises in the ordinary course of business under the rules or normal procedures or legislation governing such system or exchange; or

i. Over securities, derivatives or commodities, in respect of the acquisition cost of such securities, derivatives or commodities owed to a dealer therein or an agent for the purchase thereof where such cost fails to be paid within 180 days of being incurred; or

j. Arising out of or in connection with pre-judgment legal process or a judgment or a judicial award relating to security for costs; or

k. Which is to renew, extend or replace a Permitted Security Interest if the principal amount secured is not thereby exceeded and such permitted Security Interest is discharged or released within 3 (three) months of the creation of the replacement Security Interest; or

l. Over cash or cash equivalents covering any indebtedness (or obligations in respect thereof. such as future interest) in respect of capital market issues in existence on the Closing Date which has been fully covered by cash or cash equivalents as a means of achieving the economic effect of full repayment of that indebtedness; or

## 10.    CREATION OF ACCOUNTS

10.1.   **Collection Accounts:** A collection account shall be opened with the Lender to receive all revenues generated from the obligor base asset (OML 120 and 121) including receivables from the off-take agreement. Withdrawals shall be made from the collection account to fund the following accounts: (i) Debt Service Reserve Account (DSRA) (ii) Operations Account (iii) Debt Service Account (iv) CAPEX (v) Compensation Account.

10.2.   **Operations Accounts:** The Borrower shall open an operations account with the Lender. On each waterfall date, the company shall deposit in the operation account from the collection account such amounts as necessary to permit payment from that account of up to 100% of the operating expenditure for the next 3months.

10.3.   **Debt Service Account:** The Lender shall open a Debt Service Account with the Lender which will be used to fund debt service obligations due on the next repayment date. This is to be funded no later than 7 days prior to from the DSRA.

10.4.   **CAPEX Reserve Account (CRA):** This account shall be established with the Lender and will be used to build up and maintain the CRA required balance. The CRA balance shall not be less than 10% of net revenues after expenses.

10.5.   **Compensation Account:** A compensation account shall be established with the Lender for the purpose of receiving all insurance payments and/or any other compensation due to the Borrower.

10.6    **DSRA Required Balance:** Debt Service Reserve Account ("DSRA") shall be opened to warehouse the DSR required balance. In an event of default, any funds held in the Debt Service Reserve Account may be promptly applied as a mandatory prepayment under the facility. This shall be maintained to hold 12 months interest obligation during the moratorium and subsequently funds sufficient to pay one quarter interest and principal shall be constantly held in this account.

MORATORIUM

The Lender hereby grants to the Borrower a moratorium on principal only of the Term Loan Facility for a period of twelve (12) months, interest will be paid during the moratorium period on a quarterly basis.

## 12. REPAYMENT

12.1   The Borrower shall make quarterly (per annum) repayment of principal and interest commencing after the moratorium period. However, interest shall be payable quarterly during the moratorium period.

12.2   The principal and interest on the facilities shall be paid by the Borrower to the Lender on the due date through the legally accepted mode of repayment as specified by the Central Bank of Nigeria, accompanied by a letter signed by the authorised representative of the Borrower, stating the purpose of the payment. Notwithstanding the purpose stated in the letter by the Borrower, the Lender shall apply any payment so received from the Borrower first in or towards the satisfaction or reduction of the payment of interest then due and unpaid before applying same to or towards the repayment of the principal sum then due and if the amount is not enough to repay the full amount then due, the Lender shall so notify the Borrower who shall within 30 (thirty) days of receiving such notification pay to the Lender the amount necessary to repay the installment in full.

12.3   Where any date for a repayment under this Clause is not a Business Day, such repayment shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

12.4   On the Final Repayment Date, the Borrower shall pay and discharge all outstanding secured obligations in full.

## 13. PREPAYMENT AND CANCELLATION

13.1.   On giving not less than 14 (fourteen) business days prior written notice to the Lender, the Borrower may prepay the Loan in whole or in part.

13.2.   Parties agree that Prepayment is allowed only in multiples of US$5,000,000.00 (Five Million US Dollars). However, a 1% flat charge shall be applied on the prepaid amount.

13.3.   Amounts prepaid will not be re-borrowed and shall first be applied in or towards payment of any interest due and unpaid then towards repayment of any principal installments then due and unpaid.

## 14. CONDITIONS PRECEDENT TO DRAWDOWN

14.1.   The Borrower shall not be entitled to draw or utilize the Term Loan Facility or any part thereof unless the Lender shall have received the following:

14.1.1. Acceptance of the offer dated July 21 2014, evidenced by signing and returning a copy of the offer letter by the authorized signatories of the Borrower. Such authority to accept the offer by the Borrower to be obtained via a duly signed Board resolution of the Borrower. The Lender confirms that the referenced offer dated July 21, 2014 has been accepted and signed by the Borrower.

14.1.2. Submission of duly executed written Board Resolution of the Borrower authorizing and accepting usage of the term loan facility.

14.1.3. Submission of a Board Resolution of the Borrower authorizing and accepting the terms and conditions contemplated under this Agreement.

14.1.4. Submission of a duly executed written Board Resolution of Allied Energy Plc and Camac Energy Incorporated authorizing the following:

   i. The use of their OML 120 and 121 as collateral for this facility. All the documents required for perfection and creation of legal charge shall be executed accordingly.

   ii. That all proceeds of crude oil export from OML 120 and 121 shall be domiciled with the Lender and transferred to the account of the Borrower with the Lender towards liquidation of the maturing installments of the Term Loan Facility.

14.1.5. Submission of a Board Resolution of the Borrower, Allied Energy Plc and Camac Energy Incorporated undertaking that the Borrower and Allied Energy Plc shall not obtain any additional finance or create any security interest over Oil Block OMLs 120 and 121 as well as its current and future assets without the prior written consent of the Lender.

14.1.6. Receipt of a Letter from the Borrower stating its current indebtedness (if any) to other lenders with the facility limits obtained, current outstanding balance (if any) and the collateral pledged.

14.1.7. Receipt of duly executed Term Loan Agreement between the Borrower and the Lender.

14.1.8. Receipt of duly executed legal charge by Allied Energy Plc and Camac Energy Incorporated on its interest in OML 120 and 121.

14.1.9. Receipt of duly executed all asset debenture over the fixed and floating assets of the Borrower in favor of the Lender.

14.1.10. Receipt of duly executed pledge over all the shares of the Borrower (including issued and unissued shares and to extend to any new shares created in the event of shares capital increases).

14.1.11. Receipt of duly executed agreement between the Borrower, Allied Energy Plc, Camac Energy Incorporated and the off-takers domiciling all the proceeds from the sale of crude from the Oil Block OML 120 and 121 with the Borrower.

14.1.12. Receipt of duly executed agreement assigning the rights of the Borrower Camac Energy Incorporated and Allied Energy Plc under all commercial contracts related to OMLs 120 and 121 (including sale and purchase agreements, off-take agreements and crude handling agreements).

14.1.13. Receipt of an irrevocable undertaking by the Borrower, Camac Energy Incorporated and Allied Energy Plc to open all NXP in respect of crude oil lifting from OML 120 and 121 throughout the tenor of the facility with the Lender and to route all proceeds of crude oil sales from OML 120 and 121 to its account with the Lender.

14.1.14. Receipt of duly executed pledge in favor of the Lender over the Borrowers accounts, receivables, rights and interests.

14.1.15. Submission of an independent reserves and technical report on the assets provided by an independent technical consultant, acceptable to the Lender.

14.1.16. Receipt of duly executed first charge on the Borrower's account with the Lender, warehousing the proceeds of crude oil sales on OML 120 and 121.

14.1.17. Receipt of duly executed standard corporate guarantee of Camac Energy Incorporated and Allied Energy Plc, the parent company of the Borrower.

14.1.18. Receipt of duly executed undertaking by the Borrower that the US Dollars and Naira equivalent of the foreign exchange or the Borrowers account with the Lender should be debited for the Dollar and/or Naira equivalent of principal and interest in the event that payment from the crude exported is delayed on due date or repayment or at the time of expiration of the facility.

14.1.19. Receipt of written confirmation or certificate of compliance issued by the Department of Petroleum Resources in respect of OML 120 and 121.

14.1.20. Receipt of documents relating to the Borrower's acquisition of the remaining economic interest in OML 120 and 121 form Allied Energy Plc and Camac Energy Incorporated.

14.1.21. Receipt of all other necessary security documents.

14.1.22. Execution of any other necessary security document(s) as may be reasonably required by the Lender.

14.2. The Lender may allow the Borrower to utilize the facilities or any part thereof notwithstanding that all or any of the conditions precedent to the utilization of the facilities have not been fulfilled and such a concession shall not prejudice the right of the Lender to insist upon the fulfillment of all the conditions precedent to the utilization thereof before further utilization of the facilities nor prejudice the right of the Lender to recover from the Borrower any part utilized before the fulfillment of all or any part of the conditions precedent.

15. **OTHER CONDITIONS**

15.1. The Borrower shall submit to the Lender a copy of its quarterly management accounts within sixty (60) days of the end of each quarter and audited accounts within one hundred and twenty (120) days of the end of each financial year.

15.2. This Term Loan Facility is made subject to availability of funds and to the rules and regulations governing banking business as enunciated by the Central Bank of Nigeria from time to time.

15.3. In line with Central Bank of Nigeria ("CBN") directive, The Lender shall disclose information relating to this facility to CBN Licensed Credit Bureaus.

15.4. Predetermination of borrowing base every six (6) months by an Engineering Consultant acceptable to the Lender.

15.5. The Borrower hereby undertakes to source foreign currency on or before maturity of the Term Loan Facility.

15.6. The Borrower, Camac Energy Incorporated and Allied Energy Plc shall inflow the repayment from proceeds generated from oil trading on/or before the expiration of the facility.

15.7. The Borrower shall be required to take out a comprehensive insurance policy with a reputable insurance company acceptable to the Lender against fire and any other form of peril on OML 120 and 121 with the Lender noted as the first loss payee.

15.8. The Borrower shall provide a list of contractors/subcontractors to be engaged in executing further expansion and development works on OML 120 & 121.

15.9. The Borrower shall use its best efforts to ensure that contractors/subcontractors associated with this project open/ maintain accounts with the Lender wherein funds shall subsequently be disbursed.

15.10. The Lender reserves the right to unilaterally review the terms and conditions of this facility from time to time in the light of changing market conditions and also to terminate this banking facility and accelerate the maturity of the Borrowers indebtedness based on any adverse information threatening the basis of this relationship or putting the banking facility at risk or loss and as a result of any breach of the terms and conditions of this facility. The Borrower shall be notified of any decision taken in this respect.

15.11. In the event of a contemplated sale of shares, issuance of additional share capital, amalgamation of business or any other change that would result in any change of ownership of the company, or a substantial share capital of the company being taken over by a new owner, the prior consent of the Lender must be obtained in writing, otherwise the facility shall become immediately due and payable.

15.12. The Borrower shall carry out periodic reserve redetermination audit to ascertain changes in borrowing base.

15.13. The Lender reserves the right to securitize, syndicate or sell its interest in this credit facility based on its global risk/liquidity management objectives during the period of the facility.

15.14. All legal fees, out-of-pocket expenses, taxes or commissions including cost of recovery of the facility in the event of default shall be for the account of the Borrower.

15.15. The Borrower shall not without the prior written consent of the Lender obtain any new facility from any other financial institution both local and foreign for further expansion of OML 120 and 121. The Lender in the event of need for additional borrowing shall have a right of first refusal.

16. **STAMP TAXES**

The Borrower shall pay and, promptly on demand, indemnify the Lender against any cost, loss or liability the Lender incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of this Agreement or any ancillary agreements.

17. **REPRESENTATIONS AND WARRANTIES**

The Borrower hereby makes the following representations and warranties to and for the benefit of the Lender

17.1. **Status**
It is a duly incorporated and validly existing company with limited liability under the laws of the Federal Republic of Nigeria.

**17.2. Powers and Authority**

It has the powers to enter into, or, as the case may be, to comply with, and be bound by all obligations expressed on its part under this Loan Agreement including the powers to borrow under this Loan Agreement and that it has taken all necessary actions to authorize the borrowings under this Loan Agreement and to authorize the execution, delivery and performance of this Loan Agreement.

**17.3. Non-Conflict**

The execution, delivery and performance of this Loan Agreement will not violate any provisions of any existing law or regulation or statute applicable to it or of any mortgage, contract or other undertaking to which it is a party or which is binding upon its assets.

**17.4. Project Cost:**

The project cost is approximately USD258.5 Million (Two Hundred and Fifty Eight Million Five Hundred Thousand Dollars).

**17.5. Borrowing Limits**

Borrowings under this Loan Agreement up to and including the maximum amount available under this Loan Agreement will not, when borrowed, cause any limit on borrowings (whether imposed by statute, regulations, agreement or otherwise), or on the powers of its board of directors, applicable to it to be exceeded.

**17.6. Accounts**

The most recent audited profit and loss account and balance sheet of the Borrower which have been or are to be delivered to the Lender together with the notes thereto give a true and fair view of the results of the operations of the Borrower for the period to which they relate and, as the case may be, the financial position of the Borrower as at the date to which they relate and have been prepared in accordance with generally accepted accounting principles in Nigeria consistently applied.

**17.7. Event of Default**

No Event of Default has occurred and is continuing.

**17.8. Proceedings pending or threatened**

No litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been started or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

(a) may restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

(b) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

**17.9. Insolvency**

No corporate action, legal proceeding or other procedure or step or creditors' process, has been taken against the Borrower.

### 17.10. Corruption

Neither the Borrower nor any of its Affiliates, and their respective officers, directors or authorised employees, agents or representatives has:

(a)  paid, promised to pay or offered to pay, or authorised the payment of, any commission, bribe, pay-off or kickback related to the OML 120 and 121 that violates or may violate any applicable law or regulation or entered into any agreement pursuant to which any such commission, bribe, pay-off or kickback may or will at any time be paid; or

(b)  offered or given any object or other thing of value to influence the action of a public official, or threatened injury to person, property or reputation, in connection with the OML 120 and 121.

### 17.11. Taxation

(a)  It has duly and punctually paid and discharged all Taxes imposed upon it or its assets within the time period allowed without incurring interest or penalties (save to the extent that the Lender is satisfied that (i) payment is being contested in good faith, (ii) it has maintained adequate reserves for the payment of such Taxes and (iii) payment can be lawfully withheld).

(b)  It is not materially overdue in the filing of any Tax returns.

(c)  No claims are being or are reasonably likely to be asserted against it with respect to Taxes other than any initial statement of Taxes due, provided by a tax authority.

### 17.12. Immunity

(a)  The execution by the Borrower of this Agreement, and the exercise by it of its rights and performance of its obligations under same will constitute, private and commercial acts performed for private and commercial purposes.

(b)  The Borrower will not be entitled to claim immunity (in relation to itself or any of its assets or property) from set-off, suit, execution, attachment or other legal process in any proceedings in relation to this Agreement or any ancillary Agreements.

## 18.  COVENANTS AND UNDERTAKINGS

### 18.1.  Duration

The undertakings in this Clause 18 will remain in force from the date of this Loan Agreement and for so long as any amount is or may be outstanding under this Loan Agreement.

### 18.2.  Financial Information

The Borrower shall deliver to the Lender copies of its audited accounts for each financial year as soon as the same are publicly available (and in any event within 120 days of the end of each of its financial year).

### 18.3.  Notification of Default

The Borrower shall notify the Lender of any Event of Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of it.

### 18.4.  Priority of Interest

The Borrower shall procure that its obligations under this Loan Agreement do and will rank in priority with all its other present and future unsecured and unsubordinated obligations (subject to the preference of certain obligations in liquidation, bankruptcy or other analogous proceedings in respect of it by operation of applicable law).

**18.5.   Change of Business/corporate structure**

The Borrower shall not change the nature of the business being carried on by it, and Shareholders as at the date of this Loan Agreement. Any change in the current board of directors shall not be effective unless the Lender is notified and the Lender's written consent obtained.

**18.6.   Production and Lifting Schedule**

The Borrower hereby undertake that on the first working day of every month, it shall provide the Lender with the certified copy of both the Daily Production Schedule as well as the Product Lifting Schedule showing the quantity of products produced and lifted respectively from OML 120 and 121.

**19.    EVENTS OF DEFAULT**

Upon the happening of any of the following events, the Lender may by notice in writing to the Borrower so long as such event is continuing declare such event to constitute an Event of Default and the amount of the Facility then outstanding and the interest accrued thereon and any other moneys payable hereunder to be immediately due and payable and its obligation to provide moneys under this Loan Agreement to be terminated:

i.      If the Borrower does not pay any moneys payable hereunder when due and such moneys remains unpaid for 30 (thirty) days after becoming due;

ii.     If any order is made or effective resolution is passed or a successful petition is presented for winding up of the Borrower or if the Borrower goes into liquidation or dissolution; or

iii.    If the Borrower suspends any of its debts or ceases or threatens to cease to carry on its business or substantially the whole of its business; or

iv.     If any encumbrancer takes possession or a receiver is appointed for any part of the assets of the Borrower and the interest of such encumbrancer or the appointment of the receiver is not terminated or rescinded within 21 (twenty one) days; or

v.      If any distress, execution, sequestration or other process is levied or enforced upon or issued out against the properties or assets/shares of the Borrower and is not discharged within 21 (twenty one) days; or

vi.     If the Borrower is unable to pay its debt within the meaning of section 409 of the Companies and Allied Matters Act 2004 or any statutory modifications or re-enactment thereof; or

vii.    If the Borrower commits any breach of any material part of this Loan Agreement and in the case of any breach capable of remedy fails to remedy the breach within thirty (30) days of being required in writing by the Lender to do so; or

viii.   If any representation or warranty made by the Borrower in this Loan Agreement or any notice, certificate or statement delivered or made hereunder proves to have been incorrect or materially inaccurate when made or delivered.

Notwithstanding any event provided above, the Lender may allow the Borrower a 'fifteen (15) days Cure Period' to remedy any event of default failing which the Lender may commence the process of realizing the security.

20.   **CHANGE IN CIRCUMSTANCE**

20.1.   If any change in the law or administrative regulations applicable to this Loan Agreement or any interpretation by the courts of law makes it unlawful or illegal for the Borrower to perform its obligations hereunder then the Borrower shall repay to the Lender any sums outstanding under the Facility together with all accrued but unpaid interest and commissions.

20.2.   If any change in applicable law or administrative regulations or in the interpretation thereof by any authority charged with the administration thereof makes it unlawful for the Lender to perform its obligations hereunder then and in any such situation:

20.2.1.   The Lender shall notify the Borrower accordingly;

20.2.2.   The Lender shall be discharged from all obligations towards the Borrower hereunder and its commitment reduced to zero; and

20.2.3.   The Borrower shall on demand repay to the Lender the Loan within 90 (ninety) days thereafter.

20.3.   The Lender undertakes that during the tenor, duration, pendency or life of this Loan Agreement it shall continue to uphold, adhere to and comply with all laws and Governmental rules and regulations applicable to it, its operations, business and status and in particular the rules, regulations and directives of the Federal Ministry of Finance, Central Bank of Nigeria and other monetary and fiscal authorities and shall not commit, do, condone, allow, facilitate or accommodate anything, action, breach or omission that will put or place the Lender in a position that it is unable to meet or continue to meet its obligations hereunder or comply with the terms of this Loan Agreement.

21.   **RECONSTRUCTION AND AMALGAMATION**

This Loan Agreement shall not be affected by any amalgamation that may be effected by the Lender, its successors-in-title or assigns with any other company or persons whether the new company thus formed shall or shall not differ in its name, objects, character and constitution, it being the intent that this Loan Agreement shall remain valid and effectual in all respects in favour of and with reference to any such new company when formed and may be proceeded on or enforced in the same manner to all intents and purposes as if such new company had been named in and referred to herein instead of the Lender.

22.   **INDULGENCE**

The Lender may without prejudice to its rights herein enter into any agreement for giving time or other accommodation to the Borrower for the Facility or other monies hereby covenanted to be paid or any part thereof and may release or compound same with the Borrower or any person, company or corporation liable to pay the same.

23.   **REMEDIES AND WAIVER**

No failure to exercise and no delay in exercising on the part of the Lender rights, powers or privileges hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

24.   **DEFAULT INDEMNITY**

If the Borrower fails to pay hereunder any sum due (of principal or interest) or to become due hereunder, the Borrower shall pay interest at the rate aforesaid on the unpaid sum from the date when such payment fell due up to the date of payment, PROVIDED that interest shall at all times be calculated and payable as simple interest and on a reducing balance basis in conformity with monetary directives issued by the Central Bank of Nigeria.

25.   **ASSIGNMENT**

The Lender and the Borrower shall be entitled, with the prior consent of the other in writing to assign any of their rights and powers under this Loan Agreement, with all or any of the obligations herein stated and may assign and/or deliver to any such assignee, the security collateral hereto and in the event of such assignment, the assignee thereof of such right and powers and of such security, if any security be assigned and/or delivered shall have the same rights and remedies as if originally named herein in place of the Lender or the Borrower as the case may be, and thereafter the assignor will be fully discharged from all responsibilities with respect to any obligations so assigned and/or security delivered.

26.   **NOTICE**

Any notice or demand required hereunder shall be deemed to have been sufficiently given if in writing and delivered by hand or courier at the addressee's address as hereinbefore stated or at each party's last known address.

27.   **ACCOUNTS**

The Lender shall open in its books such accounts as may be required by the Lender to show satisfactory evidence of the transactions contemplated by this Loan Agreement.

28.   **LEGAL COSTS, CHARGES AND EXPENSES**

The Borrower shall be responsible for the stamp duty payable in respect of this Loan Agreement and the costs in connection with the preparation, negotiation and execution of this Loan Agreement.

29.   **DISPUTE RESOLUTION**

29.1.   **Initial Mediation of Dispute**

In the event of a dispute between the parties to this Loan Agreement, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.      A meeting shall be held within 7 (seven) days at which all parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.     If within 14 (fourteen) days following the Initial Meeting, the parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the parties. Each party shall bear its proportionate share of the costs of the mediator's fees.

The parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii.     If after a period of 30 (thirty) days following the commencement of Mediation the parties are unable to resolve the dispute either party may submit the dispute to binding arbitration in accordance with clause 29.2 hereof upon 10 (ten) days prior written notice to the other party.

### 29.2.  Binding Arbitration

i.      Either party may submit any dispute arising out of this Loan Agreement that is not resolved following the processes in clauses 29.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii.     The referral of the dispute to Arbitration precludes any other course of action by the other party except upon the mutual agreement and consent of both parties.

iii.    The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Lender and the Borrower respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

iv.     Each party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Lender and the Borrower respectively.

v.      The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

### 30.   FORCE MAJEURE

Any delay in or failure of performance of this Loan Agreement by either party hereto shall not constitute default by such party or give rise to any claim for damages against it if such delay or failure of performance is caused by force majeure including but not limited to acts of God, acts of war or revolution, civil commotion, strikes, lock out, any labour unrest, governmental action, fire, flood, earthquake, destructive lightning, epidemic or other circumstances which are beyond the reasonable control of the party affected and which they could not have reasonably foreseen and guarded against and which by exercise of reasonable care and diligence they are unable to prevent.

### 31.   ACKNOWLEDGMENT

Any admission or acknowledgment in writing by the Borrower or by any authorized person on behalf of the Borrower of the amount of indebtedness of the Borrower to the Lender or any statement of account furnished by the Lender as the case may be as a true copy extracted from the books of the Lender shall be accepted as prima facie evidence against the Borrower.

32. **EXECUTION OF LOAN AGREEMENT**

This Loan Agreement may be executed in any number of counterparts and such counterparts signed by all the parties hereto shall be deemed to constitute one and the same instrument and the Loan Agreement shall become effective when each of the parties hereto shall have signed a copy thereof (whether the same or different copies) and shall have delivered the same to the Lender.

33. **SEVERABILITY OF PROVISIONS**

Any provisions in this Loan Agreement which is prohibited or unenforceable under Nigerian Law shall be ineffective to the extent only of such prohibition or unenforceability without invalidating the remaining provisions hereof.

34. **APPLICABLE LAW**

The Loan Agreement shall be governed by and construed in accordance with the Laws of the Federal Republic of Nigeria.

35. **AGREEMENT**

This Loan Agreement supersedes any prior agreements, promises, negotiations or representations either oral or written relating to the subject matter of this Loan Agreement and, except as provided for herein, may not be amended or modified.

36. **AMENDMENT**

This Loan Agreement may not be amended or modified save by a document signed and sealed by and on behalf of the parties hereto.

37. **COMMENCEMENT DATE**

Notwithstanding any other date herein provided, furnished or appearing herein the commencement date of this Loan Agreement is the execution Date as herein provided.

38. **ENTIRE AGREEMENT**

This Loan Agreement shall be read in conjunction with the offer letter for the facility by the Lender dated July 21, 2014.   In case of any conflict with the terms of the offer letter for the facility by the Lender dated July 21, 2014, the terms of the offer letter shall prevail.

## SCHEDULE 1
## FORM OF REQUEST

TO:          Zenith Bank Plc

FROM:        Camac Petroleum Limited


DATE: …………………………..

**Zenith Bank Plc**
**Term Loan Facility Agreement dated  ……………., 201…..**
    **("The Loan Agreement")**

We wish to utilize the Term Loan Facility and request a Drawing to be advanced to us as follows:

a.      Amount of Drawdown:          …………………………

b.      Date:                         …………………………

c.      Payment instructions:        …………………………


By:-
**Camac Petroleum Limited**



……………………………..          ……………………………..
Authorised "A" Signatory          Authorised "A" Signatory

**IN WITNESS WHEREOF** the Lender and the Borrower have executed these presents in the manner hereinafter appearing the day and year first above written.

THE COMMON SEAL of the within-named "LENDER"
**ZENITH BANK PLC**
Hereunto affixed in the presence of:

.............................
**DIRECTOR**

**SECRETARY**

THE COMMON SEAL of the within-named "BORROWER"
**CAMAC PETROLEUM LIMITED**
Hereunto affixed in the presence of:

.............................
**DIRECTOR**

.............................
**SECRETARY**
**BANWO & IGHODALO**
BARRISTERS & SOLICITORS
98, Awolowo Road S. W.
Ikoyi, Lagos.

# ORIGINAL

DATED THIS ......25th...... DAY OF ......NOV............ 2014

CAMAC PETROLEUM LIMITED
AS BORROWER

AND

ZENITH BANK PLC
AS LENDER

ALL ASSET DEBENTURE
OVER FIXED AND FLOATING ASSETS, PRESENT AND
FUTURE CHARGEABLE ASSETS OF CAMAC
PETROLEUM LIMITED

THIS ALL ASSETS DEBENTURE (Debenture) is made this 25 day of NOV, 2014 BETWEEN CAMAC PETROLEUM LIMITED a company incorporated in Nigeria and having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos State (hereinafter called the Borrower" which expression shall where the context so admits include its successors in title and assigns) of the one part;

AND

DULY STAMPED

ZENITH BANK PLC a bank duly registered and licensed under the laws of the Federal republic of Nigeria and having its registered office at Plot 84, Ajose Adeogun Street, Victoria Island, Lagos State (hereinafter called "the Lender" which expression shall where the context so admits include its successors-in-title and assigns) of the other part.

**WHEREAS**

A. The Borrower has applied to the Lender for a **Term Loan Facility** in the sum of **N1,600,000,000.00 (One Billion, Six Hundred Million Naira)** only hereinafter referred to as the Facility for the purposes of part financing further expansion and development of the Oil Blocks OML 120 and 121. The holder of the Oil Block OML is Allied Energy Plc.

B. The Lender has agreed to grant the Facility to the Borrower on the terms and conditions set out in the Term Loan Facility Agreement dated

C. The Borrower as beneficial owner of its fixed, floating, present and future Chargeable Assets intends to create an All Assets Debenture over the fixed, floating, present and future Chargeable Assets in favour of the Lender to secure the Borrower's obligations under the Term Loan Facility Agreement dated

D. The execution and delivery of this All Asset Debenture Agreement (Debenture) in addition to execution and delivery of other security documents in favour of the Lender as security for the Secured Obligations is a condition precedent to the Lender making the Facility available to the Borrower.

E. The Lender and the Borrower have agreed that the Facility and interest thereon and all sums which shall from time to time be outstanding and payable by the Borrower to the Lender shall be secured by way of a charge on all the Borrower's undertakings and assets, (including the assets listed in schedule 1 of the Debenture) which interest would rank prior to any other obligation.

**NOW THIS DEED WITNESSETH as follows:**

1. **DEFINITIONS AND INTERPRETATION**

1.1. **DEFINITIONS**

    i.    **"Business Day"** means a day on which banks in Nigeria are open for normal banking business excluding Saturdays and Sundays and any public holiday declared by the Federal Government of Nigeria.

    ii.    **"Charged Assets"** means all assets and undertakings of the Borrower including the fixed and floating, present and future chargeable assets of the Borrower both movable and immovable, including tangible and intangible assets;

**CHECKED**

Date
Commissioner of Stamp Duties, Ikeja

iii.   **"Collateral Rights"** means all rights, powers and remedies conferred on the Lender by or pursuant to this Debenture or by applicable laws;

iv.   **"Term Loan Facility"** means the facility (to be) granted by the Lender to the Borrower in accordance with the Term Loan Facility Agreement between Camac Petroleum Limited and Zenith Bank Plc dated

v.   **"Facility Agreement"** means the Term Loan Facility Agreement dated 2014 between Camac Petroleum Ltd as Borrower, Zenith Bank Plc as Lender (as amended, varied, novated or supplemented from time to time);

vi.   **"Facility"** has the same meaning ascribed to it in the Term Loan Facility Agreement and Facility will be so construed;

vii.   **"Month"** means a calendar month.

viii.   **"Parties"** means the parties to this Debenture and "Party" means one of them;

ix.   **"Receiver"** means a receiver or a receiver and manager appointed by the Bank pursuant to the provisions of this Debenture;

x.   **"Related Rights"** means, in relation to any asset (a) the proceeds of sale of that asset  or any part thereof; (b) all present and future rights under any licence, agreement for sale or agreement of lease in respect of that asset; (c) all present and future rights, powers, benefits, claims, contracts, warranties, remedies, security, guarantees, indemnities or covenants for title in respect of that asset; and (d) all present and future interest and other moneys and proceeds paid or payable under or in respect of that asset or its use;

xi.   **"Security"** means the security constituted by or pursuant to this Debenture;

xii.   **"Security Interest"** means any mortgage, charge, assignment, guarantee, hypothecation, security interest, title retention, lien including banker's lien, preferential right, trust arrangement, right of set-off, counterclaim, privilege or priority of any kind having the effect of security or any preference of one creditor over another arising by operation of law;

xiii.   **"Security Period"** means the period beginning on the date of this Debenture and ending on the date on which the Borrower has fully discharged its obligations under the Facility Agreement; and

xiv.   **"USD"** and **"$"** means the lawful currency of the United States of America.

**1.2.   Interpretation**

a.   **Construction:**

Unless a contrary indication appears, any reference in this All Asset Debenture to:

i.   "assets" includes present and future properties, revenues and rights of every description;

ii. a "disposal" includes any transfer, grant, lease, assignment, sale, participation or other transfer of economic ownership, compulsory acquisition, compulsory sale or other disposal or agreement for the disposal of, or the grant or creation of any interest derived from, any asset;

iii. a "Finance Document", shall mean Term Loan Facility Agreement dated or any other agreement or instrument that is referenced to in the Term Loan Facility Agreement as amended, novated, supplemented, extended, replaced or restated;

iv. the "Agent", the "Arranger", the "Account Bank", any "Counterparty", the "Lender", any "Lender", any "Finance Party" or any "Party" shall be construed so as to include its successors in title, permitted assigns and permitted transferees and, in the case of the Lender, any person for the time being appointed as Lender or Lender in accordance with this Debenture;

v. "indebtedness" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

vi. "person" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

vii. a "regulation" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

viii. a provision of law is a reference to that provision as amended or re-enacted;

ix. Event of Default is as stated in the Term Loan Agreement dated....

x. A default (other than an Event of Default) is "continuing" if it has not been remedied or waived and an Event of Default is "continuing" if it has not been waived; and

xi. a time of day is a reference to London time, Lagos time or New York Time (as specified).

b. Section, Clause and Schedule headings are for ease of reference only and do not affect the interpretation of this Debenture.

c. Unless a contrary indication appears, a term used in this Debenture or in any notice given under or in connection with this Debenture has the same meaning in the Debenture.

d. A reference to a Clause or Schedule is a reference to that clause or schedule in this Debenture.

e. References to this Debenture or any specified provision of this Debenture or any other document shall be construed as references to this All Assets Debenture, that provision or that other document as in force for the time being and as amended in accordance with the terms thereof, as the case may be, with the agreement of the relevant Parties.

f. Words importing the plural shall include the singular and vice versa.

4

g. References to any statutory provision means that statutory provision as amended, supplemented, re-enacted or replaced from time to time (whether before or after the date of this Debenture) and are to include any orders, regulations, instruments or other subordinate legislation made under the relevant statutory provision.

h. A reference in this Debenture to a mortgage of any real property includes all buildings and fixtures on that property and all Related Right.

i. The fact that no details of any specific property or agreement are included in the relevant Schedules does not affect the validity or enforceability of any security created by or pursuant to this Debenture

j. Words and phrases defined in the Companies and Allied Maters Act Cap C20 Laws of the Federal Republic of Nigeria LFN 2004 shall subject to the foregoing have the same meanings respectively in this Debenture.

k. The headings of the various clauses are inserted for convenience only and shall not affect the construction of the clauses of this Debenture.

