THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| *In re*: | Case No. 18-32106 |
| ERIN ENERGY CORPORATION, *et al.*, | Chapter 11 |
| Debtors. | Re: Dkt. No. 28 |

**OBJECTION OF PUBLIC INVESTMENT CORPORATION SOC LTD. TO DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363(C) OF THE BANKRUPTCY CODE; (II) GRANTING ADEQUATE PROTECTION FOR THE USE THEREOF; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001 AS TO USE OF CASH COLLATERAL**

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Public Investment Corporation Soc. Ltd. (**PIC**) respectfully files this objection to the *Debtor's Emergency Motion for Interim And Final Orders (i) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (ii) Granting Adequate Protection for the Use Thereof; and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral*, Dkt. No. 28 (the **Motion**).[1]

In support thereof, PIC respectfully states as follows:

**PRELIMINARY STATEMENT**

1. By the Motion, the Debtors seek authority to use approximately $10,000,000 currently on deposit with Mauritius Commercial Bank Ltd (**MCB**), which secures certain loans advanced by MCB to ERN and EPNL under the Pre-Export Finance Facility Agreement concluded on February 6, 2017 (**the MCB Facility**). In connection with such use, the

---
[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

Debtors do not propose to offer MCB any additional adequate protection against diminution in the value of its interest, arguing instead that (i) the use of the cash to fund operations will maintain the going concern value of their businesses and (ii) MCB is already fully secured and its claims against ERN and EPNL are guaranteed by PIC.

2. Neither the Motion nor the Debtors' financial projections adequately demonstrate why this relief needs to be granted on an emergency basis or, indeed, why it should necessarily be granted at all. While the Debtors allege that they require immediate access to cash collateral in order to stabilize and resume operations, the Motion provides little reason to believe that the Debtors are currently a going concern, much less one with a prospect of operating at a profit in the foreseeable future. The Monthly Cash Proforma suggests that the Debtors expect neither revenues nor operating disbursements in the near term and may very well spend $4,361,176 before even getting to the possibility of revenues in a month's time. Further, the largest components of this amount will pertain not to payroll or the maintenance of staff levels, as suggested in the Motion, but to charter expenses of $1,800,000 and insurance expenses totalling $1,600,000.[2]

3. As the Debtors themselves concede, their ability to resume operations ultimately turns on the favorable resolution of litigation in Nigeria. Assumptions that rely on this point form the entire basis for their cash flow projections. But they are not parties to that dispute and it is unclear who holds legal title to the seized assets, making the prospect of realizing value even more tenuous. There is therefore a substantial possibility that the cash collateral will be used not to fund actual operations, but to stall for time while the Debtors await developments in third-party litigation on which their very ability to operate depends. Indeed, it appears that the Debtors might very well consume over 40% of the cash collateral just to get to the point of

---

[2] The 13 Week Cash Forecast excludes Operating Disbursements in the month of May that are present in the Monthly Cash Proforma.

seeing a result. Secured parties should not be forced to bet their collateral on a legal outcome in this manner, and the Debtors' decision to seek this relief is not supported by good business judgment. That alone is reason to deny the Motion or, at the very least, defer the Motion to allow affected parties a fuller opportunity to investigate the real financial position and business prospects of the Debtors.

4.     The proposed forms of adequate protection also fall far short of the requirements of section 361 of the Bankruptcy Code. The notion that the cash collateral will allow the Debtors to eventually resume operations and generate going concern value for the benefit of creditors is highly speculative given the substantial litigation overlay. Further, as of May 9, 2018, PIC will have acquired all claims and collateral rights of MCB against ERN and EPNL in connection with its payment of its indirect guarantee obligation to MCB. PIC, like MCB before it, will be undersecured. It will also be entitled to adequate protection in equal measure and will not have the benefit of any guarantee. The Motion should therefore also be denied as to cash collateral on deposit with MCB for failure to provide adequate protection as required under the Bankruptcy Code. At a minimum, PIC should have the benefit of replacement liens in other assets of the Debtors, as the Motion proposes to provide to Zenith.

## BACKGROUND

5.     On May 4, 2018, the Debtors filed the Motion seeking, among other things, the use of certain cash collateral on deposit with Zenith and MCB. Specifically, to fund working capital in the operation of their business, the Debtors seek (i) authority to use certain funds on deposit with Zenith that secure obligations of EPNL under a term loan facility; (ii) authority to use certain funds on deposit with MCB that secure obligations of ERN and EPNL under the MCB Facility, and (iii) an order requiring MCB, but not Zenith, to release such funds

to the Debtors so that the Debtors may spend such funds consistent with the Budget (as revised to comprise a Monthly Cash Pro Forma and a 13 Week Cash Collateral Budget).

6. To protect Zenith and MCB against the diminution in the value of their respective collateral positions, the Debtors propose to provide the following forms of adequate protection: (i) maintenance of the going concern value of their business through the use of the cash collateral to fund operations; (ii) as to Zenith, a postpetition replacement lien in accounts receivable of the Debtors; and (iii) as to MCB, nothing, on the basis that MCB is already fully secured and has the benefit of a guarantee provided by PIC.

