## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Case No. 18-32106 |
| Erin Energy Corporation, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

### EMERGENCY MOTION OF ARMADA OYO LIMITED AND BUMI ARMADA (SINGAPORE) PTE. LTD. FOR AN ORDER PURSUANT TO SECTIONS 105(A), 362(D)(1), AND 363(E) OF THE BANKRUPTCY CODE MODIFYING THE AUTOMATIC STAY AND GRANTING RELATED RELIEF

**THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE A HEARING ON THIS MATTER ON MAY 23, 2018, AT 9:00 AM (CDT) IN COURTROOM 404, 515 RUSK STREET, HOUSTON, TX 77002.**

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

Armada Oyo Limited ("**AOL**") and its affiliate Bumi Armada (Singapore) Pte. Ltd.

("**BASPL**" and together with AOL, "**Bumi**") hereby move this Court (the "**Motion**") for the

entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Order**")

pursuant to sections 105(a), 362(d)(1), and 363(e) of title 11 of the United States Code (the

---

[1]     The last four digits of Erin Energy Corporation's federal tax identification number are 9798.  The other Debtors in these cases are: Erin Energy Limited, Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited.  The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

"**Bankruptcy Code**") (i) modifying the automatic stay contained in section 362(a) of the Bankruptcy Code to the extent necessary to permit Bumi to: (A) take all necessary actions with respect to the ownership and operation of the floating production storage and offloading (FPSO) vessel known as the "Armada Perdana" or "FPSO Armada Perdana" (the "**Perdana**" or the "**FPSO**") currently located off the coast of the Federal Republic of Nigeria to ensure the health and safety of the Perdana, its crew, and the surrounding environment, (B) take steps necessary to complete the demobilization of the Perdana and to return her to a suitable port or to such other location to mitigate any health, safety and environmental risks, (C) subject to obtaining required relief from the Nigerian courts and any relevant regulatory and governmental authorities (if required), take necessary actions to discharge or cause the discharge of all crude oil cargo held in the Perdana (the "**Stored Crude**") in furtherance of any sale or other transfer or disposition of such cargo, (D) commence or participate in any action in any court of competent jurisdiction, including any action in the Nigerian courts to interplead the proceeds of any sale or disposition of the Stored Crude, and to comply with the orders of such courts subject to the payment and satisfaction of all costs incurred by Bumi in connection with any sale or disposition and discharge of the Stored Crude (from the proceeds thereof or otherwise from EPNL), and (E) terminate the Agreements if and when EPNL determines to reject the Agreements, and (ii) granting such other and further relief as the Court deems just and proper.  In support of this Motion, Bumi relies upon the *Declaration of James Oliver Ellis in Support of (I) Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. for an Order Pursuant to Sections 105(a), 105(d)(2), 363(d)(1), and 363(e) of the Bankruptcy Code Modifying the Automatic Stay and Granting Related Relief and (II) Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte., Ltd. to Compel Assumption or Rejection of Executory*

*Contracts Pursuant to Sections 105(a), 105(d)(2) and 365(d)(2) of the Bankruptcy Code*, dated May 11, 2018, which is being filed contemporaneously herewith (the "**Ellis Declaration**"),[2] and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.        As described in detail herein, in early April 2018, Debtor EPNL abandoned the 308 meter long FPSO Perdana and her crew of 62 in the "Oyo Field", an oil field located 50 miles off the coast of Nigeria (and approximately 100 miles from the nearest suitable port), without helicopter service, security coverage, or the services of essential support vessels.  EPNL is obligated to provide these essential services under its pre-petition agreements with Bumi, and the Perdana cannot operate safely in the Oyo Field without such vessels.  The Perdana sits in a known piracy zone.  Without security vessels with trained armed security personnel on board in the field, the Perdana is at constant risk of attack.  With approximately 380,000 barrels of crude oil in the Perdana's cargo tank—comprising the Stored Crude—it is critical that support vessels are in the field to provide oil spill response support.  Support vessels and regular helicopter service are also required to provide supply and evacuation (including MEDIVAC) coverage. Without these services the Perdana, her crew, and the environment remain at grave risk.

2.        In the wake of EPNL's abandonment of the Perdana, Bumi is currently an involuntary lender to the Debtors in these chapter 11 cases at an estimated rate not less than $165,500 per day, which rate consists of approximately $33,000 of daily costs of providing critical services that are EPNL's obligation to provide, as well as certain fees EPNL owes under the pre-petition agreements.[3]  Due to EPNL's failure to pay and perform its post-petition

---

[2]        Capitalized terms used but not defined herein have the meanings ascribed to them in the Ellis Declaration.

[3]        Bumi reserves all rights with respect to the calculation of its claim against the Debtors.

obligations, Bumi has been forced to pay out of pocket for the necessary security, supply, and transport services that EPNL has failed to provide for months prior to the Petition Date, and has no realistic prospects for providing on a post-petition basis.  Where, as here, the Debtors have no sufficient funding or resources to meet these obligations, there is no basis to maintain the stay and cause exists for the relief requested herein.  In fact, EPNL and the other Debtors in these cases may be administratively insolvent—having commenced these cases on April 25 with zero available cash and no plans to fund the so-called going-concern operation of their businesses (including obligations under the agreements with Bumi).  The Debtors' recent attempt to fund their cases—a contested cash collateral motion—has yielded bare-bones interim funding of $620,000.  Conspicuously absent from the interim budget, however, is any provision for the costs of chartering the Perdana from AOL, procuring required operational and maintenance services from BASPL, or any of the critical health, safety, and environment-related services that EPNL is required to provide to the Perdana under the pre-petition agreements.  EPNL's blatant disregard of its obligations under the agreements materially prejudices Bumi's personnel and property and constitutes cause for relief from the automatic stay.  EPNL's assurance that the future may brighten if numerous contingencies are resolved is simply inadequate to support maintaining the stay in these circumstances.

