# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | Case No. 18-32106 |
| Erin Energy Corporation, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**EMERGENCY MOTION OF ARMADA OYO LIMITED AND BUMI ARMADA (SINGAPORE) PTE. LTD. TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS PURSUANT TO SECTIONS 105(a), 105(d)(2), AND 365(d)(2) OF THE BANKRUPTCY CODE**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED.**

**THERE WILL BE A HEARING ON THIS MATTER ON MAY 23, 2018, AT 9:00 AM (CDT) IN COURTROOM 404, 515 RUSK STREET, HOUSTON, TX 77002.**

---

[1] The last four digits of Erin Energy Corporation's federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited, Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited. The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

Armada Oyo Limited ("**AOL**") and Bumi Armada (Singapore) Pte. Ltd. ("**BASPL**", and together with AOL, "**Bumi**") hereby move this Court (the "**Motion**") for the entry of an order substantially in the form attached hereto as <u>Exhibit A</u> (the "**Proposed Order**") pursuant to 11 U.S.C. § 365(d)(2) of title 11 of the United States Code (the "**Bankruptcy Code**") compelling the Debtors to assume or reject Bumi's Agreements with Debtor Erin Nigeria Petroleum Limited ("**EPNL**") by June 15, 2018. In support of this Motion, Bumi relies upon the *Declaration of James Oliver Ellis in Support of (I) Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. for an Order Pursuant to Sections 105(a), 362(d)(1), and 363(e) of the Bankruptcy Code Modifying the Automatic Stay and Granting Related Relief and (II) Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. to Compel Assumption or Rejection of Executory Contracts Pursuant to Sections 105(a), 105(d)(2), and 365(d)(2) of the Bankruptcy Code*, dated May 11, 2018, which is being filed contemporaneously herewith (the "**Ellis Declaration**"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. This Motion is a companion motion to Bumi's *Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. for an Order Pursuant to Sections 105(a), 362(d)(1), and 363(e) of the Bankruptcy Code Modifying the Automatic Stay and Granting Related Relief*, which is being filed contemporaneously herewith (the "**Stay Relief Motion**"). As set forth in the Stay Relief Motion, there is manifest cause under section 362(d)(1) of the Bankruptcy Code for this Court to modify the automatic stay to allow Bumi to, among other things, take necessary steps to address all essential health, safety, and environmental matters in connection with the operation and maintenance of the FPSO Armada Perdana (the "**Perdana**" or the "**FPSO**") and to undertake the demobilization activities with respect thereto. Such relief is

critical to allow Bumi freedom to ensure the safety of person, property, and environment and to mitigate the mounting claims accruing against the estates on account of the Debtors' continued, post-petition breach of its payment and performance obligations under the Agreements.[2]  By this companion motion, Bumi respectfully requests that this Court enter an order on an expedited basis compelling the Debtors to assume or reject the Agreements by June 15, 2018, in order to provide the Debtors with a limited but sufficient opportunity under the circumstances to propose terms to retain the Agreements while Bumi undertakes demobilization of the FPSO from the Oyo Field.

2.   Such relief is appropriate where, as here, the Debtors have no funds available to meet their obligations under the Agreements on a post-petition basis and thus no ability to relieve Bumi from its current position as an involuntary lender in these cases.  Without the requested relief, EPNL maintains a free option to retain the Agreements at Bumi's expense with Bumi bearing all risks of maintaining the FPSO in the field.  EPNL's fanciful hopes of acquiring funds to restart operations, which rest on a multitude of contingencies and assumptions, must be weighed against the stark reality in these cases where Bumi bears all the costs and risks for each day that the Perdana remains mobilized in the Oyo Field.  Bumi is incurring costs estimated at $1,000,000 per month to procure the critical services to support the Perdana while it remains in the field.  EPNL also has no means and has not made a proposal to pay the Daily Compensation Fee of $132,500 (approximately $4 million per month) accruing on a post-bankruptcy basis under the Charterparty since EPNL has no ability to pay.  These amounts represent ever-increasing administrative expense claims against the EPNL estate (as well as EEC's estate as guarantor of EPNL's obligations under the Agreements) and raise serious doubts as to the

---

[2]   Bumi reserves all rights with respect to the calculation and allowance of its claims, its counterclaims, suits, actions, rights of set-off and recoupment and defenses against the EPNL and EEC (as guarantor of EPNL's obligations under the Agreements pursuant to the Guarantees), including, but not limited to, the entitlement to priority treatment under section 503(b) of the Bankruptcy Code.

administrative solvency of the estates.  Moreover, the prospect that EPNL could satisfy the cure amount that would be required to be paid in connection with any assumption of the Agreements (estimated to exceed $128 million) is highly speculative.

