**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | § § | Chapter 11 |
| **ERIN ENERGY CORPORATION**, *et al.*, | § § | Case No. 18-32106 |
| | § § | (Jointly Administered) |
| Debtors.[1] | § § | |

**OBJECTION OF PUBLIC INVESTMENT CORPORATION SOC LTD. TO ENTRY OF**
**FINAL ORDER AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO**
<u>**SECTION 363(C) OF THE BANKRUPTCY CODE**</u>

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Public Investment Corporation Soc. Ltd. (**PIC**) respectfully files this objection to the entry of a final order on the *Debtor's Emergency Motion for Interim And Final Orders (i) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (ii) Granting Adequate Protection for the Use Thereof; and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral*, Dkt. No. 28 (the **Motion**).

In support thereof, PIC respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      At the initial hearing on the Motion on May 9, 2018 (the **Interim Hearing**), the Court found that PIC, as assignee of the secured claims of Mauritius Commercial Bank Ltd. (**MCB**), was adequately protected by a $100 million Payment Guarantee (the **Payment Guarantee**) issued by The Standard Bank of South Africa Limited (**SBSA**) for the

---

[1] The last four digits of Erin Energy Corporation's (**ERN**) federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited (**EEL**); Erin Energy Kenya Limited (**EEKL**); and Erin Petroleum Nigeria Limited (**EPNL**). The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, Texas 77056.

benefit of MCB. The Court found that PIC held two claims: an unsecured indemnification claim against ERN and a secured claim protected by the Payment Guarantee. Transcript of Oral Argument May 9, 2018 (**Tr.**) at 131-132, 139, *In re Erin Energy Corporation, et al.*, No. 18-32106 (Bankr. S.D. Tex. May 9, 2018). On that basis, it entered the Cash Collateral Order, Dkt. No. 55, allowing $620,000 of cash collateral to be released to the Debtors (the **Interim Order**).

      2.      However, for the reasons discussed below, PIC's only recourse is as a secured creditor of the Debtors, as either assignee or subrogee of MCB. In addition, the equities of this case are more apparent now than they were at the Interim Hearing. PIC's obligation to SBSA in relation to the Payment Guarantee is governed by an Indemnity dated as of January 26, 2017 (the **Counter-Indemnity**), under which PIC transferred $100 million to SBSA for the express purpose of settling SBSA's exposure under the Payment Guarantee. The transaction structure is a closed loop in which SBSA has absolutely no credit exposure, either from an ultimate recovery or timing perspective. It is a mere conduit. PIC is, by virtue of the Counter-Indemnity, the only party with credit exposure to the Debtors. As such, PIC is entitled to assert MCB's secured claims, as either its assignee or its subrogee, and entitled to the adequate protection of its interest in the collateral securing those claims.

      3.      Further, the Debtors have no business or revenue, nor any prospective ability to generate revenue in the short or even medium term. Their ability to resume operations depends on (i) their successful navigation of a thicket of foreign litigation which is at best uncertain as to timing and outcome; (ii) the resumption of use of an offtake vessel that they have unequivocally abandoned prior to the commencement of these proceedings, which is owned by charter parties that are ostensibly owed $128 million which is well beyond the Debtors' ability to pay under any scenario; and (iii) the release of funds from a foreign bank that may be beyond the jurisdiction of this Court and which in all likelihood will simply refuse to comply with any order

of this Court. The Debtors have deteriorated well beyond the point where they can be rehabilitated. In these circumstances, this Court should prohibit any further depletion of cash.

        4.      The Motion should be denied because (i) the Debtors have failed to provide PIC with adequate protection as required under sections 361 and 363 of the Bankruptcy Code, and (ii) in any event, the continued depletion of cash collateral in the hopeless circumstances of this case is not an exercise of good business judgment.

