IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: § | | |
| § | | |
| **ERIN ENERGY CORPORATION,** *et al.*,[1] § | | Case No. 18-32106 |
| § | | |
| Debtors. § | | Chapter 11 |
| § | | |
| § | | (Jointly Administered) |

**SUPPLEMENTAL REPLY IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363(C) OF THE BANKRUPTCY CODE; (II) GRANTING ADEQUATE PROTECTION FOR THE USE THEREOF; AND (III) SCHEDULING A FINAL HEARING PURSUANT TOBANKRUPTCY RULE 4001 AS TO USE OF CASH COLLATERAL**

[Relates to ECF # 28]

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this Supplemental Reply in support of their Emergency Motion for Interim and Final Orders (i) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code, (ii) Granting Adequate Protection for the Use Thereof, and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral (the "Motion")[2] and in support hereof, respectfully state as follows:

---

[1] The last four digits of Erin Energy Corporation's ("ERN") federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited ("EEL"); Erin Energy Kenya Limited ("EEKL"); and Erin Petroleum Nigeria Limited ("EPNL"). The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

[2] Capitalized terms not defined herein shall have the meanings set forth in the Motion and/or in the Brief in Support of Debtors' Emergency Motion for Interim and Final Orders (i) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code, (ii) Granting Adequate Protection for the Use Thereof, and (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral [ECF # 54] (the "Brief").

# I.
# PRELIMINARY STATEMENT

1.     At the initial hearing on the Motion on May 9, 2018 (the "Interim Hearing"), the Court correctly found that PIC held (or would soon hold) two claims: an unsecured indemnification claim against ERN arising under the Financing Support Agreement; and MCB's secured claim. As to the unsecured indemnification claim, the Court found that PIC did not hold any interest in the MCB Cash Collateral.  As to the MCB secured claim, the Court found that, as a result of the Standard Bank of South Africa Payment Guarantee, there was no credit risk to MCB, and MCB was therefore adequately protected against the Debtors' use of the MCB Cash Collateral.  PIC, through its supplemental Objection of Public Invest Corporation Soc Ltd. To Entry of Final Order Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code [ECF #84] (the "Objection") presents no new arguments or facts that change this fundamental conclusion.

# II.
# BACKGROUND

2.     In or around February 2016, ERN determined a need for debt financing to carry out drilling and related activities.[3]  To aid ERN's efforts to raise debt financing, PIC (who at the time held approximately 30% of ERN's outstanding interests) agreed to obtain and pledge a bank issued "payment guarantee" (e.g. a letter of credit).[4]  As such, ERN and PIC entered into that Financing Support Agreement,[5] executed by PIC on December 12, 2016, whereby PIC agreed to obtain for ERN's benefit a US$100,000,000.00 payment guaranty from Standard Bank of South Africa Ltd ("SBSA") substantially similar in form to that attached to the Financing Support Agreement.

---

[3] *See* Debtors' Exhibit 18, p. 1 (references to Exhibits herein are to the Debtors' exhibits admitted at the Interim Hearing).
[4] *Id.*
[5] Debtors' Exhibit 18.

3.     With PIC's support, on or about February 6, 2017, ERN and EPNL, as borrowers, and MCB, as lender, entered into the MCB Facility.[6] As provided under the Financing Support Agreement, the MCB Facility is secured by a US$100,000,000.00 Payment Guarantee (the "Payment Guarantee") issued by SBSA.[7] The MCB Facility is also secured by a subordinated lien in certain of the Debtors' Nigerian assets, including accounts with Zenith, (the "Second Liens") and by the cash held in the Debt Service Reserve Account (the "MCB Cash Collateral").

4.     As of the Petition Date, the outstanding balance on the MCB Facility was $66,736,452.05.

**PIC's Inequitable Conduct**

5.     Upon information and belief, PIC engaged in a pattern of tortious interference whereby through its control over SacOil Holdings Ltd., the "Technical Advisor" under the MCB Facility, PIC prevented the Debtors from accessing the MCB Facility. These wrongful actions prevented ERN and EPNL from otherwise paying various creditors and resulted in substantial damages to the Debtors.

