# EXHIBIT A

**Page 1**

```
 1                    Wednesday, 15 June 2016
 2     (10.00 am)
 3              (Proceedings delayed)
 4     (10.30 am)
 5                      Housekeeping
 6     THE CHAIRMAN:  Good morning, everyone.  It is June 15, 2016.
 7        This is LCIA arbitration 132498.
 8        My name is Tom Webster.  On my left I have as
 9     co-arbitrator Lord Hoffmann.  On my right,
10     Professor Lew.
11        The first thing is if people on both sides could
12     have the attendees identify themselves for the record.
13     MR NESBITT:  Thank you, Mr Chairman.  I am Simon Nesbitt.
14     The Hogan Lovells' team beside me are Rob Shoesmith,
15     Kate Wilford, Rowena Evans, Richard Trinick,
16     Jess Webster, Mike Hornsey and Fred Kuchlin.
17        And then from NAE and Eni, we have
18     Mr Georgio Vicini, Gulio Caropreso, Giuseppe Cerrito,
19     Enrico Caligaris from Eni Legal, Mr Ellis Ebohon from
20     NAE Legal.  We have Mr Michael Davison from
21     Hogan Lovells, and besides Michael is
22     Ms Daniella Ascoli, who is our Italian-English
23     interpreter.
24     THE CHAIRMAN:  Thank you very much.
25        Mr Wade, from the respondent's side?
```

**Page 2**

```
 1     MR WADE:  From the respondent's side, I am Mr Wade.  Next to
 2     him is Mr Gunning.  Next to him is Mr Harley.  Mr Malek,
 3     from Allied sits next to him.  Beside -- I can't see who
 4     is beside you, actually.
 5        Julie Forsyth is next to Mr Malek, and
 6     Mr Maxime Girard from Navigant is next to them, and
 7     I will allow the people on the back seats, sorry
 8     gentlemen, to identify themselves.
 9        Felicity Yates, Ayo Awe, Alex Thornton,
10     Camille Arnold.
11     THE CHAIRMAN:  Thank you very much.
12        First of all, before we start, thank you very much,
13     everyone, for the efforts to be here and be prepared by
14     June, following our case management conference of
15     October.  Your efforts are very much appreciated.
16        The Tribunal views that it is appropriate in
17     international arbitration to proceed with reasonable
18     speed, that's why we have proposed this schedule, and
19     you've accomplished it, thank you.
20        From a procedural point of view, any issues on the
21     claimant's side?
22     MR NESBITT:  I have couple of housekeeping points,
23     Mr Chairman, if you want me to raise them now, if that's
24     what you mean by procedural points?
25     THE CHAIRMAN:  Yes.
```

**Page 3**

```
 1     MR NESBITT:  As the Tribunal and the respondents are aware,
 2     one of our witnesses, Mr Carbonara, who is based in
 3     Myanmar, unfortunately has a medical issue, which means
 4     he is unable to travel.  So we're arranging for him to
 5     give his evidence by video link, I think on Friday
 6     morning.
 7        The second issue is again, as I think the Tribunal
 8     will have seen from the emails last night, in light of
 9     Dr Moy's latest iteration of his production forecast
10     that has inevitably caused a delay to both Mr Filippi
11     and Mr Good finalising their expert presentations.  So
12     one remaining item on the agenda is to fix a time for
13     those to be provided.  Ditto Mr Good and Mr Taylor are,
14     I understand it, preparing a revised joint report to
15     reflect the new figures generated by the impact of
16     Dr Moy's further amendments, and that also we need to
17     seek a deadline in respect of that.
18        We are, I think, in a position where we can propose
19     end of tomorrow, if that's satisfactory to the Tribunal.
20     THE CHAIRMAN:  Very good.
21        Respondents, any procedural issue?  Then you can
22     respond in particular to the last item as regards the
23     timing.
24     MR WADE:  The initial procedural issue which I must address
25     is my clients' reservation of rights in respect of
```

**Page 4**

```
 1     jurisdictional matters, both before the High Court and
 2     before this Tribunal.  There are two separate pending
 3     matters still.
 4        In relation to the service of joint expert reports
 5     and presentations, I believe that the current version of
 6     the reservoir engineers' joint statement is with
 7     Mr Filippi, and if tomorrow works, then we are content
 8     with that, and the presentations should be delivered as
 9     soon as possible thereafter.
10        There is, I believe, although that might have been
11     remedied already -- I'm not sure we have received the
12     updated index of the bundles, and so the bundles were
13     amended yesterday, and we don't have a consolidated
14     index of those.  That would be helpful.  I am sure it is
15     coming.
16     THE CHAIRMAN:  You can check on that and work that out
17     between the parties.  As regards the timing as well of
18     any updated joint report, again we would ask you to work
19     that out between the parties and then get back to us
20     with how you see that coming out, and the Tribunal will
21     be happy with what you have worked out within reasonable
22     limitations.
23        Now, with that, start with, I believe, the opening
24     presentation of the claimant first.  The court reporters
25     have asked me to propose to you that there be
```

DTI
(+44)207 4041400                    www.DTIGlobal.com                    8th Floor, 165 Fleet Street
London EC4A 2DY

1  a mid-morning break at some point, so you might want to
2  factor that in.
3       I think that was factored into your timetable to
4  a certain extent, but I just make that point as
5  a warning.
6  MR NESBITT:  A point well taken, Mr Chairman.  Sorry, just
7  in response to what Mr Wade said.  I think he said that
8  the revised reservoir experts' joint report is with
9  Mr Filippi.  As far as I'm aware, it is not suggested
10  that there be a revised reservoir experts' report,
11  Mr Filippi simply requires additional time to prepare
12  his PowerPoint presentation, which is what we're
13  proposing he'll be able to provide by the end of
14  tomorrow.  It's the quantum experts who, as I understand
15  it, are preparing a revised joint report.
16  THE CHAIRMAN:  Very good.  Thank you for the comment.  We'll
17  let the parties work that out between themselves and let
18  us know if there's an issue.
19       Opening submissions by MR NESBITT
20  MR NESBITT:  Thank you, Mr Chairman.
21       With my colleagues from Hogan Lovells I appear for
22  the claimant in this arbitration,
23  Nigerian Agip Exploration Ltd, a subsidiary of the
24  international oil and gas company Eni SpA.
25       My clients claims are declaratory and monetary

1  page 9 at tab 1 you will see there, in Article 1.1,
2  which is the definition section, the definition of "the
3  transferred interests".
4       So those transferred interests comprised, first,
5  NAE's 40 per cent interest in the two deep offshore oil
6  mining leases, OMLs, 120 and 121, the transfer of which
7  was effected by way of a deed of assignment on
8  completion, and it is OML 120 which contains the only
9  producing discovery in the block, the Oyo field.
10       The second important element of the transferred
11  interests concerned the production sharing contract,
12  which the parties entered into in 2005 and pursuant to
13  which NAE was operating contractor of the Oyo field.
14  That part of the transferred interests is more
15  particularly defined in the SPA as:
16       "All of the sellers [that's NAE's] rights,
17  interests, duties, liabilities and obligations under the
18  PSC or deriving therefrom, including its liabilities and
19  obligations as operating contractor."
20       That part of the deal was completed by way of the
21  deed of novation.  Just for reference, you don't need to
22  turn it up yet, but that's in bundle G21, at tab 560.
23       I should also add that also being transferred to
24  Allied was all joint property, meaning materials,
25  equipment, plant, machinery, et cetera, which had been

1  relief in respect of sums, which have at least in part
2  been outstanding for almost four years.  In the
3  meantime, the respondents and their affiliates and those
4  who own and control them have been enjoying the full
5  benefit of the assets in respect of which those payments
6  are due.
7       Now, I have no doubt that the Tribunal has, not
8  least as a result of the numerous interim applications
9  and hearings that there have already been in this
10  arbitration, already acquired a very substantial degree
11  of familiarity with the background facts which have
12  brought us here today.  But the nevertheless, I will
13  start with a little of the background.  As we proceed,
14  I will give you the bundle references for the documents
15  I mention, but unless you would like to or
16  I specifically invite you to, it shouldn't always be
17  necessary to turn the documents up.
18       Under the SPA or sale and purchase agreement entered
19  into at the end of 2011 and amended and completed in
20  mid-2012, NAE contracted to sell to Allied Energy Plc
21  what is defined in the SPA as "the transferred
22  interests".  It might be helpful if at this point you
23  have to hand bundle A1, which is the so-called core
24  bundle, which contains a copy of the SPA and its
25  amendment number 1.  Indeed, if you care to turn to

1  acquired for petroleum operation by NAE during the
2  course of the parties' co-operation.
3       It is a matter of record that Allied has held the
4  OML since 1992, and that, apart from a relatively brief
5  period of co-ownership with BP and Statoil during which
6  two exploratory wells were drilled, no serious
7  development activity was undertaken until NAE came on
8  board.
9       It is also a matter of record that during its period
10  as operating contractor NAE has expended approximately
11  $1.3 billion in capital and operating costs on the Oyo
12  field.
13       Now, to that operating cost, Allied has contributed
14  precisely zero, with the exception of the amounts that
15  it did pay towards the GSO, although not all of those,
16  as we know, have in fact been paid and the balance of
17  which forms part of NAE's claim in this arbitration.
18       Moreover, of those operating costs, NAE paid
19  approximately $60 million to Allied in respect of
20  services provided by them during the period of NAE's
21  operatorship.  And during its tenure as the contractor,
22  NAE conducted significant further exploration
23  activities, culminating in the drilling of two new
24  wells, Oyo-5 and 6, of which Oyo-5 was the second
25  longest horizontal open hole gravel pack well in the

1  world at the commencement of production.
2     So in return for the transferred interests under
3  clause 4.1 of the SPA, which you'll find at page 15 in
4  the same tab, Allied agreed to pay a total consideration
5  of US$250 million plus or minus certain adjustments, and
6  of that $250 million, 100 million was payable on
7  completion with the remaining 150 payable in equal
8  instalments during 2013 and 2014 to be secured as
9  originally agreed by a bank guarantee.  Meanwhile, the
10  adjustments were to be addressed on completion on
11  an estimated basis, with any positive estimated
12  adjustment payable immediately, subject to
13  a post-completion process for dealing with any
14  additional payment or refund due either way once the
15  final figures were known.
16     But as the Tribunal knows, on 28 June 2012 at
17  Allied's request the parties agreed certain amendments
18  to the SPA, including, importantly for this arbitration,
19  first, the bank guarantee in respect of the three
20  instalments of $50 million or the deferred payments was
21  replaced with a guarantee in the sum of $150 million
22  from CAMAC International Ltd, the parent company of
23  Allied and now the second respondent in this
24  arbitration.
25     The payment dates for the three instalments were

1  deferred to 31 December 2013, 2014 and 2015, and instead
2  of being paid on completion, the adjustments were to be
3  paid in three equal instalments, the first due six days
4  after completion and the second and third due at 60-day
5  intervals thereafter.  In addition, certain changes
6  market share made to the provision which refers to the
7  adjustment mechanism, and there is a dispute about what
8  those changes mean.
9     Finally, in light of the deferral of payment of the
10  adjustments, a second guarantee was provided, this time
11  in the sum of $55 million, again by CAMAC International
12  Ltd.  Because, of course, by that time the parties knew
13  that the adjustments would be positive, rather than
14  negative, and they also knew the approximate amount of
15  the adjustments, as NAE had sent its estimated adjusted
16  statement to Allied on 21 June 2012, showing total
17  adjustments of around 54.3 million, hence CIL's
18  agreement to provide a guarantee with a ceiling of 55.
19  With those amendments, the deal completed on the same
20  day, 28 June 2012, and the first payment of $100 million
21  under the escrow account arrangements set out in
22  clause 4.3 of the SPA was made.
23     Unfortunately, the first payment was also the last.
24  Not a further cent of the agreed consideration has been
25  paid by Allied, and that is why we are here today.

1     Turning, first, to the deferred payments.  The only
2  issue remaining for the Tribunal to determine is whether
3  it has jurisdiction to make an award (a) as against
4  Allied in respect of all of the deferred payments, and
5  (b) as against CIL in respect of the third deferred
6  payment, the first two having been addressed in your
7  second partial award.
8     Indeed, that is a question that you have effectively
9  already determined in NAE's favour in relation to CIL's
10  payment obligation under the guarantee, and there is
11  nothing in Allied's evidence or its latest submissions
12  which suggests that you should reach a different
13  decision in relation to Allied's payment obligation
14  under the SPA.  On the contrary, as set out at 2.6 of
15  our pre-hearing submissions, the position as regards
16  Allied is even more straightforward.
17     Now, in a last-ditch attempt to avoid its liability
18  in its final formal re-amendment of its defence on
19  22 April 2016, Allied ran a rather half-hearted double
20  recovery argument.  You don't need to turn it up, but
21  the reference is bundle B1, tab 4, page 113 at
22  paragraph 176.  In fact it is so half-hearted that
23  Allied seems to have already forgotten that it made it
24  and makes no reference to it in its pre-hearing
25  submissions.

1     If the argument is maintained, it is one that
2  appears to confuse the concept of claiming the same debt
3  as against two different parties with recovering the
4  same debt against two different parties.  As we set out
5  at 2.8 of our pre-hearing submissions, there is no
6  difficulty with the former.
7     Now, one curious feature of the failure to make the
8  deferred payments and, indeed, the adjustment payments
9  is that Allied's own chairman, Dr Lawal, seems to be
10  unclear about whether liability for the payments is
11  denied or admitted and even whether they've been paid.
12  In his witness statement in February 2016 he says that
13  NAE's claims are denied.  The reference there is
14  bundle E1, tab 1, page 3 at paragraph 11.
15     This is what he said in a different context on
16  24 February 2014.
17     (Video recording played to the arbitration)
18  MR NESBITT:  So here we have the chairman of Allied publicly
19  representing that he's invested into the acquisition of
20  ENI's interests in Oyo to the tune of in excess of
21  $250 million while, as we sit here today, more than two
22  years since Dr Lawal made that statement, we know that
23  he has most certainly not invested in excess of
24  $250 million to acquire NAE's interest, rather his
25  investment is short by over $200 million, of which over

1    $100 million was already overdue for payment at the time
2    he made that statement.
3       Be that as it may, moving on to the adjustments.  As
4    the Tribunal is already aware, the adjustments concern
5    liabilities which NAE incurred on Allied's behalf during
6    the operation of the Oyo field, in part in conducting
7    the gas shut-off operation, or GSO, between
8    December 2010 and February 2011 -- those are the
9    so-called Oyo-5 GSO liabilities -- and in part during
10   continued operations during the period from
11   31 December 2011 up until completion on 28 June 2012,
12   part of the so-called post-economic date liabilities,
13   all of which Allied assumed liability for pursuant to
14   clause 11.2 of the SPA.
15      Now, there are four questions before you relevant to
16   the adjustments, as set out in the parties' agreed list
17   of issues, and I will address each of them briefly in
18   turn.
19      At this point, could I ask you to take out
20   bundle G21 and turn to tab 566.
21      Now, the first issue before you is whether this
22   letter authored by Allied and bearing the date
23   8 August 2012, if it was indeed a contractually
24   compliant dispute notice for the purposes of clause 5.5
25   of the SPA.  Apologies, I should have also requested

Page 13

1    that you kindly keep open bundle A1 and this time turn
2    to the second tab, which contains amendment number 1,
3    and in particular we will be looking at page 65.
4       So the issue is whether the 8 August letter was
5    delivered to and received by NAE within the ten business
6    days stipulated in clause 5.5, which you'll see at
7    page 65 and the provisions of which the Tribunal will be
8    already intimately familiar.
9       If it wasn't delivered on time, we say that the
10   respondents' defence to its liability to pay the sums
11   due, insofar as they are to be treated pursuant to the
12   adjustments mechanism, falls at the first hurdle.
13      Now, in the SPA the parties agreed that it was for
14   the party making delivery to prove the fact and time of
15   delivery.  The burden is on them.  If you want to turn
16   it up, but it isn't really necessary just now, you will
17   find the relevant provisions at clause 17 of the SPA at
18   page 35 of A1.
19      Now, it is common ground that the dispute period
20   expired on 9 August 2012.  NAE's position is very clear,
21   it says that it received the letter on 15 August, well
22   after expiry of the period, and relies inter alia on the
23   date stamp shown on the letter.  That date stamp was
24   applied by the secretary of the gentlemen to whom the
25   letter was addressed, Mr Caropreso.

Page 14

1    Conversely the respondents' position on the issue of
2    the delivery of the 8 August letter is remarkably
3    unclear.  They do not attempt to commit to when or even
4    how the letter was delivered.  They offer no more than
5    uncorroborated witness evidence as to how what they say
6    their normal practice ought to have been, which they say
7    would have been by hand or by courier to NAE's Abuja
8    office.  The Tribunal will recall that the respondents
9    were specifically asked at the 8 December 2014 hearing
10   on the guarantee claims to search for documents
11   evidencing delivery, and at the March CMC they expressly
12   confirmed that they had enough time to search for
13   relevant documents, and they produced nothing, in our
14   submission, of any relevance.
15      That seems very odd, frankly.  If, as their normal
16   practice would suggest, the letter was delivered by
17   courier or by hand, and in particular if the courier was
18   a reputable commercial courier, as is expressly required
19   by clause 17.1 of the SPA, even if the relevant
20   documents no longer exist in the files of Allied, it
21   shouldn't be too difficult to ask the courier company to
22   check its database for the relevant period, or if it was
23   delivered by hand to seek witness testimony from the
24   individual who delivered it.  But they have come up with
25   precisely nothing in terms of hard evidence and no

Page 15

1    explanation has been provided as to what searches or
2    enquiries were made.
3       By contrast, despite being in the position of the
4    recipient of the letter and, therefore, not required to
5    bear the burden of proof of the date of delivery, NAE
6    has, through its investigations, produced no less than
7    five items of documentary evidence relevant to receipt
8    of the letter, supported by witness evidence, and all
9    indicating that the date of receipt stamped on the
10   letter, 15 August 2012, was indeed the date on which it
11   was first received by NAE.
12      Now, in answer to that, the respondents don't go so
13   far as to assert in terms that the letter would have
14   been or even should have been received on the day it is
15   dated, 8 August, or the day after, rather the
16   respondents simply speculate about what NAE may or may
17   not have done or of events or processes which may or may
18   not have delayed delivery of the letter.
19      But that is all really beside the point because it
20   was the respondents' responsibility to ensure that the
21   letter was delivered to NAE within the contractual
22   deadline, and it is for the respondents to prove on
23   a balance of probabilities that they delivered the
24   letter to NAE by no later than 9 August, and they
25   haven't done so.  Indeed, in their most recent

Page 16

1    submission at 11.33, the respondents indulge in what can
2    only be described as further fanciful speculation about
3    the meaning of the internal emails within NAE, which
4    followed the receipt of the letter, and in what one can
5    only assume is something of a fit of desperation they go
6    so far as to contend that the internal correspondence
7    shows that NAE had concluded that the letter was
8    received in time but in this arbitration has
9    nevertheless decided to maintain the opposite.  Of
10   course, that contention is not correct.
11       Now, turning back to amendment number 1 to the SPA
12   and looking in particular at clause 8, which I already
13   mentioned but also clause 12, which is the redefinition
14   of the positive adjustment, the second issue before you
15   is whether, if the Tribunal determines that the letter
16   arrived on time, it did or did not amount in substance
17   to a dispute notice within the meaning of clause 5.5,
18   which says that:
19       "The purchaser shall notify the seller of any item
20   or items that it wishes to dispute, together with the
21   reasons for such dispute and a list of proposed
22   adjustments."
23       So you need to determine whether what this letter
24   contains falls within the meaning of clause 5.5 in
25   respect of either seven cost items which were not

1    that this has not yet been done it is premature for
2    Allied to comment or for the adjustment statement to be
3    final.
4        Now, on any fair reading that is not a dispute.
5    Rather, it is the adoption of a position which was not
6    actually within the scope of possible reactions to the
7    final adjustment statement contemplated in the SPA.
8    Under the SPA, NAE could only send what it regarded as
9    a final adjustment statement.  So to say it can't be
10   regarded as final is essentially meaningless.  It was
11   the final adjustment statement.  It wasn't a refusal to
12   pay either in full or in part.
13       So if the Tribunal were to consider that the SPA as
14   amended does in some way require the parties to agree
15   some of the cost items, the only contractual process so
16   agreeing or not agreeing them was for NAE to include
17   them in the final adjustment statement.  There was no
18   other process.  And if Allied did not agree to them, for
19   whatever reason, it had to say so in terms and in time,
20   and it didn't do either of those things.  So it follows
21   that the only possible and logical outcome of that
22   process is that the costs fall to be treated as agreed
23   under the SPA.  Until the commencement of this
24   arbitration, as we'll see in a moment, there was no
25   suggestion from Allied that it took issue with that

1    expressly listed out in paragraph 1 of part 1,
2    Schedule 1 to the SPA, that's the clause 12 of amendment
3    number 1 that we're looking at, or in relation to the 12
4    items which were.
5        I should say in fact the seven items are now reduced
6    to six, as the respondents' quantum expert has conceded
7    that what's referred to as maintenance/repairs, which is
8    a cost item in the sum of $1.788 million, is the same
9    thing as item 6 in clause 12, referred to as "assistance
10   field service engineer".  The reference for that to the
11   quantum experts' joint report is bundle E3, tab 4,
12   page 19.
13       Now, we address the issue of the contents of the
14   8 August letter in some detail at 3.39 to 3.66 of our
15   pre-hearing submissions, and I am not going to repeat
16   all of those points.  But the essence of our position is
17   that if the respondents had wanted to dispute any items
18   of cost, then they had to say so in terms as required by
19   clause 5.5.  They had to say "We dispute this in that
20   amount for the following reasons and here is our propose
21   the list of adjustments".  They did not do that, rather
22   in respect of the six cost items, although, of course,
23   the letter doesn't actually provide any list of specific
24   items, they simply say that those items were to be
25   agreed between the parties after completion, and given

1    logical outcome.
2        Now, in respect of the remaining cost items, by
3    which I mean those that are expressly listed out in
4    clause 12 of the SPA amendment, the position is even
5    clearer.  To the extent that the August letter could be
6    said to refer to them at all, it simply says:
7        "Allied will require such additional time as is
8    reasonable for it to fairly and adequately comment on
9    the most recent adjustment statement and accordingly the
10   dispute period provided under the SPA needs to be
11   reasonably extended."
12       So that, again, is not a dispute, it is a request
13   for an extension, a request for a variation of the SPA,
14   which had clearly provided that time was of the essence
15   for disputing the final adjustment statement.  That
16   request was not granted by NAE.
17       So we say that the letter was not in substance
18   a dispute notice.
19       The third issue is whether NAE otherwise waived the
20   contractual requirements for a dispute notice.  And,
21   again, we've addressed that issue in some detail at 3.71
22   to 3.84 of our pre-hearing submissions.
23       Again, the essence of our position is that there is
24   nothing in any of the letters sent by NAE, either before
25   or after 15 August 2012, which was inconsistent with its

1    position that the 8 August letter had been received out
2    of time or was inconsistent with the expectation that
3    Allied would meet its contractual deadlines and comply
4    with its obligation to pay the adjustments.  Indeed, the
5    striking feature of that correspondence is not so much
6    what NAE said as what Allied didn't say.  If, as is now
7    suggested, Allied genuinely believed that it had issued
8    a valid dispute notice in time, why did it not write
9    back to NAE to say so?  The people behind Allied are not
10   slow to go into print when they believe that they have
11   a complaint.  But Allied didn't do so, rather it did
12   what it always seems to do when it is faced with
13   a demand for payment, it sought more time to pay.
14      If I could ask you to turn up bundle G22, which is
15   just the next one in the sequence, and turn to tab 600,
16   this is a letter sent by Mr Kamoru Lawal to Mr Casula,
17   the chairman of NAE, on 1 October 2012, so that's after
18   all of the various letters of demand for payment have
19   been sent by NAE.
20      He says as follows -- I am looking here at about
21   four lines from the bottom of the first paragraph:
22      "To enable Allied to fund the new wells while
23   meeting its current OPEC's obligations, we request that
24   the payment of the positive adjustment be rescheduled
25   until December 31, 2016, such time being after the wells

1    letter validly disputed the entirety of the final
2    adjustment statement, which, of course, we say it
3    doesn't, nevertheless the Tribunal still has a job to do
4    in respect of the adjustments.  The parties can't agree
5    on the meaning of their contract and, indeed, two
6    independent accountants, the parties' respective quantum
7    experts, Mr Taylor and Mr Good, they can't agree if they
8    are qualified to interpret the parties' contract for
9    them.  You'll see that from their joint report,
10   bundle E3, tab 4, at page 91.
11      They can only agree what the financial implications
12   would be if one or other of the different possible
13   interpretations of the contract is upheld.  So it is
14   only in light of a determination as to the meaning of
15   the SPA that there could be a resolution to the
16   adjustment claims dispute, and there is no reason why
17   this Tribunal should not now make that determination.
18      In any event, the Tribunal still retains
19   jurisdiction over NAE's alternative claim for these sums
20   under clause 11.2 of the SPA, to which no jurisdictional
21   objection has been taken.  The value of the 11.2
22   indemnity claim is simply commensurately greater or
23   smaller, depending on whether the Tribunal determines it
24   has jurisdiction over none, some or all of the amounts
25   claimed as adjustments.

1    will have been drilled, additional production will have
2    come on stream and the deferred payments will have been
3    made."
4       So no indication of any unhappiness with the amount
5    of the adjustments.  You can put bundle G22 away.
6       The final issue, if we're wrong in relation to the
7    six cost items, i.e. the Tribunal decides that Allied
8    did serve a valid dispute notice as regards those items
9    on time or that NAE otherwise somehow waived its rights
10   to insist upon compliance with the contract, is whether
11   the Tribunal nevertheless still has jurisdiction to
12   determine NAE's claim for those cost items insofar as
13   they are being treated under the adjustments mechanism.
14      Well, if the Tribunal has jurisdiction to determine
15   NAE's claim in respect of all of the other cost items
16   set out in the final adjustment statement, which we say
17   plainly it does, as we say at 3.66 of our submissions,
18   it would be somewhat inconsistent with the principles
19   that the respondents have so enthusiastically embraced
20   in respect of the PSC claims for the Tribunal, one
21   seized of disputes regarding the final adjustments
22   statement, to stop in midstream and leave determination
23   of some of the cost items to accountants in a procedure
24   that has never been instigated by either side.
25      Even if you were to consider that the 8 August

1    Now, Allied now says that that's not the effect of
2    the SPA as amended because the amounts claimed under the
3    indemnity provision were excluded from the entire scheme
4    of the SPA, and they say that at 15.14 of their
5    submissions.
6       Now, we say that that is not a tenable reading of
7    clause 12 of amendment number 1, because that relates
8    expressly only to the positive adjustment and the
9    question of what items it should include and when they
10   should be paid.  Essentially, the whole scheme of the
11   adjustments sets out a payment mechanism, whereby NAE
12   would have the comfort that it would receive payment of
13   those specific sums in accordance with the defined
14   schedule relating to costs arising within the wider
15   context of the post-economic date liabilities.
16      It says nothing about clause 11.2 or the amounts to
17   be covered by the indemnity, and clause 11.2 was left
18   completely untouched by the amendment.  There is no
19   witness evidence of any discussion about clause 11.2.
20   And the post-economic date liabilities in Article 1.1 of
21   the SPA are expressly defined to include "any
22   liabilities incurred by the seller not taken into
23   account in full in the adjustments".
24      So the respondent's jurisdictional argument comes to
25   nothing, whichever way you look at it.  It is for the

1  Tribunal to determine what the SPA means, the payment of
2  what amounts NAE is entitled now by way of adjustments
3  and to what amounts it is entitled under the clause 11.2
4  indemnity.
5      NAE has been out of its money wholly unjustifiably
6  for a very long time and Allied needs to pay up.
7      I am going to turn now to the counterclaims which
8  the respondents have brought in this arbitration.
9      We have said many times, and I repeat, that we
10  believe that these counterclaims are no more than
11  a tactic to string out this arbitration and to delay the
12  recognition of Allied's liability for NAE's claims. In
13  the post-SPA completion correspondence between the
14  parties, with which the Tribunal is already familiar,
15  there was no mention of any such claims. In fact, there
16  was no mention at all until this arbitration was
17  commenced by NAE. To some extent, bearing in mind that
18  we have been in arbitration for some two and a half
19  years now, that delay tactic has been quite successful
20  but NAE believes that it needs to stop now.
21      Now, as I mentioned at the recent CMC, there is
22  a long list of reasons why the counterclaims don't begin
23  to get off the ground. We've set them out in
24  considerable detail in our submissions, so I will touch
25  on them here only briefly and in a moment we will

1  aspect of the Oyo field from highly technical reservoir
2  drilling and production information, to every contract
3  entered into with every service provider.
4      The other unusual feature of this relationship is
5  that, financially speaking, it was completely one-sided.
6  Allied never paid or contributed to a single cash call
7  in the entire history of the parties' relationship, and
8  the entirety of petroleum operations on the Oyo field
9  were financed by NAE, as I said, to the tune of
10  $1.3 billion. However, in return for that zero
11  contribution, and despite the lower than expected
12  production from the field, Allied nonetheless lifted
13  around $150 million in crude oil produced from the Oyo
14  field over the relevant period.
15      So against that background, in my submission, it is
16  not plausible to suppose that NAE either by agreement or
17  inadvertently would have left itself exposed to the
18  possibility of historical claims by Allied in respect of
19  petroleum operations. And they didn't, which brings me
20  back to the two there's hold questions.
21      As the Tribunal will recall from the preliminary
22  issues hearing back in July 2014, it is NAE's position
23  that any possible liability for claims of the sort now
24  being run by Allied is excluded by the express terms and
25  effect of the deed of novation.

1  address you on two important threshold issues.
2      But just by way of introduction, the counterclaims
3  are essentially for breaches of the PSC entered into in
4  July 2005 and eventually novated to Allied in June 2012.
5      Now, it is clear from the documents and the evidence
6  that this was not a typical operator/non-operator
7  contractual relationship, where often the non-operator
8  takes a bit of a back seat, pays his cash calls, and
9  lifts crude oil cargoes in proportion to his
10  participating interest. On the contrary, in this
11  relationship, and however much the respondents now try
12  to play down their role, the Allied parties and
13  individuals wanted to be and were actively involved in
14  petroleum operations with personnel on the ground in
15  Nigeria, including on the FPSO, regularly making
16  proposals and suggestions, reviewing and approving work
17  programmes, budgets, and key operational decisions, and
18  receiving information on a daily basis.
19      That that is what the parties intended and wanted is
20  also reflected in the terms of the co-operation
21  agreement and the secondment agreement, which they
22  entered into in January 2016, and the master services
23  agreement of February 2009, as well as the integrated
24  management team that they set up. Above all, they
25  enjoined very detailed knowledge of pretty much every

1      Now, strangely, and perhaps in a sign of how keen
2  they are to avoid the issue, the respondents -- and this
3  appears even in their pre-hearing submission at 9.16 --
4  continue to insist that the issue is already res
5  judicata in their favour as a result of the Tribunal's
6  first partial award. However, that was not one of the
7  preliminary issues being treated at that time, and the
8  majority of the Tribunal, you will recall, expressly
9  stated that it was not determining that point. If you
10  need the reference, it is hearing bundle C2 at tab 5,
11  page 41, paragraph 133.
12      Now, we maintain our position that the effect of the
13  deed of novation was to exclude NAE's historic liability
14  to Allied in respect of petroleum operations, and we
15  adopt our submissions that we made for the preliminary
16  issues hearing on that point. For reference you can
17  find those at bundle C1, tab 1, page 6 and tab 4,
18  page 94.
19      We say that its terms and meaning are clear. The
20  respondents say in their pre-hearing submissions -- this
21  is at 9/16 -- that the deed of novation expressly
22  preserves Allied's rights against NAE, but they don't
23  explain how it does that. In fact, the deed of novation
24  states in terms that Allied will assume the liabilities
25  and perform the obligations under the PSC in place of

1    NAE.  It is difficult to imagine how you can assume
2    something which doesn't yet exist, and so that must mean
3    that Allied was assuming past as well as future
4    liabilities, and in that sense NAE's position is on all
5    fours with the views expressed by Mr Boswood QC in his
6    dissenting opinion in October 2014, which is in
7    bundle C2, tab 6, at page 73.
8        But even if the Tribunal disagrees with that
9    interpretation, such that it considers that the correct
10   construction of the deed of novation is that all
11   liabilities under the PSC incurred up to the economic
12   date stayed with NAE, now that, following receipt of
13   Mr Taylor's quantum report, we have seen for the first
14   time how the respondents in fact approach the different
15   elements of the quantification of their claims, we know
16   that those claims are either legally impossible or are
17   brought in respect of the alleged losses of an entity
18   for whom no claim has ever been asserted in this
19   arbitration, either directly or via the supposed agency
20   of Allied.
21       At this point, I am going to give you some relief
22   from me and handover to Mr Shoesmith, who is going to
23   expand on that with the help of a short presentation.
24   MR SHOESMITH:  Just before I begin -- thank you -- I wonder
25   whether we might need a little more relief, given it is

1    20 past 11.  I have about 20 minutes' worth of material.
2    I wonder whether you would like to hear me before or
3    after the break?
4    THE CHAIRMAN:  Court reporters, would you like a break now?
5        So we will resume in 15 minutes.
6    MR SHOESMITH:  Thank you.
7    (11.22 am)
8              (A short break)
9    (11.43 am)
10   THE CHAIRMAN:  Mr Shoesmith.
11       Opening submissions by MR SHOESMITH
12   MR SHOESMITH:  Thank you, Mr Chairman.
13       So, as Mr Nesbitt touched upon before the break, at
14   sections 7 to 11 of NAE's pre-hearing submissions the
15   Tribunal will have seen that questions have arisen
16   following the submission of the respondents' quantum
17   experts' evidence as to the nature and viability of the
18   counterclaims.  So I propose to provide the Tribunal
19   with an overview of the circumstances relevant to that
20   issue and the consequences of it having arisen at such
21   an advanced stage in the arbitration, at four months
22   after the close of pleadings.
23       Like Mr Nesbitt, I will give you bundle references
24   as I go along, but I don't propose to take you to any
25   documents, unless you would specifically like to see

1    them -- please tell me if that's the case -- instead,
2    I have a few slides to demonstrate what I am saying.
3        Before we begin with those, a few words as to the
4    nature of the counterclaims in general.  On the
5    respondents' case, all claims concern only the Oyo
6    field.  The Tribunal will have seen the reference to
7    a partial assignment of the respondents' interest
8    dividing the Oyo and the non-Oyo interests for a short
9    period in 2010 and 2011.  But it's common ground that
10   non-Oyo part is not relevant to this arbitration.
11       Second, all claims derive from the parties'
12   participating interests under the PSC.  It is that
13   contract alone that confers relevant rights and
14   interests on the parties, including the right to assert
15   any of the potential counterclaims.
16       There are some loose references in the respondents'
17   pleadings to a diminution in value of the OML's, but
18   Mr Taylor's report makes clear that what he calculates
19   and what is apparently claimed for is the effect of
20   NAE's alleged breaches on the value of the beneficial
21   interests under the PSC.
22       Third, save in respect of a gas flaring fine, which
23   is valued about $1.5 million, I am not going to touch on
24   that in this part of the presentation, all claims derive
25   from alleged breaches of a single provision of the PSC,

1    and that's Article 7.1(a).  Mr Nesbitt will talk about
2    that in more detail once I am finished.
3        So moving on to my slides, the respondents'
4    collective potential counterclaims can be divided
5    roughly through three limbs.  I've have to apologise,
6    I can't quite keep up with the changes of position.  As
7    of about 7.30 last night this was the position.  It's
8    now clearly going to change again on the respondents'
9    side.  But three limbs.
10       First, in respect of Allied's own loss.  That's
11   attributable to what is called the NAE beneficial
12   interest.  That's 40 per cent participating interest in
13   the PSC that Allied that acquired from NAE on
14   28 June 2012, and that's currently, I have to say now,
15   quantified based on Mr Filippi's reservoir model at
16   $8 million approximately, I don't think that will
17   change, and based on Dr Moy's latest model until last
18   night approximately $380 million.
19       Second, in respect of the Allied CINL beneficial
20   interest for the period until the assignment of that
21   interest to CPL, that was on 7 April 2011.  Though
22   notionally a claim is said to accrue to Allied and CINL
23   in that respect, the parties' experts agree that Allied
24   and CINL suffered no loss in respect of that beneficial
25   interest in that period.  So the second bundle of

1    counterclaims is not really a claim at all.
2        Third, perhaps surprisingly instead, the
3    respondents, through the eyes of their expert at least,
4    seem to claim for losses allegedly suffered by CPL, the
5    affiliate that acquired the Allied CINL beneficial
6    interest in April 2010.  Those losses, if they are
7    relevant, are quantified at either approximately
8    2 million, based on Mr Filippi's model, or assuming it
9    remains the same somewhere in the region of 123 million,
10   based on Dr Moy's model.
11       Now, the respondents arrive at that three-pronged
12   counterclaim through an analysis, and I would say
13   a mis-analysis perhaps of various novations of the
14   beneficial interests that occurred over the period since
15   2005.  Let's start in 2005, then.
16       At the outset of the parties' relationship, I've
17   a few pictures, as their name suggests there was the
18   40 per cent NAE beneficial interest, that's there on the
19   left, being held up by a little NAE man, and
20   a cumulative 60 per cent applied Allied/CAMAC CINL,
21   let's call it beneficial interests split 57.5 per cent
22   in favour of Allied, 2.5 per cent for CINL.
23       There are no changes in the parties' beneficial
24   interests before the causes of action complained of
25   began to accrue.  If they accrued, it was as follows.

1        In respect of cementing of the 958 section of the
2    Oyo-5 well at some point between July and October 2009
3    we see that now from the respondents' pre-hearing
4    submissions, paragraph 3.9 onwards.
5        In respect of beaning up of that same well, that's
6    to say getting ready for production, accruing between
7    October and December 2009, we see that from
8    paragraph 4.4 of the respondents' pre-hearing
9    submissions.  (Pause.)
10       If the respondents establish breach in respect of
11   the cementing and beaning up claims, there is no dispute
12   that those claims accrued before the first change in
13   ownership of the beneficial interests.  That was in
14   April 2010.
15       But it also seems likely -- you'll see on the slide
16   there are some more potential claims.  It's not entirely
17   clear, however, from the respondents' case that further
18   causes of action would have accrued in respect of
19   production from the Oyo-5 well, and that's between
20   December 2009 and April 2010.  Looking at the
21   pre-hearing submissions, it seems like a breach is
22   asserted as of December 2009.  That's paragraphs 4.4 and
23   4.30 of the respondents' submissions.
24       In respect of gas flaring, that's in the same
25   period.  If a separate damages claim is made in that

1    regard, again, we're not entirely clear, that appears to
2    be asserted of as of at least February 2010, and that's
3    paragraph 6.7 of the respondents' pre-hearing
4    submissions.
5        Then there are two aspects of the Oyo-5 GSO, the gas
6    shut-off operation, namely delay in its planning.
7    Again, we're not clear whether a separate damages claim
8    is now maintained in that respect, but if it is, the
9    alleged breach seems to have been between mid-January
10   and coincidentally 7 April 2010.  That's paragraph 5.10
11   of the respondents' pre-hearing submissions.
12       Finally, in respect of obtaining packers, as they
13   are called, for the GSO.  That failure is not really
14   dwelled upon at all in the respondents' pre-hearing
15   submissions.  So, again, there is a bit of doubt about
16   that.
17       In early 2010, therefore, the potential claims of
18   the parties can only have been as shown here.  Looking
19   at the Allied/CINL side first, as indicated just now, it
20   is not certain whether breaches are alleged to have
21   occurred prior to the novation date in respect of
22   production, gas flaring, delay and packers.  So I have
23   shown those on this slide as potential claims.  They
24   have a question mark in the appropriate box of bundle
25   claims for each party.

1        On the NAE side, as I will come on to and as
2    Mr Nesbitt alluded to already, there is even more
3    uncertainty.  There is a dispute between the parties as
4    to whether NAE could ever have any claim for breach of
5    contract against itself.  NAE says that is simply not
6    possible.  But it is alleged those notional claims are
7    allocated on the slide along for everything else for
8    demonstrable purposes.  But I have put question marks in
9    those boxes as well, just so you understand what that is
10   about.
11       Whatever the viability of the counterclaims
12   allocated, for present purposes it's what happened next
13   that is important, and that's the first deed of
14   novation, as we're calling it.
15       The parties disagree as to what was novated to CPL.
16   The critical provision shown here in relevant part is
17   clause 2.1.  So with effect from and including novation
18   date Allied and CINL assigned to CPL all of their
19   respective rights, liabilities, duties, covenants,
20   undertakings, warranties, other obligations contained in
21   the PSC in respect of the Oyo field only, remember
22   that's split, including all claims and demands in
23   respect of the Oyo field arising in connection with the
24   PSC.  You have bundle reference there.
25       NAE's case is that that wording had the effect of

1    passing to CPL all of the claims shown on the previous
2    slide as having, on the respondents' case, accrued to
3    Allied and/or CINL. In NAE's submission that is the
4    only possible reading of clause 2.1 because Allied and
5    CINL would only ever have the right to claims that had
6    already accrued as of the novation date. They could
7    never have a right to claims accruing thereafter because
8    all rights had passed by agreement to CPL. It's the
9    same point that Mr Nesbitt made earlier as regards the
10   three deed of novation, and I will come back to that.
11       The respondents' reading of that provision that only
12   future claims passed, renders redundant the final words
13   regarding claims. They are effectively read out of that
14   provision.
15       On 7 April 2010, in NAE's world view, the picture
16   therefore changes considerably. The only parties who
17   could conceivably have claims under the PSC at that
18   stage in respect of any matters occurred prior to the
19   novation date are NAE, but I've already said that leads
20   to considerable doubt as to that, and CPL, CPL having
21   acquired all of Allied and CINL's rights, including
22   expressly all claims. Allied and CINL, you will see on
23   the slide, have none.
24       Of course, that's of very little practical
25   significance now because we know the quantum experts

Page 37

1    irrespective of whether that's in Allied or CINL's hands
2    or in CPL's hands, the position is the same. The
3    experts agree there is no loss.
4    LORD HOFFMANN: Yes.
5    MR SHOESMITH: So I think we're here. I've shown this on
6       the slide by a little greyed-out no claim sign, so you
7       can see that that's what happened.
8       Over more or less the next two years, from
9    April 2010, the allocation of beneficial interest under
10   the PSC remained the same in all relevant respects.
11   I say "relevant" because, as I've explained, there is
12   there is non-Oyo element, and that's rejoining the Oyo
13   element in the intervening period, but no claims arise
14   in respect of that.
15       So in that period of two years, the respondents
16   suggest that further claims arose or may have arisen if
17   they'd not already accrued prior to April 2010. That's
18   by operation of Nigerian law, the claim accrues as at
19   the date of breach, further damages do not give rise to
20   a separate free-standing claim.
21       So NAE and/or CPL may have gained additional claims
22   in respect of production, gas flaring, delay and
23   packers. Those are the alternative claims, if they
24   haven't already accrued.
25       In respect of the outcome of the GSO and the

Page 39

1    agree that any such claims resulted in no loss in the
2    period prior to 7 April 2010.
3    LORD HOFFMANN: Sorry, say that part again?
4    MR SHOESMITH: The parties' quantum experts agree that the
5       parties suffered no loss, there was no loss incurred for
6       matters occurring prior to 7 April 2010.
7    LORD HOFFMANN: Right.
8    MR SHOESMITH: So it doesn't really matter who held them,
9       whether it is Allied and CINL or whether it is CPL.
10      Even a claim by CPL in respect of such matters is not
11      viable. If you recall, on my original slides going
12      through the quantum experts' table, it is this one. It
13      is categorised as Allied's loss in respect of the
14      Allied/CINL beneficial interest. The next line down
15      underneath the circling, loss between 5 December 2009
16      and 7 April 2010. Reading across, you'll see these are
17      negative figures here --
18   LORD HOFFMANN: Yes.
19   MR SHOESMITH: -- they are a negative loss. They are no
20      loss at all.
21   LORD HOFFMANN: After 5 December 2009 is --
22   MR SHOESMITH: From when the respondents say their cause of
23      action accrued, when the losses started to be incurred,
24      until the disposal of the relevant interest on the
25      7 April 2010. So obviously for that period,

Page 38

1    alternative procedures adopted, the relevant period for
2    those, December 2010 to February 2011, are the dates of
3    the GSO, so it is not contentious that they can only
4    have arisen after the assignment.
5       Again, in the hope that it aids understanding, I've
6    put this up visually here, or at least I've tried.
7    CPL's pool of potential claims on the right has expanded
8    but, as I've said, pre-and post-novation claims are
9    alternative claims not cumulative claims, so they are
10   all shown here with a question mark.
11      Allied and CINL continued to have no claims
12   whatsoever against NAE under the PSC.
13      Of course, it remains NAE's position that
14   post-novation claims against itself are as impossible to
15   as pre-novation claims. It can't claim against itself,
16   but that's in dispute, and so, again, they are shown on
17   the slide just so that you can see what that looks like
18   on the respondents' case.
19      The NAE dispute becomes relevant at this stage.
20   We're now at 28 June 2012 because NAE and Allied
21   disagreed as to the effect of the third deed of
22   novation, which they executed on that date. The
23   relevant wording as before coincidentally perhaps is in
24   clause 2.1. That reads:
25      "The parties severally agree that with effect from

Page 40

10 (Pages 37 to 40)

1    completion as to the terms defined in the SPA, NAE shall
2    cease to be a party to the PSC in respect of the
3    transferred interest and Allied shall remain a party to
4    the PSC and all agreements deriving therefrom and shall
5    assume the liabilities, perform the obligations and be
6    entitled to all the rights and benefits therein in the
7    place of NAE."
8        NAE says that this wording has the effect of
9    assigning to Allied the entirety of its beneficial
10   interest in the PSC from the beginning.  That is the
11   only sensible reading, as we've put in our submissions,
12   of liabilities, which are separate from obligations in
13   this clause.
14       Like claims under the first deed of novation, the
15   liabilities referred to must have already arisen.
16   Future liabilities accrue to Allied as a result of the
17   assumption of all obligations.
18       Consistent with that, NAE also says that Allied
19   acquired all rights from the beginning of their
20   relationship, including any right that NAE may have had
21   to claim in respect of its interest under the PSC.  But
22   we know a claim against itself is not possible.  There
23   is no such right.
24       Allied's position is less clear.  Initially, it said
25   clause 2.1 was of prospective effect only.  We refer to

Page 41

1    at in our pre-hearing submissions at paragraph 11.45(b),
2    but the more important reference perhaps is to Mr Wade's
3    submissions at the preliminary issues hearing, and you
4    can find those in bundle C1, tab 4, page 166, starting
5    at line 5.  We don't need to go there now.
6        Following Mr Taylor's report, however, recognising
7    that it has no viable claim against NAE by operation of
8    the first deed of novation, Allied's position now
9    appears to be that clause 2.1 of the third deed of
10   novation has the curious result that Allied acquired all
11   of NAE's rights in the NAE beneficial interest from the
12   beginning.  That's consistent with NAE's reading, so
13   that would include NAE's notional claim against itself,
14   were that possible.  But at the same time, the
15   respondents' case is that Allied left the corresponding
16   liability for past breaches with NAE.
17       Now, not only is that not possible to see on the
18   face of this contract, which deals with rights and
19   liabilities together, but it is a legal impossibility.
20   Whether as a matter of English law or Nigerian law, no
21   party can have a cause of action against itself, nor can
22   it assign that cause of action to another.  But the case
23   is advanced against NAE in those terms, and that
24   assignment is, therefore, represented here.
25       On or after 28 June 2012 there are just two

Page 42

1    potential counter-claimants against NAE, Allied, if it
2    acquired NAE's impossible claim against itself -- you
3    will see I have put an extra large question mark on
4    that -- and CPL, having acquired potential claims
5    pursuant to the first deed of novation.  Those were
6    untouched by the third deed of novation.
7        There never was and, it is now common ground, there
8    never could have been any viable claim by CINL against
9    NAE.  The only viable claim it might have had on the
10   respondents' interpretation of the first deed of
11   novation, even in their world view, is a claim that all
12   parties agree resulted in no loss.
13       That is the position in which the parties found
14   themselves on the date when the counterclaims were
15   eventually brought, in October 2013.  No further causes
16   of action, I have put on the slide, are said to have
17   accrued since 28 June 2012.  Despite that, rather than
18   bringing claims on behalf of itself, Allied, were any
19   such claims possible and CPL, Allied expressly commenced
20   arbitration only in respect of itself and CINL.  You can
21   see that from the response.  That's at bundle B1, tab 2.
22   We don't need to go there now.
23       What is more, it has at all points up to and
24   including the submission of its further amended defence
25   and counterclaim -- that was just a couple of months ago

Page 43

1    on 22 April 2016 -- claimed only in respect of losses
2    allegedly suffered by Allied and by CINL.  The bundle
3    reference B1, tab 4, page 117.
4        There is no indication on the face of the pleadings,
5    despite their repeating formulation, of any intention to
6    bring any claim on behalf of CPL.  What the respondents
7    say they want, and have consistently said they want, is
8    for NAE to indemnify Allied and its affiliates but
9    crucially and expressly CINL in this case.  You'll see
10   that from the further amended defence and counterclaim,
11   B1, tab 4, page 92, and the paragraph reference, 123.1.
12       The respondents could not have been more clear as to
13   what they intended to do.  Nor has anything occurred
14   since the counterclaims were bought to change the
15   position as between the parties.  You'll see I have put
16   up here a reference to the 2013 transfer agreement.
17   That purported to reserve the respondents' right to
18   claim against NAE, but we've seen there were no such
19   claims in respect of the Allied CINL beneficial
20   interest.  They gave them away.  And no claims accrued
21   to Allied in respect of the NAE beneficial interest
22   because they are legally impossible.  On their original
23   view, they never passed in the first place but if they
24   did pass, they don't go anywhere.
25       The inclusion of reference to alleged losses of CPL

Page 44

1  in the respondents' expert evidence clearly acknowledges
2  the fact that CPL, rather than Allied, or CINL is the
3  proper counter-claimant.  But that reference does not
4  amount to formally commencing a claim.  Nor is it
5  sufficient that in the request for relief submitted with
6  the respondents' pre-hearing submissions just last
7  Friday that the respondents now formally seek an award
8  of damages and declarations in respect of Allied, CINL,
9  and their affiliates.  The reference to the pre-hearing
10  submissions there are paragraphs 17.2.6, 17.2.7, 17.3.1,
11  17.3.2.
12      No claim has ever been brought on behalf of CPL.  It
13  is to this day a non-party to the arbitration.  In fact,
14  the respondents' confusion in this regard is still
15  apparent in their pre-hearing submissions.  They
16  continue to refer at paragraph 2.7.1 to NAE's liability
17  to indemnify Allied and its affiliates, expressly CINL
18  in this case.
19      The importance of CPL's absence is clear.  The
20  period provided by the Nigerian Limitation Act for CPL's
21  claims under the PSC has in all material respects
22  already expired.  The period as in English law is six
23  years from breach.  That's section 7 of the
24  Limitation Act, which you'll see at bundle H6, tab 1,
25  page 1.

1      So CPL's potential cementing claim, for example,
2  expired in or around July or October 2015 at a time when
3  the pleadings clearly show that claim had not been
4  brought.  The bean-up production claim, they seem to
5  come together, appears to have become statute-barred in
6  around December 2015.  Again, long before any intention
7  was demonstrated to bring it.
8      So the two principal planks of the counterclaims
9  cannot be brought either by CPL, who is not here today,
10  and is statute-barred anyway, or Allied or CINL, who
11  either the disposed of or never acquired the relevant
12  rights to claim.
13      Clearly, any other pre-novation claims -- remember
14  that bundle with a question mark on them, if they are
15  maintained there is some doubt in that respect -- also
16  ran up against the statute bar on 6 April 2016.  That's
17  before the further amended statement of defence and
18  counterclaim, before the pre-hearing submissions.  Still
19  no claim evident on the face of the pleadings.
20      What is left, in particular in respect of the GSO,
21  the respondents from their pre-hearing submissions now
22  appear to accept does not form the basis of any viable
23  claim, even if it were notionally possible.  So once
24  that is particularised, it is apparent that there are no
25  viable counter-claimant against NAE.

1      Going back to my original slides, that table, the
2  largest claim by value, that's nearly $400 million on
3  the respondents' best case, subject to any changes they
4  may now like to make, that claim never came into
5  existence in the first place.  That's legally
6  impossible.  It never vested in Allied because it is
7  impossible for it to have been assigned, if it did
8  exist.  Alternatively, based on the wording of the third
9  deed of novation, clause 2.1, Allied took liability for
10  it, together with the right to claim.  So it has its own
11  legally impossible claim against itself, and it goes no
12  further than that.
13      CPL's claim, which is valued at around 100 million
14  currently on the respondents' best case, subject to
15  change, was not brought before the expiry of the
16  applicable statutory limitation period.  It has not been
17  brought now.  Not only are the respondents entitled to
18  no remedy in respect of it, but there is no remedy now
19  available to CPL.  If any claim remains at all -- it's
20  NAE's case that it doesn't -- that claim in respect of
21  the period up to 7 April 2010, based on the Allied/CINL
22  beneficial interest, it is agreed resulted in no loss.
23      For those reasons, sir, it is NAE's contention in
24  this arbitration that it has no case to answer.
25      Mr Nesbitt is going to explain, unless you have any

1  questions for me, how we arrive at the same conclusion
2  looking at the substance.
3      Further opening submissions by MR NESBITT
4  MR NESBITT:  Tempting though it is to simply stop there,
5  nevertheless we are obliged to proceed to address the
6  balance of the issues raised by the respondents in their
7  supposed counterclaims.
8      At this juncture, it would be helpful if you could
9  have to hand the PSC, which you'll find still in
10  bundle A1 at tab 5.
11 MR LEW:  We need to keep out volume G21?
12 MR NESBITT:  No, you can put that away, sir.
13      You may with to turn to page 136, where you will see
14  the contractual provision which has a starring role in
15  this arbitration, according to the respondents, that is
16  Article 7.1(a).  That is the sole contractual term of
17  the PSC of which breach is alleged.
18      That provision required NAE to:
19      "Prepare work programmes and budgets and carry out
20  approved work programmes in accordance with
21  internationally acceptable petroleum industry practices
22  and standards with the objective of avoiding waste and
23  obtaining maximum ultimate recovery of crude oil at
24  minimum cost."
25 LORD HOFFMANN:  Sorry, what page did you say?

1  MR NESBITT:  Page 136 of the bundle.  It is page 13 of the
2      contract itself.
3  LORD HOFFMANN:  That's what I wanted.  Thank you.
4  MR NESBITT:  As set out in our submissions, the respondents'
5      position on what Article 7.1(a) actually means, and more
6      particularly what "internationally acceptable petroleum
7      industry practices and standards" are, which I will
8      hence forth referred to as "standards" for short, has
9      continually shifted ranging from what I think was an
10     attempt to apply what we would say is the correct
11     interpretation of Article 7.1(a) by actually identifying
12     the standards they say are the relevant ones, and they
13     did that in their reply to defence to counterclaim --
14     which you don't need to turn up, but the reference is
15     B2, tab 7, page 11, at paragraphs 28 to 30 -- to
16     pleading, albeit in their expert evidence, a completely
17     different standard to the one articulated in the PSC
18     based upon the hypothetical views of a hypothetical
19     international oil company.  Indeed, in their pre-hearing
20     submissions the respondents go as far as -- and this is
21     at 1.14 of their pre-hearing submissions -- to criticise
22     the claimant's experts for being so foolish as to
23     consider the actual language of the clause in expressing
24     their views on what it means.
25          They also, one page back in their pre-hearing

1      submissions, which is page 5, rely upon a Nigerian
2      Supreme Court authority as to the correct Nigerian law
3      approach to the construction of contracts.
4          Now, in my submission, that authority supports the
5      approach taken by the claimant in this arbitration,
6      rather than that of the respondents, because it says:
7          "The meaning to be placed on a contract is that
8      which is the plain, clear and obvious result of the
9      terms used in the agreement."
10         I am reading from the pre-hearing submissions but
11     the relevant passage is quoted.
12         Then moving further down, four lines from the
13     bottom:
14         "In the construction of documents the question is
15     not what the parties to the document may have intended
16     to do by entering into that document but what is the
17     meaning of the words used in the document.  However,
18     where the meaning of the words used are not clear the
19     court will fall back on the intention behind the words."
20         Now, there is nothing unclear about the words used
21     in Article 7.1(a).  The Article refers to
22     "internationally acceptable petroleum industry practices
23     and standards".  It says nothing about what
24     a hypothetical oil company would consider acceptable,
25     and that's not an interpretation that can sensibly be

1      implied because it doesn't need to be.  Every oil
2      industry employee knows that petroleum operations are
3      covered by a plethora of published practices and
4      standards which have been peer-reviewed and adopted.
5          The parties to this agreement were operating in the
6      deep offshore environment, which was in 2005, and still
7      is today, a particularly hostile, challenging and
8      difficult environment.  It is not surprising that in
9      those circumstances an operator would not be willing to
10     agree to operate to anything other than a very clearly
11     defined standard, and that is the bargain that the
12     parties struck.
13  LORD HOFFMANN:  Well, you say "clearly defined", but the
14     word "acceptable" suggests what the medical negligence
15     people would call the Bolam test, doesn't it?  That is,
16     if you can find a responsible body of opinion who thinks
17     that's the right thing to do, that would be acceptable,
18     even though other people might do things differently.
19  MR NESBITT:  Well, our and our experts' view on this, in the
20     context of the petroleum industry, is that "acceptable"
21     means a practice or standard which has been
22     peer-reviewed and endorsed by the industry at large and
23     written up in that way.
24  LORD HOFFMANN:  That's a higher level of requirement, yes.
25  MR NESBITT:  Yes.

1  MR LEW:  It doesn't mean there is only one practice.
2  MR NESBITT:  Indeed, indeed.
3  MR SHOESMITH:  I think if it helps sir, the Bolam test
4      obviously is setting the bar.  If you find an acceptable
5      standard, what a bank of practitioners might deem to be
6      acceptable, that is a defence.  What we're looking at in
7      the contract, of course, is setting a standard to which
8      NAE must live up to and comply with.  So it is quite
9      right.  I think it two sides of the same coin: NAE must
10     not fall short of the higher threshold of peer-reviewed
11     embedded standards but, of course, part of that would be
12     that if it lived up to a standard that its peers
13     considered to be broadly acceptable, then it would not
14     have fallen short.
15  LORD HOFFMANN:  Well, that's what I had in mind.
16  MR SHOESMITH:  Yes.
17  LORD HOFFMANN:  I mean, you might get a situation where peer
18     review and so forth establishes that that's the only way
19     to do it.  On the other hand, you might get a situation
20     in which people have different views on how it ought to
21     be done, and in that situation one would normally say,
22     well, if there is a respectable body of people who think
23     that's the right way of doing it, then that counts as
24     an acceptable way of doing it, even though somebody else
25     might do differently.

Day 1                           NAE Arbitration                           15 June 2016

1   THE CHAIRMAN:  Aren't you putting quite a gloss on these
2       words, though?  There is no mention of peer review or
3       anything like that in these words.
4   MR NESBITT:  Well, one has to interpret what the words mean
5       and that is our interpretation.  It doesn't say
6       "peer-reviewed", but that is what the experts understand
7       those words to mean.
8   LORD HOFFMANN:  Acceptable?
9   MR NESBITT:  Yes.  But equally --
10  THE CHAIRMAN:  The experts are expressing their opinion in
11      their area of expertise.  We have to interpret the
12      contract.
13  MR NESBITT:  Yes, and the experts are trying to assist with
14      that.
15  MR LEW:  Two experts might reach different views.
16  MR NESBITT:  Well, we have three experts who have reached
17      the same view and one who has a different view.
18  LORD HOFFMANN:  Well, exactly.  I am trying to make a point
19      in your favour, actually.
20  MR NESBITT:  Yes, I understand that.
21  LORD HOFFMANN:  You may not recognise it as such.
22  MR NESBITT:  Well, when you read the respondents' experts'
23      expert reports, there Mr Dyson says that he is applying
24      the test of what would be acceptable to a hypothetical
25      international oil company.  And that's all very well,

                              Page 53

1   of their eggs in the Article 7.1(a) basket, so that's
2       what we are dealing with.
3       Secondly, as I've said, the parties were operating
4   in the deep offshore world and obviously NAE would not
5   have wanted to be held to any higher a standard than it
6   felt it was comfortable with.
7       In any event, in fact Article 7.1(a) is not the only
8   contractual restraint, if you like, on NAE's conduct.
9   Article 7.1(k) also requires NAE to indemnify Allied
10  against loss and damage as a result of negligence, and
11  that's something which the respondents have expressly
12  confirmed they do not allege in this arbitration.
13      Turning now, if I may, to the matters in respect of
14  which breach is alleged.
15      As originally set out in the counterclaims, it was
16  said that there were five matters which gave rise to
17  breaches of Article 7.1(a): drilling, cementing,
18  production, the management and implementation of the
19  GSO, and the failure to re-inject gas and the
20  corresponding gas flaring.
21      Now, according to 1.15 of the respondents'
22  pre-hearing submission, that has now been reduced down
23  to two: cementing and aggressive production.  That does
24  not come as a particular surprise and is fairly typical
25  of the way in which the respondents have changed their

                              Page 55

1   but when you actually look at what he says in his
2       reports it is pretty clear that what he's really
3       applying is his own subjective view of whether what NAE
4       did or didn't do would have been approved by his
5       hypothetical international oil operator.  In the vast
6       majority of cases that he refers to, there's actually no
7       analysis or explanation of why he believes that to be
8       the case.  He might conceivably have referred to what
9       another company with similar attributes to NAE actually
10      did in similar circumstances, but there's none of that
11      analysis.  It is hypothetical in the extreme.  Indeed,
12      he rarely makes references to what he says are examples
13      of practices and standards exhibited to his report.  We
14      say that that type of test is not what the contract
15      intended and, even if you feel that you need to give
16      consideration to the parties' intentions, that can't be
17      what they intended.
18      I think one of the points made or suggested by the
19      respondents in their pre-hearing submission is that,
20      well, if you interpret Article 7.1(a) as we do, that is
21      relatively narrow and so there might be operations where
22      NAE is effectively operating without any restraint or in
23      a vacuum, or whatever way you want to put it.  In
24      response to that, first of all, we're obviously
25      responding to the respondents' case.  They have put all

                              Page 54

1   case as the arbitration has proceeded.
2       That change is perhaps most striking in respect of
3   the gas shut off, the GSO, where the claim seems to have
4   changed from very specific operational aspects of the
5   GSO, such as the procurement and functioning of packers,
6   et cetera, as Mr Shoesmith mentioned, down to the issue
7   it would seem of whether or not it can fairly have been
8   described as successful.  The Tribunal will recall that
9   the respondents devoted large sections of their
10  pleadings and expert evidence to the GSO, only for their
11  expert ultimately to concede that the original plan was
12  technically and operationally sound, that the
13  contingency plan that NAE put in place was the only
14  option in the circumstances, and that risks were
15  successfully managed, et cetera, and that the operation
16  was successful in placing what's called the MaraSEAL
17  polymer into the target formation.
18      The Tribunal will have seen that in our covering
19  letter sent with our pre-hearing submissions we picked
20  up on this apparent shift in position after we'd seen
21  the respondents' list of issues and asked them to
22  confirm that they had dropped their allegation of breach
23  of 7.1(a) in respect of specifically the GSO, although
24  we have not had a response to that invitation.
25      Now, just pausing there for a moment.  Of course,

                              Page 56

                                          14 (Pages 53 to 56)

1    the technical matters which underlie the counterclaims
2    are very interesting, and one can, and indeed one has,
3    spent hours, days and weeks as a layperson getting one's
4    head around them.  Of course, because they've been
5    raised, we have to deal with them in considerable
6    detail.  But at the risk of stating the obvious, just
7    because they are technical and complex doesn't mean that
8    they are of any substance as legal claims.
9        Turning to the first of the respondents' surviving
10   allegations relating to the cementing of the 9 5/8
11   section of the well.
12       As we set out in our submissions that claim
13   originally consisted of eight separate elements,
14   a number of which were abandoned at the expert evidence
15   stage.  But essentially the fact remains that the
16   respondents have adduced no proof positive that the
17   cementing was actually defective, quite aside from the
18   question of the execution of the cementing job.  Rather,
19   they are limited to criticising aspects of the execution
20   and the evaluation of the cementing work.
21       Now, we've addressed each of those aspects at length
22   in our witness and expert evidence.  We say that there
23   is nothing to them.  Indeed, the respondents don't
24   really tackle NAE's or its experts' positions head on.
25   So, for example, one allegation is that NAE should have

1    shown, an analysis of the temperature results from the
2    PLT data, which was conducted as part of the GSO
3    operation in an effort to identify the source of the
4    gas, shows convincingly that the gas entering the well
5    closest to the area around the casing shoe could not
6    have been travelling behind the casing, which it
7    would have been had there been a channel in with cement,
8    and because if had the PLT data would have shown
9    a temperature cooling effect, and there is no evidence
10   on the PLT data of any such effect.
11       Turning to the production allegations, these
12   effectively amount to an allegation that NAE's approach
13   was too aggressive in terms of bean-up Oyo-5, with too
14   wide a choke size, and in its management of ongoing
15   production.  Although, as the arbitration has
16   progressed, the respondents and their experts have now
17   accepted that the relevant measure is drawdown, rather
18   than choke size.  That is the pressure differential at
19   the bottom of the well essentially.  This is expressly
20   conceded by Mr Dyson who says in terms that the key
21   parameter during bean-up and production of an oil and
22   gas well is drawdown and choke size.  The reference
23   there is the joint report at E3, tab 3, page 63.
24       Unfortunately, the respondents' experts rather got
25   off on the wrong foot by claiming that the initial

1    conducted what's called reciprocation and rotation of
2    the casing as part of the cementing job.  Reciprocation
3    is moving the casing up and down.  Rotation is rotating
4    it.  Although in the pre-hearing submission there is no
5    mention of reciprocation, only rotation.
6        But the point I am making is the respondents don't
7    really make any attempt to address the evidence of NAE's
8    expert, Mr Kellingray and indeed their fact witness
9    Mr Minelli as why it would be extremely foolhardy to
10   attempt any casing movement on any deep offshore subsea
11   well.  Equally.
12       As regards the segmented bond tool, the SBT log,
13   which NAE ran over the casing and originally, of course,
14   as we know, the respondents had claimed that it was
15   something called a CBL, which is something different and
16   a less-sophisticated type of cement evaluation, it is
17   common ground between the experts that the SBT log was
18   inconclusive, and in circumstances where all other
19   indicators suggested that the cement job was
20   satisfactory, any decision by NAE other than to drill
21   ahead and carry on would have been inconsistent with
22   NAE's obligation to avoid waste and obtain maximum
23   recovery of crude oil at minimum cost.
24       In any event, and we'll touch upon this when we get
25   to causation as well, as NAE's expert, Mr Crumpton, has

1    drawdown applied by NAE during bean-up had been 400 psi,
2    pounds per square inch, which is the unit of measure for
3    drawdown.  In fact it was about a quarter of that and,
4    indeed, was expressly recognised as not being
5    an aggressive level of drawdown by the respondents' own
6    technical team in a report that they wrote after the GSO
7    had been completed.  The reference to that is
8    bundle G16, tab 441, at page 5.
9        So, as we said in our pre-hearing submission, there
10   is a lot of reverse engineering going on.  NAE's
11   position is, in summary, on our interpretation of
12   Article 7.1(a) that there are no applicable standards,
13   either as regards the bean-up process or the level of
14   drawdown to apply during production.  The evidence shows
15   that the drawdown was carefully monitored in an effort
16   to strike a balance between the gas entry, which was
17   happening, and maintaining for production at economic
18   rates in accordance with Article 7.1(a).  In any event,
19   as Mr Nigido testifies in his statement, even when the
20   choke size was reduced, there was no evidence that it
21   affected the gas ratio.  It stayed the same.
22       In this context, it's helpful to compare the
23   drawdowns that applied on the bean-up of Oyo-5 with
24   those applied on the bean-up of Oyo-7, which is the new
25   well drilled by the respondents in 2014.

1     Could I also ask you to take out bundle E2, tab 1,
2 at page 65.
3     Bundle 6.  It is actually the same.  So page 65,
4 120.  It also says 65 in the bundle numbering.
5 MR LEW:  E2?
6 MR NESBITT:  Bundle E2, tab 1, is the Navigant report.
7 MR LEW:  It's at page ...?
8 MR NESBITT:  65.  But looking first at the slide, at the top
9     of the slide is the Oyo-7 bean-up programme, and that's
10     been taken from an exhibit to Mr Dyson's report,
11     exhibit MJD23, and it's a bean-up plan which Mr Dyson
12     expressly confirms accords with his interpretation of
13     internationally acceptable petroleum industry practices
14     and standards.  He says that on page 65 in front of you
15     at paragraph 7.2.14:
16     "By way of example, the bean-up of the subsequent
17     Oyo-7 and Oyo-8 wells, Allied/Erin did provide suitable
18     bean-up programmes along the lines required by
19     internationally acceptable petroleum industry practices
20     and standards."
21     Although he doesn't, as I said earlier, identify
22 what those standards are.
23     Going back to the slide, below the actual actual
24     drawdown data for Oyo-5.  I will come back to that in
25     a moment, but if I could ask you to stay in tab 1 and

1 turn to page 79, page 79, tab 1, and I am now looking at
2 paragraph 7.5.5 about halfway through that paragraph,
3 Mr Dyson says:
4     "The approach to the commencement of production
5 taken with Oyo-7 and Oyo-8, which drained the same
6 reservoir targeted by Oyo-5, was prudent and much more
7 careful than NAE's approach.  Both wells were carefully
8 and gradually beaned up in a controlled manner starting
9 with smaller choke sizes than those used by NAE.  In the
10 first to eight to nine months of production I understand
11 that there has been virtually no gas produced from these
12 wells."
13     So the basis for Mr Dyson's statement appears to be
14 that the bean-up on Oyo-7 started with smaller choke
15 sizes and that the steps between each new choke size
16 applied were smaller, and so you can see in the table at
17 the top on the left-hand column is the choke size, and
18 in the third column what's called "bean-up cumulative
19 time" is the cumulative period of time at which the
20 choke was kept at that size.
21     But when you look at the drawdown figures, which you
22 can see in the penultimate column of each table, you can
23 see that the drawdown planned for Oyo-7 was actually to
24 be stepped up much more rapidly than on Oyo-5.
25     So if you look at, first of all, the Oyo-7 bean-up

1 programme, in the third column that I referred to,
2 "bean-up cumulative time", by the time you get to 105 --
3 is it 105? -- 105 hours and you then look across at
4 drawdown, it says 104, but you need to go down one to
5 117 because what that means is that when you get to 105
6 hours drawdown is then stepped up to 117.  So that was
7 planning a maximum drawdown of 117 psi accumulative time
8 to reach that value of 103 hours.
9     Conversely, if you look down at the Oyo-5 bean-up
10 data, you can see that that involves a maximum drawdown
11 of 112 psi, that's again the penultimate column, the 112
12 figure at the bottom of that column, and that value has
13 been agreed between the experts as the one that was
14 actually used, the cumulative time to reach that value
15 of 169 hours.
16     So a comparison of those two sets of data shows that
17 NAE was actually being very prudent in its approach to
18 bean-up.  It was taking a longer period of time to
19 arrive at a lower drawdown.  It's effectively applying
20 quite similar conditions to those designed for Oyo-7 by
21 Allied.
22     Oyo-5 and Oyo-7 are similar wells and, as Mr Dyson
23 says, they drain the same reservoir.  It's also relevant
24 to bear in mind that NAE's approach to bean-up was taken
25 more than five years before the start-up of Oyo-7, and

1 at that time NAE had no knowledge of the very high
2 propensity for gas incursion from the Oyo reservoir,
3 whereas Allied had the benefit of all the relevant
4 accumulated know-how.
5 MR LEW:  This is a question for the experts, are these two
6     wells, these Oyo-5 and Oyo-7, are they comparable?
7 MR NESBITT:  Yes.
8 MR LEW:  They are?
9 MR NESBITT:  Yes.  When you say "comparable", do you mean in
10     their design, in their shape --
11 MR LEW:  In their design, in their shape, in the amount of
12     production they can carry?  Often when you move
13     somewhere down the road in an oil field, things will
14     change, for better or worse, depending upon the exact
15     situation.  (Pause.)
16 MR NESBITT:  Based on what we know, we believe that they are
17     very similar wells, but obviously it is their well and
18     we don't have access to all of the technical data, such
19     as that which you referred to.
20 MR LEW:  Thank you.
21 MR NESBITT:  As regards the GSO, as I mentioned the latest
22     formulation of Allied's case suggests, although without
23     expressly confirming, that Allied no longer relies on
24     the matters complained of in respect of the GSO as
25     breaches of contract.  Instead, their position seems to

1  be that it is entitled to claim wasted because of the
2  GSO as part of its damages on the basis that the GSO
3  wasn't successful.
4     We'll see what approach is taken today but it
5  appears that it may well be the case that the vast
6  majority of Mr Dyson's and Mr Crumpton's evidence on the
7  GSO's execution may now have been rendered irrelevant by
8  that shift of position.
9     On gas reinjection and flaring, there really is very
10  little to say.  A claim in relation to a supposed drop
11  in reservoir pressure was trailed in the respondents'
12  pleadings but has never materialise.  There is no
13  quantification on either a "but for" or an actual basis
14  of reservoir pressure by any of Allied's experts.  So
15  the only surviving relevance of gas flaring seems to be
16  the DPR find, which we address in our pre-hearing
17  submissions at 7.1 to 7.10.
18     You can put bundle E away if you wish.
19     In short, for all of the reasons which are set out
20  in a great more detail in our fact and expert evidence,
21  we say that the respondents don't come close to making
22  out any breach of Article 7.1(a).
23     But even if that were found to be incorrect, that
24  does not, of course, get the respondents flaring home.  They
25  must then prove that, firstly, if there was a breach,

1  Oyo-7 as follows.
2     So the top chart is the Oyo-7 oil rate.  The bottom
3  chart is the Oyo-7 gas-oil ratio.  He identifies the
4  breakthrough taking place in August 2015, I believe,
5  about 70 days after the start of production.
6     So NAE's position is that this demonstrates that the
7  problem of gas incursion from the Oyo field is linked to
8  specific reservoir features, as will be seen,
9  essentially a very high level of permeability, in
10  combination with what are referred to as dipping strata
11  or sloping rock formations, in particular, at the heel
12  of the Oyo well which were not known at the initial
13  field start-up.
14     So there is no causal link between NAE's work as
15  operator and the gas ingression.
16     But even if there were, the respondents have not
17  come close to establishing a proper causal link between
18  the gas ingression and the supposed damages that they
19  claim by way of alleged volumes of lost production.
20     Because key to Dr Moy's forecasts is one very big
21  assumption: the drilling of two additional wills in the
22  Oyo field, Oyo-7 and Oyo-8, would have been brought
23  forward in one case almost two years and in the other
24  about six months.  This is admitted in terms by the
25  respondents in their pre-hearing submission.  They say,

1  that it caused the gas ingression and, secondly, if it
2  did cause the gas ingression, that it caused a loss of
3  production to the respondents.  That's how they framed
4  their quantum claim: in terms of loss of oil production.
5     As regards the cementing, as I have already
6  mentioned, the evidence and in particular the production
7  logging tool data, the PLT data, shows that the gas
8  cannot have been entering via a channel in the cement.
9  That is also supported by Mr Filippi, who has modelled
10  the effect of a gas breakthrough attributable to
11  a cement channel and concluded that there was none.
12     As regards production, as I've already said, the
13  beaning process and drawdown applied was low, lower than
14  that planned for Oyo-7 by Allied, and lowering it
15  further had no effect on the gas-oil ratio.
16     In any event, as we'll see when we come to consider
17  the evidence in due course, the effect of the gas
18  breakthrough was not the cementing or the approach to
19  production -- neither of which, as I've said, was
20  performed in breach of any applicable industry standards
21  in any case -- but the natural features of the
22  reservoir.  As Mr Filippi will explain, despite the
23  respondents' claims to the contrary and despite all the
24  precautions apparently taken, there is also early gas
25  breakthrough on Oyo-7 and Oyo-8, shown by Mr Filippi on

1  at 8.9:
2     "The key driver in the value difference between the
3  two production forecasts [that is Dr Moy's forecast
4  versus Mr Filippi's forecast] is the production profile
5  over time and, in particular, the dates on which the
6  Oyo B and Oyo C [for which read Oyo-7 and Oyo-8] would
7  have been drilled in the 'but for' scenario."
8     Now, the sole evidential basis for this is
9  a paragraph of one witness statement where the witness
10  says that the two wells would likely have been drilled
11  and completed by mid-2012.
12     In my submission, proof to the required standard
13  that a significant undertaking, such as the drilling of
14  a deep offshore well, would have been planned, budgeted
15  for, approved and executed far earlier than it actually
16  was, needs a lot more than one paragraph in a witness
17  statement.  The respondents know that perfectly well.
18  They've tried to address the point at 8.16 of their
19  pre-hearing submissions.
20     But, frankly, those submissions don't add any
21  additional support to what is said in the witness
22  statement -- it is the statement of Mr Omidele -- and
23  even the respondents are forced to concede, as they do
24  at 8.19 of their pre-hearing submissions, the obvious
25  point that:

1    "There can be no exact certainty as to when Oyo-7
2    and Oyo-8 would have been drilled in the 'but for'
3    world."
4        But even if -- and now we're getting to the outer
5    realms of Wonderland, perhaps -- the causation hurdles
6    and all of the other hurdles could be overcome, the
7    respondents still need to prove their loss.  For that,
8    they are dependent in the first place on Dr Moy.  If
9    Dr Moy's reservoir model is not reliable, if the
10   modifications he has made to it are not appropriate and
11   if his production forecasts do not match history, then
12   if there is anything left of the house of cards at that
13   point it collapses completely.
14       We have set out at 14.3 to 14.25 of our pre-hearing
15   submissions the key respects in which we say Dr Moy's
16   ever-changing forecasts and the flawed model from which
17   they are derived show that his forecasts are not
18   reliable.  There is clearly not enough to time them all
19   this morning -- and in any event that's a task that is
20   perhaps best left to Mr Filippi and Dr Moy himself --
21   but I will give just one recent example.  The Tribunal
22   will recall that following the service of Dr Moy's
23   original report on 19 February, without leave, on
24   24 February, an amended version of his report was
25   produced, containing amended oil production rates for

1    a rock formation to transmit fluids, such as, gas, oil or
2    water, and it is measured in something called darcies.
3    It is important in this case as the Oyo reservoir was
4    found to have a significantly higher level of
5    permeability, as I mentioned a moment ago, than was
6    initially thought.
7        So logically the higher the multiple you use, the
8    higher the permeability in your model.  Its significance
9    is that a higher permeability results in more oil being
10   produced and less gas.  That is reflected in Dr Moy's
11   revised actual forecasts in his amended report, which
12   are higher than in his original report.
13       Could I ask you to take bundle E3 -- that's the
14   bundle containing all of the expert joint reports -- and
15   turn to tab 5.  This is the reservoir experts' joint
16   report.  I am now looking, first of all, at page 193.
17   The paragraph number is 6.15.2.5 in the middle of the
18   page.  Here Dr Moy says:
19       "The plots showed in figures 4, 5 and 43 as 'Dr Moy'
20   of BF1 have been taken from 'Actual_v2_3 ...'"
21       That's the forecast you saw him referring to in his
22   letter to Stephenson Harwood a moment ago:
23       "... however this has been run as a 'but for' case
24   with a global multiplier of 0.2, instead of 0.1.  This
25   results in a less gassy Oyo-5 and consequent impact on

1    Oyo-5 and different forecasts for the other wells.
2        If I could ask you, having asked you to put it away,
3    to retrieve bundle E2 and turn to tab 3, this is
4    Dr Moy's covering letter to Mr Wade at
5    Stephenson Harwood, containing his explanation of why he
6    has amended his expert report.  I am looking here at the
7    second numbered paragraph of the letter, where he says:
8        "I have further confirmed that the reservoir model
9    I developed applied a global permeability modifier of
10   0.2 ...  This was based on the core and well test
11   permeabilities (which are not mentioned in the D&M)
12   report).  It was therefore necessary to ensure that the
13   same modifier value was used in all the models, and as
14   a consequence I amended the 'Actual_v2_3' scenarios."
15       Figures, tables and their footnotes, et cetera, have
16   been revised.
17       Now, the key bit really is that he says "it was ...
18   necessary to ensure that the same modifier value was
19   used in all the models".
20       Just for information purposes, the global
21   permeability modifier is essentially a multiple which is
22   used to dictate the degree of permeability that you
23   ascribe to the reservoir in your model.  I am sure that
24   the Tribunal has understood what permeability means in
25   this context, but essentially it is the ability of

1    overall reservoir pressure and well performance.
2    I acknowledge that this run was incorrectly run with
3    a multiplier of 0.2 and I present in Appendix 9.4 ...
4    the results of the same run but using a multiplier of
5    0.1."
6        So essentially Dr Moy seems to have changed his mind
7    back again.  He now says that his actual production
8    forecast was incorrectly run and he has rerun it using
9    his original multiplier of 0.1.  The result of that is
10   lower oil production forecast from the Oyo field than
11   Dr Moy has stated in his amended report, and of course
12   a commensurate increase in the quantum of the
13   respondents' supposed damages.
14       Now, apart from the lack of confidence that, in our
15   submission, that should inspire in the reliability of
16   Dr Moy's forecasts, by reverting to his original
17   approach and using a multiplier of 0.2 in his "but for"
18   forecasts and 0.1 in his actual forecasts, if I can put
19   it this way he has given the "but for" reservoir double
20   the permeability of the actual reservoir, which means
21   when the resulting production forecasts are used to
22   calculate a damages claim by comparing the two sets of
23   forecasts, one is essentially comparing apples with
24   oranges.  Moreover, until yesterday evening, Dr Moy's
25   new figures didn't just alter the forecast actual

1  production starting from January 2016, they also changed
2  the figures for actual measured production from the
3  field up until December 2015.
4      Now, that is known production data.  It can't be
5  changed.  In other words, in an apparent attempt to
6  improve his history match, his historical production
7  figures no longer matched actual history.  Although
8  under cover of the email that we received from
9  Stephenson Harwood just before 8 o'clock last night, as
10  Mr Shoesmith mentioned, Dr Moy submitted a yet further
11  revised version of one of his forecasts, together with
12  a covering letter in which he states that the table he
13  included in the joint report the week previously was not
14  the one appropriate, which is I think another way of
15  saying wrong, and that his error this time around was
16  that he had used historic gas rates rather than
17  historical oil rates as the basis for his revised
18  forecast.
19      I will leave it to Mr Filippi to comment in due
20  course on whether or not that is an acceptable order of
21  error in the circumstances.
22      I probably have about ten minutes left, Mr Chairman,
23  if you're willing to indulge me?
24  THE CHAIRMAN:  Yes.
25  MR NESBITT:  Now, on the GSO wasted costs claim, the fact,

1  of course, is that the respondent had agreed in the side
2  agreement, that's the one approved at the Macom
3  meeting -- and you'll find it, although you don't need
4  to turn it up, in bundle G12, tab 291, page 18 -- to pay
5  the GSO costs, and that agreement wasn't in any sense
6  express or implied, conditional on the outcome of the
7  GSO operation.
8      In any event, it's clear from the evidence that the
9  respondents knew that a successful outcome, in the sense
10  of successfully shutting off the gas from entering the
11  well, was not guaranteed.  You can see that from the
12  minutes of the very same Macom meeting at which the
13  respondents agreed to fund the GSO, which is at
14  bundle G12, tab 294, page 102.  No need to turn it up.
15      It is also relevant to note that, as Mr Cerrito
16  explains at paragraphs 35 and 36 of his witness
17  statement, Allied has already recovered the GSO costs
18  from cost oil, from crude oil lifted from the field.
19      Now, finally, for the purposes of opening, the
20  contractual exclusions and acknowledgements set out in
21  clause 12 of the SPA.  So at this point it may be
22  helpful if we go back to bundle A1, tab 1, and you'll
23  find clause 12 beginning at page 26.
24      The principal provisions on which we rely are
25  clauses 12.1(a), 12.2, 12.4 and 12.20.  Although I come

1  to these provisions last, for no better reason than
2  arguably one might say that you only need to consider
3  the limitation provision if there is at least a prima
4  facie case on liability, which for all the reasons we've
5  already discussed we say there isn't, you could just as
6  easily consider them at a preliminary stage, since they
7  are yet a further reason why the counterclaims simply do
8  not get off the ground.
9      However, there is a threshold issue here too, which
10  centres on the respondents' contention, which they still
11  maintain in their pre-hearing submission at 9.9 to 9.15,
12  that the clause 12 exclusions do not apply to claims for
13  breach of the PSC brought in this arbitration, whether
14  they are framed as direct PSC claims or claims under
15  a clause 11.1 indemnity.
16      Now, that is an issue which will already be familiar
17  to the majority of the Tribunal, since, of course, it is
18  one which is ventilated at the preliminary issues
19  hearing in the context of Allied's position in respect
20  of their agreement at clause 12.18 of the SPA, which you
21  don't really need to turn to, but it is the top of
22  page 32, to waive any right of set-off as against their
23  payment obligations in the SPA.
24      The arguments run by Allied at that time -- which
25  for reference you will find in bundle C1, tab 2,

1  page 72, with NAE's arguments at C1, tab 1, page 26 --
2  are broadly the same as the arguments that they are
3  still running today.  They focus on the definition of
4  "Claim" in the SPA.
5      Now, our position is summarised at 18.59 to 18.73 of
6  our pre-hearing submissions.  There are a number of
7  reasons why the respondents are wrong, but the essence
8  of our position is that this is an issue which the
9  Tribunal has already had to determine in the context of
10  clause 12.18, and we think that that determination holds
11  good for all of the limitation provisions set out in
12  clause 12, including the ones we rely on now.
13      Now, as regards, first of all, the clause 11.1
14  indemnity claims, you found in terms that any such
15  claims would be "subject to the limitations and other
16  provisions of the SPA".  I am quoting those words from
17  paragraph 181 of the first partial award.
18      So that's very clear.
19      As regards PSC claims, you found that that
20  interpretation of clause 11.1, that it was subject to
21  the limitations and other provisions of the SPA, had to
22  be applied consistently, with the result that you
23  determined that the purpose of clause 12.8, which is
24  what you were looking at at the time, the set-off
25  waiver, was to exclude any claims relating to the

1  transferred interests, whether they were framed as PSC
2  claims or as clause 11.1 indemnity claims.  If that is
3  right, and obviously we say it is, exactly the same
4  analysis must apply when considering the purpose of any
5  other limitation provision in clause 12.
6      So we say that clause 12 applies to all of the
7  counterclaims.
8      In particular, we say that clause 12.1(a) excludes
9  NAE's liability for all of the counterclaims.
10  Clause 12.1(a) says that:
11      "The seller shall not be liable in respect of any
12  claim to the extent that the matter or circumstance
13  giving rise to the claim was known or should reasonably
14  have been known to the purchaser or its advisers, if
15  any."
16      We say that all of the counterclaims arise out of
17  matters or circumstances which Allied knew or should
18  reasonably have known about by reason of its access to
19  and involvement in the Oyo field and its operations.
20      But what is more, it is clear on the evidence that
21  Allied knew perfectly well that that was the effect of
22  that provision and during negotiations of the SPA they
23  attempted to limit its extent.  This is the last bundle
24  that I will ask you to turn up.  It is bundle G19.  I am
25  going to look at a couple of documents in this bundle.

                            Page 77

1  has deleted Mr Malek's proposed insertion and the clause
2  remains intact.  So, in other words, Allied accepted the
3  scope of clause 12.1(a) in full knowledge of its meaning
4  and consequences.
5      Now, I said earlier that clause 12 provides another
6  ground to dismiss the counterclaims on a preliminary
7  basis.  To reach that conclusion, going back to the SPA
8  and clause 12, and assuming you accept that clause 12
9  does apply to the respondents' counterclaims in this
10  arbitration, you need only read clause 12.2 in
11  conjunction with clause 12.1(a).
12      And clause 12.2(c) says:
13      "Acknowledgement.  Purchaser [that's Allied]
14  acknowledges and agrees that being a part of the
15  contractor under the PSC Allied is fully aware of all
16  information relating to the OMLs, Oyo field, the PSC,
17  all related contracts and all the related matters
18  thereof."
19      In other words, when considering the applicability
20  of clause 12.1(a), essentially you don't really need to
21  investigate whether as a matter of fact the evidence
22  demonstrates that Allied knew or should have known of
23  the relevant matters or circumstances, because the
24  bargain struck between the parties was that they agreed
25  and Allied in particular expressly agreed that it knew

                            Page 79

1      First of all, tab 509 the first page, which is 245.
2  That's an email from Mr Cerrito of NAE to Mr Malek of
3  Allied/CAMAC, sending a marked-up version of the SPA.
4      If you turn over the page, you'll see the email from
5  Mr Malek that Mr Cerrito is replying to.  This is on
6  23 December 2011, so very shortly before the SPA was
7  signed.
8      In paragraph 1 he says:
9      "Clause 12.1(a).  Allied very reluctantly accepts
10  the exclusions listed in clause 12.1(a), except that
11  these should only apply to claims arising out of
12  breaches of seller's warranty rather than oil claims.
13  We should not be precluded from asserting a claim if NAE
14  fails to honour its indemnity obligations in relation to
15  gas flaring, for example, simply because of an argument
16  Allied should have known that there could be liability
17  for gas flaring.  While we disagree with them, types of
18  exclusion listed in 12.1(a) can only make sense in the
19  context of warranties and not for claims relating to
20  breaches of covenants and indemnities, such as the gas
21  flaring indemnity."
22      However, that was not agreed.
23      If you turn to, in the same tab, page 275, and
24  remembering that this is NAE's markup of the SPA sent
25  back to Mr Malek, you can see at the top, 12.1(a), NAE

                            Page 78

1  everything.  That also makes claims of the kind made in
2  this arbitration, to borrow Mr Shoesmith's phrase,
3  legally impossible.  But that is not all.
4      If you still have, and I hope you have, bundle G19,
5  if you turn back to tab 506, that's the first tab in the
6  bundle, this is an earlier email than the one we just
7  looked at from Mr Malek to Mr Cerrito of
8  20 December 2011.  This is attaching Allied's proposed
9  amendments to the SPA.
10      If you turn to page 29 in the same tab, this
11  evidences that at that point in the parties' discussions
12  Mr Malek had also attempted to strike out clause 12.2.
13  You can see he's highlighted it -- sorry, 12.2(d), which
14  it was at that time.  He's highlighted it, and this is
15  the reason he gives:
16      "Delete (c) and (d).  Given that seller is already
17  providing very limited warranties and that Allied has
18  complained on numerous occasions that NAE is not
19  providing the information to which Allied is entitled,
20  clause (d) is inappropriate."
21      But, again, clause 12.2 was untouched in the final
22  agreement.  In other words, Allied knew perfectly well
23  what the effect of that agreement was, attempted to
24  negotiate it away, failed and ultimately accepted it
25  with their eyes wide open.

                            Page 80

1    But --
2    MR LEW:  Forgive me, where was your comment that you just
3        made on Allied's view on the draft of 12.2(c) and (d)?
4    MR NESBITT:  Sorry, it is page 29 at the bottom.  So do you
5        see 12.2(d)?  Page 29 in the bundle, 27 in the draft.
6    MR LEW:  Yes, I have that.
7    MR NESBITT:  Yes.
8    MR LEW:  I see.  The clause is underneath that.
9    MR NESBITT:  Yes.  It is in square brackets and begins with
10        the words "Delete (c) and (d)".  But if we're wrong on
11        all of that at 18.1 to 18.58 of our pre-hearing
12        submission we have summarised the detailed facts, which
13        demonstrate that as a matter of fact the respondents did
14        in any event possess the relevant knowledge of the
15        matters and circumstances which are alleged to give rise
16        to the counterclaims by reference to each constituent
17        element of the counterclaims as they were originally
18        pleaded.
19        In our submission, the facts speak for themselves.
20        Everything that is now claimed by the respondents to
21        constitute a breach of 7.1(a) in this arbitration is
22        something which the respondents and their personnel were
23        fully aware of.
24        So in conclusion, for all of the reasons outlined in
25        our pleadings, submissions, evidence, the reasons

1    outlined by Mr Shoesmith, these counterclaims are not
2        only wholly without merit but, frankly, given the
3        obvious nature of that lack of merit and the time and
4        effort and above all the huge expense involved in
5        addressing them, they are little short of scandalous.
6        Mr Chairman, unless I can assist you any further,
7        those are my submissions.
8    THE CHAIRMAN:  Thank you very much.  Shall we now have
9        a break until 2 o'clock?  Does that give everyone enough
10        time?  We will resume at 2 o'clock with the respondents.
11        Thank you.
12    (1.09 pm)
13        (The short adjournment)
14    (2.00 pm)
15        Opening submissions by MR WADE
16    THE CHAIRMAN:  Mr Wade.
17    MR WADE:  Thank you, sir.  These are the counter-claimant or
18        respondents' opening submissions for this hearing.
19        Before I begin, I know I have already made
20        a reservation of rights, but I will just refer back to
21        those reservation of rights and state them again for the
22        record.  No need to repeat them verbatim.
23        I will stay on that slide for a little bit.  The
24        difficulties of using slides, I recall that the chairman
25        noted that he likes to receive slides of opening

1    submissions and so we prepared a set, even if we're not
2        entirely accustomed to doing that.
3        There are a number of introductory points I would
4        like to make on that slide, and the first is that in the
5        course of their pre-hearing submissions served last
6        week, the claimants have introduced an entirely new
7        argument in respect of novations, which rely heavily,
8        although we didn't hear it today they were introduced by
9        Mr Shoesmith, but they rely heavily on an interpretation
10        of Nigerian case law.  So we reserve the right -- we
11        will not deal with those submissions at this point, but
12        we will respond to them in the written closing
13        submissions that are anticipated, and we are in the
14        process of obtaining the necessary Nigerian law input on
15        those.  We understand, even from a preliminary review,
16        subject to what we would say in the end, that they
17        depend on the misconstruction of the law of standing and
18        locus standi.
19        So we reject those submissions but we will respond
20        in detail in due course.
21        The other introductory comment I will make, is that,
22        as you know, Mr Gunning QC has kindly agreed to share
23        the burden of my submissions with me, and the way we
24        have split the tasks between us is that he has agreed to
25        take on the task of introducing and explaining the

1    technical aspects of the case, and we have referred to
2        that quite loosely, they deal mostly with our
3        counterclaim side, and I will shortly ask him to
4        introduce those aspects to you after I deal with the
5        first preliminary question of the construction of
6        Article 7.1 of the PSC.
7        After Mr Gunning's comments, I will return and deal
8        again at a high level with certain aspects of the case,
9        bearing in mind your other comment, Mr Chairman, that
10        you do not want to hear an entire exposition of the case
11        again.  I am grateful to you for that guidance.
12        Hopefully we will hit the high and the low points of
13        both parties' submissions.  Of course, if you have any
14        questions then please do ask them at any point.
15        Like the claimants, I, speaking for myself, don't
16        intend to take you to many of the documents at this
17        point.  But, again, if you would like to see any
18        particular document, then please do ask and stop me, and
19        I will probably take you to one or two apart from that.
20        So turning, then, to the question of PSC
21        Article 7.1(a), the text is on screen in front of you.
22        Otherwise you have seen it in the bundle already today.
23        The first question you need to think about when you
24        look at this clause is the rules of interpretation that
25        apply to it.  In our submission, it is the case of

1    Adetoun v NB Plc, which guides you on Nigerian law as to
2    the interpretation of that clause.  You have already
3    read through that paragraph today.
4        There is nothing in particular which is surprising
5    in the approach taken by the Nigerian courts.  They
6    formulate it slightly differently perhaps to other
7    courts, but the basic approach is if the words are clear
8    you don't need to construe them very far, only when
9    there is uncertainty do you need to look behind the
10   words.
11       In addition to that when looking at this clause, we
12   say you need to look at the context in which the clause
13   was agreed, and that context we have submitted and
14   continue to submit relates to the oil and gas industry,
15   and you will be aware, and we have submitted in our
16   opening, that these types of clauses are quite common
17   and seen in many similar contracts.
18       The first point we would make about it is that --
19   and this will be obvious, so I apologise for stating the
20   obvious -- this clause was negotiated between two
21   parties and included in their agreement, and it must
22   have some meaning.  It can't mean nothing.
23       The reason why I pause on that point is because, as
24   Lord Hoffmann, in making a point in favour of the
25   claimant and pausing on the Bolam test, which is similar

1    to the content of this clause, thought that this is
2    quite similar to a test where if there are other
3    companies of a similar nature who would adopt
4    a particular course of action, this clause sounds like
5    that kind of test.  He was a bit surprised, I think to
6    hear the claimant not adopting that test wholeheartedly.
7        The reason the claimant doesn't adopt that test is
8    because they say it is to be construed solely to apply
9    to a test of where there is -- to apply the standards as
10   to the -- what is their words? -- a standard imposed by
11   a peer-reviewed document which is written and published.
12       What they also say is that where there is no
13   peer-reviewed standard, then it is impossible for there
14   to be any standard and, therefore, they can do what they
15   want.  That is why they don't want to be in a world
16   where their conduct has to be measured against what
17   other similar companies would do.  They prefer the world
18   where, if it's not a peer-reviewed standard, there is no
19   standard and they are free to do what they want.  We say
20   that is not the correct construction of this term.
21       What is clear is that when the parties agreed to
22   internationally acceptable practices and standards, they
23   were aiming at something which was higher than just what
24   a particular operator wants to do or feels is
25   appropriate in the moment.  What they were aiming at was

1    a standard which any international operator of a similar
2    stature, any IOC would consider to be acceptable,
3    whether it was being applied in Nigeria or in the North
4    Sea or in the Gulf of Mexico.
5        They were not accepting a parochial national
6    standard, but they were looking for the international
7    quality of operatorship which is implied by the plain
8    language of this clause.
9    MR LEW:  Do you accept that there can be internationally
10   acceptable standards which would be different for
11   different oil fields?
12   MR WADE:  We do accept that, and we accept also that the
13   applicable standards and practices will vary from one
14   circumstance to the other.
15       So the test does have a -- not a subjective element
16   but an element which is directed at the operation that
17   the operator is conducting at the particular time.  That
18   is why we say that the test that Mr Dyson has asked
19   himself can form as a helpful guide to the Tribunal,
20   because he is asking: would an organisation with
21   a significant international experience operating oil and
22   gas fields have considered in the relevant time and the
23   relevant actions that what they were doing was
24   acceptable?
25       That can help you apply the standard, which the

1    parties have agreed to a particular set of
2    circumstances.  That is not to say that peer-reviewed
3    documents can't guide you and shouldn't have guided the
4    parties.  Certainly that's part of the plethora of
5    information sources that operators should have regard to
6    and operators complying with this clause should also
7    have regard to.
8        So we have listed a number of sources which we say
9    that the Tribunal can look at, and they include expert
10   opinion.  They include IOC manuals and recommended
11   practices.  They certainly include trade publications
12   and academic publication and, of course, the API
13   recommendations and practices.
14       There is one more point that I would like to touch
15   on before I hand over to Mr Gunning, and that is one of
16   the claims made by the claimants which can be quite
17   easily disposed of.  They say that this clause on its
18   wording can only apply if we identify a work programme,
19   because it applies to preparing work programmes, and
20   they say we haven't identified a work programme.
21       That is a bit of a red herring, because it was the
22   claimants' obligation to work to a work programme, and
23   if they weren't, then they are equally in breach.  So it
24   is their obligation to do one.  And the suggestion that
25   if they weren't working to a work programme and were

1    already in breach then they escape the standard that
2    they were meant to work to because they haven't worked
3    to a work programme is easily dismissed.  It makes no
4    sense.  It is relying on one's own breach to avoid its
5    obligation.
6    MR LEW:  Is there a particular work programme that you say
7        that they did not observe or did not follow?
8    MR WADE:  The drilling of Oyo-5 and production from it was
9        done to a work programme, but it was not breached in the
10       sense that the well wasn't drilled.  It wasn't drilled
11       well.  The well wasn't drilled properly and wasn't
12       completed properly and production from it wasn't
13       produced properly.
14   MR LEW:  So are you saying that that was not done in
15       accordance with internationally acceptable --
16   MR WADE:  Standards.
17   MR LEW:  -- standards?
18   MR WADE:  Correct.
19   MR LEW:  But that is a work programme that you say exists?
20   MR WADE:  It does exist, yes.
21   MR LEW:  And is that the only work programme you say they
22       didn't work to?
23   MR WADE:  Yes.  I am saying it's irrelevant, though.  I am
24       saying if they didn't work to a work programme, then
25       that's their breach and they can't rely on it to escape

1    suck eggs, and cut me off if what I am saying is too
2    simple.  Probably what I am going to start is so
3    exceptionally simple that you will regard it as mildly
4    offensive.  It is this simply this, that oil and gas
5    deposits are contained within sedimentary rocks.  The
6    rocks are formed by sediments that are deposited in
7    layers on the bottom of rivers, lakes and oceans, and
8    when the sediments are deposited and compacted they do
9    not form a solid mass.  Instead, spaces or pores exist
10   between the grains and the amount of space as
11   a percentage of the total volume of a formation is
12   called its porosity.
13       That is my first basic elementary point.
14       Formation fluids -- so oil, gas and water -- will
15   accumulate in those pores and oil and gas will be formed
16   from the microorganisms that lived and died in the water
17   that formed the sedimentary basin.  The larger the
18   porosity of the rock, the more fluids, the more
19   hydrocarbons that a formation will contain but high
20   porosity doesn't necessarily translate to a high
21   recovery of hydrocarbons.
22       For the ease of extracting hydrocarbons, oil and
23   gas, from the rock, what you want is for the rock to be
24   permeable, and this is a point that Mr Nesbitt touched
25   on earlier.  Permeability is essentially a consequence

1    the quality of the work they should have undertaken.
2    MR LEW:  But it is only in this one area that you say here
3        is a work programme and in following that work programme
4        they didn't apply internationally acceptable standards?
5    MR WADE:  Correct.  That's what I am saying.
6    MR LEW:  Thank you.
7    MR WADE:  With those points, I am going to hand over to
8        Mr Gunning, who will introduce the technical aspects of
9        this case to you.
10             Opening submissions by MR GUNNING
11   MR GUNNING:  I was going to try to spend a few moments
12       talking I hope in a neutral way about some of the basic
13       features of fuel reservoirs and drilling operations
14       before giving a short overview of the respondents'
15       criticisms of the steps taken by NAE.  I am conscious
16       that this is an extremely experienced Tribunal and that
17       some of the matters that I might be covering are
18       slightly elementary, but over the course of the next few
19       days we're going to be getting into some of the detail
20       of the way in which the work was executed, and I wanted
21       to be sure that you're comfortable with the underlying
22       technical basics, so that such questions as I have
23       aren't incapable of being understood.
24       So forgive me if there is an element of teaching
25       grandmothers -- I am not calling you grandmothers -- to

1    of the interconnectivity of the pores.  So if the pores
2    are well connected in a sponge, there will be high
3    permeability.  In very simple terms, the more permeable
4    a formation, the lower the pressure difference is that
5    is required to extract the oil.
6        Certain types of rock are essentially impermeable.
7    For example, shale and silty shale will be basically
8    impermeable, and they will form sometimes a cap on
9    a reservoir.  Sandstone by comparison is typically
10   relatively permeable and so it is sandstone formations
11   that tend to contain the sandstone layers that will tend
12   to contain the oil and gas.  As my learned friend said,
13   the unit of the measurement of fluid permeability is the
14   Darcy, named after Henri Darcy, the French engineer, and
15   when we come to look at these permeabilities you will
16   see they are typically measured in millidarcies or MD.
17       So that's porosity and permeability, and I was going
18   to swiftly mention water saturation.  That is typically
19   measured so that you can work out the residual capacity
20   of the pores to contain hydrocarbons.  So if you know
21   how much water is going to be contained in the space in
22   the rock, then you can work out what the balance might
23   be that could be filled with hydrocarbons.  So a way of
24   working out the volume of oil in place in a formation is
25   you establish its volume, you establish its porosity,

1    you establish its water saturation and then you work out
2    what factor you apply for oil as opposed to gas
3    extraction, and that will you give you an idea of your
4    original oil in place in the reservoir.
5        Now over geological time, because of the relatively
6    buoyancy of gas over oil and oil over water, you will
7    get a separation of layers.  So as you see on the
8    right-hand side, and this is a cutaway view of the Oyo
9    field, you have at the top a cap of gas and then you
10   have underneath that oil and beneath that water.  And
11   the point where the separation occurs between gas and
12   oil is called the gas-oil contact or GOC for short,
13   you'll see quite a bit of reference to that, and the
14   point where the rock separates between containing oil
15   and containing the aquifer is called the water-oil
16   contact, or WOC.  So that's a basic Noddy introduction
17   to some of the features of a reservoir.  Sorry for being
18   basic for it.
19   LORD HOFFMANN:  Speaking for myself, I am very grateful.
20   MR GUNNING:  One of the things that you will see it is
21   sometimes necessary to model the feature of a reservoir.
22   And the right-hand side is an example of such -- I think
23   that's something taken from a model, and this is done by
24   taking a formation and dividing it into a number of grid
25   cells, and then attributing characteristics, such as

Page 93

1    permeability and porosity to each of those grid cells.
2    Then, depending on the computer power of your Apple Mac,
3    or whatever it is, you can run a simulation of what
4    would happen if you were to start extracting oil in that
5    formation.
6        Now, there is a difficulty, as you will see, in
7    terms of the level of detail that you have in each of
8    your grid cells, because ideally -- I mean, the fluids
9    will be flowing essentially through very small areas and
10   small changes can make big differences, but for the
11   purposes of preparing these models often you need big
12   grid cells because otherwise it is impossible to do the
13   computing for them, even with the most sophisticated
14   computers.
15       Now, my next slide was intended to just give you
16   an idea of the layout of the Oyo field.  I found it
17   exceptionally difficult to find a good drawing of this
18   in the bundles.  This was the best I could find.  It's
19   in the Erin summer 2015 investor presentation.  It's not
20   actually perfect, for a reason I will point out to you,
21   but what you can see is that the field is divided into
22   two parts, essentially.  On the right-hand side, so the
23   west side, you have -- well, on the east side, rather,
24   you have something which says the central area, and on
25   the left-hand side of the screen you can see the west

Page 94

1    area.  In addition, at the very top right, there is the
2    far east area but, as far as I understand it, that
3    remains undeveloped.
4        Now, what you will see is that discovery and
5    appraisal wells were drilled by Eni in the Oyo west
6    area, so that's Oyo-3 and Oyo-2, and that was followed
7    by the drilling and exploration of Oyo-6.  But those
8    wells are quite some way away from the other ones.
9        So far as the other are concerned, you will see that
10   in 1995 BP and Statoil drilled a discovery well, Oyo-1,
11   and then two further wells are drilled in close
12   proximity to that.  Now in Oyo-4, which I think is
13   drilled in 2007 by Eni or NAE, and ultimately that was
14   to be used as the gas injection well for Oyo-5.  But
15   they got a certain amount of data about the formation
16   from that.  Oyo-5 was then drilled in 2009.
17       Now, the reason why this map is slightly inaccurate
18   is because it makes Oyo-5 look as though it is a long
19   way away from Oyo-1 and Oyo-4.  So I wondered whether --
20   I forgot to put in this presentation -- if you are able
21   to take out bundle 9, tab 198.  (Pause.)
22       Tab 196, sorry, at page 147, you should have a page
23   in the middle of a presentation that was prepared by
24   Allied, which looks a little bit like that (indicates).
25       So it is G9, tab --

Page 95

1    THE CHAIRMAN:  147?
2    MR GUNNING:  Tab 196, page 147, is the pagination in the
3    bundle.
4    MR SHOESMITH:  Page 23 of the PDF.
5    MR GUNNING:  Thank you.  Now what you will see there is in
6    the middle of the map a little star with a 1 and
7    a little star with a 4, and those are Oyo-1 and Oyo-4,
8    and then you can see that Oyo-5 really runs between the
9    two.  I could show you other drawings which show the
10   same thing but that's just to make the point that if you
11   find this a helpful map of the overall Oyo field, do
12   bear in mind that it's not perfectly to scale.
13   MR LEW:  While you're educating us, could you tell us what
14   is the distance in miles or kilometres from the far
15   east, let's say, Oyo-5 to Oyo-5, part away across?
16   MR GUNNING:  I think it's probably only a couple of
17   kilometres, 4.5, there we go.
18   MR LEW:  4.5 kilometres, so that whole area is from one end
19   to the other 10 kilometres?
20   MR GUNNING:  It is about 700 metres between them but
21   I thought it was a lot lower.  It is about 700 metres.
22   It is a small distance between Oyo-5 and Oyo-1, but, as
23   I say, you see Oyo-1 and Oyo-4 are drilled vertically
24   and you will have seen the line for Oyo-5 is
25   a horizontal line, so it runs between the two of them.

Page 96

1    You will also see that Oyo-7 is in quite close
2    proximity, and I think my learned friend made the point
3    that there are similarities that you would expect
4    between Oyo-7 and Oyo-5.
5        Oyo-8 is also in close proximity to those wells.
6    There are actually two wells in Oyo-8. I think it was
7    initially drilled vertically but then a horizontal
8    sidetrack was drilled, and there is a difference in the
9    recorded readings from the vertical and horizontal wells
10   which might be important a little bit further down the
11   line.
12       So that's an overview of the relevant reservoir.
13       What I want to do is then to move on to the next
14   slide and here I was going to talk a little bit about
15   the casing and the well itself. The diagram on the
16   right that you'll see there, where the text is
17   completely illegible, is a diagram of the subsea well
18   head and I put it up there just to show you essentially
19   the point that the casing runs as a series of concentric
20   pipes of different diameters, but it's like the opposite
21   of a Russian doll, I suppose, because the longest of the
22   casings will be the smallest, but it is hung from
23   a casing hanger, which is at the well head level.
24       This will be an important drawing I think probably
25   for the purposes of -- or it may be useful for you to

Page 97

1    G7, tab 123.
2        The other document which is very useful is at G8,
3    tab 167, and that is the final drilling report. That
4    contains a description of what was done but also
5    provides you with guidance on how to convert certain
6    depths to other depth, a point I will come to in
7    a moment.
8        You will see from that slide that at the end of the
9    well bore there was an 8.5-inch hole that was drilled.
10   It doesn't look quite like that, because naturally you
11   don't have quite as strict a curve as that. But
12   essentially within that 8.5-inch hole there was run
13   a pre-perforated pipe with wire wrapped around it that
14   was surrounded by gravel, and because there are
15   perforations, the oil can come in from the -- because of
16   the pressure difference, the oil will seep in
17   essentially to that open hole section and up the well.
18       You will see from the image that the open hole
19   section was horizontal here. And I think from one end
20   to the other it was something metres or something like
21   that. It is quite a substantial length.
22       The end that is closest to the vertical part of the
23   well is called the heel. So, if you like, the left-hand
24   side of that diagram on the bottom left, that will be
25   called the heel, and the far end will be called the toe.

Page 99

1    bear in mind when it comes to the question of
2    reciprocation, rotation, those sorts of things. Because
3    the point is made, well, you can't really reciprocate
4    the nine and five-eighths inch casing because you are in
5    close proximity to this well head and if you start
6    twisting things around and jabbering it up and down you
7    might damage the subsea well head, which is a big
8    problem on subsea well, so it wasn't an appropriate
9    thing to do.
10       In fact, as the casing was being inserted it will
11   have been reciprocated and actually was reciprocated.
12   So the issues, which was a very narrow one, and I think
13   ultimately is not going to lead anywhere, is as to
14   whether it should also have been reciprocated during the
15   period when the cement was being installed, and there is
16   a difference of view about that.
17       You will see what I've also tried to do on the
18   left-hand side of the slide is to give you an idea of
19   how the casing sizes change as you go down to various
20   depths. I found extremely useful, but you don't need to
21   look at them now, but I think for your note you might
22   find them useful, two documents. One is at G7, tab 123,
23   which is the mud logging report and contains a narrative
24   description of how the casing sizes changed and what
25   work was done as the casings were installed. So that's

Page 98

1        Now, inevitable there is going to be a gap between
2    the casing and the well bore outside it. So when the 9
3    and five-eighths-inch casing is being run in a hole, the
4    hole that is drilled is actually 12 and a quarter inches
5    wide, and the casing fitted into that. And that gap, or
6    annulus, as it is called, presents a problem, because
7    unless that gap is filled in it creates a gap down which
8    gas can run from the rock that contains gas down to the
9    heel of the open hole section of the well. So in large
10   part to stop that happening cement is injected through
11   the casing and then back up into that annulus.
12       As the well bore was being drilled originally,
13   drilling fluid will have been used for a number of
14   reasons, so to clear the drill cuttings, to balance
15   fluid pressure, to create a filter cake to stop the well
16   caving in and to lubricate the drill bit. But what it
17   means is that when the casing is lowered in, the annulus
18   will be filled with mud, and the mud will be permeable
19   and so it will provide a leak path for gas from the
20   gas-oil contact down the heel of the well.
21       So when cementing the aim is to stop that happening,
22   and that brings me on to the next slide.
23       Essentially the purpose of the cement is to create
24   zonal isolation between the gas-oil contact and the heel
25   of the well.

Page 100

25 (Pages 97 to 100)

Page 101

1    So what you try to do is you try to flush out the
2    mud by using something called spacer fluid to start with
3    and then the cement afterwards.  But the trouble that
4    you have, particularly in a horizontal well, is that
5    naturally the casing is going to sag towards the bottom
6    of the well bore.  So that would obviously provide
7    a sort of resistance which would make it more difficult
8    to remove the mud.  To stop that what are used are
9    centralisers, and the centralisers that were actually
10    used in this case are shown in the bottom right-hand
11    corner, and the idea is that those will provide some
12    separation between the casing and the walls of the well
13    bore.
14    Now, you will see I put an image at the top
15    right-hand corner that shows the sort of problem you can
16    have if you're not able to flush out the mud.  You will
17    have an area that is cemented in the annulus but then
18    an area that contains mud in it, and that is a problem,
19    because it is a channel down which the gas can run down
20    to the heel if it is not cleared out.
21    The sequence of events that you will find -- you
22    will come across when we come to the cementing part of
23    the case -- whenever you say we're coming to the
24    cementing part of the case you probably just feel mildly
25    depressed that that's what we are going to be talking

Page 102

1    about, but it starts off you put spacer fluid down the
2    casing, you will then want to separate that spacer fluid
3    from the cement that is going to follow it.  So there
4    will be something which is called a bottom dart that
5    goes on top of it, then that will hook into a plug, and
6    the plug with the spacer fluid beneath it will sink down
7    the casing, cement will be on top of the bottom of the
8    plug.
9    The first cement that goes is called lead cement --
10    it is not lead, it is lead cement -- and then following
11    that tail cement will be put on top, and then there will
12    be a top dart and a top plug, and above that there will
13    be mud, and the mud basically forces the cement down
14    through the annulus and then back up -- down through the
15    casing and then back up the sides of the annulus.
16    The diagram that I've shown you there in the middle
17    of the page comes from an exceptional -- if you're
18    trying to understand this in more detail
19    an exceptionally useful description of the process in
20    the chief counsel's report on the Macondo incident,
21    which is bundle G29, tab 17, page 187.  It is really
22    an exceptionally clear explanation of cementing
23    operations.
24    Now, in this case it not quite like this image
25    because we have a horizontal well.  So in this case if

Page 103

1    you imagine a kind of crook in the page coming out of G,
2    you will have had cement coming out horizontally and
3    pushing back and then up vertically.
4    MR LEW:  That yellow band at the top of what looks like that
5    the well --
6    MR GUNNING:  Yes.
7    MR LEW:  -- is that the top plug?
8    MR GUNNING:  Yes, that I think is intended to show the top
9    plug.  There are some underneath it, non-return valves
10    essentially, to stop this cement spinning back up the
11    casing.  But essentially the idea is that the top plug
12    as it goes down will scrape off cement so you don't get
13    a leakage of cement down the casing as you're going
14    down.
15    MR LEW:  Then what is the central bit?  You have the valve
16    underneath it.
17    MR GUNNING:  Yes.
18    MR LEW:  Then you have got a --
19    MR GUNNING:  This is an image --
20    MR LEW:  -- darker grey.
21    MR GUNNING:  Yes, this is an image of a completed cementing
22    operation.  I wonder actually -- it might be useful just
23    to take out this report, because it will show the
24    process that I was describing quite clearly.  It is G29,
25    tab 17.  You will find it at page 187.

Page 104

1    The section on water actually begins at page 183.
2    That's internal page 67 of the report.  The top
3    right-hand corner of the report says page 67.
4    THE CHAIRMAN:  Sorry, that's --
5    MR GUNNING:  G29.
6    THE CHAIRMAN:  Yes.
7    MR GUNNING:  Tab 17.
8    THE CHAIRMAN:  Yes.
9    MR GUNNING:  Then in the top right-hand corner of the page,
10    it will say "page 67".
11    THE CHAIRMAN:  Thank you.
12    MR GUNNING:  You should find the image that you have on the
13    screen in that page.  So in our bundles it is on
14    page 183 but in the report is internal page 67.
15    If you go to page 187, you can see an image of -- in
16    the bottom right-hand corner, which I just lacked the
17    computing ability to cut out because it is a funny
18    shape, this shows a cementing operation in progress.  So
19    you have spacer fluid with two arrows going down to
20    those float valves at the bottom of the casing, and
21    above that you have the bottom plug and then you have
22    the cement, and then above that you have the top plug
23    and then above that you have mud going down the casing.
24    The idea is that as you push down, the bottom plug will
25    break open and then you will continue to put pressure on

1    the -- continuing to insert mud on top of it, so that
2    will force the cement to come down.  As it comes down,
3    it comes out and back up.  So if you look at page 188,
4    the next page, it sort of comes up the annulus between
5    the well bore and the casing.
6        But the top plug should fit in position, as we see
7    here, and essentially cap off the cement at the end of
8    the job.
9        Then you will want -- ultimately you will want to
10   break is out so that you can then carry on with your
11   drilling, but this is the process.  Is that clear
12   enough?
13       Now, one of the things that you're going to have to
14   consider looking forwards is whether the evidence
15   supports our hypothesis that the relevant steps were not
16   to carry out -- a proper cementing job were carried out
17   by NAE, and as part of that process we will have to move
18   on to one of the numerous logs that's kept on the
19   project, and that brings me to my next topic, which is
20   well logging.  For present purposes, I am just going to
21   focus on the characteristics of a well log rather than
22   the content of any individual log.
23       We're going to be focusing I think on two particular
24   ones, going forwards.  The first is the log that was
25   taken from something called the segmented bond tool that

1    you will have read about, the SBT, and that was sent
2    down the well in December 2009, and it was used to
3    assess the quality -- or meant to be used to assess the
4    quality of the cement job before the open hole was
5    drilled out.
6        The second log that we will be looking at is the log
7    taken from the production logging tools in
8    December 2010, which showed where gas was coming into
9    the producing part of the well.
10       But the points I wanted to draw your attention to at
11   the moment are these.  The first is when you look at
12   these logs they will have these sort of characteristics.
13   There will be a series of columns and each of those
14   columns is called in the industry, as I understand it,
15   a track.  So when there is talk about tracks, the first
16   track, it will be the left-hand column.
17       The second point is that very commonly you will find
18   that the first track will show something, as you'll see
19   here, called the gamma ray recording, and the gamma ray
20   tools measure the naturally occurring radiation in the
21   well bore.  They provide a very good indication of the
22   presence of shale, as it happens, but more importantly
23   they provide a record against which you can then
24   correlate your depth in the well bore once the casing is
25   in place.  So before you have put the casing in, you

1    will put your gamma ray tools down and that will enable
2    you to work out -- you will have a map of the gamma ray
3    readings going all the way down.  There is usually a lot
4    of movement in the gamma ray curve, from high values to
5    low values.  So you get a very good, precise sort of
6    fingerprint of the layout of the well.
7        The other point is that once you have the casing in
8    place, although the radiation measurements are reduced,
9    they are not eliminated.  So even with the casing in
10   place you can work out what your depth is in the well
11   bore because of the radiation measurements.  So you can
12   get an exact depth measurement once the casing is in
13   place by comparing your cased hole gamma ray log to your
14   open hole gamma ray log.  So, in other words, you can
15   match your log as you've been going down with casing in
16   place against where you were when there wasn't any
17   casing in place at all.
18       So it's very common to find that as a kind of depth
19   gauge in these logs.
20       The third thing I was going to mention is that
21   typically you will have something that indicates your
22   depth on these logs, and typically the depth that will
23   be shown is called the AHD or a long hold depth.  That
24   is not the same as the true vertical depth because the
25   well is going down and across and then horizontal.

1        What I have tried to do on this slide is to give you
2    some useful figures going forward which identify for you
3    the long hole depth of the gas-oil contact, and then its
4    comparative true vertical depth, and also something
5    called TVDSS, that is true vertical depth subsea.  True
6    vertical depths are often corrected to allow for the
7    elevation above the mean sea level of the depth
8    reference point of the well, and there was a 26-metre
9    difference in relation to these measurements.
10       Then I have given you also the end of the 9 and
11   five-eighths-inch casing, you can find out where that
12   is, and then the end of the 8.5-inch hole.  So when
13   I said the horizontal hole was about 600 metres long,
14   you can see it is the difference the AHD measurements on
15   that table.
16       The final point I was going to make about logs is
17   that you will see that they record different information
18   about different characteristics of the well in different
19   tracks but they also sometimes contain different
20   information in different scales within the same track.
21       So if you look in the track 1, we have gamma ray
22   readings.  We also have minimum delta T and maximum
23   delta T readings, and also we have differential tension
24   readings.  They are all to different scales, they are
25   all measuring different things, but they are all on the

1   same track.
2       That brings me on to the next slide, which is the
3   next topic along, which is about producing from the
4   well.  The way that oil is produced in a well is through
5   the pressure difference between the reservoir and the
6   well bore.  The pressure difference causes oil and gas
7   and water to expand out of the rock and into the well,
8   and the pressure difference between the bottom and the
9   top of the well causes the oil, gas and water to expand
10  upwards.  That pressure difference is affected by the
11  choke, and choke measurements are typically given in
12  64ths of an inch, and that is the diameter of the choke
13  incidentally.  It's not the radius, it's the diameter of
14  it.  So there is a connection anyway between choke size,
15  pressure difference and flow through a well.
16  MR LEW:  What did you say the width was?
17  MR GUNNING:  The diameter of the choke will just be called
18      the choke measurement.
19  MR LEW:  You said typically the size --
20  MR GUNNING:  It will be measured in 64ths of an inch.
21  MR LEW:  64th?
22  MR GUNNING:  Of an inch, exactly.  So when you see 18
23      64ths -- my maths has failed me.  I should have chosen
24      something simple like 32/64ths, it would be half an
25      inch.  Sorry about that.

1       Anyway.  When the fluids emerged from the well they
2   have to be separated out and the quantities of fluids
3   will be measured using a separator, and here one of the
4   stories that you will come across is that there were
5   meant to be two separators, two functioning separators
6   on the FPSO, a test separator and a production
7   separator.  But the fact that there was only one working
8   meant that actually the entirety of the streams coming
9   from Oyo-6 and Oyo-5 were being joined together before
10  separation.  We'll have to examine what the consequence
11  of that are for the reliability of some of the data that
12  we have.
13      Finally, I have also given the units of measurement
14  that you will come across in the right-hand side.
15  I found that helpful to have a note of those.  They are
16  relatively obvious when you know them.  I don't think
17  there is any significant difference between a stock tank
18  barrel and a barrel.  I think they amount to the same
19  thing, but sometimes it is STB and sometimes it is BBL.
20      The comparison, though, of the volume of gas that is
21  taken at the separator to the volume of oil gives
22  a gas-oil ratio, and that will be measured in standard
23  cubic feet per barrel.  Standard cubic feet of gas per
24  barrel of oil.
25      And it is important to understand that there is

1   naturally occurring level of gas in the oil, regardless
2   of any incursion from the gas cap.  Indeed, the
3   expansion of that gas helps to force the oil up the oil
4   well, because the gas will tend to expand I think more
5   than oil will expand when you go to a different pressure
6   level.
7       The natural level of the GOR, or gas-oil radio, in
8   the Oyo-5 well was measured in a pressure volume
9   temperature analysis, which was done in October 2009,
10  and the natural level was found then to be 649 standard
11  cubic feet per barrel.  So if you had that level of
12  gas-oil ratio it wouldn't necessarily ring any alarm
13  bells because you would be expecting that to exist
14  naturally within the formation.
15      Another point to make is that as the pressure in the
16  reservoir reduces, there will come a point where gas
17  will naturally bubble out of the oil, and that's called
18  the bubble point pressure.  Where that happens it means
19  that gas can enter the oil stream from further down the
20  oily part of a formation.  So once that happens, once
21  you pass the bubble point pressure, you would naturally
22  expect the gas-oil ratio to increase to some extent.
23      But there's a quite separate process, which it is
24  very important to understand in this case, because it
25  I think explains in substantial measure one of the

1   things that went wrong, which is gas coning.  That is
2   a manner by which gas can migrate from the gas cap into
3   the production stream.  It is called gas coning because
4   the gas literally cones down from the gas cap, when the
5   buoyancy forces that are keeping the gas layer separate
6   are overcome.  There's going to be quite a lot of
7   evidence about this process.  But I would just flag two
8   points.
9       The first, and perhaps I found most unexpected
10  point, until it was explained to me, is that gas coning
11  is most likely to occur where the permeability is lower.
12  The lower the permeability the more likely you are to
13  have gas coning.  The reason for that is where the
14  permeability is lower, a greater pressure difference is
15  required to extract the oil.  So that greater pressure
16  difference results in a greater likelihood of in effect
17  sucking the gas from the gas cap into the production
18  stream.
19      The second thing, though, which is the opposite end
20  of that, is that the gas will tend to cone through areas
21  that are more permeable.  So although it takes lower
22  permeabilities to cause the coning to occur, it will
23  tend to come through the more permeable bits.
24      So those are the technical features I thought
25  I would take you to and that brings me on swiftly to

1    what it is that we complain about.
2        I think those fall basically into three topics, the
3    third, which is flaring, we can take quickly, because
4    you will see in due course the plan was that 98 per cent
5    of the gas that came out of Oyo-5 was intended to be
6    reinjected into Oyo-4, but because of the high volumes
7    of gas that were being produced and the unavailability
8    of compressors on the FPSO that didn't happen, and as
9    a result a lot of the gas had to be flared off, and
10   although it is a matter that Mr Wade will be dealing
11   with the claimant agreed to indemnify the respondent
12   against the fines that were incurred in relation to
13   that.  So that's flaring.
14       Cementing and production.  What we say in relation
15   to these is essentially that NAE went about the
16   cementing and management of production in
17   an uncontrolled and inappropriate manner, and then it
18   failed to respond promptly or at all to the evidence of
19   problems by taking appropriate remedial action.
20       So that's the essence of our case.  I'm not going to
21   take any of the evidence for granted, so you haven't heard the facts yet.
22   the opening submissions, so you haven't heard the facts yet.
23   MR LEW:  You are stating the case and you are saying that
24   it's failure to achieve zonal isolation and to recognise
25   the shortcoming in the cement job, that you say was in

1    breach of industry practice?
2    MR GUNNING:  Yes, we do say that.  We do.
3        In relation to cementing there are going to be four
4    questions that you are going to want to consider at the
5    end of the case.  The first is -- and it is unlikely to
6    controversial -- was the quality of the cementing of the
7    nine and five-eighths inch casing an important process
8    for the completion of the Oyo-5 well?  That's the first
9    question.
10       The second is, how did NAE plan to execute the
11   cement job?
12       The third is, did NAE depart from that plan when
13   executing the cement job and, if so, how and in what
14   respects did it depart from the plan?
15       Then the final question you're likely to ask
16   yourselves is, what steps did NAE take to satisfy itself
17   at the end of the process as to the quality of the job,
18   and what conclusions should it have reached about it?
19       What I hope to show you, I'm not taking you for
20   granted, is that the cement job was extremely important.
21   It was essential, as we've seen, to ensure zonal
22   isolation between the gas cap and the heel of the open
23   hole section of the well.
24       Secondly, NAE did have a plan of sorts which was
25   prepared with or by Schlumberger but then it failed to

1    comply with that.
2        The third thing is that NAE then undertook
3    an examination of the quality of the cement using
4    a segmented bond tool before proceeding to drill out the
5    open hole section but they seemed to have done the
6    drilling without paying any sufficient regard to what
7    the segmented bond tool analysis showed.  If they had
8    examined it properly, they would have realised that it
9    showed bad cement in the material area, which is from
10   the gas cap or the gas-oil contact point down to the
11   heel, and that remedial work was required.  But they
12   didn't do that and so a leak path was permitted to
13   remain in place between the gas cap and the well.
14       So that's what we say, and we say that was not in
15   accordance with internationally acceptable standards.
16       That takes me on to the second area of criticism,
17   which is the management of production.  I think there
18   are likely to be six questions that you have to consider
19   here.
20       The first is, was it important for the production of
21   oil from Oyo-5 to be carefully managed?  Is the
22   commencement of production to be carefully managed?
23       The second is, did NAE develop a suitable plan for
24   opening up the well?
25       The third is, what, if any, arrangements did they

1    have in place to enable them to monitor production as
2    the well was opened up?
3        The fourth point is, taking those arrangements, if
4    any, into amount, did they control the opening of the
5    well sufficiently cautiously?
6        Then, fifthly, when problems were discovered, how
7    did they respond?
8        Then the final one, was that response sufficiently
9    prompt?
10       What I hope we will show you through the evidence on
11   these topics is that they knew or ought to have known
12   that it was extremely important to manage the production
13   process carefully to prevent gas entering the production
14   screen, because they knew the proximity of the gas cap.
15   They knew that.
16       The second is they don't appear to have had
17   a satisfactory plan for the opening up of the well, and
18   they appeared to have targeted a production rate of
19   around about 15,000 or 17,000 barrels of oil per day,
20   which they should have realised could give rise to
21   an early gas incursion.
22       The third thing is that they were lacking basic
23   information about the performance of the wells at the
24   time that they opened them up.  So they weren't able to
25   monitor the performance accurately and so didn't control

1    the opening up of the wells appropriately.
2        Then within a week or so of opening up the well, the
3    gas-oil ratio had risen to levels which suggest a gas
4    incursion.  They were way above that level -- or they
5    began to be consistently above the natural GOR that you
6    would expect, but they didn't do anything about that for
7    about six months.  Indeed, the action that they
8    ultimately took was to undertake a work-over sequence in
9    December 2010 to January 2011, which comprised using
10   a production logging tool and then a gas shut-off
11   operation.  But by that time it is clear, I think, that
12   gas coning had occurred and the GSO operation that was
13   undertaken was not able to rectify the problem of gas
14   incursion.
15       Now, we can see some of the difficulties that were
16   experienced in the aftermath of opening up the well in
17   the next slide, which shows the declining rate of
18   production from Oyo-5.  Red against a scale of thousands
19   of barrels on the left is the number of barrels that
20   were being produced per day from 5 December onwards.  So
21   there's a spike to start with for a small number of
22   days, then it relentlessly falls downwards.  But running
23   across that you have a continually increasing gas
24   production rate and gas-oil ratio.
25       You will notice at the top of the black line is

1    to go to.  So there's a dispute on the expert evidence
2    what you can draw from that.  But certainly this would
3    be consistent with poor cementing.
4        But what you will also see is that the gas incursion
5    was not limited to the heel.  The measurements are
6    not -- so that's at the first 20 metres or so from the
7    heel you have a lot of gas going in, and then you have
8    a little patch which is running for about another
9    70 metres or so, where there is gas coming in but not so
10   much.  Then you get to the next little patch, which is
11   about a 10 or 11-metre patch, where again you have a lot
12   of gas coming in and so on.
13       What this shows is that as you go further down the
14   production part of the well, you have gas coming in
15   which is evidence of gas coning.  So that is what was
16   discovered to be the position as at December 2010.
17       That leads me to the gas shut-off.  You can see the
18   effect of the gas shut-off on this slide.  You have to
19   read it with a little bit of care because in the middle
20   of it what you see is a period where the gas rate slumps
21   to a very low level, and the gas-oil ratio slumps to
22   a very low level.  That's because the well was shut off.
23   It was closed for a substantial period before the GSO
24   operation was carried out.  So there is a little spike
25   as that's happening but then it falls down.

1    shown the choke settings at the time that those
2    measurements were taken.  So as the choke settings
3    increased, you can see that there were increases in the
4    gas amount and the gas-oil risk.
5        Now, a snapshot of the gas ingress into the
6    producing part of the well can be seen from this image,
7    which is the result of the production logging tool
8    analysis in December 2010.  What it shows is that
9    over -- if you look at the right-hand side, the green
10   blocks represent the proportion of all oil.  Red blocks
11   represent the proportion of gas.  Blue will be water.
12   So there is very little water coming in for the first
13   seven or so rows, but the very first row is at the heel
14   of the production part of the well.  What you are seeing
15   there is a very high amount of gas incursion coming in
16   through there.
17       Now, you're going to have to consider -- there is
18   a dispute on the expert evidence about this -- whether
19   that evidences the likelihood that there was a channel
20   running down from the gas-oil contact down through the
21   casing, because this is the first point where that would
22   be expected to come in, is at the heel of the well.
23       Equally it will be said that the pressure difference
24   is always going to be greatest at the heel of the well,
25   and so it is the most natural place for the gas coning

1        But what you can see essentially is that after the
2    GSO the amount of oil that was being recovered continued
3    to decline and the gas-oil ratio continued to increase.
4    So the GSO was not successful in the sense of stemming
5    the problem of gas incursion.  I don't think there is
6    any dispute about that.
7        Now, that leads me to the final point that I was
8    going to make, which is on the question of causation.
9    Here NAE, through its expert Mr Filippi, runs the
10   argument that in effect the gas incursion and the change
11   in GOR rates and so on were essentially unavoidable, and
12   they say the characteristics of the well and its
13   proximity to the gas-oil contact meant that there was
14   always going to be gas coning.  I think their evidence
15   will be to the effect that their model shows that
16   serendipitously for NAE by opening it up rather
17   aggressively or quickly they happened to achieve the
18   optimal economic recovery.  We will have to look at that
19   evidence fairly carefully.  But this chart provides
20   a comparison of the consequences of managing all four of
21   the active wells, Oyo-5, 6, 7 and 8.  And when you do
22   look at these charts you do need to be very careful
23   about the scale.  Because sometimes these are shown to
24   a log scale on the left-hand side, which completely
25   masks the differences between the wells.  But Oyo-5 is

1    the red one and it shows how the GOR changed for the
2    cumulative barrels of oil, and it shoots up basically,
3    and, indeed, it goes off the scale on this particular
4    chart.  It goes up to in excess of 20,000 standard cubic
5    feet per barrel.
6        By contrast what you have there is Oyo-6, which is
7    bumbling along at a much lower level.  Oyo-6 doesn't
8    even have an associated gas cap, so it is not really
9    comparable, and you wouldn't be expect it to be behaving
10   in the way of Oyo-5.  But of interest is the fact that
11   Oyo-7 and Oyo-8, which are in the same reservoir but
12   being managed with a lower rate of production, are not
13   showing the same gas-oil ratio at all.
14       So what this shows, I invite you to draw from it is
15   that actually more cautiously managed there did not need
16   to be this huge gas incursion or gas-oil ratio, and
17   those things have not happened on Oyo-7 and Oyo-8.
18   I think my learned friend took you to a slide on Oyo-7
19   for the purpose of saying look at the purpose of this
20   the gas -- the oil recovery is reducing.  Be careful
21   with that slide because you need to take into account he
22   chock sizes as that was happening, and the choke sizes
23   change in Oyo-7, and those explain the production.
24       If you're looking at the GOR, which is also on the
25   slide, you need to look at it by comparison to the GOR

1    on Oyo-5, and you can see from this that the profile is
2    really completely different.
3        So in short, what we say is that if the production
4    had been managed more cautiously and if there hadn't
5    been a leak down this cementing, then the problems that
6    were encountered (inaudible) could have been avoided.
7        That's the end of my section.  I'm sorry for ...
8    MR WADE:  So that was in the end of the interesting section,
9        and I wonder if we might have a convenient break now for
10       a cup of coffee and to relieve the transcribers?
11   THE CHAIRMAN:  Yes.  Shall we take 15 minutes?  By the way,
12       to the extent we've used PowerPoints or whatever, if you
13       can send those on electronically to the Tribunal that
14       would be appreciated.  We will see you back in
15       15 minutes.
16   (3.05 pm)
17                        (A short break)
18   (3.18 pm)
19   MR WADE:  May I?
20   THE CHAIRMAN:  Yes, please.
21   MR WADE:  So Mr Gunning has just shown us the inevitable
22       consequences of the failure to manage production from
23       Oyo-5, and in the next few moments I plan to spend some
24       time talking about the financial consequences and effect
25       of that, followed by a few brief comments on the deed of

1    novation question and exclusions of liability, which
2    have been touched upon.  After that, I will make some
3    comments about NAE's adjustment claim against Allied,
4    and I will not deal with the deferred payments claim at
5    the moment, because it is subject still -- well, much of
6    the debate is subject still to the court's decision, and
7    that is pending, but also because the issues have been
8    addressed in submissions and probably don't need to be
9    repeated at this time.
10       Again, if there are any questions, of course I will
11   be happy to answer them.
12       So on the slide presentation you see a copy of
13   an agreed table from the agreed witness statement, the
14   agreed quantum expert report.  I must tell you now that
15   this is the agreed statement that will change because
16   Mr Moy's revision will result in some changes to the
17   quantum model, and I will touch on that in more detail
18   in a minute.  But I understand that the figures on the
19   bottom three left-hand rows and the total will change.
20   It doesn't matter for current purposes how they will
21   change but I just wanted to make it clear that that is
22   about to change.
23       The issue of quantum gladly, perhaps, is one of less
24   complexity than the technical issues, and we are
25   indebted to the services of both sides' quantum experts

1    in that regard because there is almost more common
2    ground between them than there are matters which
3    separate them.
4        The most important common ground between them is
5    that both experts agree that Mr Taylor's model properly
6    models the PSC and properly reflects the manner in which
7    the losses caused to the counter-claimants and their
8    affiliates result from NAE's breaches of the PSC.  And
9    I should say, if proven, because that is not a matter
10   for the quantum experts but they are assessing the
11   economic consequences of the breach.
12       So they agree on how you should -- or how the
13   damages should be calculated in this case.  You will see
14   as a result on the columns on each side it predicts for
15   both parties.  Both parties' experts predict that damage
16   had occurred to Allied.  There is a magnitude of
17   difference between them but it's nevertheless
18   an interesting feature of the claimants' case that even
19   on their best case scenario they predict a loss to the
20   counter-claimants resulting from the breaches which are
21   alleged.
22       In our submission, that's an unusual feature of this
23   case and it's a signpost for the Tribunal as to where
24   we're going to end up, and the big question we say is
25   going to be not was there a breach but how much damage

**Page 125**

1    has resulted from the breach.
2        The other points which I would like to tell you
3    about in relation to this model are the points of
4    disagreement.  The first and most important point of
5    disagreement between the parties is which input goes
6    into this model to calculate the loss?  Dr Moy's
7    production forecasts, are they input into the model, in
8    which case you get the damage subject to the change
9    which is on the left-hand side of the table, or do you
10   input Mr Filippi -- is it Mr Filippi?
11   MR NESBITT:  Mr Filippi, I was also mispronouncing it.
12   MR WADE:  So Mr Filippi's model would result in the damages
13   on the right-hand side of that table.
14       The second big point of disagreement or the point of
15   disagreement which has a big financial impact is the
16   timing in which Oyo-8 or the replacement wells Oyo-7 and
17   Oyo-8 would have been drilled in the "but for" world.
18   That is a point of disagreement which Mr Nesbitt has
19   already highlighted, and I am repeating that to say that
20   it has a big financial consequence as well.  The earlier
21   they would have been drilled, the greater the income in
22   the "but for" world that the counter-claimants would
23   have made, and the later the less income they would have
24   made in the "but for" world.  So that's a point on which
25   they disagree and it has a significant impact on the

**Page 126**

1    damages.
2    MR LEW:  Just explain that to me.  You say if the well had
3    been dug earlier, profits would have come through
4    earlier.
5    MR WADE:  Correct.
6    MR LEW:  If the well has not been dug, the resource is still
7    there.
8    MR WADE:  The resource is still there, but there is a time
9    limit within which we look at this partially because of
10   the length of the leases and partially -- that's it,
11   I think, it is the length of the leases I think which
12   govern the amount of money that could have been made out
13   of the leases.  So we're looking up until 2021.
14       If the wells were sunk in 2012, then there would
15   have been more income -- it doesn't actually matter so
16   much because of the depletion of the oil from the wells
17   over time and they both deplete before the end of the
18   lease.  But I am just being pointed out that there is
19   also a discounting cash flow element to the timing of
20   the well.  The earlier you are producing, the more
21   income you can make from it.
22   THE CHAIRMAN:  Is there any effect in the changing price in
23   oil?
24   MR WADE:  There will be an effect, yes, but that has been
25   taken into account --

**Page 127**

1    THE CHAIRMAN:  In fact because they were higher prices
2    a couple of years ago.
3    MR WADE:  Correct.  But it's more a question of quantities
4    than the price of oil, as I understand it.
5    MR LEW:  I think my point about quantities is that the oil
6    is still there.  Even if you seek to produce it two or
7    three years later, you might produce a greater amount
8    but you're still able to produce the same amount --
9    MR GUNNING:  But you receive the money later, and so if
10   you're doing a net current value for it, it will
11   discount in the cash flow later and you will get
12   a lesser amount than it's current -- I think that's
13   probably part of --
14   MR WADE:  The experts will tell us, but I also understand
15   that pressure depletes from the field over time and the
16   later you drill a well, the less you can extract from it
17   in the circumstances where a well is producing.
18       The difference between the parties is that the
19   counter-claimants say that in circumstances where "but
20   for" world Oyo-5 was producing an income stream for
21   them, they would have hurried up and girdled their loins
22   and drilled a new well to increase production from the
23   field and they would have no reason to delay at all
24   their production -- their drilling plans.  But in the
25   real world they had to raise finance and the drilling of

**Page 128**

1    the new wells was delayed.
2        Mr Filippi says there is no reason for any
3    difference in the "but for" and the real world as to
4    when the new wells would have been drilled.
5        The third question on which there is a disagreement
6    between the experts is the question on whether Allied
7    did or did not suffer loss on the transfer of its
8    interest to CPL.  That is reflected in the second line
9    from the top, where Mr Taylor models a lot of
10   28 million, whereas Mr Filippi says that the
11   counter-claimant -- that Allied in particular made
12   a profit of 4.7 million on the sale of the interest on
13   to CPL.
14       That, with your permission, is as far as I want to
15   take the issue of quantum at this time.
16       So moving on to the question of the deed of novation
17   and, as I mentioned before, there are two elements to
18   this now.  One which was presented by Mr Shoesmith and
19   which we do not address today and the other relates to
20   the third deed of novation.  The majority of the
21   Tribunal will remember, as mentioned before, that this
22   was an issue that you have already dealt with and
23   decided in the first preliminary issues hearing that we
24   held some two years ago now.
25       Although the claimants tell us that this is an issue

1    which you haven't decided because you didn't make
2    a ruling on it specifically, the finding that you did --
3    the ruling that you did make was at paragraph 241 of
4    your award, and by a majority then you decided that
5    clause 11.1 of the SPA:
6        "... does require the claimant to indemnify Allied
7    in respect of pre-economic debt liabilities, including
8    under the PSC losses suffered by Allied and its
9    affiliates, subject to the limitations and under
10   provisions of the SPA."
11       You may recall, although you didn't say so expressly
12   here, that that was in response to arguments that the
13   counter-claimants should not be allowed to rely on
14   claims under clause 11.1 because of the effect of the
15   third novation.
16       So this, in our submission, is the starting point.
17   From here you start and you don't need to revisit the
18   novation point at all.  This is your fixed point of
19   reference for starting and analysing the SPA.
20       You already have our arguments in a sense, because
21   you've heard them and they are recorded -- both oral
22   arguments and our written arguments are before you.  But
23   in case it is necessary, then the real arguments don't
24   change at all.
25       This is a case by the way that NAE has run not only

1    they are entitled to an indemnity of any losses they
2    have suffered, including as a result of breaches of the
3    PSC by themselves and by their affiliates.  That, of
4    course, answers, and I do so without the necessary
5    detail at the moment, but it also answers the question
6    of whether it is right or wrong that CPL didn't bring
7    a case in its own name in these proceedings.
8        Under clause 11.1 it doesn't need to and, therefore,
9    it didn't, but there would be a question of whether it
10   would be allowed to under the SPA.  But the SPA
11   expressly allows Allied to recover CPL's losses, and
12   that is, of course, part of the allocation of
13   liabilities between the parties to the particular
14   contract.  But they were also contemplating expressly
15   the inter-group and intra-group liabilities, and they
16   were thinking the losses aren't all going to accrue to
17   Allied, and so Allied is entitled to claim in respect of
18   its affiliates.  That is expressly provided in the SPA
19   but also in your award.  That is the point from which we
20   start in this part of the proceedings.
21       The third argument we made in our pre-hearing
22   submission -- preliminary point, sorry, in our
23   preliminary issues submissions to you, which you might
24   recall, of course, was that the deed of novation was
25   a forward-looking document, and we analysed clause 2,

1    before you and failed.  They ran it again before the
2    High Court in their jurisdictional challenge in
3    an attempt to reverse your ruling on the grounds of
4    jurisdiction, and there they failed too.  So if we are
5    now going at the third bite at this particular cherry,
6    then we will meet that challenge as necessary.
7        The key points are that the SPA itself operates as
8    an allocation of liabilities or does contain
9    an allocation of liabilities between Allied and NAE, and
10   that allocation of liability was very carefully
11   negotiated and executed.
12       And the novation by contrast was just a mechanical
13   vehicle by which the transfer of the duties of NAE under
14   the PSC was moved to Allied.  So you will recall,
15   perhaps, that under the deed of novation -- sorry, I am
16   not flicking ahead fast enough -- the key provision
17   which allowed you to conclude that the deed of novation
18   didn't affect the allocation of liabilities between the
19   parties was clause 3, which expressly says that nothing
20   in this deed of novation affects the rights between
21   Allied and NAE as agreed in the SPA.
22       Those rights as between Allied -- hopefully I'm
23   going backwards to the right place -- those rights as
24   agreed between Allied and NAE are those which you
25   determined in relation to 11.1 that they can claim that

1    and we looked also -- and just stop me if this is not
2    just sparking memories for you but you want to go to the
3    provisions, we looked at the provisions of clause 2 of
4    the deed of novation, all of which is forward-looking,
5    the language of all of which is forward-looking, and we
6    looked at the exclusion of Article 17.2 of the PSC,
7    which you may recall.
8        Do we have that on a slide?  No, we don't.
9        And Article 17.2 of the PSC is an Article under
10   which NAE would remain liable for the PSC going forward,
11   not only retrospectively but prospectively as well and,
12   therefore, in line with the allocation of liabilities
13   from the pre-and post-economic dates, so from the
14   economic date the prospective liabilities of NAE were
15   expressly excluded by excluding the effect of
16   Article 17.2 to the PSC.
17       I am conscious that for you Lord Hoffmann this might
18   not spark any memories and shouldn't really.
19   LORD HOFFMANN:  I have seen some of the documents.
20   MR WADE:  So I am quite happy to leave it there, on the
21   basis that we will probably revisit this issue in the
22   closing submissions and move on.  If you want to revisit
23   any of those clauses and discuss them with me with them
24   open, I will do so.
25   THE CHAIRMAN:  That's fine with the Tribunal.

1    MR WADE:  So now turning to NAE's legal defences.  NAE has
2       raised two legal defences to the claims against it.
3          The first is that Allied has agreed to vary by
4       conduct -- waive its claims under the PSC or vary them.
5       So those are the two defences that they raise on grounds
6       of the operation of law.  Our response to both of those
7       is quite similar.  NAE in its submissions hasn't taken
8       account of the requirements of those defences, and under
9       Nigerian law -- and this is at H1, is the reference, is
10      the case H1, 19 -- under Nigerian law to prove waiver
11      you must show that the representor intended to effect
12      the legal relations between the parties.
13         There is no evidence at all, because it wasn't the
14      case, that in anything that Allied did they intended to
15      change the legal relations between the parties.
16      Anything that they did was pursuant to the legal
17      framework in which they were operating under the PSC,
18      and so any participation in Opcom meetings, any
19      compliance with subsidiary agreements, any secondments,
20      it was all done within the framework of written
21      agreements and concluded agreements, and were not
22      intended to vary any of the terms of the PSC at all.
23         In any event, and this is another point that NAE
24      would have to prove, and I can't show that they relied
25      on any representations by NAE, in the sense that we've

1       heard earlier today how NAE claims that Allied was fully
2       participating in all of the operations and receiving
3       information and engaging in management decisions.  That
4       is a line of argument which we have referred to as the
5       jointly agreed fallacy in our submissions.  It is
6       a fallacy because it is factually unproven.  But it is
7       also a fallacy in circumstances where NAE's witnesses
8       tell you in their statements, for example Mr Carbonara
9       at paragraph 63, or Mr Cherri at paragraph 51, they tell
10      you that the Allied operatives were not people that they
11      trusted.  I accept that I am paraphrasing here, but they
12      do indicate a degree of lack of respect towards the
13      technical abilities of Allied's personnel, and to
14      an extent Allied's personnel themselves would accept
15      that compared with Eni and NAE's experience, they were
16      the weaker party and they did not expect and would not
17      have expected NAE or Eni to rely on any of their
18      recommendations or proposals.  Indeed, they weren't
19      relied upon.  The same arguments are equally an answer
20      to the variation defence which is raised also in its
21      pre-hearing submissions.
22         In relation to variation, the position is slightly
23      stronger from the counter-claimants' position because
24      Nigerian law is very clear on the effect of no variation
25      clauses, and we have Nigerian authority in the bundle on

1       this, and Nigerian law, unlike English law, prohibits
2       revision of contracts by conduct where there is a no
3       variation clause which requires variations in writing.
4          Turning then to the exclusion of limitation clauses.
5          Mr Nesbitt introduced the issue to you, and two of
6       you will recall it from the preliminary issues hearing
7       as well.  Mr Nesbitt took you to some pre-contractual
8       exchanges of emails, the point there being really
9       whether all of Allied's claims under any contract are
10      excluded by the wording of clause 12 of the SPA.
11         The first point we make returns to the issue of the
12      allocation of liabilities between the parties, and we
13      say that you should read clause 12 in that context.  We
14      have a carefully negotiated agreement in which pre- and
15      post-economic date liabilities were divided expressly
16      between the parties, and the Tribunal has to think of
17      how clause 12, which has exclusions of liabilities,
18      operates within that.
19         It is against that background that you need to look
20      at what is being excluded.  The language of clause 12 --
21      and tell me if you want to look at it is at --
22      THE CHAIRMAN:  Whichever you prefer.
23      MR WADE:  You may recall that otherwise we can open up
24      clause 12, which is at --
25      THE CHAIRMAN:  I just happen to have it almost open in front

1       of me.  That is my reason --
2       MR WADE:  It is at bundle A, tab 1, page 26.  Throughout
3       clause 12 you will see constant references to "exclusion
4       of liability for Claims".  It is that provision which
5       the respondents and counter-claimants rely on, when they
6       say that nothing in clause 12 relates to the claims that
7       are being advanced by Allied and CINL and on behalf of
8       CPL, because all of clause 12 -- and it doesn't matter
9       where you point at, but all of clause 12 relates to
10      capital C claims.  When you turn at page 5 of the bundle
11      or, indeed, 5 of the contract itself to the definition
12      of "Claim" you see that:
13         "A Claim means a claim means a claim for any breach
14      or alleged breach of any of the warranties or any other
15      claim for any other breach of this agreement."
16         Now, I would ask you to -- of course, you don't have
17      to -- but I would ask you to underline the term "this
18      agreement" because it is a defined term and because its
19      the point that I wish to emphasise to you.  It is
20      breaches of this agreement in respect of which any
21      matter is excluded.
22         The definition continues:
23      "... in respect of this agreement or in respect of
24      any matter arising out of this agreement or any of the
25      completion documents."

1    So you can look it up, but the completion documents
2  are the deed of novation and the deed of assignment.
3    The completion documents do not include the PSC, of
4  course.
5    As arbitration lawyers you might be thinking to
6  yourselves, well, if it's any matter arising out of,
7  then that sounds a lot like Fiona Trust and, therefore,
8  it's any matter arising out of or in connection with it
9  will include the PSC, and that is indeed the
10  jurisdictional ruling paraphrased that you made.  But
11  this is not an arbitration contract, and this clause,
12  together with clause 12, needs to be read within the
13  context of the SPA generally, and the context of the SPA
14  is that the parties negotiated and agreed an economic
15  separation of liabilities up to the economic date and
16  from the economic date, and the exclusion of liabilities
17  and the references to "Claim" makes sense in that
18  context.
19    You will notice also, although perhaps it's not the
20  strongest of my points, that there is no express
21  reference to -- although there are claims for breach of
22  warranty, there is no express reference to claims for
23  breach of an indemnity.  Of course, the indemnity is
24  an entirely different animal to the warranties.  It is
25  expressly stated in the indemnities that Allied may

Page 137

1    recover damages or the losses of affiliates.  That
2  wouldn't be the same for any other type of claim under
3  the SPA.
4    Now, there are two more points that I would like to
5  make orally about -- well, there will probably be more
6  than two, but two that immediately come to mind that
7  I would like to make orally about our submissions in
8  this regard.  I suppose the first preliminary point 0,
9  then, is that these are submissions which you accepted.
10  So, again, our starting point is already from a position
11  where you have understood our submissions in relation to
12  clause 12 and you've made a ruling as to the operation
13  of clause 11.1 and 11.2, but 11.1 in particular.
14    The second is, of course, we were deeply concerned
15  as to the correctness of our submissions to you until
16  the jurisdictional hearing in which your first award was
17  challenged.  Our concern was alleviated at that point
18  because counsel for NAE made the very same submission
19  against us in that case.  The reference for that is at
20  G26, tab 676, page 28, and lines 7 to 11.  The argument
21  he was putting there was that, even though you have
22  jurisdiction under clause 11.1 to address claims under
23  the indemnity in clause 11.1, you can't have parallel
24  jurisdiction for claims under the PSC because of claims
25  being "Claims" aren't claims under the PSC and,

Page 138

1    therefore, you don't have jurisdiction under the PSC.
2    Having accepted our position and the correct
3  interpretation of the SPA in that regard, it is
4  impermissible, in our submission, for NAE to change tack
5  and say to you now the "Claims" has no meanings.
6    The final point, and I make this with the
7  reservation that about -- a caveat about the importance
8  of pre-contractual exchanges which in fairness would be
9  said against me have been relied upon by both parties in
10  this arbitration for context.  But as far as they are
11  dispositive, it is probably fair to say that when
12  Mr Malek made concessions in emails accepting deletions
13  of parts of clause 12, you don't know and you can't know
14  whether he did so because he was alive to the definition
15  of "Claims".  And, in our submission, he must have been,
16  having drafted the contract.  So when he gave up the
17  wording you were referred to before in clause 12, he did
18  so in the full knowledge that it made no difference
19  whatsoever.  It made no difference because the
20  definition of "Claims" protected the rights he wanted
21  protected in any event.
22    So to the extent that pre-contractual correspondence
23  and exchanges have great weight or not, in this case
24  they have done in relation to these.  Of course, in
25  relation to the pre-contractual exchanges that we rely

Page 139

1    on, the position is entirely different and we will get
2  to --
3  THE CHAIRMAN:  We've understood the parties' flexibility
4    about relying on pre-contractual exchanges.
5  MR WADE:  Okay.  So that was my final point on the issue of
6    the clause 12 exclusions.
7    No, that wasn't the final point.  My slides correct
8  me.  The final point is that you should test -- whenever
9    you think carefully about the clause 12 exclusions you
10  should test the exclusion in relation to the terms of
11  indemnity 11.7, which is the gas flaring indemnity.  The
12  background to the gas flaring indemnity is that it was
13  entered in circumstances where the parties had already
14  been told they were going to be fined for gas flaring
15  and Allied had been complaining about the gas flaring
16  for a great deal of time and NAE had done nothing to
17  correct it.  In these circumstances, the indemnity at
18  clause 11.7 was entered into and NAE accepted liability
19  for all of the gas flaring, for any fines arising from
20  the gas flaring, up until the economic date.
21    The parties negotiated that from the economic date
22  Allied would be responsible for any gas flaring and any
23  fines that arise in relation to that.  If NAE's current
24  view of clause 12 is correct, then this indemnity has no
25  meaning whatsoever.  That applies also by the way in

Page 140

35 (Pages 137 to 140)

www.DTIGlobal.com        8th Floor, 165 Fleet Street
London EC4A 2DY

1  relation to thinking about the novation.  The parties
2  took the trouble to negotiate a set of indemnities,
3  including an indemnity for events of which they were
4  well aware, and then by some magical operation of
5  clause 12 those provisions are emptied of any content.
6  If that is the case, if clause 12 applies to disapply
7  the first half of clause 11.7, why did the parties enter
8  into it at all?  Did they intend clause 11.7 to be
9  disapplied?  Was this a gotcha moment on behalf of Eni
10  or NAE?  Did NAE think to itself "Well, excellent"?
11  I don't think so, I think parties must be taken to have
12  negotiated in reasonable good faith and they would not
13  have intended to agree one provision and then close it
14  out by the back door.
15      So that's probably my last submission on the
16  exclusion clauses.
17      Turning then to NAE's claim against Allied -- how
18  are we doing for time?
19      Do I have another 15 minutes or so?
20  THE CHAIRMAN:  Yes.
21  MR WADE:  Yes.  (Pause.)
22      So, first of all, again I must make my submissions
23  here without prejudice to all of the various
24  jurisdictional and other objections which we have
25  pending.

Page 141

1  like -- and I say this with almost certainty -- that NAE
2  was aware that Allied had served the dispute notice on
3  time, and they weren't aware of it from the very first
4  moment but they became aware of it and they concluded
5  that it was served on time.
6  MR LEW:  You just said that this has come about from
7  disclosure.
8  MR WADE:  It has come about --
9  MR LEW:  Can you take us to those documents.
10  MR WADE:  Yes, I will.  So let's go there, please.  The
11  first document I would like to take you to is --
12  THE CHAIRMAN:  Before you take us to their documents that
13  you received on disclosure, am I correct that your case
14  is that Allied sent the notice to Abuja?
15  MR WADE:  Correct.
16  THE CHAIRMAN:  And that somebody at NAE in Abuja sent to it
17  somebody else in Port Harcourt?
18  MR WADE:  Correct.
19  THE CHAIRMAN:  And that the stamp is, therefore, the Port
20  Harcourt stamp but it is not the Abuja stamp?
21  MR WADE:  And that is now no longer disputed.  NAE now
22  accepts that that is the Port Harcourt stamp.
23  THE CHAIRMAN:  But you actually have no record of how it was
24  sent by Allied to Abuja?
25  MR WADE:  Well, we have.  The only evidence you have and the

Page 143

1      I would like also to point out, of course, that we
2  have dealt with the adjustments claim that is being
3  levelled by NAE against Allied at great length, for
4  example in our rejoinder and reply submissions at B1,
5  480 to 485.  There are numerous references here, but the
6  short point here is that we maintain the arguments that
7  we have made in the past.  So these submissions don't
8  replace them.
9      One of the key issues, though, which has arisen and
10  has been addressed today as well is the issue of the
11  dispute notice and its timeliness.
12      It has been put against us from the very beginning
13  of this arbitration, although in fairness not before
14  then, that the dispute notice was served late.  It was
15  served on 15 August, instead of on 9 August.  There is
16  a stamp to show it.  Our clients, the respondents, have
17  been puzzled about this, knowing full well as,
18  Mr Kamoru Lawal's witness statement evidences, that they
19  had disputed the dispute notice on the 8th or the 9th at
20  the latest.  They were very confused by this, and we
21  have been through a lengthy process of making enquiries
22  and asking for disclosure and eventually obtaining
23  disclosure, which shows that our clients were right.
24      Not only are the respondents correct that they
25  submitted the dispute notice on time, but it looks

Page 142

1  only evidence in this arbitration, which is uncontested
2  as of yet, is that Mr Kamoru Lawal emailed it from
3  Houston to the Abuja office from where it was delivered,
4  probably by hand, possibly by courier, although the lack
5  of evidence of a courier would suggest that it was
6  delivered by hand, and this was common practice in
7  Allied, to --
8  THE CHAIRMAN:  Do we have a copy of that email?
9  MR WADE:  We do.  We do not.  We have searched.  You ordered
10  us to search and we did search.  And we don't.
11      Nor do we have a copy of a later email in which it
12  was sent somewhere else.  It is a lacuna in our case,
13  but we have witness evidence from the person who sent it
14  as to how it was sent, and that will no doubt be tested.
15  THE CHAIRMAN:  I had forgotten about that, but could you
16  remind me, did the signatory of the letter indicate that
17  he was in Houston on that day --
18  MR WADE:  I believe so.
19  THE CHAIRMAN:  -- in his witness statement?
20  MR WADE:  I believe he was in Houston.  It was emailed
21  from --
22  THE CHAIRMAN:  I don't recall that.
23  MR WADE:  It was emailed.  I have met him in Houston so
24  I assumed he was there.  He was travelling.
25  MR LEW:  He emailed it from Houston?

Page 144

36 (Pages 141 to 144)

| | |
|---|---|
| 1   MR WADE:  I understand that it was emailed to Abuja. | 1   like to take you, please, to an earlier tab in that |
| 2        I should clarify -- | 2        document, which is the tab before. |
| 3   MR LEW:  Okay.  So there ought to be a place from which it | 3   LORD HOFFMANN:  579. |
| 4        was emailed and a place at which it was received. | 4   MR WADE:  This is an email in response from Mr Caropreso. |
| 5   MR WADE:  Correct. | 5        Internally he was asked whether he has received any |
| 6   MR LEW:  And that hasn't -- | 6        dispute notice. |
| 7   MR WADE:  It has not surfaced notwithstanding our best | 7        Initially he answers no in this email, "I haven't |
| 8        efforts, and we -- | 8        received anything but I sent this letter." |
| 9   MR WADE:  Assume that occurred, somebody printed out the | 9   MR LEW:  Which document are you looking at? |
| 10       letter. | 10  MR WADE:  Sorry.  (Pause.) |
| 11  MR WADE:  Somebody in Abuja printed out the letter, yes. | 11       Sorry, I have -- |
| 12  MR LEW:  And delivered it. | 12  THE CHAIRMAN:  I accept the blame because I interrupted you. |
| 13  MR WADE:  Correct, by hand and we have not been to | 13  MR WADE:  Yes, and I apologise for that blowing me off |
| 14       identify -- | 14       course.  Now, may I ask you please to turn to tab 578 in |
| 15  MR LEW:  You are presuming by hand. | 15       the same bundle. |
| 16  MR WADE:  We are presuming by hand because there is no | 16  MR LEW:  What was the document you had us at before? |
| 17       courier document. | 17  THE CHAIRMAN:  We're now going to start at 578. |
| 18  MR LEW:  So is there somebody who can actually say | 18  MR WADE:  If we can start at 578 and there is an email in |
| 19       "I printed it out and I took it"? | 19       English at the bottom of the page. |
| 20  MR WADE:  No, there is not.  Not for lack of asking.  There | 20       At the bottom of the page Mr Giannini asks |
| 21       is nobody who can recall it. | 21       Mr Caropreso whether, having delivered the final |
| 22  LORD HOFFMANN:  You started off by saying that there were | 22       adjustment statement on 24 July, and that's in the |
| 23       documents disclosed which made your point, and I don't | 23       first, did Allied ever respond with a dispute notice, |
| 24       think we've seen them yet. | 24       and that's final paragraph, in accordance with |
| 25  MR WADE:  No, we haven't seen them yet we're getting there. | 25       clause 5.5 of the SPA? |
| Page 145 | Page 147 |

| | |
|---|---|
| 1        We're recalling the background -- | 1        Mr Caropreso replies at the bottom of that page by |
| 2   THE CHAIRMAN:  We're getting there. | 2        saying: |
| 3   MR WADE:  -- I think is what the chairman was trying to do. | 3        "I confirm that we have not received any dispute |
| 4        Is that correct, sir? | 4        notice in relation to the final adjustment..." |
| 5   THE CHAIRMAN:  Absolutely.  Why don't we go to the | 5        He i s writing on 27 August: |
| 6        disclosure documents?  (Pause.) | 6        "... and I attach the letter which I sent on |
| 7   MR WADE:  So the first document I would like to take you to | 7        23 August." |
| 8        is in bundle G21. | 8        He also says: |
| 9   LORD HOFFMANN:  Yes. | 9        "The bank has confirmed we haven't received any |
| 10  MR WADE:  At tab 580, 338.  The tab is 580. | 10       payment from Allied." |
| 11  LORD HOFFMANN:  580? | 11       Now, the letter, if you just turn one page over, |
| 12  MR WADE:  Yes. | 12       still in tab 578, at page 333, the Tribunal may |
| 13       No, it's not. | 13       recognise this letter, it is the letter which you relied |
| 14  LORD HOFFMANN:  It's in Italian. | 14       on in your second award as the basis for deciding that |
| 15  MR WADE:  It looks like I have the wrong reference, anyway. | 15       NAE was in good faith when it made its claim under the |
| 16       (Pause.) | 16       adjustment guarantee. |
| 17       It is at page 388.  Sorry, it is page 338 of the | 17       Then if you could, please, turn now to tab 579, you |
| 18       tab, the same tab. | 18       see Mr Caropreso sending an email to the same group of |
| 19  LORD HOFFMANN:  Of 580? | 19       people saying: |
| 20  MR WADE:  Yes, of tab 580, yes. | 20       "Dear all, I send you the letter sent by Allied on |
| 21  LORD HOFFMANN:  I only have six pages on 580. | 21       the subject." |
| 22  THE CHAIRMAN:  Page 2 of the PDF. | 22       Then on the next page is the dispute notice, and |
| 23  LORD HOFFMANN:  Oh, at the bottom.  Yes. | 23       Mr Caropreso explains in his witness statement at |
| 24  MR WADE:  But if I may, actually by way of additional | 24       paragraph 37 -- I don't think we need to go there -- |
| 25       background, as our background was interrupted, I would | 25       that although this dispute notice was sitting on his |
| Page 146 | Page 148 |

1  desk for at least almost two weeks, he hadn't noticed
2  it.  That is why he sent on the 23rd the letter to
3  Allied, and that is why also on the 27th he sent the
4  internal email saying "We haven't received anything".
5      But then he reached the bottom of his pile of papers
6  on his desk, or something else occurred, and he
7  discovered that the dispute notice had been sent.  We
8  don't know how he discovered it, but it is now
9  acknowledged that it was discovered.
10     We also understand that the 15 August stamp was
11 applied by Mr Caropreso's secretary, after it was
12 received in his office.  So it was not applied in Abuja
13 at all but it was applied in Port Harcourt.  We don't
14 know how it arrived in Port Harcourt but that is where
15 the stamp was received.
16     Then if we go to tab 580 latterly at last, and that
17 is an internal Eni/NAE email -- in fact it's an internal
18 NAE email, in terms of the people who are on it, as far
19 as I understand, and we turn to the English translation
20 on page 388, and Mr Giannini is updating Mr Pagano on
21 the developments with regard to the dispute notice.
22     He says in the first paragraphs:
23     "We have received this.  We need to investigate
24 what's happening."
25     Sorry:

Page 149

1      "We have received this."
2      And he gives the background in the first paragraphs,
3  and it is the final two paragraphs from which I draw my
4  conclusions in a minute.
5      He says:
6      "We are verifying with legal if the response from
7  Allied was sent and delivered in the time defined by the
8  SPA."
9      He says:
10     "If so or in which case [after the brackets] we will
11 open a dialogue with Allied.  If it is not [he continues
12 in the next paragraph] otherwise it our intention to
13 apply the SPA requiring the payment of the first
14 tranche."
15     So an internal investigation is launched by NAE/Eni.
16 There is a bit of a gap in the documents and
17 I understand that they were identified to us in the
18 disclosure process, but they are privileged so we don't
19 have them, and that is not something we complain about.
20     But if you go to the next tab, at tab 581, we see
21 another update from Mr Giannini to Mr Caropreso and
22 others, including Mr Pagano, and the subject is "Dispute
23 period with respect to the final adjustment statement
24 under the SPA".  You have the conclusion of the
25 investigation.

Page 150

1      Mr Giannini says:
2      "With regard to the letter received from Allied
3  relative to the final adjustments for the Jan/June 2012
4  costs we are preparing a draft report reply in which we
5  state that we are willing to hold a meeting in order to
6  establish the definitive amount."
7      And so if you go back to his previous email, you
8  know that he was going to do that if the investigation
9  revealed that the dispute notice was served in time.  So
10 on 29 August Mr Giannini says "Well, if it was turned in
11 time we are going to open a dialogue and we are going to
12 agree or try and agree" -- well, I imply that from the
13 words "open a dialogue".
14     But on 4 September you see that that is what they
15 are doing.  They haven't gone for the other option.
16 They haven't demanded money.  They haven't decided to
17 demand money.  They've decided to open a dialogue.
18 MR LEW:  The notice of dispute, what did that ask for?
19 MR WADE:  Sorry?
20 MR LEW:  What did the notice of dispute ask for?
21 MR WADE:  The notice of dispute did two things, and I am
22     looking at it conveniently.  It is at tab 579 on
23     page 335, but it did two things.  It identified
24     a particular item which should not have been claimed as
25     an adjustment, and it said: as a result, your notice

Page 151

1      can't be final.  So your final adjustment notice can't
2      be final because it has an incorrect entry in it.  It
3      says: in any event we can't address this within the
4      time, we don't know if it is right or wrong, and our
5      interpretation of that letter is that we, therefore,
6      challenge it because we need more time to evaluate the
7      claims that you are making.
8          So it concludes with a request for a meeting.  But
9      you will recall, and this is important, in my
10     submission, that once they had discovered the dispute
11     notice NAE only intended to comply with that request for
12     a meeting if the dispute notice was received in time,
13     according to their investigation, and then they did.
14         So --
15 LORD HOFFMANN:  Anyway, that's the evidence that shows you
16     were right?
17 MR WADE:  Yes, that is the evidence that shows we were
18     right.  It raises questions which are, I suppose, not
19     for me to answer but it does raise questions about the
20     basis of the finding previously made about the good
21     faith nature of the claim made under the adjustments
22     guarantee.  Whether that would have had any difference,
23     I don't know if it would, in terms of your award, but it
24     is nevertheless an important question to think about as
25     you consider the evidence that you hear in this hearing.

Page 152

38 (Pages 149 to 152)

1    (Pause).
2        I want to leave that issue for now.  We'll revisit
3    it, I believe, in the course of the hearing.  If you
4    have any more questions about that, then I will happily
5    address them.  Or I will try to, when I say "happily".
6        On the slides I go through these very same emails
7    that we've just seen.  It is probably better to see them
8    in the flesh.
9        The slide there is the email covering the actual
10   letter which the Tribunal might recall on
11   11 September --
12   THE CHAIRMAN:  That's the next letter in the series.
13   MR WADE:  The next letter is when NAE does actually invite
14   Allied to hold a hearing on the 19th, and there are
15   expressions of willingness to meet and resolve the
16   issue.  We rely on that -- initially we relied on that
17   for waiver and now we rely on it as proof that the
18   dispute notice was received on time according to NAE's
19   own investigation and, alternatively, if that is not
20   proven, then it is certainly evidence of waiver, and the
21   documents we've seen go to both issues as well.
22       The other aspect which I would briefly address in
23   relation to the adjustments, the Tribunal is aware that
24   the respondents' case is that matters which shouldn't
25   have been claimed were claimed within the adjustments

1    and our clients' alternative case in relation to this
2    claim is that if we are entirely wrong or misapplied the
3    law, and the dispute notice was received late and not
4    waived, and the timeliness wasn't waived, and you do
5    have jurisdiction to determine the issue, then it would
6    be wrong for you -- it would be unconscionable and
7    contrary to the parties' intentions for you to simply
8    rubber stamp a dispute notice -- sorry, a final
9    adjustment statement which is known to be wrong.
10       So our case has always been put that if you do get
11   to considering the adjustments claim on its substance --
12   so this is our alternative case -- then you mustn't just
13   rubber stamp the final adjustment statement, you must
14   look at whether the claims were validly made.  We
15   invited the claimant to prove its claim.  In the end,
16   they tried to do that but, of course, they can't prove
17   the entire final adjustment statement, nor their claim.
18   In this regard, we have adduced expert evidence from
19   Mr Taylor in relation to which of the items claimed
20   under the final adjustments statement were properly
21   claimed.
22       This is an area on which I should say the experts
23   agree less on, although they don't completely disagree.
24   They agree on many issues, but the questions they don't
25   agree upon I will highlight in a minute.

1        Mr Taylor concludes in relation to -- and this is
2    how he conducted the investigation -- that for costs to
3    be recoverable as adjustments they had to be permitted
4    costs, and he considers that he is -- as a chartered
5    accountant whom might have been appointed to conduct the
6    independent expert analysis or at least a person of
7    similar qualifications, he has reviewed the contract and
8    he considers that there are categories of items, claims
9    which are permitted, and to fall within a claim that is
10   allowed the claims must be permitted under the contract.
11   The costs must have been incurred between the date of
12   the SPA and completion, so 31 December to 28 June.  They
13   must be supported by adequate third party documentation.
14   So he agrees that the claim must be proven.  And one of
15   the other issues which arises from the adjustments
16   process is that NAE had to show proof of payment.
17       Now, Mr Good, the expert appointed be NAE, doesn't
18   agree with all of those points but he doesn't disagree
19   with them either necessarily.  His instructions prevent
20   him from analysing the contract on the grounds that
21   these are legal questions.  So he doesn't offer
22   a different conclusion, he just doesn't say anything.
23   So you have evidence as to how this clause should
24   operate from an expert accountant and you have another
25   expert accountant who agrees with many of the

1    mathematical calculations but not the basis under which
2    they are applied.
3        There are two final points which can be made about
4    Mr Taylor's analysis.  The first one on the slide is
5    I think a relevant and important one, although it's not
6    the final answer.  The first point is that on the date
7    of the final adjustment statement, the FAS, only
8    6.8 million of the 48 claimed was properly supported and
9    within the dates permitted.  So at the date of the FAS,
10   of the 48 million only 6.8 million was supported by the
11   documents produced.  That's relevant to your
12   consideration of Allied's response to this final
13   adjustment statement.  Were they completely bonkers when
14   they wrote back and said "We need more time, this
15   doesn't make sense"?  Or was their response a reasonable
16   one in the circumstances?
17       The next point which isn't on this slide is that,
18   finally, following disclosure of additional documents by
19   Mr Good in relation to the final adjustments statement
20   claims, Mr Taylor concludes now that if you have
21   jurisdiction to look at this at all, then the correct
22   amount that was properly claimed is 28.1 million.  But
23   he is only able to reach that conclusion on the basis of
24   evidence provided after the close of submissions by
25   NAE's expert witness.

| | |
|---|---|
| 1    That brings me to the end of my pre-hearing | 1    arbitration? |
| 2    submissions, subject to any questions or comments that | 2    **A. Yes, it is.** |
| 3    you have. | 3    Q. And if you turn to the end of the document, page 59 in |
| 4    THE CHAIRMAN: Thank you very much. That's very helpful | 4        the bundle, is that your signature at the end of the |
| 5        from both sides. | 5        document? |
| 6        Now, it is 4.25 pm. We have on the schedule one | 6    **A. Yes, it is.** |
| 7        witness. Shall we start with that witness? | 7    Q. Is there anything that you wish to amend or add to your |
| 8    MR NESBITT: Do I have an opportunity to reply to Mr Wade? | 8        witness statement? |
| 9    THE CHAIRMAN: No. Was that provided for in -- | 9    **A. No.** |
| 10   MR NESBITT: It wasn't expressly provided for, but I think | 10   MR NESBITT: Thank you, Mr Cerrito. If you wait there the |
| 11       the agreement was -- or the direction was that each | 11       respondents' counsel will have some questions for you. |
| 12       party would have two hours each for opening. I think | 12           Cross-examination by MR WADE |
| 13       I've got a little bit of time left. I haven't | 13   MR WADE: Good afternoon, Mr Cerrito. You have your |
| 14       calculated it. | 14       statement there and have you opened it to the right tab? |
| 15       Yes, and I think Mr Wade said that he thought that | 15   **A. Yes.** |
| 16       we might be longer in reply than in opening, as | 16   Q. I understand from your statement that between |
| 17       I recall, but I don't think it should come as a surprise | 17       August 2009 and April 2012 you were the finance and |
| 18       but I am obviously in the Tribunal's hands. (Pause.) | 18       control manager for NAE; is that correct? |
| 19   THE CHAIRMAN: No. You will have a chance in due course to | 19   **A. That's correct.** |
| 20       reply, but it may be in writing, so there will be no | 20   Q. And you were responsible in relation to the PSC that's |
| 21       further submissions at this point. | 21       relevant to this case and the OMLs for preparing |
| 22       Shall we have a 15-minute break and then we can | 22       financial statements, cost recovery and cash flow -- |
| 23       start with our first witness? | 23       internal control and cash flow and relations with |
| 24   MR NESBITT: That will be Mr Cerrito. | 24       partners. |
| 25   THE CHAIRMAN: Very well. | 25   **A. Yes.** |
| Page 157 | Page 159 |

| | |
|---|---|
| 1    (4.24 pm) | 1    Q. Correct? |
| 2        (A short break) | 2    **A. Correct.** |
| 3    (4.38 pm) | 3    Q. You were also part of the management committee or Macom |
| 4        MR GIUSEPPE CERRITO (called) | 4        as we refer to it; is that correct? |
| 5    THE CHAIRMAN: Good afternoon. Could you state your name | 5    **A. Correct, yes.** |
| 6        for the record, please. | 6    Q. And after April 2012 you became the general manager |
| 7    **A. Yes, I am Giuseppe Cerrito.** | 7        corporate and finance control for NAOC? |
| 8    THE CHAIRMAN: Very good. And you've provided a witness | 8    **A. Yes.** |
| 9        statement in these proceedings. | 9    Q. And I understand that NAOC is Eni's onshore producing |
| 10   **A. Correct, yes.** | 10       company in Nigeria; is that correct? |
| 11   THE CHAIRMAN: And you understand that it is your obligation | 11   **A. That's correct.** |
| 12       to tell the truth? | 12   Q. And at the same time you remained a director of NAE -- |
| 13   **A. Yes, I understand.** | 13   **A. Yes, I became a director of NAE.** |
| 14   THE CHAIRMAN: And that the failure to intentionally to tell | 14   Q. -- in April 2012. |
| 15       the truth could have serious consequences for you? | 15   **A. Correct.** |
| 16   **A. Yes, I know.** | 16   Q. Okay. You say in your statement at paragraph 13, I'm |
| 17   THE CHAIRMAN: Very good. Claimant, would you like to | 17       not sure if you want to look at it, but please do if you |
| 18       introduce the witness. | 18       want to, that you attended Macom meeting number 9 in |
| 19           Examination-in-chief by MR NESBITT | 19       September 2009? |
| 20   MR NESBITT: Thank you, Mr Chairman. | 20   **A. That's correct.** |
| 21       Good afternoon, Mr Cerrito. Could Mr Cerrito be | 21   Q. And that is the Macom meeting in which the GSO was |
| 22       given bundle D1, please. | 22       approved; is that correct? |
| 23       Mr Cerrito, if you could turn to tab 5 in that | 23   **A. Yes, that's correct.** |
| 24       bundle, please. The document there, is that a copy of | 24   Q. And at that point you were also aware of the side letter |
| 25       the witness statement that you've given in this | 25       to the Macom -- to the GSO; is that correct? |
| Page 158 | Page 160 |

1    A. Yes.
2    Q. Okay. Can I ask you, please, to look at that side
3       letter. It's in folder G12 at tab 291. It starts at
4       page 18. You can see at the top there is a heading
5       "Side letter to the PSC on OML 120 and 121 regarding
6       Oyo-5 well intervention". Can you see that?
7    A. Yes.
8    Q. Can you please turn to the final page of that document,
9       which is at 21. You see that there is a signature block
10      there which is signed and dated on 1 October -- well,
11      between 1 and 4 October 2012 -- 2010, I'm sorry. 2010.
12   A. Yes.
13   Q. And just briefly, is the signature on the top right
14      left-hand side, so the top left-hand side under NAE, is
15      that the signature of Mr Pagano?
16   A. Yes, that's correct.
17   Q. And was Mr Pagano -- at that time, was he the directing
18      manager or the general manager of --
19   A. Managing director and vice-president of the company.
20   Q. Of NAE? Okay.
21      Can you please turn to the second page of this
22      document at paragraph 2. In that paragraph you see that
23      Allied agreed to pay for the Oyo GSO -- if you don't
24      mind I will just call it the GSO.
25   A. Yes.

Page 161

1    Q. That's correct, Allied agrees to pay?
2       Can you please also look at paragraph 4, and can
3       you -- I won't ask you to read it to the Tribunal unless
4       the Tribunal wants it read. I find that generally --
5    THE CHAIRMAN: No.
6    MR WADE: But you see there that -- is it correct that if
7       there was an expenditure in excess of 10 per cent of the
8       AFE, then any expenditure in excess of that had to be
9       approved by Macom? Is that correct?
10   A. Yes, in excess of 10 per cent of the approved
11      authorisation of our expenditure.
12   Q. And if it was not approved by Macom, then Allied would
13      not have to pay the excess, would it?
14   A. Well, it is not written in this way because it is
15      written:
16      "The costs overrun shall be presented to Macom for
17      approval and if approved the financing of such costs of
18      overrun shall be the sole responsibility of Allied in
19      accordance with the payment obligation."
20      If it was not approved, well, it is not written
21      which are the consequences.
22   Q. I understand. Thank you. We've read the provision
23      and --
24   A. However, just for clarification, the AFE was approved
25      for $50.9 million.

Page 162

1    Q. And so you pre-empted my next question, thank you very
2       much. My next question which you have just answered, is
3       it correct that the AFE was approved at the amount you
4       have just stated? I think it is 50.963 --
5    A. I think so.
6    Q. -- and that's referred to in paragraph 26 of your
7       statement, isn't it?
8    A. Yes.
9    Q. And is it correct that there is no further AFE? There
10      was no additional AFE after that?
11   A. Yes --
12      That was --
13   A. -- this is correct.
14   Q. -- the final one?
15   A. There was no possibility to have a new AFE.
16   Q. Okay. So now can I please ask you to turn to bundle --
17      it's a new bundle to me, E3, at tab 4. (Pause).
18      That is the joint statement between Mr Nicholas Good
19      and Mr Mark Taylor, both of whom are the quantum experts
20      in this arbitration.
21      Do you see that?
22   A. Yes.
23   Q. You do. Can I ask you, please ... (Pause).
24      Could I ask you, please, to turn to page 101 in that
25      tab. 101. Turn to paragraph 5.2.

Page 163

1    A. 5.2?
2    Q. Yes.
3    A. Yes.
4    Q. And the entry there is "Oyo-5 GSO costs".
5       Can you see in the third column or the column to the
6       right --
7    A. Yes.
8    Q. -- can you see it says:
9       "The experts agree that the B1 documentation
10      referred to by Mr Taylor ..."
11      We'll go there in a second:
12      "... records an expenditure by Allied ..."
13      It doesn't say that, let me read you what it says:
14      "The experts agree that the B1 documentation
15      referenced by Mr Taylor and Allied's schedule detail of
16      GSO costs exhibit MPJT18 records expenditure of
17      44.5 million between April 2011 and March 2013 and notes
18      that the partial invoice supported received [and there
19      is a reference there] ties to amounts included in
20      Allied's schedule of GSO costs."
21      Do you see that?
22   A. Yes, I saw that.
23   Q. Good. In the paragraph below that, there is a reference
24      to a different document:
25      "The experts also note that the schedule of Oyo-5

Page 164

41 (Pages 161 to 164)

| | |
|---|---|
| 1   GSO costs prepared by NAE shows 43.1 million paid by | 1   **A. Yes, 59,697,438.2 (sic).** |
| 2    Allied and its affiliates which is 1.4 million lower | 2   Q. Do you understand that to be the total cost of the GSO? |
| 3    (sheet 4 Oyo-5 GSO) workbook exhibited at MPJT24." | 3   **A. Well, I do not have this evidence because in the last** |
| 4    Do you see that? | 4    **exchange we made between us and Allied we arrived at 56** |
| 5    Then there is a reference to the fact that the | 5    **point something. In the range of 56 million.** |
| 6    difference is probably due to the fact that the NAE | 6   Q. Okay -- |
| 7    document was produced earlier. | 7   **A. Then in all that there were invoices not approved by** |
| 8   **A. Well, we draft the --** | 8    **Allied. There were negotiation ongoing with some** |
| 9   Q. I'm just asking -- | 9    **contractors which were -- to which Allied was trying to** |
| 10   **A. -- the payment until June 2012.** | 10    **reduce the amount of the invoices, like Schlumberger.** |
| 11   Q. Correct. So the reference explains there the difference | 11    **So I'm not able to say which is the final amount.** |
| 12    between the two schedules; correct? That one produced | 12   Q. So can I ask you, please, to turn to folder F20 at |
| 13    earlier than the other? | 13    tab 24. That is the other document we looked at before |
| 14   **A. Correct.** | 14    in the joint expert report. This is easier to identify |
| 15   Q. So you agree that Allied paid -- of the GSO costs Allied | 15    and it might be easier for you in particular, but if you |
| 16    paid $44.5 million towards the GSO costs? Do you agree | 16    look on the first page, 110, you see that there is the |
| 17    that? | 17    final adjustment statement. That is the title there. |
| 18   **A. Well, I have -- I had evidence for 43 million. The** | 18   **A. Yes.** |
| 19    **additional 1.4 I believed the experts was able to get** | 19   Q. And if you go to page 114 -- |
| 20    **the evidence. We received the evidence until June 2012** | 20   **A. Yes.** |
| 21    **for $43 million.** | 21   Q. -- we have there a breakdown of the GSO costs. |
| 22   Q. That's what -- | 22   **A. Yes.** |
| 23   **A. Which Allied paid and recovered.** | 23   Q. Is that correct? If you look at the total amount of US |
| 24   Q. -- what you agree. And you do not agree the figure of | 24    dollars, that is an amount you were just mentioning -- |
| 25    44.5 of which you're not aware? | 25    the approximation you were just mentioning, isn't it? |
| Page 165 | Page 167 |

| | |
|---|---|
| 1   **A. I -- well, I do not have direct evidence of the** | 1   **A. Well, I --** |
| 2    **additional 1.4.** | 2   Q. It's a bit higher than you said, it is 57. |
| 3   Q. Yes. | 3   **A. That's correct, 57. I'm not sure that all the costs** |
| 4   **A. I have the evidence for 43.** | 4    **included in these table were supported by final** |
| 5   Q. Can I ask you, please, then, to go to folder F20 -- | 5    **invoices, in the sense that at that time there were** |
| 6    sorry, F19 is -- that's the one he agrees. | 6    **still a discussion and a negotiation with contractors to** |
| 7    Can you open, please, F19 at tab 18. This document | 7    **finalise the cost.** |
| 8    is -- which you can glean from the index prepared by | 8   Q. I see. |
| 9    claimants' counsel., this document is exhibit MPJT, | 9   **A. We were providing a table like these frequently. We** |
| 10    which was referred to in the table you just looked at in | 10    **tried to reconcile both positions.** |
| 11    the joint statement at paragraph 5.2. | 11   Q. I understand. Thank you. |
| 12    Please don't worry, I'm not going to ask you to | 12    So here you have also the lower amount, the amount |
| 13    agree the amounts here. | 13    paid of 43.08 million, which is the amount paid by |
| 14   LORD HOFFMANN: You did say 19? | 14    Allied -- |
| 15   MR WADE: It is F19, tab 18. | 15   **A. Yes.** |
| 16   LORD HOFFMANN: Oh, tab 18. Sorry. | 16   Q. -- and we said it's the lower amount because this is |
| 17   MR WADE: I am going to ask you to turn to the final page of | 17    an earlier document; correct? |
| 18    that printout of a spreadsheet. | 18   **A. Correct.** |
| 19   **A. Yes.** | 19   Q. And turning back to the question of the level of the |
| 20   Q. Page 278. | 20    FAE, we said that the FAE was approved costs of the GSO |
| 21   **A. Yes.** | 21    at $50,963,912, and that's correct. And if we add |
| 22   Q. I will ask you, please, to look at column 9, starting | 22    10 per cent to that, would you agree that the total is |
| 23    from the left and going right, under the heading "Final | 23    just over 56 million? |
| 24    invoice amount endorsed". Can you please read out the | 24   **A. Yes, that's correct. However --** |
| 25    total of the final invoice endorsed there? | 25   Q. And -- |
| Page 166 | Page 168 |

1   A. -- this was -- if I can clarify, this was one of the
2       points, because just for your understanding, this table,
3       since it is including the payment of March 2012, means
4       that this is a table prepared more than one year after
5       the GSO was sent, and there is a clear -- it was
6       reflecting what was happening during that period that
7       there were negotiations ongoing with the contractor.
8       The invoices were still under discussion.  The payments
9       were not done.  The contractors were claiming for the
10      payments.  And the value -- final value of the GSO was
11      not yet closed.
12          This was an estimate prepared in -- I believe in
13      June or in -- between May and June 2012 and --
14  Q.  Mr Cerrito, I'm sorry --
15  A.  -- it is not the final estimate.
16  Q.  I'm sorry to interrupt, and I apologise to the Tribunal
17      for the interruption.  Because of the time I want to
18      move on.
19  THE CHAIRMAN:  Mr Cerrito, I think the point was what was
20      the amount that was authorised?
21  MR WADE:  Right.
22  THE CHAIRMAN:  And I think --
23  MR WADE:  I am loath to interrupt you at all but
24      I apologise.
25  THE CHAIRMAN:  So if you could just answer the questions as

1       directly as possible.
2   A.  Mr Chairman, the point -- just because if in June 2012
3       we arrived at this amount, because we get this amount in
4       June 2012 more or less, because in April we were still
5       earning something which was a lower amount, which was in
6       the range of 55/56 million.  We have communication
7       between the parties, we can see.  Since we were in
8       June 2012, we were closer to the completion of the SPA,
9       the completion date.  At that time there was no
10      possibility to call for a Macom to revise the AFE.
11  THE CHAIRMAN:  Wait a second.  That's fine.  Now you're
12      explaining why it wasn't approved, as far as I've
13      understood.
14  A.  This is my --
15  THE CHAIRMAN:  You weren't asked that question directly.
16      The lawyers for the claimant can ask you questions in
17      redirect --
18  A.  I'm sorry.
19  THE CHAIRMAN:  But --
20  MR WADE:  But in fact my next question was going to be, was
21      there ever an approval of the costs beyond 10 per cent?
22      And I think you just said that there was never approval
23      for more than the additional 10 per cent.  I understand.
24      Thank you.
25          Moving topic, then, you say in your statement that

1       you were part of the team that negotiated the SPA
2       amendment.
3   A.  Yes.
4   Q.  Can you please tell us or tell me who else was on the
5       team.
6   A.  Well, the team is usually composed by the lead
7       negotiator, the --
8   Q.  Can I stop you.  Can you please tell me the name and
9       their role straightaway?
10  A.  Yes, Mr Vicini was the lead negotiator of -- for that
11      transaction.  Then we have Mr Ellis Ebohon for the legal
12      aspect and --
13  Q.  Was he involved in that transaction?
14  A.  Well, to look at the legal aspect, to cover the legal
15      aspects, of course.
16  Q.  Was anybody else involved in that PSC amendment?
17  A.  Yes.  Probably not -- well, the team -- the main part of
18      the team was composed by myself, by Mr Vicini and by the
19      legal party.
20  Q.  And was Mr Pagano involved at all?
21  A.  Of course, but it was not him holding the direct
22      negotiation.  During a negotiation there is always
23      a team which is following the amendment of the
24      documents, all the aspects relevant to the negotiations,
25      and then at management level to which we are presenting

1       the results of the negotiation, which is deciding about
2       the --
3   Q.  And was Mr Casula also part of the management level of
4       the team?
5   A.  Yes, of course.  He was the chairman of the company.
6   Q.  And he did participate in negotiations in relation to
7       the amendment?
8   A.  Not directly in the negotiation.  All our exchange of
9       emails or communication between the two negotiations
10      teams.
11  Q.  So not at the lower level?
12  A.  Not at your -- in the negotiation team directly.  Of
13      course, he was part of the management team to which we
14      were referring to.
15  Q.  And if the management part of the team reached
16      an agreement or a decision with the management part of
17      the other side's team --
18  A.  Yes.
19  Q.  -- was that the decision that you had to implement in
20      your drafting?
21  A.  Well, if there is a decision, if there is a decision at
22      a higher level, usually the management level call the
23      negotiation team asking for the implementation of -- for
24      a proposal which include the implementation of such a
25      decision.

1    Q. I understand, thank you.
2    **A. This is the process.**
3    Q. And when you were negotiating the SPA amendment, NAE's
4       primary objective, and perhaps both parties, but NAE's
5       primary objective was to achieve completion, wasn't it?
6    **A. Yes, it was.**
7    Q. And the reason you were so keen to achieve completion
8       was that the deal that you secured was -- and by "deal"
9       I mean the payment that was agreed under the SPA -- was
10      a vastly inflated payment for the interest that was
11      being sold, wasn't it?
12   **A. Well, I didn't understand really the --**
13   Q. So the --
14   **A. So the payment --**
15   Q. -- payment that Allied promised to pay NAE was vastly in
16      excess -- vastly means by a very great deal -- in excess
17      of what the interest was worth. That's correct, isn't
18      it?
19   **A. Well, I do not agree with this sentence, in the sense**
20      **that I believe we provided to -- in the sense that in**
21      **the documents, the value of our asset in our book was in**
22      **the range of $240 million.**
23   Q. Can I ask you please to open G21.
24   THE CHAIRMAN: Were you finished?
25   MR WADE: Sorry, I didn't mean -- I apologise if I had

                          Page 173

1       interrupted. I thought you had reached a natural
2       conclusion.
3    **A. The value of the asset in our books was $240 million,**
4       **more or less, if I remember well, but the range is in**
5       **this one in this way, and so the value of the asset was**
6       **not so far -- the consideration was not so far from the**
7       **value of the asset. This was the object -- the**
8       **objective of our -- I mean, the target of our**
9       **transaction, this value.**
10   Q. Can I ask you to turn to volume G21, please, at tab 550.
11   LORD HOFFMANN: Tab?
12   MR WADE: Tab 550.
13      The first page of the exhibit is 107, and --
14   **A. Yes.**
15   Q. -- the English is at 109. Can I ask you, please, to
16      turn to page 109.
17   **A. 109.**
18   Q. At the top of that page, can you see that the first
19      email in this chain is an email from Mr Casula to
20      Mr Descalzi, Claudio Descalzi?
21   **A. Yes.**
22   Q. Can you please explain to the Tribunal who Mr Descalzi
23      was at the time and who is he now?
24   **A. Yes. Mr Descalzi was the chief operating officer of the**
25      **exploration and production division at that time, and he**

                          Page 174

1       is currently the chief executive, CEO, of Eni at the
2       moment.
3    Q. And in the cc line, the copied line, you see the people
4       are mentioned Mr Magnani, Mr Ranco. Is it Ms Ranco?
5       Mr Dall'Omo, Mr Pagano, Mr Bollini. I think that's a
6       Mr, or it might be that that is a lady.
7       Are those people in the cc line, are they board
8       members of Eni's exploration and production division or
9       were they directors of some other company?
10   **A. They were at that time in charge of various departments**
11      **in the exploration and production division.**
12   Q. The subject of this email is "Nigeria OML 120 and 121
13      assignment update"; is that correct?
14   **A. Yes.**
15   Q. I should say perhaps, members of the Tribunal, that
16      I will be finished very soon. This is the last document
17      I intend to take -- just because of the time.
18   THE CHAIRMAN: Thank you very much.
19   MR WADE: So we're not staying all night.
20      Can you briefly quickly read the email to
21      Mr Descalzi, which starts with "Claudio".
22   **A. Yes:**
23      **"Below is the note shared with the competent**
24      **function that illustrates the final condition with**
25      **respect to the represented to the board of directors,**

                          Page 175

1       the primary difference is the guarantee given for the
2       balance of the consideration. Now ultimate parent
3       company guarantee originally bank guarantee."
4    Q. I'm sorry, I didn't mean you to read it out loud, if
5       I want you to read out loud I will ask you to. That's
6       very kind of you. But I do invite the Tribunal to read
7       the email, I just don't want to waste time on reading it
8       out loud.
9       But on the penultimate line before the end of the
10      email, it says "the first $100 million are already
11      paid."
12      Correct?
13   **A. Correct.**
14   Q. And the signature is now scheduled on the 28th. Is it
15      fair to say that this email was presenting the terms of
16      the agreement that had been reached in relation to the
17      assignment of the OMLs in June 2012?
18   **A. Well, I was not part of this email. The email was sent**
19      **on the 26th. I suppose that this is confirming the**
20      **terms of the agreements which were analysed on the 28th.**
21   Q. So the first amendment agreement?
22   **A. The first amendment --**
23   Q. This is informing the directors of the terms of the
24      first amendment; correct?
25   **A. I guess. I mean --**

                          Page 176

| | |
|---|---|
| 1   Q. And can you turn to the next page, please, and although | 1   A. Yes. |

**Page 177**

1   Q. And can you turn to the next page, please, and although
2     we don't have a signature, we're looking at the email
3     which Mr Casula was forwarding to Mr Descalzi from
4     Mr Pagano, in which the terms are actually summarised.
5   **A. Which email is it?**
6   Q. So the email which you started reading out loud was the
7     email from Mr Casula to Mr Descalzi and he is forwarding
8     an email from Mr Pagano, isn't he?
9   **A. Yes.**
10   Q. And the email from Mr Pagano has the same heading,
11     121 -- "120/121 assignment update", and the second
12     paragraph starts:
13     "In the context of the realisation process of the
14     Eni ENP portfolio" ..."
15     I stop there for a second, since we're there, at
16     this time Eni had decided to sell off a number of its
17     assets; is that correct?  Do you know if that's correct?
18     Around June 2012, Eni was in a process, a general
19     process, of selling off exploration and production
20     assets?
21   **A. General process, I cannot say.  To sell oil well 120 to**
22     **121.**
23   Q. Well, if you can't say, then you can't.  But he says
24     here -- he explains the nature of the holdings in the
25     OMLs, and he goes on to say at the conclusion of the

**Page 177**

1     farm-out process on 29 December, NAE and Allied, I am
2     paraphrasing, agreed a price of 250 million and he gives
3     the schedule of payments in the paragraph below.
4   **A. I'm sorry, I'm --**
5   Q. He lists the schedule of payments that's agreed, and
6     then at the bottom of 109 there's a list of agreed
7     comments.
8   **A. Yes.**
9   Q. Then at the top of 110 there is a discussion about bank
10     guarantees or guarantees, and then in the paragraph
11     after that, starting on 1 June --
12   **A. 2012.**
13   Q. -- "Allied notified NAE of its difficulties in
14     finalising the transaction under the terms described
15     above.  After further discussion, after having extended
16     via mutual accord the long-stop date to 28 June the
17     parties agreed as following ..."
18     Then again there is a list of payments.
19     And then there is a section sign, I don't know what
20     that's called, that section sign.  It says:
21     "The adjustments related to the costs sustained by
22     NAE in the period from January to June 2012 shall be
23     paid by Allied following the issuance of a parent
24     guarantee by CAMAC International in favour of NAE for
25     the corresponding value."

**Page 178**

1   A. Yes.
2   Q. You see that there?  And that's the term that was
3     agreed, wasn't it?
4   **A. Yes.**
5   Q. Further down, under the heading "Conclusions", there is
6     a comment, bullet point 3:
7     "Already with the payment at closing of the first
8     tranche of the consideration..."
9     And that's a payment that had already been made:
10     "... Eni obtains better value compared with the
11     expected residual value in the event of no assignment.
12     It is believed that even with the new terms reported
13     above, the assignment opportunity is in Eni's interest
14     and thus should be pursued."
15     So my question to you is that Mr Pagano here is
16     describing that even with a payment of $100 million,
17     about 40 per cent of the agreed price, Eni has already
18     made better value than keeping the asset?  That's what's
19     he's saying here; right?
20   **A. Well, the fact that it is a do nothing profile -- so**
21     **looking at the value based on --**
22   Q. Can I first ask you, is that what he is saying here?
23   **A. This is what he said but it is not --**
24   Q. And therefore --
25   THE CHAIRMAN:  Just a second, if you would like to add a

**Page 179**

1     comment, please do.
2   **A. If I can explain, the point that the value of the asset**
3     **is calculated only on the do nothing profile of the two**
4     **wells was giving the value which is, of course, a low**
5     **value of the asset.  Of course, when you make**
6     **an evaluation of the asset you have various scenarios.**
7     **In the case, if we were looking at the redevelopment**
8     **of the asset, it is -- because when we evaluate an asset**
9     **we have usually different scenarios.  If we were looking**
10     **at the redevelopment of the asset with additional**
11     **investment, additional intervention, it possible the**
12     **value was different from the negative one represented in**
13     **these -- in the present email, in the sense that --**
14   THE CHAIRMAN:  Just a second but I am just looking at the
15     email.  The email says -- it doesn't talk about other
16     scenarios.  It talks about --
17   **A. It is --**
18   THE CHAIRMAN:  "The first tranche of the consideration Eni
19     obtains a better value compared to the expected residual
20     value in the event of no assignment."
21     And I think the comment was, do you have any comment
22     on that?  This is not your email, I don't believe, and
23     do you have any comment on that particular sentence?
24   **A. The only comment that I can add to this email is the**
25     **fact that I was the finance manager of the company and**

**Page 180**

Day 1                          NAE Arbitration                    15 June 2016

1    I know -- I know that the net value of the asset at that
2    time was $240 million.  I believe that we represented
3    this value to our internal -- to Eni's board of
4    directors.  I needed to check what we represented to
5    them, but I remember that this was one of the
6    information provided to the top management for
7    submission of the approval to the Eni board of
8    directors.  One of the information was the value in our
9    books was $240 million.
10   THE CHAIRMAN:  But he doesn't mention that in his email.
11   A.  No, because this is an internal email to the management.
12   It is not the what it was represented to the Eni board
13   of directors.  The Eni board of directors, the approval
14   was got before that email, because we represented -- we
15   presented our deal to the Eni board of directors before
16   this email.  So it was the -- the deal was already
17   approved.  What he was presenting to the CEO at that
18   time was an updated situation on the negotiation but not
19   the full picture of the value of the asset.
20   MR WADE:  Do you by any chance know why Mr Pagano is not
21   giving evidence in this arbitration?
22   A.  No, no, I don't know.
23   Q.  One final question then, please.  You believe that it's
24   correct that if -- that a party should only be entitled
25   to claim costs if he can prove that he's paid them.

Page 181

1    That's correct, isn't it?
2    A.  Well, this was not the intention of the parties.  At the
3    time we finalised the adjusted -- the final adjustment
4    statement, because in June 2012 -- in July 2012, when we
5    presented the final adjustment statement, there was, of
6    course, no time to recover all the supporting documents
7    of the cost included in the final adjustment statement,
8    because, of course, there were -- there were invoices
9    not yet received.  So the final adjustment statement was
10   based for some months on an estimate -- on costs which
11   were supposed to be the final value, in the sense that
12   in the management of a contract with a third party
13   contractor you receive the invoice after the service has
14   been rendered.  Therefore, for the invoices relevant to
15   June even to me the final invoice and, of course, the
16   payment that usually make after 40/45 -- six days have
17   not been made.  So it was not possible in the short
18   period provided by the SPA to provide Allied all the
19   supporting documents with evidence of the payment
20   already -- all the payments done.
21       But despite this factor, we -- after the submission
22   of the final adjustment statement we gave the
23   opportunity to Allied to sit together, to reconcile the
24   position, to provide additional information, if they
25   needed, to provide additional evidence.  Unfortunately,

Page 182

1    we were never asked for the additional evidence.
2    Q.  If they had attended that meeting and -- you were
3    willing to provide the additional evidence?
4    A.  Of course.  At that time probably not all -- at that
5    time probably not all the documents.  If you are
6    referring to the meeting of September 19, probably not
7    all the documents were still available in September,
8    because the time to recover all the invoices, accept all
9    the invoices and make the payment probably was not
10   enough to have all the documents in September.  But, of
11   course, we were providing what we had been able to get
12   at that time.
13   Q.  And if in the meeting in September the invoices showed
14   that you had asked for too much, would you then accept
15   a lower payment?
16   A.  If there was a clear mistake, why not?
17   MR WADE:  Thank you.  I have no more questions.
18                Questions from the TRIBUNAL
19   THE CHAIRMAN:  Were you involved in sending the final
20   adjustment statement to Allied?
21   A.  Yes, I was.
22   THE CHAIRMAN:  Were you involved in sending the supporting
23   data to Allied?
24   A.  Not directly.  The supporting data that were sent in
25   July 20 -- sorry, in June 2012 dealt -- of course

Page 183

1    I know, because the activity was done by Mr Caropreso
2    which was the finance management at the time and he told
3    me that he collected -- he took at least two weeks to
4    collect all the available documents with his own
5    department, involving two or three staff of his own
6    department.  So they collect all the documents
7    available, they scanned copies of the invoices, and
8    the -- and they downloaded the entire books of the
9    company from our SAP system.  So we -- as company we
10   have a subsystem in which we were booking all the
11   transactions.  The transactions were transparent to
12   everybody, in the sense that downloading all the
13   transactions, everything was tracked, the right
14   transaction, the wrong transaction and the reversal of
15   each transaction.
16   THE CHAIRMAN:  And that information, when was that provided?
17   A.  It was provided together with the final adjustment
18   statement, one day before the final adjustment
19   statement.  There was a CD provided by letter --
20   THE CHAIRMAN:  I see that the date of it is July 23 but
21   I also see the receipt is apparently exactly the same
22   time by Allied.  Do you have any explanation for that?
23   Was it sent out on July 23 or July 24?
24   A.  I cannot answer.  I believe it was the 23rd -- usually
25   our -- what we were doing -- this was not the case but

Page 184

46 (Pages 181 to 184)

1  usually we were advancing to our partner the letter by
2  emails, because this was our general practice, advancing
3  the letter by emails, then providing the original
4  document by courier.
5  THE CHAIRMAN:  Yes.  So you provided all of this material on
6  a CD-ROM and they received it on July 26 when they
7  received the final adjustment statement --
8  A.  Yes --
9  THE CHAIRMAN:  -- is that correct?
10  A.  -- we have the evidence that they received -- we have
11  the stamp on the letter.  In the letter -- the original
12  letter -- the original letter that we provided to them
13  is stamped by Allied on July 26.
14  THE CHAIRMAN:  So they would not have had a chance to review
15  the CD before they received the final adjustment
16  statement; is that correct?
17  A.  Well, in the CD there was already the breakdown of the
18  costs --
19  THE CHAIRMAN:  Excuse me --
20  A.  Yes, I don't believe they were able to --
21  THE CHAIRMAN:  They received them virtually at the same
22  time?
23  A.  Yes.
24  THE CHAIRMAN:  That was the only question.
25  A.  Yes, I believe, yes.

Page 185

1                          INDEX
2                          PAGE
3  Housekeeping .......................................1
4
5  Opening submissions by MR NESBITT ..................5
6
7  Opening submissions by MR SHOESMITH ................30
8
9  Further opening submissions by ....................48
10      MR NESBITT
11
12  Opening submissions by MR WADE ....................82
13
14  Opening submissions by MR GUNNING .................90
15
16  MR GIUSEPPE CERRITO (called) ......................158
17
18      Examination-in-chief by MR NESBITT .........158
19
20      Cross-examination by MR WADE ...............159
21
22      Questions from THE TRIBUNAL ................183
23
24
25

Page 187

1  THE CHAIRMAN:  Okay.
2      Redirect?
3  MR NESBITT:  No redirect, thank you Mr Chairman.
4  THE CHAIRMAN:  Thank you very much.  No further questions,
5  then.  You are released, Mr Cerrito.  Thank you very
6  much for your testimony.
7  A.  Thank you everybody.
8  THE CHAIRMAN:  Shall we now adjourn until tomorrow morning
9  at 10.00 am?
10  MR NESBITT:  If we must, Mr Chairman.
11  THE CHAIRMAN:  I look forward to seeing you at 10.00 am.
12  (5.30 pm)
13      (The arbitration adjourned until 10.00 am
14      on Thursday, 16 June 2016)
15
16
17
18
19
20
21
22
23
24
25

Page 186

47 (Pages 185 to 187)

**A**

**A1** 6:23 14:1,18
    48:10 74:22
**abandoned** 57:14
**abilities** 134:13
**ability** 70:25
    104:17
**able** 5:13 95:20
    101:16 116:24
    117:13 127:8
    156:23 165:19
    167:11 183:11
    185:20
**absence** 45:19
**Absolutely** 146:5
**Abuja** 15:7 143:14
    143:16,20,24
    144:3 145:1,11
    149:12
**academic** 88:12
**accept** 46:22 79:8
    87:9,12,12 134:11
    134:14 147:12
    183:8,14
**acceptable** 48:21
    49:6 50:22,24
    51:14,17,20 52:4
    52:6,13,24 53:8
    53:24 61:13,19
    73:20 86:22 87:2
    87:10,24 89:15
    90:4 115:15
**accepted** 59:17
    79:2 80:24 138:9
    139:2 140:18
**accepting** 87:5
    139:12
**accepts** 78:9 143:22
**access** 64:18 77:18
**accomplished** 2:19
**accord** 178:16
**accords** 61:12
**account** 10:21
    24:23 121:21
    126:25 133:8

**accountant** 155:5
    155:24,25
**accountants** 22:23
    23:6
**accrue** 32:22 33:25
    41:16 131:16
**accrued** 33:25
    34:12,18 37:2,6
    38:23 39:17,24
    43:17 44:20
**accrues** 39:18
**accruing** 34:6 37:7
**accumulate** 91:15
**accumulated** 64:4
**accumulative** 63:7
**accurately** 116:25
**accustomed** 83:2
**achieve** 113:24
    120:17 173:5,7
**acknowledge** 72:2
**acknowledged**
    149:9
**Acknowledgement**
    79:13
**acknowledgements**
    74:20
**acknowledges** 45:1
    79:14
**acquire** 12:24
**acquired** 6:10 8:1
    32:13 33:5 37:21
    41:19 42:10 43:2
    43:4 46:11
**acquisition** 12:19
**Act** 45:20,24
**action** 33:24 34:18
    38:23 42:21,22
    43:16 86:4 113:19
    117:7
**actions** 87:23
**active** 120:21
**actively** 26:13
**activities** 8:23
**activity** 8:7 184:1
**actual** 49:23 61:23

61:23 65:13 71:11
    72:7,18,20,25
    73:2,7 153:9
**Actual_v2_3** 71:20
**Actual_v2_3'** 70:14
**add** 7:23 68:20
    159:7 168:21
    179:25 180:24
**addition** 10:5 85:11
    95:1
**additional** 5:11
    9:14 20:7 22:1
    39:21 67:21 68:21
    146:24 156:18
    163:10 165:19
    166:2 170:23
    180:10,11 182:24
    182:25 183:1,3
**address** 3:24 13:17
    18:13 26:1 48:5
    58:7 65:16 68:18
    128:19 138:22
    152:3 153:5,22
**addressed** 9:10
    11:6 14:25 20:21
    57:21 123:8
    142:10
**addressing** 82:5
**adduced** 57:16
    154:18
**adequate** 155:13
**adequately** 20:8
**Adetoun** 85:1
**adjourn** 186:8
**adjourned** 186:13
**adjournment** 82:13
**adjusted** 10:15
    182:3
**adjustment** 9:12
    10:7 12:8 17:14
    19:2,7,9,11,17
    20:9,15 21:24
    22:16 23:2,16
    24:8 123:3 147:22
    148:4,16 150:23

151:25 152:1
    154:9,13,17 156:7
    156:13 167:17
    182:3,5,7,9,22
    183:20 184:17,18
    185:7,15
**adjustments** 9:5,10
    10:2,10,13,15,17
    13:3,4,16 14:12
    17:22 18:21 21:4
    22:5,13,21 23:4
    23:25 24:11,23
    25:2 142:2 151:3
    152:21 153:23,25
    154:11,20 155:3
    155:15 156:19
    178:21
**admitted** 12:11
    67:24
**adopt** 28:15 86:3,7
**adopted** 40:1 51:4
**adopting** 86:6
**adoption** 19:5
**advanced** 30:21
    42:23 136:7
**advancing** 185:1,2
**advisers** 77:14
**AFE** 162:8,24
    163:3,9,10,15
    170:10
**affect** 130:18
**affiliate** 33:5
**affiliates** 6:3 44:8
    45:9,17 124:8
    129:9 131:3,18
    138:1 165:2
**aftermath** 117:16
**afternoon** 158:5,21
    159:13
**agency** 29:19
**agenda** 3:12
**aggressive** 55:23
    59:13 60:5
**aggressively**
    120:17

**Agip** 5:23
**ago** 43:25 71:5,22
    127:2 128:24
**agree** 19:14,18 23:4
    23:7,11 32:23
    38:1,4 39:3 40:25
    43:12 51:10 124:5
    124:12 141:13
    151:12,12 154:23
    154:24,25 155:18
    164:9,14 165:15
    165:16,24,24
    166:13 168:22
    173:19
**agreed** 9:4,9,17
    10:24 13:16 14:13
    18:25 19:22 47:22
    63:13 74:1,13
    78:22 79:24,25
    83:22,24 85:13
    86:21 88:1 113:11
    123:13,13,14,15
    130:21,24 133:3
    134:5 137:14
    161:23 173:9
    178:2,5,6,17
    179:3,17
**agreeing** 19:16,16
**agreement** 6:18
    10:18 26:21,21,23
    27:16 37:8 44:16
    50:9 51:5 74:2,5
    75:20 80:22,23
    85:21 135:14
    136:15,18,20,23
    136:24 157:11
    172:16 176:16,21
**agreements** 41:4
    133:19,21,21
    176:20
**agrees** 79:14
    155:14,25 162:1
    166:6
**AHD** 107:23
    108:14

**ahead** 58:21 130:16
**aids** 40:5
**aim** 100:21
**aiming** 86:23,25
**alarm** 111:12
**albeit** 49:16
**Alex** 2:9
**alia** 14:22
**alive** 139:14
**allegation** 56:22
57:25 59:12
**allegations** 57:10
59:11
**allege** 55:12
**alleged** 29:17 31:20
31:25 35:9,20
36:6 44:25 48:17
55:14 67:19 81:15
124:21 136:14
**allegedly** 33:4 44:2
**alleviated** 138:17
**Allied** 2:3 6:20 7:24
8:3,13,19 9:4,23
10:16,25 11:4,16
11:19,23 12:18
13:13,22 15:20
19:2,18,25 20:7
21:3,6,7,9,11,22
22:7 24:1 25:6
26:4,12 27:6,12
27:18,24 28:14,24
29:3,20 32:13,19
32:22,23 33:5,22
36:18 37:3,4,21
37:22 38:9 39:1
40:11,20 41:3,9
41:16,18 42:10,15
43:1,18,19 44:2,8
44:19,21 45:2,8
45:17 46:10 47:6
47:9 55:9 63:21
64:3,23 66:14
74:17 75:24 77:17
77:21 78:9,16
79:2,13,15,22,25

80:17,19,22 95:24
123:3 124:16
128:6,11 129:6,8
130:9,14,21,22,24
131:11,17,17
133:3,14 134:1,10
136:7 137:25
140:15,22 141:17
142:3 143:2,14,24
144:7 147:23
148:10,20 149:3
150:7,11 151:2
153:14 161:23
162:1,12,18
164:12 165:2,15
165:15,23 167:4,8
167:9 168:14
173:15 178:1,13
178:23 182:18,23
183:20,23 184:22
185:13
**Allied's** 9:17 11:11
11:13 12:9 13:5
25:12 28:22 32:10
38:13 41:24 42:8
64:22 65:14 75:19
80:8 81:3 134:13
134:14 135:9
156:12 164:15,20
**Allied/CAMAC**
33:20 78:3
**Allied/CINL** 35:19
38:14 47:21
**Allied/Erin** 61:17
**allocated** 36:7,12
**allocation** 39:9
130:8,9,10,18
131:12 132:12
135:12
**allow** 2:7 108:6
**allowed** 129:13
130:17 131:10
155:10
**allows** 131:11
**alluded** 36:2

**alter** 72:25
**alternative** 23:19
39:23 40:1,9
154:1,12
**alternatively** 47:8
153:19
**amend** 159:7
**amended** 4:13 6:19
19:14 24:2 43:24
44:10 46:17 69:24
69:25 70:6,14
71:11 72:11
**amendment** 6:25
14:2 17:11 18:2
20:4 24:7,18
171:2,16,23 172:7
173:3 176:21,22
176:24
**amendments** 3:16
9:17 10:19 80:9
**amount** 10:14
17:16 18:20 22:4
45:4 59:12 64:11
91:10 95:15
110:18 116:4
118:4,15 120:2
126:12 127:7,8,12
151:6 156:22
163:3 166:24
167:10,11,23,24
168:12,12,13,16
169:20 170:3,3,5
**amounts** 8:14
23:24 24:2,16
25:2,3 164:19
166:13
**analysed** 131:25
176:20
**analysing** 129:19
155:20
**analysis** 33:12 54:7
54:11 59:1 77:4
111:9 115:7 118:8
155:6 156:4
**and/or** 37:3 39:21

**animal** 137:24
**annulus** 100:6,11
100:17 101:17
102:14,15 105:4
**answer** 16:12 47:24
123:11 134:19
152:19 156:6
169:25 184:24
**answered** 163:2
**answers** 131:4,5
147:7
**anticipated** 83:13
**anybody** 171:16
**anyway** 46:10
109:14 110:1
146:15 152:15
**apart** 8:4 72:14
84:19
**API** 88:12
**Apologies** 13:25
**apologise** 32:5
85:19 147:13
169:16,24 173:25
**apparent** 45:15
46:24 56:20 73:5
**apparently** 31:19
66:24 184:21
**appear** 5:21 46:22
116:16
**appeared** 116:18
**appears** 12:2 28:3
35:1 42:9 46:5
62:13 65:5
**Appendix** 72:3
**Apple** 94:2
**apples** 72:23
**applicability** 79:19
**applicable** 47:16
60:12 66:20 87:13
**applications** 6:8
**applied** 14:24
33:20 60:1,23,24
62:16 66:13 70:9
76:22 87:3 149:11
149:12,13 156:2

**applies** 77:6 88:19
140:25 141:6
**apply** 49:10 60:14
75:12 77:4 78:11
79:9 84:25 86:8,9
87:25 88:18 90:4
93:2 150:13
**applying** 53:23
54:3 63:19
**appointed** 155:5,17
**appraisal** 95:5
**appreciated** 2:15
122:14
**approach** 29:14
50:3,5 59:12 62:4
62:7 63:17,24
65:4 66:18 72:17
85:5,7
**appropriate** 2:16
35:24 69:10 73:14
86:25 98:8 113:19
**appropriately**
117:1
**approval** 162:17
170:21,22 181:7
181:13
**approved** 48:20
54:4 68:15 74:2
160:22 162:9,10
162:12,17,20,24
163:3 167:7
168:20 170:12
181:17
**approving** 26:16
**approximate** 10:14
**approximately**
8:10,19 32:16,18
33:7
**approximation**
167:25
**April** 11:19 32:21
33:6 34:14,20
35:10 37:15 38:2
38:6,16,25 39:9
39:17 44:1 46:16

47:21 159:17
160:6,14 164:17
170:4
**aquifer** 93:15
**arbitration** 1:7
2:17 5:22 6:10
8:17 9:18,24
12:17 17:8 19:24
25:8,11,16,18
29:19 30:21 31:10
43:20 45:13 47:24
48:15 50:5 55:12
56:1 59:15 75:13
79:10 80:2 81:21
137:5,11 139:10
142:13 144:1
159:1 163:20
181:21 186:13
**area** 53:11 59:5
90:2 94:24 95:1,2
95:6 96:18 101:17
101:18 115:9,16
154:22
**areas** 94:9 112:20
**arguably** 75:2
**argument** 11:20
12:1 24:24 78:15
83:7 120:10
131:21 134:4
138:20
**arguments** 75:24
76:1,2 129:12,20
129:22,22,23
134:19 142:6
**arisen** 30:15,20
39:16 40:4 41:15
142:9
**arises** 155:15
**arising** 24:14 36:23
78:11 136:24
137:6,8 140:19
**Arnold** 2:10
**arose** 39:16
**arrangements**
10:21 115:25

116:3
**arranging** 3:4
**arrive** 33:11 48:1
63:19
**arrived** 17:16
149:14 167:4
170:3
**arrows** 104:19
**Article** 1:7 24:20
32:1 48:16 49:5
49:11 50:21,21
54:20 55:1,7,9,17
60:12,18 65:22
84:6,21 132:6,9,9
132:16
**articulated** 49:17
**Ascoli** 1:22
**ascribe** 70:23
**aside** 57:17
**asked** 4:25 15:9
56:21 70:2 87:18
147:5 170:15
183:1,14
**asking** 87:20
142:22 145:20
165:9 172:23
**asks** 147:20
**aspect** 27:1 153:22
171:12,14
**aspects** 35:5 56:4
57:19,21 84:1,4,8
90:8 171:15,24
**assert** 16:13 31:14
**asserted** 29:18
34:22 35:2
**asserting** 78:13
**assess** 106:3,3
**assessing** 124:10
**asset** 173:21 174:3
174:5,7 179:18
180:2,5,6,8,8,10
181:1,19
**assets** 6:5 177:17
177:20
**assign** 42:22

**assigned** 36:18 47:7
**assigning** 41:9
**assignment** 7:7
31:7 32:20 40:4
42:24 137:2
175:13 176:17
177:11 179:11,13
180:20
**assist** 53:13 82:6
**assistance** 18:9
**associated** 121:8
**assume** 17:5 28:24
29:1 41:5 145:9
**assumed** 13:13
144:24
**assuming** 29:3 33:8
79:8
**assumption** 41:17
67:21
**attach** 148:6
**attaching** 80:8
**attempt** 11:17 15:3
49:10 58:7,10
73:5 130:3
**attempted** 77:23
80:12,23
**attended** 160:18
183:2
**attendees** 1:12
**attention** 106:10
**attributable** 32:11
66:10
**attributes** 54:9
**attributing** 93:25
**August** 13:23 14:4
14:20,21 15:2
16:10,15,24 18:14
20:5,25 21:1
22:25 67:4 142:15
142:15 148:5,7
149:10 151:10
159:17
**authored** 13:22
**authorisation**
162:11

**authorised** 169:20
**authority** 50:2,4
134:25
**available** 47:19
183:7 184:4,7
**avoid** 11:17 28:2
58:22 89:4
**avoided** 122:6
**avoiding** 48:22
**award** 11:3,7 28:6
45:7 76:17 129:4
131:19 138:16
148:14 152:23
**aware** 3:1 5:9 13:4
79:15 81:23 85:15
141:4 143:2,3,4
153:23 160:24
165:25
**Awe** 2:9
**Ayo** 2:9

_____
**B**
**b** 11:5 68:6
**B1** 11:21 43:21
44:3,11 142:4
164:9,14
**B2** 49:15
**back** 2:7 4:19 17:11
21:9 26:8 27:20
27:22 37:10 47:1
49:25 50:19 61:23
61:24 72:7 74:22
78:25 79:7 80:5
82:20 100:11
102:14,15 103:3
103:10 105:3
122:14 141:14
151:7 156:14
168:19
**background** 6:11
6:13 27:15 135:19
140:12 146:1,25
146:25 150:2
**backwards** 130:23
**bad** 115:9

**balance** 8:16 16:23
48:6 60:16 92:22
100:14 176:2
**band** 103:4
**bank** 9:9,19 52:5
148:9 176:3 178:9
**bar** 46:16 52:4
**bargain** 51:11
79:24
**barrel** 110:18,18
110:23,24 111:11
121:5
**barrels** 116:19
117:19,19 121:2
**based** 3:2 32:15,17
33:8,10 47:8,21
49:18 64:16 70:10
179:21 182:10
**basic** 85:7 90:12
91:13 93:16,18
116:22
**basically** 92:7
102:13 113:2
121:2
**basics** 90:22
**basin** 91:17
**basis** 9:11 26:18
46:22 62:13 65:2
65:13 68:8 73:17
79:7 132:21
148:14 152:20
156:1,23
**basket** 55:1
**BBL** 110:19
**bean-up** 46:4 59:13
59:21 60:1,13,23
60:24 61:9,11,16
61:18 62:14,18,25
63:2,9,18,24
**beaned** 62:8
**beaning** 34:5,11
66:13
**bear** 16:5 63:24
96:12 98:1
**bearing** 13:22

25:17 84:9
**began** 33:25 117:5
**beginning** 41:10,19
42:12 74:23
142:12
**begins** 81:9 104:1
**behalf** 13:5 43:18
44:6 45:12 136:7
141:9
**behaving** 121:9
**believe** 4:5,10,23
21:10 25:10 64:16
67:4 144:18,20
153:3 169:12
173:20 180:22
181:2,23 184:24
185:20,25
**believed** 21:7
165:19 179:12
**believes** 25:20 54:7
**bells** 111:13
**beneath** 93:10
102:6
**beneficial** 31:20
32:11,19,24 33:5
33:14,18,21,23
34:13 38:14 39:9
41:9 42:11 44:19
44:21 47:22
**benefit** 6:5 64:3
**benefits** 41:6
**best** 47:3,14 69:20
94:18 124:19
145:7
**better** 64:14 75:1
153:7 179:10,18
180:19
**beyond** 170:21
**BF1** 71:20
**big** 67:20 94:10,11
98:7 124:24
125:14,15,20
**billion** 8:11 27:10
**bit** 26:8 35:15
70:17 82:23 86:5

88:21 93:13 95:24
97:10,14 100:16
103:15 119:19
150:16 157:13
168:2
**bite** 130:5
**bits** 112:23
**black** 117:25
**blame** 147:12
**block** 7:9 161:9
**blocks** 118:10,10
**blowing** 147:13
**Blue** 118:11
**board** 8:8 175:7,25
181:3,7,12,13,15
**body** 51:16 52:22
**Bolam** 51:15 52:3
85:25
**Bollini** 175:5
**bond** 58:12 105:25
115:4,7
**bonkers** 156:13
**book** 173:21
**booking** 184:10
**books** 174:3 181:9
184:8
**bore** 99:9 100:2,12
101:6,13 105:5
106:21,24 107:11
109:6
**borrow** 80:2
**Boswood** 29:5
**bottom** 21:21 50:13
59:19 63:12 67:2
81:4 91:7 99:24
101:5,10 102:4,7
104:16,20,21,24
109:8 123:19
146:23 147:19,20
148:1 149:5 178:6
**bought** 44:14
**box** 35:24
**boxes** 36:9
**BP** 8:5 95:10
**brackets** 81:9

150:10
**breach** 34:10,21
35:9 36:4 39:19
45:23 48:17 55:14
56:22 65:22,25
66:20 75:13 81:21
88:23 89:1,4,25
114:1 124:11,25
125:1 136:13,14
136:15 137:21,23
**breached** 89:9
**breaches** 26:3
31:20,25 35:20
42:16 55:17 64:25
78:12,20 124:8,20
131:2 136:20
**break** 5:1 30:3,4,8
30:13 82:9 104:25
105:10 122:9,17
157:22 158:2
**breakdown** 167:21
185:17
**breakthrough**
66:10,18,25 67:4
**brief** 8:4 122:25
**briefly** 13:17 25:25
153:22 161:13
175:20
**bring** 44:6 46:7
131:6
**bringing** 43:18
**brings** 27:19
100:22 105:19
109:2 112:25
157:1
**broadly** 52:13 76:2
**brought** 6:12 25:8
29:17 43:15 45:12
46:4,9 47:15,17
67:22 75:13
**bubble** 111:17,18
111:21
**budgeted** 68:14
**budgets** 26:17
48:19

**bullet** 179:6
**bumbling** 121:7
**bundle** 6:14,23,24
7:22 11:21 12:14
13:20 14:1 18:11
21:14 22:5 23:10
28:10,17 29:7
30:23 32:25 35:24
36:24 42:4 43:21
44:2 45:24 46:14
48:10 49:1 60:8
61:1,3,4,6 65:18
70:3 71:13,14
74:4,14,22 75:25
77:23,24,25 80:4
80:6 81:5 84:22
95:21 96:3 102:21
134:25 136:2,10
146:8 147:15
158:22,24 159:4
163:16,17
**bundles** 4:12,12
94:18 104:13
**buoyancy** 93:6
112:5
**burden** 14:15 16:5
83:23
**business** 14:5

_____
**C**
**c** 68:6 80:16 81:10
136:10
**C1** 28:17 42:4
75:25 76:1
**C2** 28:10 29:7
**cake** 100:15
**calculate** 72:22
125:6
**calculated** 124:13
157:14 180:3
**calculates** 31:18
**calculations** 156:1
**Caligaris** 1:19
**call** 27:6 33:21
51:15 161:24

170:10 172:22
**called** 32:11 35:13
56:16 58:1,15
62:18 71:2 91:12
93:12,15 99:23,25
99:25 100:6 101:2
102:4,9 105:25
106:14,19 107:23
108:5 109:17
111:17 112:3
158:4 178:20
187:16
**calling** 36:14 90:25
**calls** 26:8
**CAMAC** 9:22
10:11 178:24
**Camille** 2:10
**cap** 92:8 93:9 105:7
111:2 112:2,4,17
114:22 115:10,13
116:14 121:8
**capacity** 92:19
**capital** 8:11 136:10
**Carbonara** 3:2
134:8
**cards** 69:12
**care** 6:25 119:19
**careful** 62:7 120:22
121:20
**carefully** 60:15
62:7 115:21,22
116:13 120:19
130:10 135:14
140:9
**cargoes** 26:9
**Caropreso** 1:18
14:25 147:4,21
148:1,18,23
150:21 184:1
**Caropreso's**
149:11
**carried** 105:16
119:24
**carry** 48:19 58:21
64:12 105:10,16

**case** 2:14 31:1,5
    34:17 36:25 37:2
    40:18 42:15,22
    44:9 45:18 47:3
    47:14,20,24 54:8
    54:25 56:1 64:22
    65:5 66:21 67:23
    71:3,23 75:4
    83:10 84:1,8,10
    84:25 90:9 101:10
    101:23,24 102:24
    102:25 111:24
    113:20,23 114:5
    124:13,18,19,23
    125:8 129:23,25
    131:7 133:10,14
    138:19 139:23
    141:6 143:13
    144:12 150:10
    153:24 154:1,10
    154:12 159:21
    180:7 184:25
**cased** 107:13
**cases** 54:6
**cash** 26:8 27:6
    126:19 127:11
    159:22,23
**casing** 58:2,3,10,13
    59:5,6 97:15,19
    97:23 98:4,10,19
    98:24 100:2,3,5
    100:11,17 101:5
    101:12 102:2,7,15
    103:11,13 104:20
    104:23 105:5
    106:24,25 107:7,9
    107:12,15,17
    108:11 114:7
    118:21
**casings** 97:22 98:25
**Casula** 21:16 172:3
    174:19 177:3,7
**categories** 155:8
**categorised** 38:13
**causal** 67:14,17

**causation** 58:25
    69:5 120:8
**cause** 38:22 42:21
    42:22 66:2 112:22
**caused** 3:10 66:1,2
    124:7
**causes** 33:24 34:18
    43:15 109:6,9
**cautiously** 116:5
    121:15 122:4
**caveat** 139:7
**caving** 100:16
**CBL** 58:15
**cc** 175:3,7
**CD** 184:19 185:15
    185:17
**CD-ROM** 185:6
**cease** 41:2
**ceiling** 10:18
**cells** 93:25 94:1,8
    94:12
**cement** 58:16,19
    59:7 66:8,11
    98:15 100:10,23
    101:3 102:3,7,9,9
    102:10,11,13
    103:2,10,12,13
    104:22 105:2,7
    106:4 113:25
    114:11,13,20
    115:3,9
**cemented** 101:17
**cementing** 34:1,11
    46:1 55:17,23
    57:10,17,18,20
    58:2 66:5,18
    100:21 101:22,24
    102:22 103:21
    104:18 105:16
    113:14,16 114:3,6
    119:3 122:5
**cent** 7:5 10:24
    32:12 33:18,20,21
    33:22 113:4 162:7
    162:10 168:22

170:21,23 179:17
**central** 94:24
    103:15
**centralisers** 101:9
    101:9
**centres** 75:10
**CEO** 175:1 181:17
**Cerrito** 1:18 74:15
    78:2,5 80:7
    157:24 158:4,7,21
    158:21,23 159:10
    159:13 169:14,19
    186:5 187:16
**certain** 5:4 9:5,17
    10:5 35:20 84:8
    92:6 95:15 99:5
**certainly** 12:23
    88:4,11 119:2
    153:20
**certainty** 69:1
    143:1
**cetera** 7:25 56:6,15
    70:15
**chain** 174:19
**chairman** 1:6,13,24
    2:11,23,25 3:20
    4:16 5:6,16,20
    12:9,18 21:17
    30:4,10,12 53:1
    53:10 73:22,24
    82:6,8,16,24 84:9
    96:1 104:4,6,8,11
    122:11,20 126:22
    127:1 132:25
    135:22,25 140:3
    141:20 143:12,16
    143:19,23 144:8
    144:15,19,22
    146:2,3,5,22
    147:12,17 153:12
    157:4,9,19,25
    158:5,8,11,14,17
    158:20 162:5
    169:19,22,25
    170:2,11,15,19

172:5 173:24
    175:18 179:25
    180:14,18 181:10
    183:19,23 184:16
    184:20 185:5,9,14
    185:19,21,24
    186:1,3,4,8,10,11
**challenge** 130:2,6
    152:6
**challenged** 138:17
**challenging** 51:7
**chance** 157:19
    181:20 185:14
**change** 32:8,17
    34:12 44:14 47:15
    56:2 64:14 98:19
    120:10 121:23
    123:15,19,21,22
    125:8 129:24
    133:15 139:4
**changed** 55:25 56:4
    72:6 73:1,5 98:24
    121:1
**changes** 10:5,8
    32:6 33:23 37:16
    47:3 94:10 123:16
**changing** 126:22
**channel** 59:7 66:8
    66:11 101:19
    118:19
**characteristics**
    93:25 105:21
    106:12 108:18
    120:12
**charge** 175:10
**chart** 67:2,3 120:19
    121:4
**chartered** 155:4
**charts** 120:22
**check** 4:16 15:22
    181:4
**Cherri** 134:9
**cherry** 130:5
**chief** 102:20 174:24
    175:1

**chock** 121:22
**choke** 59:14,18,22
    60:20 62:9,14,15
    62:17,20 109:11
    109:11,12,14,17
    109:18 118:1,2
    121:22
**chosen** 109:23
**CIL** 11:5
**CIL's** 10:17 11:9
**CINL** 32:19,22,24
    33:5,20,22 36:18
    37:3,5,22 38:9
    40:11 43:8,20
    44:2,9,19 45:2,8
    45:17 46:10 136:7
**CINL's** 37:21 39:1
**circling** 38:15
**circumstance** 77:12
    87:14
**circumstances**
    30:19 51:9 54:10
    56:14 58:18 73:21
    77:17 79:23 81:15
    88:2 127:17,19
    134:7 140:13,17
    156:16
**claim** 8:17 22:12,15
    23:19,22 29:18
    32:22 33:1,4
    34:25 35:7 36:4
    38:10 39:6,18,20
    40:15 41:21,22
    42:7,13 43:2,8,9
    43:11 44:6,18
    45:4,12 46:1,3,4
    46:12,19,23 47:2
    47:4,10,11,13,19
    47:20 56:3 57:12
    65:1,10 66:4
    67:19 72:22 73:25
    76:4 77:12,13
    78:13 123:3,4
    130:25 131:17
    136:12,13,13,13

136:15 137:17
138:2 141:17
142:2 148:15
152:21 154:2,11
154:15,17 155:9
155:14 181:25
**claimant** 4:24 5:22
50:5 85:25 86:6,7
113:11 129:6
154:15 158:17
170:16
**claimant's** 2:21
49:22
**claimants** 83:6
84:15 88:16
128:25
**claimants'** 88:22
124:18 166:9
**claimed** 23:25 24:2
31:19 44:1 58:14
81:20 151:24
153:25,25 154:19
154:21 156:8,22
**claiming** 12:2
59:25 169:9
**claims** 5:25 12:13
15:10 22:20 23:16
25:12,15 27:18,23
29:15,16 31:5,11
31:24 34:11,12,16
35:17,23,25 36:6
36:22 37:1,5,7,12
37:13,17,22 38:1
39:13,16,21,23
40:7,8,9,9,11,14
40:15 41:14 43:4
43:18,19 44:19,20
45:21 46:13 57:8
66:23 75:12,14,14
76:14,15,19,25
77:2,2 78:11,12
78:19 80:1 88:16
129:14 133:2,4
134:1 135:9 136:4
136:6,10 137:21

137:22 138:22,24
138:24,25,25
139:5,15,20 152:7
154:14 155:8,10
156:20
**clarification**
162:24
**clarify** 145:2 169:1
**Claudio** 174:20
175:21
**clause** 9:3 10:22
13:14,24 14:6,17
15:19 17:12,13,17
17:24 18:2,9,19
20:4 23:20 24:7
24:16,17,19 25:3
36:17 37:4 40:24
41:13,25 42:9
47:9 49:23 74:21
74:23 75:12,15,20
76:10,12,13,20,23
77:2,5,6,8,10 78:9
78:10 79:1,3,5,8,8
79:10,11,12,20
80:12,20,21 81:8
84:24 85:2,11,12
85:20 86:1,4 87:8
88:6,17 129:5,14
130:19 131:8,25
132:3 135:3,10,13
135:17,20,24
136:3,6,8,9
137:11,12 138:12
138:13,22,23
139:13,17 140:6,9
140:18,24 141:5,6
141:7,8 147:25
155:23
**clauses** 74:25 85:16
132:23 134:25
135:4 141:16
**clear** 14:20 26:5
28:19 31:18 34:17
35:1,7 41:24
44:12 45:19 50:8

50:18 54:2 74:8
76:18 77:20 85:7
86:21 100:14
102:22 105:11
117:11 123:21
134:24 169:5
183:16
**cleared** 101:20
**clearer** 20:5
**clearly** 20:14 32:8
45:1 46:3,13
51:10,13 69:18
103:24
**clients** 5:25 142:16
142:23
**clients'** 3:25 154:1
**close** 30:22 65:21
67:17 95:11 97:1
97:5 98:5 141:13
156:24
**closed** 119:23
169:11
**closer** 170:8
**closest** 59:5 99:22
**closing** 83:12
132:22 179:7
**CMC** 15:11 25:21
**co-arbitrator** 1:9
**co-operation** 8:2
26:20
**co-ownership** 8:5
**coffee** 122:10
**coin** 52:9
**coincidentally**
35:10 40:23
**collapses** 69:13
**colleagues** 5:21
**collect** 184:4,6
**collected** 184:3
**collective** 32:4
**column** 62:17,18
62:22 63:1,11,12
106:16 164:5,5
166:22
**columns** 106:13,14

124:14
**combination** 67:10
**come** 15:24 22:2
36:1 37:10 46:5
55:24 61:24 65:21
66:16 67:17 74:25
92:15 99:6,15
101:22,22 105:2
110:4,14 111:16
112:23 118:22
126:3 138:6 143:6
143:8 157:17
**comes** 24:24 98:1
102:17 105:2,3,4
**comfort** 24:12
**comfortable** 55:6
90:21
**coming** 4:15,20
101:23 103:1,2
106:8 110:8
118:12,15 119:9
119:12,14
**commenced** 25:17
43:19
**commencement** 9:1
19:23 62:4 115:22
**commencing** 45:4
**commensurate**
72:12
**commensurately**
23:22
**comment** 5:16 19:2
20:8 73:19 81:2
83:21 84:9 179:6
180:1,21,21,23,24
**comments** 84:7
122:25 123:3
157:2 178:7
**commercial** 15:18
**commit** 15:3
**committee** 160:3
**common** 14:19
31:9 43:7 58:17
85:16 107:18
124:1,4 144:6

**commonly** 106:17
**communication**
170:6 172:9
**compacted** 91:8
**companies** 86:3,17
**company** 5:24 9:22
15:21 49:19 50:24
53:25 54:9 160:10
161:19 172:5
175:9 176:3
180:25 184:9,9
**comparable** 64:6,9
121:9
**comparative** 108:4
**compare** 60:22
**compared** 134:15
179:10 180:19
**comparing** 72:22
72:23 107:13
**comparison** 63:16
92:9 110:20
120:20 121:25
**competent** 175:23
**complain** 113:1
150:19
**complained** 33:24
64:24 80:18
**complaining**
140:15
**complaint** 21:11
**completed** 6:19
7:20 10:19 60:7
68:11 89:12
103:21
**completely** 24:18
27:5 49:16 69:13
97:17 120:24
122:2 154:23
156:13
**completion** 7:8 9:7
9:10 10:2,4 13:11
18:25 25:13 41:1
114:8 136:25
137:1,3 155:12
170:8,9 173:5,7

complex 57:7
complexity 123:24
compliance 22:10
    133:19
compliant 13:24
comply 21:3 52:8
    115:1 152:11
complying 88:6
composed 171:6,18
compressors 113:8
comprised 7:4
    117:9
computer 94:2
computers 94:14
computing 94:13
    104:17
concede 56:11
    68:23
conceded 18:6
    59:20
conceivably 37:17
    54:8
concentric 97:19
concept 12:2
concern 13:4 31:5
    138:17
concerned 7:11
    95:9 138:14
concessions 139:12
conclude 130:17
concluded 17:7
    66:11 133:21
    143:4
concludes 152:8
    155:1 156:20
conclusion 48:1
    79:7 81:24 150:24
    155:22 156:23
    174:2 177:25
conclusions 114:18
    150:4 179:5
condition 175:24
conditional 74:6
conditions 63:20
conduct 55:8 86:16

133:4 135:2 155:5
conducted 8:22
    58:1 59:2 155:2
conducting 13:6
    87:17
cone 112:20
cones 112:4
conference 2:14
confers 31:13
confidence 72:14
confirm 56:22
    148:3
confirmed 15:12
    55:12 70:8 148:9
confirming 64:23
    176:19
confirms 61:12
confuse 12:2
confused 142:20
confusion 45:14
coning 112:1,3,10
    112:13,22 117:12
    118:25 119:15
    120:14
conjunction 79:11
connected 92:2
connection 36:23
    109:14 137:8
conscious 90:15
    132:17
consequence 70:14
    91:25 110:10
    125:20
consequences
    30:20 79:4 120:20
    122:22,24 124:11
    158:15 162:21
consequent 71:25
consider 19:13
    22:25 49:23 50:24
    66:16 75:2,6 87:2
    105:14 114:4
    115:18 118:17
    152:25
considerable 25:24

37:20 57:5
considerably 37:16
consideration 9:4
    10:24 54:16
    156:12 174:6
    176:2 179:8
    180:18
considered 52:13
    87:22
considering 77:4
    79:19 154:11
considers 29:9
    155:4,8
consisted 57:13
consistent 41:18
    42:12 119:3
consistently 44:7
    76:22 117:5
consolidated 4:13
constant 136:3
constituent 81:16
constitute 81:21
construction 29:10
    50:3,14 84:5
    86:20
construe 85:8
construed 86:8
contact 93:12,16
    100:20,24 108:3
    115:10 118:20
    120:13
contain 91:19
    92:11,12,20
    108:19 130:8
contained 36:20
    91:5 92:21
containing 69:25
    70:5 71:14 93:14
    93:15
contains 6:24 7:8
    14:2 17:24 98:23
    99:4 100:8 101:18
contemplated 19:7
contemplating
    131:14

contend 17:6
content 4:7 86:1
    105:22 141:5
contention 17:10
    47:23 75:10
contentious 40:3
contents 18:13
context 12:15 24:15
    51:20 60:22 70:25
    75:19 76:9 78:19
    85:12,13 135:13
    137:13,13,18
    139:10 177:13
contingency 56:13
continually 49:9
    117:23
continue 28:4
    45:16 85:14
    104:25
continued 13:10
    40:11 120:2,3
continues 136:22
    150:11
continuing 105:1
contract 7:11 22:10
    23:5,8,13 27:2
    31:13 36:5 42:18
    49:2 50:7 52:7
    53:12 54:14 64:25
    131:14 135:9
    136:11 137:11
    139:16 155:7,10
    155:20 182:12
contracted 6:20
contractor 7:13,19
    8:10,21 79:15
    169:7 182:13
contractors 167:9
    168:6 169:9
contracts 50:3
    79:17 85:17 135:2
contractual 16:21
    19:15 20:20 21:3
    26:7 48:14,16
    55:8 74:20

contractually
    13:23
contrary 11:14
    26:10 66:23 154:7
contrast 16:3 121:6
    130:12
contributed 8:13
    27:6
contribution 27:11
control 6:4 116:4
    116:25 159:18,23
    160:7
controlled 62:8
controversial 114:6
convenient 122:9
conveniently
    151:22
Conversely 15:1
    63:9
convert 99:5
convincingly 59:4
cooling 59:9
copied 175:3
copies 184:7
copy 6:24 123:12
    144:8,11 158:24
core 6:23 70:10
corner 101:11,15
    104:3,9,16
corporate 160:7
correct 17:10 29:9
    49:10 50:2 86:20
    89:18 90:5 126:5
    127:3 139:2 140:7
    140:17,24 142:24
    143:13,15,18
    145:5,13 146:4
    156:21 158:10
    159:18,19 160:1,2
    160:4,5,10,11,15
    160:20,22,23,25
    161:16 162:1,6,9
    163:3,9,13 165:11
    165:12,14 167:23
    168:3,17,18,21,24

173:17 175:13
176:12,13,24
177:17,17 181:24
182:1 185:9,16
**corrected** 108:6
**correctness** 138:15
**correlate** 106:24
**correspondence**
17:6 21:5 25:13
139:22
**corresponding**
42:15 55:20
178:25
**cost** 8:13 17:25
18:8,18,22 19:15
20:2 22:7,12,15
22:23 48:24 58:23
74:18 159:22
167:2 168:7 182:7
**costs** 8:11,18 19:22
24:14 73:25 74:5
74:17 151:4 155:2
155:4,11 162:16
162:17 164:4,16
164:20 165:1,15
165:16 167:21
168:3,20 170:21
178:21 181:25
182:10 185:18
**counsel** 138:18
159:11 166:9
**counsel's** 102:20
**counter-claimant**
45:3 46:25 82:17
128:11
**counter-claimants**
43:1 124:7,20
125:22 127:19
129:13 136:5
**counter-claimants'**
134:23
**counterclaim** 33:12
43:25 44:10 46:18
49:13 84:3
**counterclaims** 25:7

25:10,22 26:2
30:18 31:4,15
32:4 33:1 36:11
43:14 44:14 46:8
48:7 55:15 57:1
75:7 77:7,9,16
79:6,9 81:16,17
82:1
**counts** 52:23
**couple** 2:22 43:25
77:25 96:16 127:2
**courier** 15:7,17,17
15:18,21 144:4,5
145:17 185:4
**course** 8:2 10:12
17:10 18:22 23:2
37:24 40:13 52:7
52:11 56:25 57:4
58:13 65:24 66:17
72:11 73:20 74:1
75:17 83:5,20
84:13 86:4 88:12
90:18 113:4
123:10 131:4,12
131:24 136:16
137:4,23 138:14
139:24 142:1
147:14 153:3
154:16 157:19
171:15,21 172:5
172:13 180:4,5
182:6,8,15 183:4
183:11,25
**court** 4:1,24 30:4
50:2,19 130:2
**court's** 123:6
**courts** 85:5,7
**covenants** 36:19
78:20
**cover** 73:8 171:14
**covered** 24:17 51:3
**covering** 56:18
70:4 73:12 90:17
153:9
**CPL** 32:21 33:4

36:15,18 37:1,8
37:20,20 38:9,10
39:21 43:4,19
44:6,25 45:2,12
46:9 47:19 128:8
128:13 131:6
136:8
**CPL's** 39:2 40:7
45:19,20 46:1
47:13 131:11
**create** 100:15,23
**creates** 100:7
**critical** 36:16
**criticise** 49:21
**criticising** 57:19
**criticism** 115:16
**criticisms** 90:15
**crook** 103:1
**Cross-examination**
159:12 187:20
**crucially** 44:9
**crude** 26:9 27:13
48:23 58:23 74:18
**Crumpton** 58:25
**Crumpton's** 65:6
**cubic** 110:23,23
111:11 121:4
**culminating** 8:23
**cumulative** 33:20
40:9 62:18,19
63:2,14 121:2
**cup** 122:10
**curious** 12:7 42:10
**current** 4:5 21:23
123:20 127:10,12
140:23
**currently** 32:14
47:14 175:1
**curve** 99:11 107:4
**cut** 91:1 104:17
**cutaway** 93:8
**cuttings** 100:14

─────── **D** ───────
**d** 80:16,20 81:3,10

**D&M** 70:11
**D1** 158:22
**daily** 26:18
**Dall'Omo** 175:5
**damage** 55:10 98:7
124:15,25 125:8
**damages** 34:25
35:7 39:19 45:8
65:2 67:18 72:13
72:22 124:13
125:12 126:1
138:1
**Daniella** 1:22
**darcies** 71:2
**Darcy** 92:14,14
**darker** 103:20
**dart** 102:4,12
**data** 59:2,8,10
61:24 63:10,16
64:18 66:7,7 73:4
95:15 110:11
183:23,24
**database** 15:22
**date** 13:12,22 14:23
14:23 16:5,9,10
24:15,20 29:12
35:21 36:18 37:6
37:19 39:19 40:22
43:14 132:14
135:15 137:15,16
140:20,21 155:11
156:6,9 170:9
178:16 184:20
**dated** 16:15 161:10
**dates** 9:25 40:2
68:5 132:13 156:9
**Davison** 1:20
**day** 10:20 16:14,15
45:13 116:19
117:20 144:17
184:18
**days** 10:3 14:6 57:3
67:5 90:19 117:22
182:16
**deadline** 3:17 16:22

**deadlines** 21:3
**deal** 7:20 10:19
57:5 83:11 84:2,4
84:7 123:4 140:16
173:8,8,16 181:15
181:16
**dealing** 9:13 55:2
113:10
**deals** 42:18
**dealt** 128:22 142:2
183:25
**Dear** 148:20
**debate** 123:6
**debt** 12:2,4 129:7
**December** 10:1
13:8,11 15:9
21:25 34:7,20,22
38:15,21 40:2
46:6 73:3 78:6
80:8 106:2,8
117:9,20 118:8
119:16 155:12
178:1
**decided** 17:9
128:23 129:1,4
151:16,17 177:16
**decides** 22:7
**deciding** 148:14
172:1
**decision** 11:13
58:20 123:6
172:16,19,21,21
172:25
**decisions** 26:17
134:3
**declarations** 45:8
**declaratory** 5:25
**decline** 120:3
**declining** 117:17
**deed** 7:7,21 27:25
28:13,21,23 29:10
36:13 37:10 40:21
41:14 42:8,9 43:5
43:6,10 47:9
122:25 128:16,20

130:15,17,20
131:24 132:4
137:2,2
**deem** 52:5
**deep** 7:5 51:6 55:4
58:10 68:14
**deeply** 138:14
**defective** 57:17
**defence** 11:18
14:10 43:24 44:10
46:17 49:13 52:6
134:20
**defences** 133:1,2,5
133:8
**deferral** 10:9
**deferred** 9:20 10:1
11:1,4,5 12:8 22:2
123:4
**defined** 6:21 7:15
24:13,21 41:1
51:11,13 136:18
150:7
**definition** 7:2,2
76:3 136:11,22
139:14,20
**definitive** 151:6
**degree** 6:10 70:22
134:12
**delay** 3:10 25:11,19
35:6,22 39:22
127:23
**delayed** 1:3 16:18
128:1
**Delete** 80:16 81:10
**deleted** 79:1
**deletions** 139:12
**delivered** 4:8 14:5
14:9 15:4,16,23
15:24 16:21,23
144:3,6 145:12
147:21 150:7
**delivery** 14:14,15
15:2,11 16:5,18
**delta** 108:22,23
**demand** 21:13,18

151:17
**demanded** 151:16
**demands** 36:22
**demonstrable** 36:8
**demonstrate** 31:2
81:13
**demonstrated** 46:7
**demonstrates** 67:6
79:22
**denied** 12:11,13
**depart** 114:12,14
**department** 184:5
184:6
**departments**
175:10
**depend** 83:17
**dependent** 69:8
**depending** 23:23
64:14 94:2
**deplete** 126:17
**depletes** 127:15
**depletion** 126:16
**deposited** 91:6,8
**deposits** 91:5
**depressed** 101:25
**depth** 99:6 106:24
107:10,12,18,22
107:22,23,24
108:3,4,5,7
**depths** 98:20 99:6
108:6
**derive** 31:11,24
**derived** 69:17
**deriving** 7:18 41:4
**Descalzi** 174:20,20
174:22,24 175:21
177:3,7
**described** 17:2 56:8
178:14
**describing** 103:24
179:16
**description** 98:24
99:4 102:19
**design** 64:10,11
**designed** 63:20

**desk** 149:1,6
**desperation** 17:5
**despite** 16:3 27:11
43:17 44:5 66:22
66:23 182:21
**detail** 18:14 20:21
25:24 32:2 57:6
65:20 83:20 90:19
94:7 102:18
123:17 131:5
164:15
**detailed** 26:25
81:12
**determination**
22:22 23:14,17
76:10
**determine** 11:2
17:23 22:12,14
25:1 76:9 154:5
**determined** 11:9
76:23 130:25
**determines** 17:15
23:23
**determining** 28:9
**develop** 115:23
**developed** 70:9
**development** 8:7
**developments**
149:21
**devoted** 56:9
**diagram** 97:15,17
99:24 102:16
**dialogue** 150:11
151:11,13,17
**diameter** 109:12,13
109:17
**diameters** 97:20
**dictate** 70:22
**died** 91:16
**difference** 68:2
92:4 97:8 98:16
99:16 108:9,14
109:5,6,8,10,15
110:17 112:14,16
118:23 124:17

127:18 128:3
139:18,19 152:22
165:6,11 176:1
**differences** 94:10
120:25
**different** 11:12
12:3,4,15 23:12
29:14 49:17 52:20
53:15,17 58:15
70:1 87:10,11
97:20 108:17,18
108:18,19,20,24
108:25 111:5
122:2 137:24
140:1 155:22
164:24 180:9,12
**differential** 59:18
108:23
**differently** 51:18
52:25 85:6
**difficult** 15:21 29:1
51:8 94:17 101:7
**difficulties** 82:24
117:15 178:13
**difficulty** 12:6 94:6
**diminution** 31:17
**dipping** 67:10
**direct** 75:14 166:1
171:21
**directed** 87:16
**directing** 161:17
**direction** 157:11
**directly** 29:19
170:1,15 172:8,12
183:24
**director** 160:12,13
161:19
**directors** 175:9,25
176:23 181:4,8,13
181:13,15
**disagree** 36:15
78:17 125:25
154:23 155:18
**disagreed** 40:21
**disagreement**

125:4,5,14,15,18
128:5
**disagrees** 29:8
**disapplied** 141:9
**disapply** 141:6
**disclosed** 145:23
**disclosure** 142:22
142:23 143:7,13
146:6 150:18
156:18
**discount** 127:11
**discounting** 126:19
**discovered** 116:6
119:16 149:7,8,9
152:10
**discovery** 7:9 95:4
95:10
**discuss** 132:23
**discussed** 75:5
**discussion** 24:19
168:6 169:8 178:9
178:15
**discussions** 80:11
**dismiss** 79:6
**dismissed** 89:3
**disposal** 38:24
**disposed** 46:11
88:17
**dispositive** 139:11
**dispute** 10:7 13:24
14:19 17:17,20,21
18:17,19 19:4
20:10,12,18,20
21:8 22:8 23:16
34:11 36:3 40:16
40:19 118:18
119:1 120:6
142:11,14,19,25
143:2 147:6,23
148:3,22,25 149:7
149:21 150:22
151:9,18,20,21
152:10,12 153:18
154:3,8
**disputed** 23:1

142:19 143:21
**disputes** 22:21
**disputing** 20:15
**dissenting** 29:6
**distance** 96:14,22
**Ditto** 3:13
**divided** 32:4 94:21
    135:15
**dividing** 31:8 93:24
**division** 174:25
    175:8,11
**document** 50:15,16
    50:17 84:18 86:11
    99:2 131:25
    143:11 145:17
    146:7 147:2,9,16
    158:24 159:3,5
    161:8,22 164:24
    165:7 166:7,9
    167:13 168:17
    175:16 185:4
**documentary** 16:7
**documentation**
    155:13 164:9,14
**documents** 6:14,17
    15:10,13,20 26:5
    30:25 50:14 77:25
    84:16 88:3 98:22
    132:19 136:25
    137:1,3 143:9,12
    145:23 146:6
    150:16 153:21
    156:11,18 171:24
    173:21 182:6,19
    183:5,7,10 184:4
    184:6
**doing** 52:23,24
    83:2 87:23 127:10
    141:18 151:15
    184:25
**doll** 97:21
**dollars** 167:24
**door** 141:14
**double** 11:19 72:19
**doubt** 6:7 35:15

37:20 46:15
    144:14
**downloaded** 184:8
**downloading**
    184:12
**downwards** 117:22
**DPR** 65:16
**Dr** 3:9,16 12:9,22
    32:17 33:10 67:20
    68:3 69:8,9,15,20
    69:22 70:4 71:10
    71:18,19 72:6,11
    72:16,24 73:10
    125:6
**draft** 81:3,5 151:4
    165:8
**drafted** 139:16
**drafting** 172:20
**drain** 63:23
**drained** 62:5
**draw** 106:10 119:2
    121:14 150:3
**drawdown** 59:17
    59:22 60:1,3,5,14
    60:15 61:24 62:21
    62:23 63:4,6,7,10
    63:19 66:13
**drawdowns** 60:23
**drawing** 94:17
    97:24
**drawings** 96:9
**drill** 58:20 100:14
    100:16 115:4
    127:16
**drilled** 8:6 22:1
    60:25 68:7,10
    69:2 89:10,10,11
    95:5,10,11,13,16
    96:23 97:7,8 99:9
    100:4,12 106:5
    125:17,21 127:22
    128:4
**drilling** 8:23 27:2
    55:17 67:21 68:13
    89:8 90:13 95:7

99:3 100:13
    105:11 115:6
    127:24,25
**driver** 68:2
**drop** 65:10
**dropped** 56:22
**due** 6:6 9:14 10:3,4
    14:11 66:17 73:19
    83:20 113:4
    157:19 165:6
**dug** 126:3,6
**duties** 7:17 36:19
    130:13
**dwelled** 35:14
**Dyson** 53:23 59:20
    61:11 62:3 63:22
    87:18
**Dyson's** 61:10
    62:13 65:6

---

**E**

**E** 65:18
**E1** 12:14
**E2** 61:1,5,6 70:3
**E3** 18:11 23:10
    59:23 71:13
    163:17
**earlier** 37:9 61:21
    68:15 79:5 80:6
    91:25 125:20
    126:3,4,20 134:1
    147:1 165:7,13
    168:17
**early** 35:17 66:24
    116:21
**earning** 170:5
**ease** 91:22
**easier** 167:14,15
**easily** 75:6 88:17
    89:3
**east** 94:23 95:2
    96:15
**Ebohon** 1:19
    171:11
**economic** 29:11

60:17 120:18
    124:11 132:14
    137:14,15,16
    140:20,21
**educating** 96:13
**effect** 24:1 27:25
    28:12 31:19 36:17
    36:25 40:21,25
    41:8,25 59:9,10
    66:10,15,17 77:21
    80:23 112:16
    119:18 120:10,15
    122:24 126:22,24
    129:14 132:15
    133:11 134:24
**effected** 7:7
**effectively** 11:8
    37:13 54:22 59:12
    63:19
**effort** 59:3 60:15
    82:4
**efforts** 2:13,15
    145:8
**eggs** 55:1 91:1
**eight** 57:13 62:10
**either** 9:14 17:25
    19:12,20 20:24
    22:24 27:16 29:16
    29:19 33:7 46:9
    46:11 60:13 65:13
    155:19
**electronically**
    122:13
**element** 7:10 39:12
    39:13 81:17 87:15
    87:16 90:24
    126:19
**elementary** 90:18
    91:13
**elements** 29:15
    57:13 128:17
**elevation** 108:7
**eliminated** 107:9
**Ellis** 1:19 171:11
**email** 73:8 78:2,4

80:6 144:8,11
    147:4,7,18 148:18
    149:4,17,18 151:7
    153:9 174:19,19
    175:12,20 176:7
    176:10,15,18,18
    177:2,5,6,7,8,10
    180:13,15,15,22
    180:24 181:10,11
    181:14,16
**emailed** 144:2,20
    144:23,25 145:1,4
**emails** 3:8 17:3
    135:8 139:12
    153:6 172:9 185:2
    185:3
**embedded** 52:11
**embraced** 22:19
**emerged** 110:1
**emphasise** 136:19
**employee** 51:2
**emptied** 141:5
**enable** 21:22 107:1
    116:1
**encountered** 122:6
**endorsed** 51:22
    166:24,25
**Energy** 6:20
**engaging** 134:3
**engineer** 18:10
    92:14
**engineering** 60:10
**engineers'** 4:6
**English** 42:20
    45:22 135:1
    147:19 149:19
    174:15
**Eni** 1:17,19 5:24
    95:5,13 134:15,17
    141:9 175:1
    177:14,16,18
    179:10,17 180:18
    181:7,12,13,15
**ENI's** 12:20 160:9
    175:8 179:13

181:3
**Eni/NAE** 149:17
**enjoined** 26:25
**enjoying** 6:4
**ENP** 177:14
**enquiries** 16:2
  142:21
**Enrico** 1:19
**ensure** 16:20 70:12
  70:18 114:21
**enter** 111:19 141:7
**entered** 6:18 7:12
  26:3,22 27:3
  140:13,18
**entering** 50:16 59:4
  66:8 74:10 116:13
**enthusiastically**
  22:19
**entire** 24:3 27:7
  84:10 154:17
  184:8
**entirely** 34:16 35:1
  83:2,6 137:24
  140:1 154:2
**entirety** 23:1 27:8
  41:9 110:8
**entitled** 25:2,3 41:6
  47:17 65:1 80:19
  131:1,17 181:24
**entity** 29:17
**entry** 60:16 152:2
  164:4
**environment** 51:6
  51:8
**equal** 9:7 10:3
**equally** 53:9 58:11
  88:23 118:23
  134:19
**equipment** 7:25
**Erin** 94:19
**error** 73:15,21
**escape** 89:1,25
**escrow** 10:21
**essence** 18:16 20:14
  20:23 76:7 113:20

**essential** 114:21
**essentially** 19:10
  24:10 26:3 57:15
  59:19 67:9 70:21
  70:25 72:6,23
  79:20 91:25 92:6
  94:9,22 97:18
  99:12,17 100:23
  103:10,11 105:7
  113:15 120:1,11
**establish** 34:10
  92:25,25 93:1
  151:6
**establishes** 52:18
**establishing** 67:17
**estimate** 169:12,15
  182:10
**estimated** 9:11,11
  10:15
**et** 7:25 56:6,15
  70:15
**evaluate** 152:6
  180:8
**evaluation** 57:20
  58:16 180:6
**Evans** 1:15
**evening** 72:24
**event** 23:18 55:7
  58:24 60:18 66:16
  69:19 74:8 81:14
  133:23 139:21
  152:3 179:11
  180:20
**events** 16:17
  101:21 141:3
**eventually** 26:4
  43:15 142:22
**ever-changing**
  69:16
**everybody** 184:12
  186:7
**evidence** 3:5 11:11
  15:5,25 16:7,8
  24:19 26:5 30:17
  45:1 49:16 56:10

57:14,22 58:7
59:9 60:14,20
65:6,20 66:6,17
74:8 77:20 79:21
81:25 105:14
112:7 113:18,21
116:10 118:18
119:1,15 120:14
120:19 133:13
143:25 144:1,5,13
152:15,17,25
153:20 154:18
155:23 156:24
165:18,20,20
166:1,4 167:3
181:21 182:19,25
183:1,3 185:10
**evidences** 80:11
  118:19 142:18
**evidencing** 15:11
**evident** 46:19
**evidential** 68:8
**exact** 64:14 69:1
  107:12
**exactly** 53:18 77:3
  109:22 184:21
**examination** 115:3
**Examination-in-...**
  158:19 187:18
**examine** 110:10
**examined** 115:8
**example** 46:1 57:25
  61:16 69:21 78:15
  92:7 93:22 134:8
  142:4
**examples** 54:12
**excellent** 141:10
**exception** 8:14
**exceptional** 102:17
**exceptionally** 91:3
  94:17 102:19,22
**excess** 12:20,23
  121:4 162:7,8,10
  162:13 173:16,16
**exchange** 167:4

172:8
**exchanges** 135:8
  139:8,23,25 140:4
**exclude** 28:13
  76:25
**excluded** 24:3
  27:24 132:15
  135:10,20 136:21
**excludes** 77:8
**excluding** 132:15
**exclusion** 78:18
  132:6 135:4 136:3
  137:16 140:10
  141:16
**exclusions** 74:20
  75:12 78:10 123:1
  135:17 140:6,9
**Excuse** 185:19
**execute** 114:10
**executed** 40:22
  68:15 90:20
  130:11
**executing** 114:13
**execution** 57:18,19
  65:7
**executive** 175:1
**exhibit** 61:10,11
  164:16 166:9
  174:13
**exhibited** 54:13
  165:3
**exist** 15:20 29:2
  47:8 89:20 91:9
  111:13
**existence** 47:5
**exists** 89:19
**expand** 29:23 109:7
  109:9 111:4,5
**expanded** 40:7
**expansion** 111:3
**expect** 97:3 111:22
  117:6 121:9
  134:16
**expectation** 21:2
**expected** 27:11

118:22 134:17
179:11 180:19
**expecting** 111:13
**expended** 8:10
**expenditure** 162:7
  162:8,11 164:12
  164:16
**expense** 82:4
**experience** 87:21
  134:15
**experienced** 90:16
  117:16
**expert** 3:11 4:4
  18:6 33:3 45:1
  49:16 53:23 56:10
  56:11 57:14,22
  58:8,25 65:20
  70:6 71:14 88:9
  118:18 119:1
  120:9 123:14
  154:18 155:6,17
  155:24,25 156:25
  167:14
**expertise** 53:11
**experts** 5:14 23:7
  32:23 37:25 38:4
  39:3 49:22 53:6
  53:10,13,15,16
  58:17 59:16,24
  63:13 64:5 65:14
  123:25 124:5,10
  124:15 127:14
  128:6 154:22
  163:19 164:9,14
  164:25 165:19
**experts'** 5:8,10
  18:11 30:17 38:12
  51:19 53:22 57:24
  71:15
**expired** 14:20
  45:22 46:2
**expiry** 14:22 47:15
**explain** 28:23 47:25
  66:22 121:23
  126:2 174:22

180:2
explained 39:11
  112:10
explaining 83:25
  170:12
explains 74:16
  111:25 148:23
  165:11 177:24
explanation 16:1
  54:7 70:5 102:22
  184:22
exploration 5:23
  8:22 95:7 174:25
  175:8,11 177:19
exploratory 8:6
exposed 27:17
exposition 84:10
express 27:24 74:6
  137:20,22
expressed 29:5
expressing 49:23
  53:10
expressions 153:15
expressly 15:11,18
  18:1 20:3 24:8,21
  28:8,21 37:22
  43:19 44:9 45:17
  55:11 59:19 60:4
  61:12 64:23 79:25
  129:11 130:19
  131:11,14,18
  132:15 135:15
  137:25 157:10
extended 20:11
  178:15
extension 20:13
extent 5:4 20:5
  25:17 77:12,23
  111:22 122:12
  134:14 139:22
extra 43:3
extract 92:5 112:15
  127:16
extracting 91:22
  94:4

extraction 93:3
extreme 54:11
extremely 58:9
  90:16 98:20
  114:20 116:12
eyes 33:3 80:25

_____

**F**

F19 166:6,7,15
F20 166:5 167:12
face 42:18 44:4
  46:19
faced 21:12
facie 75:4
fact 8:16 11:22
  14:14 18:5 25:15
  28:23 29:14 45:2
  45:13 55:7 57:15
  58:8 60:3 65:20
  73:25 79:21 81:13
  98:10 110:7
  121:10 127:1
  149:17 165:5,6
  170:20 179:20
  180:25
factor 5:2 93:2
  182:21
factored 5:3
facts 6:11 81:12,19
  113:22
factually 134:6
FAE 168:20,20
failed 80:24 109:23
  113:18 114:25
  130:1,4
fails 78:14
failure 12:7 35:13
  55:19 113:24
  122:22 158:14
fair 19:4 139:11
  176:15
fairly 20:8 55:24
  56:7 120:19
fairness 139:8
  142:13

faith 141:12 148:15
  152:21
fall 19:22 50:19
  52:10 113:2 155:9
fallacy 134:5,6,7
fallen 52:14
falls 14:12 17:24
  117:22 119:25
familiar 14:8 25:14
  75:16
familiarity 6:11
fanciful 17:2
far 5:9 16:13 17:6
  49:20 68:15 85:8
  95:2,2,9 96:14
  99:25 128:14
  139:10 149:18
  170:12 174:6,6
farm-out 178:1
FAS 156:7,9
fast 130:17
favour 11:9 28:5
  33:22 53:19 85:24
  178:24
feature 12:7 21:5
  27:4 93:21 124:18
  124:22
features 66:21 67:8
  90:13 93:17
  112:24
February 12:12,16
  13:8 26:23 35:2
  40:2 69:23,24
feel 54:15 101:24
feels 86:24
feet 110:23,23
  111:11 121:5
Felicity 2:9
felt 55:6
field 7:9,13 8:12
  13:6 18:10 27:1,8
  27:12,14 31:6
  36:21,23 64:13
  67:7,13,22 72:10
  73:3 74:18 77:19

79:16 93:9 94:16
  94:21 96:11
  127:15,23
fields 87:11,22
fifthly 116:6
figure 63:12 165:24
figures 3:15 9:15
  38:17 62:21 70:15
  71:19 72:25 73:2
  73:7 108:2 123:18
files 15:20
Filippi 3:10 4:7 5:9
  5:11 66:9,22,25
  69:20 73:19 120:9
  125:10,10,11
  128:2,10
Filippi's 32:15 33:8
  68:4 125:12
filled 92:23 100:7
  100:18
filter 100:15
final 9:15 11:18
  19:3,7,9,10,11,17
  20:15 22:6,16,21
  23:1 37:12 80:21
  99:3 108:16
  114:15 116:8
  120:7 139:6 140:5
  140:7,8 147:21,24
  148:4 150:3,23
  151:3 152:1,1,2
  154:8,13,17,20
  156:3,6,7,12,19
  161:8 163:14
  166:17,23,25
  167:11,17 168:4
  169:10,15 175:24
  181:23 182:3,5,7
  182:9,11,15,22
  183:19 184:17,18
  185:7,15
finalise 168:7
finalised 182:3
finalising 3:11
  178:14

finally 10:9 35:12
  74:19 110:13
  156:18
finance 127:25
  159:17 160:7
  180:25 184:2
financed 27:9
financial 23:11
  122:24 125:15,20
  159:22
financially 27:5
financing 162:17
find 9:3 14:17
  28:17 42:4 48:9
  51:16 52:4 65:16
  74:3,23 75:25
  94:17,18 96:11
  98:22 101:21
  103:25 104:12
  106:17 107:18
  108:11 162:4
finding 129:2
  152:20
fine 31:22 132:25
  170:11
fined 140:14
fines 113:12 140:19
  140:23
fingerprint 107:6
finished 32:2
  173:24 175:16
Fiona 137:7
first 1:11 2:12 4:24
  7:4 9:19 10:3,20
  10:23 11:1,6
  13:21 14:12 16:11
  21:21 28:6 29:13
  32:10 34:12 35:19
  36:13 41:14 42:8
  43:5,10 44:23
  47:5 54:24 57:9
  61:8 62:10,25
  69:8 71:16 76:13
  76:17 78:1,1 80:5
  83:4 84:5,23

85:18 91:13 102:9
105:24 106:11,15
106:18 112:9
114:5,8 115:20
118:12,13,21
119:6 125:4
128:23 133:3
135:11 138:8,16
141:7,22 143:3,11
146:7 147:23
149:22 150:2,13
156:4,6 157:23
167:16 174:13,18
176:10,21,22,24
179:7,22 180:18
**firstly** 65:25
**fit** 17:5 105:6
**fitted** 100:5
**five** 16:7 55:16
63:25
**five-eighths** 98:4
114:7
**five-eighths-inch**
100:3 108:11
**fix** 3:12
**fixed** 129:18
**flag** 112:7
**flared** 113:9
**flaring** 31:22 34:24
35:22 39:22 55:20
65:9,15 78:15,17
78:21 113:3,13
140:11,12,14,15
140:19,20,22
**flawed** 69:16
**flesh** 153:8
**flexibility** 140:3
**flicking** 130:16
**float** 104:20
**flow** 109:15 126:19
127:11 159:22,23
**flowing** 94:9
**fluid** 92:13 100:13
100:15 101:2
102:1,2,6 104:19

**fluids** 71:1 91:14
91:18 94:8 110:1
110:2
**flush** 101:1,16
**focus** 76:3 105:21
**focusing** 105:23
**folder** 161:3 166:5
167:12
**follow** 89:7 102:3
**followed** 17:4 95:6
122:25
**following** 2:14
18:20 29:12 30:16
42:6 69:22 90:3
102:10 156:18
171:23 178:17,23
**follows** 19:20 21:20
33:25 67:1
**foolhardy** 58:9
**foolish** 49:22
**foot** 59:25
**footnotes** 70:15
**for'** 68:7 69:2 71:23
**force** 105:2 111:3
**forced** 68:23
**forces** 102:13 112:5
**forecast** 3:9 68:3,4
71:21 72:8,10,25
73:18
**forecasts** 67:20
68:3 69:11,16,17
70:1 71:11 72:16
72:18,18,21,23
73:11 125:7
**forgive** 81:2 90:24
**forgot** 95:20
**forgotten** 11:23
144:15
**form** 46:22 87:19
91:9 92:8
**formal** 11:18
**formally** 45:4,7
**formation** 56:17
71:1 91:11,14,19
92:4,24 93:24

94:5 95:15 111:14
111:20
**formations** 67:11
92:10
**formed** 91:6,15,17
**former** 12:6
**forms** 8:17
**formulate** 85:6
**formulation** 44:5
64:22
**Forsyth** 2:5
**forth** 49:8 52:18
**forward** 67:23
108:2 132:10
186:11
**forward-looking**
131:25 132:4,5
**forwarding** 177:3,7
**forwards** 105:14,24
**found** 43:13 65:23
71:4 76:14,19
94:16 98:20
110:15 111:10
112:9
**four** 6:2 13:15
21:21 30:21 50:12
114:3 120:20
**fours** 29:5
**fourth** 116:3
**FPSO** 26:15 110:6
113:8
**framed** 66:3 75:14
77:1
**framework** 133:17
133:20
**frankly** 15:15
68:20 82:2
**Fred** 1:16
**free** 86:19
**free-standing**
39:20
**French** 92:14
**frequently** 168:9
**Friday** 3:5 45:7
**friend** 92:12 97:2

121:18
**front** 61:14 84:21
135:25
**fuel** 90:13
**full** 6:4 19:12 24:23
79:3 139:18
142:17 181:19
**fully** 79:15 81:23
134:1
**function** 175:24
**functioning** 56:5
110:5
**fund** 21:22 74:13
**funny** 104:17
**further** 3:16 8:22
10:24 17:2 34:17
39:16,19 43:15,24
44:10 46:17 47:12
48:3 50:12 66:15
70:8 73:10 75:7
82:6 95:11 97:10
111:19 119:13
157:21 163:9
178:15 179:5
186:4 187:9
**future** 29:3 37:12
41:16

## G

**G** 103:1
**G12** 74:4,14 161:3
**G16** 60:8
**G19** 77:24 80:4
**G21** 7:22 13:20
48:11 146:8
173:23 174:10
**G22** 21:14 22:5
**G26** 138:20
**G29** 102:21 103:24
104:5
**G7** 98:22 99:1
**G8** 99:2
**G9** 95:25
**gained** 39:21
**gamma** 106:19,19

107:1,2,4,13,14
108:21
**gap** 100:1,5,7,7
150:16
**gas** 5:24 13:7 31:22
34:24 35:5,22
39:22 55:19,20
56:3 59:4,4,22
60:16,21 62:11
64:2 65:9,15 66:1
66:2,7,10,17,24
67:7,15,18 71:1
71:10 73:16 74:10
78:15,17,20 85:14
87:22 91:4,14,15
91:23 92:12 93:2
93:6,9,11 95:14
100:8,8,19 101:19
106:8 109:6,9
110:20,23 111:1,2
111:3,4,16,19
112:1,2,2,3,4,4,5
112:10,13,17,17
112:20 113:5,7,9
114:22 115:10,13
116:13,14,21
117:3,10,12,13,23
118:4,5,11,15,25
119:4,7,9,12,14
119:15,17,18,20
120:5,10,14 121:8
121:16,20 140:11
140:12,14,15,19
140:20,22
**gas-oil** 66:15 67:3
93:12 100:20,24
108:3 110:22
111:7,12,22
115:10 117:3,24
118:4,20 119:21
120:3,13 121:13
121:16
**gassy** 71:25
**gauge** 107:19
**general** 31:4 160:6

161:18 177:18,21 185:2
**generally** 137:13 162:4
**generated** 3:15
**gentlemen** 2:8 14:24
**genuinely** 21:7
**geological** 93:5
**Georgio** 1:18
**getting** 34:6 57:3 69:4 90:19 145:25 146:2
**Giannini** 147:20 149:20 150:21 151:1,10
**Girard** 2:6
**girdled** 127:21
**Giuseppe** 1:18 158:4,7 187:16
**give** 3:5 6:14 29:21 30:23 39:19 54:15 69:21 81:15 82:9 93:3 94:15 98:18 108:1 116:20
**given** 18:25 29:25 72:19 80:16 82:2 108:10 109:11 110:13 158:22,25 176:1
**gives** 80:15 110:21 150:2 178:2
**giving** 77:13 90:14 180:4 181:21
**gladly** 123:23
**glean** 166:8
**global** 70:9,20 71:24
**gloss** 53:1
**go** 16:12 17:5 21:10 30:24 42:5 43:22 44:24 49:20 63:4 74:22 96:17 98:19 104:15 111:5 119:1,13 132:2

143:10 146:5 148:24 149:16 150:20 151:7 153:6,21 164:11 166:5 167:19
**GOC** 93:12
**goes** 47:11 102:5,9 103:12 121:3,4 125:5 177:25
**going** 18:15 25:7 29:21,22 31:23 32:8 38:11 47:1 47:25 60:10 61:23 77:25 79:7 90:7 90:11,19 91:2 92:17,21 97:14 98:13 100:1 101:5 101:25 102:3 103:13 104:19,23 105:13,20,23,24 107:3,15,20,25 108:2,16 112:6 113:20 114:3,4 118:17,24 119:7 120:8,14 124:24 124:25 130:5,23 131:16 132:10 140:14 147:17 151:8,11,11 166:12,17,23 170:20
**good** 1:6 3:11,13,20 5:16 23:7 76:11 94:17 106:21 107:5 141:12 148:15 152:20 155:17 156:19 158:5,8,17,21 159:13 163:18 164:23
**GOR** 111:7 117:5 120:11 121:1,24 121:25
**gotcha** 141:9
**govern** 126:12

**gradually** 62:8
**grains** 91:10
**grandmothers** 90:25,25
**granted** 20:16 113:21 114:20
**grateful** 84:11 93:19
**gravel** 8:25 99:14
**great** 65:20 139:23 140:16 142:3 173:16
**greater** 23:22 112:14,15,16 125:21 127:7
**greatest** 118:24
**green** 118:9
**grey** 103:20
**greyed-out** 39:6
**grid** 93:24 94:1,8 94:12
**ground** 14:19 25:23 26:14 31:9 43:7 58:17 75:8 79:6 124:2,4
**grounds** 130:3 133:5 155:20
**group** 148:18
**GSO** 8:15 13:7,9 35:5,13 39:25 40:3 46:20 55:19 56:3,5,10,23 59:2 60:6 64:21,24 65:2,2 73:25 74:5 74:7,13,17 117:12 119:23 120:2,4 160:21,25 161:23 161:24 164:4,16 164:20 165:1,3,15 165:16 167:2,21 168:20 169:5,10
**GSO's** 65:7
**guarantee** 9:9,19 9:21 10:10,18 11:10 15:10

148:16 152:22 176:1,3,3 178:24
**guaranteed** 74:11
**guarantees** 178:10 178:10
**guess** 176:25
**guidance** 84:11 99:5
**guide** 87:19 88:3
**guided** 88:3
**guides** 85:1
**Gulf** 87:4
**Gulio** 1:18
**Gunning** 2:2 83:22 88:15 90:8,10,11 93:20 96:2,5,16 96:20 103:6,8,17 103:19,21 104:5,7 104:9,12 109:17 109:20,22 114:2 122:21 127:9 187:14
**Gunning's** 84:7

___

## H

**H1** 133:9,10
**H6** 45:24
**half** 25:18 109:24 141:7
**half-hearted** 11:19 11:22
**halfway** 62:2
**hand** 6:23 15:7,17 15:23 48:9 52:19 88:15 90:7 144:4 144:6 145:13,15 145:16
**handover** 29:22
**hands** 39:1,2 157:18
**hanger** 97:23
**happen** 94:4 113:8 135:25
**happened** 36:12 39:7 120:17

121:17
**happening** 60:17 100:10,21 119:25 121:22 149:24 169:6
**happens** 106:22 111:18,20
**happily** 153:4,5
**happy** 4:21 123:11 132:20
**Harcourt** 143:17 143:20,22 149:13 149:21
**hard** 15:25
**Harley** 2:2
**Harwood** 70:5 71:22 73:9
**he'll** 5:13
**head** 57:4,24 97:18 97:23 98:5,7
**heading** 161:4 166:23 177:10 179:5
**hear** 30:2 83:8 84:10 86:6 152:25
**heard** 113:22 129:21 134:1
**hearing** 15:9 27:22 28:10,16 42:3 75:19 82:18 128:23 135:6 138:16 152:25 153:3,14
**hearings** 6:9
**heavily** 83:7,9
**heel** 67:11 99:23,25 100:9,20,24 101:20 114:22 115:11 118:13,22 118:24 119:5,7
**held** 8:3 33:19 38:8 55:5 128:24
**help** 29:23 87:25
**helpful** 4:14 6:22 48:8 60:22 74:22

87:19 96:11 110:15 157:4
**helps** 52:3 111:3
**Henri** 92:14
**herring** 88:21
**high** 4:1 64:1 67:9 84:8,12 91:19,20 92:2 107:4 113:6 118:15 130:2
**higher** 51:24 52:10 55:5 71:4,7,8,9,12 86:23 127:1 168:2 172:22
**highlight** 154:25
**highlighted** 80:13 80:14 125:19
**highly** 27:1
**historic** 28:13 73:16
**historical** 27:18 73:6,17
**history** 27:7 69:11 73:6,7
**hit** 84:12
**Hoffmann** 1:9 38:3 38:7,18,21 39:4 48:25 49:3 51:13 51:24 52:15,17 53:8,18,21 85:24 93:19 132:17,19 145:22 146:9,11 146:14,19,21,23 147:3 152:15 166:14,16 174:11
**Hogan** 1:14,21 5:21
**hold** 27:20 107:23 151:5 153:14
**holding** 171:21
**holdings** 177:24
**holds** 76:10
**hole** 8:25 99:9,12 99:17,18 100:3,4 100:9 106:4 107:13,14 108:3 108:12,13 114:23

115:5
**home** 65:24
**honour** 78:14
**hook** 102:5
**hope** 40:5 80:4 90:12 114:19 116:10
**hopefully** 84:12 130:22
**horizontal** 8:25 96:25 97:7,9 99:19 101:4 102:25 107:25 108:13
**horizontally** 103:2
**Hornsey** 1:16
**hostile** 51:7
**hours** 57:3 63:3,6,8 63:15 157:12
**house** 69:12
**housekeeping** 1:5 2:22 187:3
**Houston** 144:3,17 144:20,23,25
**huge** 82:4 121:16
**hung** 97:22
**hurdle** 14:12
**hurdles** 69:5,6
**hurried** 127:21
**hydrocarbons** 91:19,21,22 92:20 92:23
**hypothesis** 105:15
**hypothetical** 49:18 49:18 50:24 53:24 54:5,11

─────── I ───────
**i.e** 22:7
**idea** 93:3 94:16 98:18 101:11 103:11 104:24
**ideally** 94:8
**identified** 88:20 150:17 151:23

**identifies** 67:3
**identify** 1:12 2:8 59:3 61:21 88:18 108:2 145:14 167:14
**identifying** 49:11
**illegible** 97:17
**illustrates** 175:24
**image** 99:18 101:14 102:24 103:19,21 104:12,15 118:6
**imagine** 29:1 103:1
**immediately** 9:12 138:6
**impact** 3:15 71:25 125:15,25
**impermeable** 92:6 92:8
**impermissible** 139:4
**implement** 172:19
**implementation** 55:18 172:23,24
**implications** 23:11
**implied** 51:1 74:6 87:7
**imply** 151:12
**importance** 45:19 139:7
**important** 7:10 26:1 36:13 42:2 71:3 97:10,24 110:25 111:24 114:7,20 115:20 116:12 124:4 125:4 152:9,24 156:5
**importantly** 9:18 106:22
**imposed** 86:10
**impossibility** 42:19
**impossible** 29:16 40:14 43:2 44:22 47:6,7,11 80:3 86:13 94:12

**improve** 73:6
**inaccurate** 95:17
**inadvertently** 27:17
**inappropriate** 80:20 113:17
**inaudible** 122:6
**incapable** 90:23
**inch** 60:2 98:4 109:12,20,22,25 114:7
**inches** 100:4
**incident** 102:20
**incidentally** 109:13
**include** 19:16 24:9 24:21 42:13 88:9 88:10,11 137:3,9 172:24
**included** 73:13 85:21 164:19 168:4 182:7
**including** 7:18 9:18 26:15 31:14 36:17 36:22 37:21 41:20 43:24 76:12 129:7 131:2 141:3 150:22 169:3
**inclusion** 44:25
**income** 125:21,23 126:15,21 127:20
**inconclusive** 58:18
**inconsistent** 20:25 21:2 22:18 58:21
**incorrect** 65:23 152:2
**incorrectly** 72:2,8
**increase** 72:12 111:22 120:3 127:22
**increased** 118:3
**increases** 118:3
**increasing** 117:23
**incurred** 13:5 24:22 29:11 38:5 38:23 113:12

155:11
**incursion** 64:2 67:7 111:2 116:21 117:4,14 118:15 119:4 120:5,10 121:16
**indebted** 123:25
**indemnify** 44:8 45:17 55:9 113:11 129:6
**indemnities** 78:20 137:25 141:2
**indemnity** 23:22 24:3,17 25:4 75:15 76:14 77:2 78:14,21 131:1 137:23,23 138:23 140:11,11,12,17 140:24 141:3
**independent** 23:6 155:6
**index** 4:12,14 166:8 187:1
**indicate** 134:12 144:16
**indicated** 35:19
**indicates** 95:24 107:21
**indicating** 16:9
**indication** 22:4 44:4 106:21
**indicators** 58:19
**individual** 15:24 105:22
**individuals** 26:13
**indulge** 17:1 73:23
**industry** 48:21 49:7 50:22 51:2,20,22 61:13,19 66:20 85:14 106:14 114:1
**inevitable** 100:1 122:21
**inevitably** 3:10
**inflated** 173:10

**information** 26:18 27:2 70:20 79:16 80:19 88:5 108:17 108:20 116:23 134:3 181:6,8 182:24 184:16
**informing** 176:23
**ingress** 118:5
**ingression** 66:1,2 67:15,18
**initial** 3:24 59:25 67:12
**initially** 41:24 71:6 97:7 147:7 153:16
**injected** 100:10
**injection** 95:14
**input** 83:14 125:5,7 125:10
**insert** 105:1
**inserted** 98:10
**insertion** 79:1
**insist** 22:10 28:4
**insofar** 14:11 22:12
**inspire** 72:15
**installed** 98:15,25
**instalments** 9:8,20 9:25 10:3
**instigated** 22:24
**instructions** 155:19
**intact** 79:2
**integrated** 26:23
**intend** 84:16 141:8 175:17
**intended** 26:19 44:13 50:15 54:15 54:17 94:15 103:8 113:5 133:11,14 133:22 141:13 152:11
**intention** 44:5 46:6 50:19 150:12 182:2
**intentionally** 158:14
**intentions** 54:16

154:7
**inter** 14:22
**inter-group** 131:15
**interconnectivity** 92:1
**interest** 7:5 12:24 26:10 31:7 32:12 32:12,20,21,25 33:6,18 38:14,24 39:9 41:3,10,21 42:11 44:20,21 47:22 121:10 128:8,12 173:10 173:17 179:13
**interesting** 57:2 122:8 124:18
**interests** 6:22 7:3,4 7:11,14,17 9:2 12:20 31:8,12,14 31:21 33:14,21,24 34:13 77:1
**interim** 6:8
**internal** 17:3,6 104:2,14 149:4,17 149:17 150:15 159:23 181:3,11
**Internally** 147:5
**international** 2:17 5:24 9:22 10:11 49:19 53:25 54:5 87:1,6,21 178:24
**internationally** 48:21 49:6 50:22 61:13,19 86:22 87:9 89:15 90:4 115:15
**interpret** 23:8 53:4 53:11 54:20
**interpretation** 29:9 43:10 49:11 50:25 53:5 60:11 61:12 76:20 83:9 84:24 85:2 139:3 152:5
**interpretations** 23:13

**interpreter** 1:23
**interrupt** 169:16 169:23
**interrupted** 146:25 147:12 174:1
**interruption** 169:17
**intervals** 10:5
**intervening** 39:13
**intervention** 161:6 180:11
**intimately** 14:8
**intra-group** 131:15
**introduce** 84:4 90:8 158:18
**introduced** 83:6,8 135:5
**introducing** 83:25
**introduction** 26:2 93:16
**introductory** 83:3 83:21
**invested** 12:19,23
**investigate** 79:21 149:23
**investigation** 150:15,25 151:8 152:13 153:19 155:2
**investigations** 16:6
**investment** 12:25 180:11
**investor** 94:19
**invitation** 56:24
**invite** 6:16 121:14 153:13 176:6
**invited** 154:15
**invoice** 164:18 166:24,25 182:13 182:15
**invoices** 167:7,10 168:5 169:8 182:8 182:14 183:8,9,13 184:7
**involved** 26:13 82:4

171:13,16,20 183:19,22
**involvement** 77:19
**involves** 63:10
**involving** 184:5
**IOC** 87:2 88:10
**irrelevant** 65:7 89:23
**irrespective** 39:1
**isolation** 100:24 113:24 114:22
**issuance** 178:23
**issue** 3:3,7,21,24 5:18 11:2 13:21 14:4 15:1 17:14 18:13 19:25 20:19 20:21 22:6 28:2,4 30:20 56:6 75:9 75:16 76:8 123:23 128:15,22,25 132:21 135:5,11 140:5 142:10 153:2,16 154:5
**issued** 21:7
**issues** 2:20 13:17 26:1 27:22 28:7 28:16 42:3 48:6 56:21 75:18 98:12 123:7,24 128:23 131:23 135:6 142:9 153:21 154:24 155:15
**Italian** 146:14
**Italian-English** 1:22
**item** 3:12,22 17:19 18:8,9 151:24
**items** 16:7 17:20,25 18:4,5,17,22,24 18:24 19:15 20:2 22:7,8,12,15,23 24:9 154:19 155:8
**iteration** 3:9

────── J ──────

**jabbering** 98:6
**Jan/June** 151:3
**January** 26:22 73:1 117:9 178:22
**Jess** 1:16
**job** 23:3 57:18 58:2 58:19 105:8,16 106:4 113:25 114:11,13,17,20
**joined** 110:9
**joint** 3:14 4:4,6,18 5:8,15 7:24 18:11 23:9 59:23 71:14 71:15 73:13 163:18 166:11 167:14
**jointly** 134:5
**judicata** 28:5
**Julie** 2:5
**July** 26:4 27:22 34:2 46:2 147:22 182:4 183:25 184:20,23,23 185:6,13
**juncture** 48:8
**June** 1:1,6 2:14 9:16 10:16,20 13:11 26:4 32:14 40:20 42:25 43:17 155:12 165:10,20 169:13,13 170:2,4 170:8 176:17 177:18 178:11,16 178:22 182:4,15 183:25 186:14
**jurisdiction** 11:3 22:11,14 23:19,24 130:4 138:22,24 139:1 154:5 156:21
**jurisdictional** 4:1 23:20 24:24 130:2 137:10 138:16 141:24

## K

**Kamoru** 21:16
   142:18 144:2
**Kate** 1:15
**keen** 28:1 173:7
**keep** 14:1 32:6
   48:11
**keeping** 112:5
   179:18
**Kellingray** 58:8
**kept** 62:20 105:18
**key** 26:17 59:20
   67:20 68:2 69:15
   70:17 130:7,16
   142:9
**kilometres** 96:14
   96:17,18,19
**kind** 80:1 86:5
   103:1 107:18
   176:6
**kindly** 14:1 83:22
**knew** 10:12,14 74:9
   77:17,21 79:22,25
   80:22 116:11,14
   116:15
**know** 5:18 8:16
   12:22 29:15 37:25
   41:22 58:14 64:16
   68:17 82:19 83:22
   92:20 110:16
   139:13,13 149:8
   149:14 151:8
   152:4,23 158:16
   177:17 178:19
   181:1,1,20,22
   184:1
**know-how** 64:4
**knowing** 142:17
**knowledge** 26:25
   64:1 79:3 81:14
   139:18
**known** 9:15 67:12
   73:4 77:13,14,18
   78:16 79:22
   116:11 154:9

**knows** 9:16 51:2
**Kuchlin** 1:16

## L

**lack** 72:14 82:3
   134:12 144:4
   145:20
**lacked** 104:16
**lacking** 116:22
**lacuna** 144:12
**lady** 175:6
**lakes** 91:7
**language** 49:23
   87:8 132:5 135:20
**large** 43:3 51:22
   56:9 100:9
**larger** 91:17
**largest** 47:2
**last-ditch** 11:17
**late** 142:14 154:3
**latest** 3:9 11:11
   32:17 64:21
   142:20
**launched** 150:15
**law** 39:18 42:20,20
   45:22 50:2 83:10
   83:14,17 85:1
   133:6,9,10 134:24
   135:1,1 154:3
**Lawal** 12:9,22
   21:16 144:2
**Lawal's** 142:18
**lawyers** 137:5
   170:16
**layer** 112:5
**layers** 91:7 92:11
   93:7
**layout** 94:16 107:6
**layperson** 57:3
**LCIA** 1:7
**lead** 98:13 102:9,10
   102:10 171:6,10
**leads** 37:19 119:17
   120:7
**leak** 100:19 115:12

122:5
**leakage** 103:13
**learned** 92:12 97:2
   121:18
**lease** 126:18
**leases** 7:6 126:10
   126:11,13
**leave** 22:22 69:23
   73:19 132:20
   153:2
**left** 1:8 24:17 27:17
   33:19 42:15 46:20
   69:12,20 73:22
   99:24 117:19
   157:13 166:23
**left-hand** 62:17
   94:25 98:18 99:23
   106:16 120:24
   123:19 125:9
   161:14,14
**legal** 1:19,20 42:19
   57:8 133:1,2,12
   133:15,16 150:6
   155:21 171:11,14
   171:14,19
**legally** 29:16 44:22
   47:5,11 80:3
**length** 57:21 99:21
   126:10,11 142:3
**lengthy** 142:21
**less-sophisticated**
   58:16
**lesser** 127:12
**let's** 33:15,21 96:15
   143:10
**letter** 13:22 14:4,21
   14:23,25 15:2,4
   15:16 16:4,8,10
   16:13,18,21,24
   17:4,7,15,23
   18:14,23 20:5,17
   21:1,16 23:1
   56:19 70:4,7
   71:22 73:12
   144:16 145:10,11

147:8 148:6,11,13
   148:13,20 149:2
   151:2 152:5
   153:10,12,13
   160:24 161:3,5
   184:19 185:1,3,11
   185:11,12,12
**letters** 20:24 21:18
**level** 51:24 60:5,13
   67:9 71:4 84:8
   94:7 97:23 108:7
   111:1,6,7,10,11
   117:4 119:21,22
   121:7 168:19
   171:25 172:3,11
   172:22,22
**levelled** 142:3
**levels** 117:3
**Lew** 1:10 48:11
   52:1 53:15 61:5,7
   64:5,8,11,20 81:2
   81:6,8 87:9 89:6
   89:14,17,19,21
   90:2,6 96:13,18
   103:4,7,15,18,20
   109:16,19,21
   113:23 126:2,6
   127:5 143:6,9
   144:25 145:3,6,9
   145:12,15,18
   147:9,16 151:18
   151:20
**liabilities** 7:17,18
   13:5,9,12 24:15
   24:20,22 28:24
   29:4,11 36:19
   41:5,12,15,16
   42:19 129:7 130:8
   130:9,18 131:13
   131:15 132:12,14
   135:12,15,17
   137:15,16
**liability** 11:17
   12:10 13:13 14:10
   25:12 27:23 28:13

42:16 45:16 47:9
   75:4 77:9 78:16
   123:1 130:10
   136:4 140:18
**liable** 77:11 132:10
**lifted** 27:12 74:18
**lifts** 26:9
**light** 3:8 10:9 23:14
**likelihood** 112:16
   118:19
**likes** 82:25
**limbs** 32:5,9
**limit** 77:23 126:9
**limitation** 45:20,24
   47:16 75:3 76:11
   77:5 135:4
**limitations** 4:22
   76:15,21 129:9
**limited** 57:19 80:17
   119:5
**line** 38:14 42:5
   96:24,25 97:11
   117:25 128:8
   132:12 134:4
   175:3,3,7 176:9
**lines** 21:21 50:12
   61:18 138:20
**link** 3:5 67:14,17
**linked** 67:7
**list** 13:16 17:21
   18:21,23 25:22
   56:21 178:6,18
**listed** 18:1 20:3
   78:10,18 88:8
**lists** 178:5
**literally** 112:4
**little** 6:13 29:25
   33:19 37:24 39:6
   65:10 82:5,23
   95:24 96:6,7
   97:10,14 118:12
   119:8,10,19,24
   157:13
**live** 52:8
**lived** 52:12 91:16

**loath** 169:23
**locus** 83:18
**log** 58:12,17 105:21
    105:22,24 106:6,6
    107:13,14,15
    120:24
**logging** 66:7 98:23
    105:20 106:7
    117:10 118:7
**logical** 19:21 20:1
**logically** 71:7
**logs** 105:18 106:12
    107:19,22 108:16
**loins** 127:21
**long** 25:6,22 46:6
    95:18 107:23
    108:3,13
**long-stop** 178:16
**longer** 15:20 63:18
    64:23 73:7 143:21
    157:16
**longest** 8:25 97:21
**look** 24:25 54:1
    62:21,25 63:3,9
    77:25 84:24 85:9
    85:12 88:9 92:15
    95:18 98:21 99:10
    105:3 106:11
    108:21 118:9
    120:18,22 121:19
    121:25 126:9
    135:19,21 137:1
    154:14 156:21
    160:17 161:2
    162:2 166:22
    167:16,23 171:14
    186:11
**looked** 80:7 132:1,3
    132:6 166:10
    167:13
**looking** 14:3 17:12
    18:3 21:20 34:20
    35:18 48:2 52:6
    61:8 62:1 70:6
    71:16 76:24 85:11

87:6 105:14 106:6
121:24 126:13
147:9 151:22
177:2 179:21
180:7,9,14
**looks** 40:17 95:24
103:4 142:25
146:15
**loose** 31:16
**loosely** 84:2
**Lord** 1:9 38:3,7,18
38:21 39:4 48:25
49:3 51:13,24
52:15,17 53:8,18
53:21 85:24 93:19
132:17,19 145:22
146:9,11,14,19,21
146:23 147:3
152:15 166:14,16
174:11
**loss** 32:10,24 38:1,5
38:5,13,15,19,20
39:3 43:12 47:22
55:10 66:2,4 69:7
124:19 125:6
128:7
**losses** 29:17 33:4,6
38:23 44:1,25
124:7 129:8 131:1
131:11,16 138:1
**lost** 67:19
**lot** 60:10 68:16
96:21 107:3 112:6
113:9 119:7,11
128:9 137:7
**loud** 176:4,5,8
177:6
**Lovells** 1:21 5:21
**Lovells'** 1:14
**low** 66:13 84:12
107:5 119:21,22
180:4
**lower** 27:11 63:19
66:13 72:10 92:4
96:21 112:11,12

112:14,21 121:7
121:12 165:2
168:12,16 170:5
172:11 183:15
**lowered** 100:17
**lowering** 66:14
**lubricate** 100:16

---

## M

**Mac** 94:2
**machinery** 7:25
**Macom** 74:2,12
160:3,18,21,25
162:9,12,16
170:10
**Macondo** 102:20
**magical** 141:4
**Magnani** 175:4
**magnitude** 124:16
**main** 171:17
**maintain** 17:9
28:12 75:11 142:6
**maintained** 12:1
35:8 46:15
**maintaining** 60:17
**maintenance/rep...**
18:7
**majority** 28:8 54:6
65:6 75:17 128:20
129:4
**making** 14:14
26:15 58:6 65:21
85:24 142:21
152:7
**Malek** 2:2,5 78:2,5
78:25 80:7,12
139:12
**Malek's** 79:1
**man** 33:19
**manage** 116:12
122:22
**managed** 56:15
115:21,22 121:12
121:15 122:4
**management** 2:14

26:24 55:18 59:14
113:16 115:17
134:3 160:3
171:25 172:3,13
172:15,16,22
181:6,11 182:12
184:2
**manager** 159:18
160:6 161:18,18
180:25
**managing** 120:20
161:19
**manner** 62:8 112:2
113:17 124:6
**manuals** 88:10
**map** 95:17 96:6,11
107:2
**MaraSEAL** 56:16
**March** 15:11
164:17 169:3
**mark** 35:24 40:10
43:3 46:14 163:19
**marked-up** 78:3
**market** 10:6
**marks** 36:8
**markup** 78:24
**masks** 120:25
**mass** 91:9
**master** 26:22
**match** 69:11 73:6
107:15
**matched** 73:7
**material** 30:1 45:21
115:9 185:5
**materialised** 65:12
**materials** 7:24
**mathematical**
156:1
**maths** 109:23
**matter** 8:3,9 38:8
42:20 77:12 79:21
81:13 113:10
123:20 124:9
126:15 136:8,21
136:24 137:6,8

**matters** 4:1,3 37:18
38:6,10 55:13,16
57:1 64:24 77:17
79:17,23 81:15
90:17 124:2
153:24
**Maxime** 2:6
**maximum** 48:23
58:22 63:7,10
108:22
**MD** 92:16
**mean** 2:24 10:8
20:3 29:2 52:1,17
53:4,7 57:7 64:9
85:22 94:8 108:7
173:9,25 174:8
176:4,25
**meaning** 7:24 17:3
17:17,24 23:5,14
28:19 50:7,17,18
79:3 85:22 140:25
**meaningless** 19:10
**meanings** 19:10
**meanings** 139:5
**means** 3:3 25:1
49:5,24 51:21
63:5 70:24 72:20
100:17 111:18
136:13,13 169:3
173:16
**meant** 89:2 106:3
110:5,8 120:13
**measure** 59:17 60:2
106:20 111:25
**measured** 71:2
73:2 86:16 92:16
92:19 109:20
110:3,22 111:8
**measurement**
92:13 107:12
109:18 110:13
**measurements**
107:8,11 108:9,14
109:11 118:2
119:5
**measuring** 108:25

mechanical 130:12
mechanism 10:7
   14:12 22:13 24:11
medical 3:3 51:14
meet 21:3 130:6
   153:15
meeting 21:23 74:3
   74:12 151:5 152:8
   152:12 160:18,21
   183:2,6,13
meetings 133:18
members 175:8,15
memories 132:2,18
mention 6:15 25:15
   25:16 53:2 58:5
   92:18 107:20
   181:10
mentioned 17:13
   25:21 56:6 64:21
   66:6 70:11 71:5
   73:10 128:17,21
   175:4
mentioning 167:24
   167:25
merit 82:2,3
met 144:23
metres 96:20,21
   99:20 108:13
   119:6,9
Mexico 87:4
Michael 1:20,21
microorganisms
   91:16
mid-2012 6:20
   68:11
mid-January 35:9
mid-morning 5:1
middle 71:17 95:23
   96:6 102:16
   119:19
midstream 22:22
migrate 112:2
Mike 1:16
mildly 91:3 101:24
miles 96:14

millidarcies 92:16
million 8:19 9:5,6,6
   9:20,21 10:11,17
   10:20 12:21,24,25
   13:1 18:8 27:13
   31:23 32:16,18
   33:8,9 47:2,13
   128:10,12 156:8
   156:10,10,22
   162:25 164:17
   165:1,2,16,18,21
   167:5 168:13,23
   170:6 173:22
   174:3 176:10
   178:2 179:16
   181:2,9
mind 25:17 52:15
   63:24 72:6 84:9
   96:12 98:1 138:6
   161:24
Minelli 58:9
minimum 48:24
   58:23 108:22
mining 7:6
minus 9:5
minute 123:18
   150:4 154:25
minutes 30:5 73:22
   74:12 122:11,15
   141:19
minutes' 30:1
mis-analysis 33:13
misapplied 154:2
misconstruction
   83:17
mispronouncing
   125:11
mistake 183:16
MJD23 61:11
model 32:15,17
   33:8,10 69:9,16
   70:8,23 71:8
   93:21,23 120:15
   123:17 124:5
   125:3,6,7,12

modelled 66:9
models 70:13,19
   94:11 124:6 128:9
modifications
   69:10
modifier 70:9,13
   70:18,21
moment 19:24
   25:25 56:25 61:25
   71:5,22 86:25
   99:7 106:11 123:5
   131:5 141:9 143:4
   175:2
moments 90:11
   122:23
monetary 5:25
money 25:5 126:12
   127:9 151:16,17
monitor 116:1,25
monitored 60:15
months 30:21
   43:25 62:10 67:24
   117:7 182:10
morning 1:6 3:6
   69:19 186:8
move 64:12 97:13
   105:17 132:22
   169:18
moved 130:14
movement 58:10
   107:4
moving 13:3 32:3
   50:12 58:3 128:16
   170:25
Moy 69:8,20 71:18
   72:6,11 73:10
Moy' 71:19
Moy's 3:9,16 32:17
   33:10 67:20 68:3
   69:9,15,22 70:4
   71:10 72:16,24
   123:16 125:6
MPJT 166:9
MPJT18 164:16
MPJT24 165:3

mud 98:23 100:18
   100:18 101:2,8,16
   101:18 102:13,13
   104:23 105:1
multiple 70:21 71:7
multiplier 71:24
   72:3,4,9,17
mustn't 154:12
mutual 178:16
Myanmar 3:3

_____

N

NAE 1:17,20 6:20
   7:13 8:1,7,10,18
   8:22 10:15 13:5
   14:5 16:5,11,16
   16:21,24 17:3,7
   19:8,16 20:16,19
   20:24 21:6,9,17
   21:19 22:9 24:11
   25:2,5,17,20 27:9
   27:16 28:22 29:1
   29:12 32:11,13
   33:18,19 36:1,4,5
   37:19 39:21 40:12
   40:19,20 41:1,7,8
   41:18,20 42:7,11
   42:16,23 43:1,9
   44:8,18,21 46:25
   48:18 52:8,9 54:3
   54:9,22 55:4,9
   56:13 57:25 58:13
   58:20 60:1 62:9
   63:17 64:1 78:2
   78:13,25 80:18
   90:15 95:13
   105:17 113:15
   114:10,12,16,24
   115:2,23 120:9,16
   129:25 130:9,13
   130:21,24 132:10
   132:14 133:1,7,23
   133:25 134:1,17
   138:18 139:4
   140:16,18 141:10

141:10 142:3
143:1,16,21
148:15 149:18
152:11 153:13
155:16,17 159:18
160:12,13 161:14
161:20 165:1,6
173:15 178:1,13
178:22,24
NAE's 7:5,16 8:17
   8:20 11:9 12:13
   12:24 14:20 15:7
   22:12,15 23:19
   25:12 27:22 28:13
   29:4 30:14 31:20
   36:25 37:3,15
   40:13 42:11,12,13
   43:2 45:16 47:20
   47:23 55:8 57:24
   58:7,22,25 59:12
   60:10 62:7 63:24
   67:6,14 76:1 77:9
   78:24 123:3 124:8
   133:1 134:7,15
   140:23 141:17
   153:18 156:25
   173:3,4
NAE/Eni 150:15
name 1:8 33:17
   131:7 158:5 171:8
named 92:14
NAOC 160:7,9
narrative 98:23
narrow 54:21
   98:12
national 87:5
natural 66:21
   111:7,10 117:5
   118:25 174:1
naturally 99:10
   101:5 106:20
   111:1,14,17,21
nature 30:17 31:4
   82:3 86:3 152:21
   177:24

**Navigant** 2:6 61:6
**NB** 85:1
**nearly** 47:2
**necessarily** 91:20
 111:12 155:19
**necessary** 6:17
 14:16 70:12,18
 83:14 93:21
 129:23 130:6
 131:4
**need** 3:16 7:21
 11:20 17:23 28:10
 29:25 42:5 43:22
 48:11 49:14 51:1
 54:15 63:4 69:7
 74:3,14 75:2,21
 79:10,20 82:22
 84:23 85:8,9,12
 94:11 98:20
 120:22 121:15,21
 121:25 123:8
 129:17 131:8
 135:19 148:24
 149:23 152:6
 156:14
**needed** 181:4
 182:25
**needs** 20:10 25:6
 25:20 68:16
 137:12
**negative** 10:14
 38:17,19 180:12
**negligence** 51:14
 55:10
**negotiate** 80:24
 141:2
**negotiated** 85:20
 130:11 135:14
 137:14 140:21
 141:12 171:1
**negotiating** 173:3
**negotiation** 167:8
 168:6 171:22,22
 172:1,8,12,23
 181:18

**negotiations** 77:22
 169:7 171:24
 172:6,9
**negotiator** 171:7,10
**neither** 66:19
**Nesbitt** 1:13,13
 2:22 3:1 5:6,19,20
 12:18 30:13,23
 32:1 36:2 37:9
 47:25 48:3,4,12
 49:1,4 51:19,25
 52:2 53:4,9,13,16
 53:20,22 61:6,8
 64:7,9,16,21
 73:25 81:4,7,9
 91:24 125:11,18
 135:5,7 157:8,10
 157:24 158:19,20
 159:10 186:3,10
 187:5,10,18
**net** 127:10 181:1
**neutral** 90:12
**never** 22:24 27:6
 37:7 43:7,8 44:23
 46:11 47:4,6
 65:12 170:22
 183:1
**nevertheless** 6:12
 17:9 22:11 23:3
 48:5 124:17
 152:24
**new** 3:15 8:23
 21:22 60:24 62:15
 72:25 83:6 127:22
 128:1,4 163:15,17
 179:12
**Nicholas** 163:18
**Nigeria** 26:15 87:3
 160:10 175:12
**Nigerian** 5:23
 39:18 42:20 45:20
 50:1,2 83:10,14
 85:1,5 133:9,10
 134:24,25 135:1
**night** 3:8 32:7,18

 73:9 175:19
**Nigido** 60:19
**nine** 62:10 98:4
 114:7
**Noddy** 93:16
**non-operator** 26:7
**non-Oyo** 31:8,10
 39:12
**non-party** 45:13
**non-return** 103:9
**normal** 15:6,15
**normally** 52:21
**North** 87:3
**note** 74:15 98:21
 110:15 164:25
 175:23
**noted** 82:25
**notes** 164:17
**notice** 13:24 17:17
 20:18,20 21:8
 22:8 117:25
 137:19 142:11,14
 142:19,25 143:2
 143:14 147:6,23
 148:4,22,25 149:7
 149:21 151:9,18
 151:20,21,25
 152:1,11,12
 153:18 154:3,8
**noticed** 149:1
**notified** 178:13
**notify** 17:19
**notional** 36:6 42:13
**notionally** 32:22
 46:23
**notwithstanding**
 145:7
**novated** 26:4 36:15
**novation** 7:21
 27:25 28:13,21,23
 29:10 35:21 36:14
 36:17 37:6,10,19
 40:22 41:14 42:8
 42:10 43:5,6,11
 47:9 123:1 128:16

 128:20 129:15,18
 130:12,15,17,20
 131:24 132:4
 137:2 141:1
**novations** 33:13
 83:7
**number** 6:25 14:2
 17:11 18:3 24:7
 57:14 71:17 76:6
 83:3 88:8 93:24
 100:13 117:19,21
 160:18 177:16
**numbered** 70:7
**numbering** 61:4
**numerous** 6:8
 80:18 105:18
 142:5

**O**

**o'clock** 73:9 82:9
 82:10
**object** 174:7
**objection** 23:21
**objections** 141:24
**objective** 48:22
 173:4,5 174:8
**obligation** 11:10,13
 21:4 58:22 88:22
 88:24 89:5 158:11
 162:19
**obligations** 7:17,19
 21:23 28:25 36:20
 41:5,12,17 75:23
 78:14
**obliged** 48:5
**observe** 89:7
**obtain** 58:22
**obtaining** 35:12
 48:23 83:14
 142:22
**obtains** 179:10
 180:19
**obvious** 50:8 57:6
 68:24 82:3 85:19
 85:20 110:16

**obviously** 38:25
 52:4 54:24 55:4
 64:17 77:3 101:6
 157:18
**occasions** 80:18
**occur** 112:11,22
**occurred** 33:14
 35:21 37:18 44:13
 117:12 124:16
 145:9 149:6
**occurring** 38:6
 106:20 111:1
**occurs** 93:11
**oceans** 91:7
**October** 2:15 21:17
 29:6 34:2,7 43:15
 46:2 111:9 161:10
 161:11
**odd** 15:15
**offensive** 91:4
**offer** 15:4 155:21
**office** 15:8 144:3
 149:12
**officer** 174:24
**offshore** 7:5 51:6
 55:4 58:10 68:14
**Oh** 146:23 166:16
**oil** 5:24 7:5 26:9
 27:13 48:23 49:19
 50:24 51:1 53:25
 54:5 58:23 59:21
 64:13 66:4 67:2
 69:25 71:1,9
 72:10 73:17 74:18
 74:18 78:12 85:14
 87:11,21 91:4,14
 91:15,22 92:5,12
 92:24 93:2,4,6
 93:10,12,14 94:4
 99:15,16 109:4,6
 109:9 110:21,24
 111:1,3,3,5,17,19
 112:15 115:21
 116:19 118:10
 120:2 121:2,20

126:16,23 127:4,5
177:21
**oily** 111:20
**Okay** 140:5 145:3
160:16 161:2,20
163:16 167:6
186:1
**Omidele** 68:22
**OML** 7:8 8:4 161:5
175:12
**OML's** 31:17
**OMLs** 7:6 79:16
159:21 176:17
177:25
**once** 9:14 32:2
46:23 106:24
107:7,12 111:20
111:20 152:10
**one's** 57:3 89:4
**one-sided** 27:5
**ones** 49:12 76:12
95:8 105:24
**ongoing** 59:14
167:8 169:7
**onshore** 160:9
**onwards** 34:4
117:20
**Opcom** 133:18
**OPEC's** 21:23
**open** 8:25 14:1
80:25 99:17,18
100:9 104:25
106:4 107:14
114:22 115:5
132:24 135:23,25
150:11 151:11,13
151:17 166:7
173:23
**opened** 116:2,24
159:14
**opening** 4:23 5:19
30:11 48:3 74:19
82:15,18,25 85:16
90:10 113:22
115:24 116:4,17

117:1,2,16 120:16
157:12,16 187:5,7
187:9,12,14
**operate** 51:10
155:24
**operates** 130:7
135:18
**operating** 7:13,19
8:10,11,13,18
51:5 54:22 55:3
87:21 133:17
174:24
**operation** 8:1 13:6
13:7 35:6 39:18
42:7 56:15 59:3
74:7 87:16 103:22
104:18 117:11,12
119:24 133:6
138:12 141:4
**operational** 26:17
56:4
**operationally**
56:12
**operations** 13:10
26:14 27:8,19
28:14 51:2 54:21
77:19 90:13
102:23 134:2
**operatives** 134:10
**operator** 51:9 54:5
67:15 86:24 87:1
87:17
**operator/non-op...**
26:6
**operators** 88:5,6
**operatorship** 8:21
87:7
**opinion** 29:6 51:16
53:10 88:10
**opportunity** 157:8
179:13 182:23
**opposed** 93:2
**opposite** 17:9 97:20
112:19
**optimal** 120:18

**option** 56:14
151:15
**oral** 129:21
**orally** 138:5,7
**oranges** 72:24
**order** 73:20 151:5
**ordered** 144:9
**organisation** 87:20
**original** 38:11
44:22 47:1 56:11
69:23 71:12 72:9
72:16 93:4 185:3
185:11,12
**originally** 9:9 55:15
57:13 58:13 81:17
100:12 176:3
**ought** 15:6 52:20
116:11 145:3
**outcome** 19:21 20:1
39:25 74:6,9
**outer** 69:4
**outlined** 81:24 82:1
**outset** 33:16
**outside** 100:2
**outstanding** 6:2
**overall** 72:1 96:11
**overcome** 69:6
112:6
**overdue** 13:1
**overrun** 162:16,18
**overview** 30:19
90:14 97:12
**ownership** 34:13
**Oyo** 7:9,13 8:11
12:20 13:6 27:1,8
27:13 31:5,8
36:21,23 39:12
64:2 67:7,12,22
68:6,6 71:3 72:10
77:19 79:16 93:8
94:16 95:5 96:11
161:23
**Oyo-1** 95:10,19
96:7,22,23
**Oyo-2** 95:6

**Oyo-3** 95:6
**Oyo-4** 95:12,19
96:7,23 113:6
**Oyo-5** 8:24,24 13:9
34:2,19 35:5
59:13 60:23 61:24
62:6,24 63:9,22
64:6 70:1 71:25
89:8 95:14,16,18
96:8,15,15,22,24
97:4 110:9 111:8
113:5 114:8
115:21 117:18
120:21,25 121:10
122:1,23 127:20
161:6 164:4,25
165:3
**Oyo-6** 95:7 110:9
121:6,7
**Oyo-7** 60:24 61:9
61:17 62:5,14,23
62:25 63:20,22,25
64:6 66:14,25
67:1,2,3,22 68:6
69:1 97:1,4
121:11,17,18,23
125:16
**Oyo-8** 61:17 62:5
66:25 67:22 68:6
69:2 97:5,6
121:11,17 125:16
125:17

———————
**P**
**pack** 8:25
**packers** 35:12,22
39:23 56:5
**Pagano** 149:20
150:22 161:15,17
171:20 175:5
177:4,8,10 179:15
181:20
**page** 7:1 9:3 11:21
12:14 14:3,7,18
18:12 23:10 28:11

28:17,18 29:7
42:4 44:3,11
45:25 48:13,25
49:1,1,15,25 50:1
59:23 60:8 61:2,3
61:7,14 62:1,1
71:16,18 74:4,14
74:23 75:22 76:1
76:1 78:1,4,23
80:10 81:4,5
95:22,22 96:2,4
102:17,21 103:1
103:25 104:1,2,3
104:9,10,13,14,14
104:15 105:3,4
136:2,10 138:20
146:17,17,22
147:19,20 148:1
148:11,12,22
149:20 151:23
159:3 161:4,8,21
163:24 166:17,20
167:16,19 174:13
174:16,18 177:1
187:2
**pages** 146:21
**pagination** 96:2
**paid** 8:16,18 10:2,3
10:25 12:11 24:10
27:6 165:1,15,16
165:23 168:13,13
176:11 178:23
181:25
**papers** 149:5
**paragraph** 11:22
12:14 18:1 21:21
28:11 34:4,8 35:3
35:10 42:1 44:11
45:16 61:15 62:2
62:2 68:9,16 70:7
71:17 76:17 78:8
85:3 129:3 134:9
134:9 147:24
148:24 150:12
160:16 161:22,22

162:2 163:6,25
164:23 166:11
177:12 178:3,10
**paragraphs** 34:22
45:10 49:15 74:16
149:22 150:2,3
**parallel** 138:23
**parameter** 59:21
**paraphrased**
137:10
**paraphrasing**
134:11 178:2
**parent** 9:22 176:2
178:23
**parochial** 87:5
**part** 6:1 7:14,20
8:17 13:6,9,12
18:1 19:12 31:10
31:24 36:16 38:3
52:11 58:2 59:2
65:2 79:14 88:4
96:15 99:22
100:10 101:22,24
105:17 106:9
111:20 118:6,14
119:14 127:13
131:12,20 160:3
171:1,17 172:3,13
172:15,16 176:18
**partial** 11:7 28:6
31:7 76:17 164:18
**partially** 126:9,10
**participate** 172:6
**participating** 26:10
31:12 32:12 134:2
**participation**
133:18
**particular** 3:22
14:3 15:17 17:12
46:20 55:24 66:6
67:11 68:5 77:8
79:25 84:18 85:4
86:4,24 87:17
88:1 89:6 105:23
121:3 128:11

130:5 131:13
138:13 151:24
167:15 180:23
**particularised**
46:24
**particularly** 7:15
49:6 51:7 101:4
**parties** 4:17,19
5:17 7:12 9:17
10:12 12:3,4
14:13 18:25 19:14
23:4 25:14 26:12
26:19 31:14 35:18
36:3,15 37:16
38:5 40:25 43:12
43:13 44:15 50:15
51:5,12 55:3
79:24 85:21 86:21
88:1,4 124:15
125:5 127:18
130:19 131:13
133:12,15 135:12
135:16 137:14
139:9 140:13,21
141:1,7,11 170:7
173:4 178:17
182:2
**parties'** 8:2 13:16
23:6,8 27:7 31:11
32:23 33:16,23
38:4 54:16 80:11
84:13 124:15
140:3 154:7
**partner** 185:1
**partners** 159:24
**parts** 94:22 139:13
**party** 14:14 35:25
41:2,3 42:21
134:16 155:13
157:12 171:19
181:24 182:12
**pass** 44:24 111:21
**passage** 50:11
**passed** 37:8,12
44:23

**passing** 37:1
**patch** 119:8,10,11
**path** 100:19 115:12
**pause** 34:9 64:15
85:23 95:21
141:21 146:6,16
147:10 153:1
157:18 163:17,23
**pausing** 56:25
85:25
**pay** 8:15 9:4 14:10
19:12 21:4,13
25:6 74:4 161:23
162:1,13 173:15
**payable** 9:6,7,12
**paying** 115:6
**payment** 9:14,25
10:9,20,23 11:6
11:10,13 13:1
21:13,18,24 24:11
24:12 25:1 75:23
148:10 150:13
155:16 162:19
165:10 169:3
173:9,10,14,15
179:7,9,16 182:16
182:19 183:9,15
**payments** 6:5 9:20
11:1,4 12:8,8,10
22:2 123:4 169:8
169:10 178:3,5,18
182:20
**pays** 26:8
**PDF** 96:4 146:22
**peer** 52:17 53:2
**peer-reviewed** 51:4
51:22 52:10 53:6
86:11,13,18 88:2
**peers** 52:12
**pending** 4:2 123:7
141:25
**penultimate** 62:22
63:11 176:9
**people** 1:11 2:7
21:9 51:15,18

52:20,22 134:10
148:19 149:18
175:3,7
**percentage** 91:11
**perfect** 94:20
**perfectly** 68:17
77:21 80:22 96:12
**perforations** 99:15
**perform** 28:25 41:5
**performance** 72:1
116:23,25
**performed** 66:20
**period** 8:5,9,20
13:10 14:19,22
15:22 20:10 27:14
31:9 32:20,25
33:14 34:25 38:2
38:25 39:13,15
40:1 45:20,22
47:16,21 62:19
63:18 98:15
119:20,23 150:23
169:6 178:22
182:18
**permeabilities**
70:11 92:15
112:22
**permeability** 67:9
70:9,21,22,24
71:5,8,9 72:20
91:25 92:3,13,17
94:1 112:11,12,14
**permeable** 91:24
92:3,10 100:18
112:21,23
**permission** 128:14
**permitted** 115:12
155:3,9,10 156:9
**person** 144:13
155:6
**personnel** 26:14
81:22 134:13,14
**petroleum** 8:1
26:14 27:8,19
28:14 48:21 49:6

50:22 51:2,20
61:13,19
**phrase** 80:2
**picked** 56:19
**picture** 37:15
181:19
**pictures** 33:17
**pile** 149:5
**pipe** 99:13
**pipes** 97:20
**place** 28:25 41:7
44:23 47:5 56:13
67:4 69:8 92:24
93:4 106:25 107:8
107:10,13,16,17
115:13 116:1
118:25 130:23
145:3,4
**placed** 50:7
**placing** 56:16
**plain** 50:8 87:7
**plainly** 22:17
**plan** 56:11,13
61:11 113:4
114:10,12,14,24
115:23 116:17
122:23
**planks** 46:8
**planned** 62:23
66:14 68:14
**planning** 35:6 63:7
**plans** 127:24
**plant** 7:25
**plausible** 27:16
**play** 26:12
**played** 12:17
**Plc** 6:20 85:1
**pleaded** 81:18
**pleading** 49:16
**pleadings** 30:22
31:17 44:4 46:3
46:19 56:10 65:12
81:25
**please** 31:1 84:14
84:18 122:20

143:10 147:1,14
148:17 158:6,22
158:24 160:17
161:2,8,21 162:2
163:16,23,24
166:5,7,12,22,24
167:12 171:4,8
173:23 174:10,15
174:22 177:1
180:1 181:23
**plethora** 51:3 88:4
**plots** 71:19
**PLT** 59:2,8,10 66:7
**plug** 102:5,6,8,12
103:7,9,11 104:21
104:22,24 105:6
**plus** 9:5
**pm** 82:12,14
122:16,18 157:6
158:1,3 186:12
**point** 2:20 5:1,4,6
6:22 13:19 16:19
28:9,16 29:21
34:2 37:9 53:18
58:6 68:18,25
69:13 74:21 80:11
83:11 84:14,17
85:18,23,24 88:14
91:13,24 93:11,14
94:20 96:10 97:2
97:19 98:3 99:6
106:17 107:7
108:8,16 111:15
111:16,18,21
112:10 115:10
116:3 118:21
120:7 125:4,14,14
125:18,24 127:5
129:16,18,18
131:19,22 133:23
135:8,11 136:9,19
138:8,10,17 139:6
140:5,7,8 142:1,6
145:23 156:6,17
157:21 160:24

167:5 169:19
170:2 179:6 180:2
**pointed** 126:18
**points** 2:22,24
18:16 43:23 54:18
83:3 84:12 90:7
106:10 112:8
125:2,3 130:7
137:20 138:4
155:18 156:3
169:2
**polymer** 56:17
**pool** 40:7
**poor** 119:3
**pores** 91:9,15 92:1
92:1,20
**porosity** 91:12,18
91:20 92:17,25
94:1
**Port** 143:17,19,22
149:13,14
**portfolio** 177:14
**position** 3:18 11:15
14:20 15:1 16:3
18:16 19:5 20:4
20:23 21:1 27:22
28:12 29:4 32:6,7
39:2 40:13 41:24
42:8 43:13 44:15
49:5 56:20 60:11
64:25 65:8 67:6
75:19 76:5,8
105:6 119:16
134:22,23 138:10
139:2 140:1
182:24
**positions** 57:24
168:10
**positive** 9:11 10:13
17:14 21:24 24:8
57:16
**possess** 81:14
**possibility** 27:18
163:15 170:10
**possible** 4:9 19:6

19:21 23:12 27:23
36:6 37:4 41:22
42:14,17 43:19
46:23 170:1
180:11 182:17
**possibly** 144:4
**post-completion**
9:13
**post-economic**
13:12 24:15,20
132:13 135:15
**post-novation** 40:8
40:14
**post-SPA** 25:13
**potential** 31:15
32:4 34:16 35:17
35:23 40:7 43:1,4
46:1
**pounds** 60:2
**power** 94:2
**PowerPoint** 5:12
**PowerPoints**
122:12
**practical** 37:24
**practice** 15:6,16
51:21 52:1 114:1
144:6 185:2
**practices** 48:21
49:7 50:22 51:3
54:13 61:13,19
86:22 87:13 88:11
88:13
**practitioners** 52:5
**pre-** 135:14
**pre-and** 40:8
132:13
**pre-contractual**
135:7 139:8,22,25
140:4
**pre-economic**
129:7
**pre-empted** 163:1
**pre-hearing** 11:15
11:24 12:5 18:15
20:22 28:3,20

30:14 34:3,8,21
35:3,11,14 42:1
45:6,9,15 46:18
46:21 49:19,21,25
50:10 54:19 55:22
56:19 58:4 60:9
65:16 67:25 68:19
68:24 69:14 75:11
76:6 81:11 83:5
131:21 134:21
157:1
**pre-novation** 40:15
46:13
**pre-perforated**
99:13
**precautions** 66:24
**precise** 107:5
**precisely** 8:14
15:25
**precluded** 78:13
**predict** 124:15,19
**predicts** 124:14
**prefer** 86:17
135:22
**prejudice** 141:23
**preliminary** 27:21
28:7,15 42:3 75:6
75:18 79:6 83:15
84:5 128:23
131:22,23 135:6
138:8
**premature** 19:1
**prepare** 5:11 48:19
**prepared** 2:13 83:1
95:23 114:25
165:1 166:8 169:4
169:12
**preparing** 3:14
5:15 88:19 94:11
151:4 159:21
**presence** 106:22
**present** 36:12 72:3
105:20 180:13
**presentation** 4:24
5:12 29:23 31:24

94:19 95:20,23
123:12
**presentations** 3:11
4:5,8
**presented** 128:18
162:16 181:15
182:5
**presenting** 171:25
176:15 181:17
**presents** 100:6
**preserves** 28:22
**pressure** 59:18
65:11,14 72:1
92:4 99:16 100:15
104:25 109:5,6,8
109:10,15 111:5,8
111:15,18,21
112:14,15 118:23
127:15
**presuming** 145:15
145:16
**pretty** 26:25 54:2
**prevent** 116:13
155:19
**previous** 37:1
151:7
**previously** 73:13
152:20
**price** 126:22 127:4
178:2 179:17
**prices** 127:1
**prima** 75:3
**primary** 173:4,5
176:1
**principal** 46:8
74:24
**principles** 22:18
**print** 21:10
**printed** 145:9,11
145:19
**printout** 166:18
**prior** 35:21 37:18
38:2,6 39:17
**privileged** 150:18
**probabilities** 16:23

**probably** 73:22
84:19 91:2 96:16
97:24 101:24
123:8 127:13
132:21 138:5
139:11 141:15
144:4 153:7 165:6
171:17 183:4,5,6
183:9
**problem** 67:7 98:8
100:6 101:15,18
117:13 120:5
**problems** 113:19
116:6 122:5
**procedural** 2:20,24
3:21,24
**procedure** 22:23
**procedures** 40:1
**proceed** 2:17 6:13
48:5
**proceeded** 56:1
**proceeding** 115:4
**proceedings** 1:3
131:7,20 158:9
**process** 9:13 19:15
19:18,22 60:13
66:13 83:14
102:19 103:24
105:11,17 111:23
112:7 114:7,17
116:13 142:21
150:18 155:16
173:2 177:13,18
177:19,21 178:1
**processes** 16:17
**procurement** 56:5
**produce** 127:6,7,8
**produced** 15:13
16:6 27:13 62:11
69:25 71:10 89:13
109:4 113:7
117:20 156:11
165:7,12
**producing** 7:9
106:9 109:3 118:6

126:20 127:17,20
160:9
**production** 3:9
7:11 9:1 22:1
27:2,12 34:6,19
35:22 39:22 46:4
55:18,23 59:11,15
59:21 60:14,17
62:4,10 64:12
66:3,4,6,12,19
67:5,19 68:3,4
69:11,25 72:7,10
72:21 73:1,2,4,6
89:8,12 106:7
110:6 112:3,17
113:14,16 115:17
115:20,22 116:1
116:12,13,18
117:10,18,24
118:7,14 119:14
121:12,23 122:3
122:22 125:7
127:22,24 174:25
175:8,11 177:19
**Professor** 1:10
**profile** 68:4 122:1
179:20 180:3
**profit** 128:12
**profits** 126:3
**programme** 61:9
63:1 88:18,20,22
88:25 89:3,6,9,19
89:21,24 90:3,3
**programmes** 26:17
48:19,20 61:18
88:19
**progress** 104:18
**progressed** 59:16
**prohibits** 135:1
**project** 105:19
**promised** 173:15
**prompt** 116:9
**promptly** 113:18
**proof** 16:5 57:16
68:12 153:17

155:16
**propensity** 64:2
**proper** 45:3 67:17
105:16
**properly** 89:11,12
89:13 115:8 124:5
124:6 154:20
156:8,22
**property** 7:24
**proportion** 26:9
118:10,11
**proposal** 172:24
**proposals** 26:16
134:18
**propose** 3:18 4:25
18:20 30:18,24
**proposed** 2:18
17:21 79:1 80:8
**proposing** 5:13
**prospective** 41:25
132:14
**prospectively**
132:11
**protected** 139:20
139:21
**prove** 14:14 16:22
65:25 69:7 133:10
133:24 154:15,16
181:25
**proven** 124:9
153:20 155:14
**provide** 5:13 10:18
18:23 30:18 61:17
100:19 101:6,11
106:21,23 182:18
182:24,25 183:3
**provided** 3:13 8:20
10:10 16:1 20:10
20:14 45:20
156:24 157:9,10
158:8 173:20
181:6 182:18
184:16,17,19
185:5,12
**provider** 27:3

**provides** 79:5 99:5
120:19
**providing** 80:17,19
168:9 183:11
185:3
**provision** 10:6 24:3
31:25 36:16 37:11
37:14 48:14,18
75:3 77:5,22
130:16 136:4
141:13 162:22
**provisions** 14:7,17
74:24 75:1 76:11
76:16,21 129:10
132:3,3 141:5
**proximity** 95:12
97:2,5 98:5
116:14 120:13
**prudent** 62:6 63:17
**PSC** 7:18 22:20
26:3 28:25 29:11
31:12,21,25 32:13
36:21,24 37:17
39:10 40:12 41:2
41:4,10,21 45:21
48:9,17 49:17
75:13,14 76:19
77:1 79:15,16
84:6,20 124:6,8
129:8 130:14
131:3 132:6,9,10
132:16 133:4,17
133:22 137:3,9
138:24,25 139:1
159:20 161:5
171:16
**psi** 60:1 63:7,11
**publication** 88:12
**publications** 88:11
**publicly** 12:18
**published** 51:3
86:11
**purchase** 6:18
**purchaser** 17:19
77:14 79:13

**purported** 44:17
**purpose** 76:23 77:4
100:23 121:19,19
**purposes** 13:24
36:8,12 70:20
74:19 94:11 97:25
105:20 123:20
**pursuant** 7:12
13:13 14:11 43:5
133:16
**pursued** 179:14
**push** 104:24
**pushing** 103:3
**put** 22:5 36:8 40:6
41:11 43:3,16
44:15 48:12 54:23
54:25 56:13 65:18
70:2 72:18 95:20
97:18 101:14
102:1,11 104:25
106:25 107:1
142:12 154:10
**putting** 53:1 138:21
**puzzled** 142:17

**Q**
**QC** 29:5 83:22
**qualifications**
155:7
**qualified** 23:8
**quality** 87:7 90:1
106:3,4 114:6,17
115:3
**quantification**
29:15 65:13
**quantified** 32:15
33:7
**quantities** 110:2
127:3,5
**quantum** 5:14 18:6
18:11 23:6 29:13
30:16 37:25 38:4
38:12 66:4 72:12
123:14,17,23,25
124:10 128:15

163:19
**quarter** 60:3 100:4
**question** 11:8 24:9
    35:24 36:8 40:10
    43:3 46:14 50:14
    57:18 64:5 84:5
    84:20,23 98:1
    114:9,15 120:8
    123:1 124:24
    127:3 128:5,6,16
    131:5,9 152:24
    163:1,2 168:19
    170:15,20 179:15
    181:23 185:24
**questions** 13:15
    27:20 30:15 48:1
    84:14 90:22 114:4
    115:18 123:10
    152:18,19 153:4
    154:24 155:21
    157:2 159:11
    169:25 170:16
    183:17,18 186:4
    187:22
**quickly** 113:3
    120:17 175:20
**quite** 25:19 32:6
    52:8 53:1 57:17
    63:20 84:2 85:16
    86:2 88:16 93:13
    95:8 97:1 99:10
    99:11,21 102:24
    103:24 111:23
    112:6 132:20
    133:7
**quoted** 50:11
**quoting** 76:16

———— **R** ————
**radiation** 106:20
    107:8,11
**radio** 111:7
**radius** 109:13
**raise** 2:23 127:25
    133:5 152:19

**raised** 48:6 57:5
    133:2 134:20
**raises** 152:18
**ran** 11:19 46:16
    58:13 130:1
**Ranco** 175:4,4
**range** 167:5 170:6
    173:22 174:4
**ranging** 49:9
**rapidly** 62:24
**rarely** 54:12
**rate** 67:2 116:18
    117:17,24 119:20
    121:12
**rates** 60:18 69:25
    73:16,17 120:11
**ratio** 60:21 66:15
    67:3 110:22
    111:12,22 117:3
    117:24 119:21
    120:3 121:13,16
**ray** 106:19,19
    107:1,2,4,13,14
    108:21
**re-amendment**
    11:18
**re-inject** 55:19
**reach** 11:12 53:15
    63:8,14 79:7
    156:23
**reached** 53:16
    114:18 149:5
    172:15 174:1
    176:16
**reactions** 19:6
**read** 37:13 53:22
    68:6 79:10 85:3
    106:1 119:19
    135:13 137:12
    162:3,4,22 164:13
    166:24 175:20
    176:4,5,6
**reading** 19:4 24:6
    37:4,11 38:16
    41:11 42:12 50:10

176:7 177:6
**readings** 97:9
    107:3 108:22,23
    108:24
**reads** 40:24
**ready** 34:6
**real** 127:25 128:3
    129:23
**realisation** 177:13
**realised** 115:8
    116:20
**really** 14:16 16:19
    33:1 35:13 38:8
    54:2 57:24 58:7
    65:9 70:17 75:21
    79:20 96:8 98:3
    102:21 121:8
    122:2 132:18
    135:8 173:12
**realms** 69:5
**reason** 19:19 23:16
    75:1,7 77:18
    80:15 85:23 86:7
    94:20 95:17
    112:13 127:23
    128:2 136:1 173:7
**reasonable** 2:17
    4:21 20:8 141:12
    156:15
**reasonably** 20:11
    77:13,18
**reasons** 17:21
    18:20 25:22 47:23
    65:19 75:4 76:7
    81:24,25 100:14
**recall** 15:8 27:21
    28:8 38:11 56:8
    69:22 82:24
    129:11 130:14
    131:24 132:7
    135:6,23 144:22
    145:21 152:9
    153:10 157:17
**recalling** 146:1
**receipt** 16:7,9 17:4

29:12 184:21
**receive** 24:12 82:25
    127:9 182:13
**received** 4:11 14:5
    14:21 16:11,14
    17:8 21:1 73:8
    143:13 145:4
    147:5,8 148:3,9
    149:4,12,15,23
    150:1 151:2
    152:12 153:18
    154:3 164:18
    165:20 182:9
    185:6,7,10,15,21
**receiving** 26:18
    134:2
**recipient** 16:4
**reciprocate** 98:3
**reciprocated** 98:11
    98:11,14
**reciprocation** 58:1
    58:2,5 98:2
**recognise** 53:21
    113:24 148:13
**recognised** 60:4
**recognising** 42:6
**recognition** 25:12
**recommendations**
    88:13 134:18
**recommended**
    88:10
**reconcile** 168:10
    182:23
**record** 1:12 8:3,9
    82:22 106:23
    108:17 143:23
    158:6
**recorded** 97:9
    129:21 131:18
**recording** 12:17
    106:19
**records** 164:12,16
**recover** 131:11
    138:1 182:6 183:8
**recoverable** 155:3

**recovered** 74:17
    120:2 165:23
**recovering** 12:3
**recovery** 11:20
    48:23 58:23 91:21
    120:18 121:20
    159:22
**rectify** 117:13
**red** 88:21 117:18
    118:10 121:1
**redefinition** 17:13
**redevelopment**
    180:7,10
**redirect** 170:17
    186:2,3
**reduce** 167:10
**reduced** 18:5 55:22
    60:20 107:8
**reduces** 111:16
**reducing** 121:20
**redundant** 37:12
**refer** 20:6 41:25
    45:16 82:20 160:4
**reference** 7:21
    11:21,24 12:13
    18:10 28:10,16
    31:6 36:24 42:2
    44:3,11,16,25
    45:3,9 49:14
    59:22 60:7 75:25
    81:16 93:13 108:8
    129:19 133:9
    137:21,22 138:19
    146:15 164:19,23
    165:5,11
**referenced** 164:15
**references** 6:14
    30:23 31:16 54:12
    136:3 137:17
    142:5
**referred** 18:7,9
    41:15 49:8 54:8
    63:1 64:19 67:10
    84:1 134:4 139:17
    163:6 164:10

166:10
referring 71:21
    172:14 183:6
refers 10:6 50:21
    54:6
reflect 3:15
reflected 26:20
    71:10 128:8
reflecting 169:6
reflects 124:6
refund 9:14
refusal 19:11
regard 35:1 45:14
    88:5,7 91:3 115:6
    124:1 138:8 139:3
    149:21 151:2
    154:18
regarded 19:8,10
regarding 22:21
    37:13 161:5
regardless 111:1
regards 3:22 4:17
    11:15 22:8 37:9
    58:12 60:13 64:21
    66:5,12 76:13,19
region 33:9
regularly 26:15
reinjected 113:6
reinjection 65:9
reject 83:19
rejoinder 142:4
rejoining 39:12
related 79:17,17
    178:21
relates 24:7 85:14
    128:19 136:6,9
relating 24:14
    57:10 76:25 78:19
    79:16
relation 4:4 11:9,13
    18:3 22:6 65:10
    78:14 108:9
    113:12,14 114:3
    125:3 130:25
    134:22 138:11

139:24,25 140:10
    140:23 141:1
    148:4 153:23
    154:1,19 155:1
    156:19 159:20
    172:6 176:16
relations 133:12,15
    159:23
relationship 26:7
    26:11 27:4,7
    33:16 41:20
relative 151:3
relatively 8:4 54:21
    92:10 93:5 110:16
released 186:5
relentlessly 117:22
relevance 15:14
    65:15
relevant 13:15
    14:17 15:13,19,22
    16:7 27:14 30:19
    31:10,13 33:7
    36:16 38:24 39:10
    39:11 40:1,19,23
    46:11 49:12 50:11
    59:17 63:23 64:3
    74:15 79:23 81:14
    87:22,23 97:12
    105:15 156:5,11
    159:21 171:24
    182:14
reliability 72:15
    110:11
reliable 69:9,18
relied 133:24
    134:19 139:9
    148:13 153:16
relief 6:1 29:21,25
    45:5
relies 14:22 64:23
relieve 122:10
reluctantly 78:9
rely 50:1 74:24
    76:12 83:7,9
    89:25 129:13

134:17 136:5
    139:25 153:16,17
relying 89:4 140:4
remain 41:3 115:13
    132:10
remained 39:10
    160:12
remaining 3:12 9:7
    11:2 20:2
remains 33:9 40:13
    47:19 57:15 79:2
    95:3
remarkably 15:2
remedial 113:19
    115:11
remedied 4:11
remedy 47:18,18
remember 36:21
    46:13 128:21
    174:4 181:5
remembering
    78:24
remind 144:16
remove 101:8
rendered 65:7
    182:14
renders 37:12
repeat 18:15 25:9
    82:22
repeated 123:9
repeating 44:5
    125:19
replace 142:8
replaced 9:21
replacement
    125:16
replies 148:1
reply 49:13 142:4
    151:4 157:8,16,20
replying 78:5
report 3:14 4:18
    5:8,10,15 18:11
    23:9 29:13 31:18
    42:6 54:13 59:23
    60:6 61:6,10

69:23,24 70:6,12
    71:11,12,16 72:11
    73:13 98:23 99:3
    102:20 103:23
    104:2,3,14 123:14
    151:4 167:14
reported 179:12
reporters 4:24 30:4
reports 4:4 53:23
    54:2 71:14
represent 118:10
    118:11
representations
    133:25
represented 42:24
    175:25 180:12
    181:2,4,12,14
representing 12:19
representor 133:11
reputable 15:18
request 9:17 20:12
    20:13,16 21:23
    45:5 152:8,11
requested 13:25
require 19:14 20:7
    129:6
required 15:18
    16:4 18:18 48:18
    61:18 68:12 92:5
    112:15 115:11
requirement 51:24
requirements
    20:20 133:8
requires 5:11 55:9
    135:3
requiring 150:13
rerun 72:8
res 28:4
rescheduled 21:24
reservation 3:25
    82:20,21 139:7
reserve 44:17 83:10
reservoir 4:6 5:8,10
    27:1 32:15 62:6
    63:23 64:2 65:11

65:14 66:22 67:8
    69:9 70:8,23 71:3
    71:15 72:1,19,20
    92:9 93:4,17,21
    97:12 109:5
    111:16 121:11
reservoirs 90:13
residual 92:19
    179:11 180:19
resistance 101:7
resolution 23:15
resolve 153:15
resource 126:6,8
respect 3:17,25 6:1
    6:5 8:19 9:19
    11:4,5 17:25
    18:22 20:2 22:15
    22:20 23:4 27:18
    28:14 29:17 31:22
    32:10,19,23,24
    34:1,5,10,18,24
    35:8,12,21 36:21
    36:23 37:18 38:10
    38:13 39:14,22,25
    41:2,21 43:20
    44:1,19,21 45:8
    46:15,20 47:18,20
    55:13 56:2,23
    64:24 75:19 77:11
    83:7 129:7 131:17
    134:12 136:20,23
    136:23 150:23
    175:25
respectable 52:22
respective 23:6
    36:19
respects 39:10
    45:21 69:15
    114:14
respond 3:22 83:12
    83:19 113:18
    116:7 147:23
respondent 9:23
    74:1 113:11
respondent's 1:25

2:1 24:24
**respondents** 3:1,21
  6:3 15:8 16:12,16
  16:22 17:1 18:17
  22:19 25:8 26:11
  28:2,20 29:14
  33:3,11 34:10
  38:22 39:15 44:6
  44:12 45:7 46:21
  47:17 48:6,15
  49:20 50:6 54:19
  55:11,25 56:9
  57:16,23 58:6,14
  59:16 60:25 65:21
  65:24 66:3 67:16
  67:25 68:17,23
  69:7 74:9,13 76:7
  81:13,20,22 82:10
  136:5 142:16,24
**respondents'** 14:10
  15:1 16:20 18:6
  30:16 31:5,7,16
  32:3,8 34:3,8,17
  34:23 35:3,11,14
  37:2,11 40:18
  42:15 43:10 44:17
  45:1,6,14 47:3,14
  49:4 53:22 54:25
  55:21 56:21 57:9
  59:24 60:5 65:11
  66:23 72:13 75:10
  79:9 82:18 90:14
  153:24 159:11
**responding** 54:25
**response** 5:7 43:21
  54:24 56:24 116:8
  129:12 133:6
  147:4 150:6
  156:12,15
**responsibility**
  16:20 162:18
**responsible** 51:16
  140:22 159:20
**restraint** 54:22
  55:8

**result** 6:8 28:5
  41:16 42:10 50:8
  55:10 72:9 76:22
  113:9 118:7
  123:16 124:8,14
  125:12 131:2
  151:25
**resulted** 38:1 43:12
  47:22 125:1
**resulting** 72:21
  124:20
**results** 59:1 71:9,25
  72:4 112:16 172:1
**resume** 30:5 82:10
**retains** 23:18
**retrieve** 70:3
**retrospectively**
  132:11
**return** 9:2 27:10
  84:7
**returns** 135:11
**revealed** 151:9
**reversal** 184:14
**reverse** 60:10 130:3
**reverting** 72:16
**review** 52:18 53:2
  83:15 185:14
**reviewed** 155:7
**reviewing** 26:16
**revise** 170:10
**revised** 3:14 5:8,10
  5:15 70:16 71:11
  73:11,17
**revision** 123:16
  135:2
**revisit** 129:17
  132:21,22 153:2
**Richard** 1:15
**right** 1:9 31:14
  37:5,7 38:7 40:7
  41:20,23 44:17
  47:10 51:17 52:9
  52:23 75:22 77:3
  83:10 95:1 97:16
  130:23 131:6

142:23 152:4,16
  152:18 159:14
  161:13 164:6
  166:23 169:21
  179:19 184:13
**right-hand** 93:8,22
  94:22 101:10,15
  104:3,9,16 110:14
  118:9 125:13
**rights** 3:25 7:16
  22:9 28:22 31:13
  36:19 37:8,21
  41:6,19 42:11,18
  46:12 82:20,21
  130:20,22,23
  139:20
**ring** 111:12
**rise** 39:19 55:16
  77:13 81:15
  116:20
**risen** 117:3
**risk** 57:6 118:4
**risks** 56:14
**rivers** 91:7
**road** 64:13
**Rob** 1:14
**rock** 67:11 71:1
  91:18,23,23 92:6
  92:22 93:14 100:8
  109:7
**rocks** 91:5,6
**role** 26:12 48:14
  171:9
**rotating** 58:3
**rotation** 58:1,3,5
  98:2
**roughly** 32:5
**row** 118:13
**Rowena** 1:15
**rows** 118:13 123:19
**rubber** 154:8,13
**rules** 84:24
**ruling** 129:2,3
  130:3 137:10
  138:12

**run** 27:24 71:23
  72:2,2,4,8 75:24
  94:3 99:12 100:3
  100:8 101:19
  129:25
**running** 76:3
  117:22 118:20
  119:8
**runs** 96:8,25 97:19
  120:9
**Russian** 97:21

───────────
**S**
**s** 148:5
**sag** 101:5
**sale** 6:18 128:12
**sandstone** 92:9,10
  92:11
**SAP** 184:9
**satisfactory** 3:19
  58:20 116:17
**satisfy** 114:16
**saturation** 92:18
  93:1
**save** 31:22
**saw** 71:21 164:22
**saying** 31:2 73:15
  89:14,23,24 90:5
  91:1 113:23
  121:19 145:22
  148:2,19 149:4
  179:19,22
**says** 12:12 14:21
  17:18 20:6 21:20
  24:1,16 36:5 41:8
  41:18 50:6,23
  53:23 54:1,12
  59:20 61:4,14
  62:3 63:4,23
  68:10 70:7,17
  71:18 72:7 77:10
  78:8 79:12 94:24
  104:3 128:2,10
  130:19 148:8
  149:22 150:5,9

151:1,10 152:3
  164:8,13 176:10
  177:23 178:20
  180:15
**SBT** 58:12,17
  106:1
**scale** 96:12 117:18
  120:23,24 121:3
**scales** 108:20,24
**scandalous** 82:5
**scanned** 184:7
**scenario** 68:7
  124:19
**scenarios** 70:14
  180:6,9,16
**schedule** 2:18 18:2
  24:14 157:6
  164:15,20,25
  178:3,5
**scheduled** 176:14
**schedules** 165:12
**scheme** 24:3,10
**Schlumberger**
  114:25 167:10
**scope** 19:6 79:3
**scrape** 103:12
**screen** 84:21 94:25
  104:13 116:14
**sea** 87:4 108:7
**search** 15:10,12
  144:10,10
**searched** 144:9
**searches** 16:1
**seat** 26:8
**seats** 2:7
**second** 3:7 7:10
  8:24 9:23 10:4,10
  11:7 14:2 17:14
  31:11 32:19,25
  70:7 106:6,17
  112:19 114:10
  115:16,23 116:16
  125:14 128:8
  138:14 148:14
  161:21 164:11

170:11 177:11,15
179:25 180:14
**secondly** 55:3 66:1
114:24
**secondment** 26:21
**secondments**
133:19
**secretary** 14:24
149:11
**section** 7:2 34:1
45:23 57:11 99:17
99:19 100:9 104:1
114:23 115:5
122:7,8 178:19,20
**sections** 30:14 56:9
**secured** 9:8 173:8
**sedimentary** 91:5
91:17
**sediments** 91:6,8
**see** 2:3 4:20 7:1
14:6 19:24 23:9
30:25 34:3,7,15
37:22 38:16 39:7
40:17 42:17 43:3
43:21 44:9,15
45:24 48:13 62:16
62:22,23 63:10
65:4 66:16 74:11
78:4,25 80:13
81:5,8 84:17
92:16 93:7,13,20
94:6,21,25 95:4,9
96:5,8,23 97:1,16
98:17 99:8,18
101:14 104:15
105:6 106:18
108:14,17 109:22
113:4 117:15
118:3 119:4,17,20
120:1 122:1,14
123:12 124:13
136:3,12 148:18
150:20 151:14
153:7 161:4,6,9
161:22 162:6

163:21 164:5,8,21
165:4 167:16
168:8 170:7
174:18 175:3
179:2 184:20,21
**seeing** 118:14
186:11
**seek** 3:17 15:23
45:7 127:6
**seen** 3:8 29:13
30:15 31:6 44:18
56:18,20 67:8
84:22 85:17 96:24
114:21 118:6
132:19 145:24,25
153:7,21
**seep** 99:16
**segmented** 58:12
105:25 115:4,7
**seized** 22:21
**sell** 6:20 177:16,21
**seller** 17:19 24:22
77:11 80:16
**seller's** 78:12
**sellers** 7:16
**selling** 177:19
**send** 19:8 122:13
148:20
**sending** 78:3
148:18 183:19,22
**sense** 29:4 74:5,9
78:18 89:4,10
120:4 129:20
133:25 137:17
156:15 168:5
173:19,20 180:13
182:11 184:12
**sensible** 41:11
**sensibly** 50:25
**sent** 10:15 20:24
21:16,19 56:19
78:24 106:1
143:14,16,24
144:12,13,14
147:8 148:6,20

149:2,3,7 150:7
169:5 176:18
183:24 184:23
**sentence** 173:19
180:23
**separate** 4:2 34:25
35:7 39:20 41:12
57:13 102:2
111:23 112:5
124:3
**separated** 110:2
**separates** 93:14
**separation** 93:7,11
101:12 110:10
137:15
**separator** 110:3,6,7
110:21
**separators** 110:5,5
**September** 151:14
153:11 160:19
183:6,7,10,13
**sequence** 21:15
101:21 117:8
**serendipitously**
120:16
**series** 97:19 106:13
153:12
**serious** 8:6 158:15
**serve** 22:8
**served** 83:5 142:14
142:15 143:2,5
151:9
**service** 4:4 18:10
27:3 69:22 182:13
**services** 8:20 26:22
123:25
**set** 10:21 11:14
12:4 13:16 22:16
25:23 26:24 49:4
55:15 57:12 65:19
69:14 74:20 76:11
83:1 88:1 141:2
**set-off** 75:22 76:24
**sets** 24:11 63:16
72:22

**setting** 52:4,7
**settings** 118:1,2
**seven** 17:25 18:5
118:13
**severally** 40:25
**shale** 92:7,7 106:22
**shape** 64:10,11
104:18
**share** 10:6 83:22
**shared** 175:23
**sharing** 7:11
**sheet** 165:3
**shift** 56:20 65:8
**shifted** 49:9
**shoe** 59:5
**Shoesmith** 1:14
29:22,24 30:6,10
30:11,12 38:4,8
38:19,22 39:5
52:3,16 56:6
73:10 82:1 83:9
96:4 128:18 187:7
**Shoesmith's** 80:2
**shoots** 121:2
**short** 12:25 29:23
30:8 31:8 49:8
52:10,14 65:19
82:5,13 90:14
93:12 122:3,17
142:6 158:2
182:17
**shortcoming**
113:25
**shortly** 78:6 84:3
**show** 46:3 69:17
96:9,9 97:18
103:8,23 106:18
114:19 116:10
133:11,24 142:16
155:16
**showed** 71:19
106:8 115:7,9
183:13
**showing** 10:16
121:13

**shown** 14:23 35:18
35:23 36:16 37:1
39:5 40:10,16
59:1,8 66:25
101:10 102:16
107:23 118:1
120:23 122:21
**shows** 17:7 59:4
60:14 63:16 66:7
101:15 104:18
117:17 118:8
119:13 120:15
121:1,14 142:23
152:15,17 165:1
**shut** 56:3 119:22
**shut-off** 13:7 35:6
117:10 119:17,18
**shutting** 74:10
**sic** 167:1
**side** 1:25 2:1,21
22:24 32:9 35:19
36:1 74:1 84:3
93:8,22 94:22,23
94:23,25 98:18
99:24 110:14
118:9 120:24
124:14 125:9,13
160:24 161:2,5,14
161:14
**side's** 172:17
**sides** 1:11 52:9
102:15 157:5
**sides'** 123:25
**sidetrack** 97:8
**sign** 28:1 39:6
178:19,20
**signatory** 144:16
**signature** 159:4
161:9,13,15
176:14 177:2
**signed** 78:7 161:10
**significance** 37:25
71:8
**significant** 8:22
68:13 87:21

110:17 125:25
**significantly** 71:4
**signpost** 124:23
**silty** 92:7
**similar** 54:9,10
63:20,22 64:17
85:17,25 86:2,3
86:17 87:1 133:7
155:7
**similarities** 97:3
**Simon** 1:13
**simple** 91:2,3 92:3
109:24
**simply** 5:11 16:16
18:24 20:6 23:22
36:5 48:4 75:7
78:15 91:4 154:7
**simulation** 94:3
**single** 27:6 31:25
**sink** 102:6
**sir** 47:23 48:12
52:3 82:17 146:4
**sit** 12:21 182:23
**sits** 2:3
**sitting** 148:25
**situation** 52:17,19
52:21 64:15
181:18
**six** 10:3 18:6,22
22:7 45:22 67:24
115:18 117:7
146:21 182:16
**size** 59:14,18,22
60:20 62:15,17,20
109:14,19
**sizes** 62:9,15 98:19
98:24 121:22,22
**slide** 34:15 35:23
36:7 37:2,23 39:6
40:17 43:16 61:8
61:9,23 82:23
83:4 94:15 97:14
98:18 99:8 100:22
108:1 109:2
117:17 119:18

121:18,21,25
123:12 132:8
153:9 156:4,17
**slides** 31:2 32:3
38:11 47:1 82:24
82:25 140:7 153:6
**slightly** 85:6 90:18
95:17 134:22
**sloping** 67:11
**slow** 21:10
**slumps** 119:20,21
**small** 94:9,10 96:22
117:21
**smaller** 23:23 62:9
62:14,16
**smallest** 97:22
**snapshot** 118:5
**so-called** 6:23 13:9
13:12
**sold** 173:11
**sole** 48:16 68:8
162:18
**solely** 86:8
**solid** 91:9
**somebody** 52:24
143:16,17 145:9
145:11,18
**somewhat** 22:18
**soon** 4:9 175:16
**sophisticated** 94:13
**sorry** 2:7 5:6 38:3
48:25 80:13 81:4
93:17 95:22 104:4
109:25 122:7
130:15 131:22
146:17 147:10,11
149:25 151:19
154:8 161:11
166:6,16 169:14
169:16 170:18
173:25 176:4
178:4 183:25
**sort** 27:23 101:7,15
105:4 106:12
107:5

**sorts** 98:2 114:24
**sought** 21:13
**sound** 56:12
**sounds** 86:4 137:7
**source** 59:3
**sources** 88:5,8
**SpA** 5:24 6:18,21
6:24 7:15 9:3,18
10:22 11:14 13:14
13:25 14:13,17
15:19 17:11 18:2
19:7,8,13,23 20:4
20:10,13 23:15,20
24:2,4,21 25:1
41:1 74:21 75:20
75:23 76:4,16,21
77:22 78:3,6,24
79:7 80:9 129:5
129:10,19 130:7
130:21 131:10,10
131:18 135:10
137:13,13 138:3
139:3 147:25
150:8,13,24
155:12 170:8
171:1 173:3,9
182:18
**space** 91:10 92:21
**spacer** 101:2 102:1
102:2,6 104:19
**spaces** 91:9
**spark** 132:18
**sparking** 132:2
**speak** 81:19
**speaking** 27:5
84:15 93:19
**specific** 18:23
24:13 56:4 67:8
**specifically** 6:16
15:9 30:25 56:23
129:2
**speculate** 16:16
**speculation** 17:2
**speed** 2:18
**spend** 90:11 122:23

**spent** 57:3
**spike** 117:21
119:24
**spinning** 103:10
**split** 33:21 36:22
83:24
**sponge** 92:2
**spreadsheet** 166:18
**square** 60:2 81:9
**staff** 184:5
**stage** 30:21 37:18
40:19 57:15 75:6
**stamp** 14:23,23
142:16 143:19,20
143:20,22 149:10
149:15 154:8,13
185:11
**stamped** 16:9
185:13
**standard** 49:17
51:11,21 52:5,7
52:12 55:5 68:12
86:10,13,14,18,19
87:1,6,25 89:1
110:22,23 111:10
121:4
**standards** 48:22
49:7,8,12 50:23
51:4 52:11 54:13
60:12 61:14,20,22
66:20 86:9,22
87:10,13 89:16,17
90:4 115:15
**standi** 83:18
**standing** 83:17
**star** 96:6,7
**starring** 48:14
**start** 2:12 4:23 6:13
33:15 67:5 91:2
94:4 98:5 101:2
117:21 129:17
131:20 147:17,18
157:7,23
**start-up** 63:25
67:13

**started** 38:23 62:14
145:22 177:6
**starting** 42:4 62:8
73:1 129:16,19
138:10 166:22
178:11
**starts** 102:1 161:3
175:21 177:12
**state** 82:21 151:5
158:5
**stated** 28:9 72:11
137:25 163:4
**statement** 4:6
10:16 12:12,22
13:2 19:2,7,9,11
19:17 20:9,15
22:16,22 23:2
46:17 60:19 62:13
68:9,17,22,22
74:17 123:13,15
142:18 144:19
147:22 148:23
150:23 154:9,13
154:17,20 156:7
156:13,19 158:9
158:25 159:8,14
159:16 160:16
163:7,18 166:12
167:17 170:25
182:4,5,7,9,22
183:20 184:18,19
185:7,16
**statements** 134:8
159:22
**states** 28:24 73:12
**stating** 57:6 85:19
113:23
**Statoil** 8:5 95:10
**stature** 87:2
**statute** 46:16
**statute-barred** 46:5
46:10
**statutory** 47:16
**stay** 61:25 82:23
**stayed** 29:12 60:21

staying 175:19
STB 110:19
stemming 120:4
Stephenson 70:5
  71:22 73:9
stepped 62:24 63:6
steps 62:15 90:15
  105:15 114:16
stipulated 14:6
stock 110:17
stop 22:22 25:20
  48:4 84:18 100:10
  100:15,21 101:8
  103:10 132:1
  171:8 177:15
stories 110:4
straightaway 171:9
straightforward
  11:16
strangely 28:1
strata 67:10
stream 22:2 111:19
  112:3,18 127:20
streams 110:8
strict 99:11
strike 60:16 80:12
striking 21:5 56:2
string 25:11
stronger 134:23
strongest 137:20
struck 51:12 79:24
subject 9:12 47:3
  47:14 76:15,20
  83:16 123:5,6
  125:8 129:9
  148:21 150:22
  157:2 175:12
subjective 54:3
  87:15
submission 15:14
  17:1 27:15 28:3
  30:16 37:3 43:24
  50:4 54:19 55:22
  58:4 60:9 67:25
  68:12 72:15 75:11

81:12,19 84:25
124:22 129:16
131:22 138:18
139:4,15 141:15
152:10 181:7
182:21
submissions 5:19
  11:11,15,25 12:5
  18:15 20:22 22:17
  24:5 25:24 28:15
  28:20 30:11,14
  34:4,9,21,23 35:4
  35:11,15 41:11
  42:1,3 45:6,10,15
  46:18,21 48:3
  49:4,20,21 50:1
  50:10 56:19 57:12
  65:17 68:19,20,24
  69:15 76:6 81:25
  82:7,15,18 83:1,5
  83:11,13,19,23
  84:13 90:10
  113:22 123:8
  131:23 132:22
  133:7 134:5,21
  138:7,9,11,15
  141:22 142:4,7
  156:24 157:2,21
  187:5,7,9,12,14
submit 85:14
submitted 45:5
  73:10 85:13,15
  142:25
subsea 58:10 97:17
  98:7,8 108:5
subsequent 61:16
subsidiary 5:23
  133:19
substance 17:16
  20:17 48:2 57:8
  154:11
substantial 6:10
  99:21 111:25
  119:23
subsystem 184:10

successful 25:19
  56:8,16 65:3 74:9
  120:4
successfully 56:15
  74:10
suck 91:1
sucking 112:17
suffer 128:7
suffered 32:24 33:4
  38:5 44:2 129:8
  131:2
sufficient 45:5
  115:6
sufficiently 116:5,8
suggest 15:16 39:16
  117:3 144:5
suggested 5:9 21:7
  54:18 58:19
suggestion 19:25
  88:24
suggestions 26:16
suggests 11:12
  33:17 51:14 64:22
suitable 61:17
  115:23
sum 9:21 10:11
  18:8
summarised 76:5
  81:12 177:4
summary 60:11
summer 94:19
sums 6:1 14:10
  23:19 24:13
sunk 126:14
support 68:21
supported 16:8
  66:9 155:13 156:8
  156:10 164:18
  168:4
supporting 182:6
  182:19 183:22,24
supports 50:4
  105:15
suppose 27:16
  97:21 138:8

152:18 176:19
supposed 29:19
  48:7 65:10 67:18
  72:13 182:11
Supreme 50:2
sure 4:11,14 70:23
  90:21 160:17
  168:3
surfaced 145:7
surprise 55:24
  157:17
surprised 86:5
surprising 51:8
  85:4
surprisingly 33:2
surrounded 99:14
surviving 57:9
  65:15
sustained 178:21
swiftly 92:18
  112:25
system 184:9

─────── T ───────

T 108:22,23
tab 7:1,22 9:4
  11:21 12:14 13:20
  14:2 18:11 21:15
  23:10 28:10,17,17
  29:7 42:4 43:21
  44:3,11 45:24
  48:10 49:15 59:23
  60:8 61:1,6,25
  62:1 70:3 71:15
  74:4,14,22 75:25
  76:1 78:1,23 80:5
  80:5,10 95:21,22
  95:25 96:2 98:22
  99:1,3 102:21
  103:25 104:7
  136:2 138:20
  146:10,10,18,18
  146:20 147:1,2,14
  148:12,17 149:16
  150:20,20 151:22

158:23 159:14
161:3 163:17,25
166:7,15,16
167:13 174:10,11
174:12
table 38:12 47:1
  62:16,22 73:12
  108:15 123:13
  125:9,13 166:10
  168:4,9 169:2,4
tables 70:15
tack 139:4
tackle 57:24
tactic 25:11,19
tail 102:11
take 13:19 30:24
  61:1 71:13 83:25
  84:16,19 95:21
  103:23 112:25
  113:3,21 114:16
  121:21 122:11
  128:15 143:9,11
  143:12 146:7
  147:1 175:17
taken 5:6 23:21
  24:22 50:5 61:10
  62:5 63:24 65:4
  66:24 71:20 85:5
  90:15 93:23
  105:25 106:7
  110:21 118:2
  126:25 133:7
  141:11
takes 26:8 112:21
  115:16
talk 32:1 97:14
  106:15 180:15
talking 90:12
  101:25 122:24
talks 180:16
tank 110:17
target 56:17 174:8
targeted 62:6
  116:18
task 69:19 83:25

tasks 83:24
Taylor 3:13 23:7
    128:9 154:19
    155:1 156:20
    163:19 164:10,15
Taylor's 29:13
    31:18 42:6 124:5
    156:4
teaching 90:24
team 1:14 26:24
    60:6 171:1,5,6,17
    171:18,23 172:4
    172:12,13,15,17
    172:23
teams 172:10
technical 27:1 57:1
    57:7 60:6 64:18
    84:1 90:8,22
    112:24 123:24
    134:13
technically 56:12
tell 31:1 96:13
    123:14 125:2
    127:14 128:25
    134:8,9 135:21
    158:12,14 171:4,4
    171:8
temperature 59:1,9
    111:9
Tempting 48:4
ten 14:5 73:22
tenable 24:6
tend 92:11,11
    111:4 112:20,23
tension 108:23
tenure 8:21
term 48:16 86:20
    136:17,18 179:2
terms 15:25 16:13
    18:18 19:19 26:20
    27:24 28:19,24
    41:1 42:23 50:9
    59:13,20 66:4
    67:24 76:14 92:3
    94:7 133:22

140:10 149:18
    152:23 176:15,20
    176:23 177:4
    178:14 179:12
test 51:15 52:3
    53:24 54:14 70:10
    85:25 86:2,5,6,7,9
    87:15,18 110:6
    140:8,10
tested 144:14
testifies 60:19
testimony 15:23
    186:6
text 84:21 97:16
thank 1:13,24 2:11
    2:12,19 5:16,20
    29:24 30:6,12
    49:3 64:20 82:8
    82:11,17 90:6
    96:5 104:11 157:4
    158:20 159:10
    162:22 163:1
    168:11 170:24
    173:1 175:18
    183:17 186:3,4,5
    186:7
therefrom 7:18
    41:4
thereof 79:18
they'd 39:17
thing 1:11 18:9
    51:17 96:10 98:9
    107:20 110:19
    112:19 115:2
    116:22
things 19:20 51:18
    64:13 93:20 98:2
    98:6 105:13
    108:25 112:1
    121:17 151:21,23
think 3:5,7,18 5:3,7
    32:16 39:5 49:9
    52:3,9,22 54:18
    73:14 76:10 84:23
    86:5 93:22 95:12

96:16 97:2,6,24
    98:12,21 99:19
    103:8 105:23
    110:16,18 111:4
    111:25 113:2
    115:17 117:11
    120:5,14 121:18
    126:11,11 127:5
    127:12 135:16
    140:9 141:10,11
    141:11 145:24
    146:3 148:24
    152:24 156:5
    157:10,12,15,17
    163:4,5 169:19,22
    170:22 175:5
    180:21
thinking 131:16
    137:5 141:1
thinks 51:16
third 10:4 11:5
    20:19 31:22 33:2
    40:21 42:9 43:6
    47:8 62:18 63:1
    107:20 113:3
    114:12 115:2,25
    116:22 128:5,20
    129:15 130:5
    131:21 155:13
    164:5 182:12
Thornton 2:9
thought 71:6 86:1
    96:21 112:24
    157:15 174:1
thousands 117:18
three 9:19,25 10:3
    32:5,9 37:10
    53:16 113:2
    123:19 127:7
    184:5
three-pronged
    33:11
threshold 26:1
    52:10 75:9
Thursday 186:14

ties 164:19
time 3:12 5:11
    10:10,12 13:1
    14:1,9,14 15:12
    17:8,16 19:19
    20:7,14 21:2,8,13
    21:25 22:9 25:6
    28:7 29:14 42:14
    46:2 62:19,19
    63:2,2,7,14,18
    64:1 68:5 69:18
    73:15 75:24 76:24
    80:14 82:3,10
    87:17,22 93:5
    116:24 117:11
    118:1 122:24
    123:9 126:8,17
    127:15 128:15
    140:16 141:18
    142:25 143:3,5
    150:7 151:9,11
    152:4,6,12 153:18
    156:14 157:13
    160:12 161:17
    168:5 169:17
    170:9 174:23,25
    175:10,17 176:7
    177:16 181:2,18
    182:3,6 183:4,5,8
    183:12 184:2,22
    185:22
timeliness 142:11
    154:4
times 25:9
timetable 5:3
timing 3:23 4:17
    125:16 126:19
title 167:17
today 6:12 10:25
    12:21 46:9 51:7
    65:4 76:3 83:8
    84:22 85:3 128:19
    134:1 142:10
toe 99:25
told 140:14 184:2

Tom 1:8
tomorrow 3:19 4:7
    5:14 186:8
tool 58:12 66:7
    105:25 115:4,7
    117:10 118:7
tools 106:7,20
    107:1
top 61:8 62:17 67:2
    75:21 78:25 93:9
    95:1 101:14 102:5
    102:7,11,12,12
    103:4,7,8,11
    104:2,9,22 105:1
    105:6 109:9
    117:25 128:9
    161:4,13,14
    174:18 178:9
    181:6
topic 105:19 109:3
    170:25
topics 113:2 116:11
total 9:4 10:16
    91:11 123:19
    166:25 167:2,23
    168:22
touch 25:24 31:23
    58:24 88:14
    123:17
touched 30:13
    91:24 123:2
track 106:15,16,18
    108:20,21 109:1
tracked 184:13
tracks 106:15
    108:19
trade 88:11
trailed 65:11
tranche 150:14
    179:8 180:18
transaction 171:11
    171:13 174:9
    178:14 184:14,14
    184:15
transactions

184:11,11,13
**transcribers**
  122:10
**transfer** 7:6 44:16
  128:7 130:13
**transferred** 6:21
  7:3,4,10,14,23 9:2
  41:3 77:1
**translate** 91:20
**translation** 149:19
**transmit** 71:1
**transparent** 184:11
**travel** 3:4
**travelling** 59:6
  144:24
**treated** 14:11 19:22
  22:13 28:7
**Tribunal** 2:16 3:1,7
  3:19 4:2,20 6:7
  9:16 11:2 13:4
  14:7 15:8 17:15
  19:13 22:7,11,14
  22:20 23:3,17,18
  23:23 25:1,14
  27:21 28:8 29:8
  30:15,18 31:6
  56:8,18 69:21
  70:24 75:17 76:9
  87:19 88:9 90:16
  122:13 124:23
  128:21 132:25
  135:16 148:12
  153:10,23 162:3,4
  169:16 174:22
  175:15 176:6
  183:18 187:22
**Tribunal's** 28:5
  157:18
**tried** 40:6 68:18
  98:17 108:1
  154:16 168:10
**Trinick** 1:15
**trouble** 101:3 141:2
**true** 107:24 108:4,5
  108:5

**Trust** 137:7
**trusted** 134:11
**truth** 158:12,15
**try** 26:11 90:11
  101:1,1 151:12
  153:5
**trying** 53:13,18
  102:18 146:3
  167:9
**tune** 12:20 27:9
**turn** 6:17,25 7:22
  11:20 13:18,20
  14:1,15 21:14,15
  25:7 48:13 49:14
  62:1 70:3 71:15
  74:4,14 75:21
  77:24 78:4,23
  80:5,10 136:10
  147:14 148:11,17
  149:19 158:23
  159:3 161:8,21
  163:16,24,25
  166:17 167:12
  174:10,16 177:1
**turned** 151:10
**turning** 11:1 17:11
  55:13 57:9 59:11
  84:20 133:1 135:4
  141:17 168:19
**TVDSS** 108:5
**twisting** 98:6
**two** 4:2 7:5 8:6,23
  11:6 12:3,4,21
  23:5 25:18 26:1
  27:20 35:5 39:8
  39:15 42:25 46:8
  52:9 53:15 55:23
  63:16 64:5 67:21
  67:23 68:3,10
  72:22 84:19 85:20
  94:22 95:11 96:9
  96:25 97:6 98:22
  104:19 105:23
  110:5,5 112:7
  127:6 128:17,24

133:2,5 135:5
138:4,6,6 149:1
150:3 151:21,23
156:3 157:12
165:12 172:9
180:3 184:3,5
**type** 54:14 58:16
  138:2
**types** 78:17 85:16
  92:6
**typical** 26:6 55:24
**typically** 92:9,16
  92:18 107:21,22
  109:11,19

**U**
**ultimate** 48:23
  176:2
**ultimately** 56:11
  80:24 95:13 98:13
  105:9 117:8
**unable** 3:4
**unavailability**
  113:7
**unavoidable**
  120:11
**uncertainty** 36:3
  85:9
**unclear** 12:10 15:3
  50:20
**unconscionable**
  154:6
**uncontested** 144:1
**uncontrolled**
  113:17
**uncorroborated**
  15:5
**underlie** 57:1
**underline** 136:17
**underlying** 90:21
**underneath** 38:15
  81:8 93:10 103:9
  103:16
**understand** 3:14
  5:14 36:9 53:6,20

62:10 83:15 95:2
102:18 106:14
110:25 111:24
123:18 127:4,14
145:1 149:10,19
150:17 158:11,13
159:16 160:9
162:22 167:2
168:11 170:23
173:1,12
**understanding**
  40:5 169:2
**understood** 70:24
  90:23 138:11
  140:3 170:13
**undertake** 117:8
**undertaken** 8:7
  90:1 117:13
**undertaking** 68:13
**undertakings**
  36:20
**undertook** 115:2
**undeveloped** 95:3
**unexpected** 112:9
**unfortunately** 3:3
  10:23 59:24
  182:25
**unhappiness** 22:4
**unit** 60:2 92:13
**units** 110:13
**unjustifiably** 25:5
**unproven** 134:6
**untouched** 24:18
  43:6 80:21
**unusual** 27:4
  124:22
**update** 150:21
  175:13 177:11
**updated** 4:12,18
  181:18
**updating** 149:20
**upheld** 23:13
**upwards** 109:10
**US$250** 9:5
**use** 71:7

**useful** 97:25 98:20
  98:22 99:2 102:19
  103:22 108:2
**usually** 107:3 171:6
  172:22 180:9
  182:16 184:24
  185:1

**V**
**v** 85:1
**vacuum** 54:23
**valid** 21:8 22:8
**validly** 23:1 154:14
**value** 23:21 31:17
  31:20 47:2 63:8
  63:12,14 68:2
  70:13,18 127:10
  169:10,10 173:21
  174:3,5,7,9
  178:25 179:10,11
  179:18,21 180:2,4
  180:5,12,19,20
  181:1,3,8,19
  182:11
**valued** 31:23 47:13
**values** 107:4,5
**valve** 103:15
**valves** 103:9 104:20
**variation** 20:13
  134:20,22,24
  135:3
**variations** 135:3
**various** 21:18
  33:13 98:19
  141:23 175:10
  180:6
**vary** 87:13 133:3,4
  133:22
**vast** 54:5 65:5
**vastly** 173:10,15,16
**vehicle** 130:13
**ventilated** 75:18
**verbatim** 82:22
**verifying** 150:6
**version** 4:5 69:24

versus 68:4
vertical 97:9 99:22
    107:24 108:4,5,6
vertically 96:23
    97:7 103:3
vested 47:6
viability 30:17
    36:11
viable 38:11 42:7
    43:8,9 46:22,25
vice-president
    161:19
Vicini 1:18 171:10
    171:18
video 3:5 12:17
view 2:20 37:15
    43:11 44:23 51:19
    53:17,17 54:3
    81:3 93:8 98:16
    140:24
views 2:16 29:5
    49:18,24 52:20
    53:15
virtually 62:11
    185:21
visually 40:6
volume 48:11 91:11
    92:24,25 110:20
    110:21 111:8
    174:10
volumes 67:19
    113:6

_____
          W
Wade 1:25 2:1,1
    3:24 5:7 70:4
    82:15,16,17 87:12
    89:8,16,18,20,23
    90:5,7 113:10
    122:8,19,21
    125:12 126:5,8,24
    127:3,14 132:20
    133:1 135:23
    136:2 140:5
    141:21 143:8,10

143:15,18,21,25
144:9,18,20,23
145:1,5,7,11,13
145:16,20,25
146:3,7,10,12,15
146:20,24 147:4
147:10,13,18
151:19,21 152:17
153:13 157:8,15
159:12,13 162:6
166:15,17 169:21
169:23 170:20
173:25 174:12
175:19 181:20
183:17 187:12,20
Wade's 42:2
wait 159:10 170:11
waive 75:22 133:4
waived 20:19 22:9
    154:4,4
waiver 76:25
    133:10 153:17,20
walls 101:12
want 2:23 5:1
    14:15 44:7,7
    54:23 84:10 86:15
    86:15,19 91:23
    97:13 102:2 105:9
    105:9 114:4
    128:14 132:2,22
    135:21 153:2
    160:17,18 169:17
    176:5,7
wanted 18:17 26:13
    26:19 49:3 55:5
    90:20 106:10
    123:21 139:20
wants 86:24 162:4
warning 5:5
warranties 36:20
    78:19 80:17
    136:14 137:24
warranty 78:12
    137:22
wasn't 14:9 19:11

65:3 74:5 89:10
89:10,11,11,12
98:8 107:16
133:13 140:7
154:4 157:10
170:12 173:5,11
179:3
waste 48:22 58:22
    176:7
wasted 65:1 73:25
water 71:2 91:14
    91:16 92:18,21
    93:1,6,10 104:1
    109:7,9 118:11,12
water-oil 93:15
way 7:7,20 9:14
    19:14 24:25 25:2
    26:2 51:23 52:18
    52:23,24 54:23
    55:25 61:16 67:19
    72:19 73:14 83:23
    90:12,20 92:23
    95:8,19 107:3
    109:4 117:4
    121:10 122:11
    129:25 140:25
    146:24 162:14
    174:5
we'll 5:16 19:24
    58:24 65:4 66:16
    110:10 153:2
    164:11
we're 3:4 5:12 18:3
    22:6 35:1,7 36:14
    39:5 40:20 52:6
    54:24 69:4 81:10
    83:1 90:19 101:23
    105:23 124:24
    126:13 145:25
    146:1,2 147:17
    175:19 177:2,15
we've 20:21 25:23
    41:11 44:18 57:21
    75:4 114:21
    122:12 133:25

140:3 145:24
153:7,21 162:22
weaker 134:16
Webster 1:8,16
Wednesday 1:1
week 73:13 83:6
    117:2
weeks 57:3 149:1
    184:3
weight 139:23
wells 8:6,24 21:22
    21:25 61:17 62:7
    62:12 63:22 64:6
    64:17 68:10 70:1
    95:5,8,11 97:5,6,9
    116:23 117:1
    120:21,25 125:16
    126:14,16 128:1,4
    180:4
went 112:1 113:15
weren't 88:23,25
    116:24 134:18
    143:3 170:15
west 94:23,25 95:5
whatsoever 40:12
    139:19 140:25
whichever 24:25
    135:22
wholeheartedly
    86:6
wholly 25:5 82:2
wide 59:14 80:25
    100:5
wider 24:14
width 109:16
Wilford 1:15
willing 51:9 73:23
    151:5 183:3
willingness 153:15
wills 67:21
wire 99:13
wish 65:18 136:19
    159:7
wishes 17:20
witness 12:12 15:5

15:23 16:8 24:19
57:22 58:8 68:9,9
68:16,21 74:16
123:13 142:18
144:13,19 148:23
156:25 157:7,7,23
158:8,18,25 159:8
witnesses 3:2 134:7
WOC 93:16
wonder 29:24 30:2
    103:22 122:9
wondered 95:19
Wonderland 69:5
word 51:14
wording 36:25
    40:23 41:8 47:8
    88:18 135:10
    139:17
words 31:3 37:12
    50:17,18,19,20
    53:2,3,4,7 73:5
    76:16 79:2,19
    80:22 81:10 85:7
    85:10 86:10
    107:14 151:13
work 4:16,18 5:17
    26:16 48:19,20
    57:20 67:14 88:18
    88:19,20,22,22,25
    89:2,3,6,9,19,21
    89:22,24,24 90:1
    90:3,3,20 92:19
    92:22 93:1 98:25
    107:2,10 115:11
work-over 117:8
workbook 165:3
worked 4:21 89:2
working 88:25
    92:24 110:7
works 4:7
world 9:1 37:15
    43:11 55:4 69:3
    86:15,17 125:17
    125:22,24 127:20
    127:25 128:3

worry 166:12
worse 64:14
worth 30:1 173:17
wouldn't 111:12
   121:9 138:2
wrapped 99:13
write 21:8
writing 135:3 148:5
   157:20
written 51:23 83:12
   86:11 129:22
   133:20 162:14,15
   162:20
wrong 22:6 59:25
   73:15 76:7 81:10
   112:1 131:6
   146:15 152:4
   154:2,6,9 184:14
wrote 60:6 156:14

**X**

**Y**

Yates 2:9
year 169:4
years 6:2 12:22
   25:19 39:8,15
   45:23 63:25 67:23
   127:2,7 128:24
yellow 103:4
yesterday 4:13
   72:24

**Z**

zero 8:14 27:10
zonal 100:24
   113:24 114:21

**0**

0 138:8
0.1 71:24 72:5,9,18
0.2 70:10 71:24
   72:3,17

**1**

1 6:25 7:1 12:14

14:2 17:11 18:1,1
   18:2,3 21:17 24:7
   28:17 45:24,25
   61:1,6,25 62:1
   74:22 76:1 78:8
   96:6 108:21 136:2
   161:10,11 178:11
   187:3
1.09 82:12
1.1 7:1 24:20
1.14 49:21
1.15 55:21
1.3 8:11 27:10
1.4 165:2,19 166:2
1.5 31:23
1.788 18:8
10 96:19 119:11
   162:7,10 168:22
   170:21,23
10.00 1:2 186:9,11
   186:13
10.30 1:4
100 9:6 10:20 13:1
   47:13 176:10
   179:16
101 163:24,25
102 74:14
103 63:8
104 63:4
105 63:2,3,3,5
107 174:13
109 174:15,16,17
   178:6
11 12:14 30:1,14
   49:15 138:20
   153:11
11-metre 119:11
11.1 75:15 76:13,20
   77:2 129:5,14
   130:25 131:8
   138:13,13,22,23
11.2 13:14 23:20,21
   24:16,17,19 25:3
   138:13
11.22 30:7

11.33 17:1
11.43 30:9
11.45(b) 42:1
11.7 140:11,18
   141:7,8
110 167:16 178:9
112 63:11,11
113 11:21
114 167:19
117 44:3 63:5,6,7
12 17:13 18:2,3,9
   20:4 24:7 74:21
   74:23 75:12 76:12
   77:5,6 79:5,8,8
   100:4 135:10,13
   135:17,20,24
   136:3,6,8,9
   137:12 138:12
   139:13,17 140:6,9
   140:24 141:5,6
12.1(a) 74:25 77:8
   77:10 78:9,10,18
   78:25 79:3,11,20
12.18 75:20 76:10
12.2 74:25 79:10
   80:12,21
12.2(c) 79:12 81:3
12.2(d) 80:13 81:5
12.20 74:25
12.4 74:25
12.8 76:23
120 7:6,8 61:4
   161:5 175:12
   177:21
120/121 177:11
121 7:6 161:5
   175:12 177:11,22
123 33:9 98:22 99:1
123.1 44:11
13 49:1 160:16
132498 1:7
133 28:11
136 48:13 49:1
14.25 69:14
14.3 69:14

147 95:22 96:1,2
15 1:1,6 9:3 14:21
   16:10 20:25 30:5
   122:11,15 141:19
   142:15 149:10
15-minute 157:22
15,000 116:19
15.14 24:4
150 9:7,21 27:13
158 187:16,18
159 187:20
16 186:14
166 42:4
167 99:3
169 63:15
17 14:17 102:21
   103:25 104:7
17,000 116:19
17.1 15:19
17.2 132:6,9,16
17.2.6 45:10
17.2.7 45:10
17.3.1 45:10
17.3.2 45:11
176 11:22
18 74:4 109:22
   161:4 166:7,15,16
18.1 81:11
18.58 81:11
18.59 76:5
18.73 76:5
181 76:17
183 104:1,14
   187:22
187 102:21 103:25
   104:15
188 105:3
19 18:12 69:23
   133:10 166:14
   183:6
193 71:16
196 95:22 96:2
198 95:21
1992 8:4
1995 95:10

19th 153:14

**2**

2 33:8 43:21 75:25
   82:9,10 131:25
   132:3 146:22
   161:22
2.00 82:14
2.1 36:17 37:4
   40:24 41:25 42:9
   47:9
2.5 33:22
2.6 11:14
2.7.1 45:16
2.8 12:5
20 30:1,1 80:8
   119:6 183:25
20,000 121:4
200 12:25
2005 7:12 26:4
   33:15,15 51:6
2007 95:13
2009 26:23 34:2,7
   34:20,22 38:15,21
   95:16 106:2 111:9
   159:17 160:19
2010 13:8 31:9 33:6
   34:14,20 35:2,10
   35:17 37:15 38:2
   38:6,16,25 39:9
   39:17 40:2 47:21
   106:8 117:9 118:8
   119:16 161:11,11
2011 6:19 13:8,11
   31:9 32:21 40:2
   78:6 80:8 117:9
   164:17
2012 9:16 10:16,20
   13:11,23 14:20
   16:10 20:25 21:17
   26:4 32:14 40:20
   42:25 43:17
   126:14 151:3
   159:17 160:6,14
   161:11 165:10,20

169:3,13 170:2,4
170:8 176:17
177:18 178:12,22
182:4,4 183:25
**2013** 9:8 10:1 43:15
44:16 164:17
**2014** 9:8 10:1 12:16
15:9 27:22 29:6
60:25
**2015** 10:1 46:2,6
67:4 73:3 94:19
**2016** 1:1,6 11:19
12:12 21:25 26:22
44:1 46:16 73:1
186:14
**2021** 126:13
**21** 10:16 161:9
**22** 11:19 44:1
**23** 78:6 96:4 148:7
184:20,23
**23rd** 149:2 184:24
**24** 12:16 69:24
147:22 167:13
184:23
**240** 173:22 174:3
181:2,9
**241** 129:3
**245** 78:1
**250** 9:6 12:21,24
178:2
**26** 74:23 76:1 136:2
163:6 185:6,13
**26-metre** 108:8
**26th** 176:19
**27** 81:5 148:5
**275** 78:23
**278** 166:20
**27th** 149:3
**28** 9:16 10:20 13:11
32:14 40:20 42:25
43:17 49:15
128:10 138:20
155:12 178:16
**28.1** 156:22
**28th** 176:14,20

**29** 80:10 81:4,5
151:10 178:1
**291** 74:4 161:3
**294** 74:14

---
**3**

**3** 12:14 59:23 70:3
130:19 179:6
**3.05** 122:16
**3.18** 122:18
**3.39** 18:14
**3.66** 18:14 22:17
**3.71** 20:21
**3.84** 20:22
**3.9** 34:4
**30** 49:15 187:7
**31** 10:1 13:11 21:25
155:12
**32** 75:22
**32/64ths** 109:24
**333** 148:12
**335** 151:23
**338** 146:10,17
**35** 14:18 74:16
**36** 74:16
**37** 148:24
**380** 32:18
**388** 146:17 149:20

---
**4**

**4** 11:21 18:11 23:10
28:17 42:4 44:3
44:11 71:19 96:7
151:14 161:11
162:2 163:17
165:3
**4.1** 9:3
**4.24** 158:1
**4.25** 157:6
**4.3** 10:22
**4.30** 34:23
**4.38** 158:3
**4.4** 34:8,22
**4.5** 96:17,18
**4.7** 128:12

**40** 7:5 32:12 33:18
179:17
**40/45** 182:16
**400** 47:2 60:1
**41** 28:11
**43** 71:19 165:18,21
166:4
**43.08** 168:13
**43.1** 165:1
**44.5** 164:17 165:16
165:25
**441** 60:8
**48** 156:8,10 187:9
**480** 142:5
**485** 142:5

---
**5**

**5** 28:10 38:15,21
42:5 48:10 50:1
60:8 71:15,19
117:20 136:10,11
158:23 187:5
**5.10** 35:10
**5.2** 163:25 164:1
166:11
**5.30** 186:12
**5.5** 13:24 14:6
17:17,24 18:19
147:25
**5/8** 57:10
**50** 9:20
**50,963,912** 168:21
**50.9** 162:25
**50.963** 163:4
**506** 80:5
**509** 78:1
**51** 134:9
**54.3** 10:17
**55** 10:11,18
**55/56** 170:6
**550** 174:10,12
**56** 167:4,5 168:23
**560** 7:22
**566** 13:20
**57** 168:2,3

**57.5** 33:21
**578** 147:14,17,18
148:12
**579** 147:3 148:17
151:22
**580** 146:10,10,11
146:19,20,21
149:16
**581** 150:20
**59** 159:3
**59,697,438.2** 167:1

---
**6**

**6** 8:24 18:9 28:17
29:7 46:16 61:3
120:21
**6.15.2.5** 71:17
**6.7** 35:3
**6.8** 156:8,10
**60** 8:19 33:20
**60-day** 10:4
**600** 21:15 108:13
**63** 59:23 134:9
**649** 111:10
**64th** 109:21
**64ths** 109:12,20,23
**65** 14:3,7 61:2,3,4,8
61:14
**67** 104:2,3,10,14
**676** 138:20

---
**7**

**7** 30:14 32:21 35:10
37:15 38:2,6,16
38:25 45:23 47:21
49:15 120:21
138:20
**7.1** 65:17 84:6
**7.1(a)** 32:1 48:16
49:5,11 50:21
54:20 55:1,7,17
56:23 60:12,18
65:22 81:21 84:21
**7.1(k)** 55:9
**7.10** 65:17

**7.2.14** 61:15
**7.30** 32:7
**7.5.5** 62:2
**70** 67:5 119:9
**700** 96:20,21
**72** 76:1
**73** 29:7
**79** 62:1,1

---
**8**

**8** 13:23 14:4 15:2,9
16:15 17:12 18:14
21:1 22:25 32:16
73:9 120:21
**8.16** 68:18
**8.19** 68:24
**8.5-inch** 99:9,12
108:12
**8.9** 68:1
**82** 187:12
**8th** 142:19

---
**9**

**9** 7:1 14:20 16:24
57:10 95:21 100:2
108:10 142:15
160:18 166:22,22
**9.15** 75:11
**9.16** 28:3
**9.4** 72:3
**9.9** 75:11
**9/16** 28:21
**90** 187:14
**91** 23:10
**92** 44:11
**94** 28:18
**958** 34:1
**98** 113:4
**9th** 142:19