**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| ERIN ENERGY CORPORATION, *et al.*, | § | Case No. 18-32106 |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**MOTION OF PUBLIC INVESTMENT CORPORATION SOC LTD. FOR DISMISSAL,**
**ABSTENTION, OR CONVERSION**
**UNDER 11 U.S.C. § 305 (A)(1) AND 1112(B)**

---

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU
OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING,
SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING.  UNLESS
OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE
WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-FOUR (24)
DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING.  YOU MUST
SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE
NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED
AND GRANT THE RELIEF REQUESTED.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

Public Investment Corporation Soc. Ltd. (**PIC**) respectfully files this motion seeking dismissal or abstention pursuant to section 305 of the Bankruptcy Code or dismissal or conversion pursuant to section 1112(b) (the **Motion**).

In support thereof, PIC respectfully states as follows:

---

[1]     The last four digits of Erin Energy Corporation's (**ERN**) federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited (**EEL**); Erin Energy Kenya Limited (**EEKL**); and Erin Petroleum Nigeria Limited (**EPNL**). The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, Texas 77056.

## PRELIMINARY STATEMENT

1.     The creditors of these Debtors and the Court have been relegated to mere spectators of the Debtors' Nigerian litigation, with this Court having no role in the outcome, timing, or prospects thereof.  In these circumstances, the automatic stay or a discharge is of no meaning, creditors who respect the stay or a discharge will be disadvantaged to those who do not, and there is no legitimate business reason for a bankruptcy proceeding where the Court will not have a role in determining ownership or distribution of the key assets of the estates. The attendant value destruction should not be countenanced, and the Court should dismiss these cases.

2.     Section 1112(b) of the Bankruptcy Code empowers a court to dismiss a bankruptcy case, or alternatively to convert a chapter 11 case to one under chapter 7, where there is substantial or continuing loss to the estate and the debtor does not have a reasonable likelihood of rehabilitation. 11 U.S.C. § 1112(b). Section 305(a)(1) of the Bankruptcy Code likewise allows a court to dismiss or suspend a bankruptcy case where "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1).

3.     The Debtors currently have no operations or revenues, have no cash other than cash collateral, and project expenses in the near term that total hundreds of thousands, if not millions, of dollars. Against these costs, which may be understated, the Debtors' prospects appear to turn entirely on a series of contingencies that requires them, or perhaps other parties, to prevail in litigation in Nigeria, resume use of an offtake vessel they have abandoned, and access cash in the hands of a foreign creditor that has indicated it will not respect the jurisdiction of this court. The Debtors are in such dire straits that they are willing to pay their offtakers $2.7 million of PIC's cash collateral to simply buy sixty additional days of life. Rampant speculation of this kind at the expense of creditors is not a basis for rehabilitation that should be endorsed by this

Court. PIC therefore respectfully requests that the above-captioned cases be dismissed or, alternatively, that this Court abstain from further proceedings or convert the cases to chapter 7.

## JURISDICTION

4.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory bases for the relief requested are sections 1112(b) and 305(a)(1) of the Bankruptcy Code.

## BACKGROUND

### I.      The Debtors' Cash Projections and Operational Contingencies

5.      On May 4, 2018, the Debtors filed a motion (the **Emergency Cash Collateral Motion**) [Dkt. No. 28], seeking, among other things, the authority to use approximately $10 million in cash collateral currently on deposit with Mauritius Commercial Bank Ltd (**MCB**). In connection with the Emergency Cash Collateral Motion, the Debtors filed a 13 Week Cash Forecast covering the period from April 30, 2018, through July 27, 2018 [Dkt. No. 52-1] and a Monthly Cash Proforma covering the 8-month period from May 2018 through December 2018 (the **Cash Proforma**) [Dkt. No. 52-6]. On May 28, 2018, the Debtors filed two updated 13 Week Cash Forecasts covering the period through August 24, 2018. One of the two forecasts is premised on the Debtors' restarting their operations (the **Restart Cash Forecast**) [Dkt. Nos. 141-4], while the other is not (the **No Restart Cash Forecast**) [Dkt. No. 141-3].

6.      At the initial hearing on the Emergency Cash Collateral Motion on May 9, 2018 (the **Interim Hearing**), the Debtors presented testimony from Dippo Bello, the vice president of financial planning and treasurer for ERN, and Loretta Cross, financial advisor to the Debtors. Transcript of Oral Argument May 9, 2018, *In re Erin Energy Corporation, et al.*, No. 18-32106 (Bankr. S.D. Tex. May 9, 2018) (**May 9 Tr.**). Additional testimony from Mr. Bello

was presented at the second hearing on the Emergency Cash Collateral Motion on May 23, 2018 (the **Second Hearing**). *In re Erin Energy Corporation, et al.*, No. 18-32106 (Bankr. S.D. Tex. May 23, 2018) (**May 23 Tr.**).

