IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| **ERIN ENERGY CORPORATION**, *et al.,*[1] | § § | Case No. 18-32106 |
| Debtors. | § § | Chapter 11 |
| | § § | (Jointly Administered) |

**DEBTOR'S EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, AND 364 AND FEDERAL BANKRUPTCY RULES 2002, 4001 AND 9004 FOR A FINAL ORDER AUTHORIZING THE DEBTORS TO INCUR <u>POST-PETITION SECURED INDEBTEDNESS</u>**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 19, 2018 AT 9:00 A.M. IN COURTROOM 404, 4th FLOOR, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN TWENTY-FOUR (24) DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**EMERGENCY RELIEF HAS BEEN REQUESTED, IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER, IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELEIVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] The last four digits of Erin Energy Corporation's ("ERN") federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited ("EEL"); Erin Energy Kenya Limited ("EEKL"); and Erin Petroleum Nigeria Limited ("EPNL").  The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

TO THE HONORABLE MARVIN ISGUR, U.S. BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned proposed attorneys, hereby file this Emergency Motion for Pursuant to 11 U.S.C. §§ 105, 361, and 364 and Federal Bankruptcy Rules 2002, 4001, and 9004 for a Final Order Authorizing the Debtors to Incur Post-Petition Secured Indebtedness (the "Motion") and in support hereof, respectfully states as follows:

## I.
## JURISDICTION AND VENUE

1. This Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested in this Motion are Bankruptcy Code §§ 105, 361, 362, and 363 and Bankruptcy Rules 2002, 4001, and 9014.

## II.
## BACKGROUND

2. On April 25, 2018 (the "Petition Date"), the Debtors, filed voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. An official committee of unsecured creditors (the "Committee") was appointed in the cases on May 16, 2018.

3. ERN operates through its subsidiaries as an independent oil and gas exploration and production ("E&P") company focused on energy resources in Africa with headquarters

located at 1330 Post Oak Blvd., Suite 2250, Houston, Texas 77056. In total, ERN has ten (10) wholly owned subsidiaries and one partially owned subsidiary. EEL is a wholly owned subsidiary of ERN organized under the laws of the Cayman Islands. EEL was founded in 2012 and is also the parent of EEKL. EPNL is a limited company incorporated under the laws of the Federal Republic of Nigeria. Founded in 2009, EPNL is currently the main operating subsidiary of ERN in Nigeria and accounts for almost all of ERN's revenues.

4. EEKL is a subsidiary of EEL and is organized under the laws of the Republic of Kenya. Founded in 2012, EEKL is the operating subsidiary of ERN in the country of Kenya. Although EEKL holds four licenses in the country, there are no ongoing operations in Kenya.

5. The Debtors focus their efforts on acquiring and developing high-potential E&P assets in Sub-Saharan Africa, and exploring those assets through strategic partnerships with national oil companies, indigenous local partners, and other independent oil companies. The Debtors' current asset portfolio consists of five licenses across Nigeria, Ghana and The Gambia covering an area of approximately 1.5 million acres. The Debtors' strategic acquisitions and aggressive E&P strategies have helped sustain their growth and success.

6. A number of factors – including regulation and the prolonged commodity downturn – have had a material adverse effect on the Debtors' financial condition. The most significant impact has been in Nigeria where certain pending legal matters culminated in armed agents of Nigerian Agip Exploration Limited ("NAEL") boarding the EPNL offtake vessel and seizing valuable assets. NAEL's wrongful actions resulted in ERN and EPNL's inability to operate and market crude oil from the Oyo Field offshore Nigeria.

7. The disruption of operations in Nigeria coupled with the Debtors' inability to service mounting debt obligations and other trade payable obligations has resulted in a severe

cash-flow shortage. Through these Bankruptcy Cases, the Debtors seek protection and enforcement of the automatic stay with respect to the Debtors' assets while the Debtors seek alternative sources of funding pending resolution of the Nigerian litigation.

## III.
## RELIEF REQUESTED

8. By this Motion, the Debtors seek this Court's authorization under sections 364(b) and (c) of the Bankruptcy Code to obtain a debtor-in-possession loan ("DIP Loan") from Greg Holcombe (the "DIP Lender") pursuant to the terms and conditions set forth in a non-amortizing multi-draw senior secured term loan note (the "DIP Note").

