**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Case No. 18-32106 |
| Erin Energy Corporation, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**OBJECTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO EMERGENCY MOTION**
**PURSUANT TO 11 U.S.C. §§ 105, 361, AND 364 AND FEDERAL BANKRUPTCY**
**RULES 2002, 4001, AND 9004 FOR A FINAL ORDER AUTHORIZING THE**
**DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS**

**[Relates to Docket No. 203]**

The Official Committee of Unsecured Creditors (the "Committee") of the above-captioned debtors (collectively, the "Debtors") hereby objects (the "Objection") to the *Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, and 364 and Federal Bankruptcy Rules 2002, 4001, and 9004 for a Final Order Authorizing the Debtors to Incur Post-Petition Secured Indebtedness* [Docket No. 203] (the "Motion").[2]  In support of the Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The DIP Loan is a bridge to nowhere.  While the DIP Lender may be willing to blindly travel along this bridge, the Committee is not and would prefer to take the next exit – chapter 7.  The Committee submits that the Debtors' assets and pending litigation can effectively

---

[1]     The last four digits of Erin Energy Corporation's federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited; Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited. The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

be administered by a chapter 7 trustee while avoiding the need to incur additional indebtedness, including the millions of dollars required to restart operations.

2.    The DIP Loan is sized to cover the cost of the Debtors' remaining operations (mainly payroll) until the July 6 hearing in Nigeria.  However, ***regardless of the outcome of the hearing, there is no dispute that the Debtors will have insufficient funds to operate after July 13.***  Moreover, the DIP Lender has declined to make any further funds available to the Debtors, regardless of the outcome of the hearing.

3.    Under the circumstances, the DIP Loan provides no measurable benefit to creditors or these estates.  Instead, the proceeds of the DIP Loan will primarily be used to pay management that currently sits in empty offices with nothing to do.  Moreover, the DIP Loan will be secured by unencumbered assets and the DIP Lender will receive a superpriority claim that may be paid from the proceeds of unencumbered assets – effectively stripping away the only meaningful assets available to satisfy general unsecured claims.

4.    The obligations of the DIP Loan will ultimately be borne by the general unsecured creditors.  Whether the DIP Lender is repaid from the proceeds of unencumbered assets or the secured creditors that are primed enforce their superpriority claims against the unencumbered assets, the DIP Loan will ultimately put $1.1 million in obligations ahead of general unsecured creditors.  In addition, the unencumbered assets may be foreclosed upon by the DIP Lender, placing the DIP Lender, an acquaintance of Mr. Lawal, in control of causes of action against the Debtors' directors and officers.

5.    The Committee submits that, under the circumstances, the Motion should be denied and these chapter 11 cases converted to cases under chapter 7 to permit a trustee to

manage the orderly liquidation of the Debtors' assets, regardless of the outcome of the hearing in Nigeria.

## OBJECTION

### A.    Notice of the Motion is Inadequate Under the Circumstances

6.      On Friday afternoon, June 15, 2018, the Debtors filed the Motion.  Pursuant to the Motion, the Debtors seek to have the Motion heard on Tuesday morning, June 19, 2018 (the "DIP Hearing").  Accordingly, the Debtors seek the entry of an order, authorizing the Debtors to grant liens on all of the Debtors' unencumbered assets on 1 business day notice.  More troubling, it appears that the Debtors seek the entry of a final order rather than interim relief.

7.      In the prayer for relief, the Debtors ask the Court to "authorize, on an interim basis, entry of the order submitted herewith authorizing the Debtors to borrow the funds necessary for the interim period . . ."  Motion at p. 15.  However, the form of order annexed to the Motion is a final order and does not contemplate a further hearing.  In addition, nowhere in the Motion do the Debtors define "interim period."  Accordingly, to the extent the Debtors in fact seek emergency interim relief at the DIP Hearing, they have neglected to explain in their motion – or put forth any evidence supporting – how much money they need access to on an emergency basis to avoid irreparable harm.

8.      Bankruptcy Rule 4001(c) requires a minimum of 15 days' notice for a final hearing on a motion for authority to obtain credit.  Although a court may conduct a hearing on shortened notice, in such circumstances, a court "may authorize the obtaining of credit *only to the extent necessary to avoid immediate and irreparable harm* to the estate pending a final hearing."  Bankruptcy Rule 4001(c)(2) (emphasis added).

9.     The Debtors, to the extent they seek interim relief at the DIP Hearing, have failed to provide notice of the form of the interim order and have failed to establish what portion of the proposed financing is necessary to avoid immediate and irreparable harm to the Debtors' estates.

