## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Case No. 18-32106 |
| Erin Energy Corporation, *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

### EXPEDITED MOTION OF THE OFFICIAL COMMITTEE
### OF UNSECURED CREDITORS TO CONVERT CASES TO CHAPTER 7

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**THERE WILL BE A HEARING ON THIS MOTION ON JULY 12, 2018 AT 2:00 PM (CENTRAL TIME) IN COURTROOM 404, 515 RUSK, HOUSTON, TX 77002.**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of the above-captioned debtors (collectively, the "<u>Debtors</u>") hereby moves this Court (the "<u>Motion</u>") to

---

[1] The last four digits of Erin Energy Corporation's federal tax identification number are 9798. The other Debtors in these cases are: Erin Energy Limited; Erin Energy Kenya Limited; and Erin Petroleum Nigeria Limited. The Debtors' service address is: 1330 Post Oak Blvd., Suite 2250, Houston, TX 77056.

convert these chapter 11 cases to cases under chapter 7 pursuant to section 1112(b) of Title 11 of the United States Code (the "Bankruptcy Code"). In support of the Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. "Cause" exists to convert these cases to cases under chapter 7 because the Debtors have experienced substantial and continuing losses and it's unlikely that the Debtors' business can be rehabilitated. Indeed, the following facts are undisputed:

- The Debtors have virtually no cash (other than the four-week lifeline provided by the interim debtor-in-possession financing);

- The Debtors' previous motion for the use of cash collateral was denied;

- The Debtors have not generated any revenue since the fall of 2017;

- The Debtors have incurred millions of dollars of monthly expenses during these cases, generating substantial losses;

- The Debtors have not been profitable, and have experienced continuing losses, since at least 2016;

- According to the Debtors' financial advisor, the Debtors will not have any third-party financing in place on July 6, and will not engage in substantive discussions concerning possible financing prior to that time;

- The Debtors' prior business plan (presented on May 28 in connection with the Cash Collateral Motion, but apparently abandoned) was built on a series of flawed assumptions and was not credible; and

- Even if the Debtors prevail in the litigation pending in Nigeria on July 6, disputes over title to the assets may remain, preventing any sale of such assets.

2. The Debtors have no viable path forward and should not be permitted to gamble with creditors' money. For these reasons, and for those that will be established at trial, the Motion should be granted.

---

[2] The Motion is based on the factual record that currently exists. The Committee reserves the right to supplement the Motion after it receives the Debtors' amended or restated forecasts and/or business plan and completes all factual and expert discovery.

**JURISDICTION AND VENUE**

3.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The statutory basis for the relief requested herein is section 1112(b) of the Bankruptcy Code.

**PROCEDURAL BACKGROUND**

6.     On April 25, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

7.     On May 16, 2018, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee, as reconstituted on May 30, 2018, consists of the following five (5) members: (i) Baker Hughes; (ii) Schlumberger Overseas S.A.; (iii) Transocean Offshore Gulf of Guinea VII; (iv) AOS Orwell Limited; and (v) Armada Oyo Limited.

**A.     The Debtors' Assets and Liabilities**

8.     The Debtors' operational assets were largely owned by Debtor Erin Petroleum Nigeria Ltd. ("EPNL"), and fall into three categories: (i) interests in Nigerian offshore oil leases (the "Nigerian Assets"), the Debtors' ownership of which, as discussed below, is heavily contested; (ii) an intercompany receivable of $8.5 million owed to Debtor Erin Energy

Corporation by non-Debtor Erin Energy Gambia Ltd.; and (iii) the proceeds of pending and potential causes of action, including a derivative action pending against certain of the Debtors' former directors and officers, a direct action against Public Investment Corp. Soc. Ltd. ("PIC"), and chapter 5 causes of action, including fraudulent and preferential transfers.

