## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 7** |
| **ERIN ENERGY CORPORATION, *et al.*,** | § | |
| | § | **Case No. 18-32106** |
| | § | |
| Debtors[1] | § | **(Jointly Administered)** |

## OBJECTION OF THE RECEIVER/MANAGER TO THE MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST (I) THE DEPARTMENT OF PETROLEUM RESOURCES OF THE GOVERNMENT OF NIGERIA, AND (II) THE NIGERIAN MANAGER/RECEIVER, FOR ACTUAL DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY AND THE CRUDE OIL ORDER, PUNITIVE DAMAGES AND FEES AND COSTS PURSUANT TO BANKRUPTCY CODE §§ 105, 362, 541, AND BANKRUPTCY RULE 9014
### [Ref. Doc. No. 594]

TO THE HONORABLE MARVIN ISGUR, UNITED STATES BANKRUPTCY JUDGE:

Comes now Chuma Maduekwe, the receiver/manager (the "R/M") for Erin Petroleum Nigeria Limited ("EPNL"), and files this objection (the "Objection") to the *Motion to Enforce the Automatic Stay Against (I) the Department of Petroleum Resources of the Government of Nigeria, and (II) the Nigerian Manager/Receiver, for Actual Damages for Violation of the Automatic Stay and the Crude Oil Order, Punitive Damages and Fees and Costs Pursuant to Bankruptcy Code §§ 105, 362, 541, and Bankruptcy Rule 9014* [Doc. No. 594] (the "Motion") filed by Ronald J. Sommers, chapter 7 trustee (the "Trustee") for the Debtors, Kasowitz Benson Torres, LLP, Diamond McCarthy LLP, Stout LLP, and Moyes & Co. (collectively, the "Movants"). In further support of the Motion, the R/M respectfully states as follows:

---

[1] The debtors in these chapter 7 cases (the "Chapter 7 Case(s)"), for which joint administration has been granted, include:  Erin Energy Corporation ("ERN"), Erin Energy Limited ("EEL"); Erin Energy Kenya Limited ("EEKL"); and Erin Petroleum Nigeria Limited (collectively, the "Debtors").  The Chapter 7 Trustee's service address is Nathan Sommers Jacobs, 2800 Post Oak Blvd., #6100, Houston, TX 77056.

## I.   <u>PRELIMINARY STATEMENT</u>[2]

1.      The R/M files this Objection because the Movants have baselessly accused the R/M of violating the automatic stay and the Crude Oil Order.  Since his appointment, the R/M has complied with Zenith's irrevocable instruction to exercise control and dominion over only the Abandoned Property.  The R/M has taken considerable steps to work with the Nigerian Parties and sell the Crude Oil in a manner consistent with the Crude Oil Order, which expressly contemplates compliance with applicable Nigerian law.  The R/M shares the Movants' disappointment that the Proceeds have not been made available for disbursement to all of the Parties according to the agreed upon distribution waterfall provided for in the Crude Oil Order.

2.      The R/M requests that the Court deny the Motion with respect to the R/M because the Court lacks jurisdiction over the R/M.  The R/M has not appeared in the Chapter 7 Cases and does not consent to the jurisdiction of the Court by filing this Objection.  The R/M has not filed a proof of claim.  The R/M is not a signatory to the Crude Oil Order.  The Movants did not properly serve the R/M with the Motion.  Moreover, because the Movants have not properly served the R/M, the Court does not have the power to enter the relief against the R/M as requested in the Motion.

3.      In the Motion, the Movants assert that the DPR has taken numerous actions that are alleged to have violated the automatic stay and the Crude Oil Order.  The R/M has neither taken, nor do the Movants allege that the R/M has taken, any actions that violate the automatic stay or the Crude Oil Order.  The R/M has consistently: (i) worked with the Nigerian Parties to enforce the Crude Oil Order in Nigeria, (ii) attempted to sell the Crude Oil, and (iii) attempted to distribute

---

[2] Capitalized terms used in this Preliminary Statement but not defined herein shall have the meanings ascribed to such terms below.

4816-7323-4338 v.11

the Proceeds.  Moreover, the R/M received notice that the DPR cancelled the OMLs and has allegedly executed a contract to sell the Crude Oil.  Because of the DPR's actions, the R/M commenced injunction proceedings in Nigeria against the DPR.  For these reasons, the R/M respectfully requests that the Court, to the extent that the Court has jurisdiction over the R/M, deny the Motion with respect to the R/M.

## II.    **JURISDICTION**

4.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has subject matter jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. §157(b).

5.    The R/M respectfully asserts that the Court does not have personal jurisdiction over him.  The R/M is not consenting to the jurisdiction of this Court and is in no way waiving any jurisdictional defenses to or defects of the Motion.  The R/M files the Objection only to the extent that the Court determines that it has jurisdiction over the R/M.

## III.   **BACKGROUND**

A.    **The Bankruptcy Cases and the Crude Oil Order**

6.    On April 25, 2018 (the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code.  On July 13, 2018, the Court converted the chapter 11 cases to the Chapter 7 Cases.