### 1.3. Effectiveness of this Debenture

a. Notwithstanding any other provision of this Debenture or the Term Loan Facility Agreement dated                 or any other Finance Document, this Debenture shall only be effective on and from the date it is signed by the Parties.

b. **Entire Agreement**

In the interpretation of the provisions of this Debenture, this Debenture shall be read in conjunction with the provisions of the Term Loan Facility Agreement dated…., entered between the Borrower and Lender in respect of the loan Facility and executed.

c. **Effect as a Deed**

This Debenture is intended to take effect as a deed notwithstanding that any Party may have executed it under hand only.

## 2. REPRESENTATIONS AND WARRANTIES

2.1. The Borrower represents and warrants to the Lender that:

a. **Ownership of the Chargeable Assets:** It is absolutely, solely and beneficially entitled to all the Chargeable Assets as from the date it or any part of it falls to be charged under this Debenture and the rights of the Borrower in respect of the Chargeable Assets are free from any encumbrance or security interest of any kind other than the Security being created hereunder.

b. **Power:** It has the power to execute, deliver and perform its obligations under this Debenture and all necessary corporate, shareholder and other action has been taken by it to authorise the execution, delivery and performance of this Debenture.

c. **Consents Obtained:** Every material consent, permit, authorisation, licence or approval of, registration with or declaration to, governmental or public bodies or authorities or courts required by it to authorise, or required by it in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of this Debenture or the performance by it of its obligations under this Debenture has been obtained or made and is in full force and effect and there has been no default in the observance of any material conditions or restrictions (if any) imposed on, or in connection with, any of the same and none of them is subject to any legal challenge or revocation or similar proceeding.

d.   **Binding Obligations:** This Debenture constitutes its valid and legally binding obligations, enforceable against the Borrower in accordance with its terms.

e.   **No Disposal:** Other than as permitted by the Facility Agreement the Borrower has not sold or agreed to sell or otherwise disposed of or agreed to dispose of the benefit of all or any of the Borrower's right, title and interest in and to the Charged Assets.

2.2.  The representations made by the Borrower on the date of this Debenture shall be deemed to be repeated by the Borrower by reference to the facts and circumstances then subsisting on the first day of each Interest Payment Date throughout the Security Period.

3.   Upon the Lender's declaring an Event of Default pursuant to clause 19 of the Term Loan Agreement, the Borrower will on written demand from the Lender pay and discharge all moneys and liabilities due and owing to the Lender by the Borrower under the Term Loan Agreement and any Ancillary Documents (as defined in the Term Loan Agreement)

4.   The Borrower as BENEFICIAL OWNER hereby charges in favour of the Lender for the consideration aforesaid all its assets with the payment and discharge of ALL moneys for the time being owing under this Security (including any expenses or charges arising out of or in connection with the acts authorised by this Debenture, ALL its undertaking goodwill and moveable properties for the time being both present and future wherever situate including its uncalled capital stock, raw materials, works in progress, finished works, materials stock equipment by whatever name and book debts hereinafter called ("the assets") and such charge shall be a first fixed charge or debenture on the assets and further charges to the Lender by way of Floating Debenture over all its future fixed and floating assets.

5.   The Borrower shall not create any further debenture or charges upon and so that no lien shall in any case or in any manner arise on or affect any part of the said assets without the prior written consent of the Lender. PROVIDED that any further debentures, mortgages or charges created by the Borrower with the consent of the Lender over the said assets (otherwise than in favour of the Lender) shall be expressed to be subject to this Debenture.

6.   Regarding any present or future uncalled capital and unissued shares of the Borrower, the Borrower hereby covenants and agrees with the Lender that:

(a)  The said uncalled capital and unissued shares of the Borrower shall not during the continuance of this security be issued or called up or received in advance of calls without the consent in writing of the Lender first sought and obtained.

(b)  The amount to be paid in respect of the said uncalled capital shall be paid to the Lender, which may at any time apply a competent part thereof in or towards satisfaction of the moneys intended to be secured.

(c)  At all times during the continuance of this Security the Borrower will permit the Lender or any persons authorized by the Lender to have access to and inspect free of all charges the share register and transfer books of the Borrower and all transfers of the Borrower's shares.

(d) During the continuance of this Security the Borrower shall immediately after the presentation of any transfer of unpaid or partly paid shares in the capital of the Borrower give to the Lender notice in writing containing full particulars of such proposed transfer and shall not register any transfer of any such shares in the said capital until at least fourteen days after such notice as aforesaid shall have been given to the Lender and shall not register such transfer at all if within the said period of fourteen days the Lender shall object to the proposed transferee; and

6

(e) If the amount due and owing on this Debenture shall not be paid as and when it becomes payable the Borrower will at the request of the Lender call up or procure to be called up the uncalled capital hereby charged by such installment and payable at such time (not being contrary to the regulations of the Borrower) as the Lender shall in writing direct.

(f) The Borrower shall have no authority to sell or in any way transfer any of the present fixed and floating assets charged by this Debenture.

7.   All moneys and liabilities intended to be hereby secured or other balance thereof for the time being remaining unpaid shall immediately become payable notwithstanding anything to the contrary herein contained:

(a)   If the Lender shall demand payment in writing from the Borrower and leave notice of such demand at the Borrower's registered post and seven days have elapsed after such notice without payment;

(b)   If the Borrower fails to pay the rent payable in respect of any leasehold premises for the time being held by the Borrower or fails to perform and observe the covenants and conditions contained in or implied by the Grant(s) Assignment of lease(s) under which any immoveable property is held;

(c)   If an order be made or an effective resolution be passed for the winding-up of the Borrower;

(d)   If a distress or execution be levied or enforced upon or against any of the property of the Borrower and be not paid within seven days;

(e)   If the Borrower shall stop payment or shall cease or threaten to cease to carry on its business; and

(f)   If the Borrower shall commit any breach of the covenants and conditions herein contained, or in the Facility Agreement and any other undertaking by the Borrower or on its behalf to be performed and observed.

8.   At any time after the moneys and liabilities intended to be hereby secured shall have become payable under the provisions of this Debenture, the Lender may appoint by writing under the hands of its duly appointed Attorney or under the seal of the Lender any person whether an officer of the Lender or not to be a Receiver and/or Manager of the assets or any part thereof and may in like manner from time to time remove any Receiver and/or Manager so appointed and appoint another in his stead. The Receiver and/or Manager so appointed shall in addition to and without prejudice to the powers conferred upon him by law have power:

(a)   To take immediate possession of the property hereby secured or any part thereof and for that purpose to take or defend proceedings in the name of the Borrower or otherwise.

(b)   To sell (by public auction or private treaty) lease or let or concur in selling leasing or letting all or any of the property hereby secured and to carry any such sale leasing or letting into effect in the name and on behalf of the Borrower or otherwise.

(c)   To demand and recover all the income and of the property hereby secured by action distress or otherwise to the full extent of the estate or interest which the Borrower could dispose of and to give effectual receipts accordingly for the same to exercise any powers which may have been delegated to it by the Lender pursuant to these presents.

(d)    To make and effect all repairs and insurances and do all other acts which the Borrower might do in the ordinary conduct of its business as well for the improvement and for the protection of the property hereby secured.

(e)    To make any arrangements or compromises which the Receiver and/or Manager shall think expedient in the interest of the Lender.

(f)    To appoint managers, officers, agents, accountants, advisers, stewards, workmen and others for the aforesaid purposes or any of them upon such terms as to remuneration or otherwise as he may think proper.

(g)    To give valid receipts for all moneys and execute all conveyances, assignments, deeds, assurances and things which may be proper or desirable for realizing such property and to do all such other acts and things as may be considered to be conducive to any of the matters or the powers aforesaid and which the Receiver and/or Manager lawfully can do as agent for the Borrower.

(h)    To use the name of the Borrower for all or any of the purposes aforesaid and in any legal proceedings.

(i)    To execute and deliver any deed or deeds or instrument and to convey, assign or otherwise assure the property over which he is appointed.

(j)    Receive property or any part thereof or any interest therein in the name or on behalf of the Borrower and by deed in the name and on behalf of the Borrower to grant, assign or demise the legal estate in any such property to the purchaser or lessee thereof.

(k)    To do all such other acts and things as may be considered by the Lender to be incidental or conducive to any of the matters or powers aforesaid and which he or they lawfully may or can do as agent or agents of the Borrower.

9.    A Receiver and/or Manager so appointed shall be the agent of the Borrower and the Borrower shall alone be liable for his acts and defaults and remuneration and he shall have authority and be entitled to exercise the powers hereinafter set forth and to do all such acts and things which a Receiver and/or Manager lawfully may or can do which may be necessary for or considered to be incidental or conducive to the carrying on of the business of the Borrower including the raising of money with the consent of the Lender on security of the said assets or without security and generally to take possession of, collect and get in all or any part of the assets and for that purpose to take proceedings in the name of the Borrower or otherwise as may seem expedient to sell any or any part of the assets and to make any compromise.

10.    All moneys received by any such Receiver and/or Manager shall after providing for all costs and expenses incurred in carrying on the business of the Borrower or the sale or disposal of the whole or any part of the said assets be applied:

FIRSTLY if the Receiver and/or Manager so desires but not otherwise in payment of rents, rates, taxes and outgoings affecting any immovable property of the Borrower and of premium on fire and other insurances thereon and on the said assets and the cost of executing necessary and proper repairs and replacements.

SECONDLY in payment of all costs, charges and expenses of and incidental to the appointment of the Receiver and/or Manager and the exercise by him or all or any of the powers aforesaid including the reasonable remuneration of the Receiver and/or Manager.

THIRDLY in or towards payment of all unpaid interest and all charges due under this Debentures

FOURTHLY in or towards payment of all principal moneys due in respect of this Debenture.

FIFTHLY any surplus shall be paid to the Borrower.

11.   In the event of default or breach of this Debenture, no purchaser or other person or Borrower dealing with the Lender or any Receiver and/or Manager appointed by it or with their attorneys or agents shall be concerned to enquire whether the powers exercised or purported to be exercised have become exercisable or whether any money remains due on the Security of this debenture or as to the necessity or expediency of the stipulations and conditions subject to which any sale shall have been made or otherwise as to the property or regularity of such sale calling in collection nor conversion or to the application of any money paid to the Lender or such Receiver and/or Manager and in absence of Mala fides on the part of such purchaser, mortgagor, mortgagee or other person or Borrower such dealing shall be deemed so far as regards the safety and protection of such purchaser person or Borrower to be within the powers hereby conferred and to be valid and effectual accordingly.

12.   The Borrower hereby covenants with the Lender:

(a) To keep proper accounts relating to the said business and to allow the Lender or its authorized representatives to inspect the same at all reasonable times and from time to time to furnish such information with respect to the assets and all other assets and liabilities of the Borrower as the Lender may require.

(b) When necessary to repair, renew or replace all movable plant machinery engines tools implements utensils and other effects of a like nature now used or hereafter to be used for the purpose of or in connection with the business of the Borrower when and as the same shall be in disrepair worn out or destroyed.

(c) To permit the Lender and such person as the Lender shall from time to time in writing for the purpose appoint to enter into and upon the premises of the Borrower to view the state and condition of the said assets.

(d) To insure and keep in the name of the Borrower with an insurance office approved by the Lender such of the said assets (or towards the discharge of the principal and other moneys hereby secured as the Lender may require AND if default shall be made in keeping the said assets in good state of repair and in perfect working order and condition and so insured as aforesaid or In depositing any such policy or delivering any such receipt aforesaid the Lender may repair the said assets or such of them as shall in their opinion require reparation and may insure and keep insured the said assets or any part thereof as they may deem fit AND the Borrower will on demand repay to the Lender every sum of money expended by the Lender for the above purpose or any of them with interest at the rate of the Facility from the time of same respectively having been expended and until such repayment the same shall be a first charge upon the said assets and to have every policy of insurance relating to the said assets endorsed with a memorandum of the interests of the Lender as debenture holder and with a provision that all moneys payable under any such policy shall be paid to the Lender, to be applied to the benefit of the Lender in the manner hereinbefore appearing; and Not to assign mortgage sublet or part with the possession of the property belonging to the Borrower now or in the future without the prior consent in writing of the Lender first had and obtained.

13.     The Borrower hereby further covenants to indemnify the Lender in the full Facility/amount thereof against all costs, charges and expenses (including the costs of maintaining or enforcing or endeavouring to enforce this Security) incurred hereunder by the Lender  and all other moneys property paid by the Lender in respect of the said costs, charges and expenses or otherwise and the same together with interest thereon as aforesaid shall be added to the moneys hereby secured.  PROVIDED that the charge hereby created shall be in addition and without prejudice to any and every other remedy lien or security which the Lender may or but for said charge would have for the moneys hereby secured or any part thereof.

14.     The Lender shall not by reason of its entering into possession of any of the said assets be liable to account as mortgagee in possession or for anything except actual receipts or be liable for any loss upon realization or for any default or omission for which a mortgagee in possession might be liable.

## 15.     EFFECTIVENESS OF SECURITY

### 15.1.   Continuing Security

The Security created by or pursuant to this Debenture shall remain in full force and effect as a continuing security for the Secured Obligations unless and until discharged by the Lender in the manner provided for in Clause 16.1 of this Debenture (*Redemption of Security*).

### 15.2.   Cumulative Rights

The Security and Collateral Rights created by or pursuant to this Debenture shall be cumulative, in addition to and independent of every other security, which the Lender may at any time hold for the Secured Obligations including any other rights, powers and remedies provided by law.  No prior security held by the Lender over the whole or any part of the Charged Assets shall merge into the Security constituted by this Debenture.

### 15.3.   No Prejudice

The Security and the Collateral Rights created by or pursuant to this Debenture shall not be prejudiced by any unenforceability or invalidity of any other agreement or document or by any time or indulgence granted to the Borrower or any other person, or the Lender or by any variation of the terms of the trust upon which the Lender holds the security or by any other thing which might otherwise prejudice that security or any Collateral Right.

### 15.4.   Remedies and Waivers

No failure on the part of the Lender to exercise, or any delay on its part in exercising, any Collateral Right shall operate as a waiver of that Collateral Right, nor shall any single or partial exercise of any Collateral Right preclude any further or other exercise of that or any other Collateral Right.

### 15.5.   No Liability

None of the Lender or its nominee(s) or any Receiver shall be liable by reason of:

15.5.1 taking any action permitted by this Debenture; or

15.5.2 any neglect or default in connection with the  Charged Assets or;

15.5.3 taking possession of or realizing all or any part of the Charged Assets

the Borrower agrees that it shall not assert or seek to assert against the Lender, its nominee(s) or any Receiver any claim it may have against them in respect of any act or omission of the Lender, its nominee(s) or any Receiver under this Debenture

## 15.6.  Partial Invalidity

If, at any time, any provision of this Debenture is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Debenture nor of such provision under the laws of any other jurisdiction shall in any way be affected or impaired thereby and, if any part of the security intended to be created by or pursuant to this Debenture is invalid, unenforceable or ineffective for any reason, that shall not affect or impair any other part of the Security.

## 15.7.  Immediate Recourse

The Borrower waives any right it may have of first requiring the Lender to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Borrower under this Debenture or enforcing the Security.

## 15.8.  Waiver of defences

The obligations of, and the Security created by, the Borrower under this Debenture will not be affected by any act, omission, matter or thing which, but for this Clause would reduce, release or prejudice its Secured Obligations under, or the Security created by or pursuant to this Debenture and whether or not known to the Borrower including but not limited to the following:

15.8.1. any time, waiver or consent granted to, or composition with, any person;

15.8.2. the release of any other third parties or any other person under the terms of any composition or arrangement with any creditor;

15.8.3 any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of, any Obligor or any other person;

15.8.4. any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Finance Document or any other document or security or of the Secured Obligations;

15.8.5. any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or Security or of the Secured Obligations; or

15.8.6. any insolvency or similar proceedings.

## 16.   RELEASE OF SECURITY

## 16.1.  Redemption of Security

At the termination of the Security Period, the Lender shall, at the request and cost of the Borrower, release and cancel the Security and procure the reassignment to the Borrower of the property and assets assigned to the Lender pursuant to this Debenture.

**16.2. Retention of Security**

The Lender may retain this Debenture, the Security and all documents of title, certificates and other documents relating to or evidencing ownership of all or any part of the Charged Assets until the Secured Obligations have been discharged in full and a deed of release filed with the Corporate Affairs Commission and other relevant government authority in respect of any Security constituted by virtue of this Debenture, which the Lender undertakes to file at the termination of the Security Period.

**17.    INDEMNITY**

The Borrower shall from time to time, on the demand of the Lender:

**17.1.**    reimburse the Lender, its nominee(s) and any Receiver on a full indemnity basis for all costs, expenses, losses and liabilities (including legal fees and the fees, costs and expenses of any advisers or consultants) incurred by the Lender in connection with the enforcement of, or the preservation of any rights under this Debenture;

**17.2.**    pay or reimburse the Lender, its nominee(s) and any Receiver for any Amounts or Claims paid or incurred by it in acting as Lender under or in connection with this Debenture or the Charged Assets including (i) any Agent/Delegate Liabilities; and (ii) Amounts or Claims incurred in the course of disputing or defending any Amounts or Claims made against the Lender or any Agent/Delegate Liabilities, save to the extent that such Amounts or Claims arise from or are caused by the Lender's, Agent/Delegate's fraud, gross negligence or wilful misconduct.  "Amounts or Claims" are losses, liabilities, costs, claims, actions, demands or expenses and "Agent/Delegate Liabilities" are Amounts or Claims which the Lender is or would be obliged to pay or reimburse to any of its agents or delegates appointed pursuant to this Debenture; and

**17.3.**    indemnify the Lender, its agents, managers, officers, employees, delegates, advisers and any Receiver for any expense, claim, liability, loss, cost, damage or expense incurred or arising in connection with the exercise or purported exercise of any rights, powers and discretions under this Debenture in the absence of fraud, gross negligence, wilful misconduct on their part.

**18.    ASSIGNMENT**

**18.1.**    The Lender may assign and transfer all or any of its rights and obligations under this Debenture in accordance with the Facility Agreement and for this purpose, the Lender shall subject to the Facility Agreement be entitled to disclose such information concerning the Borrower and this Debenture as the Lender considers appropriate to any actual or proposed successor or to any person to whom information may be required to be disclosed by any applicable law subject to the agreement of the third-party to be bound by the existing non-disclosure agreement between Borrower and Lender concerning non-public information.

**18.2.**    The Borrower shall not assign or delegate any of its rights or obligations under this Debenture without the prior written consent of the Lender.

**19.    NOTICES**

**19.1.    Communications in writing**

Any communication to be made under or in connection with the Debenture shall be made in writing and, unless otherwise stated, may be made by fax or letter.

## 19.2.  Addresses

**19.2.1.** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) for any communication or document to be made or delivered under or in connection herewith is:

**19.2.1.1.**  The contact details of the Borrower for this purpose are:

| | |
|---|---|
| Address: | Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos |
| Fax: | +2341 |
| Email: | |
| Attention: | |

**19.2.1.2.**  The contact details of the Lender for this purpose are:

| | |
|---|---|
| Address: | Zenith Bank Plc, Plot 84 Ajose Adeogun Street, Victoria Island, Lagos |
| Fax number: | +2341 |
| Email: | |
| Attention: | Company Secretary, Mr. Micheal Osilama Otu |
| Phone No: | +23412781971 |

## 19.3.  Delivery

**19.3.1.** Any communication or document made or delivered by one person to another under or in connection with this Debenture shall only be effective:

**19.3.1.1.**  if by way of fax, , at the time of transmission, if received before 1700 hours in the place of delivery on a Business Day, and otherwise on the next Business Day; or if by way of letter,5 (five) business days after being mailed by either registered or certified mail, return receipt requested with postage prepaid.

**19.3.2.** Any communication or document to be made or delivered to the Lender shall be effective only when actually received by the Lender and then only if it is expressly marked for the attention of the officer identified in Clause 19.2.1.2

## 19.4.  Notification of address and fax number

Each party shall promptly notify the other party of any change to its address and fax number pursuant to Clause 19.2 (*Addresses*).

## 19.5.  Electronic communication

**19.5.1.** Any communication to be made between the Borrower and the Lender under or in connection with this Debenture may be made by electronic mail or other electronic means, if the Borrower and the Lender:

**19.5.1.1.**  agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

**19.5.1.2.**  notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means;

**19.5.1.3.**  notify each other of any change to their address or any other such information supplied by them.

**19.5.2.** Any electronic communication made between the Borrower and the Lender shall be effective only when actually received in readable form and in the case of any electronic communication made by the Lender to the Borrower only if it is addressed in such a manner as the Agent or the Lender shall specify for this purpose.

13

### 19.6. English language

Any notice given under or in connection with this Debenture must be in English.

## 20.   PAYMENT FREE OF DEDUCTION

All payments to be made to the Lender, including its fees and costs, under this Debenture shall be made free and clear of and without deduction for any tax unless the Borrower is required to make such payment subject to the deduction or withholding of tax, in which case the sum payable by the Borrower, in respect of which such deduction or withholding is required to be made, shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the person on account of whose liability to tax such deduction or withholding has been made receives and retains (free from any liability in respect of such deduction or withholding) a net sum equal to the sum which it would have received and retained had such deduction or withholding not been made.

## 21.   DISCRETION AND DELEGATION

### 21.1   Discretion

Any liberty or power which may be exercised or any determination which may be made under this Debenture by the Lender or any Receiver may, subject to the terms and conditions of the Facility Agreement and this Debenture, be exercised or made in its absolute and unfettered discretion without any obligation to give reasons.

### 21.2   Delegation

Each of the Lender and Receiver shall have full power to delegate, either generally or specifically, the powers, authorities and discretions conferred on it by this Debenture on such terms and conditions as it shall see fit which delegation shall not preclude either the subsequent exercise, any subsequent delegation or any revocation of such power, authority or discretion by the Lender or the Receiver itself.

## 22.   GOVERNING LAW

This Debenture and all obligations arising out of or in connection with it shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria.

## 23.   FURTHER ASSURANCE

23.1.   The Borrower shall promptly, at its own cost, do any act, make any filing or registration or sign, seal, execute and deliver such mortgages, charges, transfers, assignments, securities, notices, deeds, instruments or other documents as in each case the Lender shall from time to time stipulate, and in such form as the Lender may require to:

23.1.1. perfect and protect the Security intended to be conferred on the Lender by this Debenture or the first priority ranking thereof or which are required for the exercise of the Collateral Rights;

23.1.2. maintain the Security Interests intended to be hereby created or the first priority ranking thereof;

23.1.3. create, perfect or protect any security Interest which it may, or may be required to, create in connection with this Debenture;

23.1.4. stamp (and up-stamp at the discretion of the Lender) this Debenture as and when demanded by the Lender; and

14

23.1.5. to facilitate the enforcement of the Security, the exercise of the Collateral Rights and the realization of the Charged Assets.

## 24.  DISPUTE RESOLUTION

### 24.1.  Initial Mediation of Dispute

In the event of a dispute between the Parties to this All Assets Debenture, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.     A meeting shall be held within 7 (seven) days at which all parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.     If within 14 (fourteen) days following the Initial Meeting, the parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the Parties.  Each Party shall bear its proportionate share of the costs of the mediator's fees.

     The Parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii.     If after a period of 30 (thirty) days following the commencement of Mediation the Parties are unable to resolve the dispute either Party may submit the dispute to binding arbitration in accordance with clause 24.2 hereof upon 10 (ten) days prior written notice to the other Party.

### 24.2.  Binding Arbitration

i.     Either party may submit any dispute arising out of this All Assets Debenture that is not resolved following the processes in clauses 24.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii.     The referral of the dispute to Arbitration precludes any other cause of action by the other Party except upon the mutual agreement and consent of both Parties.

iii.     The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Lender and the Borrower respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

     Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

iv.     Each Party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Lender and the Borrower respectively.

24.2.1. The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

## SCHEDULE

ALL THE FIXED AND FLOATING ASSETS OF THE COMPANY, INCLUDING ITS PRESENT AND FUTURE ACQUIRED ASSETS WHEREVER SITUATE INCLUDING ITS UNCALLED CAPITAL, STOCKS BUT PARTICULARLY THE ASSETS LOCATED AT CAMAC HOUSE, PLOT 1649, OLOSA STREET, VICTORIA ISLAND, LAGOS STATE.

IN WITNESS WHEREOF the parties hereto have caused their common seals to be affixed hereto the day and year first above written.

The Common Seal of the within-named
CAMAC PETROLEUM LIMITED
was affixed In presence of:

DIRECTOR                              DIRECTOR / SECRETARY

The Common Seal of the within-named
ZENITH BANK PLC was affixed
In presence of:

DIRECTOR

THE WITHIN INSTRUMENT IS IN THE
OPINION OF THE COMMISSIONER OF
STAMP DUTIES CHARGEABLE WITH
DUTY OF $\pm$.6,000,000
AND THE DUTY THEREON HAS BEEN
ASSESSED ACCORDINGLY

COMMISSIONER OF STAMP DUTIES IKEJA

SECRETARY

412
18/05/15

ORIGINAL

Allied Energy Plc

(Fomerly Allied Energy Resources (Nigeria) Limited)

(as Chargor)

and

Zenith Bank Plc

(as Chargee)

and

Camac Petroleum Limited

(as Company)

**DEED OF LEGAL CHARGE OVER INTEREST IN OML 120 AND 121**

THIS DEED OF LEGAL CHARGE IS MADE THE .......................................

BY

(1)     **Cavac Petroleum Limited**, a company incorporated under the laws of the Federal Republic
        of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos  (the
        "**Company**" or the "**Borrower**"); and

(2)     **Allied Energy Plc (formerly Allied Energy Resources (Nigeria Limited)**
        incorporated under the laws of the Federal Republic of Nigeria having its registered office at
        Plot 1649, Olosa Street, Victoria Island, Lagos  (the "**Chargor**"); and

(3)     **Zenith Bank Plc**, a banking Company incorporated and licensed under the Laws of the
        Federal Republic of Nigeria having its registered office at Plot 84, Ajose Adeogun Street,
        Victoria Island, Lagos State (the "**Chargee**").

Chargor, Chargee and Company are hereinafter sometime individually referred to as 'Party' or
collectively as' Parties'

**WHEREAS:**

i.      The Chargor is the awradee of Oil Mining Lease No. 120 and 121 (also known as OML 120
        and 121 or the "Charged Interest") by virtue of an Acreage Allocation (Discretionary Award)
        of OPL 210 issued by the Ministry of Petroleum Resources (Petroleum Resources
        Department) to the Chargor on the 3rd Day of June, 1992.

ii.     By virtue of the letter dated August 28, 2002 the Ministry of Petroleum Resources conveyed
        the approval of the President, Commander in Chief of the Federal Republic of Nigeria
        convert OPL 210 to two (2) OMLs i.e. 120 and 121.

iii.    The Company (a related company to the Chargor) has approached the Chargee for a facility
        in the sum of N3,940,000,000.00 (Three Billion, Nine Hundred and Forty Million Naira
        only) ("**the facility**") to finance the further expansion and development of the Oil Blocks in
        OML 120 and 121 and the Chargee has by its offer letter dated July 21, 2014 agreed to grant
        the facility to the Company, which offer was duly accepted by the Company, following which
        the Chargee and the Company entered into an agreement governing the facility dated on or
        around the date hereof (the "Facility Agreement").

iv.     part security for the repayment of the facility granted to the Company by the Chargee
        under paragraph (iii) above, the Chargor has agreed to charge in favour of the Chargee
        enitre interest in OML 120 and 121 arising from the Acreage Allocation (Discretionary
        Award) of OPL 210 issued to it by the Ministry of Petroleum Resources.

1. **Definitions**

   Words and expressions defined in the Term Loan Facility Agreement between Zenith Bank Plc (Lender) and Camac Petroleum Limited (Borrower) dated ................................ shall, unless the context otherwise requires, have the same meaning when used in this Deed of Legal Charge.

2. **CHARGE**

2.1.   The Chargor hereby irrevocably charges and agrees to charge in favour of the Chargee its entire interest in OML 120 and 121 for as long as any liabilities under the facility remain outstanding.

2.2.   The Chargor shall not create any charge over its interest in OML 120 and 121 or any part thereof so that no lien shall in any case or in any manner arise on or affect the Charged Interest without the prior written consent of the Chargee PROVIDED that any further charge created by the Chargor with the consent of the Chargee over the Charged Interest (otherwise than in favour of the Chargee) shall be expressed to be subject to this Charge.

2.3.   For the purposes of this Clause, the Chargor covenants and undertakes that an Account (in line with the Term Loan Facility Agrement) shall be maintained with the Chargee and that all other payments that shall be due and payable to it from the sale of crude proceeds from the Chargor's interest in OML 120 and 121 shall be domiciled to the Chargee.

3. **DOMICILATION**

   The Chargor hereby covenants to irrevocably domicile proceeds of sale of crude oil produced from OML 120 and OML 121 into its Account No. 5050005786 and/or the Borrower's Account No.5050009368 with the Chargee and has instructed accordingly.

4. **NEGATIVE PLEDGE**

4.1.   At all times during the continuance of this security the Chargor shall permit, upon request, the Chargee or any persons authorised by the Chargee, with three days prior notice to have access to and inspect free of all charges all documents, licenses, certificates and permits required by regulation to be maintained by the Chargor in respect of the Charged interest.

4.2.   The Chargor shall have no authority to sell or in any way transfer or create any other interest or security, in the whole or any part of its interest in OML 120 and 121 charged by this presents except with the consent of the Chargee.

**5.    CRYSTALLIZATION OF CHARGE**

The Charge constituted under this Deed of Legal Charge shall become enforceable:

5.1.    If any amounts due under the Facility Agreement remain unpaid within 5 days of the expiring of any applicable grace periods by the Company.

5.2.    If the Chargor shall fail to pay any levy, duty, impost, tax or any form of payment whatsoever due to any government authority (or any other entity) in respect of the Charged Interest or fails to perform and observe the covenants and conditions contained in or implied by OML 120 and 121;

5.3.    If an order be made or an effective resolution be passed for the winding-up of the Company;

5.4.    If a distress or execution be levied or enforced upon or against the Charged Interest and has not been paid within thirty (30) days;

5.5.    If the Company or the Chargor shall stop payment or shall cease or threaten to cease to carry on its business; and

5.6.    If the Company or the Chargor shall commit any breach of the covenants and conditions herein contained and on its behalf to be performed and observed except where the breach is rectified within a period of 14 (fourteen) days of formal notification of the breach on the defaulting party.

**6.    POWER OF RECEIVER**

6.1.    At any time after Charge constituted under this Deed of Legal Charge shall have become enforceable under the provisions of Clause 5 hereof the Chargee may appoint by writing under the hands of its duly appointed Attorney or under the seal of the Chargee any person whether an officer of the Chargee or not, to be a Receiver and/or Manager of the Chargor and may in like manner from time to time remove any Receiver and/or Manager so appointed and appoint another in his stead. The Receiver and/or Manager so appointed shall in addition to and without prejudice to the powers conferred upon him by law have power:

6.1.1.    To take immediate possession of the interest hereby charged (Charged Interest) and for that purpose to take or defend proceedings in the name of the Chargor or otherwise.

6.1.2.    To sell (by public auction or private treaty) lease or let or concur in selling or leasing the Charged Interest hereby charged and to carry any such sale or leasing into effect in the name and on behalf of the Chargor or otherwise.

6.1.3.  To demand and recover all the income of the Charged Interest hereby charged by action, distress or otherwise to the full extent of the Charged Interest which the Chargor could dispose of and to give effectual receipts accordingly for the same to exercise any powers which may have been delegated to it by the Chargee pursuant to these presents.

6.1.4.  To make any arrangements or compromises with respect to the Charged Interest which the Receiver and/or Manager shall think expedient in the interest of the Chargor.

6.1.5.  To appoint managers, officers, agents, accountants, advisers, stewards, workmen and others for the aforesaid purposes or any of them upon such terms as to remuneration or otherwise as he may think proper.

6.1.6.  To give valid receipts for all moneys and execute all conveyances, assignments, deeds, assurances and things which may be proper or desirable for realising the Charged Interest and to do all such other reasonable acts and things as may be considered to be conducive to any of the matters or the powers aforesaid and which the Receiver and/or Manager lawfully can do as agent for the Chargor.

6.1.7.  To use the name of the Chargor for all or any of the purposes aforesaid and in any legal proceedings.

6.1.8.  To execute and deliver any deed or deeds or instrument and to convey or assign the Charged Interest over which he is appointed Receiver or any interest therein in the name or on behalf of the Chargor and by deed in the name and on behalf of the Chargor to grant, assign or vest the legal title in the Charged Interest to the purchaser or lessee thereof.

6.1.9.  To do all such other acts and things as may be considered by the Chargee to be incidental or conducive to any of the matters or powers aforesaid and which he or they lawfully may or can do as agent or agents of the Chargor.

6.2.  A Receiver and/or Manager so appointed shall be the agent of the Chargor and the Chargor shall alone be liable for his acts and defaults and remuneration and he shall have authority and be entitled to exercise the powers hereinafter set forth and to do all such acts and things which a Receiver and/or Manager lawfully may or can do which may be necessary for or considered to be incidental or conducive to the carrying on of the business of the Chargor.

7.    APPLICATION OF MONEYS

7.1.    All moneys received by any such Receiver and/or Manager shall after providing for all costs and expenses incurred in carrying on the business of the company or the sale or disposal of the Charged Interest shall be applied:

FIRSTLY in payment of all cost, charges and expenses of and incidental to the appointment of the Receiver and/or Manager and the exercise by him of all or any of the powers aforesaid including the reasonable remuneration of the Receiver and/or Manager.

SECONDLY in or towards payment of all unpaid interest and all charges due under the facility.