7. The Motion is not accompanied by any documentation that might allow parties to evaluate the sufficiency of this adequate protection or even determine if the Debtors have going concern value to preserve, save for a Monthly Cash Proforma that is entirely dependent on assumptions about legal outcomes in Nigeria. Further, while the Debtors acknowledge this significant Nigerian litigation overlay on their ability to resume operations, they omit certain facts that provide important context for the relief sought in the Motion and for these bankruptcy cases more generally, including the existence of litigation in the Bankruptcy Court for the Southern District of New York alleging prepetition irregularities involving ERN and certain of its current and former affiliates, Allied Energy PLC (**Allied**), CAMAC International Nigeria Limited (**CAMAC Nigeria**), and CAMAC International Limited (**CAMAC International**).

I.  *Relationship among ERN, EPNL, MCB, and PIC*

8. As described in the Declaration of Sakiru Adefemi (Femi) Ayoade In Support of the Debtors' Chapter 11 Petitions and First Day Motions (the **First Day Declaration**), PIC is a significant shareholder of ERN and, in accordance with a Financing Support Agreement between ERN and PIC dated February 6, 2017 (the **FSA**), procured a

4

$100,000,000 Payment Guarantee issued by The Standard Bank of South Africa Limited to support the obligations of ERN and EPNL under the MCB Facility (the **Payment Guarantee**).

9. On May 8, 2018, to facilitate MCB's withdrawal of its demand on the Payment Guarantee, PIC and MCB entered into a transfer certificate (the **Transfer Certificate**) under which PIC will pay MCB $68,602,273.37 and all claims and collateral rights of MCB against ERN and EPNL under the MCB Facility will be novated to PIC, with effect from May 9, 2018. As of the date hereof, the principal amount due and owing under the MCB Facility, exclusive of interest, is $65,595,344.82.

10. On January 26, 2018, ERN and EPNL filed a complaint against PIC in the Supreme Court of the State of New York, commencing the case captioned *Erin Energy Corporation and Erin Petroleum Nigeria Limited v. Public Investment Corporation Soc Ltd.*, No. 650436/2018 (Sup. Ct. N.Y. Cnty. January 26, 2018) (the **New York Litigation**). In such complaint, ERN and EPNL allege that PIC wrongfully interfered with the process for the approval and payment of amounts under the MCB Facility. New York Litigation, Dkt. No. 1. PIC has filed a motion to dismiss on the basis of lack of personal jurisdiction and failure to state a claim. New York Litigation, Dkt. No. 18.

## II. Chapter 15 proceedings in the Southern District of New York

11. CAMAC International, the former indirect parent of the Debtors, is currently the subject of liquidation proceedings before the Grand Court of the Cayman Islands, Financial Services Division (the **CAMAC Liquidation**), and of ancillary proceedings before Judge Shelley Chapman in the United States Bankruptcy Court for the Southern District of New York under Chapter 15 of the Bankruptcy Code (the **CAMAC Chapter 15**). On November 2, 2017, an order was entered in the CAMAC Chapter 15 recognizing the CAMAC Liquidation as a

foreign main proceeding. *In re CAMAC International Limited – In Official Liquidation*, Case No. 17-12827 (SCC) (Bankr. S.D.N.Y. November 2, 2017) [Dkt. No. 7].

12. On April 9, 2018, the joint official liquidators of CAMAC International commenced an adversary proceeding in the CAMAC Chapter 15 in order to investigate the dissipation of CAMAC International assets in the eighteen months prior to the CAMAC Liquidation and the concurrent transfer of significant assets from Allied and CAMAC Nigeria, including a controlling stake in ERN shares and ERN promissory notes with an aggregate outstanding amount of approximately $123 million, to an unaffiliated entity for unclear consideration. The defendants in the adversary proceeding include, among others, current and former officers, directors, senior accounting representatives, and in-house counsel for CAMAC International, as well as ERN itself. *See Fu v. Lawal*, Adv. Pr. No. 18-01205 (SCC) (Bankr. S.D.N.Y., filed April 9, 2018).

## OBJECTION

13. PIC objects to the Motion on the basis that the Debtors' proposed use of cash collateral, whether or not on an emergency basis, is not supported by good business judgment in circumstances where they do not have operations and their ultimate ability to function as a going concern is highly speculative. Further, the Debtors do not propose to provide MCB or PIC, as the transferee by novation of all claims and collateral rights of MCB against ERN and EPNL under the MCB Facility, with adequate protection as required under section 361 of the Bankruptcy Code.

14. PIC expressly reserves the right to supplement or amend this objection prior to any continued or final hearing on the Motion.