3.      It is therefore essential that Bumi be provided with relief from the stay under section 362(a) of the Bankruptcy Code to take all necessary steps to complete demobilization of the Perdana and her crew from the Oyo Field.  Doing so is the only way to mitigate the extreme prejudice to Bumi's interests as well as to stop the ongoing accrual of claims against EPNL (and EEC as EPNL's guarantor).

## REQUEST FOR EMERGENCY CONSIDERATION

4.      Bumi requests emergency consideration of this Motion.  Immediate stay relief is necessary to, as more fully described below, prevent further irreparable harm to Bumi and to provide Bumi with all necessary relief to take actions to mitigate costs and the health, safety, and environmental risks associated with maintaining the status quo to keep the Perdana in the Oyo Field.  Furthermore, in the circumstances of these cases, the continuation of the status quo not only prejudices Bumi's interests, but EPNL's bankruptcy estate as well due to the continuing accrual of Bumi's claims against EPNL arising from its failure to satisfy its post-petition payment obligations as well as provide critical services in the field that EPNL is required to provide pursuant to its agreements with Bumi.  As such, cause exists to grant the relief requested herein on an emergency basis.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(G).

6.      The statutory bases for the relief requested in this Motion are sections 105(a), 362(d)(1), and 363(e) of the Bankruptcy Code and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

7.      On April 25, 2018 (the "**Petition Date**"), Erin Energy Corporation ("**EEC**") and its affiliated debtors, including Erin Petroleum Nigeria Limited (f/k/a CAMAC Petroleum Ltd.) ("**EPNL**", and together with EEC and the other debtors in these cases, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court, which cases have been consolidated for procedural purposes only.

8.     The FPSO Perdana.     AOL is the registered owner of the Perdana.  *Ellis Declaration* ¶ 6.  The Perdana provides offshore production facilities that house both processing equipment and storage for production of hydrocarbons.  *Id.* ¶ 5.  An FPSO is deployed to an offshore oil field and connects to one or more well heads by way of risers (essentially hoses or pipes used to raise hydrocarbons from a well head on the sea floor to the FPSO on the surface).  *See Id.* ¶ 39.  Hydrocarbons removed through the undersea well heads are processed and stored in the FPSO's cargo tanks before offloading via an offtake hose into commercial tankers.  *Id.* ¶¶ 5-6.

9.     The Perdana is 308 meters long.  *Id.*¶ 6.  To operate in the field safely and efficiently it must be supported by offshore support vessels ("**OSVs**") and supply vessels, which perform a variety of support functions including resupply of food, water, and spare parts, MEDIVAC, non-medical evacuation, and oil spill response.  *Id.* ¶ 6.  In addition, the Perdana does not have a self-propulsion system and, therefore, to move in or off the field it requires the use of escort tugs after all the necessary decommissioning and demobilization steps have been carried out.  *Ellis Declaration* ¶ 13.  Separately, for crew rotation purposes, MEDIVAC, and supply support, the Perdana requires regular helicopter service to and from the mainland.  *Id.*  Additional support is required because the Perdana is located in a known piracy zone and as such the Perdana is always at risk of attack.  *Id.* ¶¶ 12-13.  Per a recent report from the Commercial Crime Services Division of the International Chamber of Commerce, the Gulf of Guinea—where the Perdana is located—accounted for 29 piracy incidents in the first quarter of fiscal year 2018, more than 40% of the global total.  *Id.* at Exh. G.  To address critical health and safety risks, the vessel requires constant security support, which can include trained armed personnel deployed on the chartered security or naval vessels deployed to the field.  *Id.* ¶¶ 13, 39.

10.     The Charterparty and the O&M Contract.   AOL entered into a Contract of Bareboat Charterparty for the Perdana in the Oyo Field Development with Oceanic Consultants Nigeria Limited ("**Oceanic**") on February 17, 2014 (effective as of January 1, 2014) (as novated and amended, the "**Charterparty**"), under which AOL agreed to charter the Perdana to Oceanic. *Id.* ¶ 7.  On March 25, 2014 Oceanic novated its interest under the Charterparty to EPNL (f/k/a Camac Petroleum Limited) by a Deed of Novation dated March 25, 2014.  *Ellis Declaration* ¶ 7. On the same date, EEC (then known as CAMAC Energy Inc.) issued a parent company guarantee and indemnity in favor of AOL as security to support EPNL's payment and performance obligations under the Charterparty (the "**Guarantee-Charterparty**").  *Id.*

11.     Under the Charterparty, EPNL covenants to pay AOL certain fees and charges, including the "Daily Compensation Fee" and "Standby Fee" (as defined in the Charterparty), in consideration of the supply by AOL of the Perdana pursuant to the Charterparty.  *Id.* ¶ 9.  The current Daily Compensation Fee owing to AOL under the Charterparty is $132,500.  *Id.*