3. Given EPNL's long history of both monetary and non-monetary defaults, its recent abandonment of the Perdana in the field, its apparent administrative insolvency, and the lack of any realistic ability to assume the Agreements, the balance of harms weighs strongly in favor of Bumi, and this Court should grant the relief request herein to compel EPNL to assume or reject the Agreements by June 15, 2018.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding under 28 U.S.C. § 157(b).  The statutory predicates for the relief requested in this Motion are sections 105(a), 105(d)(2), and 365(d)(2) of the Bankruptcy Code and Rules 9013 and 9014 of the Federal Rules of Bankruptcy Procedure.

## EMERGENCY RELIEF REQUESTED

5. The need for immediate, emergency relief was confirmed by the Debtors' representations to the Court at the first day hearing in these chapter 11 cases on May 1, 2018 (the "**May 1 Hearing**"), and is further evidenced by their recent *Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral* [Dkt. 28] (the "**Cash Collateral Motion**") and representations at the hearing on the Cash Collateral Motion held on May 9, 2018.  Apart from the limited grant of authority to use up to $620,000 of cash collateral to fund payroll and certain expenses related to maintaining the Debtors' Gambian assets, the Debtors have no available funding to restart operations in the Oyo Field and to provide any assurance of payment to Bumi, their involuntary lender.  Restarting operations would require sufficient funding to enable EPNL to meet its substantial post-petition payment and performance obligations under the Agreements, including, *inter alia*, obligations to provide critical services needed to mitigate health, safety, and

4

environmental risks in the field and pay the Daily Compensation Fee due under the Charterparty. The Debtors' own 13-week cash flow budget that was attached to the Cash Collateral Motion notably includes no provision for the payments due to Bumi under the Agreements for services provided during the budget period. Further, none of the $620,000 of cash collateral authorized for use by the Debtors will be used to address any payment or performance obligations of EPNL under the Agreements, including their obligation to pay the Daily Compensation Fee. *Cash Collateral Order* [Dkt. 55]. In light of the extreme prejudice incurred by Bumi in these circumstances emergency relief is justified and EPNL should be compelled to either assume or reject the Agreements by June 15, 2018.

## BACKGROUND

6. Bumi respectfully refers this Court to the Stay Relief Motion and the Ellis Declaration filed contemporaneously herewith, which provide a full overview of the background and facts to support granting the relief requested under this Motion. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stay Relief Motion.

## BASIS FOR RELIEF

7. Section 365(d)(2) of the Bankruptcy Code provides the Court with the power to compel a debtor to assume or reject an executory contract within a specified period of time:

> In a case under [chapter 11], the trustee may assume or reject an executory contract…of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

11 U.S.C. § 365(d)(2).

8. Furthermore, pursuant to section 105(d)(2) of the Bankruptcy Code, courts have authority to enter an order compelling debtors to assume or reject executory contracts by a date certain. Section 105(d) provides:

5

> The court . . . (1) shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and (2) unless inconsistent with another provision of this title . . . may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure the case is handled expeditiously and economically, including an order that – (A) sets the date by which the trustee must assume or reject an executor contract.

11 U.S.C. § 105(d). Section 105(a) also provides necessary support to grant such other equitable relief that is necessary and consistent with relief granted under other sections of the Bankruptcy Code.

9.  The purpose of section 365(d), as recognized by Congress, is to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate." *Univ. Med. Ctr. v. Sullivan* (*In re Univ. Med. Ctr.*), 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845); *see also In re Mirant Corp.*, 303 B.R. 319, 331 (Bankr. N.D. Tex. 2003) (holding that if movant makes a showing that "certainty" is vital for its business planning and can only be achieved through requiring the debtor to "promptly" make the assumption/rejection election, "the court would likely grant such relief"). A party who "cannot afford the uncertainty during the pendency of the reorganization" of whether its contract will be assumed may request under section 365(d)(2) that the bankruptcy court order the debtor to decide whether to assume or reject the contract within a specified period. *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1216 (7th Cir. 1984).