## BACKGROUND

        5.      PIC hereby gives notice pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, made applicable by Rule 9017 of the Federal Rules of Bankruptcy Procedure, of its intention to raise issues of English law, as set forth in the Declaration of Jennifer Marshall filed contemporaneously herewith (the **Marshall Declaration**). It also hereby incorporates, as if fully set forth herein, the background and argument contained in its initial objection to the Cash Collateral Motion dated May 9, 2018, Dkt. No. 45 (the **Objection**) and its supplemental brief dated May 9, 2018, Dkt. No. 51 (the **Supplemental Brief**).[2]

        6.      On May 4, 2018, the Debtors filed the Cash Collateral Motion, seeking the turnover and use of approximately $10 million in cash collateral on deposit with MCB. These funds secure certain loans advanced by MCB to ERN and EPNL under a Pre-Export Finance Facility Agreement concluded on February 6, 2017 (the **MCB Facility**). The Debtors asserted that MCB's interest in the cash would be protected by the Debtors' maintaining the going concern value of their business and that MCB was fully secured under the Payment Guarantee. The Payment Guarantee is an English law-governed demand guarantee, issued by SBSA, that PIC procured for the benefit of ERN pursuant to a Financing Support Agreement dated February 6, 2017.

---

[2]      Capitalized terms used but not defined herein shall have the meanings given to them in the Objection and the Supplemental Brief.

7.      The relationship between PIC and SBSA is governed by the Counter-Indemnity attached to the Marshall Declaration as Exhibit E.[3] Under the Counter-Indemnity, PIC paid SBSA $100 million for the express purpose of settling SBSA's exposure under the Payment Guarantee and, further, irrevocably authorized SBSA to pay or settle any claim which may be made against it under the Payment Guarantee. Counter-Indemnity ¶¶ 1, 3. SBSA is also permitted to debit any account held in PIC's name to satisfy PIC's indebtedness to SBSA. Counter-Indemnity ¶5. The Payment Guarantee is fully supported by PIC's cash deposit with SBSA, and PIC is therefore the real party in interest while SBSA is a mere conduit.

8.      On May 8, 2018, PIC and MCB entered into a transfer certificate attached to the Supplemental Brief as Exhibit A (the **Transfer Certificate**) and a Deed of Undertaking to the Supplemental Brief as Exhibit B (the **Deed of Undertaking**). Under these documents, PIC agreed to pay MCB a total of $68,602,273.37 in return for the novation of all claims and collateral rights of MCB against ERN and EPNL under the MCB Facility, with effect from May 9, 2018.

9.      On May 9, 2018, PIC filed the Objection, arguing that the maintenance of going concern value was too speculative to serve as adequate protection and that, as the successor to MCB's claims and interests under the MCB Facility, it would not otherwise be protected by the Payment Guarantee. The Court then requested, at or shortly before 12:30 p.m., Central Time, that the parties provide additional briefing on the adequate protection issues by 5:15 p.m.,. Tr. at 81-86.

10.     In the Supplemental Brief, PIC argued that the protection provided by the Payment Guarantee was illusory because of its obligation to reimburse SBSA for any draws. If PIC were forced to draw on the Payment Guarantee rather than have recourse to the collateral

---

[3]      The form of Counter-Indemnity attached to the Marshall Declaration is unexecuted and is being filed in order to give all parties-in-interest adequate time to review and consider this Objection. An executed form of Counter-Indemnity will be submitted once located.

securing the MCB Facility, it would be left with only an unsecured indemnification claim against ERN rather than, as required under the Bankruptcy Code, the indubitable equivalent of its security interest in the cash collateral. Considering the Payment Guarantee as adequate protection, or for that matter any form of security in the hands of PIC, would elevate form over substance and be contrary to longstanding bankruptcy policy requiring secured creditors to be protected against diminution in the value of their collateral.

11.     The Debtors analogized the Payment Guarantee to a letter of credit and argued that, due to the independence principle, PIC's unsecured indemnification claim should be distinguished from its secured claim under the MCB Facility. *Brief in Support of Debtor's Emergency Motion for Interim and Final Orders (i) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (ii) Granting Adequate Protection for the Use Thereof; And (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral*, pg. 4, Dkt. No. 54. The Court agreed, viewing the two claims as distinct and finding that the Payment Guarantee was sufficient to constitute adequate protection for the latter. Tr. at 131-132, 139. On this basis, it entered the Interim Order authorizing the Debtors to spend up to $620,000 of cash collateral, directing MCB to immediately transfer that amount to the Debtors, and scheduling a further hearing for May 23, 2018, at 9:00 a.m.