6.     Pursuant to the MCB Facility, ERN was required to submit "Utilisation Requests" before MCB would disburse loan proceeds. So long as ERN complied with the limited conditions precedent under Section 4.2 of the MCB Facility, or such conditions were waived or inapplicable, MCB was required to fund ERN's Utilisation Requests. Section 4.2 of the MCB Facility provides the Technical Advisor with limited rights to review Utilisation Requests. The Technical Advisor's role, however, was intended solely to ensure that the Utilisation Requests contain all of the

---

[6] Debtors' Exhibit 14.
[7] Debtors' Exhibit 19.

3

pertinent information (e.g., proper names and amounts of invoices), and to confirm that past proceeds funded under the MCB Facility were used for ERN's drilling programs.

7.   Upon information and belief, PIC, working through the Technical Advisor, began obstructing the approval process and preventing or delaying the disbursement of funds from MCB, despite ERN's good faith compliance with the terms of the MCB Facility and the Financing Support Agreement. For example, PIC, without right, demanded extensive and detailed information from ERN before PIC or the Technical Advisor would "approve" the release of funds. PIC had no right to interfere under the MCB Facility and no right to review or approve ERN's Utilisation Requests.

8.   In or about October 2017, ERN, through its counsel Jackson Walker LLP, sent a letter to PIC highlighting these wrongful actions, identifying the harm that such actions were causing, and demanding that PIC cease its tortious conduct. (A copy of the October 2017 Letter is attached hereto as **Exhibit A**.)

9.   Despite a further follow-up from Jackson Walker (attached hereto as **Exhibit B**), PIC refused to cease interfering with the Debtors' operations. Thus, on or about February 13, 2018, ERN and EPNL commenced a civil action against PIC in the Supreme Court of the State of New York. (A copy of ERN's Summons and Original Complaint is attached hereto as **Exhibit C**).

### III.
### REPLY

10.   In its Objection, PIC primarily argues that the Court should reverse its findings at the Initial Hearing and determine not to treat PIC as holding two separate claims. PIC asserts that this result is necessary because, either pursuant to §509 of the Bankruptcy Code or the doctrine of equitable subrogation, it would be entitled to subrogation of MCB's rights if MCB (or PIC in

4

MCB's shoes) were to collect upon the SBSA Payment Guarantee. PIC additionally argues that further use of cash collateral is not supported by sound business judgment.

11. PIC is incorrect on both points. Neither §509 of the Bankruptcy Code nor the doctrine of equitable subrogation applies to PIC under these circumstances. Further, the Debtors recognize their burden to establish that any proposed expenditures – which, given the Debtors current state, the Court has found to be outside the ordinary course – are supported by the sound exercise of the Debtors' business judgment. At the continued hearing set for Wednesday, May 23, 2018, the Debtors will meet this burden.

A. **PIC's Tortious Conduct Validates the Debtors' Business Judgment**

12. As set forth above, the Debtors recognize their evidentiary burden required to justify the further use of cash collateral. PIC argues that no further funds should be expended because the Debtors have no real prospect for reorganization if this Court grants the motion for stay relief filed by Armada Oyo Ltd. and Bumi Armada (Singapore) Pte Ltd ("Armada"). PIC further casts aspersions upon the Debtors' general judgment, disregard for the safety of crew, and unwillingness to support critical corporate assets in light of Armada's allegations in its lift stay motion. Yet, given PIC's tortious interference with the Debtors' ability to pay Armada and fund any alleged obligations under the Armada charter, PIC's accusations ring utterly hollow. While the Nigerian litigation referenced in PIC's Objection has certainly negatively impacted the Debtors operations, PIC's interference with the Debtors' ability to access previously arranged credit has severely hampered the Debtors' ability to meet certain payment obligations. Indeed, given PIC's tortious conduct, the Debtors' decision to seek bankruptcy protection was and remains entirely justified.