       7.     The May 9 testimony from Ms. Cross indicated that the Cash Proforma was intended to demonstrate the operating cash flow that could hypothetically be generated from the Debtors' operations in Nigeria. May 9 Tr. at 98. It excludes certain capital expenditures. May 9 Tr. at 98. More importantly, it is also premised on a number of significant assumptions that will ultimately determine whether the Debtors are able to resume operations at all. May 9 Tr. at 99. If these assumptions are not met, the Cash Proforma does not contemplate any near-term source of revenue or cash for the Debtors other than the cash collateral that is the subject of the Emergency Cash Collateral Motion. The same is true of the Restart Cash Forecast, which is presumably premised on the same assumptions as the Cash Proforma.

       8.     The Debtors do not have any binding offers for postpetition financing, having apparently only opened their data room a week into the bankruptcy. May 23 Tr. at 72. This is despite the obvious urgency and the precariousness of their cash position. The majority shareholder is capable of providing additional funding but is apparently unwilling to do so. May 23 Tr. at 95. Though the Debtors are in discussions with a potential investor and another will allegedly get back to them the weekend following the Second Hearing, the reluctance on the part of any party to provide additional capital is presumably due to the same substantial questions and contingencies that are assumed in the Cash Proforma. May 23 Tr. at 72; ("And they are looking and asking questions. And we are very hopeful that we will get offers, even knowing that they know what we have."); May 23 Tr. at 94 ("So they – they are all asking so much questions, so – ").

9.     *First*, the Debtors must monetize crude oil on board the Armada Perdana vessel that is currently the subject of a writ of attachment filed by Nigerian Agip Exploration Limited (**NAEL**). May 9 Tr. at 99. In the near term, this requires successful removal of the writ following a hearing which the Debtors alleged was initially scheduled for May 22, 2018, and which has now been adjourned to July 6, 2018. May 9 Tr. at 99, 110; May 23 Tr. at 81. An additional hearing is scheduled for the middle of June, though the Debtors' witnesses have been inconsistent as to precisely what that hearing is about. May 9 Tr. at 110, 118;[2] May 23 Tr. at 91.[3]

10.     On information and belief, EPNL's motion to set aside and vacate the writ, which is pending before the Nigerian Federal High Court (the **Vacatur Motion**), is the only litigation (i) dealing with the Debtors' claim to ownership of the crude oil and (ii) in which the Debtors have sought the discharge of the writ(s). The motion is opposed by NAEL, and was postponed pending the outcome of an appeal before the Lagos Court of Appeal which took place on May 24, 2018, to which neither of the Debtors are a party. The appeal does not include the discharge of the writs and could take up to three months to finalise. Copies of the briefs of the arguments raised at the appeal hearing are attached as Exhibits A and B.

11.     In addition, and on information and belief, the only matter pending in June 2018 is an ancillary matter before the Federal High Court of Abuja. This litigation, as before, does not involve either of the Debtors and does not pertain to the writ(s) in issue. This much is apparent from the briefs submitted by the parties to that litigation attached hereto as Exhibits C and D.

---

[2]     Ms. Cross: I'm sorry, yes. Sorry. The hearing in the middle of June is to determine who the owner of the assets are. If they're not Allied's assets then they can't attach to them. So they're two different hearings. The one on the – in the middle of June is probably the more important hearing because it would determine who owns the assets versus whether not a piece of paper that was filed had all the appropriate identification on it.

May 9 Tr. at 118.

[3]     Mr. Bello: I mean, like I mentioned, I don't believe that any one of these cases is addressing the ownership of the oil. So, none of the cases is addressing who owns the oil or who owns anything.

May 12 Tr. at 91.

12.     Assuming that EPNL regains access to and establishes ownership of the oil, it will also need to obtain an export permit from the Nigerian Department of Petroleum Resources before the oil can be transferred or sold. May 9 Tr. at 99; May 23 Tr. at. 89-90. The Debtors are also unclear as to how the pending litigations interact with the permit process, though there is some suggestion that the litigations may have caused the delay. May 23 Tr. at 89-90 ("There is a writ wrongfully attached to the assets, which might have caused the Nigerian government to delay the issuance of the approval."). This is mere conjecture, and it is not certain that the resolution of the litigations will have any impact whatsoever on the permit approval process. Conversely, it is also not certain whether obtaining the permit alone would be enough to allow them to sell the oil if the writ remains outstanding.

13.     The likely outcome of these challenges is by no means clear, and the Debtors have placed no information before this Court to suggest that its claims will, ultimately, succeed or what, if any, the likely prospects of success are.