9. The Debtors seek entry of an order (the "DIP Order"), substantially in the form of the order submitted herewith, to borrow from DIP Lender $1,100,000.00. The funds to be extended under the DIP Order will provide the Debtors with operating capital to allow it to fund existing payroll obligations and other immediate needs as set forth in the budget attached here to as **Exhibit A** (the "Budget").

10. The DIP Lender has proposed to lend the funds requested by the Debtors pursuant to the DIP Order.

11. The Debtors have determined that the DIP Loan is vital to the Debtors' ability to among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors. The Debtors have already reduced their staff to a minimum necessary to preserve the Debtors' remaining assets. Without access to the DIP Loan, the Debtors will not have sufficient funds to finance these minimum operations and will be forced to

cease all corporate activities. Consequently, the Debtors' continued viability and ability to preserve the Debtors' estates is dependent upon obtaining the DIP Loan.

12. The Debtors submit that the terms of the DIP Loan are fair and reasonable under the circumstances. The DIP Lender is offering the DIP Loan with the view that this financing will provide necessary capital to allow the Debtors to continue its efforts to preserve various estate assets. The Debtors therefore request that this Court approve the use of the DIP Loan consistent with the terms of the Budget.

## IV.
## SUMMARY OF KEY TERMS

13. The DIP Lender has proposed the following terms for the DIP Loan:

| | |
|---|---|
| <u>Debtor/Borrower</u>: | ERN (the "Company"), EEL, EPNL and EEKL |
| <u>DIP Lender</u>: | Greg Holcombe (the **"DIP Lender"**). |
| <u>Amount</u>: | Up to $1,100,000.00. |
| <u>Interest</u>: | 10.0% per annum, which interest shall be payable in-kind by adding such amounts to the then outstanding principal balance on each interest payment date. |
| | Automatically upon the occurrence and during the continuance of any event of default, all outstanding principal, fees and other obligations under the DIP Note shall bear interest at a rate per annum of 2.0% in excess of the rate then applicable to such DIP Loan. |
| <u>Use of Proceeds</u>: | No Debtor shall pay any expenses or other disbursements other than those set forth in the Budget. The DIP Borrowers shall deliver to the DIP Lender by 11:59 p.m. (New York time), on Thursday of each week, rolling 13-week cash flows, together with a reconciliation for the prior week and the cumulative period from the Petition Date. |

| | |
|---|---|
| Maturity Date: | The maturity date of the DIP Note shall be the earlier of (a) 180 days after the Interim Order Entry Date, (b) the effective date of any chapter 11 plan for the reorganization of the DIP Borrowers or any other Debtor, (c) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code section 363 or otherwise, and (d) the termination of the DIP Note (the "***DIP Maturity Date***"). |
| Events of Default: | The Events of Default (each, an **"Event of Default"**) include: |

1. The failure to make any payments when due; material inaccuracy of representations and warranties when made or deemed made; violations of covenants; material monetary and non-monetary judgments enforceable and payable prior to payment of the DIP Note;

2. The failure of the Guarantors to execute and deliver the Guarantor Documents to the DIP Lender, or the failure of the DIP Borrowers to execute and deliver the Local Law Documents to the DIP Lender, in each case, accompanied by any necessary consents, , and the validity, perfection and first priority status of the liens granted under the Guarantor Documents, in form reasonably acceptable to the DIP Lender, by the date that is 10 business days following the Interim Order Entry Date;

3. The filing of a motion by any Debtor seeking dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the bankruptcy or insolvency of any Guarantor without the prior written consent of the DIP Lender;

4. The dismissal or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

5. The appointment of a trustee, examiner or other person with expanded powers under any of the Chapter 11 Cases;

6. The Bankruptcy Court's entry of an order granting any lien or claim that is senior to or *pari passu* with the DIP Lender's liens and claims under the DIP Note without the prior written consent of the DIP Lender;

7. The payment or granting of adequate protection with respect to prepetition debt (other than with the prior written consent of the

DIP Lender);