10.     For the foregoing reasons, the Court should deny the Debtors' request for emergency interim relief and schedule the Motion to be heard on a final basis with appropriate notice to all creditors.

**B.      The DIP Loan Delays the Inevitable and Wrestles Control of Unencumbered Assets Away From General Unsecured Creditors**

11.     Throughout these cases, the Committee has only been able to identify three potential sources of recovery for general unsecured creditors: (1) the proceeds of the pending derivative action against the Debtors' directors and officers relating to a 2013 transaction with related parties;[3] (2) the unencumbered assets of the Debtors' wholly owned subsidiary, Erin Energy Gambia Ltd. ("Erin Gambia");[4] and (3) the proceeds of chapter 5 causes of action, including any fraudulent transfers and preference actions (collectively, the "Unencumbered Assets").[5]

12.     The Debtors propose to grant the DIP Lender a first priority perfected lien and security interest in and upon substantially all assets of the Debtors and causes of action, including accounts receivable, commercial tort claims, and the "proceeds of avoidance actions

---

[3]     The derivative action was commenced prepetition in the Delaware Chancery Court by Robert Lenois, on behalf of himself and all other similarly situated stockholders of Erin Energy Corporation, and derivatively on behalf of Erin Energy Corporation against Kase Lukman Lawal, Lee P. Brown, William J. Campbell, J. Kent Friedman, John Hofmeister, Ira Wayne McConnell, Hazel R. O'Learly, and CAMAC Energy Holdings, Limited.  The derivative action asserts that the Debtors' directors and officers breached their fiduciary duty when they authorized the Debtors to purchase certain oil and gas interests in Nigeria from Allied Energy Plc, a company controlled by Kase Lawal, who at the time was also the Debtors' CEO and Chairman.  The plaintiff asserts that the Debtors overpaid for the assets by between $86.2 million and $198.8 million.

[4]     The Debtors' schedules of assets and liabilities [Docket No. 183] (the "Schedules") reflect an intercompany receivable owed from Erin Gambia to Erin Energy Corporation in the approximate amount of $8.5 million.

[5]     The Schedules reflect transfers to insiders within 1 year before the petition date in the approximate amount of $4 million, including nearly $1 million in rent to Mr. Lawal's company, CAMAC International Corporation.

for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code . . ." Motion at pp. 7-8; *see also* Final Order at ¶ 6. In other words, the Debtors propose to grant a first priority lien on the Unencumbered Assets – the only potential source of recovery for general unsecured creditors.

13.     The Debtors will argue that the maximum principal balance of the DIP Loan is only $1.1 million and that any residual value of the Unencumbered Assets will flow to the general unsecured creditors. However, this argument fails for several reasons.

14.     First, as discussed more fully below, the DIP Loan is insufficient to provide the Debtors with any meaningful runway. Accordingly, the Debtors will, more likely than not, default on the DIP Loan and the DIP Lender will foreclose on the Unencumbered Assets ***and control the disposition of the Unencumbered Assets***. For example, it is an event of default if the Debtors make "any payment not provided for in the Budget." Motion at p. 7. On June 13, 2018, the Debtors filed a motion for authority to retain and compensate certain professionals in the ordinary course of business, including its Nigerian counsel, with a monthly cap of $50,000 for each professional. This motion, which the Committee opposes, will be heard at the DIP Hearing. However, the requested fees to be paid to the Debtors' Nigerian counsel are not provided for in the Budget. Accordingly, to the extent the Debtors remit any funds to their Nigerian counsel, it will be an immediate default under the DIP Loan.

15.     The DIP Lender is a current shareholder of the Debtors and his motives for making the DIP Loan are highly suspect. From an objective standpoint, the DIP Loan is not economically rational, as the sources of recovery (other than protracted litigation) are for all practical purposes non-existent at the moment. As the Court is aware, the ownership of the Debtors' purported Nigerian assets is the subject of ongoing litigation in Nigeria. Although there

is a crucial hearing scheduled in Nigeria on July 6, there is no guarantee that there will be a dispositive ruling at that time.  The Nigerian court may take the matter under advisement or may continue the matter, which it has already done once before.  Moreover, even if the Debtors hit a homerun in Nigeria on July 6, the DIP Loan is insufficient for the Debtors to meet their financial needs the following week – let alone enough money to resume operations or sell their assets.  Accordingly, in light of the hair-trigger default provisions contained in the DIP Documents and absolutely no ability of the Debtors to survive beyond July 6 regardless of the outcome of the Nigerian litigation, the Committee fears that the DIP Loan is a veiled attempt to bury the causes of action that exist against insiders, including the Debtors' directors and officers.[6]