9.  The Debtors also have substantial liabilities, including (i) $81.3 million owed under a secured term credit facility (the "Zenith Facility") to Zenith Bank Plc. ("Zenith"); (ii) $66.5 million owed under a secured facility (the "MCB Facility") to PIC, as assignee of Mauritius Commercial Bank Ltd.; and (iii) over $742 million in unsecured debt. The Zenith Facility is secured by first priority liens on substantially all of EPNL's assets, and the MCB Facility is secured by second priority liens on substantially all of EPNL's assets.

B.  **The Cash Collateral Motion**

10. On May 4, 2018, the Debtors filed the *Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code; (II) Granting Adequate Protection for the Use Thereof; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 as to Use of Cash Collateral* [Dkt. No. 28] (the "Cash Collateral Motion").

11. On May 9, 2018, the Court entered its *Cash Collateral Order* [Dkt. No. 55], allowing the Debtors' interim use of $620,000 of cash collateral through May 23, 2018.[3] On May 31, 2018, however, following further proceedings, the Court denied the Debtors' further use of cash collateral. *See* May 31 Hrg. Tr. at 72:9 – 74:10.

---

[3] The Court's interim cash collateral order was clarified by way of its *Amended Cash Collateral Order* [Dkt. No. 113].

C.     **The DIP Loan**

12.    On June 15, 2018, the Debtors filed their *Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, and 364 and Federal Bankruptcy Rules 2002, 4001, and 9004 for a Final Order Authorizing the Debtors to Incur Post-Petition Secured Indebtedness* [Dkt. No. 203] (the "DIP Motion"), seeking this Court's approval of $1.1 million of short-term debtor-in-possession financing.

13.    On June 25, 2018, the Court entered its *Interim Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing; and (II) Modifying the Automatic Stay* [Dkt. No. 247] (the "Interim DIP Order").  Pursuant to the Interim DIP Order, the Debtors were authorized to borrow up to $642,000 on an interim basis from Gregory Holcombe, subject to the terms and conditions set forth in the Interim DIP Order.  The final hearing on the DIP Motion will occur when the Motion is heard.

D.     **The Nigerian Proceedings**[4]

14.    As the Court is aware, the Debtors have been embroiled in various legal proceedings pending in the Republic of Nigeria.  After receiving an arbitration award (the "Arbitration Award") against Allied Energy Plc. ("Allied") and CAMAC International (Nigeria) Limited ("CINL"), Nigerian Agip Exploration Ltd. ("NAEL") sought to enforce the Arbitration Award in Nigeria.  In May 2017, the Federal High Court, Holden at Lagos, Nigeria (the "Nigerian Court") issued an order enforcing the Arbitration Award in Nigeria (the "Enforcement Order").  Allied and CINL applied to set aside the Enforcement Order, which the Nigerian Court

---

[4] The Committee's understanding of the numerous interrelated legal proceedings currently pending in Nigeria come from, *inter alia*, the *Declaration of Sakiru Adefemi (Femi) Ayoade in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 5], and the *Declaration of Adedolapo A. Akinrele, Senior Advocate of Nigeria* (the "Akinrele Declaration") [Dkt. No. 222], as the Committee has not retained separate Nigerian counsel.

denied.[5] On January 23, 2018, the Nigerian Court issued a Writ of Attachment and Sale of Goods (the "Writ of Attachment") against Allied and CINL, which granted NAEL the right to pursue the assets of Allied and CINL located "within the Lagos Judicial Division." Just over a week later, on January 31, NAEL landed a helicopter on the FPSO Armada Perdana (the "FPSO"), and prevented the oil being stored on the FPSO from being offloaded.

15. Before the Writ of Attachment was issued, Allied and CINL appealed the Enforcement Order (the "Nigerian Appeal") with a motion for a stay of execution before the Nigerian Federal Court of Appeal (the "Court of Appeal"). On May 24, 2018, the Court of Appeal adjourned the Nigerian Appeal to a future date.