7.    On July 13, 2018, the United States Trustee appointed the Trustee.

8.    On October 18, 2018, the Trustee filed the *Notice of Trustee's Proposed Abandonment of Property* [Doc. No. 471] (the "Crude Oil Abandonment Notice").  Pursuant to the Crude Oil Abandonment Notice, the Trustee provided notice of his abandonment of:

> [A]ny and all interests of EPNL's bankruptcy estate (the "Estate"), if any, in (i) the Crude Oil ("Crude Oil") detailed in Question 21 to Part 5 of the

SOFA [Docket No. 186, p. 4 of 64] and produced and discharged into the Vessel FPSO Armada Perdana (IMO: 8302131; MMSI: 352916000) located on Latitude: 05º 23' 16.66 N and Longitude: 04º 35' 29.35 E at a water depth of 350 meters to 400 meters in the Oil Mining Lease 120 (the "FPSO") and therein held and kept in the tanks on board the FPSO; (ii) the Production Sharing Contract, dated July 22, 2005 (as may have been amended, the "PSC"), (iii) the Oil Mining Leases 120 and 121; (iv) seismic data detailed in Question 60 to Part 10 of the SOFA; (v) all offshore equipment located in Nigeria that is not onboard the FPSO; and (vi) all of EPNL's personal property onboard the FPSO (collectively, the "Abandoned Property") pursuant to the proposed order that is agreed upon in form and substance by the Parties . . . .

Crude Oil Abandonment Order, ¶ 4.

9.      On October 18, 2018, the Court entered the *Order (I) Approving Abandonment of Property and (II) Lifting the Automatic Stay on Such Abandoned Property* [Doc. No. 470] (the "Crude Oil Order").  The following provisions of the Crude Oil Order are particularly relevant to the Motion and the Objection:

- The Court authorized the Trustee to abandon the Estates' interests in the Abandoned Property.  *See* Crude Oil Order, ¶ 1.

- The Court modified the automatic stay "to the extent applicable" to allow Zenith Bank Plc ("Zenith") "to exercise all remedies, if any, against or in respect of the Abandoned Property, including without limitation to appoint a receiver/manager."  *Id.* at ¶ 2.

- The Court authorized a distribution waterfall for the proceeds of the Crude Oil, contemplated and approved by all of the Parties,[3] that was intended to occur after "the Receiver/Manager sells the Crude Oil, ***pursuant to applicable Nigerian law.***"  *Id.* at ¶ 3 (emphasis added).

10.      Counsel for each of the Parties agreed to the form and substance of the Crude Oil Order.  *See* Crude Oil Order, pp. 5–6.  The R/M was not a party to and did not sign the Crude Oil Order.

---

[3] Any reference to the "Parties" shall mean collectively Bumi, Zenith, NAE, PIC, and the Trustee as each are defined in the Crude Oil Order.  The "Nigerian Parties" shall mean the Parties, except for the Trustee.

**B.**     **Appointment of the R/M**

11.     On October 23, 2018, Zenith presented the Deed of Appointment of Receiver/Manager (the "Deed of Appointment") for filing to the Corporate Affairs Commission (the "CAC") in Nigeria.  Pursuant to the Deed of Appointment, Zenith appointed the R/M as the receiver/manager over EPNL as of October 22, 2018.[4]  *See also Notice of Zenith Bank Plc's Appointment of Receiver/Manager* [Doc. No. 484].  On October 24, 2018, the CAC registered the Deed of Appointment.  *See* Doc. No. 484-1, p. 2.  The Deed of Appointment provides that the R/M's duties include, among other things to:  (i) "sell the Crude Oil on board the FPSO. . ."; (ii) "appoint or consult with any party in the course of the Receiver/Manager's duties with a view to effectively discharging the duties"; and (iii) "make any arrangements or compromise which the Receiver/Manager shall think expedient."  Deed of Appointment, ¶¶ (c), (f), and (l).

12.     On October 23, 2018, Zenith sent a letter to the R/M irrevocably instructing the R/M not to exercise any control or dominion over any asset that is not Abandoned Property, pursuant to the Crude Oil Order. *See* Doc. No. 484-2.

**C.**     **Steps Taken to Sell the Crude Oil Pursuant to Applicable Nigerian Law**

13.     On November 1, 2018, the R/M sent e-mail correspondence to the Parties regarding his proposed process to sell the Crude Oil in a manner consistent with Nigerian Law.  The R/M explained that he was contacting the relevant Parties for assistance in locating a buyer.  Moreover, because any sale of the Crude Oil necessarily required the approval and assistance of the

---

[4] On October 22, 2018, Zenith also appointed the R/M as the receiver/manager over Allied Energy Plc (In-Receivership) ("Allied").  In such capacity, the R/M is referred to herein as the "Allied R/M."

Department of Petroleum Resources (the "DPR"),[5] the R/M explained that he was working with Nigerian counsel for Bumi to contact the DPR regarding the sale.