THIRDLY in or towards payment of all principal moneys due in respect of this Deed of Legal Charge.

FOURTHLY any surplus shall be paid to the Chargor.

8.    COVENANTS

8.1.    The Chargor hereby covenants with the Chargee:

8.1.1.    It shall deliver to the Chargee the following (on the date hereof) in form and substance acceptable to the Chargee as security in accordance with the terms of this Charge:

a)    the original OML deed document for OML 120 and 121

8.1.2.    it shall not, except with the prior written consent of the Chargee:

i.    create or permit to exist over all or part of its interest therein any Security Interest (other than created or expressly permitted to be created under this Charge) whether ranking prior to, pari passu with or behind the security contained in this Charge;or

ii.    permit any person other than the Chargor or the Chargee or the Chargee's nominee or nominees to be registered as owners;

8.1.3.    it shall promptly forward to the Chargee all material documents relating to the Charged Interest which it may receive from time to time;

8.1.4.    until the Company has performed all of its obligations under the Facility Agreement and the loan have been paid in full, it shall not claim payment whether directly or by set-off, lien, counterclaim or otherwise of any amount which may be or has become due to the Chargor by the Company other than as contemplated and/or expressly permitted by the Facility Agreement or this Charge.

8.1.5.  To keep proper documentation relating to the Charged Interest and to allow the Chargee or its authorised representatives to inspect the same at all reasonable times and from time to time to furnish such information in respect of the Charged Interest which are interests accruing from the OML 120 and 121.

8.1.6.  Not to assign or charge the Charged Interest now or in the future without the prior consent in writing of the Chargor first had and obtained.

9.  The Chargor hereby further covenants to indemnify the Chargee in the full amount thereof against all costs, charges and expenses (including the costs of maintaining or enforcing or endeavouring to enforce this security) properly incurred hereunder by the Chargee and all other moneys properly incurred by the Chargee in respect of the said costs, charges and expenses or otherwise and the same together with interest thereon as aforesaid shall be for the account of the Chargor.  PROVIDED that the Charge hereby created shall be in addition and without prejudice to any and every other remedy, lien or security which the Chargee but for the said charge would have for the liabilities hereby secured or any part thereof.

10.  The Chargee shall not, by reason of its enforcing this security be liable to account as Chargee in possession in connection with the Charged Interest or be liable for any loss upon realisation or for any default or omission for which a Chargee in possession might be liable.

11.  **APPLICABLE LAW**

This Agreement shall be construed and governed in all respects in accordance with the Laws of the Federal Republic of Nigeria.

12.  **NOTICE TO THE MINISTER OF PETROLEUM.**

12.1. The Chargor shall do all such acts or things and sign, execute and produce all such documents as may now or in the future be required to obtain the consent of the Minister of Petroleum (and any other relevant authority) respectively to the Charge.

12.2. The Chargor shall furnish the Chargee with evidence of the application for consent, such as a letter duly acknowledged by the office the Ministry of Petroleum respectively.

13.  **Representations and Warranties by the Chargor**

The Chargor represents and warrants to the Chargee and undertakes that:

13.1.  the oil mining lease was granted to the Chargor by the President of the Federal Repbulic of Nigeria through the office of the Minister for Petroleum resources with respect to Oil fields OYO 7, 8, AND 9 for a period of twenty years commencing from February 27, 2001;

13.2.     no litigation against the Chargor or the Company is current or, pending or threatened.

13.3.     this Charge constitutes a legal, valid, binding and enforceable obligation and is a first priority security interest over the Charged interest effective in accordance with its terms;

13.4.     the execution, delivery, observance and performance by the Chargor of this Charge will not result in any violation of any law, statute, ordinance, rule or regulation applicable to it;

13.5.     as a registrable instrument the charge is expected to be registered at the Corporate Affairs Commission (CAC) within 90 days of creation of same pursuant to the provisions of Section 197 (2)(d) of the Companies and Allied Matters Act Cap C. 20 LFN 2004;

13.6.     it has obtained all the necessary authorisations and consents to enable it to enter into this Charge and the necessary authorisations and consents will remain in full force and effect at all times during the subsistence of the security constituted by this Charge;

13.6.1. the company irrevocably consents to the transfer of the Charged interest pursuant to the enforcement by the Chargee of any of its rights under this Charge;

## 14.   Power of Attorney

14.1. The Chargor hereby irrevocably and by way of security for the payment of the Secured Obligations and the performance of its obligations under this Charge appoints the Chargee as its true and lawful attorney (with full power to appoint substitute and to sub-delegate) on behalf of the Chargor and in the Chargor's own name or otherwise, at any time and from time to time, to sign, seal, deliver and complete all documents and do all acts and things which the Chargee may consider to be necessary or advisable to perfect or improve its security over the Charged interest. The Chargor hereby ratifies and confirms anything that any such attorney may lawfully execute or do in the interest of securing the facility under the Facility Agreement.

## 15.   Powers of the Chargee

### 15.1. Enforcement

The Chargee's rights of enforcement in relation to this Charge shall become immediately enforceable upon any reach by the Company of the terms of the Facility Agreement or default of any term of this Deed by the Chargor or reasonably suspesion of default) of any term of this agreement by the Chargor. The Chargee may in its discretion enforce all or any part of this Charge in any manner it thinks fit. For the avoidance of doubt, the Chargee's rights of enforcement shall include (without limitation) the right:

15.1.1. to perfect or improve its title to and security over the Charged interest in such manner as the Chargee may in its absolute discretion determine;

15.1.2. without notice to, or further consent or concurrence by, the Chargor to assign the Charged interest or any part thereof by such method, at such place and upon such terms as the Chargee may in its absolute discretion determine, with power to postpone any such assignment and in any such case the Chargee may exercise any and all rights attaching to the Charged interest;

15.1.3. to assume ownership of the Oil mining lease (OML 120 and 121) over the oil fields OYO 7, 8 and 9 and receive the proceeds of the production of crude oil on the oil fields.;

15.1.4. to exercise any and all other rights, powers and discretions of the Chargor in respect of the Charged interest in such manner as the Chargee may in its absolute discretion determine;

15.1.5. to procure that the Chargee is registered at the Ministry of petroleum resources as the holder of the oil mining lease OML 120 and 121 for the duration of the lease;

15.1.6. otherwise to enforce any of the rights of the Chargee under or in connection with this Charge in such manner as the Chargee may in its absolute discretion determine; and

## 16.   DISPUTE RESOLUTION

16.1.   **Initial Mediation of Dispute**

In the event of a dispute between the parties to this Deed of Legal Charge, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.   A meeting shall be held within 7 (seven) days at which all Parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.   If within 14 (fourteen) days following the Initial Meeting, the Parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the Parties. Each Party shall bear its proportionate share of the costs of the mediator's fees.

The Parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii. If after a period of 30 (thirty) days following the commencement of Mediation the Parties are unable to resolve the dispute either Party may submit the dispute to binding arbitration in accordance with clause 16.2 hereof upon 10 (ten) days prior written notice to the other Party.

### 16.2. Binding Arbitration

i. Either Party may submit any dispute arising out of this Deed of Legal Charge that is not resolved following the processes in clauses 16.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii. The referral of the dispute to Arbitration precludes any other cause of action by the other Party except upon the mutual agreement and consent of both Parties.

iii. The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Chargor and the Chargee respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

iv. Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

v. Each Party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Chargor, the Chargee and the Company respectively.

16.2.1. The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

## 17. SEVERABILITY

17.1. If due to a change in any applicable law or due to a decision or any other act by any competent authority, one or more terms or provisions of this Deed of Legal Charge can no longer be enforced or an amendment of one or more of the provisions of this Deed of Legal Charge is required, the Parties agree that they shall endeavour to find an alternative solution approaching as near as possible the contractual situation existing prior to such a change, decision or act.

17.2. If one or more provisions of this Deed of Legal Charge are determined to be invalid or not enforceable, the remaining provisions shall not be affected thereby, and the Deed of Legal Charge shall be administered as though the invalid or not enforceable provisions were not a part of the Deed of Legal Charge.

## 18. WAIVERS

No Party shall be deemed to have waived any right under this Deed of Legal Charge unless that waiver is in writing, refers to this Deed of Legal Charge and is executed by that Party. Failure or forbearance to insist on the strict performance or observance by a Party of a provision of this Deed of Legal Charge shall not be construed as a waiver by that Party of any right under this Agreement. Waiver of a right by a Party under this Deed of Legal Charge shall not preclude that Party in the future from enforcing any other right whether similar or dissimilar to the right that was waived or relinquished.

## 19. NOTICES

### 19.1.    Communications in writing

Any communication to be made under or in connection with this Deed of Legal Charge shall be made in writing and, unless otherwise stated, may be made by fax or letter.

### 19.2.    Addresses

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) for any communication or document to be made or delivered under or in connection herewith is:

The contact details of the Chargor for this purpose are:

Address:     Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos
Fax:         +2341
Email:
Attention:

The contact details of the Chargee for this purpose are:

Address:     Zenith Bank Plc, Plot 84/87, Ajose Adeogun Street, Victoria Island, Lagos
Fax number:  +2341
Email:
Attention:   Company Secretary, Mr. Michael Osilama Otu;

The contact details of the Company for this purpose are:

Address:     Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos
Fax:         +2341
Email:
Attention:

19.3.     **Delivery**

19.3.1. Any communication or document made or delivered by one person to another
under or in connection with this Deed of Legal Charge shall only be effective:

19.3.1.1.   if by way of fax, , at the time of transmission. if received before 1700 hours in
the place of delivery on a Business Day, and otherwise on the next Business Day;
or

19.3.1.2.   if by way of letter, 5 (five) business days after being mailed by either
registered or certified mail, return receipt requested with postage prepaid.

and, if a particular department or officer is specified as part of its address details provided
under Clause 19 (*Notices*), if addressed to that department or officer.

19.3.2. Any communication or document to be made or delivered to the Chargee shall be effective
only when actually received by the Chargee and then only if it is expressly marked for the
attention of the department or officer identified with the Chargee's signature below (or any
substitute department or officer as the Chargee shall specify for this purpose).

19.4.   **Notification of address and fax number**

Each party shall promptly notify the other party of any change to its address and fax number
pursuant to Clause 19.2 (*Addresses*).

19.5.   **Electronic communication**

19.5.1. Any communication to be made between the Chargor, the Chargee and the Company under
or in connection with this Deed of Legal Charge may be made by electronic mail or other
electronic means, if the Chargor, the Chargee, and the Company:

19.5.1.1.   agree that, unless and until notified to the contrary, this is to be an accepted
form of communication;

19.5.1.2.   notify each other in writing of their electronic mail address and/or any other
information required to enable the sending and receipt of information by that
means;

19.5.1.3.   notify each other of any change to their address or any other such information
supplied by them.

19.5.2. Any electronic communication made between the Chargor, the Chargee and the Company
shall be effective only when actually received in readable form and in the case of any
electronic communication made by the Chargor or the Company to the Chargee only if it is
addressed in such a manner as the Chargee shall specify for this purpose.

20.    **Miscellaneous**

20.1. The charge hereby created shall not be affected by any failure by the Chargee to take any other security.

20.2. The Chargee may at all times, without discharging or in any way affecting the security hereby created, determine or vary the Chargor's obligations; grant the Chargor any time or indulgence; deal with, exchange, release, modify or abstain from perfecting or enforcing any Shares or rights which it may now or hereafter have from or against the Chargor.

21.    **Law and Jurisdiction**

21.1.    This Charge is governed by, and shall be construed in accordance with, the laws of the Federal republic of Nigeria

In **WITNESS WHEREOF** this Deed of Legal Charge has been entered into the day and year first above written

**THE COMMON SEAL** of the within-named Borrower/Company

**Camac Petroleum Limited**

was hereunto affixed in the presence of

**DIRECTOR**                                **DIRECTOR/SECRETARY**

**THE COMMON SEAL** of the within-named Chargor

**Allied Energy Plc**

was hereunto affixed in the presence of

**DIRECTOR**                                **DIRECTOR/SECRETARY**

**THE COMMON SEAL** of the within-named Chargee

**Zenith Bank Plc**

was hereunto affixed in the presence of

**DIRECTOR**                                **SECRETARY**

THE WITHIN INSTRUMENT IS IN THE
OPINION OF THE COMMISSIONER OF
STAMP DUTIES CHARGEABLE WITH
DUTY OF ₦14,775,000
AND THE DUTY THEREON HAS BEEN
ASSESSED ACCORDINGLY 18/5/18
COMMISSIONER OF STAMP DUTIES

ORIGINAL

## DEED OF ASSIGNMENT OF RIGHTS

### BETWEEN

### CAMAC PETROLEUM LIMITED
#### (ASSIGNOR)

### AND

### ALLIED ENERGY PLC
#### (ASSIGNOR)

### AND

### CAMAC ENERGY INC.
#### (ASSIGNOR)

### AND

### ZENITH BANK PLC
#### (ASSIGNEE)

---

DEED OF ASSIGNMENT OF RIGHTS ACCRUING FROM ALL COMMERCIAL CONTRACTS
RELATING TO OML 120 AND 121 INCLUDING SALE AND PURCHASE AGREEMENTS,
OFFTAKE AGREEMENTS AND CRUDE HANDLING AGREEMENTS ENTERED INTO BY
CAMAC PETROLEUM LIMITED, ALLIED ENERGY PLC AND CAMAC ENERGY INC.

THIS DEED OF ASSIGNMENT OF RIGHTS MADE THIS ........ DAY OF .............. 201...

**BETWEEN**

**CAMAC PETROLEUM LIMITED** a limited liability company incorporated under the Laws of the Federal Republic of Nigeria, having its offices at Camac House, Plot 1649, Olosa street, Victoria Island, Lagos (hereinafter referred to as the "**First Assignor**" which expression shall where the context so admits include its successors in title and assigns) of the first Part.

**AND**

**ALLIED ENERGY PLC** a company incorporated under the Laws of the Federal Republic of Nigeria, having its offices at Plot 1649, Olosa street, Victoria Island, Lagos (hereinafter referred to as the "**Second Assignor**" which expression shall where the context so admits include its successors in title and assigns) of the Second Part.

**AND**

**CAMAC ENERGY INC.** a company incorporated under the Laws of Delaware, United States of America, having its registered address at 1330 Post Oak Boulevard, Houston, TX 77056, USA (hereinafter referred to as the "**Third Assignor**" which expression shall where the context so admits include its successors in title and assigns) of the Third Part.

**IN FAVOUR OF:**

**ZENITH BANK PLC** a banking company incorporated and licensed under the Laws of the Federal Republic of Nigeria whose registered office is at Zenith heights, Plot 84, Ajose Adeogun Sreet, Victoria Island, Lagos (hereinafter called the "**Assignee**" which expression shall where the context so admits include its successors in title and assigns)

Camac Petroleum Limited, Allied Energy Plc and Camac Energy Inc. (First, Second and Third Assignors) shall collectively be referred to as the Assignors.

**WHEREAS:**

i.  The Assignors have signed several commercial contracts including sale and purchase agreements, offtake agreements, crude handling agreements etc (collectively hereinafter called **"commercial contracts"**) with respect to the OML 120 and 121.

ii.  Pursuant to the Term Loan Facility Agreement between Zenith Bank Plc and Camac Petroleum Limited dated (                    ), the Assignee has agreed to provide a term loan facility to the First Assignor subject to the terms and conditions set out in the Term Loan Facility Agreement.

iii.  It is a condition precedent to the Term Loan Facility Agreement that the Assignors enter into this Deed of Assignment of all of their rights and interest in commercial contract including sale and purchase agreements, offtake agreements, crude handling agreements etc with respect to OML 120 and 121 provided that this security shall also secure any future facility that may be availed by the Assignee to the First Assignor or its Subsidiaries which facilities must be within the threshold of the value of this security.

**1. DEFINITIONS**

Words and expressions defined in the Term Loan Facility Agreement shall unless the context otherwise requires, have the same meaning when used in this Deed.

**2. ASSIGNMENT**

The Assignors (jointly and severally) hereby irrevocably assign absolutely to the Assignee all of its interests and rights to payment of any sum under the Commercial Contracts including sale and purchase agreements, offtake agreements, crude handling agreements etc solely as security and for the purposes of the repayment of the Term Loan Facility granted by the Assignee to the First Assignor by virtue of the Term Loan Facility Agreement dated (                    ), 2014. Provided always that once the obligations under the Term Loan Facility have been fully repaid, the assignment granted hereunder will abate and the Assignee's right of payment of any sum under the Commercial Contract shall immediately revert to the Assignors herein.

For the purposes of this Clause, the Assignors covenant and undertake that an Account shall be maintained with the Assignee (in line with the Term Loan Facility Agreement between Zenith Bank Plc and Camac Petroleum Limited dated (                )) and that all other payments that shall be due and payable to it under the Commercial Contracts shall be domiciled with the Assignee.

The assignors having assigned their rights in the commercial contracts to the assignee shall not assign those rights to a third party without obtaining the written consent of the assignee.

## 3. DOMICILATION

The Assignors hereby covenants to irrevocably domicile all proceeds of receivables from all commercial contracts with respect to OML 120 and 121 into its Account No.5050005786 and Account No. 5050009368 with the Assignee and has instructed the parties to the commercial contracts to do so.

## 4. LAW

This Agreement shall be construed and governed in all respects in accordance with the Laws of the Federal Republic of Nigeria.

## 5. NON RESTRICTION AND/OR LIMITATIONS

The Assignors (jointly and severally) hereby covenant that it does not have any restriction or limitation with respect to the assignment of its rights/interest in the commercial contracts and that where such restriction or limitation exist, it has obtained the requisite consent or waiver of the limitation provision from the other party.

The Assignors jointly and severally hereby indemnify the Assignee against any loss or injury or damage it may suffer as a consequence of breach by any of the Assignors of this provision or any other provision of this Deed.

## 6. REPRESENTATIONS & WARRANTIES

i.  The Assignors represent and warrant that the Person executing this Agreement on its behalf has been duly authorised to bind it. The Assignors further represent and warrant that it has the corporate capacity to execute this Agreement and perform its obligations hereunder, and is duly registered or incorporated, validly existing and in good standing.

ii.  The Assignors represent and warrant that the execution, delivery and performance of this Agreement will not conflict with or violate or constitute a breach or default under any agreement governing the organisation, management, business or affairs of the Party, including its by-laws, memorandum of association or articles of association, or any agreement or instrument to which it is a party, or, to its best knowledge any Applicable Law, administrative regulation or court order, judgment or decree applicable to it.

iii.  The Assignors represent and warrant that it is not subject to an order by a court within the applicable jurisdiction or subject to an effective resolution for the reorganisation under any Bankruptcy law, dissolution, liquidation, or winding up or has become insolvent or bankrupt, made an assignment for the benefit of creditors or appointed a receiver for a substantial part of its assets.

iv.  All covenants, warranties, representations, indemnities and other obligations of whatsoever kind given, made or undertaken by the Assignors shall continue in full force and effect notwithstanding any change in the composition of the Assignors.

## 7. ARBITRATION

The parties hereto agree that any dispute arising from this Deed shall be resolved in line with the Dispute Resolution and Arbitration provisions of the Term Loan Facility Agreement between Zenith Bank Plc and Camac Petroleum Limited dated (                ).

## 8. SEVERABILITY

i.  If due to a change in any applicable law or due to a decision or any other act by any competent authority, one or more terms or provisions of this Agreement can no longer be enforced or an amendment of one or more of the provisions of this Agreement is required, the Parties agree that they shall endeavour to find an alternative solution approaching as near as possible the contractual situation existing prior to such a change, decision or act.

ii. If one or more provisions of this Agreement are determined to be invalid or not enforceable, the remaining provisions shall not be affected thereby, and the Agreement shall be administered as though the invalid or not enforceable provisions were not a part of the Agreement.

## 9. WAIVERS

No Party shall be deemed to have waived any right under this Agreement unless that waiver is in writing, refers to this Agreement and is executed by that Party. Failure or forbearance to insist on the strict performance or observance by a Party of a provision of this Agreement shall not be construed as a waiver by that Party of any right under this Agreement. Waiver of a right by a Party under this Agreement shall not preclude that Party in the future from enforcing any other right whether similar or dissimilar to the right that was waived or relinquished.

## 10. NOTICES

All notices and other communications required under this agreement to be in writing shall be addressed to the authorized representatives of the parties at the addresses set out above, or to such other addresses which a party may from time to time notify the other party pursuant hereto.  Such notices and communications shall be deemed given upon:(a) actual receipt, (b) 5 (five) business days after being mailed by either registered or certified mail, return receipt requested with postage prepaid, (c) if by electronic mail, upon transmission (d) when sent by facsimile with receipt confirmed by telephone.

**IN WITNESS WHEREOF** the parties hereto have caused their respective Common Seals to be hereunto affixed the day and year first above written.

The Common Seal of the within named First Assignor
**CAMAC PETROLEUM LIMITED**
was hereunto affixed in the presence of:

DIRECTOR                                         DIRECTOR

The Common Seal of the within named Second Assignor
**ALLIED ENERGY PLC**
was hereunto affixed in the presence of:

DIRECTOR                                         DIRECTOR

The Common Seal of the within named Third Assignor
**CAMAC ENERGY INC.**
was hereunto affixed in the presence of:

AUTHORIZED OFFICER                               SECRETARY

THE WITHIN INSTRUMENT IS IN
OF THE COMMISSIONER OF
STAMP DUTIES CHARGEABLE WITH
DUTY OF
AND THE DUTY THEREON HAS BEEN
ASSESSED ACCORDINGLY
COMMISSIONER OF STAMP DUTIES

CAMAC Energy Inc.
CORPORATE
SEAL
1979
DELAWARE

The Common Seal of the within named Assignee
**ZENITH BANK PLC**
was hereunto affixed in the presence of:

DIRECTOR                                         SECRETARY

RC 180681



# CORPORATE AFFAIRS COMMISSION
## FEDERAL REPUBLIC OF NIGERIA

# Certificate of Registration of

## A DEED OF LEGAL CHARGE

## COMPANIES AND ALLIED MATTERS ACT 1990
### Pursuant to section 197, 198 (2), 203 (1)

### ALLIED ENERGY PLC

*It is hereby certified that A DEED OF LEGAL CHARGE
Dated the Fourteenth day of May, 2015
and created by the above named company, incorporated in Nigeria
securing the sum of Three Billion, Nine Hundred and Forty
Million Naira (N3,940,000,000) in favour of Zenith Bank Plc,
Plot 84, Ajose Adeogun Street, Victoria Island, Lagos, has been
registered
Given under the seal of the Corporate Affairs Commission Abuja,
Nigeria*

*This Twenty-Sixth day of May, 2015*

Receipt No: CAC/GTB 0544923
For =N=78,800,000.00



**BELLO MAHMUD**

Registrar - General

816825

**RC 860957**



# CORPORATE AFFAIRS COMMISSION
## FEDERAL REPUBLIC OF NIGERIA

# Certificate of Registration of

### A DEED OF ALL ASSETS DEBENTURE

## COMPANIES AND ALLIED MATTERS ACT 1990
*Pursuant to section 197, 198 (2), 203 (1)*

### CAMAC PETROLEUM LIMITED

*It is hereby certified that A DEED OF ALL ASSETS DEBENTURE
Dated the Twenty-Fifth day of November, 2014
and created by the above named company, incorporated in Nigeria
securing the sum of One Billion, Six Hundred Million Naira
(N1,600,000,000) in favour of Zenith Bank Plc, Plot 84, Ajose
Adeogun Street, Victoria Island, Lagos, has been registered
Given under the seal of the Corporate Affairs Commission Abuja,
Nigeria*

*This Twelfth day of December, 2014*

Receipt No: CAC/GTB 548347
For =N=16,000,000 00



**BELLO MAHMUD**



784289

Registrar – General

# Agip Moves to Take over Oyo Oilfield in OML 120

**Stories by Ejiofor Alike**

Following the order of a Federal High Court sitting in Lagos, which enforced and recognised a final award rendered at the London Court of International Arbitration (LCIA) on February 14, 2017 in favour of Nigerian Agip Exploration Limited (NAE) in respect of the Oyo oilfield in Oil Mining lease (OML) 120, the Nigerian subsidiary of the Italian firm has moved to take over the field, THISDAY has learnt.

Justice Hadiza R. Shagari of the Federal High Court had ordered the NAOC to take over OYO oilfield after a protracted legal dispute between the subsidiary of the Italian oil firm and two Nigerian Companies - Allied Energy Plc and Camac International (Nig) Ltd.

According to the judgment of the Court in the suit numbered FHC/L/CS/625/2017, the order was sequel to the ruling of the London Court of International Arbitration (LCIA) which arose from a dispute on a Sale and Purchase Agreement (SPA) concluded in June 2012 between Nigerian Agip Exploration Limited (NAE) as seller and Allied Energy Plc as purchaser.

In the court order signed by the Registrar, Joseph Olujoye, the judge ordered that leave be granted to the claimant/applicant that London Court of International Arbitration Final Award be recognised and enforced by the court.

The judge ruled that its decision was based on Section 31 (1) and (2); Section 51 (1) and Section 57 (1) of the Arbitration and Conciliation Act CAP A18 Volume 1, Laws of the Federation of Nigeria.

Justice Shagari ruled that the court made the order "upon reading the affidavit in support of the ex-parte originating summons sworn to by Ogbene Abang, Nigerian, a senior legal officer and a staff of NAE .... and the exhibits attached thereto marked exhibits NAE 1A – NAE5 the written address in support of the ex-parte originating summons signed by Chief TJ Onomigbo Okpoko (SAN) ...After hearing Chief TJO Okpoko (SAN) with Charles Ajuyah (SAN) and Eguono Enum counsel for the claimant applicant moved in terms of ex-parte originating summons and adopted the written address filed as the argument.

And the court having listened and considered the submission of the learned counsel and delivered ruling on May 11, 2017."

Under the Sale and Purchase Agreement (SPA), Nigerian Agip Exploration Limited had transferred to Allied Energy Plc the entirety of its interests and rights in the two Oil Mining Leases 120 and 121 in the deep offshore region of Nigeria.

Payment of part of the price for the transferred interests and rights was deferred to be paid by Allied Energy Plc to Nigerian Agip Exploration Limited.

Nigerian Agip Exploration Limited filed the arbitration at the London Court of International Arbitration in accordance with the terms for submission to arbitration as provided for in the SPA.

The arbitration was finally concluded on February 14, 2017 when the Final Award was issued by the arbitrators.

The OML 120 contains the Oyo Field which is located approximately 75 kilometres from the coast in water depths ranging from 200 to 500 metres.

The Oyo Field commenced production in December 2009 and the wells are connected to the Armada Perdana FPSO, a Floating Production Storage Offloading (FPSO) unit.



ZENITH BANK PLC

HEAD OFFICE
Zenith Heights, Plot 84/87 Ajose Adeogun Street,
P. O. Box 75316, Victoria Island, Lagos.
Tel: (01) 2788000, 4645000 2928000
www.zenithbank.com I SWIFT: ZEIBNGLA.

February 14, 2018

The Managing Director
Erin Petroleum Nigeria Limited
Plot 1649 Olosa Street
Victoria Island
Lagos

<u>Attention: Mr. Femi Ayoade</u>

Dear Sir,

<u>IN THE MATTER OF THE RECOGNITION AND ENFORCEMENT OF THE FINAL AWARD IN LCIA
ARBITRATION NO. 132498 - IN RE SUIT NO. SUIT NO. FHC/L/CS/625/2017 BETWEEN NIGERIA
AGIP EXPLORATION LTD V. ALLIED ENERGY PLC & ANOR</u>

Our attention has been drawn to a Final Award by the London Court of International Arbitration
(LCIA), which was recognized and entered at the Federal High Court, Ikoyi, Lagos, in Suit No.
FHC/L/CS/625/2017, as a final Judgment in favour of Nigeria Agip Exploration Ltd (Claimant). for the
cumulative sum of USD$101,638,966.67 (One Hundred and One Million, Six Hundred and Thirty
Eight Thousand, Nine Hundred and Sixty Six United States Dollars, Sixty Seven Cents) and
interest thereon compounded on a monthly basis against Camac International (Nigeria) Ltd (Erin
Petroleum Nigeria Ltd); the cumulative sum of USD$175,123,614.85 (One Hundred and Seventy
Five Million, One Hundred and Twenty Three Thousand, Six Hundred and Fourteen United
States Dollars, Eighty Five Cents) and interest thereon compounded on a monthly basis against
Allied Energy Plc; and the sums of £7,119,290.99 (Seven Million, One Hundred and Nineteen
Thousand, Two Hundred and Ninety Pounds, Ninety Nine Pence); €550,796.01 (Five Hundred
and Fifty Thousand, Seven Hundred and Ninety Six Euro, One Cent) and USD$5,900 (Five
Thousand, Nine Hundred United States Dollars) against Camac International (Nig.) Ltd (Erin
Petroleum Nigeria Ltd) and Allied Energy Plc jointly and severally. A copy of the Judgment of the
Court is herein attached.

You will recall that the proceeds of the contracts which are now being attached by this judgment
constitutes a major source of repayment of the Credit Facilities granted by the Bank to your
goodselves, and this is capable of jeopardizing the repayment of the facility.

1


ZENITH

In view of this recent worrisome developments and considering the provisions of the Loan Agreement between your Company and the Bank, we write to invite you for an urgent meeting with the Management of the Bank on **February 22, 2018 by 10am** to enable us evaluate the impact of the Judgment on your repayment obligation to the Bank.

Kindly confirm your availability for the meeting by telephone on 01-2781971 or 01-2781980

Yours faithfully,
ZENITH BANK PLC

WOLE BABALOLA
HEAD, LOAN REVIEW DEPT

MICHAEL OSILAMA OTU
HEAD, LEGAL/COMPANY SECRETARY

Attd

## IN THE FEDERAL HIGH COURT
## HOLDEN AT LAGOS, NIGERIA

### SUIT NO: FHC/L/CS/625/2017

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT,
CAP, A18, LAWS OF THE FEDERATION OF NIGERIA (LFN), 2004 AND
IN THE MATTER OF THE RECOGNITION AND ENFORCEMENT OF
THE FINAL AWARD IN LCIA ARBITRATION NO: 132498.

BETWEEN:

NIGERIA AGIP EXPLORATION LTD          ......     CLAIMANT/
                                                APPLICANT

AND

1.   ALLIED ENERGY PLC
2.   CAMAC INTERNATIONAL (NIGERIA) LTD } RESPONDENTS

### ORDER

UPON THIS EX-PARTE ORIGINATING

SUMMONS dated the 18th day of April, 2017

and filed on the 20th day of April, 2017 brought

on behalf of the Claimant/Applicant praying the

Honourable Court for the following Order:

1.   For LEAVE that the London Court of
     International Arbitration Final Award
     made in London on 14th February, 2017
     in LCIA ARBITRATION NO: 132498.

     BETWEEN:

     Nigeria Agip Exploration Ltd (as
     Claimant)

     AND

Originating Summons and adopted the written address

filed as the argument.

And the Court having listened and considered the

submission of the Learned Counsel and delivered Ruling

on the 11th day of May, 2017

## IT IS HEREBY ORDERED

1. That **LEAVE** be granted to the
   Claimant/Applicant that the London Court of
   International Arbitration Final Award
   made in London on 14th February, 2017
   in LCIA ARBITRATION NO: 132498.

   BETWEEN:

   Nigeria Agip Exploration Ltd

   AND

   Allied Energy PLC
   CAMAC International Ltd
   CAMAC International (Nig) Ltd

   be recognized and enforced by this Honourable
   Court pursuant to Section 31(1) and (2), Section
   51(1) and (2) and Section 57 (1) of the Arbitration
   and Conciliation Act CAP A18, Volume 1, Laws of
   the Federation of Nigeria.

   **ISSUED AT LAGOS**, under the hand of

   the presiding judge and the seal of this

   Honourable Court this Thursday the 11th day of

   May, 2017.

   **JOSEPH OLUJOYE**
   **REGISTRAR**

Allied Energy PLC

CAMAC International Ltd    .. (as Respondents)
CAMAC International (Nig) Ltd

be recognized and enforced by this Honourable
Court pursuant to Section 31(1) and (2), Section
51(1) and (2) and Section 57 (1) of the Arbitration
and Conciliation Act CAP A18, Volume 1, Laws of
the Federation of Nigeria.

2.  And for such further order(s) as the Honourable
Court may deem fit to make in the circumstances.

## UPON READING THE AFFIDAVIT IN SUPPORT

## OF THE EX-PARTE ORIGINATING SUMMONS

sworn to by Ogbene Abang, Nigerian, a Senior Legal

Officer and a Staff of Nigerian Agip Exploration Ltd of

No. 1, Elsie Femi Pearse Street, Victoria Island, Lagos

State and the Exhibits attached thereto marked Exhibits

NAE1A - NAE5 the written address in support of the

Ex-parte Originating Summons signed by Chief T.J

Onomigbo Okpoko OON (SAN) all filed at the Court

Registry on the 20th day of April, 2017.