## I.  *The use of cash collateral is not warranted in the circumstances*

15. While the Debtors' proposed use of cash collateral to fund working capital may be justified in circumstances where there is a realistic prospect of going concern value to preserve, it is far from clear that this is the case here. *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996) ("We have found that a reorganization is not in prospect and simply using up the collateral . . . is not acceptable."). Not only do the Debtors fail to present any evidence that suggests they are or will be a viable operating company, but the Monthly Cash Pro Forma suggests exactly the opposite: that in the near term, the Debtors have no expectation of revenue and that the disbursements will pertain not to profit-generating activities, but to maintenance costs and insurance. All projections of future revenue depend entirely on certain critical assumptions about the Debtors' ability to realize on assets that are currently arrested, on a vessel they cannot currently use, in Nigeria.

16. Indeed, by the Debtors' own admission, their ability to continue operating turns on material considerations well beyond immediate cash flow concerns. The Motion itself identifies the "most significant" impact on the Debtors' financial condition as Nigerian Agip Exploration Limited's seizure of certain assets in Nigeria. Motion, ¶ 6. Such seizure was, however, apparently made by Nigerian governmental parties, pursuant to a Nigerian court order enforcing an arbitral award under the Rules of the London Court of International Arbitration. Declaration ¶ 43. Thus, to the extent the Debtors' ability to actually resume operations turns on the resolution of these issues in their favor, the degree to which going concern value will be preserved by the use of cash collateral is questionable. In reality, it appears that the cash collateral will be used not to fund actual profit-generating operations, but to bridge the gap as the Debtors await the outcome of third-party litigation in a foreign jurisdiction. The Monthly Cash Pro Forma suggests that the cost of doing so may be as much as $4,361,176.

## II. *The adequate protection proposed by the Debtors is not sufficient*

17. Under the Bankruptcy Code, the use of cash collateral is conditioned on the provision of adequate protection to the secured party. 11 U.S.C. §§ 361, 363(c)(2)(B) and (E). While the question of what constitutes adequate protection must be decided on a case-by-case basis, the purpose of the requirement is to protect the secured party from diminution in the value of its interest in collateral during the reorganization process. *In re Energy Partners, Ltd.*, 409 B.R. 211, 235–36 (Bankr. S.D. Tex. 2009). The Debtors bear the burden of proving that the interest of PIC will be adequately protected. *Id.*

18. Here, the Debtors argue that adequate protection is present because (i) the use of the cash collateral to fund operations will preserve the going concern value of their business and (ii) MCB is already fully secured and has the benefit of the Payment Guarantee. They do not, however, provide sufficient support as to the adequacy of either, especially in light of the significant factual questions raised by the various disputes in Nigeria and the United States.

19. First, because the use of cash collateral to fund working capital is presumably always intended to allow a debtor to continue operations, the preservation of going concern value should only constitute sufficient adequate protection in circumstances where there is no diminution in the value of the collateral and a debtor can be expected to operate profitably. *See In re Goode*, 235 B.R. 584, 589 (Bankr. E.D. Tex. 1999) (denying use of cash collateral for lack of adequate protection where the only evidence of adequate protection was the debtor's stated belief that its business operations would improve); *See In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (finding a secured creditor to be adequately protected where there was no diminution in the value of the collateral and the debtor operated at a profit post-petition); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (finding that the

creditor was adequately protected where the value of its collateral increased during the case). Here, the Debtors do not provide evidence as to either of these things and, by their own admission, are not operating profitably and only project otherwise subject to a favorable outcome in foreign litigation. By contrast, in *Pursuit*, on which the Debtors rely, the court found that the collateral had not declined in value during the bankruptcy, that the debtor had been operating at a profit during the case, and that projections of profit in future months were reliable. *Pursuit*, 193 B.R. at 717.

20. Second, while the Debtors propose to provide Zenith with postpetition replacement liens in accounts receivable notwithstanding their view that it is "significantly oversecured," they do not propose to provide any additional adequate protection to MCB on the basis that it is fully secured and has the benefit of a guarantee from PIC. Motion ¶ 17. PIC believes that MCB is, and PIC will be, undersecured. Further, following the novation, PIC will be equally entitled to adequate protection and will not have the benefit of any guarantee, having paid MCB.

## CONCLUSION

21. For the foregoing reasons, PIC respectfully requests that this Court deny the Motion as to amounts on deposit with MCB and grant such other and further relief as it deems just and proper.

Dated: May 9, 2018
Houston, Texas

**VINSON & ELKINS LLP**

/s/ *Bradley R. Foxman*
Rebecca L. Petereit
(Texas Bar No. 24062776)
Bradley R. Foxman
(Texas Bar No. 24065243
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
rpetereit@velaw.com
bfoxman@velaw.com

- and -

**ALLEN & OVERY LLP**
Laura Hall
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
laura.hall@allenovery.com

*Attorneys for Public Investment Corporation Soc. Ltd.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 9, 2018, a true and complete copy of the foregoing objection was served upon filing via the Court's EM/ECF electronic system on all parties subscribing thereto, as well as by regular mail on the Debtors' Master Service List.

/s/ *Bradley R. Foxman*
Bradley R. Foxman