12.     In connection with the Charterparty, Oceanic and BASPL entered into a Contract for Provision of Operational and Maintenance Services for FPSO Perdana in the Oyo Field Development dated February 17, 2014 (effective as of January 1, 2014) (as amended and novated, the "**O&M Contract**" and together with the Charterparty, the "**Agreements**").  *Id.* ¶ 8. On March 25, 2014 Oceanic also novated its interest under the Charterparty to EPNL (f/k/a Camac Petroleum Limited) by a Deed of Novation dated March 25, 2014.  *Id.*  On the same date, EEC (then known as Camac Energy Inc.) issued a parent company guarantee and indemnity in favor of BASPL to support EPNL's payment and performance obligations under the O&M Contract (the "**Guarantee-O&M Contract**" and together with the Guarantee-Charterparty, the "**Guarantees**").  *Id.*  The Agreements and the Guarantees are governed by English law.  *Ellis*

*Declaration* ¶ 8.  Under the Agreements, the Perdana was deployed to an oilfield known as the "Oyo Field" located approximately 50 miles off the coast of Nigeria, to exploit certain oil mining leases with the Nigerian Government.  *Id ¶ 12.*

13.     Under the O&M Contract, while BASPL undertakes to provide onboard services related to the maintenance and operation the Perdana, EPNL undertakes to "perform, arrange and meet the costs" of a variety of critical services that must be provided in connection with the safe deployment and operation of the Perdana in the Oyo Field.  *Ellis Declaration* Exh. A (O&M Agreement) § 11.2.  EPNL's obligations with respect to these services include, *inter alia*, providing security necessary for the safety of the vessel, required support vessels and escort tugs, and helicopter service.  *Id.* §§ 11.2.3, 11.2.9, 11.2.10.  A failure to provide any of these services raises immediate health, safety and environmental risks that cannot be left unmitigated.  *Ellis Declaration* ¶¶ 11, 24, 25, 27.

14.     <u>EPNL's Failure to Perform</u>.  EPNL, from the outset of the Charterparty and O&M Contract, failed either wholly or partially to make payment of monthly invoiced amounts, such that, as at the end of June 2015 in excess of $52,000,000 was overdue and unpaid.  *Ellis Declaration* ¶ 14.  However, given the complexity, expense and risks of redeploying the FPSO, Bumi had no practical alternative but to work in good faith with EPNL to try to find a solution. *Id*.  In consequence, amendments to payment terms, and various other amendments to the Charterparty and the O&M Contract, were reaffirmed by way of a letter dated June 30, 2015 (the "**Amendment Letter**").  *Id. ¶* 15.  Pursuant to the Amendment Letter, EPNL was granted a discount (by way of a retrospective extension of the Standby Period) of approximately $22,000,000 from amounts then due and unpaid under the Charterparty and the O&M Contract, and deferred payment terms in relation to other unpaid amounts then due under the Charterparty

and the O&M Contract.  *Id.* ¶ 15.  Pursuant to the Amendment Letter the parties agreed that the Daily Compensation Fee of $132,500 would be payable on and from May 1, 2015.  *Id.*

15.     At least for the first few months following the Amendment Letter, EPNL made payments due under the modified payment schedules under the Charterparty and the O&M Contract.  *Id.* ¶ 16.  By late 2015, however, EPNL again became delinquent in payment.  *Id.* ¶ 16.  Due to EPNL's ongoing material breaches of the Agreements (including the failure to pay), AOL and BASPL delivered numerous correspondences to EPNL reserving rights, providing notice of default, and demanding payment of outstanding amounts due under the Agreements.  *Ellis Declaration* ¶ 17.

16.     On March 15, 2017, in connection with ongoing discussions to reach a consensual resolution on a plan to address the overdue amounts owing under the Agreements, AOL confirmed to EEC that in furtherance of those efforts AOL was prepared to temporarily accept "minimum" cash payments of $1.8 million per month in partial satisfaction of the accrued amounts due under the Charterparty (subject to increase in the event certain production and oil price thresholds were passed) pending the entry into a "definitive addendum" memorializing any agreements reached by the parties on modifications to the Charterparty (the "**March 15 Correspondence**").  *Id.* ¶ 18.  For the avoidance of doubt, the minimum proposed cash payments in no way modified the accrual of unpaid obligations pursuant to the Charterparty or relieved EPNL of its liability for the full payment of all such obligations, including the Daily Compensation Fee of $132,500, which amounts would only be modified (if at all) in connection with the parties' entry into the contemplated addendum.  *Id.*  According to the March 15 Correspondence, AOL would accept such minimum payments from the period between January 1, 2017 and execution of the contemplated addendum, which had to be accomplished by no later

than May 6, 2017. *Id.* While no such addendum was ever executed, AOL continued to accept and apply any partial payments to the oldest outstanding invoices (unless otherwise directed by EPNL). *Id.* Accordingly, while AOL has received and applied partial payments on occasion that have reduced AOL's total claim, there has been no discharge, waiver, or modification of the amounts due under the unpaid relevant invoices and the amounts that continue to accrue on a post-petition basis. *Id.* ¶ 18.