10. Thus, although the Bankruptcy Code provides Chapter 11 debtors with "breathing space" within which to determine whether a particular executory contract should be assumed or rejected, such "breathing space . . . is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002); *see also In re Templeton,* 154 B.R. 930, 935 (Bankr. W.D. Tex. 1993) ("If prior to the estate's making its election [to assume or reject a lease], the creditor believes

6

itself to be suffering some loss . . . it can petition the court for relief, either by moving to compel an earlier election to assume or reject . . . or by seeking relief from the automatic stay").

11. In assessing a section 365(d) motion, a court must consider not only the debtor's need for "breathing space," but also the non-debtor party's need for certainty and stability. *See In re Enron Corp.*, 279 B.R. at 702-03. In this regard, the determination of what constitutes a reasonable time to assume or reject a particular executory contract or unexpired lease is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case, including harm to the non-debtor party. *See*, *e.g*., *In re Burger Boys*, 94 F.3d 755, 760 (2d Cir. 1996) (*citing Theatre Holding Corp. v. Mauro*, 681 F.2d 102 (2d Cir. 1982) (per curiam)); *In re Adelphi Communications Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); *In re Panaco, Inc.*, No. 02-37811-H3-11, 2002 WL 31990368, at *3-4 (Bankr. S.D. Tex. Dec. 10, 2002) (granting motion compelling debtor to assume or reject contract by specified date finding "sometimes the other party to the contract needs to know whether the trustee is planning to assume or reject a contract or lease, in order for the other party to take actions either to perform its end of the contract or to mitigate its damages.").

12. Courts have looked to a number of factors to inform whether a motion to compel assumption or rejection should be granted, including:

- the nature of the interests at stake;
- the balance of the hurt to the litigants;
- the good to be achieved;
- the safeguards afforded to the litigants;
- the debtor's failure or ability to satisfy post-petition obligations;
- the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;
- the importance of the contract to the debtor's business and reorganization;

- whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;

- whether exclusivity has been terminated; and

- above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*See*, *e.g., In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012) (*citing In re Adelphia Communications*, 291 B.R. 283, 292-94 (Bankr. S.D.N.Y. 2003)).

13. Courts have not hesitated to compel a debtor to assume or reject an executory contract by a date certain to protect the non-debtor from suffering continuing damage. *See, e.g., In re UTEX Commc'ns Corp.*, 457 B.R. 549, 569-70 (Bankr. W.D. Tex. 2011) (granting motion compelling debtor to assume or reject contract by specified date); *In re EnCap Golf Holdings, LLC*, Case No. 08-18581 (NLW), 2008 WL 5955350, at *5 (Bankr. D.N.J. Dec. 24, 2008) (same); *Zion Credit Corp. v. Rebel Rents, Inc. (In re Rebel Rents, Inc.)*, 291 B.R. 520, 531 (Bankr. C.D. Cal. 2003) (granting motion and compelling debtor to assume or reject personal property lease); *In re Adelphia Commc'ns Corp.*, 291 B.R. at 295-300 (granting motion and compelling debtor to assume or reject lease); *In re Panaco, Inc.*, 2002 WL 31990368, at *3-*4 (granting motion and compelling debtor to assume or reject leases); *In re Shalom Hosp. Inc.*, No. 02-00276, 2002 WL 1001000, at *3 (Bankr. N.D. Iowa May 9, 2002) (granting motion and compelling debtor to assume or reject executory contract).

14. Moreover, courts have recognized that when it is inevitable that the debtor will ultimately seek a particular form of relief with respect to an executory contract (*i.e.*, assumption or, alternatively, rejection), there is no legitimate reason for allowing the debtor to delay such action. *See, e.g., In re Res. Tech. Corp.*, 254 B.R. 215, 227 (Bankr. N.D. Ill. 2000) (finding that where assumption of executory contract was "cornerstone" of proposed reorganization parties

were entitled to know whether debtor could effect such assumption or not); *In re Hawker Beechcraft,* 483 B.R. at 431 (same).