12.     The Payment Guarantee is governed by English law. Because the Cash Collateral Motion was filed on an emergency basis and there was limited time in which to prepare the Objection and the Supplemental Brief, PIC was unable to obtain the advice of English counsel on the Payment Guarantee and, in particular, on rights of subrogation associated with demand guarantees. Nor were all the relevant documents available at that time. PIC has since had the opportunity to obtain this advice and additional documents, including the Counter-Indemnity.

13.     In short, if the Payment Guarantee were drawn, SBSA paid PIC, and PIC reimbursed SBSA, PIC would end up subrogated to its own secured claimed under the MCB Facility. The fact that PIC has already furnished SBSA with the funds necessary to do this further highlights the circuitous reality of what is being proposed. The Court should not require PIC to carry out these transactions before it recognizes that PIC's interest in the collateral securing the MCB Facility is not adequately protected by the Payment Guarantee. To hold otherwise would deprive PIC of its status as a secured creditor, and to do otherwise would result in PIC forfeiting its security interest in the cash and provide a windfall to the Debtors.

## OBJECTION

### I.     *Subsequent Disclosures Cast Further Doubt on the Use of Cash Collateral*

14.     The Motion should be denied on the basis that the Debtors' proposed use of cash collateral is not supported by good business judgment in circumstances where they are not operating and have little prospect of continuing as a going concern. The preservation of going concern value is fictitious and not adequate protection. Since the Interim Hearing, it has become clear that the Debtors' position is far more precarious. Armada Oyo Limited and Bumi Armada (Singapore) Pte Ltd., the owner and service provider of the offtake vessel on which the Debtors' operations appear to rely, now seek relief from the automatic stay and to compel the Debtors to assume or reject their contracts. *See* Motion for Relief from Stay, Dkt. No. 69; Motion to Compel Assumption or Rejection of Executory Contracts. Dkt. No. 71; Tr. at 117 (acknowledging that there is a "large amount due to Armada because [the Debtors] haven't made the payments a certain amount is accrued."). The allegations in these filings not only suggest that the Debtors lack the wherewithal to resume operations regardless of the outcome of the litigation in Nigeria, but raise questions as to their general judgment, their disregard for the safety of crew, and their unwillingness to support critical corporate assets. *Id*.

15.     The Debtors have also not adequately addressed, whether by witness testimony or otherwise, any of the other practical hurdles identified at the Interim Hearing. Tr. at 113.[4] In particular, proceeds from the sale of the oil will apparently be paid into a bank account maintained with Zenith Bank plc (**Zenith**). Tr. at 58, 99, 113. Zenith does not believe that it or EPNL (as entities incorporated in Nigeria) should be subject to the jurisdiction of this Court and may refuse to respect any rulings in these proceedings. *See* Sworn Affidavit of Facts of Mr. Bosah Okonyia, Dkt. No. 38-1, ¶63 ("[T]he appropriate Court clothed with jurisdiction to hear any matter relating to arrangement and compromise with creditors involving [EPNL] is the 'Federal High Court of Nigeria' to the exclusion of any other Court."). Zenith also appears to have commenced foreclosure proceedings, including with respect to the very account in which the proceeds of any sale would be deposited. Tr. at 58, 91 (describing the challenges of creating an accurate cash forecast with Zenith commencing foreclosure proceedings). It is clear that the Debtors have nothing left to lose and are simply betting cash collateral (perhaps the only value left) on a series of remote outcomes that make up the assumptions in their budget. *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996) ("We have found that a reorganization is not in prospect and simply using up the collateral . . . is not acceptable.").