**B.     PIC's Secured Claim is Adequately Protected**

13.    Next, PIC argues that this Court should reverse its prior ruling and find that PIC's only real interest in this case is as a secured creditor and that, in PIC's hands, the SBSA Payment Guarantee provides no substantive protection. PIC reaches this conclusion by arguing that SBSA should be treated as a mere conduit. It further argues that, once properly recast, PIC's unsecured claim should be viewed as a guarantor claim, and that, under applicable theories of subrogation, "unsecured PIC's" payment of "secured PIC's" claim would entitle "unsecured PIC" to subrogation of "secured PIC's" rights. Because these arguments are not supported by any authority cited by PIC or otherwise, this Court should hold to its original, correct conclusion.

*(i)     English Common Law Does Not Support PIC's Argument*

14.    First, PIC argues that payment pursuant to the SBSA Payment Guarantee would entitle PIC to subrogation rights under English common law. To support this argument, PIC submits the affidavit of Jennifer Marshal, a Partner of PIC's counsel in this case, Allen & Overy LLP. Marshal acknowledges that the qualities of a demand guarantee (i.e. that the issuer's obligations are primary and autonomous in nature) would traditionally preclude the availability of subrogation under English common law. Marshal Declaration ¶¶ 18, 19. Marshal, nevertheless, advocates for the recognition of subrogation rights when a party is forced to make payment pursuant to a demand guaranty, such as the Payment Guarantee. Lacking statutory or jurisprudential support, Marshal relies heavily upon a Law Quarterly Review article published in 2000 as persuasive authority. Marshal Declaration ¶ 19. Notably, Marshal implicitly acknowledges that, in the near 20 years following the publication of the Ward and McCormack article, no English court of law has recognized the subrogation rights argued for therein. Marshal Declaration ¶ 18. Ultimately, Marshal's affidavit merely highlights the inescapable conclusion

6

that the alleged rights of subrogation asserted by PIC have not been established under English law. Marshal Declaration ¶¶ 14, 18.

15. PIC thus asks this Court to recognize rights of subrogation under English law under circumstances where said rights are admittedly not created under the relevant statutory-like provisions of the Uniform Rules for Demand Guarantees (the "URDG") (which Marshal admits is applicable)[8] and have never been granted or recognized by an English court of law. This Court should decline to do so.

    *(ii)*    <u>US Law Does Not Support PIC's Claim</u>

16. Having conceded that no English court has recognized the subrogation rights sought in the instant matter, PIC nevertheless argues that this Court should be at ease in creating new English common law rights because, "the same issues have been considered and affirmatively resolved in the United States." Objection ¶ 18. PIC argues then that, under either Bankruptcy Code § 509 or the doctrine of equitable subrogation as recognized by US courts, PIC would be entitled to subrogation rights if the Payment Guarantee is viewed as being similar to a letter of credit. Unfortunately for PIC, it is far from clear that these issues have been resolved as PIC suggests. In fact, those US courts to have considered the analogous circumstance – i.e. whether payment upon a letter of credit entitles the issuing bank to rights of subrogation – have cast serious doubts upon PIC's position.

---

[8] As noted in the Marshal Declaration, while the URDG codifies a uniform set of rules applicable to demand guarantees, its enforcement is voluntary in nature.

(a)     <u>Subrogation is not available under 11 U.S.C. §509</u>

17. Section 509(a) of the Bankruptcy Code provides that, "[e]xcept as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment." 11 U.S.C. § 509(a). In *CCF, Inc. v. First Nat'l Bank & Tr. Co. (In re Slamans)*, the Court of Appeals for the Tenth Circuit considered § 509 in the context of a letter of credit. 69 F.3d 468, 473 (10th Cir. 1995). The Court of Appeals explained § 509 as follows:

> Under the plain language of the Bankruptcy Code, an entity is subrogated to the rights of a creditor if it: (1) "is *liable with* the debtor on" (or has secured); (2) "a claim of a creditor against the debtor;" and (3) "pays such claim." *Id.* (emphasis added). The word "liable" means "bound or obliged in law or equity." Black's Law Dictionary 824 (5th ed. 1979). The word "with" means "in addition to." *Id.* at 1436. Consequently, looking to the plain language of the statute and giving effect to its meaning, e.g., *Schusterman*, 63 F.3d at 989, "an entity . . . is liable with the debtor," 509(a), when the entity is bound or obliged in law or equity in addition to the debtor on "a claim of a creditor against the debtor."