14.     On May 18, 2018, NAEL filed an emergency motion, seeking comfort that the automatic stay will not prevent it from replying to or otherwise participating in the Vacatur Motion. *See* Emergency Motion of Nigerian Agip Exploration Limited Pursuant to Section 105(a) of the Bankruptcy Code Seeking the Entry of an Order (I) Determining that the Automatic Stay Does Not Apply to an Action Commenced by the Debtors or (II) Granting Alternative Relief (the **NAEL Stay Motion**) [Dkt. No. 95]. The NAEL Stay Motion provides more detail on the Nigerian proceedings and indicates that in addition to the writ that is the immediate subject of the Vacatur Motion, the Nigerian courts will need to resolve more substantive questions as to whether EPNL holds interests in the crude oil and the relevant Nigerian oil mining leases, as opposed to an interest under a Production Sharing Contract. NAEL Stay Motion ¶ 12, 20. These leases include Oyo Fields 7 and 8, which are the sole producing assets contemplated in the Cash

Proforma. May 9 Tr. at 19 ("Within the oil mining lease there are some fields. The main field that has been developed is the Oyo field, and we had production from Oyo 7 and Oyo 8."); May 9 Tr. at 99 ("So this is really just based on the producing assets Oyo 8 and Oyo 7, I think 7, Oyo 8 and 7 and what they can produce and what the cost is to produce those."). An order on the NAEL Stay Motion was entered on May 23, 2018.

15.     ***Second***, the Debtors must be able to use the cash proceeds from the sale of the oil, which will be paid into an EPNL bank account maintained with, and subject to the security interest of, Zenith Bank plc (**Zenith**). May 9 Tr. at 58. EPNL owes Zenith approximately $78 million in total and payment into this account appears to be mandated by law. May 23 Tr. at 85, 93. Zenith has filed papers asserting that it has security over all of EPNL's assets and that neither it nor EPNL, as Nigerian entities, should be subject to the jurisdiction of this Court. *See* Sworn Affidavit of Facts of Mr. Bosah Okonyia, [Dkt. No. 38-1], ¶¶ 58, 63 (the **Zenith Affidavit**) ("[T]he appropriate Court clothed with jurisdiction to hear any matter relating to arrangement and compromise with creditors involving [EPNL] is the 'Federal High Court of Nigeria' to the exclusion of any other Court."). Zenith has declared EPNL's loan to be in default on various bases, including non-payment of principal and interest, failure to fund a debt service reserve account, failure to institute hedge protection, and the imposition of the writ by NAEL. Zenith Affidavit ¶¶ 22-37. The Debtors' witnesses have been inconsistent as to whether Zenith has commenced foreclosure proceedings. May 9 Tr. at 91;[4] May 23 Tr. at 85.[5]

---

[4]     Ms. Cross: Just the amount of time that we've had to put it together. I think that and also, you know, there have been a number of filings during the week that have made it more complicated for us to actually put together a forecast. Anything from all of the sudden having Zenith start foreclosure proceedings . . .

May 9 Tr. at 91.

[5]     Mr. Foxman: And have [Zenith] commenced collection actions towards the debtor's assets?
Mr. Bello: No.
Mr. Foxman: They have not commenced any.
Mr. Bellow: No.

May 23 Tr. at 85.

16.     The Debtors therefore acknowledge that gaining access to any sale proceeds would require them to "come to some agreement with Zenith for the use of cash proceeds or some kind of adequate protection payments." May 9 Tr. at 99-100. This may require, at a minimum, that they reinstate the facility by paying Zenith the amount past due of $7 million, as contemplated in Week 8 of the Restart Cash Forecast. May 23 Tr. at 93 ("What needs to be done with Zenith is to get the facility current and get the loan to be a performing loan again."). But even this would require Zenith to make a concession to the Debtors, as Zenith would presumably be entitled to demand the entire $78 million due on the basis of the numerous prior events of default under its facility. Zenith Affidavit ¶¶ 22-37. Zenith has also seemingly appeared in the Nigerian proceedings in relation to NAEL's writ. Zenith Affidavit ¶ 51.

17.     **_Third_**, the Debtors must retain the use of the Armada Perdana, the offtake vessel currently chartered by EPNL, or find a replacement offtaker. May 9 Tr. at 100. As to the Armada Perdana, the Debtors are not currently paying any of the maintenance expenses required under either their charter agreement with Armada Oyo Limited (**Armada**) or their services agreement with Bumi Armada (Singapore) Pte Ltd. (**BASPL** and, together with Armada, **Bumi**) and appear to be in substantial arrears under these agreements (the **Agreements**). May 9 Tr. at 115, 117. On May 14, 2018, Bumi filed motions seeking relief from the automatic stay and to compel the Debtors to assume or reject their contracts. _See_ Motion for Relief from Stay (the **Lift Stay Motion**) [Dkt. No. 69]; Motion to Compel Assumption or Rejection of Executory Contracts (the **Assumption or Rejection Motion** and, together with the Lift Stay Motion, the **Bumi Motions**) [Dkt. No. 71]. In the Lift Stay Motion, Bumi alleges that the Debtors abandoned the vessel and withdrew all essential support services, including offshore support vessels with food, water, and spare parts, thereby endangering the vessel and its crew. Lift Stay Motion ¶¶ 21-26. In addition to a $132,000 Daily Compensation Fee to which Armada is entitled, Bumi currently