8. The failure of liens or superpriority claims granted with respect to the DIP Note to be valid, perfected, and enforceable in all material respects with the priorities described herein or the failure of any Guarantor Document to be valid and enforceable under applicable law, or of any lien on any assets of the Guarantors granted in favor of the DIP Lender to be valid, perfected and enforceable in all material respects with the priorities described herein, provided, however, failure to obtain government approval for a lien on the assets of EEGAL shall not be an Event of Default;

9. The filing of a motion by any Debtor seeking, or the entry of, one or more orders of the Bankruptcy Court (i) reversing, amending, supplementing, vacating, or otherwise modifying the Interim DIP Order or Final DIP Order, as applicable, without the prior written consent of the DIP Lender, or (ii) avoiding or requiring repayment of any of the payments made to the DIP Lender in accordance with the terms thereof;

10. The entry of one or more orders of the Bankruptcy Court modifying the automatic stay without the prior written consent of the DIP Lender;

11. The making of any payment not provided for in the Budget, or any deviation in the "Total Receipts" or "Total Disbursements" line of the Budget by more than 10% (measured on a cumulative basis from the Interim Order Effective Date);

12. Any Debtor's failure to comply with any other material term of the Interim DIP Order or Final DIP Order; and

13. On or before the date that is thirty (30) calendar days following the Interim Order Entry Date, the Final DIP Order shall have been entered by the Bankruptcy Court.

| | |
|---|---|
| <u>Collateral/Priority:</u> | The DIP Note shall be secured by first-priority perfected liens and security interests (the "DIP Liens"), granted by the Debtors and approved by the Bankruptcy Court pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, in and upon all prepetition and postpetition real and personal, tangible and intangible property and assets of each of the Debtors of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, |

contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, one hundred percent (100%) of the capital stock of each Debtor's direct and indirect domestic and foreign subsidiaries, all inter-company notes held by the Debtors, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action including proceeds of avoidance actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (the "**Avoidance Actions**")), and any and all proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, the "**DIP Collateral**").

Notwithstanding anything to the contrary, the DIP Liens: (a) shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens on all DIP Collateral that is not otherwise subject to any existing, valid and enforceable liens; (b) shall, pursuant to section 364(c)(3) of the Bankruptcy Code, constitute junior security interests in and liens on all DIP Collateral immediately junior in priority to any and all existing, valid and enforceable liens, including Senior Third Party Liens[2] on or in the DIP Collateral; and (c) shall, pursuant to section 364(d) of the Bankruptcy Code, constitute senior priority priming security interests in and liens on all DIP Collateral (in all cases for clauses (a), (b) and (c) of this sub-paragraph, the DIP Liens shall be subject to the Carve-Out and Senior Third Party Liens). The DIP Liens shall at all times be senior to the following (i) any inter-company claim of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (ii) any security interest or lien which is avoided or disallowed or otherwise preserved for the benefit of any Debtor's estate under section 551 or any other provision of the Bankruptcy Code, and (iii) any other security interest or lien that is not a Senior Third Party Lien. The DIP Liens shall, as of the Petition Date, be deemed legal,

---

[2] For purposes hereof, "Senior Third Party Liens" shall mean liens in any DIP Collateral granted by order of the Bankruptcy Court prior to entry of the Final Order; provided that, Senior Third Party Liens shall not include liens on any causes of action, including without limitation, fraudulent conveyance actions and claims, for undue enrichment or otherwise, against Nigerian Agip Exploration Limited, and any other persons or entities involved in, or benefiting from, the seizure of crude oil owned by EPNL from the FSPO Armada Perdana pursuant to the Writ of Attachment and Sale of Goods against Allied Energy Plc ("**Allied**") and CAMAC International (Nigeria) Limited ("**CINL**"), including, without limitation, Allied and CINL.