16.     Second, assuming the DIP Lender's motives are pure, there is no guarantee that the Unencumbered Assets will generate proceeds in excess of $1.1 million.  For example, the Court previously denied the Debtors' request for use of cash collateral because, among other things, it found that Erin Gambia was insolvent.  *See* May 31 Hrg. Tr. at 73:1-6 ("And I find that it is from the limited testimony I have more likely than not that The Gambian entities are insolvent and that they are unable to pay their debts as they come do without funding from their parent, which doesn't have the money to fund them with.").  To the extent the proceeds of the Unencumbered Assets are less than $1.1 million, the general unsecured creditors will be left with nothing – a risk that is unacceptable to the Committee.  In addition, regardless of whether the proceeds of the Unencumbered Assets exceed $1.1 million, every dollar that is paid from the Unencumbered Assets to the DIP Lender is one less dollar available to pay general unsecured creditors.

---

[6]     Pursuant to the *Notice of Deposition of Gregory Holcombe* [Docket No. 206], the Committee will depose the DIP Lender on June 18, 2018 at 2:00 p.m. (Central Time) to, among other things, investigate the DIP Lender's connections to the Debtors' insiders and motivation behind making the DIP Loan.

17.     Third, as evidenced by the Budget, the DIP Loan is insufficient for the Debtors to survive beyond the second week of July and represents a bridge to nowhere.  The Debtors assert that the DIP Loan is "vital to the Debtors' ability to among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors."  Motion at ¶ 11.  However, the Debtors have terminated a significant amount of their employees, ceased all operations, and have no sources of revenue.  The Committee submits that any prospect of reorganization has, like the Armada Perdana will soon do, sailed away.  Rather than needlessly encumber the Unencumbered Assets to the detriment of general unsecured creditors, these chapter 11 cases should be converted to cases under chapter 7.  Under the circumstances, a chapter 7 trustee can monetize the Unencumbered Assets for the benefit of general unsecured creditors and avoid any further unnecessary and ill-advised expenditures, such as payroll for unutilized employees.

**C.      There Is No Credible Evidence of Equity Value in Encumbered Assets**

18.     The Debtors' remaining assets – primarily interests in two oil mining leases located offshore Nigeria (the "Nigerian Assets") – are encumbered by secured liens granted in favor of two prepetition lenders.  First, the Debtors owe $81.3 million to Zenith Bank PLC (the "Zenith Facility").  The Zenith Facility is secured by first liens in substantially all of Erin Petroleum Nigeria Limited's ("EPNL") assets.  Second the Debtors owe $66.5 million to Mauritius Commercial Bank Limited (the "MCB Facility").  The MCB Facility is secured by second liens upon substantially all of EPNL's assets.

19.     There is no evidence that the value of the Debtors' assets exceed its secured liabilities.  As this Court is aware, the ownership of the Nigerian Assets – the Debtors' only

potential source of revenue at this time – is the subject of pending litigation in Nigeria. Assuming that the Debtors own the Nigerian Assets, the Debtors have not presented any credible valuation of such assets.  In fact, the Debtors have previously represented that, even if the Nigerian court rules in their favor, it will take millions of dollars to restart operations – money that the DIP Lender is not willing to provide.  For example, attached as <u>Exhibit B</u> is the 13-week cash forecast prepared by the Debtors [Docket No. 141-4], which indicates that it costs more than $5 million to bring the oil well back online, not including the significant anticipated cost and expense of the FPSO Armada Perdana (or its replacement).  Moreover, the Debtors have acknowledged on <u>Schedule E</u> of Erin Petroleum Nigeria Limited's schedules of assets and liabilities [Docket No. 186] that various governmental entities hold the following undisputed priority claims:

| Entity | Description | Scheduled Amount |
| --- | --- | --- |
| Federal Government of Nigeria | Royalty Liabilities | $7,688,039.28 |
| Federal Inland Revenue Services | Withholding Taxes | $23,688,369.17 |
| Federal Inland Revenue Services | VAT Taxes | $22,838,776.20 |
| Niger Delta Development Commission | Levy | $8,650,281.80 |
| Nigerian Content Development & Monitoring Board | Nigerian Content Development | $5,072,970.08 |
| **TOTAL:** | | **$67,938,436.53** |

20.    To the extent the Debtors prevail in Nigeria and are allowed to immediately sell the oil onboard the FPSO Armada Perdana, there is no evidence that the Nigerian government, owed more than $67 million, will allow the sale proceeds to leave Nigeria without first satisfying the Nigerian government's undisputed priority claims.