16. On March 2, 2018, Debtor EPNL filed a motion with the Nigerian Court to join the Writ Litigation (the "EPNL Motion"). EPNL seeks to set aside the Writ of Attachment based on its contention that it owns the oil on the FPSO—not CINL or Allied—such that the enforcement of the Writ of Attachment against the FPSO was improper. A hearing in the Writ Litigation concerning the EPNL Motion was originally scheduled for May 22, 2018, but was continued until July 6, 2018.[6]

17. Because there are both procedural and substantive challenges to the Writ of Attachment, it is possible that the Writ of Attachment is vacated on procedural grounds without resolution of the substantive dispute over title. Such a result would likely prevent the Debtors from selling or otherwise monetizing the assets until the cloud over title was removed.

---

[5] The litigation pending in the Nigerian Court concerning the Writ of Attachment is referred to herein as the "Writ Litigation").

[6] Separately, on June 1, 2018, the Nigerian Department of Petroleum Resources (the "DPR") filed an interpleader motion with the Nigerian Court (the "Nigerian Interpleader"). In the Nigerian Interpleader, the DPR seeks an order mandating the release of the oil stored on the FPSO. A hearing with respect to the Nigerian Interpleader is scheduled for July 6, 2018. *See Akinrele Declaration*, at ¶ 7(a).

E.   **Bumi Armada's Lift Stay Motion and the FPSO**

18.   On May 14, 2018, Armada Oyo Ltd. and Bumi Armada (Singapore) Pte. Ltd. (collectively, "Bumi Armada") filed their *Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. for an Order Pursuant to Sections 105(a), 362(d)(1), and 363(e) of the Bankruptcy Code Modifying the Automatic Stay and Granting Related Relief* [Dkt. No. 69] (the "Stay Relief Motion"), and the related *Emergency Motion of Armada Oyo Limited and Bumi Armada (Singapore) Pte. Ltd. to Compel Assumption or Rejection of Executory Contracts Pursuant to Sections 105(a), 105(d)(2), and 365(d)(2) of the Bankruptcy Code* [Dkt. No. 71] (the "Assumption Motion"). Bumi Armada, the owner of the FPSO, asserts that it is incurring monthly costs of at least $1 million to provide critical services to the FPSO on behalf of the Debtors, and the Debtors have also not been paying the nearly $4 million per month required under their contract with Bumi Armada.

19.   The Court carried forward the Stay Relief Motion and the Assumption Motion to June 19 (and subsequently carried those motions forward to July 17, 2018). Critically, the Court also entered an "interim order for adequate protection granting Armada Oyo Limited and Bumi Armada (Singapore) PTE. Ltd. a first lien on the oil aboard the FPSO Armada Perdana." Courtroom Minutes, May 30, 2018.

20.   If the Assumption Motion is granted, the Debtors will be required to make aggregate cure payments of at least $128 million to Bumi Armada as a condition to assuming their contracts. *See* May 29, 2018 Hrg. Tr. at 70:19 – 25; *Declaration of James Oliver Ellis* [Dkt. No. 70], at ¶ 41. Given the Debtors' precarious financial condition and lack of capital, the Debtors will likely be forced to reject its contract with Bumi Armada. According to the Debtors' financial advisor, the Debtors will need at least six months to replace Bumi Armada. *See* May

29, 2018 Hrg. Tr. at 41:19 – 42:2; 59:10 – 24.  Significantly, the Court has already permitted Bumi Armada to take all steps to demobilize the FPSO up to but not including disconnecting the FPSO from the Oyo Field.  Should the Court grant the Stay Relief Motion at the July 17 hearing, the FPSO will be permitted to disconnect from the Oyo Field.

## ARGUMENT

21. Section 1112(b) of the Bankruptcy Code provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, upon cause . . ." 11 U.S.C. § 1112(b)(1).

22. Section 1112(b)(4) of the Bankruptcy Code lists non-exclusive grounds that constitute "cause" for dismissal.  *See e.g. In re Irasel Sand, LLC*, 569 B.R. 433, 439 (Bankr. S.D. Tex. 2017); *see also Matter of Koerner*, 800 F.2d 1358, 1367 (5th Cir. 1986).  Cause exists to dismiss these bankruptcy cases because there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  Section 1112(b)(4)(A) involves a two-pronged analysis:  "First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains.  Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing." *Nester v. Gateway Access Solutions, Inc.* (*In re Gateway Access Solutions, Inc.*), 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007); *see also In re TMT Procurement Corp.*, 534 B.R. 912, 919 (Bankr. S.D. Tex. 2015).