14.     Based on all of the information known at the time and the advice of Nigerian counsel, the Nigerian Parties collectively determined that the most efficient way to sell the Crude Oil was to use an existing lawsuit pending in Nigeria regarding the Crude Oil, rather than initiating a new lawsuit, to obtain approval of the sale of the Crude Oil by the Nigerian Federal High Court (as defined below).  The Nigerian Parties worked collectively to propose a form of order to file in in the Interpleader Proceeding (as defined below) pending before the Nigerian Federal High Court that tracked the distribution waterfall set forth in the Crude Oil Order which would be filed as a consent judgment (the "Nigerian Enforcement Pleading").  As a result, the Nigerian Parties agreed on the form of the Nigerian Enforcement Pleading.  Despite substantial efforts, the Nigerian Parties could not obtain the DPR's approval for filing the Nigerian Enforcement Pleading.

15.     The R/M, together with the other Nigerian Parties, met with the DPR over the course of many months to resolve the DPR's concerns regarding the sale of the Crude Oil and the Nigerian Enforcement Pleading.  The following matters continued to prevent the Nigerian Parties from filing the Nigerian Enforcement Pleading:  (i) DPR's demand for the payment of alleged outstanding royalties exceeding USD $35 million, (ii) the Nigerian Parties' determination of how to treat the Restart Escrow Allocation per paragraph four (4) of the Crude Oil Order because the Crude Oil was not sold before November 30, 2018, (iii) DPR's denial to agree to the form of the Nigerian Enforcement Pleading, (iv) DPR's refusal to provide the Nigerian Parties with regulatory approvals to conduct the offtake, and (v) DPR's cancellation of the OMLs.

_____

[5] Nigerian law provides that "no person shall import, store, sell or distribute any petroleum products in Nigeria without a license granted by the [Petroleum] Minister."  *See* Section 4(1), Petroleum Act, Chapter 350 LFN 1990.  The Petroleum Minister (as defined herein), as an administrative procedure, carries out this process for the DPR.

D.    **Litigation in Nigeria**

    *i.    The DPR Cancels the OMLs*

16.    The R/M does not dispute the Trustee's allegations that the DPR has taken actions that have frustrated the attempt to sell the Crude Oil, distribute the proceeds from the sale of the Crude Oil (the "Proceeds"), and restart the Oyo fields.[6]  The R/M, however, has not consented to or assisted the DPR in such actions.  On the contrary, the R/M has taken significant steps to enjoin the DPR's actions and enforce the Crude Oil Order in Nigeria.

17.    On March 25, 2019, the Nigerian Ministry of Petroleum Resources (the "Petroleum Minister") and the DPR sent a letter (the "March 25 Letter") to the Allied R/M regarding the Oil Mining Leases 120 and 121 located in the Oyo fields (collectively, the "OMLs").[7]  In this letter, the DPR provided the Allied R/M with notice that "pursuant to the Petroleum Act, Cap P10 LFN 2004, the Honourable Minister of Petroleum Resources has approved the revocation of OMLs 120 and 121 for failure to pay the outstanding Oil Royalty and Gas Flared Penalties in the sum of USD$35,748,264.82. . . ."  A copy of the March 25 Letter is attached hereto as **Exhibit 1**.

18.    On April 24, 2019, Dolapo Akinrele, counsel for Bumi, sent e-mail correspondence to the R/M informing the R/M that Bumi would demobilize the FPSO by June 30, 2019.  Mr. Akinrele advised the R/M to remove any equipment, or else Bumi would consider the equipment abandoned.[8]

---

[6] The R/M does not contend herein that these actions gave rise to a violation of the automatic stay or the Crude Oil Order.

[7] The ownership of the OMLs is disputed and is subject to litigation in Nigeria.  *See e.g., infra* note 9.

[8] The R/M does not contend herein that these actions gave rise to a violation of the automatic stay or the Crude Oil Order.

4816-7323-4338 v.11

*ii.*   ***The R/M Seeks to Enjoin the DPR, Bumi, and other Nigerian Parties from Taking Actions Adverse to the Crude Oil Order***

19.     After the Nigerian Parties' out of court attempts to resolve the issues with the DPR failed, on May 7, 2019, the R/M, in his capacity as the receiver/manager of both Allied and EPNL (collectively, the "Injunction Plaintiffs"), filed the *Motion on Notice*, *Motion Exparte,* and *Statement of Claim* (such pleadings, taken together, the "Injunction Motion") in the Federal High Court of Nigeria, Holden at Lagos (the "Nigeria Federal High Court").   The Injunction Motion initiated suit number FHC/L/CS/748/2019.   A copy of the Injunction Motion is attached hereto as **Exhibits 2A–2C**.

20.     By the Injunction Motion, the Injunction Plaintiffs seek relief against each of the following listed defendants:   (i) Bumi Armada Berhad ("Berhad"), (ii) Armada Oyo Ltd ("Armada"), (iii) Century Energy Services Limited ("CESL"), (iv) Zenith, (v) NAEL, (vi) the DPR, (vii) the Petroleum Minister, and (viii) PIC (collectively, (i)–(viii), the "Injunction Defendants")  The Injunction Motion is currently pending before the Nigeria Federal High Court and is scheduled for hearing on October 31, 2019.