AND AFTER HEARING Chief T.J.O Okpoko (SAN)

with Charles Ajuyah (SAN) and Eguono Erhun Counsel

for the Claimant Applicant moved in terms of Ex-parte

## IN THE FEDERAL HIGH COURT OF NIGERIA
## HOLDEN AT LAGOS.

### CERTIFICATE OF JUDGEMENT
### OF FINAL AWARD OF THE LONDON COURT OF INTERNATIONAL ARBITRATION
### MADE ON 14TH FEBRUARY 2017 IN LCIA ARBITRATION NO. 132498.

| FULL TITLE | FULL NAME OF THE COURT ISSUING | FORM OR NATURE OF CLAIM | NAME AND ADDRESS OF PARTY ORDERED TO PAY MONEY OR TO DO OR NOT TO DO ANY ACT. | NAME AND ADDRESS OF WHOM PAYMENTS IS MADE IN HIS FAVOUR | DATE OF AWARD | ABSTRACT OF AWARD |
|---|---|---|---|---|---|---|
| LCIA ARBITRATION NO. 132498. IN THE MATTER OF THE RECOGNITION AND ENFORCEMENT OF THE FINAL AWARD IN LCIA ARBITRATION NO. 132498 BETWEEN: NIGERIAN AGIP EXPLORATION LTD AND ALLIED ENERGY ...; AND CAMAC INTERNATIONAL (NIGERIA) LTD | BEFORE THE ARBITRATION TRIBUNAL AT LONDON COURT OF INTERNATIONAL ARBITRATION PRESIDED BY - THOMAS WEBSTER - PROF. JULIAN LEW QC, AND - LORD LEONARD HOFFMANN | CLAIMANT'S CLAIMS FOR DECLARATORY RELIEFS:- A. DISMISSING THE 1ST RESPONDENT'S DEFENCE AND REQUESTS FOR RELIEFS AND DIRECTIONS. B. i 3si THE TRIBUNAL HAS JURISDICTION OVER THE ADJUSTMENTS CLAIM AND THE DEFERRED PAYMENT CLAIMS. C. (iii) PURSUANT TO CLAUSE 5.3 AND 14.1, OF THE SPA, THE 1ST RESPONDENT IS OBLIGED TO PAY TO THE CLAIMANT THE AMOUNT OF THE ADJUSTMENTS SET OUT IN THE FINAL ADJUSTMENT STATEMENT, TOGETHER WITH INTEREST THEREON AT THE DEFAULT RATE, PAYABLE ON THE TOTAL AMOUNT OF THE ADJUSTMENTS DUE ON EACH OF THE FIRST, SECOND AND THIRD PAYMENT DATES AND ACCRUING UNTIL THE DATE OF ACTUAL PAYMENT. D. (iv) FURTHER OR ALTERNATIVELY, PURSUANT TO CLAUSES 11.2 AND 14.1, OF THE SPA, THE 1ST RESPONDENT IS LIABLE FOR, AND OBLIGED TO INDEMNIFY THE CLAIMANT IN RESPECT OF ANY ITEMS CLAIMED ON THE FINAL ADJUSTMENTS | ALLIED ENERGY PLC. PLOT 1649 O.OSA STREET, CAMAC HOUSE, VICTORIA ISLAND, LAGOS. CAMAC INTERNATIONAL (NIG) LTD PLOT: 1649 CLOSA STREET, CAMAC HOUSE VICTORIA ISLAND, LAGOS. | NIGERIAN AGIP EXPLORATION LIMITED NO. 1, 51SIE FEMI PEARSE STREET VICTORIA ISLAND, LAGOS. | 14TH FEBRUARY, 2017. | 1. CAMAC INTERNATIONAL LIMITED TO PAY CLAIMANT USD$50MILLION AS DEFERRED PAYMENT GUARANTEE WITH RESPECT OF THIRD CTL DEFERRED PAYMENT. 2. CAMAC INTERNATIONAL LIMITED TO PAY THE CLAIMANT INTEREST ON THE CLAIMANT INTEREST THE THREE INSTALMENTS OF USD350 MILLION FROM 7 JANUARY, 2014, 7 JANUARY, 2015 AND 4 JANUARY, 2016 AT THE AGREED RATE PLUS 2% COMPOUNDED ON A MONTHLY BASIS UNTIL SUH AMOUNT IS PAID. 3. CAMAC INTERNATIONAL LIMITED TO PAY INTEREST ON THE AMOUNT DUE UNDER THE ADJUSTMENTS GUARANTEE OF USD$51,255,819.25 PLUS ACCRUED INTEREST AS AT 28 |

E. O. ADAKA
Principal Asst. Registrar
FEDERAL HIGH COURT
RCCI

1

PAYMENT DATES.

(ii)     THE SUM OF US$2,782,522.27 (TWO
MILLION, SEVEN HUNDRED AND
EIGHTY TWO THOUSAND, FIVE
HUNDRED AND TWENTY TWO US
DOLLARS AND SEVENTY SEVEN
CENTS) BEING THE AMOUNT PAID
BY THE CLAIMANT TO THIRD PARTY
CONTRACTORS IN RESPECT OF THE
ADDITIONAL OYO 5 GSO
LIABILITIES.

(iii)    THE SUM OF US$150,000,000. (ONE
HUNDRED AND FIFTY MILLION US
DOLLARS) BEING THE AMOUNT OF
THE FIRST, SECOND AND THIRD
DEFERRED PAYMENTS.

(iv)    INTEREST AT THE DEFAULT RATE
ON ALL AMOUNTS DUE FROM THE
RELEVANT PAYMENT DATES UP TO
THE DATE OF THE TRIBUNAL'S
AWARD, AND ACCRUING AT THE
DEFAULT RATE ON A DAILY BASIS
THEREAFTER UNTIL THE DATES AS
THE TRIBUNAL SHALL DETERMINE
TO BE APPROPRIATE;

(v)     ALTERNATIVELY, DAMAGES
CORRESPONDING TO THE AMOUNTS
SET OUT ABOVE, PLUS INTEREST ON
DAMAGES ACCRUING FROM THE
DATE ON WHICH THE
CORRESPONDING AMOUNTS FELL
DUE.

c.

d)    AN AWARD ORDERING THE RESPNDENTS
TO PAY ALL COST AND EXPENSES INCURRED
IN CONNECTION WITH THIS ARBITRATION,
TOGETHER WITH INTEREST THEREON,
INCLUDING BUT NOT LIMITED TO:

(i)     ALL LEGAL COSTS AND

THAT:

a.  17.1.2 THE TRIBUNAL HAS NO SUBJECT
    MATTER JURISDICTION OVER NAE'S FINAL
    ADJUSTMENTS STATEMENT CLAIM AGAINST
    ALLIED.

b.  '17.1.2 THE TRIBUNAL DOES HAVE
    JURISDICTION TO DETERMINE WHETHER
    PARAGRAPH 15(2)(I) OF THE SECOND
    PARTIAL AWARD RESULTS IN AN
    OVERPAYMENT TO NAE.

c.  17.1.3 A DECLARATION THAT OR ORDER IN
    RESPECT OF ANY OVERPAYMENT IN
    RELATION TO PARAGRAPH 15(2)(I) OF THE
    SECOND PARTIAL AWARD.

d.  17.1.4 THE RESPONDENTS DO NOT OWE
    ANY SUM TO THE CLAIMANT.

e.  17.1.5 THE CLAIMANT IS LIABLE TO PAY
    DAMAGES TO ALLIED AND CINL IN RESPECT
    OF THE LOSSES SUFFERED BY ALLIED, CINL
    AND THEIR AFFILIATES RESULTING FROM
    NAE'S BREACHES OF THE PSC AND/OR ANY
    OTHER AGREEMENT.

f.  17.1.6 THE CLAIMANT/NAE IS LIABLE TO
    INDEMNIFY ALLIED PURSUANT TO CLAUSE 11
    OF THE SPA AGAINST-

    (a)  THE DAMAGES AND LOSSES SUSTAINED
         BY ALLIED AND IT AFFILIATES AS A
         RESULT OF NAE'S BREACHES OF THE PSC
         IN THE AMOUNT OF US$106.1 MILLION
         ALTERNATIVELY SUCH AMOUNT AS THE
         TRIBUNAL FINDS TO BE DUE TO ALLIED
         AND/OR ITS AFFILIATES, AND

    (b)  THE PENALTY OF US1,464,839 IMPOSED
         ON ALLIED BY THE DPR IN RESPECT OF
         THE FLARING OF GAS BY NAE ON OYO
         FIELD.

RESPONDENTS' MONETARY RELIEF:

(c) INTEREST ON THE RESPONDENT'S LEGAL COSTS AT THE AGREED RATE OR THE RATE IN ARTICLE 10.1 OF THE PSC, ALTERNATIVELY AT A RATE DETERMINED TO BE APPROPRIATE BY THE TRIBUNAL.

(d) ALL OTHER PROFESSIONAL FEES, INCLUDING THE FEES AND DISBURSEMENTS OF THE RESPONDENTS' REPLY.

(e) ALLL COST OF THE ARBITRATION, INCLUDING THOSE OF THE TRIBUNAL AND THE LCIA, AND

(f) ANY AND ALL OTHER ASSOCIATED COSTS.

I HEREBY CERTIFY THAT THIS CERTIFICATE CORRECTLY AND FULLY SETS FORTH THE PARTICULARS OF FINAL AWARD OF THE LONDON COURT OF INTERNATINAL ARBITRATION, LCIA ARBITRATION NO. 132498 DELIVERED ON THE 14TH DAY OF FEBRUARY 2017 AND REGISTERED AS JUDGEMENT OF THE FEDERAL HIGH COURT, LAGOS ON 11TH MAY, 2017 IN SUIT NO. FHC/L/CS/625/2017.

DATED AT LAGOS THIS……………30TH……DAY OF ……… MAY ……… 2017

DEPUTY CHIEF REGISTRAR
FOR: CHIEF REGISTRAR

# OKWUBANEGO & OKWUBANEGO

*A Professional Corporation of Attorneys & Counsellors*

ABUJA OFFICE:
SUITE 7, SHALOM PLAZA,
PLOT 1088, JOSEPH GOMWALK STREET,
GUDU DISTRICT,ABUJA.
TEL: (09) 290-0411, 08033267252
Email:arubakzcama_okwu@ymail.com

BENTONVILLE OFFICE:
2001 SE 10TH STREET,
BENTONVILLE,
AR72716-0550, U.S.A.
TEL: (214) 479-271-9004
Email:okwuban@yahoo.com

## SEARCH REPORT

| | | |
|---|---|---|
| **1.** | **Date of Search:** | 13/04/18 |
| **2.** | **Name of Company:** | ERIN PETROLEUM NIGERIA LIMITED (Previously called CAMAC PETROLEUM LIMITED, name changed on 20/08/15) |
| **3.** | **RC:** | 860,957 |
| **4.** | **Date of Incorporation:** | 28/12/09 |
| **5.** | **Share Capital:** | 10,000,000 |
| **6 (i)** | **New Registered Address:** | Plot 1649, Olosa Street, Victoria Island Lagos |
| **(ii)** | **Old Registered Address:** | 35, Moloney Street Lagos |

**7.** **Subscribers (A):** CO2 of 23/12/09

| | **Address:** | **Shares:** |
|---|---|---|
| (a) Pacific Asia Petroleum Inc | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA | 9,999,999 |
| (b) Frank C. Ingriselli | Same | 1 |

**(B)** CO2 of 28/1/11

| | **Address:** | **Shares:** |
|---|---|---|
| (a) CAMAC Energy Inc | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA | 9,999,999 |
| (b) Byron Dunn | Same | 1 |

**(C)** **Subscribers:** CO2 of 1/6/11

| | **Address:** | **Shares:** |
|---|---|---|
| (a) CAMAC Energy Inc | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA | 9,999,999 |
| (b) Kase Lawal | 1330 Post Oak Blvd, Ste 2575, Houston, Tx 77056 USA | 1 |

**(D)** **Subscribers:** CO2 of 3/3/16

| | **Address:** | **Shares:** |
|---|---|---|
| (a) Erin Energy Corporation | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA | 9,999,999 |
| (b) Dippo Bello | Same | 1 |

**8.** **Directors (A):** CO7 of 20/12/09

| | **Address:** |
|---|---|
| (a) Ingriselli Frank | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA |
| (b) Groth Stephen | Same |

**(B)** **Directors:** CO7 of 3/06/10

| | **Address:** |
|---|---|
| (a) Ingriselli Frank | 250 East Hartsdale Avenue Suite 47 Hartsdale New York 10530 USA |
| (b) Lawal Abiola | Plot 1649 Olosa Street Victoria Island |

**(C)** **Directors:** CO7 of 1/10/10

| | **Address:** |
|---|---|
| (a) Lawal Abiola | 1330, Post Oak Blvd, Suite 2575, Houston, Tx 77056 USA |
| (b) Groth Stephen | Same |

**(D) Directors: CO7 of 1/12/11**
  (a) Lawal Kase
  (b) Camimos Edward
  (b) Ogunjimi Olusegun

**Address:**
1330, Post Oak Blud, Suite 2575, Houston, Tx 77056 USA
Same
Plot 1649, Olosa Street Victoria Island Lagos

**(E) Directors: CO7 of 18/7/12**
  (a) Lawal Kase
  (b) Ogunjimi Olusegun
  (c) Camimos Edward
  (d) Conrtright Jeff

**Address:**
1330, Post Oak Blud, Suite 2575, Houston, Tx 77056 USA
Plot 1649, Olosa Street Victoria Island Lagos
1330, Post Oak Blud, Suite 2575, Houston, Tx 77056 USA
Same

**(F) Directors: CO7 of 2/7/13**
  (a) Lawal Kase
  (b) Ogunjimi Olusegun
  (c) Camimos Edward
  (d) Conrtright Jeff

**Address:**
1330, Post Oak Blud, Suite 2575, Houston, Tx 77056 USA
Plot 1649, Olosa Street Victoria Island Lagos
1330, Post Oak Blud, Suite 2575, Houston, Tx 77056 USA
Same

**( ) Directors: CO7 of 19/3/14**
  (a) Kase Lawal
  (c) Adefemi Ayoade
  (b) Adama Traore

**Address:**
Plot 1649, Olosa Street Victoria Island Lagos
Same
"

**(H) Directors: CO7 of 8/1/15**
  (a) Kase Lawal
  (b) Adefemi Ayoade
  (c) Adama Traore
  (d) Dippo Bello

**Address:**
Plot 1649, Olosa Street Victoria Island Lagos
Same
"
"

**9. Annual Returns:** 2010 – 2015 filed

**10. Registered Charge:** A Deed of All Assets Debenture dated 25/11/14, Registered on 12/12/14 securing the sum of ₦1.6B IFO Zenith Bank Plc Plot 84, Ajose Adeogun Street, Victoria Island Lagos.

**11. Secretary:** Banwo & Ighodalo - 98 Awolowo Road South-West, Ikoyi Lagos

**12. Main Object:** To make investments of any description whatsoever, etc.

**13. Borrowing Powers:** Memo: Clause d. Articles: Article 7

**14. Remarks:** Company duly incorporated. Note that subscribers in (A) above refer to the subscribers at incorporation while (B – D) represents subsequent allotments made thereafter. Ditto to the Directors (A – H) above

COURT OF APPEAL
RECEIVED
1 8 APR 2018
LAGOS, NIGERIA

**IN THE COURT OF APPEAL**
**HOLDEN AT LAGOS**

APPEAL NO:

SUIT NO: FHC/L/CS/625/2017

BETWEEN

ZENITH BANK PLC  ⎤ APPLICANT

AND

1. **NIGERIAN AGIP EXPLORATION LIMITED**
2. **ALLIED ENERGY PLC**  ⎤ **RESPONDENTS**
3. **ERIN PETROLEUM NIGERIA LIMITED**
   (*Previously Known as "Camac Petroluem Limited)*

## NOTICE OF MOTION

**BROUGHT PURSUANT TO ORDER 6 RULES 1, 2, AND 4 OF THE COURT OF APPEAL RULES 2016, SECTION 24 OF THE COURT OF APPEAL ACT, LAWS OF THE FEDERATION OF NIGERIA, CAP C37 LFN 2004, SECTION 243 OF THE 1999 CONSTITUTION (AS AMENDED) AND UNDER THE INHERENT JURISDICTION OF THIS HONOURABLE COURT**

---

**TAKE NOTICE** that this Honourable Court shall be moved on ___ day of ___ at the hour of 9.00 O'clock in the forenoon or so soon thereafter as Counsel may be heard on behalf of the Applicant praying for the following orders:

1. **An Order** granting the Applicant Leave to join as an Interested Party to Suit No. FHC/L/CS/625/2017 between the Nigeria Agip Exploration Limited V Allied Energy Plc & Anor pursuant to Section 243 (a) of the 1999 Constitution of the Federal Republic of Nigeria (as Amended).

2. **An Order** granting the Applicant an extension of time within which to seek leave to appeal against the Order of the Federal High Court of Nigeria made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

**Kenna** Partners
Barristers & Solicitors

3. **An Order** granting the Applicant leave to appeal against the Order of the Federal High Court of Nigeria made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

4. **An Order** granting the Applicant an extension of time within which to Appeal against the Order of the Federal High Court of Nigeria made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

5. **An Order** of this Honourable Court granting the Applicant leave to appeal as an interested party against the order of the Federal High Court made on May 11, 2018 in Suit No. FHC/L/CS/625/2017.

6. **AND** for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**AND FURTHER TAKE NOTICE** that the grounds of this application are as follows:

1. That the Order of the Federal High Court of Nigeria delivered on May 11, 2017 in Suit No. FHC/L/CS/625/2017 (recognizing the Award given by the London Court of International Arbitration in favour of Nigerian Agip Exploration Limited dated February 14, 2017 and entered as Final Order of the Federal High Court of Nigeria) contains reliefs that affect the Applicant's rights.

2. The Applicant has a constitutional right to be heard and to appeal against the Order of the Federal High Court in Suit No. FHC/L/CS/625/2017 delivered on May 11, 2017 as a party interested and affected by the Order.

3. The Supreme Court in the case of **Chukwu V I.N.E.C. (2014) 10 N.W.L.R. (Pt. 1415) 385 Pp. 408-409, paras. A-B** pronounced that;

> "*the first prayer a person seeking leave to appeal as an interested party must seek is for leave to be made a party in the case pursuant to section 243(a) of the 1999 Constitution.*" [*emphasis on ours*]

4. The period within which the Applicant was required to appeal against the Order made by the lower Court on May 11, 2017 in Suit No. FHC/L/CS/625/2017 has lapsed.

5. In the circumstance, leave of this Honourable Court is required for the Applicant to appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

6. The delay occasioned in making this application was not borne out of disrespect for the lower Court or this Honourable Court as the Applicant was unaware of the Arbitral Award entered as final Order of the Federal High Court of Nigeria on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

7. This Honourable Court is empowered to grant the reliefs sought in this application as they pertain to the Applicant's constitutional right to fair hearing as enshrined in section 36 of the 1999 Constitution of the Federal Republic of Nigeria (as amended).

8. That this is a proper case for the Honourable Court to grant the said reliefs.

AND TAKE FURTHER NOTICE that the following documents are exhibited in this application:

1. A certified true copy of the Enforcement Order of the Federal High Court made on May 11 2018;
2. Proposed Notice of Appeal containing Proposed Grounds of Appeal;
3. The Deed of Legal Charge between the Applicant and the 2nd and 3rd Respondents;
4. The Loan Facility Agreement between the Applicant and the 3rd Respondent;
5. The All Asset Debenture Deed between the Applicant and the 2nd Respondent.

**DATED THIS 17th DAY OF April, 2018**

**Signed by: *Bridget Osazuwa, Esq***



**Professor Fabian Ajogwu, SAN**
**Charles Nwabulu, ACArb**
**Okechukwu Ekweanya, Esq**
**Kelvin Erhonsele, ACIArb**
**Abisola Yusuf (Miss)**
**Bridget Osazuwa,(Miss)**
**Oluyemi Adebo, Esq**
Counsel to the Applicant



✓

**Kenna** Partners
Barristers & Solicitors

**KENNA PARTNERS**
Kenna Place
8 Ogunyemi Road, Palace Way
Oniru, Victoria Island, Lagos.
Tel: +234 815 839 0704
cnwabulu@kennapartners.com

## FOR SERVICE ON:

1. **The 1st Respondent**
   Nigerian Agip Exploration Limited
   1, Elsie Femi Pearse Street
   Victoria Island
   Lagos.

2. **The 2nd Respondent**
   Allied Energy Plc
   Plot 1649, Olosa Street
   Camac House, Victoria Island
   Lagos

3. **The 3rd Respondent**
   Erin Petroleum Nigeria Limited
   *(Previously Known as "Camac Petroluem Limited)*
   Plot 1649, Olosa Street
   Camac House, Victoria Island
   Lagos

# IN THE COURT OF APPEAL
## HOLDEN AT LAGOS

**APPEAL NO:**
**SUIT NO: FHC/L/CS/625/2017**

**BETWEEN**

**ZENITH BANK PLC**  }  **APPLICANT**

**AND**

1. **NIGERIAN AGIP EXPLORATION LIMITED**
2. **ALLIED ENERGY PLC**  **RESPONDENTS**
3. **ERIN PETROLEUM NIGERIA LIMITED**
   *(Previously Known as "Camac Petroluem Limited)*

## AFFIDAVIT IN SUPPORT OF THE APPLICANT'S NOTICE OF MOTION DATED APRIL 17, 2018

I, Bosah Okonyia, Male, Christian, Nigerian Citizen of Zenith Heights, Plot 84/87 Ajose Adeogun Street, Victoria Island, Lagos State do hereby make oath and state as follows:

1. That I am a Legal Practitioner in the law department of the Applicant, by virtue of which position I am conversant with the facts of this case.

2. That I have the consent and authority of my employer (the Applicant) to depose to this Affidavit.

3. That except as otherwise stated, I depose to facts within my personal knowledge, as well as from information obtained by me from reading the documents pertaining to the events leading up to this matter and from information derived in the course of carrying out my duties in the employment of the Applicant.

4. That the Applicant is a public company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84, Ajose Adeogun Street, Victoria Island, Lagos State.

5. The 1st Respondent is a private limited company incorporated under the Laws of the Federal Republic of Nigeria to carry on business in Nigeria with its offices situate at 1, Elsie Femi Pearse Street, Victoria Island, Lagos.

6. The 2nd Respondent is a public company incorporated under the Laws of the Federal Republic of Nigeria with its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos.

7. The 3rd Respondent (Previously known as '*Camac International Nigeria Limited*') is a private limited company incorporated under the Laws of the Federal Republic of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos.

8. That by virtue of an Acreage Allocation (Discretionary Award) of OPL 210 issued by the Ministry of Petroleum Resources (Petroleum Resources Department), the 2nd Respondent is the legal holder of Oil Mining Lease (OML) 120 and 121.

9. That by virtue of a transfer agreement between the 2nd and 3rd Respondents, the 3rd Respondent acquired all the economic interest of the 2nd Respondents in the oil block covered by OML 120 and 121 (although the approval of the Minister of Petroleum was yet to be obtained with respect to the transfer).

10. That the 3rd Respondent sometime in 2014 approached the Applicant for a Term Loan Facility of USD100, 000,000.00 (One Hundred Million United States Dollars) to part-finance the expansion and development of the oil blocks covered by OML120 and 121.

11. That by virtue of a Term Loan Facility Agreement, the Applicant granted a loan facility of USD100, 000,000.00 (One Hundred Million United States Dollars) to the 3rd Respondent. A copy of the Term Loan Facility Agreement is hereto annexed and marked as **Exhibit 1**.

12. That as security for the repayment of the loan facility granted by the Applicant to the 3rd Respondent, the 3rd Respondent undertook to obtain in favour of the Applicant, a legal charge over the 2nd and 3rd Respondents' entire interest in Oil Block OML 120 and 121.

13. That further to paragraph 12 above, a Deed of Legal Charge over interest in OML 120 and 121 dated May 14, 2014 was executed between the Applicant and the 2nd and 3rd Respondents, by which the 2nd Respondent charged its entire interest in OML 120 and 121 in favour of the Applicant.

14. That similarly, an All Asset Debenture dated November 25, 2014 was executed between Applicant and the 3rd Respondent, by which the 3rd Respondent charged ALL its assets whether fixed or floating, present and future in favour of the Applicant.

15. That some of the agreements executed as security for the repayment of the Term Loan Facility Agreement granted by the Applicant to the 3rd Respondent are:

    15.1 All Assets Debenture dated November 25, 2014;
    15.2 Deed of Legal Charge dated May 14, 2015; and
    15.3 Deed of Assignment of Rights.

16. The agreements outlined in paragraph 15 above are hereto annexed and marked as **Exhibits 2, 3 and 4** respectively.

17. That following the execution of the above referenced Deed of Legal Charge and Deed of All Assets Debenture, the Applicant registered the aforementioned security documents at the Corporate Affairs Commission which are evidenced by the Certificate of Registration of Deed of Legal Charge dated May 26, 2015 and the Certificate of Registration of Deed of All Assets Debenture dated December 12, 2014. Copies of the Certificates of Registration are hereto annexed and marked as **Exhibits 5 and 6 respectively**.

18. That in compliance with Clause 3 (Disbursement) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent (earlier described as **Exhibit 1**), the Applicant has fulfilled its obligation by disbursing the entire sum granted under the facility agreement to the 3rd Respondent.

19. That by Clause 17 (Representation and Warranties) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent, particularly, paragraph 17.8 (proceedings pending or threatened), the 3rd Respondent represented and warranted to the Applicant that, no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been stated or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

    a) May restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

    b) If adversely determined, would reasonably be expected to have a material adverse effect.

20. That at the time of entering into the Term Loan Facility Agreement and the Disbursement of the loan sum by the Applicant to the 3rd Respondent, the Applicant was not aware or informed of the existence of any litigation,

arbitration or administrative proceeding involving the 1st Respondent against the 2nd and 3rd Respondents or any other parties thereof.

21. That by a newspaper extract from *Thisday* Newspaper dated February 20, 2018, the Applicant became aware of an Arbitral Award given at the London Court of International Arbitration (LCIA) on February 14, 2017. A copy of the newspaper extract is hereto *annex*ed and marked as **Exhibit 7**.

22. That by the above referenced newspaper publication, the Applicant became aware that the 1st Respondent had obtained a Final Arbitral Award against the 2nd and 3rd Respondents from the LCIA in an Arbitration with Arbitration number: LCIA 132498.

23. That the Arbitral Award which was given by the London Court of International Arbitration purportedly arose from a dispute on a Sale and Purchase Agreement (SPA) which was concluded in June 2012 between 1st Respondent as Seller and the 2nd Respondent as Purchaser.

24. That by virtue of the above referenced SPA, the 1st Respondent had transferred to the 2nd Respondent, the entirety of its interest and rights in both Oil Mining Leases 120 and 121.

25. That the said Arbitral Award was given in respect of the Oil Assets (OML 120 and 121), the interest of which is charged in favour of the Applicant as security for the repayment of the Term Loan Facility granted by the Applicant to the 3rd Respondent.

26. That by virtue of an Order of the Federal High Court of Nigeria made on May 11, 2017, leave of Court was granted to 1st Respondent that the LCIA Final Award dated February 14, 2017 be recognised and enforced by the Court pursuant to Section 31 (1) and (2), Section 51(1) and (2) and Section 57 (1) of the Arbitration and Conciliation Act CAP A18, Volume 1, Laws of the Federation of Nigeria. A copy of the Order of the Federal High Court dated May 11, 2017 is hereto annexed and marked as **Exhibit 8**.

27. That the said order of the Federal High Court enforcing and recognising the Arbitral Award is for the cumulative sum of $101,638,966.67 (One Hundred and One Million, Six Hundred and Thirty Eight Thousand, Nine Hundred and Sixty Six United States Dollars, Sixty Seven Cents) and interest thereon compounded on a monthly basis against the 3rd Respondent.

28. The cumulative sum of $175,123,614.85 (One Hundred and Seventy Five Million, One Hundred and Twenty Three Thousand, Six Hundred and Fourteen United States Dollars, Eight Five Cents) and interest compounded thereon on a monthly basis against the 2nd Respondent; and

the sums of £7,119,290.99 (Seven Million, One Hundred and Nineteen Thousand, Two Hundred and Ninety Pounds, Ninety Nine Pence);

29. And €550,796.01 (Five Hundred and Fifty Thousand, Seven Hundred and Ninety Six Euro, One Cent) and $5,900 (Five Thousand, Nine Hundred United States Dollars) against the 2nd Respondent and the 3rd Respondent jointly and severally.

30. That the Applicant was not aware of the existence of any Sale and Purchase Agreement entered into between the 1st and 2nd Respondent neither was it informed of the existence of the Arbitral Proceedings from which the Final Arbitral Award given by the LCIA dated February 14, 2017 (now recognised by an order of the Federal High Court dated May 11, 2017) arose.

31. That the 1st Respondent in an attempt to realise the fruits of the Award granted by the LCIA and recognised by an Order of the Federal High Court dated May 11, 2017 executed a '*Notice of Seizure/Attachment of Goods*' by locking the export valve on the FPSO operated by the 2nd Respondent (the interest of which has been charged in favour of the Applicant for the repayment of the loan granted by the Applicant to the 3rd Respondent).

32. That the Applicant being unaware of the existence of the Arbitral Proceedings from which the Final Arbitral Award obtained by the 1st Respondent against the 2nd and 3rd Respondent dated February 14, 2017 arose until several months after the Award was recognised by an order of the Federal High Court made on May 11, 2017 was unable to make an appearance at the lower Court for an opportunity to be heard.

33. That the enforcement of the Order of the Federal High Court (recognising the Arbitral Award given by the LCIA) made on May 11, 2017 will put the security for the loan granted by the Applicant to the 3rd Respondent in jeopardy.

34. That the Applicant is an interested and necessary party whose genuine interests is adversely affected by the Order of the Federal High Court made on May 11, 2017.

35. That the Applicant has a constitutional right to be heard and to appeal against the Order of the Federal High Court in Suit No. FHC/L/CS/625/2017 delivered on May 11, 2017 as a party interested and affected by the Order.

36. That before the Applicant can appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017 as an interested party, Leave of this Honourable Court is required.

37. That the Applicant has palpable and weighty interests which deserve to be protected from decimation by the Honourable court in the circumstance.

38. That the period within which the Applicant was required to appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017 has lapsed.

39. That in the circumstance, leave of this Honourable Court is required for the Applicant to appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

40. That the delay occasioned in bringing this application was not borne out of disrespect for the lower Court or this Honourable Court but owing to the fact that the Applicant was unaware of the Final Arbitral Award recognised by an Order of the Federal High Court of Nigeria made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

41. That the proposed Notice of Appeal containing the Appellant's proposed grounds of Appeal is hereto annexed and marked **Exhibit 9**.

42. That the Applicant innocently believed there were no existing or imminent infringements on its secured interests prior to being aware through **Exhibit 7** (newspaper extract from *Thisday* Newspaper dated February 20, 2018).

43. That this Honourable Court is empowered to grant the reliefs sought in this application.

44. That this is a proper case for the Honourable Court to grant the said reliefs.

45. That it would be in the interest of justice for the Honourable Court to grant this application as the Respondent will not be prejudiced by the grant of same.

46. That I make this deposition in good faith believing all the facts deposed to be true and correct to the best of my knowledge and in accordance with the Oaths Act.



**DEPONENT**

Sworn to at the Court of Appeal Registry,
Lagos, this /ʰ day of April, 2018

**BEFORE ME**

**COMMISSIONER FOR OATHS**

MRS O. EKE C. E
Snr Executive Officer
COURT OF APPEAL
LAGOS



Filed on 08/05/18 @ 2:00pm

# IN THE COURT OF APPEAL OF NIGERIA
## HOLDEN AT LAGOS

**APPEAL NO: CA/L/495ᴹ/2018**
**SUIT NO: FHC/L/CS/625/2017**

**BETWEEN**

**ZENITH BANK PLC**

} **APPLICANT**

**AND**

1. **NIGERIA AGIP EXPLORATION LIMITED.**
2. **ALLIED ENERGY PLC**       **RESPONDENTS**
3. **ERIN PETROLEUM NIGERIA LIMITED**
(*Previously Known as "Camac Petroluem Limited)*

COURT OF APPEAL
**RECEIVED**
0 8 MAY 2018
LAGOS, NIGERIA

## NOTICE OF MOTION

**BROUGHT PURSUANT TO ORDER 6 RULES 1 AND 4 OF THE COURT OF APPEAL RULES, 2016, SECTION 17 OF THE COURT OF APPEAL ACT CAP. C36 LFN 2004 AND UNDER THE INHERENT JURISDICTION OF THE HONOURABLE COURT**

**TAKE NOTICE** that this Honourable Court shall be moved on ......day of ............... 2018 at the hour of 9.00 O'clock in the forenoon or so soon thereafter as Counsel may be heard on behalf of the Applicant praying for the following orders:

1. **AN Order** for a stay of execution of the Judgment delivered by the Honourable Justice Hadiza R. Shagari of the Federal High Court on May 11, 2017 pending the hearing and determination of the Motion for Leave to Appeal dated April 17, 2018 filed by the Applicant and the Appeal to be filed by the Applicant in this matter.

2. **AND** for such further or other orders as this Honourable Court may deem fit to make in the circumstances.

**TAKE FURTHER NOTICE** that the grounds upon which the application is based are as follows:

1. That the Applicant being dissatisfied with the Judgment delivered by the lower Court on May 11, 2017 has filed a Motion for Leave to Appeal against the said Judgement.

**KENNA PARTNERS**
BARRISTERS & SOLICITORS

2. That the Judgment of the Federal High Court of Nigeria delivered on May 11, 2017 in Suit No. FHC/L/CS/625/2017 (recognizing the Award given by the London Court of International Arbitration, dated February 14, 2017, in favour of Nigerian Agip Exploration Limited and entered as Final Judgment of the Federal High Court of Nigeria) contains reliefs that affect the Applicant's rights.

3. The Applicant has a constitutional right to be heard and to appeal against the Judgment of the Federal High Court in Suit No. FHC/L/CS/625/2017 delivered on May 11, 2017 as a party interested and affected by the Judgment.

4. That there are serious issues to be determined on appeal.

5. That the Applicant has fulfilled the conditions for the grant of an order of Stay of Execution and this Honourable Court is empowered to grant the order sought.