17.    <u>2017 Suspension of Charterparty and O&M Contract</u>. The Charterparty and O&M Contract, as amended by the Amendment Letter, provide AOL and BASPL with suspension and termination rights in the event of non-payment of amounts owed by EPNL. *Ellis Declaration* ¶ 19. Consistent with those rights, and due to the continued failure of EPNL to comply with its payment obligations to AOL and BASPL under the Agreements, on June 21, 2017, AOL and BASPL each delivered notices to EPNL suspending their performance under the Charterparty and O&M Contract, respectively (the "**Suspension Notices**"). *Id.* The suspension of performance included a suspension of all offtake activities on the Perdana until Bumi received payment in full of all outstanding amounts. *Id.* Notwithstanding the suspension, BASPL confirmed in the Suspension Notice related to the O&M Contract that it would continue to carry out critical maintenance and perform any other activities BASPL deemed necessary to mitigate occupational health and safety and environmental risks. *Id.*

18.    At the request of the Nigerian Government's Department of Petroleum Resources ("**DPR**")[4], which had expressed concern regarding the suspension of production in the Oyo Field, AOL and BASPL re-engaged with EPNL to determine whether the parties could agree on a course of action to resolve the immediate operational issues on the Perdana and begin to address EPNL's outstanding payment defaults. *Id.* ¶ 20. As a result of these discussions, AOL

---

[4]    The DPR is the Nigerian Government agency with responsibility for the Oyo Field.

and BASPL agreed to permit oil to continue to flow into and be processed and stored in the Perdana, and allowed two separate "exceptional" offtakes (the "**2017 Offtakes**") of the crude oil then held in the Perdana, subject to an agreed portion of the proceeds generated from the sale of the crude oil removed from the Perdana remitted to AOL and BASPL.  *Id.*  EPNL also acknowledged that the 2017 Offtakes did not constitute a lifting, waiver or compromise of the suspension of the Charterparty or the O&M Contract.  *Ellis Declaration* ¶ 20.

19.     <u>Execution of Writ of Attachment</u>.  On January 31, 2018, security personnel and court officials from the Federal High Court of Port Harcourt (the "**Federal High Court**") landed a helicopter on the Perdana to execute a Writ of Attachment (the "**Attachment**").  *Id.* ¶ 21.  The Attachment was issued by the Federal High Court in connection with a pending lawsuit between Nigerian Agip Exploration Limited ("**AGIP**") on the one hand and Allied Energy Plc ("**Allied**")[5] and CAMAC International (Nigeria) Ltd. on the other.   Aoyade Declaration ¶ 43; *Ellis Declaration* ¶ 22.  The court officials chained and padlocked the export valve of the Perdana (thereby blocking its offtake capabilities for any sales of crude oil) and warned the EPNL representatives and all crew on board that the 380,000 barrels of Stored Crude were in the custody of the Federal High Court and that any act to offtake the Stored Crude would be a violation of the Federal High Court's attachment order and could result in contempt charges, fines, and imprisonment.  *Ellis Declaration* ¶ 22.  The Attachment and related proceedings are wholly unrelated to Bumi's claims against EPNL.

20.     On February 14, 2018, Mr. Malcolm Gomes, the Head of JV Management of Bumi Group, sent an email to Mr. Dippo Bello, the Vice-President, Financial Planning and Treasurer of EEC and a director of EPNL, with Ms. Pat Maseli and Mr. Enorense Amadasu of

---

[5]     Allied is referred to as a "related party to the Debtors" in the Aoyade Declaration, but no information is provided on the nature of that relationship.  *Aoyade Declaration* ¶ 16 [Dkt. 5].

the DPR in copy, requesting an explanation from EEC and EPNL of the situation and EEC and EPNL's payment mechanism to satisfy the total sum due and owing to AOL and BASPL. *Id* ¶ 23. Notwithstanding repeated follow-up requests via email and phone from Mr. Gomes to Mr. Bello, Mr. Bello failed to respond to the February 14 Correspondence. *Id.*

21. <u>EPNL's Failure to Perform Obligations Under the O&M Contract Necessary to Ensure Health and Safety of Persons and Property Aboard the FPSO</u>. Since February 19, 2018, EPNL has ceased providing regular helicopter service to the Perdana as it must under the express terms of the O&M Contract. *Id.* ¶ 24. Bumi attempted to procure performance from EPNL subsequently—to no avail. *Id.* ¶¶ 25-28.

22. Further, on April 1, 2018, EPNL communicated to Bumi that it would not provide required amounts of marine diesel oil for the operation of a critical gas turbine generator, the loss of which could be a ground to suspend the Perdana's class certificate, causing substantial financial damages to Bumi that would result in additional substantial claims against EPNL. *Id.* ¶¶ 29-30.

23. <u>EPNL Abandons the Perdana and Her Crew</u>. On April 9, 2018, EPNL began to abandon its operations. *See Ellis Declaration* ¶ 31. The essential OSV chartered by EPNL to service the Perdana departed the Oyo Field and has not returned. *Id.* ¶¶ 33-36. A critical supply vessel chartered by EPNL was so low on fuel that it was anchored to a buoy and unable to operate in any support role. *Id* ¶ 31. Bumi representatives immediately informed EPNL that the situation posed major safety concerns and could cause shortages of food and critical spares on board the Perdana and must be remedied without delay. *Id.*

24. In response to the ensuing crisis created by EPNL's inability to meet its obligations to its contractors and vendors, on April 10, 2018, EPNL delivered a notice to BASPL

asserting that the EPNL-chartered OSV had suffered an alleged act of "sabotage" requiring its departure from the Oyo Field, and that the Attachment is among the "Force Majeure Events" as that term is defined in the O&M Contract. *Id.* ¶ 33. Rather than address the critical health and safety conditions that arose in the wake of EPNL's abandonment, EPNL directed BASPL to take all necessary steps to shut down operations on the Perdana. *Id.* On April 11, 2018, BASPL disputed EPNL's contentions, including that any Force Majeure Events had occurred, but nonetheless confirmed that BASPL would proceed as directed to shut down operations, while reminding EPNL that its obligations under the Agreements remained in full force and effect. *See Ellis Declaration* ¶ 34.