## ARGUMENT

15. As described in the Stay Relief Motion, the interests at stake for Bumi are enormous. The Agreements concern the charter of a 308-meter-long FPSO located 50 miles off the coast of Nigeria (and approximately 100 miles from the nearest suitable port). *Ellis Declaration* ¶ 6. Even after EPNL's abandonment of the Perdana and its crew, and the shutdown of operations on the FPSO prior to the Petition Date in accordance with EPNL's direction, the logistics of maintaining the status quo on the Perdana and in the Oyo Field include, but are not limited to:

- maintaining a reduced of approximately 35 (down from approximately 60 during ordinary operations) (*id.* ¶¶ 36, 38);
- deploying armed security personnel to the Perdana to help protect it from attack (*id.* ¶ 37);
- "flushing and purging the topsides", which involves flushing the plant with water to remove all hydrocarbon residue from the processing plant onboard the Perdana (*id.* ¶ 38);
- chartering an OSV and supply ship support and bringing those assets into the Oyo Field (*id.* ¶ 36); and
- arranging for a resumption in regular helicopter service (*id.*).

16. Bumi estimates that EPNL's performance defaults costs it $33,000 per day, which is in addition to the fees and expenses payable by EPNL to Bumi under the Agreements, including the $132,500 Daily Compensation Fee owing under the Charterparty. *Ellis Declaration* ¶ 41. As of April 30, 2018, the total amount owing from EPNL to Bumi is not less than $128,406,397.79, comprising the following: (i) $122,367,387.80 due to AOL under the Charterparty; and (ii) $6,039,009.99 due to BASPL under the O&M Contract. *Id*.

17. Given the scope of Bumi's interests and the ongoing harm to those interests by funding all of the critical services that are required to maintain the status quo on the Perdana and in the Oyo Field, the "balance of the hurt," "good to be achieved," and "safeguards" by granting this Motion are patently evident. *See In re Hawker Beechcraft, Inc.*, 483 B.R. at 429. As a primary matter, granting the relief requested in this Motion will provide Bumi with much needed certainty and, in the very likely event the Agreements are rejected by EPNL, a pathway to terminating the Agreements pursuant to their terms.

18. Further, the requested relief will allow Bumi to limit the "damage" that it "will [inevitably] suffer beyond the compensation available under the Bankruptcy Code." *See Id.* As set forth in detail in the Ellis Declaration and the Stay Relief Motion, the Debtors may be administratively insolvent and have abandoned their obligations under the Agreements. *See Stay Relief Motion* at ¶ 2. As a result, Bumi is not receiving payments it is entitled to receive from EPNL under the Agreements (including the $132,500 Daily Compensation Fee) and is currently expending an estimated $33,000 per day to provide the services that EPNL is obligated to provide in order to keep the Perdana mobilized despite the fact that the Debtors are not performing under the Agreements and have no plans to provide any adequate protection to Bumi as required under section 363(e) of the Bankruptcy Code. Thus, Bumi is shouldering significant losses that it is unlikely to ever recover, and these losses grow greater by the day. Bumi should not be forced to continue to bear losses while waiting for a decision on contract treatment by a non-performing debtor. *See In re EnCap Gold Holdings, LLC*, 2008 WL 5955350, at *5 (finding that where "[Debtor] has not indicated that it will make . . . any . . . postpetition instalments as they come due . . . . When balanced against the nature of [debtor's] business . . . is evident that the lack of a specific time to assume or reject the [executory contract] is a greater detriment to [movant] than it is a benefit to [debtor].").

19. Due to EPNL's abandonment of operations, its own instruction to Bumi that it should immediately shut down operations, and the imposition of a Nigerian attachment preventing any offtakes from the Perdana, the Perdana is plainly not a source of revenue for EPNL or any of the other Debtors now or in the near future. *See* Ellis Declaration ¶¶ 21, 33, 34. It is also important to note that the only operating well subject to the Agreements—"OYO 8"—has been offline for more than six weeks due to the ongoing material defaults and breaches of EPNL's obligations under the Agreements. *Id.* ¶¶ 35, 42. Accordingly, the Debtors would need to provide clear instructions and provide sufficient cash for required diesel/nitrogen injections to revive the well. *Id.* ¶ 42. At best, EPNL's interest in the Agreements is entirely speculative—contingent on the exceedingly remote possibility that a white knight will materialize and inject significant amounts of cash into the Debtors' estates to allow assumption, or assumption and assignment, of the Agreements. Such a scenario is highly unlikely, especially given that the costs for such assumption, or assumption and assignment, would necessitate the payment of cure costs to Bumi pursuant to section 365 of the Bankruptcy Code totaling over $128 million.