---

4       Ms Hall: Is it correct to say that for the debtors to realize free cash flow, the following things have to happen:

   (a) the removal of legal restrictions on the oil on the vessel by the Nigerian court;
   (b) the hiring of contract staff and an offtake vessel to actually take the oil off of the current vessel then transferring or selling that oil in some way to Glencore;
   (c) Glencore making a payment into EPNL's Zenith bank account; and
   (d) Zenith releasing the funds notwithstanding that it is currently foreclosing on the assets of the Debtor including that account, is that correct?

   Ms. Cross: That is correct.

   Tr. at 113.

16.     PIC is also concerned that even if these bankruptcy cases resulted in a plan being confirmed, a highly speculative outcome, the international nature of the assets and other foreign creditors would pose repeated and ultimately insurmountable barriers to enforcement. Creditors such as PIC who have respected the Court's jurisdiction would be irreparably harmed by those who ignored it, creating a situation where these bankruptcy cases and their costs are meaningless and value destructive. Continuing to use cash collateral in these circumstances is wasteful.

## II.     The Adequate Protection Proposed by the Debtors is Not Sufficient

17.     In entering the Interim Order, the Court drew a distinction between PIC's unsecured indemnity claim against ERN, on the one hand, and the secured MCB Facility claim it acquired from MCB, on the other, finding that PIC was adequately protected as to the latter by virtue of the Payment Guarantee. Tr. at 131-132, 139. However, as further demonstrated by the fact that PIC itself has already funded any payment SBSA may be required to make, the Payment Guarantee, from the perspective of the PIC, is a fiction that provides no protection at all. SBSA's role is in effect limited to that of a pass-through intermediary that holds no real interest in the transaction and does not bear credit risk. Courts can and frequently do disregard the nominal presence of an intermediate entity in order to rule on the real substance of a transaction. *See In re Eureka S. R.R., Inc.*, 72 B.R. 813, 816 (Bankr. N.D. Cal. 1987) ("[I]f this court as a court of equity is entitled to disregard form and make its determination based upon the substance of a transaction . . . it can see no reason why intervening entities with no real interest in the matter cannot also be disregarded.") (citing *Pepper v. Litton*, 308 U.S. 295, 304 (1939)); *In re Best Prod. Co., Inc.*, 157 B.R. 222, 230 (Bankr. S.D.N.Y. 1993) ("I am simply stripping away the 'dressing' on these transactions and viewing the parties' transactions in light of the economic realities of what took place."). *Merit Mgt. Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889

(2018) (disregarding presence of intermediate banks for purposes of applying safe harbor for settlement payments). Even these cases at least involve the use of an intermediary to facilitate a transfer between two distinct parties, whereas here, because PIC is the assignee of the secured claims of MCB, full payment of all obligations under all the relevant contracts would have SBSA simply returning PIC's money to PIC.

18.    In addition, after the resolution of all necessary payments under the Payment Guarantee, PIC would still hold a security interest entitled to adequate protection under sections 361 and 363 of the Bankruptcy Code. The Payment Guarantee is an English-law demand guarantee, which is distinguished from other forms of credit support by the fact that it imposes a primary obligation to pay the beneficiary on demand. Marshall Declaration ¶14. But notwithstanding the independence of obligations, the better view under English law is that payments under a demand guarantee create rights of subrogation. Marshall Declaration ¶¶18-19. The same issues have been considered and affirmatively resolved in the United States. Section 5-117 of the Uniform Commercial Code (the **UCC**), which has been adopted in Texas, makes clear as a statutory matter, that the independence principle is not a barrier to rights of subrogation:

> (a)    An issuer that honors a beneficiary's presentation is subrogated to the rights of the beneficiary to the same extent as if the issuer were a secondary obligor of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.

> (b)    An applicant that reimburses an issuer is subrogated to the rights of the issuer against any beneficiary, presenter, or nominated person to the same extent as if the applicant were the secondary obligor of the obligations owed to the issuer and has the rights of subrogation of the issuer to the rights of the beneficiary stated in Subsection (a).