*Id.* Applying this framework to the issue of subrogation arising from payment upon a letter of credit, the Court of Appeals explained that, because the issuer's liability arose from the letter of credit rather than from the instrument giving rise to the debtor's liability, the issuer was not "liable with" the debtor as required by § 509. *Id*. at 475-76.

18. Other Courts have reached the same conclusion. *Hamada v. Far E. Nat'l Bank (in Re Hamada)*, 291 F.3d 645, 650-51 (9th Cir. 2002) ("In short, issuers of letters of credit are not "liable with" the debtor on the obligation owed to the creditor; therefore, letter of credit issuers are not eligible under § 509 for statutory subrogation in this context."); *Berliner Handels-Und Frank-Furter Bank v. E. Tex. Steel Facilities, Inc. (In re E. Tex. Steel Facilities, Inc.)*, 2000 U.S. Dist.

8

LEXIS 4106, at *6 (N.D. Tex. Mar. 30, 2000); *Kaiser Steel Corp. v. Bank of Am. Nat'l Trust & Savings Assoc. (In re Kaiser Steel Corp.)*, 89 B.R. 150, 153 (Bankr. D. Colo. 1988) (same).

     (b)  Revised UCC 5-117 does not modify § 509.

  19.  PIC argues, however, that Revised UCC 5-117, which modifies the common law and provides that the independence principle is not a bar to subrogation under state law, alters the analysis noted above as to application of § 509. Yet, while revised 5-117 removes the independence principle as a basis for denying equitable subrogation, the revision maintains the integrity of the independence principle. *Rogers v. CIT Grp./Equipment Fin., Inc. (In re B.C. Rogers Poultry, Inc.)*, 455 B.R. 524, 564 (Bankr. S.D. Miss. 2011). Thus, the analysis above is not modified, and Courts considering the issue after the promulgation of the UCC revisions have continued to find § 509 inapplicable. *Hamada*, 291 F.3d 645, 650-51 (9th Cir. 2002); *E. Tex. Steel Facilities, Inc.*, 2000 U.S. Dist. LEXIS 4106, at *6 (N.D. Tex. Mar. 30, 2000).

  20.  Moreover, UCC 5-117 is not applicable to the Payment Guaranty and, as admitted in the Marshal Declaration, the relevant statutory-like provisions of the URDG do not provide for the right of subrogation or otherwise modify the doctrines of independence or autonomy. Thus, even if revised UCC 5-117 could be viewed as modifying § 509, such modification is of no import here. Under English common law, the obligations of SBSA (or PIC) under the Payment Guarantee are independent of the Debtors' obligations under the MCB Facility. Thus, neither SBSA nor PIC is entitled to subrogation under § 509 of the Bankruptcy Code.

     (c)  PIC is also not entitled to equitable subrogation.

  21.  PIC lastly argues that, because subrogation would be available under US common law, this Court may find that subrogation rights should be recognized under English common law. PIC's argument is flawed for many reasons. First, prior to the promulgation of revised UCC 5-

9

117, US courts recognized that the doctrine of independence barred the granting of subrogation rights to a party paying pursuant to a letter of credit. *See, e.g. Tudor Dev. Grp. v. United States Fid. & Gaur. Co.*, 968 F.2d 357 (3d Cir. 1992). While revised UCC 5-117 modifies this result, PIC acknowledges that there is no statutory equivalent applicable to the Payment Guaranty under English law, and no jurisprudential authority exists to support modification of the English common law result.