provides these services at an estimate cost of $33,000 per day. Lift Stay Motion ¶ 27. The monthly accrual of amounts owed to Bumi could therefore be as much as $5.1 million, with the amount attributable to critical support services alone, which presumably cannot be waived or altered, being approximately $1 million. *Id.* Moreover, in its Assumption or Rejection Motion, Bumi estimates that the Debtors are in arrears in excess of $128 million and would need to pay that amount as a cure payment in connection with the assumption of the relevant contracts. Assumption or Rejection Motion ¶ 2. If the Debtors reject their agreements with Bumi and seek replacement offtake services at a market rate, the projected costs will presumably increase, as the $1.8 million per month for "FPSO Vessel Charter Expense" in the Cash Proforma and the Restart Cash Forecast is apparently based on a temporary arrangement between EPNL and Bumi. Lift Stay Motion ¶ 16.

18.     At the Second Hearing, the Debtors and Bumi announced a "resolution" of the Bumi Motions and, later that day, filed an agreed order setting forth the terms of their agreement, Dkt. No. 117 (the **Agreed Order**). The key terms of the agreement include the Debtors' payment of $2.5 million to Bumi in two installments beginning no later than May 30, 2018, and the funding of an escrow account with an additional $200,000 to pay certain estimated demobilization expenses if and when the Armada Perdana departs. Agreed Order ¶¶ 1, 5. As the Debtors have no funds, these amounts will be paid entirely out of PIC's cash collateral, and indeed the timing of the first installment is keyed off of the entry of an order granting the Emergency Cash Collateral Motion. Agreed Order ¶ 1. Under the Agreed Order, the failure to pay either installment, or voluntary termination by the Debtors, will result in the rejection of the Agreements, the termination of any and all interests of the Debtors in and to the Armada Perdana, and the lifting of the automatic stay without further notice or hearing to allow Bumi to demobilize the vessel. Agreed Order ¶ 3. Even if both installments are paid, these events will

also occur at Bumi's sole option on or after July 31, 2018, unless Bumi agrees otherwise. Agreed Order ¶ 4. In the meantime, the stay is lifted to the extent necessary to allow Bumi to prepare to demobilize the vessel. Agreed Order ¶ 2.

## II.    The Debtors' Litigation Against PIC

19.    On May 22, 2017, the Debtors' filed their Supplemental Reply in support of the Emergency Cash Collateral Motion, Dkt. No. 107 (the **Supplemental Reply**). In the Supplemental Reply, they allege various bad acts on the part of PIC that purportedly led to their present financial distress by impairing their ability to draw on the facility provided by MCB (the **MCB Facility**). Supplemental Reply ¶¶ 5-9.

20.    These allegations are the subject of pending litigation that ERN and EPNL commenced against PIC in the Supreme Court for New York County. *Erin Energy Corporation and Erin Petroleum Nigeria Limited v. Public Investment Corporation Soc Ltd.*, No. 650436/2018 (Sup. Ct. N.Y. Cnty. January 26, 2018) (the **New York Litigation**). PIC has filed a motion to dismiss. New York Litigation, Dkt. No. 18. At the request of the Debtors, the motion to dismiss has been adjourned to December 4, 2018. New York Litigation, Dkt. No. 47.

21.    Needless to say, the Court should give no weight to the Debtors' attempt to introduce, in the context of a cash collateral motion, matters that are the subject of pending litigation that they themselves commenced in another court and then sought to adjourn. PIC nevertheless notes that Erin's financial distress and inability to service its debt obligations began well before any of the events alleged in the New York Litigation. This much is clear on the face of Erin's Form 10-Q for the quarterly period ended June 30, 2017 attached hereto as Exhibit E (the **10-Q**) and Amended Form 10-K for the fiscal year ended December 31, 2017, attached hereto as Exhibit F (the **10-K**).

22.     As set out in the 10-Q, as of June 30, 2017, Erin (i) had incurred losses for the preceding three and six months, and had a working capital deficit of $280.7 million (10-Q pg. 12); (ii) was already experiencing shutdowns in its wells, including as a result of a dispute in relation to the Armada Perdana (10-Q pg. 12); (iii) was already in default under the MCB Facility, due to the failure to make principal and interest payments due on June 30, 2017, as well as a vendor's commencement of litigation against a wholly-owned Erin subsidiary seeking $ 10 million (10-Q pgs. 16, 34); and (iv) acknowledged its inability to generate sufficient cash from operations to satisfy certain obligations as they became due, relying instead on draws under the MCB Facility and short-term loans from a related party for funding (10-Q pg. 34). Further, the drawdown period for the MCB Facility, as well as the grace period for repayment, ended already on June 30, 2017 (10-Q pg. 15). Upon information and belief, Erin has not successfully negotiated an extension with MCB.