valid, binding, enforceable, and perfected liens, not subject to subordination (except as expressly provided in this Final Order), impairment or avoidance, for all purposes in the Cases and any Successor Case, in each case without the necessity of any further action, including the execution or delivery by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Lender of any DIP Collateral. Other than the Carve-Out and Senior Third Party Liens, no other liens or security interests, whether for postpetition financing, adequate protection or otherwise, whether arising pursuant to sections 363 or 364 of the Bankruptcy Code or otherwise, shall be senior or equal to or pari passu with the DIP Liens in these Cases or any Successor Case without the express written consent of the DIP Lender given in accordance with the DIP Documents (which consent may be withheld in his sole discretion). Without either (a) the prior written consent of the DIP Lender, which may be withheld in his sole discretion, or (b) the indefeasible payment and satisfaction in full, in cash of the DIP Obligations and termination of the lending commitments under the DIP Facility, all on a final basis, no security interest or lien shall be granted or allowed in the Cases or any Successor Case, whether for postpetition financing, adequate protection or otherwise, whether arising pursuant to sections 363 or 364 of the Bankruptcy Code or otherwise, on any asset or property of any Debtor that is not subject to the DIP Liens in favor of the DIP Lender.

| | |
|---|---|
| <u>Conditions Precedent</u>: | DIP Lenders obligation to provide funding under the DIP Loan shall be subject to, among other things: |

1. Entry of an order by the Bankruptcy Court approving the DIP Loan, in a form satisfactory to the DIP Lender, in its sole discretion.

2. The DIP Lender shall receive first priority security interests in: (a) all of the equity interests in EEGHL to the extent owned by EEIL (granted by EEIL pursuant to a Cayman law pledge agreement), (b) all of the equity interests of EEGHL held by a Debtor, and (c) all of the assets of EEGAL (granted by EEGAL pursuant to Cayman law security agreement and a Gambian law security agreement) (all such foreign law security documents, collectively, the "**Local Law Documents**"); provided that any

9

grant of liens on the assets of EEGAL will be conditioned upon first getting necessary government approvals to grant such liens; provided further that, upon entry of this Final Order, prior to entry into the applicable Local Law Documents, the DIP Lender will make funds available to the Borrowers under the DIP Note, subject to the Approved Budget, while such governmental approvals are being sought in good faith, it being understood that the Debtors shall provide the DIP Lender with reasonable assurances regarding progress towards entry into and consummation of the Local Law Documents and the granting of all other liens contemplated by the DIP Note.

## V.
## APPLICABLE AUTHORITY

14. Section 364(c) of the Bankruptcy Code provides:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured with a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. 364(c).

15. Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for postpetition financing and provides:

> (c) Obtaining Credit
>
> (1) Motion; Service. A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on any committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or, if the case is a chapter 9 municipality case or a

>chapter 11 reorganization case and no committee of unsecured creditors has been appointed pursuant to § 1102, on the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement.
>
>(2) <u>Hearing</u>. The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.
>
>(3) <u>Notice</u>. Notice of hearing pursuant to this subdivision shall be given to the parties on whom service of the motion is required by paragraph (1) of this subdivision and to such other entities as the court may direct.

FED. R. BANKR. P. 4001(c).

16. In seeking the approval of a postpetition loan, courts consider the following factors in determining whether obtaining postpetition financing pursuant to section 364(c) is appropriate: (i) whether the debtor is unable to obtain unsecured credit under section 364(b); (ii) whether the transaction is necessary to preserve the assets of the debtor's estate; and (iii) whether the terms of the transaction are fair, reasonable and adequate under the circumstances. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed postpetition financing) (citations omitted); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (noting that a court "may not approve any credit transaction under subsection (c) unless the debtor demonstrates that it has reasonably attempted, but failed, to obtain unsecured credit under sections 364(a) or (b)") (citations omitted); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

### i. The Debtors Could Not Obtain Unsecured Financing.

17. As noted previously before the Court, the Debtors have sought postpetition financing from various sources and until now have been unable to find any form of financing—unsecured or secured. The Debtors do not believe unsecured financing is available from any source at this time.

### ii. The DIP Loan is Necessary to Preserve Estate Assets

18. The Debtors' decision to enter into the DIP Loan is the culmination of an extensive process the goal of which was to procure the best available financing under the circumstances. Ultimately, the Debtors' decision to enter into the DIP Loan was the best and only real option available to the Debtors and entry of the DIP Order is in the best interests of the Debtors, their estate and their stakeholders.