21.    On May 4, 2018, the Debtors filed an emergency motion for authority to use cash collateral on a non-consensual basis.  *See* Docket No. 28.  Although this Court initially permitted

the Debtors to use up to $620,000.00 of cash collateral [Docket No. 55], the Court subsequently found that there is insufficient equity in the Debtors' assets to provide adequate protection to the Debtors' secured lenders and denied the further use of cash collateral.  *See* May 31 Hrg. Tr. at 72:9-73:9.

22.     Since the hearing on May 31, 2018, nothing with respect to the Debtors' assets or operations has changed.  To the extent the Court grants the relief requested in the Motion and authorizes the Debtors to incur the DIP Loan, the Debtors' secured creditors will receive a superpriority claim under section 507(b) of the Bankruptcy Code to the extent of any diminution of value in their collateral.  Section 507(b) grants a secured creditor a superpriority claim, in the amount of any diminution in value of its collateral, ahead of all other unsecured claims (including all administrative expenses).  This superpriority claim may be paid from the proceeds of unencumbered assets.   Under the circumstances, the secured creditors will receive superpriority claims up to the proceeds of the DIP Loan ($1.1 million) and this amount will be paid from unencumbered assets, as there is no evidence of any equity value in the encumbered assets.  Accordingly, to the extent the DIP Lender is able to prime the secured creditors, the cost of doing so is borne by the general unsecured creditors – a cost the Committee believes is unnecessary under the circumstances.

### D.     The Budget Reflects a Lack of Business Judgment

23.     The Motion seeks, among other things, authority to use the proceeds of the DIP Loan pursuant to Budget.  However, the legitimacy of the Budget remains a mystery to the Committee.  For example, the Budget contemplates transfers to non-debtor foreign subsidiaries in excess of $160,000 (or approximately 15% of the DIP Loan).  Moreover, neither the Motion nor the Budget indicates how much the Debtors need on an emergency interim basis to avoid

irreparable harm to these estates.  The following table sets forth the Committee's questions and concerns with respect to the Budget.

| Budget Line Item | Aggregate Amount | Issue |
| --- | --- | --- |
| Misc (Including Travel) | $39,839 | Unknown use.  Need details. |
| Payroll | $323,450 | Payroll includes payments to non-debtor employees.  Debtors have provided the Committee with an explanation for week 1 payroll expenses, but have not identified the purpose of the remaining amount. It is also unknown why the Debtors continue to employ 19 employees, including various human resource and administrative personnel when their operations have effectively been shut down for months. |
| Rents & Utilities | $93,350 | With only 19 employees (only 3 of which are in the United States), it is unknown why this amount is so high.  The Committee has been informed that the Debtors rent space from an affiliate of Mr. Lawal. The Committee is concerned that this line item may reflect payments that will benefit Mr. Lawal in the form of artificially inflated rent. |
| Website & Other Services | $22,000 | Unknown use.  Need details.  If this amount is for routine email and web hosting services, it is extremely suspect. |
| Broker Fees | $85,000 | The Committee has been informed that this amount reflects a potential retainer for an investment banker to facilitate a sale process.  However, the Debtors should not be required to provide a retainer.   Any investment banker retained by these estates may be retained and compensated in accordance with the Bankruptcy Code.  In addition, it is unclear why the Debtors would engage an investment banker prior to the July 6 hearing in Nigeria. |
| Other Misc. | $60,000 | Unknown use. Need details. |
| Ghana Office Lease | $32,000 | The non-debtor Ghana subsidiary has 1 employee. |
| Expenses for Ghana | $45,240 | Significant payment to a non-debtor subsidiary without explanation. |

24.     The issues identified in the table above reflect the nature of these cases in general – a complete lack of diligence, explanation, and trust.  The Budget does not appear to be based on any reasonable business judgment, but instead reflects management's desire to pay themselves while they sit in empty offices with nothing to do.

## <u>CONCLUSION</u>

WHEREFORE, the Committee respectfully requests that this Court deny the relief requested in the Motion and enter an order converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

Dated:   June 18, 2018

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Steven W. Golden*
Jeffrey N. Pomerantz (admitted *pro hac vice*)
Ira D. Kharasch (admitted *pro hac vice*)
Jason H. Rosell (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 227-6910

Steven W. Golden (TX Bar No. 24099681)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700

*Proposed Counsel for the*
*Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing has been served by electronic transmission to all registered ECF users appearing in these cases.

Dated: June 18, 2018
New York, NY

*/s/ Steven W. Golden*
Steven W. Golden