A. **There is Both a Substantial and Continuing Loss to the Estates**[7]

23. With respect to the first prong of the test—"substantial or continuing loss to or diminution of the estate"—a party need only demonstrate substantial *or* continuing loss, but need not demonstrate both. *TMT*, 534 B.R. at 918. Nevertheless, the Debtors have already admitted to both elements.

24. Specifically, at the recent hearing on the DIP Motion, the Debtors' financial advisor admitted that the Debtors have not generated any revenue since the fall of 2017. June 19 Hrg. Tr. at 120:7-19. Yet, the Debtors are accumulating millions of dollars of obligations per month, including administrative expenses in the form of, *inter alia*, professional fees and amounts owed to Bumi Armada. Accordingly, the Debtors clearly have had sustained substantial losses.[8]

25. Moreover, the Debtors' losses have continued for years. Indeed, the Debtors' financial advisor admitted that the Debtors were not profitable in 2016, 2017, or 2018, and could not recall the last year the Debtors earned a profit.[9] June 19 Hrg. Tr. at 121:11-122:17. In evaluating whether a loss is "continuing," a court should "look beyond a debtor's financial statement and make a full evaluation of the present condition of the estate." *In re Moore Construction, Inc.*, 206 B.R. 436, 437-38 (Bankr. N.D. Tex. 1997). As discussed in more detail

---

[7] The Committee incorporates paragraphs 30 to 37 of the *Motion of Public Investment Corporation Soc Ltd. for Dismissal, Abstention, or Conversion Under 11 U.S.C. § 305(a)(1) and 1112(b)* [Dkt. No. 142] as if fully set forth herein.

[8] A substantial loss is one that "is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors." *Id.* "[A]ny negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of [continuing loss to or diminution of the estate]." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004); *see also TMT*, 534 B.R. at 918.

[9] Indeed, the Debtors were not only unprofitable during this period, but were in default under the contracts with their largest service provider, Bumi Armada, since 2014 (contracts that required the Debtors to pay millions of dollars each month). June 19 Hrg. Tr. at 160:2 – 161:4.

below, the Debtors' present condition shows that their losses are likely to continue regardless of the outcome of the Writ Litigation.

### B.     The Debtors Have No Reasonable Likelihood of Rehabilitation

26.     The evidence will establish that the Debtors losses are likely to continue because there is no "reasonable likelihood of rehabilitation" of the Debtors' businesses.  "Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516 (citing *In re Gonic Realty Trust*, 909 F.2d 624, 627 (1st Cir. 1990)); *In re The Ledges Apartments*, 58 B.R. 84, 87 (Bankr. D. Vt. 1986); *In re Wright Air Lines, Inc.*, 51 B.R. 96, 100 (Bankr. N.D. Ohio 1985)).

27.     The Debtors have no realistic chance to restore the viability of their businesses because the Debtors' business plan is based on a series of far-fetched assumptions that, taken together, show that the plan is not credible, let alone viable.[10]

28.     As a threshold matter, the Plan contemplated two specific revenue sources to fund the restart of the Debtors' operations.  First, the Debtors assumed that they would be able to use $9.4 million in cash collateral.  But as the Debtors' financial advisor has admitted, the Court already denied the Cash Collateral Motion, and the Debtors will not be able to use the cash collateral unless there's either a successful motion or the secured lenders consent (and no negotiations concerning the use of cash collateral had occurred as of the hearing on the DIP Motion).  June 19 Hrg. Tr. 133:23-135:1, 136:18-22.

---

[10]     The Debtors presented a 13-week forecast in connection with the Cash Collateral Motion (the "Business Plan").  During the hearing on the DIP Motion, the Debtors' financial advisor suggested that the Debtors had abandoned the Business Plan, but the Debtors offered no alternative.  In the absence of an alternative business plan, the Debtors cannot show a "reasonable likelihood of rehabilitation."  To remove any doubt, for the reasons above, the Business Plan provides no realistic path forward.