21.     In the Injunction Motion, the R/M requests an order from the Nigeria Federal High Court:

- restraining the Injunction Defendants "from doing anything or taking any step[s] to frustrate the interests of the [Injunction] Plaintiffs and creditors or reneging on the share formula of the crude oil and abandonment. . .which. . .formed the basis of the [Crude Oil Order]." *See Motion on Notice*, ¶ a.

- restraining the Injunction Defendants "from doing anything or taking any step[s] to frustrate the [Crude Oil Order] issued by Judge Isgur[] of the United States Bankruptcy Court for the Southern District of Texas, Houston Division." *See id.* at ¶ b.

- restraining Berhad, Armada, and CESL from "decommissioning the FPSO while the crude oil and other relevant assets. . . are still onboard." *See id.* at ¶ c.

- mandating the DPR and the Petroleum Minister to approve the sale of the Crude Oil. *See id.* at ¶ f.

- directing the Proceeds of the sale of the Crude Oil into "an interest yielding account in the name of the Deputy Chief Registrar of the Federal High Court pending the hearing and determination of the substantive suit." *See id.* at ¶ g.

### *iii.  The Sale of the Crude Oil and the Pending Offtake*

22.     Prior to the Petition Date, on April 18, 2017, the Deputy Chief Registrar of the Federal High Court (the "Registrar") and NAEL filed an interpleader proceeding in the NAEL Litigation (as defined herein)[9] (the "Interpleader Action").  A copy of the Interpleader Action is attached hereto as **Exhibit 3**.  The Interpleader Action is between the Registrar and NAEL as judgment creditors, Allied and CAMAC International as judgment debtors, and the Petroleum Minister and DPR as claimants/applicants.  The Interpleader Action sought, among other things, the following relief:

> AN ORDER that the Claimants, the Judgment Creditor and the Judgment Debtors appear and state the nature and particulars of their respective claims to the Oil Mining Lease No. 120 (OML 120) and Oil Mining Lease No. 121 (OML 121) offshore Nigeria and all crude oil produced from oil fields in the said OML 120 and OML 121, including but not limited to all crude oil produced from OYO Fields discharged into the vessels FPSO Armada Perdana. . . .

*See* Interpleader Action, p. 2 of 15.

---

[9] On February 14, 2017, the London Court of International Arbitration entered an arbitration award (the "Arbitration Award") in favor of NAEL against Allied and CAMAC International (Nigeria) Ltd. ("CAMAC International"), an affiliate of CAMAC Petroleum Limited (now EPNL), in respect of the Oyo oilfield in Oil Mining Lease 120.  *See* Docket No. 187-3, pp. 166–67 of 177.

On May 11, 2017, in the suit styled and numbered *Nigeria AGIP Exploration Ltd. and Allied Energy Plc. and CAMAC International (Nigeria) Ltd.*, FHC/L/CS/625/2017 (the "NAEL Litigation"), the Nigeria Federal High Court entered the *Order* enforcing and recognizing the Arbitration Award in Nigeria.  *See* Docket No. 38-1, pp. 78–80.  The NAEL Litigation generally concerns NAEL's writ of attachment of the Crude Oil and enforcement of its Arbitration Award and the ownership of the OMLs.

23.     On May 21, 2019, in the Interpleader Proceeding, the Nigeria Federal High Court entered the *Order* (the "May 21 Order").  A copy of the May 21 Order is attached hereto as **Exhibit 4**.  Pursuant to the May 21 Order, the Nigeria Federal High Court ordered that "the Crude Oil in the [FPSO] is hereby ordered to be sold and proceeds of sale be applied as follows:

> (a)  The DPR's first line charge of 12.5% be handed over to the DPR.
>
> (b)  That the rest of the Proceeds be paid into an interest yielding Bank Account in the name of the Deputy Chief Registrar Federal High Court Lagos Division pending the determination of the issues on this case."

*See* May 21 Order, p. 3.

24.     At the hearing on the May 21 Order, consistent with the Injunction Motion, Nigerian counsel for the R/M did not oppose the relief sought:  (i) to sell the Crude Oil, (ii) pay DPR its allocation, and (iii) deposit the remaining proceeds with the Registrar to be placed in an interest yielding account, pending the Nigerian Parties' ability to enforce the Crude Oil Order and the disbursement waterfall in Nigeria pursuant to applicable Nigerian law.  *See* May 21 Order, p. 2.

25.     On June 18, 2019, the Registrar wrote a letter (the "June 18 Letter") to the Allied R/M.  A copy of the June 18 Letter is attached hereto as **Exhibit 5**.  By the June 18 Letter, the Registrar directed the Allied R/M to (i) locate a valuer to value the Crude Oil, (ii) obtain bids, and (iii) obtain payment from the highest bidder.