6. That not granting this Motion for Stay of Execution will lead to the dissipation of the *res* in this matter and force a *fait accompli* on this Honourable Court, in view of the Applicant's intention to appeal against the Judgment of the Federal High Court of Nigeria of May 11, 2017 and the Motion for Leave to appeal already filed.

**ALSO TAKE FURTHER NOTICE** that the Applicant shall at the hearing of this application rely on all processes/papers filed by parties in the suit.

**DATED THIS 8TH DAY OF MAY, 2018**

*Signed by*: **Bridget Osazuwa**



_____

**Professor Fabian Ajogwu, SAN**
**Charles Nwabulu, ACIArb**
**Okechukwu Ekweanya, Esq**
**Kelvin Erhonsele, ACIArb**
**Abisola Yusuf (Miss)**
✓ **Bridget Osazuwa (Miss)**
**Oluyemi Adebo, Esq**
Counsel to the Applicant
**KENNA PARTNERS**
Kenna Place
8 Ogunyemi Road, Palace Way
Oniru, Victoria Island, Lagos.
Tel: +234 815 839 0704

**KENNA PARTNERS**
BARRISTERS | SOLICITORS

cnwabulu@kennapartners.com

## FOR SERVICE ON:

1. **The 1ˢᵗ Respondent**
   Nigerian Agip Exploration Limited
   1, Elsie Femi Pearse Street
   Victoria Island
   Lagos.

2. **The 2ⁿᵈ Respondent**
   Allied Energy Plc
   Plot 1649, Olosa Street
   Camac House, Victoria Island
   Lagos

3. **The 3ʳᵈ Respondent**
   Erin Petroleum Nigeria Limited
   *(Previously Known as "Camac Petroluem Limited)*
   Plot 1649, Olosa Street
   Camac House, Victoria Island
   Lagos

# IN THE COURT OF APPEAL OF NIGERIA
## HOLDEN AT LAGOS

APPEAL NO: CA/L/495ᴹ/2018
SUIT NO: FHC/L/CS/625/2017

**BETWEEN**

**ZENITH BANK PLC** } **APPLICANT**

**AND**

1. **NIGERIA AGIP EXPLORATION LIMITED.**
2. **ALLIED ENERGY PLC**
3. **ERIN PETROLEUM NIGERIA LIMITED**
(*Previously Known as "Camac Petroluem Limited)* **RESPONDENTS**

## AFFIDAVIT IN SUPPORT

I, **Mr. Bosah Okonyia**, Male, Nigerian Citizen of Zenith Heights, Plot 84/87 Ajose Adeogun Street, Victoria Island, Lagos State do hereby make oath and state as follows:

1. That I am a Legal Practitioner in the law department of the Applicant, by virtue of which position I am conversant with the facts of this case.

2. That I have the consent and authority of my employer (the Applicant) to depose to this Affidavit.

3. That except as otherwise stated, I depose to facts within my personal knowledge, as well as from information obtained by me from reading the documents pertaining to the events leading up to this matter and from information derived in the course of carrying out my duties in the employment of the Applicant.

4. That the Applicant is a public company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84, Ajose Adeogun Street, Victoria Island, Lagos State.

5. The 1ˢᵗ Respondent is a private limited company incorporated under the Laws of the Federal Republic of Nigeria to carry on business in Nigeria with its offices situate at 1, Elsie Femi Pearse Street, Victoria Island, Lagos.

6. The 2nd Respondent is a public company incorporated under the Laws of the Federal Republic of Nigeria with its registered office situate at Plot 1649, Olosa Street, Victoria Island, Lagos.

**KENNA PARTNERS**
BARRISTERS | SOLICITORS

7. The 3rd Respondent (Previously known as 'Camac International Nigeria Limited') is a private limited company incorporated under the Laws of the Federal Republic of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos.

8. That by virtue of an Acreage Allocation (Discretionary Award) of OPL 210 issued by the Ministry of Petroleum Resources (Petroleum Resources Department), the 2nd Respondent is the legal holder of Oil Mining Lease (OML) 120 and 121.

9. That by virtue of a transfer agreement between the 2nd and 3rd Respondents, the 3rd Respondent acquired all the economic interest of the 2nd Respondents in the oil block covered by OML 120 and 121 (although the approval of the Minister of Petroleum was yet to be obtained with respect to the transfer).

10. That the 3rd Respondent sometime in 2014 approached the Applicant for a Term Loan Facility of USD100,000,000.00 (One Hundred Million United States Dollars) to part-finance the expansion and development of the oil blocks covered by OML120 and 121.

11. That by virtue of a Term Loan Facility Agreement, the Applicant granted a loan facility of USD100,000,000.00 (One Hundred Million United States Dollars) to the 3rd Respondent. A copy of the Term Loan Facility Agreement is hereto annexed and marked as **Exhibit 1**.

12. That as security for the repayment of the loan facility granted by the Applicant to the 3rd Respondent, the 3rd Respondent undertook to obtain in favour of the Applicant, a legal charge over the 2nd and 3rd Respondents' entire interest in Oil Block OML 120 and 121.

13. That further to paragraph 12 above, a Deed of Legal Charge over interest in OML 120 and 121 dated May 14, 2014 was executed between the Applicant and the 2nd and 3rd Respondents, by which the 2nd Respondent charged its entire interest in OML 120 and 121 in favour of the Applicant.

14. That similarly, an All Asset Debenture dated November 25, 2014 was executed between the Applicant and the 3rd Respondent, by which the 3rd Respondent charged ALL its assets whether fixed or floating, present and future in favour of the Applicant.

15. That some of the agreements executed as security for the repayment of the Term Loan Facility Agreement granted by the Applicant to the 3rd Respondent are:

15.1.    All Assets Debenture dated November 25, 2014;
15.2.    Deed of Legal Charge dated May 14, 2015; and

**KENNA PARTNERS**
BARRISTERS | SOLICITORS

15.3.      Deed of Assignment of Rights.

16. The agreements outlined in paragraph 15 above are hereto annexed and marked as **Exhibits 2, 3 and 4** respectively.

17. That following the execution of the above referenced Deed of Legal Charge and Deed of All Assets Debenture, the Applicant registered the aforementioned security documents at the Corporate Affairs Commission which are evidenced by the Certificate of Registration of Deed of Legal Charge dated May 26, 2015 and the Certificate of Registration of Deed of All Assets Debenture dated December 12, 2014. Copies of the Certificates of Registration are hereto annexed and marked as **Exhibits 5 and 6 respectively**.

18. That in compliance with Clause 3 (Disbursement) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent (earlier described as **Exhibit 1**), the Applicant has fulfilled its obligation by disbursing the entire sum granted under the facility agreement to the 3rd Respondent.

19. That by Clause 17 (Representation and Warranties) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent, particularly, paragraph 17.8 (proceedings pending or threatened), the 3rd Respondent represented and warranted to the Applicant that, no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been stated or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

   a) May restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

   b) If adversely determined, would reasonably be expected to have a material adverse effect.

20. That at the time of entering into the Term Loan Facility Agreement and the Disbursement of the loan sum by the Applicant to the 3rd Respondent, the Applicant was not aware or informed of the existence of any litigation, arbitration or administrative proceeding involving the 1st Respondent against the 2nd and 3rd Respondents or any other parties thereof.

21. That by a newspaper extract from *Thisday* Newspaper dated February 20, 2018, the Applicant became aware of an Arbitral Award given at the London Court of International Arbitration (LCIA) on February 14, 2017. A copy of the newspaper extract is hereto annexed and marked as **Exhibit 7**.

**KENNA PARTNERS**
BARRISTERS | SOLICITORS

22. That by the above referenced newspaper publication, the Applicant became aware that the 1st Respondent had obtained a Final Arbitral Award against the 2nd and 3rd Respondents from the LCIA in an Arbitration with Arbitration number: LCIA 132498.

23. That the Arbitral Award which was given by the London Court of International Arbitration purportedly arose from a dispute on a Sale and Purchase Agreement (SPA) which was concluded in June 2012 between 1st Respondent as Seller and the 2nd Respondent as Purchaser.

24. That by virtue of the above referenced SPA, the 1st Respondent had transferred to the 2nd Respondent, the entirety of its interest and rights in both Oil Mining Leases 120 and 121.

25. That the said Arbitral Award was given in respect of the Oil Assets (OML 120 and 121), the interest of which is charged in favour of the Applicant as security for the repayment of the Term Loan Facility granted by the Applicant to the 3rd Respondent.

26. That by virtue of an Order of the Federal High Court of Nigeria made on May 11, 2017, leave of Court was granted to 1st Respondent that the LCIA Final Award dated February 14, 2017 be recognised and enforced by the Court pursuant to Section 31 (1) and (2), Section 51(1) and (2) and Section 57 (1) of the Arbitration and Conciliation Act CAP A18, Volume 1, Laws of the Federation of Nigeria. A copy of the Order of the Federal High Court dated May 11, 2017 is hereto annexed and marked as **Exhibit 8**.

27. That the said order of the Federal High Court enforcing and recognising the Arbitral Award is for the cumulative sum of $101,638,966.67 (One Hundred and One Million, Six Hundred and Thirty Eight Thousand, Nine Hundred and Sixty Six United States Dollars, Sixty Seven Cents) and interest thereon compounded on a monthly basis against the 3rd Respondent.

28. That the said order is also for the cumulative sum of $175,123,614.85 (One Hundred and Seventy Five Million, One Hundred and Twenty Three Thousand, Six Hundred and Fourteen United States Dollars, Eight Five Cents) and interest compounded thereon on a monthly basis against the 2nd Respondent; and the sums of £7,119,290.99 (Seven Million, One Hundred and Nineteen Thousand, Two Hundred and Ninety Pounds, Ninety Nine Pence); and €550,796.01 (Five Hundred and Fifty Thousand, Seven Hundred and Ninety Six Euro, One Cent) and $5,900 (Five Thousand, Nine Hundred United States Dollars) against the 2nd Respondent and the 3rd Respondent jointly and severally.

29. That the Applicant was not aware of the existence of any Sale and Purchase Agreement purportedly entered into between the 1st and 2nd Respondent neither was it informed of the existence of the Arbitral Proceedings from which

**KENNA PARTNERS**
BARRISTERS I SOLICITORS

the Final Arbitral Award given by the LCIA dated February 14, 2017 (now recognised by an order of the Federal High Court dated May 11, 2017) arose.

30. That the Applicant being unaware of the existence of the Arbitral Proceedings from which the Final Arbitral Award obtained by the 1st Respondent against the 2nd and 3rd Respondent dated February 14, 2017 arose until several months after the Award was recognised by an order of the Federal High Court made on May 11, 2017 was unable to make an appearance at the lower Court for an opportunity to be heard.

31. That the enforcement of the Order of the Federal High Court (recognising the Arbitral Award given by the LCIA) made on May 11, 2017 will put the security for the loan granted by the Applicant to the 3rd Respondent in jeopardy.

32. That the Applicant is an interested and necessary party whose genuine interests is adversely affected by the Order of the Federal High Court made on May 11, 2017.

33. That the Applicant has palpable and weighty interests which deserve to be protected from decimation by the Honourable court in the circumstance.

34. That the Applicant is now apprehensive of risks that will affect the security and thus affect its interests.

35. That the Applicant, dissatisfied with the Order of the lower Court filed a Motion on Notice for leave to appeal against the said Order. A copy of the said Motion on Notice for Leave to Appeal with the proposed Notice of Appeal attached thereto is annexed hereto and marked as **Exhibit 9.**

36. That I know for a fact that there are serious issues to be determined on appeal.

37. That the Applicant has fulfilled the conditions for the grant of an order of Stay of Execution and this Honourable Court is empowered to grant the order sought.

38. That I know for a fact that not granting this Motion for Stay of Execution will lead to the dissipation of the *res* in this matter and force a *fait accompli* on this Honourable Court, in view of the Applicant's intention to appeal against the Judgment of the Federal High Court of Nigeria dated 11, 2017 and the Motion for Leave to appeal already filed.

39. That it is in the interest of justice for this Honourable Court to stay execution of the Judgment of the Federal High Court made on May 11, 2017 pending the determination of the Applicant's Motion for Leave to Appeal filed and Notice of Appeal to be filed against the said Order.

**KENNA PARTNERS**
BARRISTERS | SOLICITORS

40.   That the Applicant undertakes to pay damages in the event that the application ought not to have been granted.

41.   That the Respondent will not be prejudiced by this application.

42.   That I depose to this affidavit in good faith, conscientiously believing same to be true and in accordance with the Oaths Act.

<u>DEPONENT</u>

Sworn to at the Court of Appeal Registry
Registry, Lagos, this ....... Day of May, 2018

BEFORE ME

S. O. O. AFARE (MRS)
SENIOR REGISTRAR
COURT OF APPEAL
LAGOS
COMMISSIONER FOR OATHS



DATED  THIS ..........DAY OF ......................................, 2014

CAMAC PETROLEUM LIMITED
AS BORROWER

AND

ZENITH BANK PLC
AS LENDER

$100,000,000 (ONE HUNDRED MILLION UNITEDSTATES
DOLLARS)

TERM LOAN FACILITY AGREEMENT
FOR THE EXPANSION AND DEVELOPMENT OF THE OIL
BLOCK OML 120 AND 121

**THIS TERM LOAN FACILITY AGREEMENT** is made the ......... day of ......... between

**CAMAC PETROLEUM LIMITED**, a Company Incorporated under the Laws of the Federal Republic of Nigeria having its office at Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos (hereinafter referred to as **"The Borrower"** which expression shall where the context so admits include its successors-in-title and assigns) of the one part.

**AND**

**ZENITH BANK PLC**, a banking Company Incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84 Ajose Adeogun Street, Victoria Island, Lagos State (hereinafter referred to as **"The Lender"** which expression shall where the context so admits include its successors-in-title and assigns) of the other part.

The Borrower and the Lender shall be jointly referred to as "Parties" in this agreement.

**WHEREAS:**

i.     The Borrower has applied to the Lender for **a Term Loan Facility** in the principal sum of **$100,000,000.00 (One Hundred Million United States Dollars)** for the purposes of part financing the expansion and development of the Oil Block OML 120 and 121.

ii.    The legal holder of the Oil Block OML 120 and 121 is Allied Energy Plc. The Lender understands that by virtue of a Transfer Agreement, between Allied Energy Plc and the Borrower, the Borrower acquired all the economic interest of Allied Energy Plc in Oil Block OML 120 and 121. The approval of the Minister of Petroleum has not been obtained with respect to the transfer.

iii.   Pursuant to the request for the Term Loan Facility by the Borrower, the Lender has made an Offer of Credit Facility (dated July 21, 2014) to the Borrower, the terms of which have been duly accepted by the Borrower.

iv.    The Lender and the Borrower have agreed upon the grant of the term loan facility by the Lender to the Borrower on the terms and conditions herein contained.

**NOW THEREFORE IT IS AGREED** as follows:

1.         **INTERPRETATION**

    1.1    In this Loan agreement except the context otherwise admits, the following words, terms, phrases and expressions shall have the meanings ascribed hereto. Further the male gender shall include the female gender and vice-versa while the words and phrases in the singular shall include the plural and vice-versa.

        i.    **"All Assets Debenture"** means the Nigerian law governed agreement so granted by or to be granted by the Borrower in favour of the Lender and to include, without limitation, a charge over the current and future assets of the Borrower.

              **"Availability Period"** means the period during which the Lender undertakes to make the Term Loan Facility available to the Borrower for utilization subject to the satisfaction by the Borrower of all the conditions precedent to drawdown.

iii.   **"Available Facility"** means the undrawn and uncancelled portion of the Term Loan Facility.

iv.   **"Ancillary Documents"** means the Legal Charge over the OML 120 and 121, All Asset Debenture, Deed of Share Charge over the shares of the sponsors, Corporate Guarantees, Letter of Comfort from CAMAC Energy Holdings Limited and all other documents referenced in this Agreement required in order to give effect to the Terms of this Agreement.

v.   **"Board of Directors"** means the board of directors for the time being of the Borrower within the meaning of the Companies and Allied Matters Act CAP C20, Laws of the Federal Republic of Nigeria, 2004.

vi.   **"Business Day"** means a day on which banks in Nigeria are open for normal banking business excluding Saturdays and Sundays and any public holiday declared by the Federal Government of Nigeria.

vii.   **"Charged Assets"** means each of the assets and undertakings of the Borrower and more particularly charged to the Lender in the All Assets Debenture dated on or about the date of this Agreement between the Lender and the Borrower.

viii.   **CAPEX Reserve Account ("CRA"):** An account established with the Lender and which will be used to build up and maintain the CRA required balance. Such amount shall not be less than 10% of net revenue after expenses.

ix.   **"Compensation Account"** Means the account established with the Lender to be used to receive all insurance payments and/or any other compensation due to the Borrower.

x.   "Closing date" means the                        or any other date agreed for the execution of this Agreement and any other ancillary agreements.

xi.   **"Drawdown"** means when all the conditions to drawdown set forth in this Agreement are met.

xii.   "Debt Service Reserve Account" means the account established by the borrower with the Lender to be used to fund debt service obligations dues on the next repayment date. To be funded no later than 7 days prior to each repayment date.

xiii.   **"Events of Default"** means any one of the events stated in clause 19 hereof.

xiv.   **"Final Maturity Date"** means ..., 2019 or any other date as may be agreed in writing between the Lender and the Borrower.

xv.   **"Legal Charge"** means the legal charge created or to be created over Oil Block OML 120 and 121 (which license is held by Allied Energy Plc).

xvi.    **"LIBOR"** means the London Interbank Offered Rate which is the rate at which banks offer and place money at the London inter-bank money market. Specifically, this is the one-month LIBOR rate for a period equal to that interest period which appears on the screen display designated as page 3750 on the Moneyline Telerate Service (or such other screen display or service as may replace it for the purpose of displaying British Bankers' Association LIBOR Rates for Dollar deposits in the London interbank market) at or about 1100 hours GMT on the applicable rate fixing day.

xvii.   **Material Adverse Effect;** means any outcome or circumstance which materially and adversely affects the obligations of the Borrower under this facility agreement or materially and adversely affects any of the securities hereby created.

xviii.  **"Moratorium"** means a period of grace during which repayment of the principal amount of the Loan shall be suspended and shall be twelve (12) months commencing from the date of the first drawdown.

xix.    **"Month"** means a calendar month.

xx.     "Obligor" means any person having an obligation (directly or indirectly under this facility agreement or any other ancillary agreement related to this facility (including Allied Energy Plc, the off takers, Camac Energy Incorporated.... etc)

xxi.    **"Project"** means the further expansion and development of the Oil Block OML 120 and 121.

xxii.   **"Request"** means a request by the Borrower to utilize the Term Loan Facility, substantially in the form of Schedule 1.

xxiii.  "Sponsors" means the shareholders of the Borrowers.

xxiv.   **"The Term Loan Facility"** means the term loan facility described in clause 2 granted to the Borrower by the Lender.

xxv.    **"The Loan amount"** means the aggregate principal amounts drawn by the Borrower at any time under the Term Loan Facility and not repaid or prepaid.

xxvi.   **"USD"** and **"$"** means the lawful currency of the United States of America.

1.2     Words and phrases defined in the Companies and Allied Maters Act Cap C20 Laws of the Federal Republic of Nigeria 2004 shall subject to the foregoing have the same meanings respectively in this Term Loan Facility Agreement.

1.3.    The headings of the various clauses are inserted for convenience only and shall not affect the construction of the clauses of this Term Loan Facility Agreement.

1.4    References to any statute or statutory provisions are to the statute or provisions as may from time to time be amended, modified, extended or re-enacted.

2.    **FACILITY**

The Lender hereby grants to the Borrower upon the terms and subject to the conditions herein contained a term loan facility in the aggregate principal sum of **US$100,000,000.00 (One Hundred Million United States Dollars)** to be designated the Term Loan Facility and the Borrower hereby accepts the Facility from the Lender.

3.    **DISBURSEMENT**

3.1.    The Term Loan Facility shall be available for utilization for a period of 12 (twelve) months from the date of execution of this agreement.

3.2.    The disbursement shall be made in 4 (four) tranches of US$25,000,000 (Twenty Five Million US Dollars) each upon satisfaction by the Borrower of all the condition precedent. It being understood that at least 10% of the facility (equivalent of N1.6Billion Naira) shall be disbursed in Nigeria currency (Naira).

3.3.    The Term Loan Facility shall be available in US Dollars (for offshore portion) and Naira (for payment to local contractors and suppliers). The dollar portion will also be available for utilization as letters of credit: unconfirmed, confirmed, deferred and Usance.

4.    **COMMITMENT**

The Lender hereby undertakes and agrees that subject to the terms of this Loan Agreement and the Offer Letter for the facility it shall during the Availability Period make the Term Loan Facility available to the Borrower for utilization for the purpose stated in clause 5 as contemplated under this Agreement.

5.    **PURPOSE**

5.1.    The Borrower shall utilize the Loan strictly for the purposes of part financing the expansion and development of the Oil Block OML 120 and 121.

5.2.    The Facility shall be utilzed (i) via direct payment to suppliers and contractors, offshore payment via letters of credit and transfers based on the terms of supply while direct disbursement shall be made to local suppliers from the Naira disbursement (ii) to fund financing costs, expenses and fees associated with the facility.

5.3.    The Lender is not bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

6.    **TENOR**

This Term Loan Facility shall be for a period of five (5) years inclusive of twelve (12) months moratorium on Principal only.

4

7.  **DRAWINGS**

7.1. The Borrower shall be entitled to make drawings under the Term Loan Facility at any time during the Availability Period, and for each such drawing (to be designated a "Drawing") the Borrower must complete a Request, such Request to be made in the form of schedule 1 hereto and delivered to the Lender during a Business Day. The Lender shall communicate acceptance of the Request to the Borrower within thirty (30) days of the request.

7.2. Drawings under the Facility shall be subject to satisfaction by the Borrower of all the conditions precedent to drawdown stipulated in the accepted Offer Letter dated July 21, 2014 in each case in form and substance satisfactory to the Lender unless waived by the Lender on such terms as the Lender deems fit in writing.

7.3. Notwithstanding any other provision of this Loan Agreement, including, without limitation, those in Clauses 3.3 and 5.2, the amount of any standby letter of credit issued hereunder shall not be considered to be a drawing under the Term Loan Facility but shall be considered to be a Contingent Liability which reduces availability but does not incur interest and/or charges until actual presentation for payment.

8.  **INTEREST AND OTHER FEES**

8.1. The dollar rate of interest chargeable in respect of the Loan shall be LIBOR + 7.5% par annum, subject to a floor of 9.5% per annum.

8.2. The Naira interest rate shall be 18.75% per annum. This rate is subject to upward or downward review by the Lender in line with money market realities. However, any future advice of upward review shall be for information only and will be deemed accepted accordingly unless the facility is paid down on the effective date of such upward review.

8.3. Default interest will be payable on all overdue amounts at floor rate plus applicable margin of 2.00% per annum.

8.4. The Borrower shall also pay the following other fees

(i)   **Management Fee** at 1% flat, payable upfront upon acceptance of offer;

(ii)  **Processing Fee** at 0.35% flat, payable upfront upon acceptance of offer.

(iii) **Commitment Fee** at 0.50%, payable quarterly in arrears annually on the undrawn balance.

(iv)  **Loan Service Fee (Periodic):** 0.5% payable upfront upon acceptance and on every anniversary on the outstanding balance until the facility is fully repaid.

8.5. Where any interest payment or principal repayment under this Clause is due on a day that is not a Business Day, such payment shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is none).

**SECURITY**

9.1. As security for the repayment of the Loan, which security shall terminate and be released by the Lender at such time as no amount is or may be outstanding under this Loan Agreement, the Borrower shall:

(a) Obtain in favor of the Lender a Legal Charge over Allied Energy Plc and Camac Energy Incorporated's entire interest in Oil Block OML 120 and 121;

(b) Create in favor of the Lender a fixed and floating Legal Charge by way of an All Assets Debenture over its present and future assets including any currently unissued shares in the Borrower or any shares created as a result of an increase in the authorised share capital of the Borrower. This Agreement and the All Asset Debenture to be executed and read contemporeneously.

(c) Obtain in favor of the Lender, a corporate guarantee (covering the entire facility and interests) from Camac Energy Incorporated (the parent company of the Borrower) and a corporate guarantee (covering the entire facility and interests) from Allied Energy Plc.

(d) Obtain an undertaking from Allied Energy Plc and Camac Energy Incorporated committing to domicile the proceeds from the sale of crude oil from OMLs 120 and 121 and processing of all NXPs from such sales through its account with the Lender.

(e) Obtain a letter of comfort from Camac Energy Holdings Limited to ensuring that its subsidiary (Allied Energy Plc and Camac Energy Incorporated) domicile the crude oil proceeds with the Lender and ensure performance of obligations under this Term Loan Facility Agreement

(f) Obtain an assignment to the Lender of all the rights in the share capital of the Borrower and to ensure the shareholders of the borrower create a pledge in favor of the Lender over their shares in the Borrower (including current and future shares as well as additional shares in the event of increase in the authorized share capital of the Borrower).

(g) Assign to the Lender, the Borrower's rights under all commercial contracts including sale and purchase agreements, off-take agreements and crude handling agreements.

(h) Cause Allied Energy Plc and Camac Energy Incorporated to assign to the Lender all their rights under all commercial contracts relating to OMLs 120 and 121 including sale and purchase agreements, off-taker agreements and crude handling agreements.

(i) Create in favor of the Lender, an irrevocable Domiciliation agreement (between the Borrower, Allied Energy Plc, Camac Energy Incorporated and off-takers domiciling all proceeds from the off take agreement in the designated accounted opened with the Lender.

(j) Enter into an irrevocable undertaking (along with Allied Energy Plc and Camac Energy Incorporated) to open all NXP in respect of crude oil lifting from OMLs 120 and 121 being financed throughout the tenor of the facility with the Lender and to route all proceeds of crude oil sales from OMLs 120 and 121 to its account with the Lender.

(k) Create a charge in favor of the Lender over all of the Borrower's accounts, receivables, rights and interest and cause Allied Energy Plc and Camac Energy Incorporated to create a charge in favor of the Lender over all its accounts, receivables, rights and interest with respect to OML 120 and 121.

(l) Assign to the Lender, all rights under any hedging agreement entered into in relation to the Facility.

(m) Assign to the Lender, all insurance and reinsurance contracts including performance guarantees by EPC related to the project.

(n) Obtain from the off-takers of the crude oil from OMLs 120 and 121 a commitment/acknowledgment of domiciliation instruction by Allied Energy Plc and Camac Energy Incorporated to domicile all sales proceeds to the Borrower's account with the Lender.

(o) Pledge all its unissued shares (including news shares issued in the event increase in the share capital) to the Lender.

9.2.    Except with the written consent of the Lender, the Borrower hereby undertakes not to and shall not create or permit to subsist any other mortgage, charge, pledge or lien (each a "Security Interest") on any of its Charged Assets and/or securities hereby created except for any Security Interest:

a. To secure any excise or import taxes or duties owed to, or industrial grants made by any state, government, political sub-division or international organization, or any agency, authority, instrumentality or body or any regulatory authority; or

b. Arising by operation of law; or

c. Created or arising with the prior written approval of the Lender; or

d. Created or arising out of retention of title provisions or a conditional sale in respect of goods acquired by the Borrower in the ordinary course of business; or

e. Which is a lien or other Security Interest arising in the ordinary course of the Borrower's business consistent with the Borrower's past practice and not securing Borrowings; or

f. The principal purpose and effect of which is to allow the setting-off or netting off obligations with those of a financial institution in the ordinary course of the cash management arrangements of the Borrower; or

g. Constituted by netting, set-off or cash collateral arrangements in relation to swaps or other derivative agreements in the ordinary course of its business; or

h. Arising under arrangements in connection with the participation in or trading on or through any clearing system or investment, commodities or stock exchange where the Security Interest arises in the ordinary course of business under the rules or normal procedures or legislation governing such system or exchange; or

i. Over securities, derivatives or commodities, in respect of the acquisition cost of such securities, derivatives or commodities owed to a dealer therein or an agent for the purchase thereof where such cost fails to be paid within 180 days of being incurred; or

j. Arising out of or in connection with pre-judgment legal process or a judgment or a judicial award relating to security for costs; or

k. Which is to renew, extend or replace a Permitted Security Interest if the principal amount secured is not thereby exceeded and such permitted Security Interest is discharged or released within 3 (three) months of the creation of the replacement Security Interest; or

l. Over cash or cash equivalents covering any indebtedness (or obligations in respect thereof, such as future interest) in respect of capital market issues in existence on the Closing Date which has been fully covered by cash or cash equivalents as a means of achieving the economic effect of full repayment of that indebtedness; or

## 10.   CREATION OF ACCOUNTS

10.1.   **Collection Accounts:** A collection account shall be opened with the Lender to receive all revenues generated from the obligor base asset (OML 120 and 121) including receivables from the off-take agreement. Withdrawals shall be made from the collection account to fund the following accounts: (i) Debt Service Reserve Account (DSRA) (ii) Operations Account (iii) Debt Service Account (iv) CAPEX (v) Compensation Account.

10.2.   **Operations Accounts:** The Borrower shall open an operations account with the Lender. On each waterfall date, the company shall deposit in the operation account from the collection account such amounts as necessary to permit payment from that account of up to 100% of the operating expenditure for the next 3months.

10.3.   **Debt Service Account:** The Lender shall open a Debt Service Account with the Lender which will be used to fund debt service obligations due on the next repayment date. This is to be funded no later than 7 days prior to from the DSRA.

10.4.   **CAPEX Reserve Account (CRA):** This account shall be established with the Lender and will be used to build up and maintain the CRA required balance. The CRA balance shall not be less than 10% of net revenues after expenses.

10.5.   **Compensation Account:** A compensation account shall be established with the Lender for the purpose of receiving all insurance payments and/or any other compensation due to the Borrower.

10.6   **DSRA Required Balance:** Debt Service Reserve Account ("DSRA") shall be opened to warehouse the DSR required balance. In an event of default, any funds held in the Debt Service Reserve Account may be promptly applied as a mandatory prepayment under the facility. This shall be maintained to hold 12 months interest obligation during the moratorium and subsequently funds sufficient to pay one quarter interest and principal shall be constantly held in this account.

## MORATORIUM

The Lender hereby grants to the Borrower a moratorium on principal only of the Term Loan Facility for a period of twelve (12) months, interest will be paid during the moratorium period on a quarterly basis.

## 12.   REPAYMENT

12.1   The Borrower shall make quarterly (per annum) repayment of principal and interest commencing after the moratorium period. However, interest shall be payable quarterly during the moratorium period.

12.2   The principal and interest on the facilities shall be paid by the Borrower to the Lender on the due date through the legally accepted mode of repayment as specified by the Central Bank of Nigeria, accompanied by a letter signed by the authorised representative of the Borrower, stating the purpose of the payment. Notwithstanding the purpose stated in the letter by the Borrower, the Lender shall apply any payment so received from the Borrower first in or towards the satisfaction or reduction of the payment of interest then due and unpaid before applying same to or towards the repayment of the principal sum then due and if the amount is not enough to repay the full amount then due, the Lender shall so notify the Borrower who shall within 30 (thirty) days of receiving such notification pay to the Lender the amount necessary to repay the installment in full.

12.3   Where any date for a repayment under this Clause is not a Business Day, such repayment shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

12.4   On the Final Repayment Date, the Borrower shall pay and discharge all outstanding secured obligations in full.

## 13.   PREPAYMENT AND CANCELLATION

13.1.   On giving not less than 14 (fourteen) business days prior written notice to the Lender, the Borrower may prepay the Loan in whole or in part.

13.2.   Parties agree that Prepayment is allowed only in multiples of US$5,000,000.00 (Five Million US Dollars). However, a 1% flat charge shall be applied on the prepaid amount.

13.3.   Amounts prepaid will not be re-borrowed and shall first be applied in or towards payment of any interest due and unpaid then towards repayment of any principal installments then due and unpaid.

## 14.   CONDITIONS PRECEDENT TO DRAWDOWN

14.1.   The Borrower shall not be entitled to draw or utilize the Term Loan Facility or any part thereof unless the Lender shall have received the following:

14.1.1. Acceptance of the offer dated July 21 2014, evidenced by signing and returning a copy of the offer letter by the authorized signatories of the Borrower. Such authority to accept the offer by the Borrower to be obtained via a duly signed Board resolution of the Borrower. The Lender confirms that the referenced offer dated July 21, 2014 has been accepted and signed by the Borrower.

14.1.2. Submission of duly executed written Board Resolution of the Borrower euthorizing and accepting usage of the term loan facility.

14.1.3. Submission of a Board Resolution of the Borrower authorizing and accepting the terms and conditions contemplated under this Agreement.

14.1.4. Submission of a duly executed written Board Resolution of Allied Energy Plc and Camac Energy Incorporated authorizing the following:

    i. The use of their OML 120 and 121 as collateral for this facility. All the documents required for perfection and creation of legal charge shall be executed accordingly.

    ii. That all proceeds of crude oil export from OML 120 and 121 shall be domiciled with the Lender and transferred to the account of the Borrower with the Lender towards liquidation of the maturing installments of the Term Loan Facility.

14.1.5. Submission of a Board Resolution of the Borrower, Allied Energy Plc and Camac Energy Incorporated undertaking that the Borrower and Allied Energy Plc shall not obtain any additional finance or create any security interest over Oil Block OMLs 120 and 121 as well as its current and future assets without the prior written consent of the Lender.

14.1.6. Receipt of a Letter from the Borrower stating its current indebtedness (if any) to other lenders with the facility limits obtained, current outstanding balance (if any) and the collateral pledged.