25.     In the final act of abandonment, on April 15, 2018, EPNL pulled all remaining support vessels in the Oyo Field, including two vessels that EPNL had arranged to provide essential security, and the last five EPNL personnel aboard the Perdana. *Id.* ¶ 35. Without any essential support services or EPNL personnel, the Perdana was left abandoned and exposed to pirates and other maritime risks of the Oyo Field with 60 non-EPNL crew and no means of immediate support in case of medical, security or environmental emergency. *See id.* ¶¶ 36-37.

26.     In response to EPNL's complete abandonment of the Perdana, its remaining, approximately 35, crew members—consisting of Bumi personnel and contractors—and EPNL's obligations under the Agreements, Bumi has been forced to undertake the costs of safely shutting down operations on the Perdana and securing its personnel, property, and the environment in and around the Oyo Field. *See id.* ¶¶ 37-41. In addition, by taking these steps, Bumi has also acted to preserve and secure for the benefit of the Debtors' estates the Stored Crude, which totals approximately 380,000 barrels in which EPNL claims an interest, which according to its counsel

is worth approximately $20,000,000.  May 1 Hr'g Tr. at 7.  Actions taken by Bumi in the wake

of EPNL's departure from the field include:

- continuing reduction of crew from approximately 60 individuals to 35, with additional reductions planned as critical shutdown tasks are completed (*Ellis Declaration* ¶¶ 36, 38);

- deploying armed security personnel to the Perdana to help protect it from attack (*id.* ¶ 37);

- "flushing and purging the topsides," which involves flushing the plant with water to remove all hydrocarbon residue from the processing plant onboard the Perdana (*id.* ¶ 38);

- chartering an OSV and supply ship support and bringing those assets into the Oyo Field (*Id.* ¶ 39); and

- arranging for a resumption in regular helicopter service (*id.* ¶ 36).

27.    Bumi estimates that the cost to it of procuring the various services and support

which EPNL is obligated to perform under the O&M Contract is approximately $1,000,000 per

month ($33,000 per day), which is in addition to BASPL's costs for performing its own

obligations of the O&M Contract, the $132,500 Daily Compensation Fee accruing to AOL under

the Charterparty, and the other fees and reimbursable costs being incurred by EPNL under the

Agreements.  *See Id.* ¶ 41.  As of April 30, 2018, the total amount owing from EPNL to Bumi is

not less than $128,406,397.79, comprising the following: (i) $122,367,387.80 due to AOL under

the Charterparty; and (ii) $6,039,009.99 due to BASPL under the O&M Contract.  *Id*.

28.    Despite the ongoing accrual of these costs and expenses, the Debtors have not

proposed to pay Bumi a dime in these chapter 11 cases and have no means of doing so under the

limited use of cash collateral.  *See Debtors' Emergency Cash Collateral Motion*, Exh. 13 [Dkts.

28 and 52-1].  Through their Emergency Cash Collateral Motion, the Debtors sought the non-

consensual use of certain restricted cash for a 13-week-period ended July 27, 2018, in the

amount of $10,024,826.  *Id.*  However, none of the line-items in the proposed cash collateral budget provides for payments to Bumi of any kind or the direct provision of the essential services that are EPNL's responsibility under the Agreements and that Bumi is presently procuring at its own substantial expense.  *Id.*  While this Court has entered an Order authorizing the Debtors to spend $620,000 of cash collateral over a two-week period after a contested hearing on May 9, 2018, none of those funds will be used for the payment of the $132,500 Daily Compensation Fee, any other fee or payment owing under the Agreements, or to reimburse Bumi for the significant expenses it is incurring on a post-bankruptcy basis to provide required health, safety, and environmental services as a direct result of EPNL's failure to perform or fund these critical obligations under the Agreements.  *See id; Cash Collateral Order* [Dkt. 55].

29.     In the current circumstances, Bumi is in effect an involuntary lender in these cases and the Perdana remains subject to untenable and unjustifiable risks in the Oyo Field.  To achieve a demobilization of the Perdana, Bumi has developed a plan (the "**Demobilization Plan**") to safely and efficiently leave the Oyo Field.  *Ellis Declaration* ¶ 44.  Full demobilization in accordance with the Demobilization Plan is estimated to take approximately one month and would include the following action items:

- completing flushing of the risers and pumping water into the well to plug the well;

- draining the topsides of oil;

- water flushing the topsides;

- purging the topsides of nitrogen;

- consolidating all remaining oil in cargo tanks;

- washing the cargo tanks and consolidating remaining oil in slop tanks and discharging water;

- disconnecting risers and umbilicals;

- connecting vessels to prepare for tow;

- disconnecting anchors, chains, and cables and retrieving same to deck;

- demobilizing all crew that are not required to assist with the tow; and

- towing to port.

*Id.*.

30.     Additionally, Bumi will need to remove the Stored Crude.  *Id.* ¶ 43.  In light of the multiple parties that claim an interest in the Stored Crude and the need to remove the Stored Crude so as to put the Perdana in a position to fully demobilize, Bumi seeks authorization pursuant to this Motion to commence or participate in any action to interplead the proceeds of any sale or disposition of the oil cargo in any court of competent jurisdiction, including the Nigerian courts, subject to the payment and satisfaction of all costs incurred by Bumi in connection with any sale or disposition and discharge of the Stored Crude.