20. Nothing in the record of these cases suggests there is any reasonable prospect that the Debtors will be successful in finding any short-term or long-term funding that could justify Bumi maintaining the Perdana instead of completing the demobilization and returning the Perdana to safe harbors. The Debtors' recently filed Cash Collateral Motion further demonstrates that there is no ready funding solution to address the enormous costs of meeting EPNL's post-petition obligations under the Agreements. By the Cash Collateral Motion, the Debtors sought the non-consensual use of certain restricted cash for a 13-week period ended July 27, 2018, in the amount of $10,024,826. *Debtors' Emergency Cash Collateral Motion*, Exh. 13 [Dkts. 28 and 52-1]. None of the line-items in the proposed cash collateral budge provide for adequate protection payments to Bumi of any kind, let alone the approximately $4 million per

month owing in charter payments, or the direct provision of the essential services that are EPNL's responsibility under the Agreements and that Bumi is presently procuring at its own substantial expense. *Id.* While the Debtors ultimately obtained from this Court an order authorizing use of $620,000 of cash collateral for a two-week budget period after a contested hearing on May 9, 2018, none of those funds will be used to satisfy EPNL's ongoing obligations under the Agreements. *See id*; *Interim Cash Collateral Order* [Dkt. 55].

21. With every passing day, Bumi's cure claims and its administrative expense claims against the Debtors' estates grow precipitously. In these circumstances, there is no reasonable basis upon which to permit EPNL to indefinitely retain the Agreements without any near-term proposal to satisfy its monetary and non-monetary obligations under the Agreements and without there being any feasible prospect of assuming the Agreements over Bumi's objection. *See In re Travelot Co.*, 286 B.R. 462, 469 (Bankr. S.D. Ga. 2002), as modified (Aug. 20, 2002), order clarified on reconsideration, No. 02-40020, 2002 WL 34705804 (Bankr. S.D. Ga. Aug. 26, 2002) ("Prolonging the suspense will not serve the purposes of Chapter 11. [Debtor] has all the facts before it and now must make a decision.").

## RESERVATION OF RIGHTS

22. Should the Debtors choose to assume the Agreements, Bumi reserves the right to require the determination of the cure costs associated with the Agreements.

## NOTICE

23. Notice of this Motion will be provided by email, when available, or by traditional mail to: (i) the Office of the United States Trustee for the Southern District of Texas; (ii) the Debtors; and (iii) the parties listed on the Debtors' master service list. Bumi submits that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, Bumi respectfully requests that the Court grant the Motion and enter an order, substantially in the form of the Proposed Order: (i) compelling the Debtor to assume or reject the Agreements by June 15, 2018 and (ii) granting such other and further relief as it considers appropriate.

Dated: May 14, 2018  
Houston, Texas

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C**.

By: */s/ Kevin M. Lippman*  
Kevin M. Lippman  
Texas Bar No. 00784479  
500 N. Akard Street, Suite 3800  
Dallas, Texas 75201-6659  
Telephone: (214) 855-7500  
Facsimile: (214) 855-7584  
klippman@munsch.com

-and-

John D. Cornwell  
Texas Bar No. 24050450  
700 Milam Street, Suite 2700  
Houston, TX 77002-2806  
Telephone: 713.222.1470  
Facsimile: 713.222.1475  
jcornwell@munsch.com

**COUNSEL FOR ARMADA OYO LIMITED and BUMI ARMADA (SINGAPORE) PTE. LTD.**

## **CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that I conferred with Matthew Okin, counsel for the Debtors, on May 14, 2018, and Mr. Okin indicated that the Debtors oppose the relief requested herein.

                By: */s/ Kevin M. Lippman*
                    Kevin M. Lippman
                    Texas Bar No. 00784479