Tex. Bus. & Com. Code Ann. § 5.117 (West 2018). Section 5.117 grants to the relevant party the subrogation rights that would exist if the party were a "secondary obligor," removing "an impediment that some courts have found to subrogation because they conclude that the issuer's

or other claimant's rights are 'independent' of the underlying obligation." Tex. Bus. & Com. Code Ann. § 5.117, cmt. 1 (West 2018). The commentary also expressly endorses the view that the independence principle is a temporal requirement that "undoubtedly requires the issuer to pay first" but is not otherwise intended to "set up a wall for the sake of a wall." *Id*; *Tudor Dev. Group, Inc. v. U.S. Fidelity & Guar. Co.*, 968 F.2d at 364-371 (3d. Cir. 1991) (Becker, J., dissenting).

19.     It is therefore clear, as a matter of policy, that a party that makes payment on a letter of credit, whether issuer or applicant, has the same rights of subrogation as a traditional secondary obligor such as a guarantor or surety regardless of the independence principle. *See* White, James J., *Rights of Subrogation in Letters of Credit Transactions,* ST. LOUIS U. L. J. 41, 47-74 (1996) ("If a guarantor who had done the same thing as an issuer, applicant or nominated person would have had a right to subrogation, Section 5-117 grants the same right of subrogation to the party to the letter of credit transaction as a matter of state statutory law."); Gerald T. McLaughlin, *Exploring Boundaries: A Legal and Structural Analysis of the Independence Principle of Letter of Credit Law*, 119 BANKING L.J. 501, 538-39 (2002) ("Before the enactment of Revised UCC Article 5, there was a dispute among the courts as to whether the independence principle prohibited subrogation in a letter of credit transaction. Revised UCC Section 5-117 has resolved this dispute and made it clear that the independence principle does not prevent subrogation."); *In re Mayan Networks Corp.*, 306 B.R. 295 (B.A.P. 9th Cir. 2004) (Klein, J., concurring) ("[T]he 1995 revision of UCC Article 5 made significant changes in subrogation rules regarding letters of credit by eliminating a number of technical distinctions that had led courts to conclude that subrogation was not available in letter of credit transactions. New UCC § 5-117(a) abolished former distinctions that led courts before 1995 to

discriminate against letters of credit on the premise that the "independence principle" entailed separate obligations such that the issuer was not "liable with" the underlying obligor.").

      20.    In that regard, it is well-settled under common law that "upon total satisfaction of the underlying obligation, the secondary obligor is subrogated to all rights of the obligee with respect to the underlying obligation to the extent that performance of the secondary obligation contributed to the satisfaction." RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 (1996). *See also LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 618 (Tex.2007) ("Texas has long recognized a lienholder's common law right to equitable subrogation."). Section 509 of the Bankruptcy Code would provide an additional basis for subrogation here, as courts and commentators have suggested that issuers and applicants under letters of credit should be treated as "codebtors" or "liable with a debtor" within the meaning of that provision following the enactment of Section 5.117 of the UCC. *See* White, *supra* pg. 8 at 52 ("[T]here is nothing in Section 509 or in any other part of the Bankruptcy Code that would require a court to exclude the issuer of a letter of credit from the definition of 'codebtor' or from recognition as a person 'liable with the debtor.' . . . [T]he language of Section 5-117 itself should be construed to make an issuer and the other parties there mentioned 'codebtors' as that term is used in Section 509."); *Mayan*, 306 B.R. at 309-10 (Klein, J., concurring) ("In view of new UCC § 5–117, there is no principled reason to treat letters of credit in bankruptcy as different than other guarantees for purposes of §§ 502(e) and 509.").

      21.    PIC would therefore be entitled to subrogation under either common law theories of equitable subrogation or section 509 of the Bankruptcy Code, as the two are not exclusive. *See, e.g., In re East Texas Steel Facilities. Inc*., 117 B.R. 235, 241 (Bankr. N.D. Tex. 1990) (analyzing bank's subrogation claim for postpetition payments first under section 509 and then under theory of equitable subrogation); *In re Celotex Corp.*, 289 B.R. 460, 472 (M.D. Fla.