22. Second, applying the totality of the circumstances, equitable subordination is not appropriate on these facts. While revised UCC 5-117 removes the technical bar to equitable subrogation imposed by the doctrine of independence, revised UCC 5-117 does not, as PIC argues, create an absolute right to subrogation. *Rogers v. CIT Grp./Equipment Fin., Inc. (In re B.C. Rogers Poultry, Inc.)*, 455 B.R. 524, 565 (Bankr. S.D. Miss. 2011) ("Section 5-117 does not grant subrogation as a matter of course but only 'to the same extent as if the (party) were a secondary obligor.'"). As the Fifth Circuit has stated, "[s]ubrogation is not an absolute right which a party paying the debt of another may enforce at will." *Compania Anonima Venezolana De Navegacion v. A.J. Perez Export Co.*, 303 F.2d 692, 697 (5th Cir. 1962). Instead, a party must still show that they are entitled to equitable subrogation under applicable non-bankruptcy law based on the equities of this particular case. *Rogers*, 455 B.R. at 565.

23. Here, PIC has not, because it cannot, argued that it satisfies the elements of common law equitable subrogation. For example, as a sophisticated party that fully negotiated its rights and risks under the Financing Support Agreement and the Payment Guarantee, PIC will likely not be able to show that the Debtors are being unjustly enriched. This element, as explained by the Ninth Circuit BAP in *In re Mayan Networks Corporations* is fundamental:

> Subrogation under Section 5-117 is derivative of suretyship law and leaves intact the engine of subrogation in that law: unjust enrichment. Subrogation, a creature of equity, is a remedy. It redresses the unfairness of unjust enrichment. Without unjust enrichment, subrogation is a loose remedy that can upset after the fact risk that mature commercial parties have allocated before the fact. To give parties a subrogation remedy without first finding unjust enrichment is to invest courts with the power to undo at their whim commercial relationships that private contracting parties have arranged.

*Mayan*, 306 B.R. 295, 309 (9th Cir. BAP 2004).

24. Thus, the *Rogers* court noted that equitable subrogation may not apply in the letter of credit context, even when it is available under § 5-117. *Rogers*, 455 B.R. at 567-68. The *Rogers* court explained,

> Although there is almost always enrichment in letter of credit transactions, as there is in most commercial transactions, unjust enrichment is often absent. For this reason, some scholars consider letter of credit transactions generally unsuitable for the subrogation remedy. John F. Dolan, A Study of Subrogation Mostly in Letter of Credit and Other Abstract Obligation Transactions, 64 Mo. L. Rev. 789, 801 (Fall 1999). As one court observed, "[t]he case law emphasizes that the parties to the letter of credit are, more often than not, sophisticated parties." *Barclay's Bank PLC v. Dresdner Bank Lateinamerika A.G. (In re Lancaster Steel Co.)*, 284 B.R. 152, 161 (S.D. Fla. 2002). This last fact renders letter of credit applicants "poor candidates for the remedy" of equitable subrogation. Dolan, A Study of Subrogation, 64 Mo. L. Rev. at 833.

*Id.*

25. Ultimately, it is far from certain, perhaps even doubtful that PIC could establish a right to subrogation under US law – common law or otherwise. As such, PIC's reliance upon US law as persuasive authority that this Court should expand the application of subrogation under English common law is misplaced. Given that, as PIC acknowledges, no statutory basis exists under English law to support subrogation, and no English court of law has recognized such rights as arising under similar circumstances, this Court should not modify its previous finding that PIC holds two separate and distinct claims.

WHEREFORE, the Debtor requests that this Court enter an order, in substantially the form filed herewith, granting the relief requested in this Motion, and such other and further relief as may be just and proper under the circumstances.

Respectfully submitted this 22nd day of May, 2018.

**OKIN ADAMS LLP**

By:     /s/ *David L. Curry, Jr.*
       Matthew S. Okin
       Texas Bar No. 00784695
       mokin@okinadams.com
       David L. Curry, Jr.
       Texas Bar No. 24065107
       dcurry@okinadams.com
       John Thomas Oldham
       Texas Bar No. 24075429
       joldham@okinadams.com
       Ryan A. O'Connor
       Texas Bar No. 24098190
       roconnor@okinadams.com
       1113 Vine St., Suite 201
       Houston, Texas 77002
       Tel: 713.228.4100
       Fax: 888.865.2118

**PROPOSED ATTORNEYS FOR THE DEBTORS**