23.     As set out in the 10-K, as of December 31, 2017, (i) the amount drawn under the MCB Facility was $ 65.6 million, with accrued interest and unused commitment fees of approximately $ 1 million (10-K pg. 37); (ii) Erin had only paid $0.1 million towards principal repayment of the MCB Facility (10-K pg. 37); and (iii) Erin was not in compliance with various financial ratios required under the MCB Facility (10-K pg. 37).

## ARGUMENT

### I.     Section 1112(b) Requires Dismissal or Conversion Where "Cause" is Demonstrated

24.     Section 1112(b) of the Bankruptcy Code provides that a court shall dismiss a bankruptcy case, or alternatively convert a chapter 11 case to one under chapter 7, if a party in interest establishes cause, absent unusual circumstances under which conversion is not in the best interests of creditors or the estate. 11 U.S.C. § 1112(b). Specifically, section 1112(b)(1) states that:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

25.     Section 1112(b) of the Bankruptcy Code is intended to help creditors avoid the delay and costs associated with a reorganization process in cases where the prospects of an actual reorganization are slim. *See In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) ("Creditors . . . need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated . . . The very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless.") (internal citations omitted).

26.     Courts have consistently held that dismissal or conversion is the optimal relief for creditors when the debtor has no cash-generating business to potentially increase the amount available for distribution. *See In re Johnston*, 149 B.R. 158, 162 (B.A.P. 9th Cir. 1992); *In re Blixseth*, 2009 WL 1525994, at *5 (Bankr. D. Mont. May 29, 2009); *In re Fisher*, 2008 WL 1775123, at *12 (Bankr. D. Mont. 2008).

**A.      *PIC is a "Party in Interest" With Standing to Request Dismissal or Conversion***

27.     PIC, as a secured creditor under the MCB Facility and the holder of approximately 30% of the equity in ERN, is a "party in interest" with standing to request conversion. *See* 11 U.S.C. § 1109(b) (a "party in interest" includes a "creditor" and an "equity security holder"); *In re Johnston*, 149 B.R. at 161 ("[A] creditor has standing to request the conversion from Chapter 11 to Chapter 7 pursuant to § 1112(b)."); *In re Orchard at Hansen Park*, LLC, 347 B.R. 822, 825 (Bankr. N.D. Tex. 2006) ("[A]ll persons whose pecuniary interests are directly affected by the bankruptcy proceedings" are parties in interest.).

**B.**     ***"Cause" Exist Where the Debtors Have No Operations***

28.     The Bankruptcy Code enumerates sixteen non-exclusive examples of cause to dismiss or convert a case. 11 U.S.C. § 1112(b)(4). Generally, each of these examples describes a situation in which it would be "unlikely that the benefits of reorganization will be achieved within a reasonable amount of time or at an acceptable cost." 7 COLLIER ON BANKRUPTCY, ¶1112.04[3] at 1112-24 (15th ed. rev'd 2007). The list of examples is not exhaustive and courts may find cause for other equitable reasons. *See In re Irasel Sand, LLC*, 569 B.R. 433, 439 (Bankr. S.D. Tex. 2017); *In re Strug-Division, LLC*, 375 B.R. 445, 448 (Bankr. N.D. Ill. 2007); *see also Matter of Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986) (holding that "in acting upon a request for conversion, the bankruptcy court is afforded wide discretion"); *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 371–72 (5th Cir. 1987) (en banc) ("The inquiry under § 1112 is case-specific, focusing on the circumstances of each debtor.").

29.     Section 1112(b)(4)(A) expressly provides that "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). To satisfy this standard, "the moving party must demonstrate that there is both (1) a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation." *In re TMT Procurement Corp.*, 534 B.R. 912, 919 (Bankr. S.D. Tex. 2015) (citing *In re Creekside Sr. Apartments, L.P.*, 489 B.R. 51, 61 (6th Cir. BAP 2013)).

**1.**     **There is a Substantial and Continuing Loss to the Estates.**

30.     Section 1112(b)(4) requires the demonstration of loss that is either "substantial" or "continuing." *Creekside*, 489 B.R. at 61 (citing 7 COLLIER ON BANKRUPTCY, ¶1112.04[6][a][i] (16th ed. 2014) (hereinafter **COLLIER**)). A loss is "substantial" if it is

"sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors." *TMT*, 534 B.R. at 919 (citing COLLIER ¶1112.04[6][a][i]). To determine whether there is a "continuing loss," a court must "look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate." *Irasel*, 569 B.R. at 441 (quoting *In re Moore Construction, Inc.*, 206 B.R. 436, 437–38 (Bankr. N.D. Tex. 1997)).