19. Failure to obtain this DIP Loan would gravely harm the Debtors and their creditors. Without access to the DIP Loan, the Debtors could potentially be forced to prematurely convert these cases to chapter 7 to the detriment of all parties in interest. *See In re Farmland*, 294 B.R. at 885 (approving postpetition financing that "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets. Without the continued financing, the Debtors would likely be forced into a Chapter 7 or 11 liquidation, to the detriment of all creditors"); *see also In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.")

20. Under the circumstances, the Debtors' decision to enter into the DIP Loan is a reasonable exercise of its business judgment, and the DIP Order accordingly should be entered. *See, e.g., In re Ames*, 115 B.R. at 38 (noting that courts permit debtors to "exercise their basic business judgment" when obtaining debtor-in-possession financing under section 364 of the Bankruptcy Code); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because the facility "reflect[ed] sound and prudent business judgment"); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citation omitted).

21. Prior to seeking the DIP Loan, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of the chapter 11 case, and determined that the Debtors would require postpetition financing to support its operational and chapter 11 activities. Accordingly, after significant efforts by the Debtors and their advisors, the Debtors negotiated the DIP Loan in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.

22. The Debtors believe that the Court's consideration of non-economic factors is especially appropriate here. *See In re ION Media Networks, Inc.*, Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (allowing for the consideration of non-economic factors). Absent the DIP Lender's willingness and ability to fund the DIP Loan, the Debtors would likely run out of cash and would be forced to convert its case to chapter 7. The Debtors believe that its assets will be greatly devalued by a chapter 7 conversion and that the claims against it will grow exponentially.

23.     The Debtors and their advisors determined in their sound business judgment that the DIP Loan provides a greater amount of financing on more favorable terms than any other reasonably available alternative. The Debtors submit that entering into the DIP Loan constitutes an exercise of its sound business judgment that should be approved by the Court.

### iii.   The Terms of the DIP Loan Are Fair and Reasonable.

24.     In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Judged from that perspective, the terms of the DIP Loan are fair and reasonable. The DIP Loan provides the Debtors the liquidity it needs to operate its business, thus permitting the Debtors to effectively restructure, while establishing an appropriate cash balance.

## VI.
## NOTICE

25.     Notice of this Motion will be provided by email, when available, or by traditional mail to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtor's secured creditors; (c) counsel for the Committee, and (d) the parties listed on the Debtors' master service list. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## VII.
## BASIS FOR EMERGENCY RELIEF

26.     An emergency exists because the Debtors face immediate and irreparable harm to the estate absent the emergency consideration of the relief requested in this Motion. The

immediate use is necessary, and it will stabilize the Debtors' operations by paying ordinary, postpetition operating expenses, as well as any court approved prepetition expenses that may be at issue. As a result, if an emergency hearing is not set, the Debtors will be unable to operate.

WHEREFORE, the Debtors respectfully request that this Court (i) authorize, on an interim basis, entry of the order submitted herewith authorizing the Debtors to borrow the funds necessary for the interim period; (ii) authorize the Debtor to execute and deliver the DIP Loan Documents and perform such other and further acts as may be necessary in connection therewith; (iii) set a final hearing as soon as this Court's schedule permits, following 14 days after service of this Motion for approval and entry of a final order; and (v) grant the Debtors such other and further relief as this Court may deem just and proper.

Respectfully submitted this 15th day of June, 2018.

**OKIN ADAMS LLP**

By:     /s/ *Matthew S. Okin*
       Matthew S. Okin
       Texas Bar No. 00784695
       mokin@okinadams.com
       David L. Curry, Jr.
       Texas Bar No. 24065107
       dcurry@okinadams.com
       John Thomas Oldham
       Texas Bar No. 24075429
       joldham@okinadams.com
       Ryan A. O'Connor
       Texas Bar No. 24098190
       roconnor@okinadams.com
       1113 Vine St., Suite 201
       Houston, Texas 77002
       Tel: 713.228.4100
       Fax: 888.865.2118

       **PROPOSED ATTORNEYS FOR THE DEBTORS**

**CERTIFICATE OF ACCURACY PURSUANT TO LOCAL RULE 9013-1(I)**

I hereby certify to the accuracy of the matters set forth in the foregoing motion.

By:    /s/ *David L. Curry, Jr.*
       David L. Curry, Jr.