### a. The Outcome of the July 6 Hearing is Speculative

29. The Debtors' Business Plan also assumed that they would prevail in the Writ Litigation, quickly sell the oil, and use $27 million in net proceeds as the second revenue source to fund the restart of operations. *Id.* at 122:18-123:9; 133:18-22. But the outcome of the July 6 hearing is speculative, and may not even resolve the underlying dispute over title to the Nigerian assets. In fact, the Nigerian Court may not issue a decision on July 6. *Id.* at 130:23-131:11. According to Bumi Armada's Nigerian counsel, it is unlikely that the Nigerian Court will make any decision related to the Writ Litigation or the Nigerian Interpleader until the Court of Appeals decides the case before it. *See Akinrele Declaration*, at ¶¶ 6(h), 7(f). If the Nigerian Court does not render a decision on July 6, the Debtors will remain in bankruptcy without any operations or cash flow.

30. If the Nigerian Court rules against EPNL on July 6, the Debtors will have no prospect of obtaining clean title to the Nigerian Assets. By the Debtors' own admission, the Nigerian Assets are their most critical. *See Debtors' Emergency Motion for the Entry of an Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Enforcing and Restating Automatic Stay* [Dkt. No. 8], at ¶ 8. Thus, if EPNL does not prevail on July 6, then the Debtors' Business Plan will fail and the Debtors will be unable to reorganize. June 19 Hrg. Tr. at 123:2-16.

31. Indeed, the Debtors could "prevail" in the Writ Litigation without reaping any economic benefit. For example, the Nigerian Court could vacate the Writ of Attachment on procedural grounds without addressing or resolving the dispute as to title. In that event, the Debtors would likely be prevented from selling the oil until that dispute is resolved.

### b. The Debtors Have No Reasonable Likelihood of Rehabilitation Even Assuming a "Complete Victory" on July 6

32. Even if the Nigerian Court issued a ruling on July 6 that allowed the oil aboard the FPSO to be offloaded and monetized, the proceeds from the sale of that oil are subject to substantial liens, and there is no evidence that the Debtors can provide adequate protection to their secured creditors. As the Court is aware, the Debtors owe $81.3 million under the Zenith Facility, which is secured by first liens in substantially all of EPNL's assets, including the oil aboard the FPSO. The Debtors also owe $66.5 million to PIC, on account of the MCB Facility, which is secured by second liens upon substantially all of EPNL's assets. Finally, the Court has also granted Bumi Armada a "first lien on the oil aboard the FPSO Armada Perdana."

33. As the Court has already found, there is insufficient equity in the Debtors' assets to provide adequate protection to the Debtors' secured lenders. *See* May 31 Hrg. Tr. at 72:9-73:9. Further, the Debtors have not come to any agreement with either of Zenith, PIC or Bumi Armada that would enable them to use cash collateral. *See, e.g.,* May 29, 2018 Hrg. Tr. at 71:2 – 19. Accordingly, even if the Debtors were able to take title to and then monetize the oil currently on board the FPSO, the Debtors could not use the proceeds to fund operations without providing adequate protection or gaining the secured lenders' consent – a request previously denied. June 19 Hrg. Tr. at 133:23-135:1; 136:18-22.

34. Finally, as the Debtors acknowledge on Schedule E of EPNL's schedules of assets and liabilities [Dkt. No. 186], the Debtors owe nearly $68 million to various Nigerian governmental entities. To date, the Debtors have proffered no evidence that the Nigerian

government would allow the sale proceeds to leave Nigeria without first satisfying the Nigerian government's undisputed priority claims.[11]

### c. The Debtors Do Not Have a Viable Business Plan

35. Even if the Debtors (a) received a favorable and final ruling on July 6 that eliminated any cloud to title over the oil, and (b) found a way to provide adequate protection or gain the consent of secured lenders who previously opposed the use of cash collateral, the Debtors would have no viable business plan.