26.     On June 25, 2019, by e-mail correspondence, the R/M shared the June 18 Letter with the Parties and requested information necessary to conduct the offtake of the Crude Oil and to work with the court appointed valuer.   In this correspondence, the R/M stated "I look forward to your cooperation in executing the [May 21 Order]."

27.     On July 1, 2019, the DPR sent a letter (the "July 1 Letter") to the Registrar in response to the June 18 Letter informing the Registrar that a valuer was no longer needed because

the DPR had executed a contract to sell the Crude Oil to CESL.  *See* the Motion, Exhibit B.  The DPR stated that following entry of the May 21 Order, the DPR "being the Agency of Government with responsibility for regulating activities in the petroleum industry took urgent steps to implement the [May 21 Order]."  *See* July 1 Letter, ¶ 4.  The DPR advised that it worked with the Crude Oil Marketing Division of the Nigerian National Petroleum Corporation ("NNPC") to sell the Crude Oil.  NNPC, according to the DPR "employs a well-structured competitive open tendering process for disposal of stranded, contaminated or small parcel of crude oil premised on maximum value and returns to the Federation."  *Id.* at ¶ 4.

28.     According to the July 1 Letter, by June 10, 2019, NNPC had located a buyer and obtained a tender offer.  Based on this tender offer, DPR allegedly made an offer to sell the Crude Oil to CESL—which is the same entity that allegedly demobilized, or is demobilizing, the FPSO. DPR allegedly executed a contract with CESL on June 18, 2019.  As of the July 1 Letter, the DPR was "awaiting lifting instructions from the buyer to inform the Court and arrange for the participation of [the Registrar] during the lifting exercise."  *Id.* at ¶ 9.  The July 1 Letter does not reference how the Proceeds of the DPR's sale of the Crude Oil would be distributed or otherwise handled.

29.     On July 3, 2019, the Registrar provided the Nigerian Federal High Court with a copy of the July 1 Letter (the "July 3 Letter").  A copy of this July 3 Letter is attached hereto as **Exhibit 6**.  The Registrar informed the Nigerian Federal High Court of the DPR's alleged sale of the Crude Oil.  The Registrar noted that the DPR did not state "the quantity of the product and the price thereof, nor the total amount and the custodian of the money."  July 3 Letter, p. 1.

4816-7323-4338 v.11

30.     As of the date of this Objection, the R/M is unaware whether the DPR's sale has closed.  The R/M is also unaware of the existence or disposition of the Proceeds, assuming that the DPR's sale closed.

## IV.     OBJECTION

### A.     The Court Lacks Jurisdiction Over the R/M

31.     The R/M respectfully asserts that the Court lacks jurisdiction over him.    The Movants have failed to prove that the Court has jurisdiction over the R/M.  The Movants do not allege that the R/M took any actions that violate the Crude Oil Order or the automatic stay.  The R/M does not have contacts with the United States that are continuous, systematic, and substantial to support an exercise of general jurisdiction.  The R/M has not availed himself to the jurisdiction of the Court.  For these reasons, the Court should deny the Motion with respect to the R/M for lack of jurisdiction.

### i.   Review of Applicable Authorities

32.     The first step in considering personal jurisdiction is "whether a federal statute or rule defines the extent of the court's personal jurisdiction." *Smith v. Matias (In re IFS Fin. Corp.)*, Case No. 02-39553, Adv. Nos. 04-3789, 04-3824, 04-3845, 2007 Bankr. LEXIS 3122, *7 (Bankr. S.D. Tex. Sept. 11, 2007) (Isgur, J.).  Rule 9020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that Bankruptcy Rule 9014 governs a motion for contempt. Bankruptcy Rule 9014(b) provides that service is made by Bankruptcy Rule 7004.  Bankruptcy Rule 7004(f) defines personal jurisdiction over the Motion.  *See In re IFS Fin. Corp.*, 2007 Bankr. LEXIS 3122, at *8.  "Rule 7004(f) authorizes personal jurisdiction to the extent allowed by the Fifth Amendment Due Process Clause." *Id.*

33. Under the Due Process Clause of the Fifth Amendment of the Constitution, the Court may exercise jurisdiction over the R/M if (i) the R/M has purposely availed himself of the benefits and protections of the bankruptcy court by establishing "minimum contacts" with the United States and (ii) the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 474 (1985); *see also Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999) (citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) and *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945)).

34. For purposes of evaluating a foreign defendant in a bankruptcy proceeding, courts evaluate the defendant's contacts with the entire United States. *See In re IFS Fin. Corp.*, 2007 Bankr. LEXIS 3122, at *9; *see also In re Lehman Brothers Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015) (explaining that in bankruptcy, "[t]he 'forum state' is the United States as a whole, and 'a court should consider the defendant's contacts throughout the United States.'").