14.1.7. Receipt of duly executed Term Loan Agreement between the Borrower and the Lender.

14.1.8. Receipt of duly executed legal charge by Allied Energy Plc and Camac Energy Incorporated on its interest in OML 120 and 121.

14.1.9. Receipt of duly executed all asset debenture over the fixed and floating assets of the Borrower in favor of the Lender.

14.1.10.     Receipt of duly executed pledge over all the shares of the Borrower (including issued and unissued shares and to extend to any new shares created in the event of shares capital increases).

14.1.11. Receipt of duly executed agreement between the Borrower, Allied Energy Plc, Camac Energy Incorporated and the off-takers domiciling all the proceeds from the sale of crude from the Oil Block OML 120 and 121 with the Borrower.

14.1.12. Receipt of duly executed agreement assigning the rights of the Borrower Camac Energy Incorporated and Allied Energy Plc under all commercial contracts related to OMLs 120 and 121 (including sale and purchase agreements, off-take agreements and crude handling agreements).

14.1.13. Receipt of an irrevocable undertaking by the Borrower, Camac Energy Incorporated and Allied Energy Plc to open all NXP in respect of crude oil lifting from OML 120 and 121 throughout the tenor of the facility with the Lender and to route all proceeds of crude oil sales from OML 120 and 121 to its account with the Lender.

14.1.14. Receipt of duly executed pledge in favor of the Lender over the Borrowers accounts, receivables, rights and interests.

14.1.15. Submission of an independent reserves and technical report on the assets provided by an independent technical consultant, acceptable to the Lender.

14.1.16. Receipt of duly executed first charge on the Borrower's account with the Lender, warehousing the proceeds of crude oil sales on OML 120 and 121.

14.1.17. Receipt of duly executed standard corporate guarantee of Camac Energy Incorporated and Allied Energy Plc, the parent company of the Borrower.

14.1.18. Receipt of duly executed undertaking by the Borrower that the US Dollars and Naira equivalent of the foreign exchange or the Borrowers account with the Lender should be debited for the Dollar and/or Naira equivalent of principal and interest in the event that payment from the crude exported is delayed on due date or repayment or at the time of expiration of the facility.

14.1.19. Receipt of written confirmation or certificate of compliance issued by the Department of Petroleum Resources in respect of OML 120 and 121.

14.1.20. Receipt of documents relating to the Borrower's acquisition of the remaining economic interest in OML 120 and 121 form Allied Energy Plc and Camac Energy Incorporated.

14.1.21. Receipt of all other necessary security documents.

14.1.22. Execution of any other necessary security document(s) as may be reasonably required by the Lender.

14.2.  The Lender may allow the Borrower to utilize the facilities or any part thereof notwithstanding that all or any of the conditions precedent to the utilization of the facilities have not been fulfilled and such a concession shall not prejudice the right of the Lender to insist upon the fulfillment of all the conditions precedent to the utilization thereof before further utilization of the facilities nor prejudice the right of the Lender to recover from the Borrower any part utilized before the fulfillment of all or any part of the conditions precedent.

## 15.  OTHER CONDITIONS

15.1.  The Borrower shall submit to the Lender a copy of its quarterly management accounts within sixty (60) days of the end of each quarter and audited accounts within one hundred and twenty (120) days of the end of each financial year.

15.2.  This Term Loan Facility is made subject to availability of funds and to the rules and regulations governing banking business as enunciated by the Central Bank of Nigeria from time to time.

15.3.  In line with Central Bank of Nigeria ("CBN") directive, The Lender shall disclose information relating to this facility to CBN Licensed Credit Bureaus.

15.4.  Predetermination of borrowing base every six (6) months by an Engineering Consultant acceptable to the Lender.

15.5.  The Borrower hereby undertakes to source foreign currency on or before maturity of the Term Loan Facility.

15.6.  The Borrower, Camac Energy Incorporated and Allied Energy Plc shall inflow the repayment from proceeds generated from oil trading on/or before the expiration of the facility.

15.7.   The Borrower shall be required to take out a comprehensive insurance policy with a reputable insurance company acceptable to the Lender against fire and any other form of peril on OML 120 and 121 with the Lender noted as the first loss payee.

15.8.   The Borrower shall provide a list of contractors/subcontractors to be engaged in executing further expansion and development works on OML 120 & 121.

15.9.   The Borrower shall use its best efforts to ensure that contractors/subcontractors associated with this project open/ maintain accounts with the Lender wherein funds shall subsequently be disbursed.

15.10.  The Lender reserves the right to unilaterally review the terms and conditions of this facility from time to time in the light of changing market conditions and also to terminate this banking facility and accelerate the maturity of the Borrowers indebtedness based on any adverse information threatening the basis of this relationship or putting the banking facility at risk or loss and as a result of any breach of the terms and conditions of this facility. The Borrower shall be notified of any decision taken in this respect.

15.11.  In the event of a contemplated sale of shares, issuance of additional share capital, amalgamation of business or any other change that would result in any change of ownership of the company, or a substantial share capital of the company being taken over by a new owner, the prior consent of the Lender must be obtained in writing, otherwise the facility shall become immediately due and payable.

15.12.  The Borrower shall carry out periodic reserve redetemination audit to ascertain changes in borrowing base.

15.13.  The Lender reserves the right to securitize, syndicate or sell its interest in this credit facility based on its global risk/liquidity management objectives during the period of the facility.

15.14.  All legal fees, out-of-pocket expenses, taxes or commissions including cost of recovery of the facility in the event of default shall be for the account of the Borrower.

15.15   The Borrower shall not without the prior written consent of the Lender obtain any new facility from any other financial institution both local and foreign for further expansion of OML 120 and 121. The Lender in the event of need for additional borrowing shall have a right of first refusal.

16.     **STAMP TAXES**

        The Borrower shall pay and, promptly on demand, indemnify the Lender against any cost, loss or liability the Lender incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of this Agreement or any ancillary agreements.

17.     **REPRESENTATIONS AND WARRANTIES**

        The Borrower hereby makes the following representations and warranties to and for the benefit of the Lender

   17.1.  **Status**
          It is a duly incorporated and validly existing company with limited liability under the laws of the Federal Republic of Nigeria.

12

### 17.2.   Powers and Authority

It has the powers to enter into, or, as the case may be, to comply with, and be bound by all obligations expressed on its part under this Loan Agreement including the powers to borrow under this Loan Agreement and that it has taken all necessary actions to authorize the borrowings under this Loan Agreement and to authorize the execution, delivery and performance of this Loan Agreement.

### 17.3.   Non-Conflict

The execution, delivery and performance of this Loan Agreement will not violate any provisions of any existing law or regulation or statute applicable to it or of any mortgage, contract or other undertaking to which it is a party or which is binding upon its assets.

### 17.4.   Project Cost:

The project cost is approximately USD258.5 Million (Two Hundred and Fifty Eight Million Five Hundred Thousand Dollars).

### 17.5.   Borrowing Limits

Borrowings under this Loan Agreement up to and including the maximum amount available under this Loan Agreement will not, when borrowed, cause any limit on borrowings (whether imposed by statute, regulations, agreement or otherwise), or on the powers of its board of directors, applicable to it to be exceeded.

### 17.6.   Accounts

The most recent audited profit and loss account and balance sheet of the Borrower which have been or are to be delivered to the Lender together with the notes thereto give a true and fair view of the results of the operations of the Borrower for the period to which they relate and, as the case may be, the financial position of the Borrower as at the date to which they relate and have been prepared in accordance with generally accepted accounting principles in Nigeria consistently applied.

### 17.7.   Event of Default

No Event of Default has occurred and is continuing.

### 17.8.   Proceedings pending or threatened

No litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been started or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

(a) may restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

(b) if adversely determined, would reasonably be expected to have a Material Adverse Effect.

### 17.9.   Insolvency

No corporate action, legal proceeding or other procedure or step or creditors' process, has been taken against the Borrower.

## 17.10. Corruption

Neither the Borrower nor any of its Affiliates, and their respective officers, directors or authorised employees, agents or representatives has:

(a)   paid, promised to pay or offered to pay, or authorised the payment of, any commission, bribe, pay-off or kickback related to the OML 120 and 121 that violates or may violate any applicable law or regulation or entered into any agreement pursuant to which any such commission, bribe, pay-off or kickback may or will at any time be paid; or

(b)   offered or given any object or other thing of value to influence the action of a public official, or threatened injury to person, property or reputation, in connection with the OML 120 and 121.

## 17.11. Taxation

(a)   It has duly and punctually paid and discharged all Taxes imposed upon it or its assets within the time period allowed without incurring interest or penalties (save to the extent that the Lender is satisfied that (i) payment is being contested in good faith, (ii) it has maintained adequate reserves for the payment of such Taxes and (iii) payment can be lawfully withheld).

(b)   It is not materially overdue in the filing of any Tax returns.

(c)   No claims are being or are reasonably likely to be asserted against it with respect to Taxes other than any initial statement of Taxes due, provided by a tax authority.

## 17.12. Immunity

(a)   The execution by the Borrower of this Agreement, and the exercise by it of its rights and performance of its obligations under same will constitute, private and commercial acts performed for private and commercial purposes.

(b)   The Borrower will not be entitled to claim immunity (in relation to itself or any of its assets or property) from set-off, suit, execution, attachment or other legal process in any proceedings in relation to this Agreement or any ancillary Agreements.

## 18.    COVENANTS AND UNDERTAKINGS

### 18.1.   Duration

The undertakings in this Clause 18 will remain in force from the date of this Loan Agreement and for so long as any amount is or may be outstanding under this Loan Agreement.

### 18.2.   Financial Information

The Borrower shall deliver to the Lender copies of its audited accounts for each financial year as soon as the same are publicly available (and in any event within 120 days of the end of each of its financial year).

### 18.3.   Notification of Default

The Borrower shall notify the Lender of any Event of Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of it.

### 18.4.   Priority of Interest

The Borrower shall procure that its obligations under this Loan Agreement do and will rank in priority with all its other present and future unsecured and unsubordinated obligations (subject to the preference of certain obligations in liquidation, bankruptcy or other analogous proceedings in respect of it by operation of applicable law).

### 18.5. Change of Business/corporate structure

The Borrower shall not change the nature of the business being carried on by it, and Shareholders as at the date of this Loan Agreement. Any change in the current board of directors shall not be effective unless the Lender is notified and the Lender's written consent obtained.

### 18.6. Production and Lifting Schedule

The Borrower hereby undertake that on the first working day of every month, it shall provide the Lender with the certified copy of both the Daily Production Schedule as well as the Product Lifting Schedule showing the quantity of products produced and lifted respectively from OML 120 and 121.

## 19. EVENTS OF DEFAULT

Upon the happening of any of the following events, the Lender may by notice in writing to the Borrower so long as such event is continuing declare such event to constitute an Event of Default and the amount of the Facility then outstanding and the interest accrued thereon and any other moneys payable hereunder to be immediately due and payable and its obligation to provide moneys under this Loan Agreement to be terminated;

  i.   If the Borrower does not pay any moneys payable hereunder when due and such moneys remains unpaid for 30 (thirty) days after becoming due;

  ii.  If any order is made or effective resolution is passed or a successful petition is presented for winding up of the Borrower or if the Borrower goes into liquidation or dissolution; or

  iii. If the Borrower suspends any of its debts or ceases or threatens to cease to carry on its business or substantially the whole of its business; or

  iv.  If any encumbrancer takes possession or a receiver is appointed for any part of the assets of the Borrower and the interest of such encumbrancer or the appointment of the receiver is not terminated or rescinded within 21 (twenty one) days; or

  v.   If any distress, execution, sequestration or other process is levied or enforced upon or issued out against the properties or assets/shares of the Borrower and is not discharged within 21 (twenty one) days; or

  vi.  If the Borrower is unable to pay its debt within the meaning of section 409 of the Companies and Allied Matters Act 2004 or any statutory modifications or re-enactment thereof; or

  vii. If the Borrower commits any breach of any material part of this Loan Agreement and in the case of any breach capable of remedy fails to remedy the breach within thirty (30) days of being required in writing by the Lender to do so; or

  viii. If any representation or warranty made by the Borrower in this Loan Agreement or any notice, certificate or statement delivered or made hereunder proves to have been incorrect or materially inaccurate when made or delivered.

Notwithstanding any event provided above, the Lender may allow the Borrower a 'fifteen (15) days Cure Period' to remedy any event of default failing which the Lender may commence the process of realizing the security.

## 20.    CHANGE IN CIRCUMSTANCE

20.1.    If any change in the law or administrative regulations applicable to this Loan Agreement or any interpretation by the courts of law makes it unlawful or illegal for the Borrower to perform its obligations hereunder then the Borrower shall repay to the Lender any sums outstanding under the Facility together with all accrued but unpaid interest and commissions.

20.2.    If any change in applicable law or administrative regulations or in the interpretation thereof by any authority charged with the administration thereof makes it unlawful for the Lender to perform its obligations hereunder then and in any such situation:

20.2.1.    The Lender shall notify the Borrower accordingly;

20.2.2.    The Lender shall be discharged from all obligations towards the Borrower hereunder and its commitment reduced to zero; and

20.2.3.    The Borrower shall on demand repay to the Lender the Loan within 90 (ninety) days thereafter.

20.3.    The Lender undertakes that during the tenor, duration, pendency or life of this Loan Agreement it shall continue to uphold, adhere to and comply with all laws and Governmental rules and regulations applicable to it, its operations, business and status and in particular the rules, regulations and directives of the Federal Ministry of Finance, Central Bank of Nigeria and other monetary and fiscal authorities and shall not commit, do, condone, allow, facilitate or accommodate anything, action, breach or omission that will put or place the Lender in a position that it is unable to meet or continue to meet its obligations hereunder or comply with the terms of this Loan Agreement.

## 21.    RECONSTRUCTION AND AMALGAMATION

This Loan Agreement shall not be affected by any amalgamation that may be effected by the Lender, its successors-in-title or assigns with any other company or persons whether the new company thus formed shall or shall not differ in its name, objects, character and constitution, it being the intent that this Loan Agreement shall remain valid and effectual in all respects in favour of and with reference to any such new company when formed and may be proceeded on or enforced in the same manner to all intents and purposes as if such new company had been named in and referred to herein instead of the Lender.

## 22.    INDULGENCE

The Lender may without prejudice to its rights herein enter into any agreement for giving time or other accommodation to the Borrower for the Facility or other monies hereby covenanted to be paid or any part thereof and may release or compound same with the Borrower or any person, company or corporation liable to pay the same.

## 23.    REMEDIES AND WAIVER

No failure to exercise and no delay in exercising on the part of the Lender rights, powers or privileges hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege preclude the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

24. **DEFAULT INDEMNITY**

If the Borrower fails to pay hereunder any sum due (of principal or interest) or to become due hereunder, the Borrower shall pay interest at the rate aforesaid on the unpaid sum from the date when such payment fell due up to the date of payment, PROVIDED that interest shall at all times be calculated and payable as simple interest and on a reducing balance basis in conformity with monetary directives issued by the Central Bank of Nigeria.

25. **ASSIGNMENT**

The Lender and the Borrower shall be entitled, with the prior consent of the other in writing to assign any of their rights and powers under this Loan Agreement, with all or any of the obligations herein stated and may assign and/or deliver to any such assignee, the security collateral hereto and in the event of such assignment, the assignee thereof of such right and powers and of such security, if any security be assigned and/or delivered shall have the same rights and remedies as if originally named herein in place of the Lender or the Borrower as the case may be, and thereafter the assignor will be fully discharged from all responsibilities with respect to any obligations so assigned and/or security delivered.

26. **NOTICE**

Any notice or demand required hereunder shall be deemed to have been sufficiently given if in writing and delivered by hand or courier at the addressee's address as hereinbefore stated or at each party's last known address.

27. **ACCOUNTS**

The Lender shall open in its books such accounts as may be required by the Lender to show satisfactory evidence of the transactions contemplated by this Loan Agreement.

28. **LEGAL COSTS, CHARGES AND EXPENSES**

The Borrower shall be responsible for the stamp duty payable in respect of this Loan Agreement and the costs in connection with the preparation, negotiation and execution of this Loan Agreement.

29. **DISPUTE RESOLUTION**

29.1. **Initial Mediation of Dispute**

In the event of a dispute between the parties to this Loan Agreement, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.     A meeting shall be held within 7 (seven) days at which all parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.    If within 14 (fourteen) days following the Initial Meeting, the parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the parties. Each party shall bear its proportionate share of the costs of the mediator's fees.

The parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii.   If after a period of 30 (thirty) days following the commencement of Mediation the parties are unable to resolve the dispute either party may submit the dispute to binding arbitration in accordance with clause 29.2 hereof upon 10 (ten) days prior written notice to the other party.

### 29.2.   Binding Arbitration

i.   Either party may submit any dispute arising out of this Loan Agreement that is not resolved following the processes in clauses 29.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii.   The referral of the dispute to Arbitration precludes any other course of action by the other party except upon the mutual agreement and consent of both parties.

iii.   The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Lender and the Borrower respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

iv.   Each party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Lender and the Borrower respectively.

v.   The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

## 30.   FORCE MAJEURE

Any delay in or failure of performance of this Loan Agreement by either party hereto shall not constitute default by such party or give rise to any claim for damages against it if such delay or failure of performance is caused by force majeure including but not limited to acts of God, acts of war or revolution, civil commotion, strikes, lock out, any labour unrest, governmental action, fire, flood, earthquake, destructive lightning, epidemic or other circumstances which are beyond the reasonable control of the party affected and which they could not have reasonably foreseen and guarded against and which by exercise of reasonable care and diligence they are unable to prevent.

## 31.   ACKNOWLEDGMENT

Any admission or acknowledgment in writing by the Borrower or by any authorized person on behalf of the Borrower of the amount of indebtedness of the Borrower to the Lender or any statement of account furnished by the Lender as the case may be as a true copy extracted from the books of the Lender shall be accepted as prima facie evidence against the Borrower.

32. **EXECUTION OF LOAN AGREEMENT**

This Loan Agreement may be executed in any number of counterparts and such counterparts signed by all the parties hereto shall be deemed to constitute one and the same instrument and the Loan Agreement shall become effective when each of the parties hereto shall have signed a copy thereof (whether the same or different copies) and shall have delivered the same to the Lender.

33. **SEVERABILITY OF PROVISIONS**

Any provisions in this Loan Agreement which is prohibited or unenforceable under Nigerian Law shall be ineffective to the extent only of such prohibition or unenforceability without invalidating the remaining provisions hereof.

34. **APPLICABLE LAW**

The Loan Agreement shall be governed by and construed in accordance with the Laws of the Federal Republic of Nigeria.

35. **AGREEMENT**

This Loan Agreement supersedes any prior agreements, promises, negotiations or representations either oral or written relating to the subject matter of this Loan Agreement and, except as provided for herein, may not be amended or modified.

36. **AMENDMENT**

This Loan Agreement may not be amended or modified save by a document signed and sealed by and on behalf of the parties hereto.

37. **COMMENCEMENT DATE**

Notwithstanding any other date herein provided, furnished or appearing herein the commencement date of this Loan Agreement is the execution Date as herein provided.

38. **ENTIRE AGREEMENT**

This Loan Agreement shall be read in conjunction with the offer letter for the facility by the Lender dated July 21, 2014.   In case of any conflict with the terms of the offer letter for the facility by the Lender dated July 21, 2014, the terms of the offer letter shall prevail.

**SCHEDULE 1**
**FORM OF REQUEST**

TO:       Zenith Bank Plc

FROM:      Camac Petroleum Limited

DATE: ...............................

Zenith Bank Plc
Term Loan Facility Agreement dated  ..................., 201.....
   ("The Loan Agreement")

We wish to utilize the Term Loan Facility and request a Drawing to be advanced to us as follows:

a.     Amount of Drawdown:     ...........................

b.     Date:                ...........................

c.     Payment instructions:     ...........................

By:-
Camac Petroleum Limited

..................................
Authorised "A" Signatory

..................................
Authorised "A" Signatory

**IN WITNESS WHEREOF** the Lender and the Borrower have executed these presents in the manner hereinafter appearing the day and year first above written.

THE COMMON SEAL of the within-named "LENDER"
**ZENITH BANK PLC**
Hereunto affixed in the presence of:

DIRECTOR                                    SECRETARY

THE COMMON SEAL of the within-named "BORROWER"
**CAMAC PETROLEUM LIMITED**
Hereunto affixed in the presence of:

DIRECTOR                                    SECRETARY
                                            **BANWO & IGHODALO**
                                            BARRISTERS & SOLICITORS
                                            98, Awolowo Road S. W.
                                            Ikoyi, Lagos.

EXHIBIT ............................................ IN THE
FFIDAVIT OF ...................... ..........SWORN
.T AT ................... ..................OURT
EGISTRY........................THE ...........
AY......................OF ...............20.....

BEFORE ME.....)

S. D. OLAPADE (MRS)
SENIOR REGISTRAR
COURT OF APPEAL
LAGOS

ORIGINAL

**DATED** THIS ........ 25th ........ DAY OF ........ NOV ........ 2014

CAMAC PETROLEUM LIMITED
AS BORROWER

AND

ZENITH BANK PLC
AS LENDER

ALL ASSET DEBENTURE
OVER FIXED AND FLOATING ASSETS, PRESENT AND
FUTURE CHARGEABLE ASSETS OF CAMAC
PETROLEUM LIMITED

1

THIS ALL ASSETS DEBENTURE (Debenture) is made this _____ day of NOV, 2014 BETWEEN CAMAC PETROLEUM LIMITED a company incorporated in Nigeria and having its registered office at Plot 1649, _____ Street, Victoria Island, Lagos State (hereinafter called the Borrower) which expression shall where the context _____ admits include its successors-in-title and assigns) of the one part;

AND

ZENITH BANK PLC a bank duly registered and licensed under the laws of the Federal republic of Nigeria and having its registered office at Plot _____ ad, Ajose Adeogun Street, Victoria Island, Lagos State (hereinafter called "the Lender" which expression shall where the context so admits include its successors-in-title and assigns) of the other part.

WHEREAS

A. The Borrower has applied to the Lender for a Term Loan Facility in the sum of N1,600,000,000.00 (One Billion, Six Hundred Million Naira) only hereinafter referred to as the Facility for the purposes of part financing further expansion and development of the Oil Blocks OML 120 and 121. The holder of the Oil Block OML is Allied Energy _____.

B. The Lender has agreed to grant the Facility to the Borrower on the terms and conditions set out in the Term Loan Facility Agreement dated

C. The Borrower as beneficial owner of its fixed, floating, present and future Chargeable Assets intends to create an All Assets Debenture over the fixed, floating, present and future Chargeable Assets in favour of the Lender to secure the Borrower's obligations under the Term Loan Facility Agreement dated

D. The execution and delivery of this All Asset Debenture Agreement (Debenture) in addition to execution and delivery of other security documents in favour of the Lender as security for the Secured Obligations is a condition precedent to the Lender making the Facility available to the Borrower.

E. The Lender and the Borrower have agreed that the Facility and interest thereon and all sums which shall from time to time be outstanding and payable by the Borrower to the Lender shall be secured by way of a charge on all the Borrower's undertakings and assets, (including the assets listed in schedule 1 of the Debenture) which interest shall rank prior to any other obligation.

NOW THIS DEED WITNESSETH as follows:

1. DEFINITIONS AND INTERPRETATION

1.1. DEFINITIONS

    i. "Business Day" means a day on which banks in Nigeria are open for normal banking business excluding Saturdays and Sundays and any public holiday declared by the Federal Government of Nigeria.

    ii. "Charged Assets" means all assets and undertakings of the Borrower including the fixed and floating, present and future chargeable assets of the Borrower both movable and immovable, including tangible and intangible assets

 iii. **"Collateral Rights"** means all rights, powers and remedies conferred on the Lender by or pursuant to this Debenture or by applicable laws;

 iv. **"Term Loan Facility"** means the facility (to be) granted by the Lender to the Borrower in accordance with the Term Loan Facility Agreement between Camac Petroleum Limited and Zenith Bank Plc dated

 v. **"Facility Agreement"** means the Term Loan Facility Agreement dated 2014 between Camac Petroleum Ltd as Borrower, Zenith Bank Plc as Lender (as amended, varied, novated or supplemented from time to time);

 vi. **"Facility"** has the same meaning ascribed to it in the Term Loan Facility Agreement and Facility will be so construed;

 vii. **"Month"** means a calendar month.

 viii. **"Parties"** means the parties to this Debenture and "Party" means one of them;

 ix. **"Receiver"** means a receiver or a receiver and manager appointed by the Bank pursuant to the provisions of this Debenture;

 x. **"Related Rights"** means, in relation to any asset (a) the proceeds of sale of that asset or any part thereof; (b) all present and future rights under any licence, agreement for sale or agreement of lease in respect of that asset; (c) all present and future rights, powers, benefits, claims, contracts, warranties, remedies, security, guarantees, indemnities or covenants for title in respect of that asset; and (d) all present and future interest and other moneys and proceeds paid or payable under or in respect of that asset or its use;

 xi. **"Security"** means the security constituted by or pursuant to this Debenture;

 xii. **"Security interest"** means any mortgage, charge, assignment, guarantee, hypothecation, security interest, title retention, lien including banker's lien, preferential right, trust arrangement, right of set-off, counterclaim, privilege or priority of any kind having the effect of security or any preference of one creditor over another arising by operation of law;

 xiii. **"Security Period"** means the period beginning on the date of this Debenture and ending on the date on which the Borrower has fully discharged its obligations under the Facility Agreement; and

 xiv. **"USD"** and **"$"** means the lawful currency of the United States of America.

**1.2. Interpretation**

a. **Construction:**

Unless a contrary indication appears, any reference in this All Asset Debenture to:

 i. "assets" includes present and future properties, revenues and rights of every description;

ii. a "disposal" includes any transfer, grant, lease, assignment, sale, participation or other transfer of economic ownership, compulsory acquisition, compulsory sale or other disposal or agreement for the disposal of, or the grant or creation of any interest derived from, any asset;

iii. a "Finance Document", shall mean Term Loan Facility Agreement dated or any other agreement or instrument that is referenced to in the Term Loan Facility Agreement as amended, novated, supplemented, extended, replaced or restated;

iv. the "Agent", the "Arranger", the "Account Bank", any "Counterparty", the "Lender", any "Lender", any "Finance Party" or any "Party" shall be construed so as to include its successors in title, permitted assigns and permitted transferees and, in the case of the Lender, any person for the time being appointed as Lender or Lender in accordance with this Debenture;

v. "indebtedness" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

vi. "person" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

vii. a "regulation" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

viii. a provision of law is a reference to that provision as amended or re-enacted;

ix. Event of Default is as stated in the Term Loan Agreement dated....

x. A default (other than an Event of Default) is "continuing" if it has not been remedied or waived and an Event of Default is "continuing" if it has not been waived; and

xi. a time of day is a reference to London time, Lagos time or New York Time (as specified).

b. Section, Clause and Schedule headings are for ease of reference only and do not affect the interpretation of this Debenture.

c. Unless a contrary indication appears, a term used in this Debenture or in any notice given under or in connection with this Debenture has the same meaning in the Debenture.

d. A reference to a Clause or Schedule is a reference to that clause or schedule in this Debenture.

e. References to this Debenture or any specified provision of this Debenture or any other document shall be construed as references to this All Assets Debenture, that provision or that other document as in force for the time being and as amended in accordance with the terms thereof or, as the case may be, with the agreement of the relevant Parties.

f. Words importing the plural shall include the singular and vice versa.

g.   References to any statutory provision means that statutory provision as amended, supplemented, re-enacted or replaced from time to time (whether before or after the date of this Debenture) and are to include any orders, regulations, instruments or other subordinate legislation made under the relevant statutory provision.

h.   A reference in this Debenture to a mortgage of any real property includes all buildings and fixtures on that property and all Related Right.

i.   The fact that no details of any specific property or agreement are included in the relevant Schedules does not affect the validity or enforceability of any security created by or pursuant to this Debenture

j.   Words and phrases defined in the Companies and Allied Maters Act Cap C20 Laws of the Federal Republic of Nigeria LFN 2004 shall subject to the foregoing have the same meanings respectively in this Debenture.

k.   The headings of the various clauses are inserted for convenience only and shall not affect the construction of the clauses of this Debenture.

### 1.3.   Effectiveness of this Debenture

a.   Notwithstanding any other provision of this Debenture or the Term Loan Facility Agreement dated                 or any other Finance Document, this Debenture shall only be effective on and from the date it is signed by the Parties.

b.   **Entire Agreement**

In the interpretation of the provisions of this Debenture, this Debenture shall be read in conjunction with the provisions of the Term Loan Facility Agreement dated…. entered between the Borrower and Lender in respect of the loan Facility and executed.

c.   **Effect as a Deed**

This Debenture is intended to take effect as a deed notwithstanding that any Party may have executed it under hand only.

## 2.   REPRESENTATIONS AND WARRANTIES

2.1.   The Borrower represents and warrants to the Lender that:

a.   **Ownership of the Chargeable Assets:** It is absolutely, solely and beneficially entitled to all the Chargeable Assets as from the date it or any part of it falls to be charged under this Debenture and the rights of the Borrower in respect of the Chargeable Assets are free from any encumbrance or security interest of any kind other than the Security being created hereunder.

b.   **Power:** It has the power to execute, deliver and perform its obligations under this Debenture and all necessary corporate, shareholder and other action has been taken by it to authorise the execution, delivery and performance of this Debenture.

c.   **Consents Obtained:** Every material consent, permit, authorisation, licence or approval of, registration with or declaration to, governmental or public bodies or authorities or courts required by it to authorise, or required by it in connection with, the execution, delivery, validity, enforceability or admissibility in evidence of this Debenture or the performance by it of its obligations under this Debenture has been obtained or made and is in full force and effect and there has been no default in the observance of any material conditions or restrictions (if any) imposed on, or in connection with, any of the same and none of them is subject to any legal challenge or revocation or similar proceeding.

5

d.   **Binding Obligations:** This Debenture constitutes its valid and legally binding obligations, enforceable against the Borrower in accordance with its terms.

e.   **No Disposal:** Other than as permitted by the Facility Agreement the Borrower has not sold or agreed to sell or otherwise disposed of or agreed to dispose of the benefit of all or any of the Borrower's right, title and interest in and to the Charged Assets.

2.2.   The representations made by the Borrower on the date of this Debenture shall be deemed to be repeated by the Borrower by reference to the facts and circumstances then subsisting on the first day of each Interest Payment Date throughout the Security Period.

3.   Upon the Lender's declaring an Event of Default pursuant to clause 19 of the Term Loan Agreement, the Borrower will on written demand from the Lender pay and discharge all moneys and liabilities due and owing to the Lender by the Borrower under the Term Loan Agreement and any Ancillary Documents (as defined in the Term Loan Agreement)

4.   The Borrower as BENEFICIAL OWNER hereby charges in favour of the Lender for the consideration aforesaid all its assets with the payment and discharge of ALL moneys for the time being owing under this Security (including any expenses or charges arising out of or in connection with the acts authorised by this Debenture, ALL its undertaking goodwill and moveable properties for the time being both present and future wherever situate including its uncalled capital stock, raw materials, works in progress, finished works, materials stock equipment by whatever name and book debts hereinafter called ("the assets") and such charge shall be a first fixed charge or debenture on the assets and further charges to the Lender by way of Floating Debenture over all its future fixed and floating assets.

5.   The Borrower shall not create any further debenture or charges upon and so that no lien shall in any case or in any manner arise on or affect any part of the said assets without the prior written consent of the Lender. PROVIDED that any further debentures, mortgages or charges created by the Borrower with the consent of the Lender over the said assets (otherwise than in favour of the Lender) shall be expressed to be subject to this Debenture.

6.   Regarding any present or future uncalled capital and unissued shares of the Borrower, the Borrower hereby covenants and agrees with the Lender that:

(a)   The said uncalled capital and unissued shares of the Borrower shall not during the continuance of this security be issued or called up or received in advance of calls without the consent in writing of the Lender first sought and obtained.

(b)   The amount to be paid in respect of the said uncalled capital shall be paid to the Lender, which may at any time apply a competent part thereof in or towards satisfaction of the moneys intended to be secured.

(c)   At all times during the continuance of this Security the Borrower will permit the Lender or any persons authorized by the Lender to have access to and inspect free of all charges the share register and transfer books of the Borrower and all transfers of the Borrower's shares.

(d)   During the continuance of this Security the Borrower shall immediately after the presentation of any transfer of unpaid or partly paid shares in the capital of the Borrower give to the Lender notice in writing containing full particulars of such proposed transfer and shall not register any transfer of any such shares in the said capital until at least fourteen days after such notice as aforesaid shall have been given to the Lender and shall not register such transfer at all if within the said period of fourteen days the Lender shall object to the proposed transferee; and

6

(e) If the amount due and owing on this Debenture shall not be paid as and when it becomes payable the Borrower will at the request of the Lender call up or procure to be called up the uncalled capital hereby charged by such installment and payable at such time (not being contrary to the regulations of the Borrower) as the Lender shall in writing direct.

(f) The Borrower shall have no authority to sell or in any way transfer any of the present fixed and floating assets charged by this Debenture.

7.  All moneys and liabilities intended to be hereby secured or other balance thereof for the time being remaining unpaid shall immediately become payable notwithstanding anything to the contrary herein contained:

   (a)   If the Lender shall demand payment in writing from the Borrower and leave notice of such demand at the Borrower's registered post and seven days have elapsed after such notice without payment;

   (b)   If the Borrower fails to pay the rent payable in respect of any leasehold premises for the time being held by the Borrower or fails to perform and observe the covenants and conditions contained in or implied by the Grant(s) Assignment of lease(s) under which any immoveable property is held;

   (c)   If an order be made or an effective resolution be passed for the winding-up of the Borrower;

   (d)   If a distress or execution be levied or enforced upon or against any of the property of the Borrower and be not paid within seven days;

   (e)   If the Borrower shall stop payment or shall cease or threaten to cease to carry on its business; and

   (f)   If the Borrower shall commit any breach of the covenants and conditions herein contained, or in the Facility Agreement and any other undertaking by the Borrower or on its behalf to be performed and observed.