## EMERGENCY RELIEF REQUESTED

31.     By this Motion, Bumi seeks entry of the Proposed Order on an emergency basis (i) modifying the automatic stay to the extent necessary to permit Bumi to: (A) take all necessary actions with respect to the ownership and operation of the Perdana to ensure the health and safety of the Perdana, her crew, and the surrounding environment, (B) take steps necessary to complete the demobilization of the Perdana and to return her to port or to such other location to mitigate any health, safety and environmental risks, (C) subject to obtaining required relief from the Nigerian courts and any relevant regulatory and governmental authorities (if required), take necessary actions to discharge or cause the discharge of the Stored Crude in furtherance of any sale or other transfer or disposition of the Stored Crude, (D) commence or participate in any

action in any court of competent jurisdiction, including any action in the Nigerian courts to interplead the proceeds of any sale or disposition of the Stored Crude, and to comply with the orders of such courts subject to the payment and satisfaction of all costs incurred by Bumi in connection with any sale or disposition and discharge of the Stored Crude (from the proceeds thereof or otherwise from EPNL), and (E) terminate the Agreements if and when EPNL determines to reject the Agreements, and (ii) granting such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

32.     Section 362(d) of the Bankruptcy Code provides two independent grounds upon which the court may modify the automatic stay.  *See In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 321 (Bankr. S.D.N.Y. 2001).  Specifically, section 362(d) provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; (2) with respect to a stay of an act against property under subsection (a) of this section, if— (A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization.

33.     The burden of proof under section 362(d) is a shifting one.  *In re Kaplan Breslaw Ash, LLC*, 264 B.R. at 321–22 (Bankr. S.D.N.Y. 2001).  The moving party has the initial burden to make a *prima* facie showing that either "cause" exists under section 362(d)(1) or that the debtor has no equity in the property and it is not necessary to an effective reorganization for the purposes of section 362(d)(2).  *Id.*  The debtor has the burden to prove all other issues.  *Id.; see also In re Gramercy Court, Ltd.,* No. 07-80177-G3-11, 2007 WL 2126493, at *5 (Bankr. S.D. Tex. July 19, 2007).

34.     This Court may also act pursuant to section 105(a) to the extent necessary to fashion appropriate relief in these circumstances.  As the Supreme Court has held, section 105(a) grants bankruptcy judges "broad authority . . . to take any action that is necessary or appropriate 'to prevent an abuse of process.'"  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375 (quoting section 105(a)).   The Fifth Circuit has also held that section 105(a) is to be "interpret[ed] liberally," so long as any action taken pursuant to section 105(a) is "consistent with the rest of the Bankruptcy Code."  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995).  Section 105(a) thus permits bankruptcy courts to "fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code."  *Perkins Coie v. Sadkin (In re Sadkin)*, 36 F.3d 473, 478 (5th Cir. 1994) (quoting *Chiasson v. Bingler (In re Oxford Management Inc.)*, 4 F.3d 1329, 1333 (5th Cir. 1993)).

## ARGUMENT

### A.     There is Clear "Cause" to Modify the Automatic Stay Pursuant to Section 362(d)(1) of the Bankruptcy Code

35.     "Cause" for lifting of the stay is not defined in the Bankruptcy Code, but courts hold that "[w]ether cause exists must be determined on a case by case basis based on an examination of the totality of circumstances."  *In re WGMJR, Inc.*, 435 B.R. 423, 432 (Bankr. S.D. Tex. 2010) (*citing In re Reitnauer*, 152 F.3d 341, 343 n. 4 (5th Cir.1998)); *In re Mendoza*, 111 F.3d 1264 (5th Cir. 1997); *see also In re Mirant*, 440 F.3d 238, 253 (5th Cir. 2006) ("The Bankruptcy Code does not precisely define 'cause' under § 362(d)(1), and in the past we have noted that this lack of definition affords 'flexibility to the bankruptcy courts.'").

36.     Sufficient cause exists here because there is a clear need for all possible steps to be taken to mitigate the unnecessary and ongoing risk to the safety of property, person, and environment attendant to keeping the Perdana in the Oyo Field when there is no reasonable

prospect that EPNL is or soon will be in a position to perform its ongoing post-petition monetary and non-monetary obligations under the Agreements.  Similarly, its highly unlikely EPNL will ever be in a position to assume, or assume and assign, the Agreements, as it would require a cure of all outstanding defaults, including payment of a cure amount in excess of $128 million.  *See* 11 U.S.C. 365(b)(1).  In the same vein, cause exists due to a complete inability on the part of EPNL to adequately protect Bumi's interests in the Perdana where, as here, Bumi demands such protection pursuant to section 363(e) of the Bankruptcy Code.  This is evidenced by the fact that the Debtors have allocated $0 to maintaining the Perdana in either the 13-week budget submitted with the Cash Collateral Motion or the budget items to be covered by the $620,000 in cash collateral that this Court has authorized the Debtors to expend through May 22, 2018.  *See* 11 U.S.C. 363(e); *Debtors' Emergency Cash Collateral Motion*, Exh. 13 [Dkts. 28 and 52-1]; *Cash Collateral Order* [Dkt. 55].

      i.    <u>The Totality of Circumstances and Balance of Hardships Clearly Weigh in Favor of Lifting the Stay</u>

37.    Courts have found that where the hardships that will be incurred by a movant outweigh the potential prejudice to the bankruptcy estate if the movant's stay relief motion is granted, there is cause for modifying the stay.  *See e.g.*, *In re Mirant Corp.*, 303 B.R. 319, 330 (Bankr. N.D. Tex. 2003); *Mooney v. Gill*, 310 B.R. 543, 546 (Bankr. N.D. Tex. 2002) ("The bankruptcy court must balance the hardships of the parties and base a decision on whether to modify the automatic stay on the degree of hardship involved and the goals of the Bankruptcy Code."); *In re Mosher,* 578 B.R. 765, 772 (Bankr. S.D. Tex. 2017).  As the court in *In re Mosher* observed:

> Factors generally looked to in determining whether to modify the stay for cause include interference with the bankruptcy, good or bad faith of the debtor, injury to the debtor and other creditors if the stay is modified, injury to the movant if the

stay is not modified, and the proportionality of the harms from modifying or continuing the stay. None of these factors alone is outcome determinative. The factors in the present case must be weighed within the context of all the relevant circumstances. Courts must weigh the costs and benefits of maintaining the stay.