2003) ("If an election is made to treat the claim in subrogation under § 509, and, as some cases suggest, that section is the only source for subrogation in bankruptcy, then Congress has done away with hundreds of years of equity jurisprudence by failing to provide for equitable subrogation or its kin."); *In re Northview Motors. Inc.*, 202 B.R. 389, 401 (Bankr. W.D. Pa. 1996) ("[A]s several other courts have properly pointed out, 'the doctrine of equitable subrogation is separate and distinct from the subrogation rights afforded by section 509, and ... section 509 is an additional, but not exclusive, remedy in bankruptcy.'") (quoting *In re Spirtos*, 103 B.R. 240, 245 (Bankr. C.D. Cal. 1989)).

22.     In this case, at the inception of the transaction, PIC alone assumed all the credit risk associated with MCB's loan to ENPL. It has now paid MCB the full face amount of the loan. To point to the Payment Guarantee as "protecting" PIC mischaracterizes SBSA's role in the transaction and the parties' expectations. The circularity of the argument proves its sophistry. SBSA is simply a conduit and PIC bears the only credit risk, with a security interest which is entitled to adequate protection. *See In re C.F. Simonin's Sons, Inc.*, 28 Bankr. 707, 712 (Bankr. E.D.N.C. 1983) ("The guaranty of the United States Economic Development Administration is also not adequate protection for the bank ... [because] the E.D.A. would be entitled to adequate protection as subrogee to the interest of the bank."); *In re C. Foundry Co.*, 48 B.R. 895, 900 (Bankr. N.D. Ala. 1985) ("Being subrogated to the rights of First National and I.D.B., Hajoca would have been entitled to adequate protection and an administrative expense priority to the extent of the depreciation of the property during the pendency of the debtor's Chapter 11 case."); Stephen A. Weiss, *Suretyship As Adequate Protection in Bankruptcy: The Status of Unsecured Third Party Guaranties Under Section 361 of the Bankruptcy Code*, 12 CARDOZO L. REV. 285, 300 (1990) ("In the majority of cases involving outside third-party guarantors, the suretyship should probably fail as adequate protection not because the right to

pursue a guarantor is too uncertain, but rather because the guarantor, as subrogee to the interest of the creditor, would be entitled to the same adequate protection as the creditor."). We have not found any decision in the context of guarantees and adequate protection where this kind of circularity was found to constitute adequate protection.

        23.    Therefore the Payment Guarantee does not provide PIC with the adequate protection to which it is entitled under sections 361 and 363 of the Bankruptcy Code. Drawing on the Payment Guarantee only commences a sequence of events that leaves PIC where it started, standing as a secured creditor in the place of MCB, fully exposed to diminution in the value of its collateral, but without the benefit of any prospect of recovery under the Payment Guarantee. The legal reality that results from unwinding the transaction reflects the economic reality identified in the Supplemental Brief—that the Payment Guarantee does not actually provide any protection to PIC.

## <u>CONCLUSION</u>

24.     For the foregoing reasons, PIC respectfully requests that this Court deny

the Motion and grant such other and further relief as it deems just and proper.

Dated: May 18, 2018
Houston, Texas

                                                            **VINSON & ELKINS LLP**

                                                            /s/ *Bradley R. Foxman*
                                                            Rebecca L. Petereit
                                                            (Texas Bar No. 24062776)
                                                            Bradley R. Foxman
                                                            (Texas Bar No. 24065243
                                                            Trammell Crow Center
                                                            2001 Ross Avenue, Suite 3700
                                                            Dallas, Texas 75201
                                                            rpetereit@velaw.com
                                                            bfoxman@velaw.com

                                                            - and -

                                                            **ALLEN & OVERY LLP**
                                                            Ken Coleman
                                                            Laura Hall
                                                            1221 Avenue of the Americas
                                                            New York, NY 10020
                                                            (212) 610-6300 (telephone)
                                                            (212) 610-6399 (facsimile)
                                                            ken.coleman@allenovery.com
                                                            laura.hall@allenovery.com

                                                            *Attorneys for Public Investment*
                                                            *Corporation Soc. Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2018, a true and complete copy of the foregoing objection was served upon filing via the Court's EM/ECF electronic system on all parties subscribing thereto.

/s/<i>Bradley R. Foxman</i>      
Bradley R. Foxman