31.     This prong may be satisfied by "demonstrating that the debtor suffered or has continued to experience a negative cash flow or declining asset values following the order for relief." *TMT*, 534 B.R. at 918. *See also Irasel*, 569 B.R. at 440 (citing *TMT*, 534 B.R. at 918); *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515-516 (8th Cir. 2004) ("Under the interpretation of § 1112(b)(1) consistently used in bankruptcy courts, negative cash flow alone is sufficient to establish 'continuing loss to or diminution of the estate.'"); COLLIER ¶1112.04[6][a] ("[1112(b)(4)(A)] tests whether, after the commencement of the case, the debtor has suffered or continued to experience a negative cash flow, or, alternatively, declining asset values."); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) ("All that need be found is that the estate is suffering some diminution in value").

32.     As it stands, it is abundantly clear that the Debtors currently suffer negative cash flow. The Debtors have no operations or revenues. Pending favorable developments in Nigerian litigation (which are unlikely in the short term, if at all) and the successful resolution of a series of other substantial contingencies, the Debtors rely entirely on the use of cash collateral to stay alive and fund the significant expenses set forth in the various budgets they have submitted.

33.     The No Restart Cash Forecast indicates that the Debtors will have no cash flow unless and until they are able to resume operations in Nigeria. May 9 Tr. at 92-93 ("Well

Exhibit 13 is the cash forecast for Erin Energy if we do not start up the Nigerian operations again."). In that scenario, the only cash available will be the $10 million in cash collateral that is the subject of the Emergency Cash Collateral Motion. Even then, the Debtors expect that the vast majority of this amount will be dissipated by August 24, 2018.

34.     The Cash Proforma and the Restart Cash Forecast demonstrate that the Debtors expect to have positive cash flow if they prevail against NAEL, obtain a permit from the Nigerian Department of Petroleum Resources, access and monetize the crude oil on the Armada Perdana, convince Zenith to relinquish the proceeds, and resume operations at the Oyo Field. May 9 Tr. at 113.

35.     Not only do the Debtors require all of these contingencies to be resolved in their favor, but the Cash Proforma and the Restart Cash Forecast also understate the rate at which the Debtors will actually need to use their cash. In addition to the exclusion of certain capital expenditures, the cost of chartering and operating an offtake vessel, which is already expected to be one of the largest recurring expenses, will in all likelihood be significantly greater than currently projected. The Debtors acknowledge that they are not currently paying Bumi for any of the expenses necessary to maintain and protect the crew, the vessel, or the environment, which amount to $33,000 per day. May 9 Tr. at 115, 110; Lift Stay Motion ¶ 27. Nor do the Debtors account for additional daily fees of $132,500 or the cure payment that would need to be made to these parties to retain the benefits of the existing charter. Lift Stay Motion ¶ 27. Whether $111 million (the amount indicated at the Interim Hearing), $128 million (the amount indicated in the Lift Stay Motion), or an entirely different number altogether, there is very substantial arrearage that remains unaccounted for that could consume all or a substantial proportion of the total projected receipts for 2018. May 9 Tr. at 117; Lift Stay Motion ¶ 27; Cash Proforma; Restart Cash Forecast. Even absent assumption of these arrangements and the need for cure,

there is a substantial risk of an allowed administrative claim that would render these estates administratively insolvent. Indeed, the Debtors and Bumi have already agreed to pay Bumi $2.7 million, which the parties characterize as "partial satisfaction of the amounts owed to Bumi under the Agreements," and Bumi expressly reserves all rights to assert administrative or other claims against the Debtors. Agreed Order ¶ 7. Rejection of the Agreements would require the Debtors to find replacement offtake services at a market rate, whereas the $1.8 million per month for "FPSO Vessel Charter Expense" in the Cash Proforma and Restart Cash Forecast appears to be a temporary concession that expired on May 6, 2017. Lift Stay Motion ¶ 16.

36.     Nor have the Debtors consistently explained those expenses that they have budgeted. In the Cash Proforma, one of the largest near term expenses was a $1.6 million initial payment for directors and officers liability insurance, together with monthly payments thereafter. The Debtors' witnesses were unable to offer any information as to whether any claims have already been asserted against the directors and officers of the Debtors and what the nature of those claims might be. May 23 Tr. at 94. The Debtors' counsel was also only able to obtain one of the three policies in the two weeks following the Interim Hearing, at which questions about the insurance were specifically raised by the Court. May 23 Tr. at 24; May 9 Tr. at 119. While the $1.6 million expense has been removed from the No Restart Cash Forecast and the Restart Cash Forecasts, the monthly payments remain.

37.     The Debtors therefore have substantial and continuing expenses that are not currently being mitigated by any revenues whatsoever and will likely consume all available cash within a matter of months. In the circumstances, allowing these cases to stay in chapter 11 will only result in the accrual of costs that diminish the value of these estates to the detriment of all parties in interest. Section 1112(b)(1) is intended to prevent exactly this result. *Loop Corp.*, 379 F.3d at 516 ("The purpose of § 1112(b)(1) is to 'preserve estate assets by preventing the

debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation.'") (quoting *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995)); *TMT*, 534 B.R. at 922 ("If the Court were presented with a situation where the estates continued to accumulate substantial losses to the detriment of the creditors, and if that accumulation could be avoided by conversion to chapter 7, conversion would be an appropriate remedy").