36. First, the Debtors need a vessel capable of extracting oil out of the Oyo Field. Currently, the FPSO fills that role, however, as discussed above, Bumi Armada, the owner of the FPSO, has been granted relief by this Court to prepare the vessel for demobilization. If the FPSO is, in fact, fully demobilized and disconnected from the Oyo Field, it will take at least six to twelve months and millions of dollars to find and mobilize a replacement vessel that would allow the Debtors to restart their operations, if the Debtors could even find such a vessel. *See* May 29, 2018 Hrg. Tr. at 41:19 – 42:2; 59:10 – 24.

37. Second, even if Bumi Armada remained on site, the Committee will offer fact and expert testimony to establish that the Debtors cannot profitably run their operations and that there is otherwise no reasonable likelihood that the Debtors' business can be rehabilitated.[12]

38. Finally, the Debtors have previously suggested that they might use the value of a non-debtor subsidiary domiciled in Gambia as a potential source of funding. This suggestion is not credible insofar as (a) this Court has already determined that the non-debtor entity is

---

[11] The Debtors previously contended that there was an informal "understanding" with the Nigerian government as to these amounts. May 29, 2018 Hrg. Tr. at 67:18 – 69:7. The Court should not credit such contentions without admissible evidence to support them.

[12] The Committee will review the Debtors' business plan to make sure it adequately provides expenses to cover all health, safety, security and environmental risks and potential liabilities.

insolvent (May 31 Hrg. Tr. 72:9-17), and (b) the underlying assets are subject to foreclosure proceedings by the Gambian government on account of unpaid tax obligations.

## EXPEDITED RELIEF

39. At the hearing on June 19, 2018, the Court scheduled this Motion to be heard on July 12, 2018. No party objected and no party will be prejudiced by the expedited relief requested as (i) all parties knew that this Motion would be filed and heard at the July 12, 2018 hearing, (ii) the arguments made in this Motion have been previously made by the Committee and other parties, including in the *Objection of the Official Committee of Unsecured Creditors to Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, and 364 and Federal Bankruptcy Rules 2002, 4001, and 9004 for a Final Order Authorizing the Debtors to Incur Post-Petition Secured Indebtedness* [Dkt. No. 218] and in open Court, and (iii) parties are being served with this Motion with 15 days' notice.

## NOTICE

40. Notice of this Motion will be provided to: (a) counsel to the Debtors; (b) the Office of the United States Trustee for the Southern District of Texas; (c) counsel to the Debtors' secured creditors; and (d) the parties listed on the Debtors' Master Service List. The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court enter an order converting these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

| | |
|---|---|
| Dated:   June 27, 2018 | PACHULSKI STANG ZIEHL & JONES LLP |
| | |
| | */s/Steven W. Golden* |
| | Jeffrey N. Pomerantz (admitted *pro hac vice*) |
| | Ira D. Kharasch (admitted *pro hac vice*) |
| | John A. Morris (admitted *pro hac vice*) |
| | Jason H. Rosell (admitted *pro hac vice*) |
| | 10100 Santa Monica Boulevard, 13th Floor |
| | Los Angeles, CA 90067 |
| | Telephone:  (310) 227-6910 |
| | |
| | Steven W. Golden (TX Bar No. 24099681) |
| | 780 Third Avenue, 34th Floor |
| | New York, NY 10017 |
| | Telephone:  (212) 561-7700 |
| | |
| | *Proposed Counsel for the* |
| | *Official Committee of Unsecured Creditors* |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served by electronic transmission to all registered ECF users appearing in these cases.

Dated: June 27, 2018
New York, NY                    */s/ Steven W. Golden*
                                Steven W. Golden

## CERTIFICATE OF ACCURACY

Pursuant to Local Rule 9013-1(i), I hereby certify to the accuracy of the matters set forth in the foregoing Motion.

Dated: June 27, 2018
New York, NY                    */s/ Steven W. Golden*
                                Steven W. Golden