35. Minimum contacts with the bankruptcy court may give rise to either specific or general jurisdiction. *Marathon Oil*, 182 F.3d 291, 295 (5th Cir. 1999). The bankruptcy court's exercise of specific jurisdiction is appropriate when the minimum contacts "arise from or are directly related to the cause of action." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 (1984)). General jurisdiction relates to the contacts, even if those contacts are unrelated to the cause of action, if the contacts "are continuous, systematic, and substantial." *Id.* Moreover, "[e]ven if a court finds that the defendant has the requisite minimum contacts, it can refuse to exercise jurisdiction if the exercise of jurisdiction would not be reasonable." *In re Lehman Brothers Holdings Inc.*, 535 B.R. at 621. "The plaintiff bears the burden of establishing 'minimum contacts.'" *In re IFS Fin. Corp.*, 2007 Bankr. LEXIS 3122, at *9.

4816-7323-4338 v.11

### ii. The Court Should Deny the Motion with Respect to the R/M because the Movants Failed to Prove the Court has Jurisdiction Over the R/M

36.     Although the Movants assert that the Court has jurisdiction over the property of the Estate (*see* the Motion, ¶ 5), the Movants do not allege a basis for the Court to exercise jurisdiction over the R/M.  In fact, the Movants do not allege that the R/M took any actions in violation of the Crude Oil Order or the automatic stay.  The R/M submits that the Court's exercise of jurisdiction will violate due process because (i) the R/M does not have minimum contacts with the United States giving rise to specific or general jurisdiction and (ii) maintaining the Motion against the R/M would offend the traditional notions of fair play and substantial justice.  Moreover, the R/M has not purposefully availed himself to the jurisdiction of the Court, and as detailed below, the Movants did not properly serve the R/M.  By the Objection, therefore, the R/M submits that the Movants have failed to carry their burden to prove jurisdiction over the R/M, and respectfully requests that the Court enter an order denying the Motion with respect to the R/M.

### B.     Because the R/M was not Properly Served under Bankruptcy Rule 7004, the Court Lacks the Power to Grant the Motion

37.     Bankruptcy Rule 9014 governs a motion for contempt because it is a contested matter.  *In re Teknek*, 512 F.3d 342, 345 (7th Cir. 2007) ("A motion to hold someone in contempt of court on account of acts done or omitted in a core proceeding initiates a 'contested matter' in the bankruptcy."); *In re Parker*, 392 B.R. 490, 496 (Bankr. D. Utah 2008) ("In effect, in a contested matter, the notice of hearing is treated as a summons and the motion is treated as a complaint.").  Bankruptcy Rule 9014(b) provides that service for contested matters is made pursuant to Bankruptcy Rule 7004.  Bankruptcy Rule 7004 requires personal service.

38.     When service is unavailable in the United States, service on a foreign corporation, partners, association, or individual must be made under Rule 4(f) of the Federal Rules of Civil Procedure (the "FRCP") (as made applicable to bankruptcy cases by Bankruptcy Rule 7004(a)(1)).

*See In re Teknek*, 512 F.3d at 345 ("When service must occur in a foreign nation, Fed.R.Civ.P. 4(f), incorporated by [Bankruptcy] Rule 7004(a), governs.").  Rule 4(f) of the FRCP permits service:

> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
>
>> (A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;
>>
>> (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
>>
>> (C) unless prohibited by the foreign country's law, by:
>>
>>> (i) delivering a copy of the summons and of the complaint to the individual personally; or
>>>
>>> (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
>
> (3) by other means not prohibited by international agreement, as the court orders.

*See* Rule 4(f) of the FRCP.

39.    Nigeria is not a signatory to The Hague Convention (or any similar convention), therefore Rule 4(f)(1) of the FRCP is inapplicable.  To be properly served, the Movants must have served the R/M pursuant to Rule 4(f)(2) of the FRCP.  As of the date of the Objection, the Movants appear to have provided the R/M with a file-stamped copy of the Motion by e-mail correspondence on August 9, 2019.  Under Rule 4(f)(2), service by e-mail correspondence is an insufficient method of service on the R/M, a foreign entity.

40.    In the Certificate of Service attached to the Motion, the Movants provide that:

> The undersigned hereby certifies that on August 8, 2019, a true and correct copy of the foregoing Motion was served on (i) all parties registered to receive ECF notification in the above captioned case, (ii) all parties with

15

email addresses listed on the Debtor's Master Service List via email, and (iii) all other parties on the Debtor's Master Service List by U.S.P.S. first class mail, postage prepaid. ***As to the DPR and the Nigerian Manager\Receiver, the undersigned certifies that file stamped copies were emailed to each by him on August 8, 2019, and will be followed up by mailings through the methods indicated above.***

*See* the Motion, p. 28 (emphasis added).  As of the date of this Objection, the Movants have not filed a supplemental certificate of service supporting mail service to the R/M.  The R/M has also not received any mail regarding the Motion from the Movants or any other form of personal service of the Motion.

41.     The Court cannot enter the relief the Movants seek against the R/M because the Movants did not properly serve the R/M.  The Movants' service of the Motion on the R/M did not comply with Rule 4(f) of the FRCP and, therefore, service to the R/M was inadequate under Bankruptcy Rule 7004.  *See In re Parker*, 392 B.R. at 496 (finding it "unnecessary to address the remaining arguments and objections" because "the Notice and Sanctions Motion were not served pursuant to Rule 7004, and service was therefore inadequate").