8.  At any time after the moneys and liabilities intended to be hereby secured shall have become payable under the provisions of this Debenture, the Lender may appoint by writing under the hands of its duly appointed Attorney or under the seal of the Lender any person whether an officer of the Lender or not to be a Receiver and/or Manager of the assets or any part thereof and may in like manner from time to time remove any Receiver and/or Manager so appointed and appoint another in his stead. The Receiver and/or Manager so appointed shall in addition to and without prejudice to the powers conferred upon him by law have power:

   (a)   To take immediate possession of the property hereby secured or any part thereof and for that purpose to take or defend proceedings in the name of the Borrower or otherwise.

   (b)   To sell (by public auction or private treaty) lease or let or concur in selling leasing or letting all or any of the property hereby secured and to carry any such sale leasing or letting into effect in the name and on behalf of the Borrower or otherwise.

   (c)   To demand and recover all the income and of the property hereby secured by action distress or otherwise to the full extent of the estate or interest which the Borrower could dispose of and to give effectual receipts accordingly for the same to exercise any powers which may have been delegated to it by the Lender pursuant to these presents.

(d)  To make and effect all repairs and insurances and do all other acts which the Borrower might do in the ordinary conduct of its business as well for the improvement and for the protection of the property hereby secured.

(e)  To make any arrangements or compromises which the Receiver and/or Manager shall think expedient in the interest of the Lender.

(f)  To appoint managers, officers, agents, accountants, advisers, stewards, workmen and others for the aforesaid purposes or any of them upon such terms as to remuneration or otherwise as he may think proper.

(g)  To give valid receipts for all moneys and execute all conveyances, assignments, deeds, assurances and things which may be proper or desirable for realizing such property and to do all such other acts and things as may be considered to be conducive to any of the matters or the powers aforesaid and which the Receiver and/or Manager lawfully can do as agent for the Borrower.

(h)  To use the name of the Borrower for all or any of the purposes aforesaid and in any legal proceedings.

(i)  To execute and deliver any deed or deeds or instrument and to convey, assign or otherwise assure the property over which he is appointed.

(j)  Receive property or any part thereof or any interest therein in the name or on behalf of the Borrower and by deed in the name and on behalf of the Borrower to grant, assign or demise the legal estate in any such property to the purchaser or lessee thereof.

(k)  To do all such other acts and things as may be considered by the Lender to be incidental or conducive to any of the matters or powers aforesaid and which he or they lawfully may or can do as agent or agents of the Borrower.

9.  A Receiver and/or Manager so appointed shall be the agent of the Borrower and the Borrower shall alone be liable for his acts and defaults and remuneration and he shall have authority and be entitled to exercise the powers hereinafter set forth and to do all such acts and things which a Receiver and/or Manager lawfully may or can do which may be necessary for or considered to be incidental or conducive to the carrying on of the business of the Borrower including the raising of money with the consent of the Lender on security of the said assets or without security and generally to take possession of, collect and get in all or any part of the assets and for that purpose to take proceedings in the name of the Borrower or otherwise as may seem expedient to sell any or any part of the assets and to make any compromise.

10.  All moneys received by any such Receiver and/or Manager shall after providing for all costs and expenses incurred in carrying on the business of the Borrower or the sale or disposal of the whole or any part of the said assets be applied:

FIRSTLY if the Receiver and/or Manager so desires but not otherwise in payment of rents, rates, taxes and outgoings affecting any immovable property of the Borrower and of premium on fire and other insurances thereon and on the said assets and the cost of executing necessary and proper repairs and replacements.

SECONDLY in payment of all costs, charges and expenses of and incidental to the appointment of the Receiver and/or Manager and the exercise by him or all or any of the powers aforesaid including the reasonable remuneration of the Receiver and/or Manager.

8

THIRDLY in or towards payment of all unpaid interest and all charges due under this Debentures

FOURTHLY in or towards payment of all principal moneys due in respect of this Debenture.

FIFTHLY any surplus shall be paid to the Borrower.

11.     In the event of default or breach of this Debenture, no purchaser or other person or Borrower dealing with the Lender or any Receiver and/or Manager appointed by it or with their attorneys or agents shall be concerned to enquire whether the powers exercised or purported to be exercised have become exercisable or whether any money remains due on the Security of this debenture or as to the necessity or expediency of the stipulations and conditions subject to which any sale shall have been made or otherwise as to the property or regularity of such sale calling in collection nor conversion or to the application of any money paid to the Lender or such Receiver and/or Manager and in absence of Mala-fides on the part of such purchaser, mortgagor, mortgagee or other person or Borrower such dealing shall be deemed so far as regards the safety and protection of such purchaser person or Borrower to be within the powers hereby conferred and to be valid and effectual accordingly.

12.     The Borrower hereby covenants with the Lender:

(a) To keep proper accounts relating to the said business and to allow the Lender or its authorized representatives to inspect the same at all reasonable times and from time to time to furnish such information with respect to the assets and all other assets and liabilities of the Borrower as the Lender may require.

(b) When necessary to repair, renew or replace all movable plant machinery engines tools implements utensils and other effects of a like nature now used or hereafter to be used for the purpose of or in connection with the business of the Borrower when and as the same shall be in disrepair worn out or destroyed.

(c) To permit the Lender and such person as the Lender shall from time to time in writing for the purpose appoint to enter into and upon the premises of the Borrower to view the state and condition of the said assets.

(d) To insure and keep in the name of the Borrower with an insurance office approved by the Lender such of the said assets (or towards the discharge of the principal and other moneys hereby secured as the Lender may require AND if default shall be made in keeping the said assets in good state of repair and in perfect working order and condition and so insured as aforesaid or in depositing any such policy or delivering any such receipt aforesaid the Lender may repair the said assets or such of them as shall in their opinion require reparation and may insure and keep insured the said assets or any part thereof as they may deem fit AND the Borrower will on demand repay to the Lender every sum of money expended by the Lender for the above purpose or any of them with interest at the rate of the Facility from the time of same respectively having been expended and until such repayment the same shall be a first charge upon the said assets and to have every policy of insurance relating to the said assets endorsed with a memorandum of the interests of the Lender as debenture holder and with a provision that all moneys payable under any such policy shall be paid to the Lender, to be applied to the benefit of the Lender in the manner hereinbefore appearing; and Not to assign mortgage sublet or part with the possession of the property belonging to the Borrower now or in the future without the prior consent in writing of the Lender first had and obtained.

13.    The Borrower hereby further covenants to indemnify the Lender in the full Facility/amount thereof against all costs, charges and expenses (including the costs of maintaining or enforcing or endeavouring to enforce this Security) incurred hereunder by the Lender  and all other moneys property paid by the Lender in respect of the said costs, charges and expenses or otherwise and the same together with interest thereon as aforesaid shall be added to the moneys hereby secured.  PROVIDED that the charge hereby created shall be in addition and without prejudice to any and every other remedy lien or security which the Lender may or but for said charge would have for the moneys hereby secured or any part thereof.

14.    The Lender shall not by reason of its entering into possession of any of the said assets be liable to account as mortgagee in possession or for anything except actual receipts or be liable for any loss upon realization or for any default or omission for which a mortgagee in possession might be liable.

## 15.    EFFECTIVENESS OF SECURITY

### 15.1.   Continuing Security

The Security created by or pursuant to this Debenture shall remain in full force and effect as a continuing security for the Secured Obligations unless and until discharged by the Lender in the manner provided for in Clause 16.1 of this Debenture (*Redemption of Security*).

### 15.2.   Cumulative Rights

The Security and Collateral Rights created by or pursuant to this Debenture shall be cumulative, in addition to and independent of every other security, which the Lender may at any time hold for the Secured Obligations including any other rights, powers and remedies provided by law.  No prior security held by the Lender over the whole or any part of the Charged Assets shall merge into the Security constituted by this Debenture.

### 15.3.   No Prejudice

The Security and the Collateral Rights created by or pursuant to this Debenture shall not be prejudiced by any unenforceability or invalidity of any other agreement or document or by any time or indulgence granted to the Borrower or any other person, or the Lender or by any variation of the terms of the trust upon which the Lender holds the security or by any other thing which might otherwise prejudice that security or any Collateral Right.

### 15.4.   Remedies and Waivers

No failure on the part of the Lender to exercise, or any delay on its part in exercising, any Collateral Right shall operate as a waiver of that Collateral Right, nor shall any single or partial exercise of any Collateral Right preclude any further or other exercise of that or any other Collateral Right.

### 15.5.   No Liability

None of the Lender or its nominee(s) or any Receiver shall be liable by reason of:

15.5.1  taking any action permitted by this Debenture; or

15.5.2  any neglect or default in connection with the  Charged Assets or;

15.5.3  taking possession of or realizing all or any part of the Charged Assets

the Borrower agrees that it shall not assert or seek to assert against the Lender, its nominee(s) or any Receiver any claim it may have against them in respect of any act or omission of the Lender, its nominee(s) or any Receiver under this Debenture

### 15.6. Partial Invalidity

If, at any time, any provision of this Debenture is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions of this Debenture nor of such provision under the laws of any other jurisdiction shall in any way be affected or impaired thereby and, if any part of the security intended to be created by or pursuant to this Debenture is invalid, unenforceable or ineffective for any reason, that shall not affect or impair any other part of the Security.

### 15.7. Immediate Recourse

The Borrower waives any right it may have of first requiring the Lender to proceed against or enforce any other rights or security or claim payment from any person before claiming from the Borrower under this Debenture or enforcing the Security.

### 15.8. Waiver of defences

The obligations of, and the Security created by, the Borrower under this Debenture will not be affected by any act, omission, matter or thing which, but for this Clause would reduce, release or prejudice its Secured Obligations under, or the Security created by or pursuant to this Debenture and whether or not known to the Borrower including but not limited to the following:

15.8.1. any time, waiver or consent granted to, or composition with, any person;

15.8.2. the release of any other third parties or any other person under the terms of any composition or arrangement with any creditor;

15.8.3. any incapacity or lack of powers, authority or legal personality of or dissolution or change in the members or status of, any Obligor or any other person;

15.8.4. any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Finance Document or any other document or security or of the Secured Obligations;

15.8.5. any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or Security or of the Secured Obligations; or

15.8.6. any insolvency or similar proceedings.

### 16. RELEASE OF SECURITY

### 16.1. Redemption of Security

At the termination of the Security Period, the Lender shall, at the request and cost of the Borrower, release and cancel the Security and procure the reassignment to the Borrower of the property and assets assigned to the Lender pursuant to this Debenture.

**16.2.   Retention of Security**

The Lender may retain this Debenture, the Security and all documents of title, certificates and other documents relating to or evidencing ownership of all or any part of the Charged Assets until the Secured Obligations have been discharged in full and a deed of release filed with the Corporate Affairs Commission and other relevant government authority in respect of any Security constituted by virtue of this Debenture, which the Lender undertakes to file at the termination of the Security Period.

**17.   INDEMNITY**

The Borrower shall from time to time, on the demand of the Lender:

**17.1.**   reimburse the Lender, its nominee(s) and any Receiver on a full indemnity basis for all costs, expenses, losses and liabilities (including legal fees and the fees, costs and expenses of any advisers or consultants) incurred by the Lender in connection with the enforcement of, or the preservation of any rights under this Debenture;

**17.2.**   pay or reimburse the Lender, its nominee(s) and any Receiver for any Amounts or Claims paid or incurred by it in acting as Lender under or in connection with this Debenture or the Charged Assets including (i) any Agent/Delegate Liabilities; and (ii) Amounts or Claims incurred in the course of disputing or defending any Amounts or Claims made against the Lender or any Agent/Delegate Liabilities, save to the extent that such Amounts or Claims arise from or are caused by the Lender's, Agent/Delegate's fraud, gross negligence or wilful misconduct.   "Amounts or Claims" are losses, liabilities, costs, claims, actions, demands or expenses and "Agent/Delegate Liabilities" are Amounts or Claims which the Lender is or would be obliged to pay or reimburse to any of its agents or delegates appointed pursuant to this Debenture; and

**17.3.**   indemnify the  Lender, its agents, managers, officers, employees, delegates, advisers and any Receiver for any expense, claim, liability, loss, cost, damage or expense incurred or arising in connection with the exercise or purported exercise of any rights, powers and discretions under this Debenture in the absence of fraud, gross negligence, wilful misconduct on their part.

**18.   ASSIGNMENT**

**18.1.**   The Lender may assign and transfer all or any of its rights and obligations under this Debenture in accordance with the Facility Agreement and for this purpose, the Lender shall subject to the Facility Agreement be entitled to disclose such information concerning the Borrower and this Debenture as the Lender considers appropriate to any actual or proposed successor or to any person to whom information may be required to be disclosed by any applicable law subject to the agreement of the third-party to be bound by the existing non-disclosure agreement between Borrower and Lender concerning non-public information.

**18.2.**   The Borrower shall not assign or delegate any of its rights or obligations under this Debenture without the prior written consent of the Lender.

**19.   NOTICES**

**19.1.   Communications in writing**

Any communication to be made under or in connection with the Debenture shall be made in writing and, unless otherwise stated, may be made by fax or letter.

### 19.2.   Addresses

**19.2.1.** The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) for any communication or document to be made or delivered under or in connection herewith is:

**19.2.1.1.**   The contact details of the Borrower for this purpose are:

| | |
|---|---|
| Address: | Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos |
| Fax: | +2341 |
| Email: | |
| Attention: | |

**19.2.1.2.**   The contact details of the Lender for this purpose are:

| | |
|---|---|
| Address: | Zenith Bank Plc, Plot 84 Ajose Adeogun Street, Victoria Island, Lagos |
| Fax number: | +2341 |
| Email: | |
| Attention: | Company Secretary, Mr. Micheal Osilama Olu |
| Phone No: | +23412781971 |

### 19.3.   Delivery

**19.3.1.** Any communication or document made or delivered by one person to another under or in connection with this Debenture shall only be effective:

**19.3.1.1.**   If by way of fax, , at the time of transmission, if received before 1700 hours in the place of delivery on a Business Day, and otherwise on the next Business Day; or if by way of letter,5 (five) business days after being mailed by either registered or certified mail, return receipt requested with postage prepaid.

**19.3.2.** Any communication or document to be made or delivered to the Lender shall be effective only when actually received by the Lender and then only if it is expressly marked for the attention of the officer identified in Clause 19.2.1.2

### 19.4.   Notification of address and fax number

Each party shall promptly notify the other party of any change to its address and fax number pursuant to Clause 19.2 (*Addresses*).

### 19.5.   Electronic communication

**19.5.1.** Any communication to be made between the Borrower and the Lender under or in connection with this Debenture may be made by electronic mail or other electronic means, if the Borrower and the Lender:

**19.5.1.1.**   agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

**19.5.1.2.**   notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means;

**19.5.1.3.**   notify each other of any change to their address or any other such information supplied by them.

**19.5.2.** Any electronic communication made between the Borrower and the Lender shall be effective only when actually received in readable form and in the case of any electronic communication made by the Lender to the Borrower only if it is addressed in such a manner as the Agent or the Lender shall specify for this purpose.

### 19.6. English language

Any notice given under or in connection with this Debenture must be in English.

### 20.    PAYMENT FREE OF DEDUCTION

All payments to be made to the Lender, including its fees and costs, under this Debenture shall be made free and clear of and without deduction for any tax unless the Borrower is required to make such payment subject to the deduction or withholding of tax, in which case the sum payable by the Borrower, in respect of which such deduction or withholding is required to be made, shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the person on account of whose liability to tax such deduction or withholding has been made receives and retains (free from any liability in respect of such deduction or withholding) a net sum equal to the sum which it would have received and retained had such deduction or withholding not been made.

### 21.    DISCRETION AND DELEGATION

#### 21.1    Discretion

Any liberty or power which may be exercised or any determination which may be made under this Debenture by the Lender or any Receiver may, subject to the terms and conditions of the Facility Agreement and this Debenture, be exercised or made in its absolute and unfettered discretion without any obligation to give reasons.

#### 21.2    Delegation

Each of the Lender and Receiver shall have full power to delegate, either generally or specifically, the powers, authorities and discretions conferred on it by this Debenture on such terms and conditions as it shall see fit which delegation shall not preclude either the subsequent exercise, any subsequent delegation or any revocation of such power, authority or discretion by the Lender or the Receiver itself.

### 22.    GOVERNING LAW

This Debenture and all obligations arising out of or in connection with it shall be governed by and construed in accordance with the laws of the Federal Republic of Nigeria.

### 23.    FURTHER ASSURANCE

23.1.    The Borrower shall promptly, at its own cost, do any act, make any filing or registration or sign, seal, execute and deliver such mortgages, charges, transfers, assignments, securities, notices, deeds, instruments or other documents as in each case the Lender shall from time to time stipulate, and in such form as the Lender may require to:

23.1.1. perfect and protect the Security intended to be conferred on the Lender by this Debenture or the first priority ranking thereof or which are required for the exercise of the Collateral Rights;

23.1.2. maintain the Security Interests intended to be hereby created or the first priority ranking thereof;

23.1.3. create, perfect or protect any security interest which it may, or may be required to, create in connection with this Debenture;

23.1.4. stamp (and up-stamp at the discretion of the Lender) this Debenture as and when demanded by the Lender; and

23.1.5. to facilitate the enforcement of the Security, the exercise of the Collateral Rights and the realization of the Charged Assets.

## 24.  DISPUTE RESOLUTION

### 24.1.  Initial Mediation of Dispute

In the event of a dispute between the Parties to this All Assets Debenture, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.   A meeting shall be held within 7 (seven) days at which all parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.  If within 14 (fourteen) days following the Initial Meeting, the parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the Parties.  Each Party shall bear its proportionate share of the costs of the mediator's fees.

The Parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii. If after a period of 30 (thirty) days following the commencement of Mediation the Parties are unable to resolve the dispute either Party may submit the dispute to binding arbitration in accordance with clause 24.2 hereof upon 10 (ten) days prior written notice to the other Party.

### 24.2.  Binding Arbitration

i.   Either party may submit any dispute arising out of this All Assets Debenture that is not resolved following the processes in clauses 24.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii.  The referral of the dispute to Arbitration precludes any other cause of action by the other Party except upon the mutual agreement and consent of both Parties.

iii. The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Lender and the Borrower respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

iv.  Each Party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Lender and the Borrower respectively.

24.2.1. The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

## SCHEDULE

ALL THE FIXED AND FLOATING ASSETS OF THE COMPANY, INCLUDING ITS PRESENT AND FUTURE ACQUIRED ASSETS WHEREVER SITUATE INCLUDING ITS UNCALLED CAPITAL, STOCKS BUT PARTICULARLY THE ASSETS LOCATED AT CAMAC HOUSE, PLOT 1649, OLOSA STREET, VICTORIA ISLAND, LAGOS STATE.

IN WITNESS WHEREOF the parties hereto have caused their common seals to be affixed hereto the day and year first above written.

The Common Seal of the within-named
CAMAC PETROLEUM LIMITED
was affixed In presence of:


DIRECTOR                                   DIRECTOR / SECRETARY


The Common Seal of the within-named
ZENITH BANK PLC was affixed
In presence of:


DIRECTOR

THE WITHIN INSTRUMENT IS IN THE
OPINION OF THE COMMISSIONER OF
STAMP DUTIES CHARGEABLE WITH
DUTY OF ₦6,000,000
AND THE DUTY THEREON HAS BEEN
ASSESSED ACCORDINGLY

COMMISSIONER OF STAMP DUTIES IKEJA                    SECRETARY

16

# ORIGINAL

Allied Energy Plc

(Fomerly Allied Energy Resources (Nigeria) Limited)

(as Chargor)

and

Zenith Bank Plc

(as Chargee)

and

Camac Petroleum Limited

(as Company)

## DEED OF LEGAL CHARGE OVER INTEREST IN OML 120 AND 121

THIS DEED OF LEGAL CHARGE IS MADE THE [...]

BY

(1)    Cadac Petroleum Limited, a company incorporated under the laws of the Federal Republic of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos  (the "Company" or the "Borrower"); and

(2)    Allied Energy Plc (formerly Allied Energy Resources (Nigeria Limited)) incorporated under the laws of the Federal Republic of Nigeria having its registered office at Plot 1649, Olosa Street, Victoria Island, Lagos (the "Chargor"); and

(3)    Zenith Bank Plc, a banking Company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84, Ajose Adeogun Street, Victoria Island, Lagos State (the "Chargee").

Chargor, Chargee and Company are hereinafter sometime individually referred to as Party or collectively as 'Parties'

WHEREAS:

(i)    The Chargor is the awradee of Oil Mining Lease No. 120 and 121 (also known as OML 120 and 121) (or the "Charged interest") by virtue of an Acreage Allocation (Discretionary Award) of OPL 210 issued by the Ministry of Petroleum Resources (Petroleum Resources Department) to the Chargor on the 3rd Day of June, 1992.

(ii)   By virtue of the letter dated August 28, 2002 the Ministry of Petroleum Resources conveyed the approval of the President, Commander in Chief of the Federal Republic of Nigeria to convert OPL 210 to two (2) OMLs i.e. 120 and 121.

(iii)  The Company (a related company to the Chargor) has approached the Chargee for a facility in the sum of N3,940,000,000.00 (Three Billion, Nine Hundred and Forty Million Naira only) ("the facility") to finance the further expansion and development of the Oil Blocks in OML 120 and 121 and the Chargee has by its offer letter dated July 21, 2014 agreed to grant the facility to the Company, which offer was duly accepted by the Company, following which the Chargee and the Company entered into an agreement governing the facility dated on or around the date hereof (the "Facility Agreement").

(iv)  As part security for the repayment of the facility granted to the Company by the Chargee under paragraph (iii) above, the Chargor has agreed to charge in favour of the Chargee its enitre interest in OML 120 and 121 arising from the Acreage Allocation (Discretionary Award) of OPL 210 issued to it by the Ministry of Petroleum Resources.

CHECKED

## 1. Definitions

Words and expressions defined in the Term Loan Facility Agreement between Zenith Bank Plc (Lender) and Camac Petroleum Limited (Borrower) dated ................................ shall, unless the context otherwise requires, have the same meaning when used in this Deed of Legal Charge.

## 2. CHARGE

2.1.   The Chargor hereby irrevocably charges and agrees to charge in favour of the Chargee its entire interest in OML 120 and 121 for as long as any liabilities under the facility remain outstanding.

2.2.   The Chargor shall not create any charge over its interest in OML 120 and 121 or any part thereof so that no lien shall in any case or in any manner arise on or affect the Charged Interest without the prior written consent of the Chargee PROVIDED that any further charge created by the Chargor with the consent of the Chargee over the Charged Interest (otherwise than in favour of the Chargee) shall be expressed to be subject to this Charge.

2.3.   For the purposes of this Clause, the Chargor covenants and undertakes that an Account (in line with the Term Loan Facility Agrement) shall be maintained with the Chargee and that all other payments that shall be due and payable to it from the sale of crude proceeds from the Chargor's interest in OML 120 and 121 shall be domiciled to the Chargee.

## 3. DOMICILATION

The Chargor hereby covenants to irrevocably domicile proceeds of sale of crude oil produced from OML 120 and OML 121 into its Account No. 5050005786 and/or the Borrower's Account No.5050009368 with the Chargee and has instructed accordingly.

## 4. NEGATIVE PLEDGE

4.1.   At all times during the continuance of this security the Chargor shall permit, upon request, the Chargee or any persons authorised by the Chargee, with three days prior notice to have access to and inspect free of all charges all documents, licenses, certificates and permits required by regulation to be maintained by the Chargor in respect of the Charged interest.

4.2.   The Chargor shall have no authority to sell or in any way transfer or create any other interest or security, in the whole or any part of its  interest in OML 120 and 121 charged by this presents except with the consent of the Chargee.

2

5.    **CRYSTALLIZATION OF CHARGE**

The Charge constituted under this Deed of Legal Charge shall become enforceable:

5.1.    If any amounts due under the Facility Agreement remain unpaid within 5 days of the expiring of any applicable grace periods by the Company.

5.2.    If the Chargor shall fail to pay any levy, duty, impost, tax or any form of payment whatsoever due to any government authority (or any other entity) in respect of the Charged Interest or fails to perform and observe the covenants and conditions contained in or implied by OML 120 and 121;

5.3.    If an order be made or an effective resolution be passed for the winding-up of the Company;

5.4.    If a distress or execution be levied or enforced upon or against the Charged Interest and has not been paid within thirty (30) days;

5.5.    If the Company or the Chargor shall stop payment or shall cease or threaten to cease to carry on its business; and

5.6.    If the Company or the Chargor shall commit any breach of the covenants and conditions herein contained and on its behalf to be performed and observed except where the breach is rectified within a period of 14 (fourteen) days of formal notification of the breach on the defaulting party.

6.    **POWER OF RECEIVER**

6.1.    At any time after Charge constituted under this Deed of Legal Charge shall have become enforceable under the provisions of Clause 5 hereof the Chargee may appoint by writing under the hands of its duly appointed Attorney or under the seal of the Chargee any person whether an officer of the Chargee or not, to be a Receiver and/or Manager of the Chargor and may in like manner from time to time remove any Receiver and/or Manager so appointed and appoint another in his stead. The Receiver and/or Manager so appointed shall in addition to and without prejudice to the powers conferred upon him by law have power:

6.1.1.    To take immediate possession of the interest hereby charged (Charged Interest) and for that purpose to take or defend proceedings in the name of the Chargor or otherwise.

6.1.2.    To sell (by public auction or private treaty) lease or let or concur in selling or leasing the Charged Interest hereby charged and to carry any such sale or leasing into effect in the name and on behalf of the Chargor or otherwise.

6.1.3.   To demand and recover all the income of the Charged Interest hereby charged by action, distress or otherwise to the full extent of the Charged Interest which the Chargor could dispose of and to give effectual receipts accordingly for the same to exercise any powers which may have been delegated to it by the Chargee pursuant to these presents.

6.1.4.   To make any arrangements or compromises with respect to the Charged Interest which the Receiver and/or Manager shall think expedient in the interest of the Chargor.

6.1.5.   To appoint managers, officers, agents, accountants, advisers, stewards, workmen and others for the aforesaid purposes or any of them upon such terms as to remuneration or otherwise as he may think proper.

6.1.6.   To give valid receipts for all moneys and execute all conveyances, assignments, deeds, assurances and things which may be proper or desirable for realising the Charged Interest and to do all such other reasonable acts and things as may be considered to be conducive to any of the matters or the powers aforesaid and which the Receiver and/or Manager lawfully can do as agent for the Chargor.

6.1.7.   To use the name of the Chargor for all or any of the purposes aforesaid and in any legal proceedings.

6.1.8.   To execute and deliver any deed or deeds or instrument and to convey or assign the Charged Interest over which he is appointed Receiver or any interest therein in the name or on behalf of the Chargor and by deed in the name and on behalf of the Chargor to grant, assign or vest the legal title in the Charged Interest to the purchaser or lessee thereof.

6.1.9.   To do all such other acts and things as may be considered by the Chargee to be incidental or conducive to any of the matters or powers aforesaid and which he or they lawfully may or can do as agent or agents of the Chargor.

6.2.   A Receiver and/or Manager so appointed shall be the agent of the Chargor and the Chargor shall alone be liable for his acts and defaults and remuneration and he shall have authority and be entitled to exercise the powers hereinafter set forth and to do all such acts and things which a Receiver and/or Manager lawfully may or can do which may be necessary for or considered to be incidental or conducive to the carrying on of the business of the Chargor.

7.    **APPLICATION OF MONEYS**

7.1.    All moneys received by any such Receiver and/or Manager shall after providing for all costs and expenses incurred in carrying on the business of the company or the sale or disposal of the Charged Interest shall be applied:

FIRSTLY in payment of all cost, charges and expenses of and incidental to the appointment of the Receiver and/or Manager and the exercise by him of all or any of the powers aforesaid including the reasonable remuneration of the Receiver and/or Manager.

SECONDLY in or towards payment of all unpaid interest and all charges due under the facility.

THIRDLY in or towards payment of all principal moneys due in respect of this Deed of Legal Charge.

FOURTHLY any surplus shall be paid to the Chargor.

8.    **COVENANTS**

8.1.    The Chargor hereby covenants with the Chargee:

8.1.1.    It shall deliver to the Chargee the following (on the date hereof) in form and substance acceptable to the Chargee as security in accordance with the terms of this Charge:

a) the original OML deed document for OML 120 and 121

8.1.2.    it shall not, except with the prior written consent of the Chargee:

i.    create or permit to exist over all or part of its interest therein any Security Interest (other than created or expressly permitted to be created under this Charge) whether ranking prior to, pari passu with or behind the security contained in this Charge;or

ii.    permit any person other than the Chargor or the Chargee or the Chargee's nominee or nominees to be registered as owners;

8.1.3.    it shall promptly forward to the Chargee all material documents relating to the Charged Interest which it may receive from time to time;

8.1.4.    until the Company has performed all of its obligations under the Facility Agreement and the loan have been paid in full, it shall not claim payment whether directly or by set-off, lien, counterclaim or otherwise of any amount which may be or has become due to the Chargor by the Company other than as contemplated and/or expressly permitted by the Facility Agreement or this Charge.

8.1.5. To keep proper documentation relating to the Charged Interest and to allow the Chargee or its authorised representatives to inspect the same at all reasonable times and from time to time to furnish such information in respect of the Charged Interest which are interests accruing from the OML 120 and 121.

8.1.6. Not to assign or charge the Charged Interest now or in the future without the prior consent in writing of the Chargor first had and obtained.

9. The Chargor hereby further covenants to indemnify the Chargee in the full amount thereof against all costs, charges and expenses (including the costs of maintaining or enforcing or endeavouring to enforce this security) properly incurred hereunder by the Chargee and all other moneys properly incurred by the Chargee in respect of the said costs, charges and expenses or otherwise and the same together with interest thereon as aforesaid shall be for the account of the Chargor. PROVIDED that the Charge hereby created shall be in addition and without prejudice to any and every other remedy, lien or security which the Chargee but for the said charge would have for the liabilities hereby secured or any part thereof.

10. The Chargee shall not, by reason of its enforcing this security be liable to account as Chargee in possession in connection with the Charged Interest or be liable for any loss upon realisation or for any default or omission for which a Chargee in possession might be liable.

11. **APPLICABLE LAW**

This Agreement shall be construed and governed in all respects in accordance with the Laws of the Federal Republic of Nigeria.

12. **NOTICE TO THE MINISTER OF PETROLEUM.**

12.1. The Chargor shall do all such acts or things and sign, execute and produce all such documents as may now or in the future be required to obtain the consent of the Minister of Petroleum (and any other relevant authority) respectively to the Charge.

12.2. The Chargor shall furnish the Chargee with evidence of the application for consent, such as a letter duly acknowledged by the office the Ministry of Petroleum respectively.

13. **Representations and Warranties by the Chargor**

The Chargor represents and warrants to the Chargee and undertakes that:

13.1. the oil mining lease was granted to the Chargor by the President of the Federal Republic of Nigeria through the office of the Minister for Petroleum resources with respect to Oil fields OYO 7, 8, AND 9 for a period of twenty years commencing from February 27, 2001;

6

13.2.    no litigation against the Chargor or the Company is current or, pending or threatened.

13.3.    this Charge constitutes a legal, valid, binding and enforceable obligation and is a first priority security interest over the Charged interest effective in accordance with its terms;

13.4.    the execution, delivery, observance and performance by the Chargor of this Charge will not result in any violation of any law, statute, ordinance, rule or regulation applicable to it;

13.5.    as a registrable instrument the charge is expected to be registered at the Corporate Affairs Commission (CAC) within 90 days of creation of same pursuant to the provisions of Section 197 (2)(d) of the Companies and Allied Matters Act Cap C. 20 LFN 2004;

13.6.    it has obtained all the necessary authorisations and consents to enable it to enter into this Charge and the necessary authorisations and consents will remain in full force and effect at all times during the subsistence of the security constituted by this Charge;

13.6.1. the company irrevocably consents to the transfer of the Charged interest pursuant to the enforcement by the Chargee of any of its rights under this Charge;

## 14.    Power of Attorney

14.1. The Chargor hereby irrevocably and by way of security for the payment of the Secured Obligations and the performance of its obligations under this Charge appoints the Chargee as its true and lawful attorney (with full power to appoint substitute and to sub-delegate) on behalf of the Chargor and in the Chargor's own name or otherwise, at any time and from time to time, to sign, seal, deliver and complete all documents and do all acts and things which the Chargee may consider to be necessary or advisable to perfect or improve its security over the Charged interest. The Chargor hereby ratifies and confirms anything that any such attorney may lawfully execute or do in the interest of securing the facility under the Facility Agreement.