*Id.* (quoting *In re Bovino*, 496 B.R. 492, 502 (Bankr. N.D. Ill. 2013)).

38.     Here, the balance of hardships clearly favors granting Bumi's requested relief. Neither EPNL nor any other Debtor in these cases has offered evidence of any means to fund the Debtors' performance under the Agreements.   Further, the Debtors have not shown any reasonable prospect that they will obtain funding necessary to fund these cases and operations, let alone service the extraordinary costs currently borne by Bumi to maintain the status quo to keep the Perdana in the Oyo field.

39.     Respectfully, this Court should not permit, by maintaining the automatic stay without modification, such hardship to be imposed on Bumi in circumstances where the Debtors have offered no realistic hope of either meeting their go-forward obligations under the Agreements or of coming up with the over $128 million in funds that would be required to cure outstanding monetary defaults under the Agreements in connection with their assumption.  *See In re Balco Equities Ltd., Inc.,* 312 B.R. 734, 737, 751-52 (Bankr. S.D.N.Y. 2004) (holding "cause exists because the Debtors have not been able to demonstrate an ability to reorganize" and noting "[t]he Debtors have no means of paying for the constant maintenance required to sustain seagoing vessels, including provision of a crew and the supplies necessary for their sustenance; thus it is likely that [the secured creditor] will be required to make advances in the future in order to preserve its collateral"); *see also In re Powers Aero Marine Servs., Inc.,* 42 B.R. 540, 546 (Bankr. S.D. Tex.1984) (granting stay relief to lender with respect to debtor's yacht on similar grounds).

40.     Forcing Bumi to maintain the status quo would cause precisely the type of extreme and unjustified prejudice to the interests of a non-debtor party that has constituted cause to lift the stay.  *See, e.g., In re Hallwood Energy, L.P.,* No. 09-31253-11, 2009 WL 1917418, at *6 (Bankr. N.D. Tex. July 1, 2009) (lifting automatic stay to allow secured lender to exercise state law and contract rights with respect to natural gas exploration properties pursuant to section 362(d)(1) where rapidly depleting estate assets, credible health and safety concerns, and the debtor had never been able to service debt).

ii.     Lack of Adequate Protection of Bumi's Interests in the Perdana

41.     Pursuant to section 363(e) of the Bankruptcy Code, Bumi requests that this Court condition EPNL's continued use of the Perdana under the Charterparty on the provision of adequate protection to Bumi.  11 U.S.C. 363(e) ("Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased . . . . the court with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest"); *see also In re Elder-Beerman Stores Corp.*, 201 B.R. 759, 763 (Bankr. S.D. Ohio 1996); *In re Keydata Corp.*, 8 B.R. 684, 685 (Bankr. D. Mass 1981).  Courts have held that "adequate protection in the context of relief from the automatic stay is clearly a flexible concept which requires a court to make decisions on a case-by-case basis after full consideration of peculiar characteristics common to each proceeding."  *In re Tudor Motor Lodge Assocs., Ltd. P'ship*, 102 B.R. 936, 956 (Bankr. D.N.J. 1989) (*citing In re Monore Park*, 17 B.R. 934 (D. Del. 1982)).  While most commonly considered in connection with protection to be afforded to a secured creditor, other parties, such as consignors, lessors, and co-owners are also entitled to demand adequate protection under section 363(e).  *See id.; see also Collier on Bankruptcy* ¶ 362.07 at 362-117 ("[A]dequate protection . . . is a flexible concept and

can lead to the imposition of other duties or conditions which are not directly related to the examples in section 361.").

42.     Where a party entitled to adequate protection is not provided such protection, cause exists to lift the stay.  *See In re Tudor Motor Lodge Associates, Ltd. Partnership*, 102 B.R. at 956 (granting unsecured creditor relief from automatic stay to terminate agreement where "[t]he debtor's offer of adequate protection in the form of payment of post-petition obligations" was "not adequate"); *In re Powers Aero Marine Services, Inc.*, 42 B.R. at 546 (granting motion of secured creditor for relief from stay to exercise rights under non-bankruptcy law with respect to collateral and finding "[f]or all the many instances of mismanagement . . . cause exists for lifting of the automatic stay . . . . At this point in time, the debtor . . . has virtually no liquid assets . . . . It is therefore impossible to structure an order fashioning some form of adequate protection."); *In re Peters Millworks, Inc.*, 151 B.R. 440, 444 (Bankr. N.D. Ohio 1993) (granting personal property lessor motion for relief from stay due to debtor's failure to provide proof of adequate protection).

43.     Here, Bumi's interests in the Perdana can only be adequately protected by EPNL's performance of its ongoing monetary and non-monetary obligations under the Agreements, including most urgently its obligations under the O&M Contract to provide essential services required to protect health, safety and the environment, including arranging for appropriate support vessel availability, regular helicopter service, and personnel and equipment necessary to ensure the security of the Perdana and her crew.  By failing to provide these services, Bumi has been forced both pre- and post-petition to cover those services at its own expense, which it is estimated to be $1,000,000 per month ($33,000 per day).  *Ellis Declaration* ¶ 41.