**2.      There is No Reasonable Likelihood of Rehabilitation**

38.      Section 1112(b)(4) also requires a demonstration that there is no reasonable likelihood of "rehabilitation." "Rehabilitation" is not simply a question of whether a debtor can confirm a plan, but whether "the debtor's business prospects justify continuance of the reorganization effort." *TMT*, 534 B.R. at 920 (quoting *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)). In other words, it refers to a "debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516 (citing *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990)).

39.      The Debtors do not have a reasonable likelihood of rehabilitation. They have no operations, revenues, or cash, and their prospects turn not on the viability of their business plan or on any actual restructuring, but on the resolution of their various disputes with each of NAEL, Bumi, and Zenith. These disputes will determine, among other things, whether the Debtors have the right to sell the oil on the Armada Perdana, whether the Debtors have the right and ability to obtain and sell more oil in the future, and even whether the Debtors will have access to any sale proceeds. The Debtors' likelihood of rehabilitation is little more than speculation as to whether they will prevail on all of these things, which is not a basis to allow these cases to continue. *See Quarles v. U.S. Tr.*, 194 B.R. 94, 97 (W.D. Va. 1996) ("The evidence suggests that the appellant has continued to experience negative monthly cash flow, and

the appellant's premise that outcomes in pending litigation favorable to him will cure his financial ills is pure speculation."); *In re Cont'l Holdings*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994) (finding that there was no likelihood of rehabilitation when debtor lacked a reasonably certain source of income); *In re Great Am. Pyramid Jt. Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) ("When visionary schemes for rehabilitation entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, conversion or dismissal is generally in order.").

40.     Moreover, the Debtors have operated with questionable judgment even before these bankruptcies were filed. As alleged in the Lift Stay Motion, EPNL abandoned not only its operations on the Armada Perdana, but also the personnel on board, withdrawing critical support services necessary to provide the vessel with supplies and protection. Lift Stay Motion ¶¶ 21-26. These actions left the vessel exposed to pirates and other maritime risks with no means of immediate support in case of medical, security, or environmental emergency. *Id*. Nor is EPNL, by its own admission, currently paying for any of the maintenance expenses for the vessel, which are borne by Bumi. May 9 Tr. at 115. Thus, even though EPNL seeks to release and monetize the crude oil on the Armada Perdana, and proposes future production premised on the use of the vessel or a replacement, it had no intention of fulfilling any of its obligations relating thereto until Bumi sought to lift the stay and EPNL, driven into a corner, proposed to buy more time with cash collateral. This cavalier attitude towards the safety of crew and the preservation of critical corporate assets is not consistent with a legitimate attempt at rehabilitation. Rather, it is consistent with the notion that the Debtors have filed these cases in order to stall for time while they gamble on legal developments in Nigeria.

41.     PIC is also concerned that even if these bankruptcy cases resulted in a plan being confirmed, a highly speculative outcome, the international nature of the assets and other

foreign creditors would pose repeated and ultimately insurmountable barriers to enforcement. Creditors such as PIC who have respected the Court's jurisdiction would be irreparably harmed by those who ignored it, creating a situation where these bankruptcy cases and their costs are meaningless and value destructive.

42.    Accordingly, cause for dismissal or conversion exists under section 1112(b)(4)(A) of the Bankruptcy Code.

**C.    *Dismissal or Conversion is in the Best Interests of the Debtors' Remaining Creditors.***

43.    Upon a showing of "cause," Section 1112(b) provides that the court shall convert or dismiss a case unless it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). Put another way, "the case should be converted or dismissed unless unusual facts and circumstances demonstrate that the purposes of chapter 11 would be better served by maintaining the case as a chapter 11 proceeding." *In re Prod. Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008) (citing COLLIER ¶1112.04[3]).

44.    No such unusual circumstances exist here. The Debtors currently have neither cash nor a means to operate their business and generate revenue, and are hostage not only to developments in courts other than this one, but to parties, such as Bumi and Zenith, which exert almost total control over the Debtors' future prospects. This is amply demonstrated by the Debtors' willingness to pay Bumi $2.7 million for only sixty more days of life, during which Bumi may continue preparations to demobilize the vessel. And if the parties do not come to some further agreement by July 31, 2018, which will presumably entail more payments, Bumi will be free to simply take the Armada Perdana and go, depriving the Debtors of offtake services and essentially spelling doom for whatever notion of rehabilitation in these cases. Continuing this case in chapter 11 will result in the accrual of unnecessary expenses to the Debtors' estate,

which will be beneficial to no one, and in fact will be harmful to creditors. *See In re Johnston*, 149 B.R. at 162; *In re Blixseth*, 2009 WL 1525994, at *5; *In re Fisher*, 2008 WL 1775123, at *12. Nor is a bankruptcy court prohibited from granting a motion to dismiss or convert early in a case where the circumstances warrant. *See In re Johnston*, 149 B.R. at 162 ("However, where there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case."); *In re Economy Cab & Tool Co. Inc.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984) (Chapter 11 case may be converted in early stages of proceeding where movant can show that there is "no more than a 'hopeless and unrealistic prospect' of rehabilitation").