42.     Courts recognize that the standards for service of process are to be liberally construed to further the purpose of finding personal jurisdiction where the party received actual notice.  *See In re Longoria*, 400 B.R. 543, 551–52 (Bankr. W.D. Tex. 2009) (citing *Wallace v. Shapiro (In re Shapiro)*, 265 B.R. 373, 378 (Bankr. E.D.N.Y. 2001)).  A party that appears despite inadequate service, however, does not forfeit the defense of personal jurisdiction resulting from the inadequate service.  *See In re Teknek*, 512 F.3d at 346 (noting the opposite proposition in adversary proceedings that "[a] person not properly served who *does* appear, without alerting the court to the problem and imposing the defense that personal jurisdiction is missing, forfeits that defense" even though "[t]he Bankruptcy Rules do not have a parallel provision for contested matters") (alteration in original) (citing FRCP 12(h)(1), made applicable to *adversary proceedings*

by Bankruptcy Rule 7012(b)).  The R/M's appearance in by filing the Objection, therefore, is not

a waiver of the inadequate service.

43.     For these reasons, the Court lacks authority to grant any relief the Movants seek

against the R/M.  *Recreational Props., Inc. v. Sw. Mortg. Serv. Corp.*, 804 F.2d 311, 314 (5th Cir.

1986) ("If a court lacks jurisdiction over the parties because of insufficient service of process, the

judgment is void and the. . .court must set it aside."); *In re Mertz*, No. 08-62811, 2014 Bankr.

LEXIS 2980, at *5–6 (Bankr. N.D. Ohio July 11, 2014) (holding that the court could not grant a

motion for contempt when there was failure to comply with the service requirement); *In re Parker*,

392 B.R. at 496.

## C.     The R/M did not Violate the Automatic Stay or the Crude Oil Order

44.     The Movants fail to allege any actions that the R/M has taken in violation of the

stay or the Crude Oil Order.  The Movants have therefore failed to meet their burden of proof to

establish (i) by a preponderance of the evidence, a stay violation or (ii) by clear and convincing

evidence, a finding of contempt.[10]  Importantly, the R/M has consistently taken actions to sell the

Crude Oil pursuant to Nigerian law and has accordingly worked with the Nigerian Parties to

enforce the Crude Oil Order in Nigeria,[11] sell the Crude Oil, and distribute the Proceeds.  The R/M

---

[10] *See In re Henley*, 480 B.R. 708, 799 (Bankr. S.D. Tex. 2012) ("Thus, in order to establish a violation of § 362(a), a debtor must show by a preponderance of evidence that: (1) the creditor knew of the existence of the stay; (2) the creditor's actions were taken intentionally; and (3) those actions constituted stay violations.") (citing *Young v. Repine (In re Repine)*, 536 F.3d 512, 519 (5th Cir.2008)); *see In re Reyes*, No. 10-52366-C, 2011 Bankr. LEXIS 1412, *22 (Bankr. W.D. Tex. Apr. 20, 2011) (analyzing contempt proceedings for a stay violation and holding that "the burden of proof is clear and convincing, as opposed to preponderance of evidence.").

[11] The R/M is not a party to the Crude Oil Order.  Zenith gave the R/M irrevocable authority to only exercise control over the Abandoned Property.  One of the R/M's objectives is to sell the Crude Oil pursuant to applicable Nigerian law.  The R/M has respected the waterfall distribution agreed upon by the Parties in the Crude Oil Order.  Although he is not a party to the Crude Oil Order, to sell the Crude Oil in the most expedient manner, the R/M has worked collectively with the Nigerian Parties to obtain enforcement of the Crude Oil Order in Nigeria and court approval for the sale from the Nigeria Federal High Court.

has not taken any actions that violate the automatic stay or the Crude Oil Order. The R/M has not taken control over any property that is not Abandoned Property. The R/M respectfully requests that the Court, to the extent that the Court has jurisdiction over the R/M, deny the Motion with respect to the R/M.

### i. The Motion Asserts Actions Taken by the DPR, but not by the R/M, that may have Violated the Automatic Stay and the Crude Oil Order

45. Although the Movants seek an order to enforce the automatic stay and the Crude Oil Order, and for sanctions and contempt against the R/M, the Motion does not allege that the R/M took any specific actions in violation of the automatic stay or the Crude Oil Order. In the Motion, the Movants assert that the DPR has taken numerous actions that may have violated the automatic stay and the Crude Oil Order, including:

- the DPR's cancellation of the OMLs;

- the DPR's confiscation of the Crude Oil;

- the DPR's sale of the Crude Oil to CESL (the "Sale");

- the DPR's confiscation of the Proceeds;

- the DPR's refusal to turn the Proceeds over to Zenith as the escrow agent; and

- the DPR's directive to the R/M not to interfere with the Sale (collectively, the "DPR Actions").[12]