## 15.    Powers of the Chargee

### 15.1. Enforcement

The Chargee's rights of enforcement in relation to this Charge shall become immediately enforceable upon any reach by the Company of the terms of the Facility Agreement or default of any term of this Deed by the Chargor or reasonably suspesion of default) of any term of this agreement by the Chargor.  The Chargee may in its discretion enforce all or any part of this Charge in any manner it thinks fit. For the avoidance of doubt, the Chargee's rights of enforcement shall include (without limitation) the right:

15.1.1. to perfect or improve its title to and security over the Charged interest in such manner as the Chargee may in its absolute discretion determine;

15.1.2. without notice to, or further consent or concurrence by, the Chargor to assign the Charged interest or any part thereof by such method, at such place and upon such terms as the Chargee may in its absolute discretion determine, with power to postpone any such assignment and in any such case the Chargee may exercise any and all rights attaching to the Charged interest;

15.1.3. to assume ownership of the Oil mining lease (OML 120 and 121) over the oil fields OYO 7, 8 and 9 and receive the proceeds of the production of crude oil on the oil fields.;

15.1.4. to exercise any and all other rights, powers and discretions of the Chargor in respect of the Charged interest in such manner as the Chargee may in its absolute discretion determine;

15.1.5. to procure that the Chargee is registered at the Ministry of petroleum resources as the holder of the oil mining lease OML 120 and 121 for the duration of the lease;

15.1.6. otherwise to enforce any of the rights of the Chargee under or in connection with this Charge in such manner as the Chargee may in its absolute discretion determine; and

16.  **DISPUTE RESOLUTION**

16.1.   **Initial Mediation of Dispute**

In the event of a dispute between the parties to this Deed of Legal Charge, the following procedure shall be followed to resolve the dispute prior to either party pursuing other remedies:

i.   A meeting shall be held within 7 (seven) days at which all Parties are present or represented by individuals with full decision making authority regarding the matters in dispute (Initial Meeting).

ii.   If within 14 (fourteen) days following the Initial Meeting, the Parties have not resolved the dispute, the dispute shall be referred to Mediation directed by a mediator mutually agreeable to the Parties. Each Party shall bear its proportionate share of the costs of the mediator's fees.

The Parties agree to negotiate in good faith in the Initial Meeting and in the Mediation.

iii.    If after a period of 30 (thirty) days following the commencement of Mediation the Parties are unable to resolve the dispute either Party may submit the dispute to binding arbitration in accordance with clause 16.2 hereof upon 10 (ten) days prior written notice to the other Party.

16.2.    **Binding Arbitration**

i.    Either Party may submit any dispute arising out of this Deed of Legal Charge that is not resolved following the processes in clauses 16.1 (i), (ii) and (iii) above to final and binding Arbitration.

ii.    The referral of the dispute to Arbitration precludes any other cause of action by the other Party except upon the mutual agreement and consent of both Parties.

iii.    The Arbitration contemplated hereby shall be by 3 (three) Arbitrators one of whom shall be appointed by the Chargor and the Chargee respectively while the third Arbitrator shall be nominated by the two (2) Arbitrators aforesaid and the venue for the proceedings shall be Lagos.

iv.    Where there is disagreement on the appointment of the third Arbitrator, then the third Arbitrator shall be appointed by the Chief Judge of Lagos State.

v.    Each Party shall be responsible for the cost of the Arbitrator appointed by it, while the cost of the third Arbitrator and all other costs and expenses of the arbitration proceedings shall be borne equally by the Chargor, the Chargee and the Company respectively.

16.2.1.    The Arbitration shall be conducted in accordance with the Arbitration and Conciliation Act Cap A18 Laws of the Federation of Nigeria 2004.

17.    **SEVERABILITY**

17.1.    If due to a change in any applicable law or due to a decision or any other act by any competent authority, one or more terms or provisions of this Deed of Legal Charge can no longer be enforced or an amendment of one or more of the provisions of this Deed of Legal Charge is required, the Parties agree that they shall endeavour to find an alternative solution approaching as near as possible the contractual situation existing prior to such a change, decision or act.

17.2.    If one or more provisions of this Deed of Legal Charge are determined to be invalid or not enforceable, the remaining provisions shall not be affected thereby, and the Deed of Legal Charge shall be administered as though the invalid or not enforceable provisions were not a part of the Deed of Legal Charge.

## 18. WAIVERS

No Party shall be deemed to have waived any right under this Deed of Legal Charge unless that waiver is in writing, refers to this Deed of Legal Charge and is executed by that Party. Failure or forbearance to insist on the strict performance or observance by a Party of a provision of this Deed of Legal Charge shall not be construed as a waiver by that Party of any right under this Agreement. Waiver of a right by a Party under this Deed of Legal Charge shall not preclude that Party in the future from enforcing any other right whether similar or dissimilar to the right that was waived or relinquished.

## 19. NOTICES

### 19.1.    Communications in writing

Any communication to be made under or in connection with this Deed of Legal Charge shall be made in writing and, unless otherwise stated, may be made by fax or letter.

### 19.2.    Addresses

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) for any communication or document to be made or delivered under or in connection herewith is:

The contact details of the Chargor for this purpose are:

| | |
|---|---|
| Address: | Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos |
| Fax: | +2341 |
| Email: | |
| Attention: | |

The contact details of the Chargee for this purpose are:

| | |
|---|---|
| Address: | Zenith Bank Plc, Plot 84/87, Ajose Adeogun Street, Victoria Island, Lagos |
| Fax number: | +2341 |
| Email: | |
| Attention: | Company Secretary, Mr. Michael Osilama Otu; |

The contact details of the Company for this purpose are:

| | |
|---|---|
| Address: | Camac House, Plot 1649, Olosa Street, Victoria Island, Lagos |
| Fax: | +2341 |
| Email: | |
| Attention: | |

10

19.3.      **Delivery**

19.3.1. Any communication or document made or delivered by one person to another under or in connection with this Deed of Legal Charge shall only be effective:

19.3.1.1.   if by way of fax, , at the time of transmission, if received before 1700 hours in the place of delivery on a Business Day, and otherwise on the next Business Day; or

19.3.1.2.   if by way of letter, 5 (five) business days after being mailed by either registered or certified mail, return receipt requested with postage prepaid.

and, if a particular department or officer is specified as part of its address details provided under Clause 19 (*Notices*), if addressed to that department or officer.

19.3.2. Any communication or document to be made or delivered to the Chargee shall be effective only when actually received by the Chargee and then only if it is expressly marked for the attention of the department or officer identified with the Chargee's signature below (or any substitute department or officer as the Chargee shall specify for this purpose).

19.4.   **Notification of address and fax number**

Each party shall promptly notify the other party of any change to its address and fax number pursuant to Clause 19.2 (*Addresses*).

19.5.   **Electronic communication**

19.5.1. Any communication to be made between the Chargor, the Chargee and the Company under or in connection with this Deed of Legal Charge may be made by electronic mail or other electronic means, if the Chargor, the Chargee, and the Company:

19.5.1.1.   agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

19.5.1.2.   notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means;

19.5.1.3.   notify each other of any change to their address or any other such information supplied by them.

19.5.2. Any electronic communication made between the Chargor, the Chargee and the Company shall be effective only when actually received in readable form and in the case of any electronic communication made by the Chargor or the Company to the Chargee only if it is addressed in such a manner as the Chargee shall specify for this purpose.

20. **Miscellaneous**

20.1. The charge hereby created shall not be affected by any failure by the Chargee to take any other security.

20.2. The Chargee may at all times, without discharging or in any way affecting the security hereby created, determine or vary the Chargor's obligations; grant the Chargor any time or indulgence; deal with, exchange, release, modify or abstain from perfecting or enforcing any Shares or rights which it may now or hereafter have from or against the Chargor.

21. **Law and Jurisdiction**

21.1. This Charge is governed by, and shall be construed in accordance with, the laws of the Federal republic of Nigeria

In **WITNESS WHEREOF** this Deed of Legal Charge has been entered into the day and year first above written

THE COMMON SEAL of the within-named Borrower/Company

Camac Petroleum Limited

was hereunto affixed in the presence of

DIRECTOR

DIRECTOR/SECRETARY

THE COMMON SEAL of the within-named Chargor

Allied Energy Plc

was hereunto affixed in the presence of

DIRECTOR

DIRECTOR/SECRETARY

THE COMMON SEAL of the within-named Chargee

Zenith Bank Plc

was hereunto affixed in the presence of

DIRECTOR

SECRETARY

THE WITHIN INSTRUMENT IS IN THE
OPINION OF THE COMMISSIONER OF
STAMP DUTIES CHARGEABLE WITH
DUTY OF #141,775,000
AND THE DUTY THEREON HAS BEEN
ASSESSED ACCORDINGLY

COMMISSIONER OF STAMP DUTIES

EXHIBIT ............................................... IN THE
AFFIDAVIT OF......................................... SWORN
OT AT........................................................... COURT
REGISTRY...................................................... 20...
DAY.................................OF............................

BEFORE (ME)

S. D. OLUWAGBARE (MRS)
SENIOR REGISTRAR
COURT OF APPEAL
LAGOS

ORIGINAL

DEED OF ASSIGNMENT OF RIGHTS

BETWEEN

CAMAC PETROLEUM LIMITED

(ASSIGNOR)

AND

ALLIED ENERGY PLC

(ASSIGNOR)

AND

CAMAC ENERGY INC.

(ASSIGNOR)

AND

ZENITH BANK PLC

(ASSIGNEE)

---

DEED OF ASSIGNMENT OF RIGHTS ACCRUING FROM ALL COMMERCIAL CONTRACTS RELATING TO OML 120 AND 121 INCLUDING SALE AND PURCHASE AGREEMENTS, OFFTAKE AGREEMENTS AND CRUDE HANDLING AGREEMENTS ENTERED INTO BY CAMAC PETROLEUM LIMITED, ALLIED ENERGY PLC AND CAMAC ENERGY INC.

For the purposes of this Clause, the Assignors covenant and undertake that an Account shall be maintained with the Assignee (in line with the Term Loan Facility Agreement between Zenith Bank Plc and Camac Petroleum Limited dated (                    )) and that all other payments that shall be due and payable to it under the Commercial Contracts shall be domiciled with the Assignee.

The assignors having assigned their rights in the commercial contracts to the assignee shall not assign those rights to a third party without obtaining the written consent of the assignee.

## 3. DOMICILATION

The Assignors hereby covenants to irrevocably domicile all proceeds of receivables from all commercial contracts with respect to OML 120 and 121 into its Account No.5050005786 and Account No. 5050009368 with the Assignee and has instructed the parties to the commercial contracts to do so.

## 4. LAW

This Agreement shall be construed and governed in all respects in accordance with the Laws of the Federal Republic of Nigeria.

## 5. NON RESTRICTION AND/OR LIMITATIONS

The Assignors (jointly and severally) hereby covenant that it does not have any restriction or limitation with respect to the assignment of its rights/interest in the commercial contracts and that where such restriction or limitation exist, it has obtained the requisite consent or waiver of the limitation provision from the other party.

The Assignors jointly and severally hereby indemnify the Assignee against any loss or injury or damage it may suffer as a consequence of breach by any of the Assignors of this provision or any other provision of this Deed.

## 6. REPRESENTATIONS & WARRANTIES

i.   The Assignors represent and warrant that the Person executing this Agreement on its behalf has been duly authorised to bind it. The Assignors further represent and warrant that it has the corporate capacity to execute this Agreement and perform its obligations hereunder, and is duly registered or incorporated, validly existing and in good standing.

ii.  The Assignors represent and warrant that the execution, delivery and performance of this Agreement will not conflict with or violate or constitute a breach or default under any agreement governing the organisation, management, business or affairs of the Party, including its by-laws, memorandum of association or articles of association, or any agreement or instrument to which it is a party, or, to its best knowledge any Applicable Law, administrative regulation or court order, judgment or decree applicable to it.

iii. The Assignors represent and warrant that it is not subject to an order by a court within the applicable jurisdiction or subject to an effective resolution for the reorganisation under any Bankruptcy law, dissolution, liquidation, or winding up or has become insolvent or bankrupt, made an assignment for the benefit of creditors or appointed a receiver for a substantial part of its assets.

iv.  All covenants, warranties, representations, indemnities and other obligations of whatsoever kind given, made or undertaken by the Assignors shall continue in full force and effect notwithstanding any change in the composition of the Assignors.

## 7. ARBITRATION

The parties hereto agree that any dispute arising from this Deed shall be resolved in line with the Dispute Resolution and Arbitration provisions of the Term Loan Facility Agreement between Zenith Bank Plc and Camac Petroleum Limited dated (                    ).

**IN WITNESS WHEREOF** the parties hereto have caused their respective Common Seals to be hereunto affixed the day and year first above written.

The Common Seal of the within named First Assignor
**CAMAC PETROLEUM LIMITED**
was hereunto affixed in the presence of:

DIRECTOR

DIRECTOR

The Common Seal of the within named Second Assignor
**ALLIED ENERGY PLC**
was hereunto affixed in the presence of:

DIRECTOR

DIRECTOR

The Common Seal of the within named Third Assignor
**CAMAC ENERGY INC.**
was hereunto affixed in the presence of:

AUTHORIZED OFFICER

THE WITHIN INSTRUMENT IS IN THE OPINION OF THE COMMISSIONER OF STAMP DUTIES CHARGEABLE WITH DUTY OF AND THE DUTY THEREON HAS BEEN ASSESSED ACCORDINGLY.

COMMISSIONER OF STAMP DUTIES

SECRETARY

CAMAC Energy Inc. CORPORATE SEAL 1979 DELAWARE

The Common Seal of the within named Assignee
**ZENITH BANK PLC**
was hereunto affixed in the presence of:

DIRECTOR

SECRETARY

RC 180681



## CORPORATE AFFAIRS COMMISSION
### FEDERAL REPUBLIC OF NIGERIA

# Certificate of Registration of

## A DEED OF LEGAL CHARGE

## COMPANIES AND ALLIED MATTERS ACT 1990
### *Pursuant to section 197, 198 (2), 203 (1)*

### ALLIED ENERGY PLC

*It is hereby certified that A DEED OF LEGAL CHARGE Dated the Fourteenth day of May, 2015 and created by the above named company, incorporated in Nigeria securing the sum of Three Billion, Nine Hundred and Forty Million Naira (N3,940,000,000) in favour of Zenith Bank Plc, Plot 84, Ajose Adeogun Street, Victoria Island, Lagos, has been registered.*

*Given under the seal of the Corporate Affairs Commission Abuja, Nigeria*

*This Twenty-Sixth day of May, 2015*

Receipt No: CAC/GTB 0544923
For =N=78,800,000.00



**BELLO MAHMUD**

816825

Registrar - General

RC 860957



# CORPORATE AFFAIRS COMMISSION
## FEDERAL REPUBLIC OF NIGERIA

# Certificate of Registration of

## A DEED OF ALL ASSETS DEBENTURE

# COMPANIES AND ALLIED MATTERS ACT 1990
### Pursuant to section 197, 198 (2), 203 (1)

### CAMAC PETROLEUM LIMITED

*It is hereby certified that A DEED OF ALL ASSETS DEBENTURE Dated the Twenty-Fifth day of November, 2014 and created by the above named company, incorporated in Nigeria securing the sum of One Billion, Six Hundred Million Naira (N1,600,000,000) in favour of Zenith Bank Plc, Plot 84, Ajose Adeogun Street, Victoria Island, Lagos, has been registered Given under the seal of the Corporate Affairs Commission Abuja, Nigeria*

*This Twelfth day of December, 2014*

Receipt No: CAC/GTB 548347
For =N=16,000,000.00



**BELLO MAHMUD**



784289

Registrar – General

# Agip Moves to Take over Oyo Oilfield in OML 120

**Stories by Ejiofor Alike**

Following the order of a Federal High Court sitting in Lagos, which enforced and recognised a final award rendered at the London Court of International Arbitration (LCIA) on February 14, 2017 in favour of Nigerian Agip Exploration Limited (NAE) in respect of the Oyo oilfield in Oil Mining lease (OML) 120, the Nigerian subsidiary of the Italian firm has moved to take over the field, THISDAY has learnt.

Justice Hadiza R. Shagari of the Federal High Court had ordered the NAOC to take over OYO oilfield after a protracted legal dispute between the subsidiary of the Italian oil firm and two Nigerian Companies - Allied Energy Plc and Camac International (Nig) Ltd.

According to the judgment of the Court in the suit numbered FHC/L/CS/625/2017, the order was sequel to the ruling of the London Court of International Arbitration (LCIA) which arose from a dispute on a Sale and Purchase Agreement (SPA) concluded in June 2012 between Nigerian Agip Exploration Limited (NAE) as seller and Allied Energy Plc as purchaser.

In the court order signed by the Registrar, Joseph Olujoye, the judge ordered that leave be granted to the claimant/applicant that London Court of International Arbitration Final Award be recognised and enforced by the court.

The judge ruled that its decision was based on Section 31 (1) and (2); Section 51 (1) and Section 57 (1) of the Arbitration and Conciliation Act CAP A18 Volume 1, Laws of the Federation of Nigeria.

Justice Shagari ruled that the court made the order "upon reading the affidavit in support of the ex-parte originating summons sworn to by Ogbene Abang, Nigerian, a senior legal officer and a staff of NAE .... and the exhibits attached thereto marked exhibits NAE 1A – NAE5 the written address in support of the ex-parte originating summons signed by Chief TJ Onomigbo Okpoko (SAN) ...After hearing Chief TJO Okpoko (SAN) with Charles Ajuyah (SAN) and Eguono Erhum counsel for the claimant applicant moved in terms of ex-parte originating summons and adopted the written address filed as the argument.

And the court having listened and considered the submission of the learned counsel and delivered ruling on May 11, 2017."

Under the Sale and Purchase Agreement (SPA), Nigerian Agip Exploration Limited had transferred to Allied Energy Plc the entirety of its interests and rights in the two Oil Mining Leases 120 and 121 in the deep offshore region of Nigeria.

Payment of part of the price for the transferred interests and rights was deferred to be paid by Allied Energy Plc to Nigerian Agip Exploration Limited.

Nigerian Agip Exploration Limited filed the arbitration at the London Court of International Arbitration in accordance with the terms for submission to arbitration as provided for in the SPA.

The arbitration was finally concluded on February 14, 2017 when the Final Award was issued by the arbitrators.

The OML 120 contains the Oyo Field which is located approximately 75 kilometres from the coast in water depths ranging from 200 to 500 metres.

The Oyo Field commenced production in December 2009 and the wells are connected to the Armada Perdana FPSO, a Floating Production Storage Offloading (FPSO) unit

## IN THE FEDERAL HIGH COURT
## HOLDEN AT LAGOS, NIGERIA

### SUIT NO: FHC/L/CS/625/2017

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT,
CAP, A18, LAWS OF THE FEDERATION OF NIGERIA (LFN), 2004 AND
IN THE MATTER OF THE RECOGNITION AND ENFORCEMENT OF
THE FINAL AWARD IN LCIA ARBITRATION NO: 132498.

BETWEEN:

NIGERIA AGIP EXPLORATION LTD     CLAIMANT/
                                    APPLICANT

            AND

1.     ALLIED ENERGY PLC
2.     CAMAC INTERNATIONAL (NIGERIA) LTD ⎰ RESPONDENTS

### ORDER

UPON THIS EX-PARTE ORIGINATING

SUMMONS dated the 18th day of April, 2017

and filed on the 20th day of April, 2017 brought

on behalf of the Claimant/Applicant praying the

Honourable Court for the following Order:

1.     For LEAVE that the London Court of
International Arbitration Final Award
made in London on 14th February, 2017
in LCIA ARBITRATION NO: 132498.

       BETWEEN:

       Nigeria Agip Exploration Ltd (as
Claimant)

       AND

PAYMENT DATES.

(ii) THE SUM OF US$2,782,522.27 (TWO MILLION, SEVEN HUNDRED AND EIGHTY TWO THOUSAND, FIVE HUNDRED AND TWENTY TWO US DOLLARS AND SEVENTY SEVEN CENTS) BEING THE AMOUNT PAID BY THE CLAIMANT TO THIRD PARTY CONTRACTORS IN RESPECT OF THE ADDITIONAL OYO 5 GSO LIABILITIES,

(iii) THE SUM OF US$150,000,000. (ONE HUNDRED AND FIFTY MILLION US DOLLARS) BEING THE AMOUNT OF DOLLARS) BEING THE AMOUNT OF THE FIRST, SECOND AND THIRD DEFERRED PAYMENTS.

(iv) INTEREST AT THE DEFAULT RATE ON ALL AMOUNTS DUE FROM THE RELEVANT PAYMENT DATES UP TO THE DATE OF THE TRIBUNAL'S AWARD, AND ACCRUING AT THE DEFAULT RATE ON A DAILY BASIS THEREAFTER UNTIL THE DATES AS THE TRIBUNAL SHALL DETERMINE TO BE APPROPRIATE;

(v) ALTERNATIVELY, DAMAGES CORRESPONDING TO THE AMOUNTS SET OUT ABOVE, PLUS INTEREST ON DAMAGES ACCRUING FROM THE DATE ON WHICH THE CORRESPONDING AMOUNTS FELL DUE.

C. d) AN AWARD ORDERING THE RESPONDENTS TO PAY ALL COST AND EXPENSES INCURRED IN CONNECTION WITH THIS ARBITRATION, TOGETHER WITH INTEREST THEREON, INCLUDING BUT NOT LIMITED TO:

(i) ALL LEGAL COSTS AND

Filed On 18/4/18 @ 10.55 am

**COURT OF APPEAL**
**RECEIVED**
**1 8 APR 2018**
**LAGOS, NIGERIA**

**IN THE COURT OF APPEAL**
**HOLDEN AT LAGOS**

APPEAL NO: CA/L/495m/18

**SUIT NO: FHC/L/CS/625/2017**

**BETWEEN**

**ZENITH BANK PLC** ⎤ **APPLICANT**

**AND**

1. **NIGERIAN AGIP EXPLORATION LIMITED**
2. **ALLIED ENERGY PLC**                                  **RESPONDENTS**
3. **ERIN PETROLEUM NIGERIA LIMITED**
   (*Previously Known as "Camac Petroluem Limited*)

## NOTICE OF MOTION

**BROUGHT PURSUANT TO ORDER 6 RULES 1, 2, AND 4  OF THE COURT OF APPEAL RULES 2016, SECTION 24 OF THE COURT OF APPEAL ACT, LAWS OF THE FEDERATION OF NIGERIA, CAP C37 LFN 2004, SECTION 243 OF THE 1999 CONSTITUTION (AS AMENDED) AND UNDER THE INHERENT JURISDICTION OF THIS HONOURABLE COURT**

**TAKE NOTICE** that this Honourable Court shall be moved on        day of       at the hour of 9.00 O'clock in the forenoon or so soon thereafter as Counsel may be heard on behalf of the Applicant praying for the following orders:

1. **An Order** granting the Applicant Leave to join as an Interested Party to Suit No. FHC/L/CS/625/2017 between the Nigeria Agip Exploration Limited V Allied Energy Plc & Anor pursuant to Section 243 (a) of the 1999 Constitution of the Federal Republic of Nigeria (as Amended).

2. **An Order** granting the Applicant an extension of time within which to seek leave to appeal against the Order of the Federal High Court of Nigeria made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

**Kenna** Partners
Barristers & Solicitors

5. In the circumstance, leave of this Honourable Court is required for the Applicant to appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

6. The delay occasioned in making this application was not borne out of disrespect for the lower Court or this Honourable Court as the Applicant was unaware of the Arbitral Award entered as final Order of the Federal High Court of Nigeria on May 11, 2017 in Suit No. FHC/L/CS/625/2017.

7. This Honourable Court is empowered to grant the reliefs sought in this application as they pertain to the Applicant's constitutional right to fair hearing as enshrined in section 36 of the 1999 Constitution of the Federal Republic of Nigeria (as amended).

8. That this is a proper case for the Honourable Court to grant the said reliefs.

AND TAKE FURTHER NOTICE that the following documents are exhibited in this application:

1.   A certified true copy of the Enforcement Order of the Federal High Court made on May 11 2018;

2.   Proposed Notice of Appeal containing Proposed Grounds of Appeal;

3.   The Deed of Legal Charge between the Applicant and the 2nd and 3rd Respondents;

4   The Loan Facility Agreement between the Applicant and the 3rd Respondent;

5   The All Asset Debenture Deed between the Applicant and the 2nd Respondent.

**DATED THIS 17th DAY OF April, 2018**

**Signed by: *Bridget Osazuwa, Esq***





**Professor Fabian Ajogwu, SAN**
**Charles Nwabulu, ACArb**
**Okechukwu Ekweanya, Esq**
**Kelvin Erhonsele, ACIArb**
**Abisola Yusuf (Miss)**
**Bridget Osazuwa,(Miss)**
**Oluyemi Adebo, Esq**
Counsel to the Applicant

**Kenna** Partners
Barristers & Solicitors

# IN THE COURT OF APPEAL
## HOLDEN AT LAGOS

APPEAL NO:
SUIT NO: FHC/L/CS/625/2017

**BETWEEN**

**ZENITH BANK PLC**      }      **APPLICANT**

**AND**

1. **NIGERIAN AGIP EXPLORATION LIMITED**
2. **ALLIED ENERGY PLC**               **RESPONDENTS**
3. **ERIN PETROLEUM NIGERIA LIMITED**
   (*Previously Known as "Camac Petroluem Limited*)

## AFFIDAVIT IN SUPPORT OF THE APPLICANT'S NOTICE OF MOTION DATED APRIL 17, 2018

I, Bosah Okonyia, Male, Christian, Nigerian Citizen of Zenith Heights, Plot 84/87Ajose Adeogun Street, Victoria Island, Lagos State do hereby make oath and state as follows:

1. That I am a Legal Practitioner in the law department of the Applicant, by virtue of which position I am conversant with the facts of this case.

2. That I have the consent and authority of my employer (the Applicant) to depose to this Affidavit.

3. That except as otherwise stated, I depose to facts within my personal knowledge, as well as from information obtained by me from reading the documents pertaining to the events leading up to this matter and from information derived in the course of carrying out my duties in the employment of the Applicant.

4. That the Applicant is a public company incorporated and licensed under the Laws of the Federal Republic of Nigeria having its registered office at Plot 84, Ajose Adeogun Street, Victoria Island, Lagos State.

5. The 1st Respondent is a private limited company incorporated under the Laws of the Federal Republic of Nigeria to carry on business in Nigeria with its offices situate at 1, Elsie Femi Pearse Street, Victoria Island, Lagos.

15. That some of the agreements executed as security for the repayment of the Term Loan Facility Agreement granted by the Applicant to the 3rd Respondent are:

    15.1 All Assets Debenture dated November 25, 2014;
    15.2 Deed of Legal Charge dated May 14, 2015; and
    15.3 Deed of Assignment of Rights.

16. The agreements outlined in paragraph 15 above are hereto annexed and marked as **Exhibits 2, 3 and 4** respectively.

17. That following the execution of the above referenced Deed of Legal Charge and Deed of All Assets Debenture, the Applicant registered the aforementioned security documents at the Corporate Affairs Commission which are evidenced by the Certificate of Registration of Deed of Legal Charge dated May 26, 2015 and the Certificate of Registration of Deed of All Assets Debenture dated December 12, 2014. Copies of the Certificates of Registration are hereto annexed and marked as **Exhibits 5 and 6 respectively**.

18. That in compliance with Clause 3 (Disbursement) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent (earlier described as **Exhibit 1**), the Applicant has fulfilled its obligation by disbursing the entire sum granted under the facility agreement to the 3rd Respondent.

19. That by Clause 17 (Representation and Warranties) of the Term Loan Facility Agreement between the Applicant and the 3rd Respondent, particularly, paragraph 17.8 (proceedings pending or threatened), the 3rd Respondent represented and warranted to the Applicant that, no litigation, arbitration or administrative proceeding of or before any court, arbitral body or agency has (to the best of its knowledge and belief) been stated or threatened against it (or against its directors) or any other Obligor (or against any director of an Obligor) which:

    a) May restrain its entry into, the exercise of its rights under, or the performance, enforcement of or compliance with any of its obligations under this Agreement; or

    b) If adversely determined, would reasonably be expected to have a material adverse effect.

20. That at the time of entering into the Term Loan Facility Agreement and the Disbursement of the loan sum by the Applicant to the 3rd Respondent, the Applicant was not aware or informed of the existence of any litigation,

the sums of £7,119,290.99 (Seven Million, One Hundred and Nineteen Thousand, Two Hundred and Ninety Pounds, Ninety Nine Pence);

29. And €550,796.01 (Five Hundred and Fifty Thousand, Seven Hundred and Ninety Six Euro, One Cent) and $5,900 (Five Thousand, Nine Hundred United States Dollars) against the 2nd Respondent and the 3rd Respondent jointly and severally.

30. That the Applicant was not aware of the existence of any Sale and Purchase Agreement entered into between the 1st and 2nd Respondent neither was it informed of the existence of the Arbitral Proceedings from which the Final Arbitral Award given by the LCIA dated February 14, 2017 (now recognised by an order of the Federal High Court dated May 11, 2017) arose.

31. That the 1st Respondent in an attempt to realise the fruits of the Award granted by the LCIA and recognised by an Order of the Federal High Court dated May 11, 2017 executed a *'Notice of Seizure/Attachment of Goods'* by locking the export valve on the FPSO operated by the 2nd Respondent (the interest of which has been charged in favour of the Applicant for the repayment of the loan granted by the Applicant to the 3rd Respondent).

32. That the Applicant being unaware of the existence of the Arbitral Proceedings from which the Final Arbitral Award obtained by the 1st Respondent against the 2nd and 3rd Respondent dated February 14, 2017 arose until several months after the Award was recognised by an order of the Federal High Court made on May 11, 2017 was unable to make an appearance at the lower Court for an opportunity to be heard.

33. That the enforcement of the Order of the Federal High Court (recognising the Arbitral Award given by the LCIA) made on May 11, 2017 will put the security for the loan granted by the Applicant to the 3rd Respondent in jeopardy.

34. That the Applicant is an interested and necessary party whose genuine interests is adversely affected by the Order of the Federal High Court made on May 11, 2017.

35. That the Applicant has a constitutional right to be heard and to appeal against the Order of the Federal High Court in Suit No. FHC/L/CS/625/2017 delivered on May 11, 2017 as a party interested and affected by the Order.

36. That before the Applicant can appeal against the Order of the Federal High Court made on May 11, 2017 in Suit No. FHC/L/CS/625/2017 as an interested party, Leave of this Honourable Court is required.

46. That I make this deposition in good faith believing all the facts deposed to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_____

**DEPONENT**

Sworn to at the Court of Appeal Registry,
Lagos, this /8th day of April, 2018

**BEFORE ME**

**COMMISSIONER FOR OATHS**

Motion = N3,000
Order = N500 -
Oath/filing = N300 -
(9) Exhibit = N900 -
N4,700 -

# IN THE COURT OF APPEAL
## HOLDEN AT LAGOS

APPEAL NO:
SUIT NO: FHC/L/CS/625/2017

BETWEEN

ZENITH BANK PLC           }   **APPELLANT**

AND

1. **NIGERIAN AGIP EXPLORATION LIMITED**
2. **ALLIED ENERGY PLC**
3. **ERIN PETROLEUM NIGERIA LIMITED**    **RESPONDENTS**
(*Previously Known as "Camac Petroluem Limited*)

## PROPOSED NOTICE OF APPEAL

**TAKE NOTICE** that the Appellant being dissatisfied with the Decision contained in the Order of **Honourable Justice H. R. Shagari** sitting at the Federal High Court, Ikoyi, Lagos made on May 11, 2017 (in **Suit No. FHC/L/CS/625/17 – Nigerian Agip Exploration Limited v. Allied Energy Plc & Camac International (Nigeria) Limited**) does hereby appeal to the Court of Appeal upon the grounds set out in paragraph 3 and will at the hearing of the appeal seek the relief set out in paragraph 4.

**AND** the Appellant further states that the names and addresses of the persons directly affected by the appeal are those set out in paragraph 5.

2.    **Part of the lower court decision complained of:**

      The Entire Order

3.    **Grounds of Appeal**

### GROUND 1

The Court erred in law when it held as on page 3 of the Honourable Court's order dated May 11, 2017 as follows:

      1. That **LEAVE** be granted to the Claimant/Applicant that the London Court of International Arbitration Final Award made in

e. The Court failed to consider that in *Okonkwo v Okagbue* (1994) 9 NWLR (Pt. 368) 301 at 310, the Supreme Court held that public policy means the ideas which for the time being, prevail in a community as to the conditions necessary to ensure its welfare, so that anything is treated as against public policy if it is generally regarded as injurious to the public interest.

f. The Honourable Court failed to consider that in *Statoil (Nig.) Ltd. V Inducon (Nig.) Ltd.* (2014) 9 NWLR (Pt. 1411) 43 at 55, the Court of Appeal held that public policy holds that no subject can lawfully do that which has a tendency to be injurious to the public or against public good, may be termed the policy of the law or policy in relation to the administration of the law.

g. The Court failed to consider that in the United Kingdom where the Arbitration award was issued, the High Court is willing to set aside an arbitral award on the ground of public policy as in *Stati v Kazakhstan* [2017] EWHC 1348 (Comm).

h. The Court failed to consider that in *DST v Raknoc* (1972) 2 AER 769 at page 77, the English Court of Appeal held that enforcement of award should be refused where it would be offensive to the ordinary reasonable and fully informed members of the public on whose behalf the powers of state are exercised.

i. Leave for the enforcement of the award was granted when the Appellant's interest in OMLs 120 and 121 was and is still pending.

4. **Reliefs sought from the Court of Appeal**

   **AN ORDER** allowing this appeal and setting aside the Order of the Federal High Court appealed against herein.

5. **Persons directly affected by the appeal**

a. **ZENITH BANK PLC**
   **Zenith Heights**
   **84/87, Ajose Adeogun Street**
   **Victoria Island**
   **Lagos.**

b. **NIGERIAN AGIP EXPLORATION LIMITED**
   **1, Elsie Femi Pearse Street**
   **Victoria Island**
   **Lagos**

c. **ALLIED ENERGY PLC**

Victoria Island
Lagos

3. **The 3rd Respondent**
**ERIN PETROLEUM LIMITED**
(*Previously Known as "Camac Petroluem Limited*)
Camac House
Plot 1649, Olosa Street
Victoria Island
Lagos