44.     Where, as here, there is no evidence that EPNL has the means to recommence performance of these services or otherwise fund the costs incurred by Bumi to provide the post-bankruptcy services in EPNL's stead, there is no adequate protection, and this is a further ground to modify the automatic stay to permit Bumi to take all necessary steps to implement its Demobilization Plan (including taking actions in furtherance of interpleading the proceeds of the Stored Crude) so as to be in a position to remove its personnel and property off the Oyo Field and into port as soon as possible. *See In re Knight Energy Corp.*, Nos. 09-32163-11, 09-32165-11, 2009 WL 1851739, at * 4 (Bankr. N.D. Tex., June 26, 2009) ("the Court finds that the Debtors have not met their burden to show adequate protection . . .[the Debtors] cannot come close to making debt service to [secured creditor] . . . the Debtors have a few thousand dollars in the bank"); *In re East Houston Estate Apartment, L.L.C.*, No. 07-34388-H3-11, 2007 WL 2692222, at * 2 (Bankr. S.D. Tex., Sept. 10, 2007) (finding cause for lifting the stay where debtor failed to adequately insure and provide security for relevant property).  Modifying the automatic stay to the extent necessary to permit Bumi to take these steps not only provides a means to minimize existing health, safety and environmental concerns in the field, it also has the effect of reducing claims against EPNL, including administrative expense claims (in respect of which all of Bumi's rights are reserved), arising from the ongoing expense incurred by Bumi as a direct result of EPNL's ongoing material breaches of its monetary and non-monetary performance obligations under the Agreements.  *See In re Powers Aero Marine Servs., Inc.,* 42 B.R. at 545 (granting relief from stay where "many additional funds will have to be expended, further diminishing an almost non-existent liquid estate").

## WAIVER OF FEDERAL RULE OF BANKRUPTCY 4001(a)(3)

45.     Bumi respectfully requests the Bankruptcy Court enter an order on an expedited basis waiving the stay provided under Fed. R. Bankr. P. 4001(a)(3) and permit Bumi to immediately take action within the bounds of the Proposed Order, filed herewith.

46.     The Federal Rules of Bankruptcy Procedure state:

> An order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise.
> Fed. R. Bankr. P. 4001(a)(3).

47.     As discussed above, immediate stay relief is necessary to prevent further harm to Bumi, for health, safety, and environmental concerns, and to decrease the financial burden on Bumi and prevent the ongoing accumulation of claims against EPNL and EEC (as guarantor under the Guarantees) in circumstances where future operations and reorganization appear to be fantasy.  As such, it is in the best interests of all interested parties to allow the relief requested to have immediate effect.

## NOTICE

48.     Notice of this Motion will be provided by email, when available, or by traditional mail to: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors; and (iii) the parties listed on the Debtors' master service list.  Bumi submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Intentionally left blank]*

## CONCLUSION

WHEREFORE, Bumi moves this Court to enter an order, substantially in the form of the Proposed Order, (i) modifying the automatic stay to the extent necessary to permit Bumi to: (A) take all necessary actions with respect to the ownership and operation of the Perdana to ensure the health and safety of the Perdana, her crew, and the surrounding environment, (B) take steps necessary to complete the demobilization of the Perdana and to return her to port or to such other location to mitigate any health, safety and environmental risks, (C) subject to obtaining required relief from the Nigerian courts and any relevant regulatory and governmental authorities (if required), take necessary actions to discharge or cause the discharge of the Stored Crude in furtherance of any sale or other transfer or disposition of the Stored Crude, (D) commence or participate in any action in any court of competent jurisdiction, including any action in the Nigerian courts to interplead the proceeds of any sale or disposition of the Stored Crude, and to comply with the orders of such courts subject to the payment and satisfaction of all costs incurred by Bumi in connection with any sale or disposition and discharge of the Stored Crude (from the proceeds thereof or otherwise from EPNL), and (E) terminate the Agreements if and when EPNL determines to reject the Agreements, and (ii) granting such other and further relief as the Court deems just and proper.

[*Intentionally left blank*]

Dated: May 14, 2018
Houston, Texas

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C**.

By: _/s/ Kevin M. Lippman_
Kevin M. Lippman
Texas Bar No. 00784479
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
E-mail:  klippman@munsch.com

-and-

John D. Cornwell
Texas Bar No. 24050450
700 Milam Street, Suite 2700
Houston, TX 77002-2806
Telephone: 713.222.1470
Facsimile: 713.222.1475
jcornwell@munsch.com

**COUNSEL FOR ARMADA OYO LIMITED
and
BUMI ARMADA (SINGAPORE) PTE. LTD.**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that I conferred with Matthew Okin, counsel for the

Debtors, on May 14, 2018, and Mr. Okin indicated that the Debtors opposed the relief requested

herein.

By: */s/ Kevin M. Lippman*
Kevin M. Lippman
Texas Bar No. 00784479


## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing

Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. for an

Order Pursuant to Sections 105(a), 362(d)(1), and 363(e) of the Bankruptcy Code Modifying the

Automatic Stay and Granting Related Relief has been served via the Court's CM/ECF automatic

electronic notification system and/or United States first-class mail, postage prepaid, on the

parties listed on the attached service list (as respectively indicated) on this 14th day of

May, 2018.

By: */s/ Kevin M. Lippman*
Kevin M. Lippman
Texas Bar No. 00784479