## II.     Abstention or Dismissal is Appropriate under Section 305(a)(1)

45.     The Court may also dismiss these cases under section 305(a)(1) of the Bankruptcy Code, which empowers a court to "dismiss a case" or "suspend all proceedings" if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). Courts have recognized that section 305(a)(1) reflects a recognition by Congress that "in certain cases it may be appropriate for a bankruptcy court to decline jurisdiction." *In re Argus Grp. 1700, Inc.*, 206 B.R. 737, 755 (Bankr. E.D. Pa. 1996), *aff'd sub nom., Argus Grp. 1700, Inc. v. Steinman,* 206 B.R. 757 (E.D. Pa. 1997).

46.     Courts consider multiple factors, as well as the totality of the circumstances, when assessing whether the interests of the debtor and creditors would be better served by a dismissal or suspension. *In re Tex. EMC Mgmt., LLC*, 2012 WL 627844, at *3 (Bankr. S.D. Tex. Feb. 24, 2012). These factors include: (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of

achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought. *Id*. Not all are given equal weight in every case and the court should not conduct a strict balancing. *In re Acis Capital Mgmt.,* L.P., No. 18-30264-SGJ-7, 2018 WL 1801231 (Bankr. N.D. Tex. Apr. 13, 2018) (citing *In re Monitor Single Lift I, Ltd*., 381 B.R. 455, 467 (Bankr. S.D.N.Y. 2008)).

47.     A number of these factors are relevant here. It is abundantly clear that the Debtors' future prospects ultimately turns on developments in pending litigation in Nigeria in relation to property in Nigeria, not before this Court in relation to property in the United States. Their principal dispute is seemingly with NAEL, a Nigerian party, concerning oil mining leases and crude oil in Nigeria, the ownership of which is contested and subject to further litigation in Nigeria to which the Debtors are not a party. While it remains unclear how the Debtors could prevail against NAEL, if for whatever reason they do, and thereafter manage to sell oil for their benefit, the proceeds will be delivered to, and subject to the liens of, Zenith, which may not respect the jurisdiction of this court and has asserted that EPNL, as a Nigerian entity, should be subject to insolvency proceedings in Nigeria. Indeed, Zenith has already appeared in the Nigerian proceedings and the Debtors are unable to offer any view as to whether Zenith, or indeed creditor constituents generally, would respect the automatic stay. May 23 Tr. at 85. The fact that the Debtors have abandoned any effort to use cash collateral on deposit with Zenith, which they originally sought in the Emergency Cash Collateral Motion, and have budgeted a payment of $7 million to Zenith in the Restart Cash Forecast to make the Zenith facility current, indicates that the answer to this question may be "no." May 23. at 93. Dismissal is therefore

warranted by the fact that none of the key parties, assets, or proceedings that bear on the actual question of rehabilitation are located in the United States. *See In re Northshore Mainland Services, Inc.*, 537 B.R. 192, 206 (Bankr. D. Del. 2015) (dismissing case because creditors would have expected insolvency proceedings to take place in Bahamas, the pursuit of the US cases would only generate additional litigation, and the central focus of the case was an unfinished project in the Bahamas); *Texas EMC Mgmt., LLC*, 2012 WL 627844, at *3 ("Even if this court were to permit the instant cases to continue, it is likely that the questions of ownership and/or distribution of assets would be required to be resolved in litigation.").

## CONCLUSION

For the foregoing reasons, PIC respectfully requests that this Court enter an order dismissing the above-captioned cases or, alternatively, converting them to cases under chapter 7, and granting such further relief as it deems just and proper.

Dated: May 28, 2018
Houston, Texas

**VINSON & ELKINS LLP**

/s/ *Bradley R. Foxman*
Rebecca L. Petereit
(Texas Bar No. 24062776)
Bradley R. Foxman
(Texas Bar No. 24065243)
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
rpetereit@velaw.com
bfoxman@velaw.com

- and -

**ALLEN & OVERY LLP**
Ken Coleman
Laura Hall
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
laura.hall@allenovery.com

*Attorneys for Public Investment*
*Corporation Soc. Ltd.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2018, a true and complete copy of the foregoing was served upon filing via the Court's CM/ECF electronic system on all parties subscribing thereto.

/s/ *Bradley R. Foxman*
Bradley R. Foxman