46. The Movants do not allege that the R/M took any action in violation of the Crude Oil Order or the automatic stay. In fact, the R/M has not taken any action in violation of the Crude Oil Order or the automatic stay. The R/M has attempted to enforce the Crude Oil Order in Nigeria

---

[12] The R/M is not in a position to confirm or deny the Trustee's allegations of all of the DPR Actions. The R/M received notice that the DPR cancelled the OMLs and allegedly executed a contract to sell the Crude Oil to CESL. The R/M is unaware if the Sale has closed or of the existence or disposition of the Proceeds.

and has sought to enjoin the DPR's actions, which reflects the R/M's best efforts to follow Zenith's irrevocable instructions in accordance with the Crude Oil Order.

### ii. The R/M Has Attempted to Sell the Crude Oil Pursuant to Applicable Nigerian Law and Enjoin the DPR's Actions

47.     From the beginning of the dispute regarding the disposition of the Crude Oil, each of the Parties were aware that any approval of a settlement in the United States would require court approval in Nigeria.  Indeed, the Crude Oil Order contemplated that any sale of the Crude Oil would be "pursuant to applicable Nigerian Law."  Crude Oil Order, ¶ 3.  The Crude Oil Order also directed the Parties to take "all steps reasonably required to cause the Crude Oil to be sold as expeditiously as possible. . . ."  *Id.*, at ¶ 4.

48.     Promptly after the R/M's appointment, the R/M began taking steps with the Nigerian Parties, pursuant to the Crude Oil Order, to sell the Crude Oil pursuant to applicable Nigerian law as expeditiously as possible.  In Nigeria, the Petroleum Act provides that any sale of natural resources (i.e., the Crude Oil) requires the approval of the Petroleum Minister through its regulatory processes.  *See* Section 4(1), Petroleum Act, Chapter 350 LFN 1990; *see also supra* note 5.  The R/M and the Nigerian Parties, however, were faced with various obstacles, including certain of the DPR Actions, that made it incredibly difficult for the R/M to sell the Crude Oil Order in a manner consistent with Nigerian Law.

49.     The R/M has attended many meetings in Nigeria with the Nigerian Parties and the DPR and reviewed many draft terms of the Nigerian Enforcement Pleading.  Because the DPR did not recognize the Crude Oil Order, the Nigerian Parties were unable to ever file the Nigerian Enforcement Pleading in the Nigerian Federal High Court.  None of these actions violate the automatic stay or the Crude Oil Order, but rather, are an exercise of the R/M's duty to sell the Crude Oil.  The Crude Oil Order expressly permits the R/M to sell the Crude Oil, "pursuant to

applicable Nigerian law" and to take actions to sell the Crude Oil as expeditiously as possible. Crude Oil Order, ¶¶ 3–4.  The Deed of Appointment also permitted the R/M to "make any arrangements or compromise which the Receiver/Manager shall think expedient."  Deed of Appointment, ¶ (f).  Moreover, assuming that the DPR ultimately sold the Crude Oil, the DPR has not informed the Parties or the Registrar regarding where the Proceeds are maintained.  None of these actions, however, can be attributed to the R/M.  Consequently, the R/M has not taken any action in violation of the automatic stay or the Crude Oil Order.

50.     The R/M also sought to enjoin the DPR (and the other Injunction Defendants), as detailed in the Injunction Motion.  The R/M filed the Injunction Proceeding and is currently awaiting a hearing on October 31, 2019.  The R/M is in no way complicit with the DPR Actions. On the contrary, the R/M used every available opportunity to actively protect and defend the interests of EPNL and Allied (as a consequence, the interests of the other Parties), including, but not limited to, the OMLs, the Crude Oil, and Zenith's irrevocable instructions in accordance with the Crude Oil Order.

51.     For these reasons, to the extent that the Court has jurisdiction over the R/M, the R/M objects to the Motion and respectfully requests that the Court enter an order denying the Motion with respect to the R/M.

## V.  **CONCLUSION**

WHEREFORE, the R/M respectfully requests that that the Court (i) deny the Motion with respect to the R/M and enter the proposed order submitted substantially in the form of the attached **Exhibit A**; and (ii) grant the R/M such other and further relief to which he is entitled.

RESPECTFULLY SUBMITTED this 29th day of August, 2019.

**HAYNES AND BOONE, LLP**

By: _/s/ Charles A. Beckham, Jr._
Charles A. Beckham, Jr.
Texas State Bar No. 02016600
Arsalan Muhammad
Texas State Bar No. 24074771
Martha Wyrick
State Bar No. 2410606
1221 McKinney Street, Suite 2100
Houston, TX 77010
Telephone: 713.547.2000
Facsimile:  713.547.2600
Email: charles.beckham@haynesboone.com
        arsalan.muhammad@haynesboone.com
        martha.wyrick@haynesboone.com

**COUNSEL FOR MR. CHUMA MADUEKWE
AS RECEIVER/MANAGER FOR EPNL**